**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE KRYSTAL COMPANY, *et al.*,[1] | ) | Case No. 20-61065 |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JONATHAN M. TIBUS IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Jonathan M. Tibus, declare under penalty as follows:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M").  I have twenty-two (22) years of experience in interim management and financial advisory roles and specialize in developing, evaluating, and implementing restructuring and performance improvement plans for underperforming companies, primarily in the restaurant, retail, and hospitality sectors.  I have also managed numerous in-court and out-of-court restructuring efforts.

2.      I have been acting as Chief Restructuring Officer ("CRO") of The Krystal Company since December 16, 2019.[2]  Prior to my appointment as CRO, A&M was engaged by The Krystal Company to provide restructuring advisory services beginning in November 2019.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Krystal Company (4140); Krystal Holdings, Inc. (5381); and K-Square Acquisition Co., LLC (8916).  The location of the Debtors' corporate headquarters and service address is: 1455 Lincoln Parkway, Suite 600, Dunwoody, Georgia 30346.

[2]    Shortly before the commencement of these cases, I was retained as CRO for the other two Debtor entities.

As CRO, I am familiar with the Debtors' business, day-to-day operations, and financial affairs.  I perform my duties out of The Krystal Company's headquarters located at 1455 Lincoln Parkway, Suite 600, Dunwoody, Georgia 303046.

3.     On January 19, 2020 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each commenced a case (the "Chapter 11 Cases") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "Court").   The Debtors are operating their business and managing their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Northern District of Georgia (the "United States Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.

4.     To minimize the adverse effects of filing for chapter 11 on their business and internal operations, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively the "First Day Pleadings").[3]  The First Day Pleadings seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.

5.     I submit this declaration (the "Declaration") to provide an overview of the Debtors, their business, and the Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and certain of the First Day Pleadings.  I have reviewed the Debtors' chapter 11

---

[3]   Unless otherwise defined here, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

2

petitions and First Day Pleadings, or have otherwise had the contents explained to me, and it is my belief that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' estates and their creditors' interests.  The facts set forth in each First Day Pleading are incorporated herein by reference.

6.      Except as indicated otherwise, I have personal knowledge of the matters set forth herein and all facts set forth herein are based on my personal knowledge, discussions with current and former members of the Debtors' senior management and professional advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.  I am authorized to submit this Declaration on the Debtors' behalf, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7.      The Declaration is divided into two parts.  Part I provides background information about the Debtors, their business operations, their corporate and capital structures, their restructuring efforts, and the events leading up to the filing of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

# PART I

## BACKGROUND

**A.      The Debtors and Their Business Operations**

8.      The Debtors operate the well-known restaurant brand "Krystal," which is engaged primarily in the development, operation and franchising of quick-service restaurants in the southeastern United States.  Founded in Chattanooga, Tennessee in 1932, Krystal offers affordable, consistent, hot and fresh meals, and is famous for its iconic square hamburger patty slider called a "Krystal" with a steamed bun, together with diced onions, pickle and mustard.  As the oldest quick-service restaurant chain in the South and the second oldest in the United States, the Krystal brand has a prominent place in the South's cultural landscape.  In 2012, The Krystal Company was acquired by K-Square Restaurant Partners LP.

9.      The Debtors currently operate 182 restaurants spread across nine states, including Georgia, Tennessee, Alabama, Georgia, Florida, Kentucky, Mississippi, North Carolina, South Carolina, and Arkansas.  All 182 of the Debtors' restaurant locations are leased.  Franchisees currently own and operate an additional 116 Krystal restaurants.  The majority of Krystal restaurants are located in suburban areas, many directly off of an interstate, and feature drive-throughs to allow customers to pick up a hot and fresh meal at a great value on the go.

10.      As of the Petition Date, the Debtors employ approximately 4,890 employees, consisting of 743 full-time hourly employees, 3,856 part-time hourly employees and 291 full-time salaried employees.  Approximately 50 of the Debtors' employees are based out of the Debtors' corporate headquarters, while the remaining employees work in the field at the Debtors'

restaurants. The Debtors have no unionized employees and are not party to any collective bargaining agreements.

11.     The Debtors are supported by hundreds of vendors and suppliers, ranging in size from large multinational corporations to small businesses in the areas in which the Debtors operate. US Foods, Inc. and Flowers Foods are two of the Debtors' key suppliers. The majority of the food served in Krystal restaurants is provided by US Foods, Inc., which is a leading national foodservice distributor. Likewise, the buns on which the signature Krystal burgers are served are provided by Flowers Foods, which is large producer of bakery foods based in Thomasville, Georgia.

**B.      Prepetition Capital Structure of the Debtors**

**i.      Corporate Structure and Governance**

12.     The equity ownership of the Debtors is as follows:

(a)     The Krystal Company. The Krystal Company is a Tennessee corporation that is a wholly owned subsidiary of Krystal Holdings, Inc.

(b)     Krystal Holdings, Inc. Krystal Holdings, Inc. is a Georgia corporation that is a wholly owned subsidiary of K-Square Acquisition Co., LLC. Krystal Holdings, Inc. has no significant assets or operations other than its investment in The Krystal Company.

(c)     K-Square Acquisition Co., LLC. K-Square Acquisition Co., LLC is a Delaware limited liability company that is a wholly owned subsidiary of Krystal Parent Holdings, LP. K-Square Acquisition Co., LLC has no significant assets or operations other than its investment in Krystal Holdings, Inc.

13.     All of the Debtors' operating assets are owed by debtor The Krystal Company. The board of directors for The Krystal Company consists of Michael Klump, Karl Jaeger, and Mike Elliott.  Mr. Elliott is an independent director that was appointed to the board of The Krystal Company on December 12, 2019.

14.     The Debtors operate their business from a common headquarters in Dunwoody, Georgia.  The corporate organizational structure of the Debtors is depicted on the chart annexed hereto as Exhibit A.

**ii.     Prepetition Secured Debt**

**a.     Prepetition Credit Agreement**

15.     The Debtors have had a senior secured credit facility with Wells Fargo Bank, National Association ("Wells Fargo") and certain other lenders since March 21, 2012.  In August 2015, the Debtors, Wells Fargo, and certain lenders party thereto entered into that certain Second Amended and Restated Credit Agreement, dated as of August 4, 2015 (the "Second A&R Credit Agreement").  The Second A&R Credit Agreement provided the Debtors with a Term Loan facility in the amount of $95,000,000 and a revolving credit facility in the amount of $20,000,000.

16.     In April 2018, the Debtors consummated a modification of their senior secured debt, which involved an equity infusion of $59,800,000.  The equity infusion was primarily used to: (a) repay approximately $42,000,000 of the existing term loan facility; and (b) fund substantial remodeling capital expenditures, marketing expenditures, and general working capital needs.  In connection with the modification, the Debtors entered into that certain Third Amended and Restated Credit Agreement (the "Prepetition Credit Agreement," and the facilities

thereunder, the "Prepetition Credit Facility"), with Wells Fargo, as administrative agent, and the lenders party thereto (together with Wells Fargo, the "Prepetition Lenders"). Under the Prepetition Credit Agreement, the outstanding term loans were reduced to $53,100,000 and the revolving credit facility was reduced to $10,000,000. The Prepetition Credit Facility matures on April 26, 2023, and is secured by assets of the Debtors.

**b.    Prepetition Second Lien Note**

17.    In the fall of 2019, the Debtors required additional financing for working capital purposes. On October 31, 2019, The Krystal Company, as borrower, entered into that certain Second Lien Promissory Note (the "Prepetition Second Lien Note") with KRY, LLC, as payee. Pursuant to the Prepetition Second Lien Note, KRY, LLC loaned the Debtors an amount equal to $1,500,000. The Prepetition Second Lien Note matures on October 23, 2023.

18.    The Prepetition Second Lien Note is guaranteed by certain of the Debtors and is secured by assets of the Debtors.

**C.    Events Leading to Filing**

19.    In the past few years, the Debtors have experienced strong industry-specific headwinds due to a combination of shifting consumer tastes and preferences, growth in labor and commodity costs, increased competition, and unfavorable lease terms. The proliferation of fast casual restaurants as well as online delivery platforms has created new competition for traditional quick-service chains. Moreover, quick-service restaurants have faced increasing difficulty finding and retaining qualified employees in the current labor market. It is not uncommon for quick-service restaurants to face store-level turnover in excess of 200%. These

challenges (together with company-specific business challenges) have resulted in deteriorating financial performance.

20. In the fall of 2017, the Debtors retained Boston Consulting Group to advise the Debtors with respect to their competitive positioning. In April 2018, the Debtors began a process of significant investment in nine of their stores that involved completely demolishing and then rebuilding the locations. The Debtors completed five of these rebuilds in 2018 and additional four rebuilds in 2019. On average, these rebuilds required an investment of approximately $950,000 per location. These efforts resulted in substantial increased sales for these locations, but required significant capital investment.

21. In 2018, due to declining financial performance and declines in comparable restaurant sales and income from operations, the Debtors failed to comply with certain of the financial covenants in the Prepetition Credit Agreement for the fourth quarter of 2018. This failure was ultimately cured by an equity contribution. The Debtors then defaulted under the Prepetition Credit Agreement due to the Debtors' failure to deliver audited financial statements without a "going concern" qualification for the fiscal year ending December 31, 2018. The Debtors subsequently failed to comply with the financial covenants under the Prepetition Credit Facility for the second quarter of 2019. To address these and certain other events of default, on October 31, 2019, the Debtors entered into a forbearance agreement with their lenders under the Prepetition Credit Facility. The forbearance agreement expired at 11:59 p.m. on the Petition Date.

22. In the months prior to the Petition Date, the Debtors took various steps to address their struggling financial performance. Among other things, the Debtors executed a reduction in

force, including senior executives, to consolidate functions and right-size the regional management team. The Debtors also took steps to close certain unprofitable restaurant locations. Prior to closing these restaurants, the Debtors engaged in a comprehensive review of their nonresidential real estate portfolios and identified underperforming restaurant locations with the most significant losses. If the Debtors determined that a certain restaurant location was no longer profitable to operate, and the Debtors were unable to sell, convert, or sublease the restaurant, the Debtors turned the store "dark" by entirely ceasing business at the location. While the Debtors opened three restaurants over the past twelve months, the Debtors closed approximately 44 restaurant locations, including 13 restaurant locations that closed on December 16, 2019, to help improve the Debtors' financial position and liquidity.

23. In addition to the foregoing efforts to improve financial performance, on November 14, 2019, the Debtors hired two senior executives with extensive quick-service restaurant experience to lead their ongoing revitalization efforts. Tim Ward joined The Krystal Company as the President and Chief Operating Officer and Bruce Vermilyea joined as Chief Financial Officer. Both Mr. Ward and Mr. Vermilyea are seasoned executives who brought a breadth of experience to the Debtors. Mr. Ward previously served as the Chief Operating Office of Captain D's. During his tenure there, the company experienced eight years of positive same-store sales and developed a pipeline of over 100 new restaurant locations. Mr. Vermilyea similarly worked in multiple industry leadership roles, serving 18 years with Qdoba, including three years as Chief Financial Officer.

**D.      Prepetition Security Incident**

24.      The Debtors are actively investigating a security incident that involves one of the payment processing systems that services some of their restaurants.  The Debtors have retained a leading forensics firm and are conducting an investigation to determine the extent to which information in the Debtors' systems may have been impacted.  The Debtors are cooperating with law enforcement and have also notified the payment card networks of the investigation.

25.      Although the investigation is ongoing, the Debtors have learned that the security incident may have involved payment cards processed by a payment processing system used at certain restaurants between July through September 2019.  The Debtors use multiple payment processing systems and, as a result, not all of the Debtors' restaurants have been impacted by this incident.  The Debtors have already taken steps to contain and remediate the incident and are working hard to determine the specific locations and dates for each restaurant involved in the attack. To date, the investigation has determined that about a third of the Debtors' restaurants are not impacted.  The Debtors are committed to protecting the privacy and security of their customers and will continue to take quick action as the investigation continues.

## PART II

## FIRST DAY PLEADINGS

26.      The Debtor expects to file, and respectfully request that this Court approve, the First Day Pleadings.  I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.  Moreover, I believe that the relief sought in each of the First Day

Pleadings (a) is vital to enable to Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value, and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases. Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

## A.    Procedural Motions

### Notice of Designation of Complex Chapter 11 Cases

27.    The Debtors request the entry of an order designating the Chapter 11 Cases as complex cases. The Debtors believe these cases qualify as complex Chapter 11 Cases because (a) the Debtors have total debt of more than $25 million; (b) there are more than 400 parties in interest in these cases, excluding former and current employees; (c) the Debtors are not individuals; and (d) the Debtors do not own single asset real estate.

### Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion")

28.    The Debtors request the entry of an order directing their bankruptcy cases be jointly administered for procedural purposes only under the caption of the case filed by The Krystal Company.

29.    The Debtors believe that it would be more efficient for these cases to be jointly administered. The Debtors anticipate significant activity during these cases and believe that most hearings and contested matters will apply to all of the Debtors' cases equally.

Consequently, joint administration of these cases will promote the economical and efficient administration of the Debtors' estates, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, cases.

**Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Prepare a Consolidated List of Creditors In Lieu of Submitting a Formatted Mailing Matrix, File a Consolidated List of the 30 Largest Unsecured Creditors, and Redact Certain Personal Identification Information for Individual Creditors; (II) Approving the Form and Manner of Notifying the Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (III) Granting Related Relief (the "Consolidated List of Creditors Motion")**

30.     The Debtors request authority to prepare and maintain a consolidated list of creditors (the "Creditor Matrix") in lieu of submitting a separate mailing matrix for each Debtor. Permitting the Debtors to maintain a consolidated list of their creditors in electronic format only, in lieu of filing a separate creditor matrix for each Debtor, is warranted under the circumstances of these cases.  Because the Debtors have over 5,000 potential creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error.

31.     The Debtors, working together with the Kurtzman Carson Consultants LLC, the Debtors' proposed claims and noticing agent (the "Noticing Agent"), already have prepared a single, consolidated list of the Debtors' creditors in electronic format.  The Debtors are prepared to make that list available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a separate mailing matrix for each Debtor to the Court's clerk's office.

32.    Additionally, the Debtors request the authority to redact address information of individual creditors—many of whom are employees—of the Debtors to the extent they appear on the Creditor Matrix because such information could be used to perpetrate identity theft.

33.    The Debtors also request authority to file a single consolidated list of their 30 largest general unsecured creditors (the "Consolidated Top 30 List"). A large number of creditors may be shared amongst the Debtors. The Consolidated Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

34.    Finally, the Debtors request authority to establish certain procedures for providing notice to parties of the commencement of the Chapter 11 Cases and of other related information (the "Notice of Commencement"). In particular, the Debtors request authority for the Noticing Agent to serve the Notice of Commencement on all parties entitled to notice of commencement of the Chapter 11 Cases. This will ensure that the Debtors' creditors and stakeholders receive prompt notice of the commencement of the Chapter 11 Cases and the Meeting of Creditors.

**Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules and Statements of Financial Affairs and (II) Granting Related Relief (the "Schedules Extension Motion")**

35.    The Debtors seek entry of an order granting the Debtors an additional thirty (30) days to file their schedules of assets and liabilities, schedules of current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements"). To prepare the Schedules and Statements, the Debtors must gather information from books, records, and documents relating to a multitude of transactions. Consequently, collection of the necessary information requires the expenditure of substantial time and effort on the part of the Debtors' already over-burdened employees. The efforts of the

13

employees during the initial stages of the Chapter 11 Cases will be focused in large part on attending to the Debtors' business and maximizing the value of the Debtors' estates.   For these reasons, the Debtors will likely be unable to complete their Schedules and Statements within fourteen (14) days of filing the petitions.

**Debtors' Emergency Application for Appointment of Kurtzman Carson Consultants, LLC as Claims, Noticing, and Solicitation Agent (the "KCC Retention Application")**

36.     The Debtors seek authority to employ and retain Kurtzman Carson Consultants, LLC ("KCC") as claims and noticing agent in the Chapter 11 Cases.  I believe that such relief is prudent in light of the thousands of creditors, potential creditors, and parties in interest to whom certain notices will be sent.  Accordingly, I believe that the most effective and efficient manner by which to give notice and process claims in the Chapter 11 Cases is to engage KCC, an independent third party with significant experience in this role to act as an agent of the Court.

37.     The Debtors and their advisors obtained and reviewed engagement proposals from two other claims and noticing agents to ensure a competitive process.  KCC is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of Chapter 11 Cases.  I understand that KCC has substantial experience providing services, including claims and noticing services, in matters comparable in size and complexity to this matter.

38.     I believe that KCC's rates are competitive and reasonable given KCC's services and expertise.  Appointing KCC as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the

Clerk's Office of the U.S. Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

39.     As part of the overall compensation payable to KCC under the terms of the Retention Agreement, the Debtors have agreed to certain indemnification obligations as specifically enumerated in the Retention Agreement.   The Debtors and KCC believe that the indemnification provisions contained in the Retention Agreement are customary and reasonable for KCC and comparable firms providing claims, noticing, solicitation and related administrative services.

**B.     Operational Motions**

**Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Prepetition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses; (II) Directing Banks to Honor Related Prepetition Transfers; and (III) Granting Related Relief (the "Employee Wages Motion")**

40.     The Debtors seek authority to pay the Employee Obligations that become payable during the pendency of these Chapter 11 Cases and to continue at this time their practices, programs, and policies with respect to their Employees, as such practices, programs, and policies were in effect as of the Petition Date.   The Debtors request that all banks and other financial institutions be authorized and directed, when requested by the Debtors and in the Debtors' sole discretion, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay the Employee Obligations, provided that sufficient funds are available in the applicable accounts to make the payments and transfers.   The Debtors similarly request that they be authorized to pay any cost or penalty incurred by their Employees in the event that a check issued by the Debtors for payment of the Employee Obligations is inadvertently not honored because of the filing of the Debtors' bankruptcy case.   Though the Debtors estimate any such

costs or penalties to be *de minimis* in amount, if the Debtors are not authorized to pay such costs or penalties, then their Employees will suffer the exact type of harm that the Employee Wages Motion seeks to prevent and the Debtors will suffer from loss of employee goodwill.

41.     As of the Petition Date, the Debtors employ approximately 4,890 people (the "Employees"), of which approximately 55 operate out of their corporate office located in Dunwoody, Georgia.  Of the Employees, 291 are full-time salaried Employees, 743 are full-time hourly Employees, and 3,856 are part-time hourly Employees.

42.     The Debtors employ six independent contractors (the "Independent Contractors").

43.     As described more fully below, in the ordinary course of business the Debtors have incurred certain prepetition employee obligations that remain unpaid as of the Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "Employee Obligations") will become due and payable in the ordinary course of the Debtors' business on and after the Petition Date.[4]  These obligations can generally be categorized as follows:  (a) wages, salaries, and other compensation; (b) payroll taxes; (c) vacation and holiday programs; (d) qualified 401(k) plan obligations; (e) health and welfare benefits; and (f) miscellaneous other benefits provided to the Employees in the ordinary course of business.  These obligations are described as follows:[5]

---

[4]   No amount proposed to be paid to any individual Employee will exceed the priority unsecured cap of $13,650 set forth in 11 U.S.C. §507(a)(4) and (5).

[5]   In addition to the benefits described herein, the Debtors maintain a workers' compensation plan, which is discussed in the Debtors' *Emergency Motion for Entry of an Order (I) Authorizing Debtors to Continue Prepetition Insurance and Workers' Compensation Programs and to Pay Prepetition Premiums and Related Obligations; and (II) Granting Related Relief.*

- *Wages, Salaries, and Other Compensation.* Wages, salaries, and other compensation consist of prepetition wages and salaries owed to the Debtors' Employees (the "Payroll Obligations"), consisting of (i) wages, salaries and other compensation owed to corporate Employees ("Administrative Payroll") and (ii) wages, salaries, and other compensation owed to all other Employees ("Operating Payroll"). All Employees are paid on a bi-weekly basis, with Administrative Payroll last run on January 15, 2020 and Operating Payroll last run on January 8, 2020. The average monthly gross Payroll Obligations over the past six months was approximately $775,018 for Administrative Payroll and $4,900,000 for Operating Payroll. These gross amounts include certain deductions described separately below, such as payroll taxes owed by the Employees and 401(k) contributions. Payroll Obligations are electronically deposited directly into the Employees' bank accounts. As of the Petition Date, the Debtors estimate that they owe approximately $1,482,745 on account of Operating Payroll and no amounts on account of Administrative Payroll. Accordingly, as of the Petition Date, the Debtors estimate that they owe approximately $1,482,745 total in gross Payroll Obligations.[6]

- *Independent Contractors' Compensation.* These obligations consist of amounts owed as compensation to six Independent Contractors. The average monthly gross amount of these obligations is approximately $33,000. As of the Petition Date, the Debtors estimate that they owe approximately $28,875 to the Independent Contractors.

- *Payroll Taxes.* These obligations consist of federal, state, and local income taxes, Social Security, and Medicare taxes (the "Payroll Taxes"). The Payroll Taxes include the amounts owed by the Employees that the Debtors withhold from the gross amount of the Employees' wages or salary as well as the amounts separately owed by the Debtors. The Debtors' average Payroll Taxes for each payroll over the last six months was approximately $290,273 for Administrative Payroll and $1,342,505 for Operating Payroll. This includes approximately $62,938 for the Administrative Payroll employer obligation and $495,652 for the Operating Payroll employer obligation, and approximately $227,335 and $846,854 or the Administrative Payroll and Operating Payroll employee components, respectively. As of the Petition Date, the Debtors estimate that they owe approximately $532,783 in employer and employee prepetition Payroll Taxes for Administrative Payroll and Operating Payroll. This amount is not included in the Payroll Obligations described in the paragraph above.

- *Holiday, Vacation and Sick Day Programs.* These obligations consist of time off for vacation, illness and company holidays.

---

[6]    This amount excludes prepetition severance obligations.

17

o *Holidays.* Full-time Employees at the Debtors' corporate office and full-time Employees at the District Manager level and above (the "Eligible Corporate Employees") receive ten paid holidays and seven paid early release half days per year. Full-time assistant general managers and general managers at Debtors' restaurants (the "Eligible Restaurant Employees") as well as hourly Employees receive two paid holidays, Thanksgiving Day and Christmas Day.

o *Sick Days.* Both Eligible Restaurant Employees and Eligible Corporate Employees receive two weeks of sick days per year. Unused sick days may be carried over to the following year, provided that no more than 26 weeks may be carried over. Hourly Employees are not eligible for sick leave.

o *Vacation.* Employees receive paid vacation based on years of service. Eligible Restaurant Employees receive annual paid vacation as follows: (i) Eligible Restaurant Employees receive two weeks of vacation; and (ii) after five years of employment, Eligible Restaurant Employees receive three weeks of vacation. Eligible Corporate Employees at or above Director Level (the "Eligible Directors") receive annual paid vacation as follows: (a) Eligible Directors receive three weeks of vacation; and (b) after five years of employment, Eligible Directors receive four weeks of vacation. Eligible Corporate Employees below the Director Level (the "Eligible Corporate Managers") receive annual paid vacation as follows: (y) Eligible Corporate Managers receive two weeks of vacation; and (z) after five years of employment, Eligible Corporate Managers receive three weeks of vacation. Hourly employees averaging 30 hours or more per week are eligible for one week of paid vacation after one year of employment and two weeks of paid vacation after five years of employment. Unused vacation time cannot be carried over under any of the policies.

o *Personal.* Eligible Corporate Employees also receive two personal days per year. Unused personal days cannot be carried over.

Each pay period salaried Employees accrue a portion of their vacation time as set forth above. Vacation time does not carry over to the next calendar year. The Debtors desire to continue to honor their obligations for holidays, sick days and vacation on a going forward basis. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued vacation time equals approximately $3,281,885. This amount is not included in the total Payroll Obligations described above.

- *Qualified 401(k) Plan Obligations.* The Debtors maintain a 401(k) plan sponsored by Fidelity (the "401(k) Plan"), under which eligible Employees may defer a portion of their salary on a pre-tax basis, post-tax basis, or a combination. After completing six months (1040 hours) of employment, Employees that are 21 years of age or older can contribute up to 100% of their annual pay (up to the maximum deferral amount).

18

Under the plan, the Debtors match 100% of each participating Employee's contributions for the first 3% of the participating Employee's salary, and 50% of each participating Employee's contributions for the next 2% of the Employee's salary. Contributions are deducted from the Employee's bi-weekly pay.

Approximately 261 Employees in total participate in the 401(k) Plan. On account of these participating Employees, the Debtors withhold and remit to Fidelity approximately $28,320 every two weeks on account of 401(k) Plan contributions ("401(k) Withholdings"), and the Debtors remit to Fidelity approximately $14,069 every two weeks on account of matching 401(k) contributions.

Because the Debtors' payroll is paid in arrears, as of the Petition Date the Debtors estimate that they owe approximately $12,601 in accrued 401(k) Withholdings that have not yet been remitted to Fidelity, and owe $7,488 in matching 401(k) contributions. These amounts are not included in the estimated total Payroll Obligations above. The Debtors also deduct and transmit certain payments to Fidelity relating to their Employees' 401(k) loan payments (the "401(k) Loan Withholdings"). The average monthly loan payments in 2019 were $11,403. As of the Petition Date, the Debtors estimate that they owe approximately $3,400 in unpaid 401(k) Loan Withholdings to Fidelity, which amount is not included in the estimated total Payroll Obligations above.

The Debtors seek authority, not direction, to pay prepetition amounts in respect of 401(k) Withholdings, 401(k) matching contributions, and 401(k) Loan Withholdings in the ordinary course of business on a postpetition basis.

- *Expense Reimbursement and Other Benefits*.  The Debtors reimburse eligible Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. These reimbursement obligations include such things as mileage reimbursement, meals and travel expenses, relocation expenses and office supply reimbursements.  The average monthly amount of these reimbursement obligations is approximately $129,000.  As of the Petition Date, the Debtors estimate that they owe approximately $64,500 in expense reimbursements. This amount is not included in the total Payroll Obligations above.  The Debtors also provide a communications allowance up to $100 on a monthly basis for certain Employees.

- *Tax Advantaged Health Reimbursement HSA and FSA Accounts.* Full-time management Employees of the Debtors working a minimum of 30 hours per week ("Eligible Management") and full-time non-management Employees of the Debtors working a minimum of 30 hours per week ("Eligible Crew") are both eligible for certain tax advantaged accounts through the Debtors. The Debtors offer Eligible Management and Eligible Crew the option of contributing a portion of their pre-tax wages into tax-exempt health savings accounts ("HSA") that can be used to pay qualified health care expenses.  A third-party vendor, Optum Bank, maintains the

HSAs. The Debtors request the authority to maintain the HSA program in the ordinary course of business regardless of whether the qualified expenses were incurred before or after the Petition Date. Under Debtors' 2020 benefits policy, the Debtors have agreed to contribute $250 towards the employee HSAs for those with employee only coverage, and $500 for those with covered dependents. The Debtors also offer Eligible Management and Eligible Crew the alternative option of contributing a portion of their pre-tax wages into tax-exempt Flexible Spending Accounts ("FSA") that can be used to reimburse qualified health care or dependent care expenses. United Healthcare maintains the FSAs. Pursuant to Internal Revenue Service regulations, the money in FSAs must be used by no later than March 15 of the following year; up to $500 in unused funds may be rolled over into the following plan year. Federal law limits contributions to FSAs to $2,750 for traditional FSAs and $5,000 per year for "dependent care" FSAs. The Debtors request the authority to maintain the FSA program in the ordinary course of business regardless of whether the qualified expenses were incurred before or after the Petition Date. The total monthly cost to the Debtors for the HSA and FSA programs is $4.42 per enrolled Employee. As of the Petition Date, the Debtors estimate that they owe approximately $1,655 on account of the HSA and FSA accounts. Additional "pass through" programs are discussed below.

- *Health and welfare benefits.* The Debtors provide several health and welfare benefit plans for their Employees, including insurance plans relating to medical, vision, dental, disability, and life insurance (collectively, the "Employee Benefits"). The Debtors' estimated average monthly costs in the aggregate on account of the Employee Benefits for 2020 is $242,888. By way of comparison, the average monthly costs of the plans were $233,889 in 2019 and $257,460 in 2018.

  o *Medical Plans.* The Debtors maintain and provide five medical care plans for their Employees (the "Medical Plans"), which they will be increasing to six plans for the 2020 year, through Century Healthcare and United Healthcare. Eligible Management may enroll in one of four plans (the "Management Plans") offered to them after 30 days of employment. Eligible Crew may enroll in one of two plans (the "Crew Plans"), offered to them after six months of employment averaging 30 hours per week. The Debtors pay a portion of the premiums for the Medical Plans and the balance is deducted from the Employees' paychecks.

    ▪ The Debtors' healthcare costs include health insurance for current and former Employees. There are seven former Employees covered under COBRA (covered 18 months from departure). The Debtors pay an administrative fee of approximately $260 per month to cover Employees under COBRA.

20

The Debtors' average monthly costs in the aggregate on account of the Medical Plans and COBRA over the last six months is approximately $329,584. As of the Petition Date, the Debtors owe approximately $323,000 on account of the Medical Plans and COBRA and hold approximately $143,618 in premiums collected from Employees but not yet remitted to the carrier.

o   *Basic Life Insurance*. The Debtors provide life insurance to Eligible Management at no cost to the Employee. The Debtors' average monthly premium is approximately $7,500. As of the Petition Date, the Debtors owe approximately $2,714 on account of basic life insurance.

**The following are "pass through" programs for which the Debtors make no contributions or payments. The Debtors withhold the necessary amounts from the Employee's paycheck and remit the amounts to the benefit provider. Accordingly, the Debtors ask for authority to remit amounts collected from the Employees prior to the Petition Date but not yet remitted to the carrier.**

o   *Additional Life and AD&D Insurance*. The Debtors permit Eligible Management to purchase supplemental life insurance and AD&D insurance. The Debtors collect funds from the Employees and remit to the insurance company, but do not provide any reimbursement for this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $1,668 in premiums collected from Employees but not yet remitted to the carrier.

o   *Short Term Disability and Long Term Disability*. The Debtors provide the option to purchase short-term and long-term disability insurance to Eligible Management. The Debtors collect funds from the Employees and remit the funds to the insurance company, but do not provide any reimbursement for the programs. As of the Petition Date, the Debtors hold approximately $3,518 in short term disability premiums and $3,063 in long-term disability insurance premiums collected from Employees but not yet remitted to the carrier. This amount is not included in the total Payroll Obligations above.

o   *Dental and Vision*. Eligible Management is given the opportunity to participate in a dental plan (the "Dental Plan") and a vision plan (the "Vision Plan") administered by United Healthcare. Under the Dental Plan, Employees pay a yearly deductible of $100, with the option of paying an additional $100 for increased benefits. Under the Vision Plan, Employees have a $15 exam copay and a $30 materials copay for in-network providers. As of the Petition Date, the Debtors hold approximately $6,620 in premiums collected from Employees but not yet remitted to the carrier. This amount is not included in the total Payroll Obligations above.

- *Independent Director Fees and Expenses.*  On December 12, 2019, the Board of Directors of The Krystal Company (the "Company") appointed Mike Elliott to serve as an independent director for the Company.  Aside from serving as a director, Mr. Elliott has no material relationship with the Company, its affiliates, the Company's sole stockholder and such stockholder's affiliates, or the Company's executives, and Mr. Elliott has no material affiliations with the Company or its sole stockholder that would cause Mr. Elliott to be unable to (a) exercise independent judgment based on the best interests of the Company or (b) make decisions and carry out respective responsibilities as a member of the Board of Directors, in each case, in accordance with the terms of the Company's Fourth Amended and Restated Charter, By-laws and applicable law.  As compensation for serving in this role, Mr. Elliott is paid $90,000 per year, payable monthly in advance on the first business day of each month.  In the event that Mr. Elliott ceases serving on the Board, the monthly payments are terminated; provided, however, that Mr. Elliott shall not receive less than $90,000, in the aggregate, for his service on the board.  The Debtors are also obligated to reimburse Mr. Elliott for all reasonable and documented out-of-pocket expenses (including reasonable legal fees and expenses) incurred in connection with his service as a member of the board.  As of the Petition Date, the Debtors are current with respect to these payments.  By the Employee Wages Motion, the Debtors seek authority to continue paying these amounts (collectively, the "Independent Director Fees and Expenses").

**Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Continue Prepetition Insurance and Workers' Compensation Programs and to Pay Prepetition Premiums and Related Obligations and (II) Granting Related Relief (the "Insurance Motion")**

44.     The Debtors seek an order (a) authorizing them to maintain their insurance programs, insurance policies, insurance premium financing programs, workers' compensation program, and any related agreements, as such practices, programs, and policies were in effect as of the Petition Date and to pay, in their sole discretion, prepetition amounts accrued in connection therewith and (b) authorizing applicable banks and other financial institutions to receive, process, and pay any and all checks and other transfers related to such claims.

45.     In connection with the operation of their business, the Debtors maintain various workers' compensation, liability, automobile, trade name restoration, property and flood insurance, and directors' and officers' liability policies and programs (collectively, the

22

"Insurance Policies") through several different insurance carriers (the "Insurance Carriers"), as described below.  The Debtors' Insurance Policies are listed on **Exhibit A** to the Insurance Motion, together with the applicable Insurance Carrier, policy period, deductible or self-insured retention and policy limits.

51.    The Debtors historically have spent approximately $1.27 million annually on insurance premiums, which premiums are either financed through a third party or paid directly annually.  The Debtors prepay (or causes to be prepaid through a third party) an annual premium for each of the Policies on or around the start date of each policy period, and then make subsequent payment adjustments on a monthly basis.  The Insurance Policies, for the most part, renew in January, May, June, September, and October.  The Debtors believe that, as of the Petition Date, there are no outstanding prepetition premiums due on account of the Insurance Policies.

The Insurance Premium Financing Program

52.    The Debtors are currently party to an insurance premium financing agreement (the "Premium Financing Agreement") whereby certain of the Debtors' Insurance Policies (the "Financed Policies") are financed by AFCO Credit Corporation ("AFCO").  **Exhibit A** indicates which of the Insurance Policies are included in the Premium Financing Agreement.

53.    Pursuant to the terms of the Premium Financing Agreement with AFCO, the Debtors make a down payment contemporaneously with the execution of the Premium Financing Agreement and then make eleven monthly installments to AFCO of $20,372.54 toward the balance of the financing over the term of the Premium Financing Agreement. For the Financed

Policies, the down payment of $20,372.54 under the agreement was made on or around May 1, 2019.

### The Claim Services Agreement

54.     The Debtors are qualified self-insurers in the amount of $250,000 under their General Liability policy with Travelers Property Casualty Company of America.  As such, they have entered into a Claim Services Agreement with Constitution State Services LLC ("CSS") for CSS to furnish certain Claim Services to the Debtors (the "Claims Services Agreement"), including claims administration, claims investigation and preparation, litigation assistance, escheat, and reporting requirements under section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007.  In exchange for these services, and pursuant to the terms of the Claims Services Agreement, the Debtors made a down payment of $4,418 contemporaneously with the execution of the Claims Services Agreement and then make nine monthly installments to CSS of $1,473, each due on the first of the month.

### Workers' Compensation Programs

55.     Under state law, the Debtors are required to maintain workers' compensation Insurance Policies to provide their employees with coverage for claims arising from or related to their employment with the Debtors.  In the ordinary course of business, the Debtors maintain workers' compensation insurance at the level required by statute for each U.S. state in which the Debtors conduct business (the "Workers' Compensation Program").  The Workers' Compensation Program is administered by The Travelers Indemnity Company of America

("<u>Travelers</u>").[7]  The Debtors pay all amounts related to workers' compensation claims up to a fixed per-claim deductible in the amount of $250,000, in addition to a fixed annual premium of $317,589 (the "<u>Workers' Compensation Premiums</u>") for losses that exceed the deductible. **<u>Exhibit A</u>** to the Insurance Motion lists the Workers' Compensation Program's policy period and policy limit.

The Debtors' Paid Loss Reserves

56.     In connection with the Debtors' Workers' Compensation Program, the Debtors pay Travelers amounts to cover anticipated workers' compensation claims within the Debtors' deductible (the "<u>Paid Loss Reserves</u>").   Travelers' currently holds $2,116,777 in Paid Loss Reserves.

Letters of Credit

57.     Travelers holds a letter of credit totaling $155,000 to secure the Debtors' deductible obligations on account of Debtors' Workers' Compensation Program, and Continental Casualty Company holds a letter of credit totaling $63,559 to secure the Debtors' deductible obligations on account of the Debtors' errors and omission Insurance Policy.

The Debtor's Insurance Broker

58.     The Debtors utilize Southeast Series of Lockton Companies, LLC (the "<u>Insurance Broker</u>") to obtain their Insurance Policies.

---

[7]   Certain *de minimis* legacy workers' compensation claims of the Debtors are administered by Zurich Insurance Group, CNA Insurance, and Broadspire. No amounts are paid to Zurich Insurance Group, CNA Insurance, and Broadspire on account of the administration of these claims.

25

59.     The Insurance Broker primarily assists the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates.  The Debtors pay fees (the "Brokerage Fees") to the Insurance Broker in an annual amount of approximately $120,000 over four quarterly installments. As of the Petition Date, the Debtors are current on payment of the Brokerage Fees and do not owe any unpaid quarterly installments on account of the Brokerage Fees to the Insurance Broker.

**Debtors' Emergency Motion for Entry of an Order (I) Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records and (II) Granting Related Relief (the "Cash Management Motion")**

46.     The Debtors respectfully request an order (a) authorizing them to continue to maintain their existing Bank Accounts and to continue use of their existing Business Forms; (b) authorizing, but not directing, continued use of the Cash Management system; and (c) granting them a waiver from certain of the United States Trustee's guidelines.

47.     The Debtors' Accounts, Forms, Records and Cash Management System.  The Debtors use a cash management system (the "Cash Management System") in the ordinary course of business which permits the efficient collection and application of funds.   Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of business, the Debtors maintained 202 bank accounts (collectively, the "Bank Accounts").  A list of the Bank Accounts is attached to the Cash Management Motion as **Exhibit A**.

48.     The Debtors' Cash Management System is primarily maintained at Wells Fargo Bank, National Association ("Wells Fargo").  In addition, in areas of the country where Wells Fargo branches are not as readily available, the Debtors maintain Bank Accounts with Regions

26

Bank and various other banks as set forth in **Exhibit A**.  A chart that illustrates how the Debtors'

cash flow system operates is attached to the Cash Management Motion as **Exhibit B.**

49.    A summary of the Debtors' Cash Management System and the Bank Accounts is

contained below:

A.    <u>Store Level Depository Accounts</u>.    Each restaurant maintains a store level
depository account (the "<u>Store Level Depository Accounts</u>") at Wells Fargo or Regions Bank, or
at one of several other banks as set forth on **Exhibit A**.[8]  Each Store Level Depository Account
with Wells Fargo and Regions Bank is a zero balance account.  On a daily basis, the funds are
swept from Store Level Depository Accounts to either the Wells Fargo Centralized Depository
Account (as defined below) or the Regions Bank Centralized Depository Account (as defined
below).  Funds in Store Level Depository Accounts not held at Wells Fargo or Regions Bank are
swept to the Funding Account (as defined below) two times each week.

B.    <u>Wells Fargo Centralized Depository Account</u>.  The Debtors maintain a centralized
depository account at Wells Fargo (the "<u>Wells Fargo Centralized Depository Account</u>") into
which all funds held in Store Level Depository Accounts at Wells Fargo are swept on a daily
basis.  This is a zero balance account.  All funds in the Wells Fargo Centralized Depository
Account are swept to the Funding Account on a daily basis.

C.    <u>Regions Bank Centralized Depository Account</u>.    The Debtors maintain a
centralized depository account at Regions Bank (the "<u>Regions Bank Centralized Account</u>") into
which all funds held in Store Level Depository Accounts at Regions are swept on a daily basis.
This is a zero balance account.  All funds in the Regions Bank Centralized Depository Account
are swept to the Funding Account on a daily basis.

D.    <u>Funding Account</u>: The Debtors maintain an operating account (the "<u>Funding
Account</u>") with Wells Fargo into which nearly all of the Debtors' revenues are ultimately
deposited.  Funds are then transferred out of this account, as needed, to fund nearly all of the
Debtors' disbursements.

E.    <u>Miscellaneous Accounts</u>.  The Debtors also maintain the following miscellaneous
accounts at Wells Fargo:

i.  a depository account into which franchisees deposit monies owed to the
Debtors on account of service fees;

---

[8]    There are 23 restaurants in Tennessee that share a bank account at First Tennessee Bank.

       ii.   a depository account in which the Debtors receive proceeds on account of restaurant delivery sales from third-party delivery companies (*e.g.*, Uber Eats);

      iii.   an e-commerce account in which the Debtors receive proceeds on account of online orders; and

      iv.   a corporate gift card account in which the Debtors receive the proceeds from all gift card sales.

F.    <u>Disbursement Accounts</u>: Disbursements are generally made out of the Funding Account at Wells Fargo and into controlled disbursement accounts, including accounts established to pay accounts payable, real and personal property taxes, payroll and benefits, amounts on account of gift card transactions, pension benefit payment obligations and Pension Benefit Guaranty Corporation insurance premiums, and utilities. Disbursements from these accounts are generally made by wire, check, ACH, direct debits, or automatic payments.

50.    The Debtors' existing Bank Accounts function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest. The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these cases with the same account numbers and, where applicable, automated relationship. The Debtors further request authority to deposit funds in and withdraw funds from all such accounts postpetition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, check, wire, transfers, ACH, electronic funds transfers and other debits and to treat the Bank Accounts for all purposes as debtors in possession accounts.

51.    <u>Bank Fees</u>. In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the cash management system (collectively, the "<u>Bank Fees</u>"). The Debtors estimate that they owe approximately $55,000 in unpaid Bank Fees as of the Petition Date. By the Cash Management Motion, the Debtors seek

the authority to continue to pay the Bank Fees, including the prepetition Bank Fees, in the ordinary course of business on a postpetition basis.

52.    <u>Credit Card Processing Fees</u>.    The Debtors accept credit cards at all of their restaurants.    Credit card payments received at each restaurant are processed by WorldPay, Inc. (the "<u>Credit Card Processor</u>").    The Debtors' continued ability to honor or process credit card transactions is essential to their efforts to maintain the operation of their business and maximize value to their estates.    Without this ability, the Debtors would lose the ability to conduct sales transactions in the ordinary course of business.    Pursuant to the terms of the Debtors' agreements and relationships with the Credit Card Processor, the Debtors are required to pay certain fees for credit card processing services (collectively, the "<u>Processing Fees</u>").    The Debtors estimate that they owe approximately $40,000 in unpaid Processing Fees as of the Petition Date.    By the Cash Management Motion, the Debtors seek the authority to continue to pay the Processing Fees, including any prepetition obligations, in the ordinary course of business to avoid any interruption of the Debtors' ability to process credit card transactions.

53.    <u>Existing Business Forms and Checks</u>.    In the ordinary course of business, the Debtors maintain blank check stock and use a system, which is pre-programmed by a third party, to print the Debtors' names thereon.    In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms (collectively, along with the Debtors' checks, the "<u>Business Forms</u>").    To minimize administrative expense and delay, pursuant to Procedure K(1) of the Complex Case Procedures, the Debtors request authority to continue to use the Business

Forms substantially in the forms existing immediately prior to the Petition Date, without reference to each Debtor's "Debtor in Possession" status.

54.     Requested Waiver of Certain U.S. Trustee Guidelines.   I understand that the Office of the U.S. Trustee for Region 21 (the "U.S. Trustee") has established guidelines (the "Guidelines") to supervise the administration of chapter 11 cases and prevent postpetition payments for prepetition claims. The Guidelines require a chapter 11 debtor to, among other things: (i) close its existing books, records and bank accounts, and open new postpetition books, records and bank accounts (which must bear debtor in possession labels, and must be opened at banks approved by the U.S. Trustee); (ii) establish separate bank accounts for operations, payment of taxes, cash collateral and payroll (to the extent that the debtor had a separate payroll account prepetition); and (iii) obtain new checks bearing the designation "Debtor in Possession," along with additional information.

55.     The Debtors submit that compliance with these requirements would create substantial and unnecessary administrative burdens.  Requiring the Debtors to open new bank accounts and alter their cash management system would impose unnecessary expense, confusion, and diversion of scarce time and personnel, and would hinder the efficient use of the Debtors' resources at the critical first days of these cases.  On the other hand, permitting the Debtors to maintain their existing bank accounts and existing cash management system (or to make only such changes as are appropriate in the ordinary course of business) will prevent disruption of the Debtors' operations and will not prejudice any party in interest.

56.     The Debtors' existing procedures, along with additional safeguards proposed herein, adequately address the concerns that underlie the Guidelines.  The Debtors have in place

30

sophisticated, computerized record keeping systems and will be able to ensure that all prepetition and postpetition transactions are properly accounted for and can easily be distinguished. The Debtors will continue to maintain complete and accurate records of all transfers of funds in and out of the Debtors' bank accounts.

57.     Based on the foregoing, the Debtors seek the following specific relief with respect to their books and records, cash management system, and business forms:

a.     a waiver of the requirement that the Debtors' prepetition bank accounts be closed and new postpetition bank accounts be opened;

b.     approval to maintain and continue to use without change in account style their existing bank accounts;

c.     approval to maintain and continue to use their existing Cash Management System;

d.     authority to continue to pay the Bank Fees, including prepetition Bank Fees, in the ordinary course of business;

e.     authority to continue to pay the Processing Fees, including prepetition Processing Fees, in the ordinary course of business;

f.     approval to use, in their present form, existing checks and other business forms related to the Debtors' bank accounts; *provided, however*, that upon depletion of the Debtors' current supply of such checks and forms, each Debtor will have the debtor in possession nomenclature added to such checks and forms in accordance with the Complex Case Procedures;

g.     approval to use the Debtors' existing books and records with appropriate notations to reflect the filing of the chapter 11 petitions; and

     h.     entry of an order authorizing the banks at which the Debtors have bank accounts to maintain and administer the Debtors' bank accounts in accordance with the contracts entered into between the Debtors and such banks before the filing of the Debtors' chapter 11 petitions and otherwise in accordance with past practice, and enjoining such banks from freezing or otherwise impeding the Debtors' bank accounts; *provided, however*, that such banks shall not honor any checks issued on such bank accounts on a date prior to the commencement of these Chapter 11 Cases and presented for payment to the banks postpetition unless otherwise authorized to do so by order of this Court (such as the authority to pay all prepetition employee obligations).

**Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Related Obligations and (II) Granting Related Relief (the "Tax Motion")**

58.    The Debtors seek entry of (i) an interim order substantially in the form attached to the Tax Motion as **Exhibit B** (the "Interim Order"), authorizing the Debtors to pay prepetition Taxes and Fees owed to the Taxing Authorities in an amount not to exceed $1,606,000, subject to entry of the Final Order, and scheduling a final hearing (the "Final Hearing"); and (ii) a final order substantially in the form attached to the Tax Motion as **Exhibit C** (the "Final Order").

59.    In addition, the Debtors seek authorization to honor all checks that remain uncashed prior to the Petition Date or that are otherwise returned by a Taxing Authority, as well as those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

60.    In connection with the normal operations of their business, the Debtors incur an assortment of Taxes (as defined below) and various business license, permit, and other fees (collectively, the "Fees") payable to various federal, state, and local taxing and regulatory authorities (collectively, the "Taxing Authorities"), including, but not limited to, those Taxing

Authorities listed on **Exhibit A** attached to the Tax Motion.[9]  These Taxes and Fees include, without limitation, the following:

61.    <u>Sales and Use Taxes</u>. The Debtors incur state and local sales taxes in connection with the sale of various products and services to their customers (the "<u>Sales Taxes</u>").   The Debtors collect and remit or otherwise pay the Sales Taxes as needed to the applicable Taxing Authorities.  The Debtors also incur use taxes on account of the purchase of various inventory, raw materials, supplies or other goods used in the Debtors' business (the "<u>Use Taxes</u>," together with the Sales Taxes, the "<u>Sales and Use Taxes</u>").   The Use Taxes typically arise pursuant to purchases the Debtors make from out-of-state vendors that do not collect state sales tax that would have been charged on the purchase of such goods if the purchase had occurred within the state where the vendor is located.  The Debtors estimate that they owe approximately $2,786,000 in accrued and unpaid Sales and Use Taxes as of the Petition Date.

62.    <u>Franchise Taxes</u>.  The Debtors pay income, franchise, net worth and similar taxes (the "<u>Franchise Taxes</u>," together with the Sales and Use Taxes, the "<u>Taxes</u>") to various Taxing Authorities to maintain the right to operate their business in the applicable taxing jurisdiction. Franchise Taxes vary by jurisdiction and may be based on a flat fee, net operating income, gross receipts or capital employed.  Certain states impose personal liability on officers of entities that fail to pay Franchise Taxes.  In addition, certain jurisdictions will refuse to qualify a company to do business in such state or issue certificates of good standing or other documents necessary to do business in such jurisdiction if Franchise Taxes have not been paid.  The Debtors estimate

---

[9]    Inclusion of a Taxing Authority on **Exhibit A** attached to the Tax Motion does not constitute an acknowledgement by the Debtors that the Debtors owe any obligation to such authority or that such authority will be paid pursuant to any order entered on the Tax Motion.

that they owe approximately $10,000 in accrued and unpaid Franchise Taxes as of the Petition

Date.

63.    <u>Business Licenses, Permits, and Other Fees</u>.  Many Taxing Authorities require the

payment of Fees for the right to conduct business within their jurisdictions.  Those charges may

include fees for business licenses, annual reports, permits and health and fire inspections.  These

Fees are computed in a variety of ways but are generally flat rate fees of $15,000 or less, which

are paid on a monthly, quarterly or annual basis, depending on the requirements of the particular

jurisdiction.  The Debtors pay hundreds of these Fees per year to different state and local Taxing

Authorities and are frequently required to obtain licenses and permits in any given jurisdiction in

which the Debtors conduct business.  The Debtors estimate that they owe approximately $20,000

in accrued and unpaid Fees as of the Petition Date.

> **Debtors' Emergency Motion Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices; (II) Deeming Utilities Adequately Assured of Future Performance; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")**

64.    The Debtors respectfully request the entry of an interim and final order (the

"<u>Interim Order</u>" and the "<u>Final Order</u>", respectively): (a) prohibiting the Utility Providers from

altering, refusing, or discontinuing service on account of prepetition invoices, (b) deeming

utilities adequately assured of future performance, and (c) establishing the Determination

Procedures for determining adequate assurance of payment.  The Debtors also request that the

Court schedule a final hearing at its convenience on a date in advance of the expiration of thirty

(30) days following the Petition Date.

65.    <u>The Utility Providers</u>.    Utility services are essential to the Debtors' ability to sustain their operations while these Chapter 11 Cases are pending.    To operate their business and manage their properties, the Debtors incur utility expenses for natural gas, electricity, water, sewage, waste management, local and long-distance telecommunications, and other similar services (collectively, the "<u>Utility Services</u>").    These Utility Services are provided by approximately 230 utility providers (the "<u>Utility Providers</u>"), with which Debtors may have multiple accounts.    A non-exhaustive list identifying the Utility Providers is attached to the Utilities Motion as **<u>Exhibit A</u>** (the "<u>Utilities Service List</u>").[10]

66.    The Debtors spend an aggregate amount of approximately $987,000 each month on Utility Services from the Utility Providers listed on the Utility Service List.

67.    Certain third parties, often governmental units or other public agencies, have required the Debtors to post surety bonds or deposits to secure the Debtors' payment or performance of certain obligations.    The obligations secured by these bonds and deposits include the Debtors' obligations to pay certain Utility Services.    Of the approximately 230 Utility Providers, approximately 61 hold surety bonds or deposits in the aggregated amount of approximately $937,000.

68.    To manage the Utility Services at their many locations, the Debtors contract with two third party processors: Vatic Outsourcing, LLC ("<u>Vatic</u>") and Engie Resources ("<u>Engie</u>", together with Vatic, the "<u>Utility Managers</u>").    Engie manages the Debtors' accounts for the majority of the Utility Providers and Services, including electric, water/wastewater, sewer, trash,

---

[10]    The listing of any entity on **<u>Exhibit A</u>** attached to the Utilities Motion is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code.

and gas services. Vatic manages the Debtors' accounts for the majority of the Debtors' telecommunication providers. Together, the Utility Managers manage approximately 1,028 utility accounts for the Debtors. The Utility Managers' services include providing a web-based platform and utility bill management, which include paying bills for the Utility Services as agents for the Debtors and providing accounting information to the Debtors with respect to the Utility Services they manage. Although the Debtors contract directly with the Utility Providers, invoices from the Utility Providers are directed to the Utility Managers, who then reconcile the invoices, submit them to the Debtors with a request for funding and a payment date, and then disburse the funds received from the Debtors to the Utility Providers. The Utility Managers charge the Debtors a monthly fee for such services comprised of a flat fee component and a component based on the volume of accounts processed. The Debtors pay, on average, $4,000 per month for Engie's services and $4,300 per month for Vatic's services.

69.     In general, the Debtors have established satisfactory payment history with the Utility Providers and have made payments on a regular and timely basis. To the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to undisputed invoices for prepetition Utility Services as of the Petition Date. The Debtors intend to pay any postpetition obligations for the Utility Services in a timely fashion and in the ordinary course.

70.     Continued and uninterrupted Utility Services is vital to the Debtors' ability to sustain their operations during these Chapter 11 Cases. Because of the nature of the Debtors' operations, termination or interruption of the Debtors' utility service would dramatically impair the Debtors' ability to conduct business and would cause considerable inconvenience to the

Debtors' customers and employees. If Utility Providers are permitted to terminate or disrupt service to the Debtors, the Debtors' primary revenue source would be threatened.

**Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief (the "Customer Programs Motion")**

71.    The Debtors request entry of an order (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay, honor, or otherwise satisfy prepetition obligations to customers and to otherwise continue prepetition customer practices and programs in the ordinary course of business, (b) authorizing, but not directing, the Debtors, in their sole discretion, to pay, honor, or otherwise satisfy prepetition processing costs and fees associated with these practices and programs, (c) authorizing and directing the Debtors' banks and financial institutions (collectively, the "Banks") to receive, process, honor and pay all checks and electronic payment requests relating to the foregoing, and (d) granting related relief.

60.    The Debtors' Customer Programs. The customer programs are integral to ensure the smooth functioning of the Debtors' business.  As owners and operators of quick-service dining locations, the Debtors have developed and designed various marketing strategies to generate business in the face of sophisticated competition.  Among these strategies are certain customer programs, promotions and practices designed to enhance revenues by, among other things, encouraging repeat business and developing new customer relationships.  As of the Petition Date, the programs include (collectively, the "Customer Programs"): (i) Gift Cards; and (ii) Coupon Offers.

61.    The Debtors believe that they must promptly assure customers of their continued ability to satisfy prepetition and postpetition obligations under the Customer Programs to

maintain their valuable customer base, goodwill and a myriad of other important benefits derived therefrom, following the commencement of these Chapter 11 Cases.  Any inability of the Debtors to honor these obligations promptly would be disastrous to the survival of the Debtors' business as a going concern because of the resulting destruction of goodwill and loss of customer patronage.

62.    Continued use of the Customer Programs, on the other hand, will enable the Debtors to protect their customer base and revenue growth opportunities.  Consequently, the Debtors seek the authority: (i) to maintain and administer the Customer Programs in the ordinary course of business; and (ii) to continue to pay, honor, or otherwise satisfy obligations (including processing costs and fees) associated with the Customer Programs.

72.    The Gift Cards. Gift cards (collectively, the "Gift Cards") entitle holders to receive the Debtors' products in exchange for a debit against the Gift Cards.  The Debtors maintain separate gift card stock that is specifically identifiable, which is sold inside the Debtors' restaurants.  The Debtors also use two third-party vendors that sell Gift Cards for a fee (the "Commission Fees"): (i) Blackhawk Network, which sells Gift Cards in grocery stores and drugstores; and (ii) InComm, which sells Gift Cards in Sam's Club and BJ's Wholesale Club. The Commission Fees are deducted from the Gift Card sale proceeds before the proceeds are remitted to the Debtors.  As of the Petition Date, the outstanding liability on account of the Gift Cards for the Debtors is approximately $435,000.  Based on figures from the past twelve months, on average, $18,200 in Gift Cards are redeemed each month.  The Debtors anticipate $60,400 will be redeemed in Gift Cards in the next several months (*i.e.*, from the Petition Date to March 31, 2020).

73.    <u>The Coupon Program</u>.    In the ordinary course, the Debtors conduct mass distributions of coupons and monthly value offers through a variety of distribution channels ("<u>Coupon Offers</u>").    Often these coupons and offers are valid for a fixed period of time.    To preserve the goodwill of their customer base, the Debtors seek, out of an abundance of caution, authorization to honor the coupons issued prior to the Petition Date in a manner consistent with their ordinary business practices, and to continue to issue coupons subsequent to the Petition Date in the ordinary course of business.

**Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing and Confirming Vendor Credit Support Arrangement; (II) Granting Superpriority Administrative Expense Claims; and (III) Granting Related Relief (the "<u>Vendor Credit Support Motion</u>")**

74.    The Debtors seek the entry of interim and final orders: (a) authorizing and approving the Credit Support Arrangement (as defined below); (b) granting superpriority administrative expense claims; (c) scheduling a final hearing (the "<u>Final Hearing</u>"); and (d) granting related relief.

75.    The Krystal Company and US Foods, Inc. ("<u>US Foods</u>") are party to a Master Distribution Agreement, dated as of May 13, 2018 (as amended and otherwise modified on or before the date hereof and together with all ancillary documents related thereto, the "<u>Master Distribution Agreement</u>"), pursuant to which US Foods supplies the Debtors with food products necessary for the Debtors' business.

76.    US Foods is the Debtors' primary food supplier, delivering approximately $1,400,000 in goods to the Debtors each week.    As of the Petition Date, the Debtors owe US Foods $2,871,147 and $2,981,483, all of which likely constitutes a priority claim under Section 503(b)(9) of the Bankruptcy Code (the "<u>503(b)(9) Claim</u>").

77.     The Debtors and US Foods have reached an agreement (*i.e.*, the Credit Support Arrangement) whereby US Foods will extend favorable credit terms to the Debtors in exchange for limited protection and fees.  Importantly, the Credit Support Arrangement will allow the Debtors the ability to maintain sufficient liquidity to fund their operations and expenses during these Chapter 11 Cases without granting any new liens on their assets and without paying expensive fees and interest that would otherwise be required under a post-petition secured credit facility.

78.     The Master Distribution Agreement permits US Foods to shorten the payment terms afforded to the Debtors.  However, in exchange for the protections and payments described below, US Foods has agreed to afford the Debtors' 21-day payment terms on account of post-petition goods delivered under the Master Distribution Agreement and defer payment of its 503(b)(9) Claim (the "Credit Support").

79.     In exchange for the Credit Support, the Debtors have agreed to provide US Foods with limited fees and protections pursuant to the following terms and conditions (the "Credit Support Arrangement"):

     (a)     Amount:  US Foods shall provide post-petition trade credit to the Debtors such that all payments for goods delivered after the Petition Date shall be due twenty-one days after delivery of such goods; provided, however, that the total amount owed to US Foods on account of post-petition goods shall not exceed $4,500,000.

     (b)     503(b)(9) Claim.  The Debtors request that the final order provide that the 503(b)(9) Claim shall be paid by the Debtors on the earlier of (such date, the "Final Payment Date"): (i) the date of the closing of a sale of substantially all of the Debtors' assets; (ii) the assumption of the Master Distribution Agreement pursuant to Section 365 of the Bankruptcy Code; or (iii) the effective date of a confirmed plan of reorganization.

(c)     <u>Priority</u>:  US Foods shall be granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in these Chapter 11 Cases, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates, on account of goods delivered after the Petition Date.

(d)     <u>Fees</u>.  The Debtors shall pay US Foods a one-time commitment fee in the amount of $100,000, which shall be paid by the Debtors within two business days of the entry of the interim order granting the Vendor Credit Support Motion.  Additionally, the Debtors shall pay a monthly credit fee in the amount of $50,000 (the "<u>Monthly Credit Fee</u>").  The initial Monthly Credit Fee shall be paid on the date that is one month after the Petition Date and shall be paid on the same day of each month thereafter until the Final Payment Date.  A *pro rata* portion of the Monthly fee (based on the days elapsed since the prior Monthly Fee) shall be paid on the Final Payment Date.

(e)     <u>Attorneys' Fees</u>.  The Debtors' shall reimburse US Foods for reasonable and documented attorneys' fees incurred in an amount not to exceed $100,000, except such cap shall not apply to US Foods' attorneys' fees incurred to defend Vendor Credit Support Motion or enforce any relief granted in connection with the Vendor Credit Support Motion.

80.     These terms are highly favorable to the Debtors, and the fees and protections granted thereunder are extremely limited when compared to traditional post-petition secured credit facilities.  No liens shall be granted in connection with the Credit Support Arrangement. Moreover, the Credit Support Arrangement does not require the Debtors to comply with any milestones, modifications of the automatic stay, or other obligations regarding these Chapter 11 Cases.

**Debtors' Emergency Motion for Entry of Interim and Final Orders (1) Authorizing the Debtors to use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; (2) Granting Adequate Protection to Pursuant to Sections 361 and 363 of the Bankruptcy Code; (3) Modifying the Automatic Stay, (4) Scheduling a Final Hearing Pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedures, and (5) Granting Related Relief (the "Cash Collateral Motion")**

81.     The Debtors seek the entry of an order (a) authorizing the Debtors to use cash collateral, (b) granting adequate protection, and (c) scheduling a final hearing (the "Final Hearing").

82.     As outlined above, The Krystal Company, as borrower, Wells Fargo Bank, National Association, as administrative agent (the "Agent"), and the lenders party thereto (the "Lenders") are parties to that certain Third Amended and Restated Credit Agreement, dated as of April 26, 2018 (as amended and otherwise modified from time to time, the "Credit Agreement", and together with all Loan Documents (as defined in the Credit Agreement) executed prior to the Petition Date (in each case, as amended and otherwise modified from time to time), collectively, the "Credit Documents").

83.     The Lenders assert that the principal amount of the loans and other obligations owed by the Debtors, on a joint and several basis, to the Agent and Lenders under the Credit Documents, exclusive of accrued but unpaid interest, costs, fees and expenses, was not less than $49,551,522 as of the Petition Date.  All loans and other obligations of the Debtors arising under or in connection with the Credit Agreement (including, without limitation, the "Secured Obligations" as defined therein) or any other Credit Document shall collectively be referred to herein as the "Prepetition Indebtedness."

42

84.    The Lenders assert that pursuant to the Amended and Restated Guaranty, dated as of June 28, 2013 and the other applicable Credit Documents, the other Debtors each unconditionally guaranteed, on a joint and several basis, to the Agent and the Lenders the punctual and complete performance, payment and satisfaction when due and at all times thereafter of all of the Prepetition Indebtedness.

85.    The Lenders assert that pursuant to the Credit Agreement and the other applicable Credit Documents, the Agent was granted, for its benefit and the benefit of the Lenders and the other Secured Parties, continuing liens, mortgages and security interests against, on, and in the certain prepetition collateral to secure the repayment of the Prepetition Indebtedness.

86.    The Lenders assert that substantially all of the cash held by or otherwise generated by the Debtors' businesses as of the Petition Date constitutes "cash collateral," as such term is defined in section 363(a), and is subject to the interest of the Lenders (the "Cash Collateral").

87.    Without the use of the Cash Collateral, the Debtors do not have sufficient access to working capital to operate their business in the ordinary course for a period of time sufficient to sell their assets in these Chapter 11 Cases. More specifically, the Debtors' ability to continue their operations and administer these bankruptcy cases is dependent on their ability to use the Cash Collateral.

88.    Any disruption of the Debtors' operations would be devastating at this critical juncture. The inability of the Debtors to access the Cash Collateral and to make payments on certain obligations on a timely basis may result in, inter alia, the Debtors' inability to continue the operation of their restaurants.  If this event were to occur, the impact on the Debtors' estates

would be catastrophic and would result in material harm to all of the Debtors' creditors and other

constituents.

[*Remainder of Page Intentionally Blank*]

Under penalty of perjury, I declare that the foregoing is true to the best of my knowledge

and belief.

Dated:  January 20, 2020                    /s/ *Jonathan Tibus*
        Atlanta, Georgia                    Jonathan Tibus
                                            Chief Restructuring Officer

**<u>Exhibit A</u>**

**Corporate Structure Chart**

