**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE KRYSTAL COMPANY, *et al.*,[1] | ) | Case No. 20-61065 (PWB) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' APPLICATION FOR ENTRY OF AN ORDER**
**AUTHORIZING THE EMPLOYMENT AND RETENTION OF**
**PIPER SANDLER & CO. AS INVESTMENT BANKER FOR THE DEBTORS**
**AND DEBTORS IN POSSESSION EFFECTIVE FROM THE PETITION DATE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this *Application for Entry of an Order Authorizing the Employment and Retention of Piper Sandler & Co. as Investment Banker for the Debtors and Debtors in Possession Effective from the Petition Date* (the "Application").  In support of this Application, the Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Krystal Company (4140); Krystal Holdings, Inc. (5381); and K-Square Acquisition Co., LLC (8916).  The location of the Debtors' corporate headquarters and service address is: 1455 Lincoln Parkway, Suite 600, Dunwoody, Georgia 30346.

2.      The bases for the relief requested herein are sections 327(a) 328(a), and 330(a)

of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014 and 2016 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Procedure J of the

*Amended and Restated General Order 26-2019, Procedures for Complex Chapter 11 Cases*,

dated November 4, 2019 (the "Complex Case Procedures").

## BACKGROUND

**A.      General Background**

3.      On January 19, 2020 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for

the Northern District of Georgia, Atlanta Division (the "Court").  The Debtors have continued

in possession of their properties and have continued to operate and manage their business as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No

request has been made for the appointment of a trustee or examiner, and no official committee

has yet been established in these cases.

4.      The factual background relating to the Debtors' commencement of these cases is

set forth in detail in the *Declaration of Jonathan M. Tibus in Support of Chapter 11 Petitions

and First Day Pleadings* (the "First Day Declaration") filed on the Petition Date and

incorporated herein by reference.

**B.      Piper Sandler's Qualifications and the Need for Piper Sandler's Services**

5.      The Debtors submit this Application because of the need to retain a qualified

investment banker to assist in the critical tasks associated with guiding the Debtors through

these chapter 11 cases.  The Debtors believe that the retention of an investment banker is

necessary and appropriate to enable them to evaluate the financial and economic issues raised by the Debtors' chapter 11 proceedings, successfully consummate the orderly sale of their assets, and to fulfill their statutory duties.

6.     The Debtors selected Piper Sandler & Co. ("Piper Sandler") as investment banker based upon Piper Sandler's extensive experience in matters involving complex financial restructurings, expertise in the restaurant industry, and excellent reputation for the services that it has rendered in chapter 11 cases on behalf of debtors and creditor constituencies throughout the United States.

7.     As set forth in the Declaration of Teri Stratton, Managing Director at Piper Sandler (the "Stratton Declaration"), which is attached hereto as **Exhibit B**, Piper Sandler and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out-of-court.  Some of the in and out-of-court restructurings in which Piper Sandler has been involved include Joe's Crab Shack, Sotera Wireless, Inc., Garden Fresh Restaurant Intermediate Holding, LLC, Rotary Drilling Tools, Malibu Lighting Corporation, Golden County Foods, Inc., Mi Pueblo Holdings, LLC, Chef Solutions, Inc., Claim Jumper Restaurants, LLC, Brown & Cole Stores LLC, Larry's Markets, Select Snacks, Sun World International, Inc., CFP Holdings, Inc., Hoop Retail, Inc., Mercury Plastics, Edwards Theaters, and JELD-WEN, Inc.

8.     Piper Sandler is also familiar with the Debtors' financial and business operations.  Piper Sandler has been employed by the Debtors since December 2019 and has

been assisting the Debtors in their efforts to market and sell their business.  The Debtors thus

believe that Piper Sandler is both well-qualified and uniquely able to advise the Debtors in

these chapter 11 cases in an efficient and timely manner.

**C.      Scope of Services**

9.      Subject to the Court's approval, the Debtors anticipate that Piper Sandler will

perform the following investment banking services, among others, pursuant to an Engagement

Letter between Piper Sandler and Debtors dated December 21, 2019 (the "<u>Engagement Letter</u>",

a copy of which is attached as **<u>Exhibit C</u>** to this Application):[2]

    a)    Review and analyze the Debtors' business, operations, properties,
          financial condition and prospects;

    b)    Assist the Debtors and/or participate in negotiations with the Debtors'
          creditors, suppliers, lessors, and other interested parties;

    c)    Assist the Debtors in structuring and effecting any Sale[3] or
          Restructuring[4] transaction or transactions;

    d)    Assist the Debtors in developing and preparing materials to be used in

---

[2]    To the extent there is any inconsistency between the following summary of the services set
       forth in the Engagement Letter and the terms of the Engagement Letter, the terms of the
       Engagement Letter shall control.  In addition, capitalized terms not otherwise defined
       herein shall have the meanings set forth in the Engagement Letter.

[3]    The term "<u>Sale</u>" means the disposition in one or a series of related transactions of all or
       substantially all of the assets or businesses of the Company or its subsidiaries.

[4]    The term "<u>Restructuring</u>" means any recapitalization, modification, restructuring or
       reorganization (whether or not pursuant to chapter 11 of the Bankruptcy Code) of the
       Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities
       (including partnership interests, lease obligations, trade credit facilities (but for the
       avoidance of doubt, not the negotiation by the Company of adjustments of bills from
       vendors in the ordinary course) and/or contract or tort obligations) (collectively, the
       "<u>Obligations</u>"), including pursuant to any repurchase, exchange, conversion, cancellation,
       forgiveness, retirement, plan, solicitation of consents, waivers, acceptances, authorizations
       and/or a modification or amendment to the terms, conditions or covenants thereof (provided
       such terms, condition or covenants are amended for a period exceeding twelve months);
       provided that a Restructuring does not included a Sale.

4

soliciting potential purchasers with respect to any Sale and assist the Debtors and/or participate in negotiations with potential purchasers; and

e)      Provide financial advice and assistance to the Debtors in developing any Restructuring and assist the Debtors and/or participate in negotiations with any entities or groups affected by the Restructuring.

10.      By separate motions and applications filed contemporaneously herewith or expected to be filed shortly hereafter, the Debtors are also seeking to employ: (a) Alvarez & Marsal North America, LLC, as interim management provider; (b) King & Spalding LLP, as Debtors' counsel; and (c) certain ordinary course professionals.  In addition, the Debtors may file motions or applications to employ additional professionals.  Piper Sandler will work closely with each of these professionals to prevent unnecessary or inefficient duplication of services and will take whatever steps are necessary and appropriate to avoid such duplication.

**D.      Professional Compensation**

11.      As set forth more fully in the Engagement Letter, Piper Sandler and the Debtors have agreed on the following terms of compensation and expense reimbursement (the "Fee and Expense Structure"):[5]

**Monthly Fee**.  A monthly fee (the "Monthly Fee") equal to $75,000 payable on the 20th day of each month. Commencing with the Monthly Fee paid on December 21, 2019, fifty percent (50%) of each Monthly Fee received will be credited against the amount of any Sale Fee earned.

**Restructuring Fee**.  Upon consummation of a Restructuring, a fee (the "Restructuring Fee") equal to $1,250,000.

**Sale Fee**.  In the event of a Sale, a fee (the "Sale Fee") equal to the greater of four percent (4.0%) of the Transaction Value of such Sale and $1,250,000.

---

[5]     To the extent there is any inconsistency between the summary of the Fee and Expense Structure set forth in this Application and the Fee and Expense Structure as set forth in the Engagement Letter, the terms of the Engagement Letter shall control.

Notwithstanding the foregoing, Piper Sandler shall not be paid both a Restructuring Fee and a Sale Fee in connection with the same transaction.

12.    In addition to any fees that may be paid to Piper Sandler under the Engagement Letter, the Debtors shall reimburse Piper Sandler for out-of-pocket expenses incurred in connection with its engagement by the Debtors.

13.    During the pendency of these chapter 11 cases, Piper Sandler shall apply to the Court for the allowance of compensation for professional services rendered and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and any other applicable procedures and orders of the Court and consistent with the proposed compensation arrangement set forth in the Engagement Letter.

14.    The Debtors believe that the Fee and Expense Structure set forth in the Engagement Letter is reasonable.  The Fee and Expense Structure appropriately reflects the nature of the services to be provided by Piper Sandler and the fee structures typically utilized by leading investment banking firms of similar stature to Piper Sandler for comparable engagements, both in and out-of-court.  The Fee and Expense structure is consistent with Piper Sandler's normal and customary billing practices for cases of this size and complexity that require the level of scope and services outlined herein.  Moreover, the Fee and Expense Structure is reasonable in light of (a) industry practice, (b) market rates charged for comparable services both in and out of the chapter 11 context, (c) Piper Sandler's substantial experience with respect to investment banking services, and (d) the nature and scope of work to be performed by Piper Sandler in these cases.  In particular, the Debtors believe that the Fee and Expense Structure creates a proper balance between fixed fees and contingency fees.  Similar fixed and contingency fee arrangements have been approved and implemented in other large

chapter 11 cases in this District.  *See, e.g.*, *In re Jack Cooper Ventures, Inc., et al..* No. 19-62393 (PWB) (Bankr. N.D. Ga. Sept. 3, 2019) [Docket No. 210] (authorizing employment of investment banker and approving contingent and non-contingent fees); *In re CGLA Liquidation, Inc., f/k/a Cagle's, Inc., CF Liquidation, Inc., f/k/a Cagle's Farms, Inc.*, No. 11-80202 (PWB) (Bankr. N.D. Ga. Dec. 18, 2012) [Docket No. 1053] (same).

15.    Consistent with its ordinary practice and the practice of investment bankers in other chapter 11 cases whose fee arrangements are not hours-based, Piper Sandler does not maintain contemporaneous time records or provide or conform to a schedule of hourly rates for its professionals.  Given the foregoing and that Piper Sandler's compensation is based on fixed fees, the Debtors request that, notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, any order of this Court, or any other guideline regarding the submission and approval of fee applications, Piper Sandler's professionals be excused from maintaining time records in connection with the services to be rendered pursuant to the Engagement Letter.  Piper Sandler will nonetheless maintain reasonably detailed summary time records in one-half hour increments, which records shall indicate the total hours incurred by each professional for each day and provide a brief description of the nature of the work performed.  Courts in this District in other large chapter 11 cases have excused flat-fee professionals from time-keeping requirements under similar circumstances.  *See, e.g.*, *In re Jack Cooper Ventures, Inc., et al..* No. 19-62393 (PWB) (Bankr. N.D. Ga. Sept. 3, 2019) [Docket No. 210] (requiring investment banker only to keep reasonably detailed summary time records in one-half hour increments while indicating the total hours incurred by each professional for each day and briefly describing the nature of the work performed); *In re CGLA*

*Liquidation, Inc., f/k/a Cagle's, Inc., CF Liquidation, Inc., f/k/a Cagle's Farms, Inc.*, No. 11-80202 (PWB) (Bankr. N.D. Ga. Dec. 18, 2012) [Docket No. 1053] (same).

**E.      Indemnification of Piper Sandler**

16.      As part of the overall compensation payable to Piper Sandler under the terms of the Engagement Letter, the Engagement Letter provides for certain indemnification obligations to Piper Sandler and its affiliates, and each of their respective officers, directors, managers, members, partners, consultants, employees and agents, and any other controlling persons, to the fullest extent lawful, from and against any claims, liabilities, losses, damages, costs and expenses, as incurred, related to or arising out of or in connection with Piper Sandler's services under the Engagement Letter.[6]   Such terms of indemnification, as modified by the Order, reflect the qualifications and limits on such terms that are customary for investment bankers such as Piper Sandler in chapter 11 cases.  *See, e.g.*, *In re Jack Cooper Ventures, Inc., et al.*, o. 19-62393 (PWB) (Bankr. N.D. Ga. Sept. 3, 2019) [Docket No. 210] (approving similar indemnification provisions); *see also In re EveryWare Global, Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. May 20, 2015) (same); *In re Caesars Entm't Operating Co., Inc.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Mar. 26, 2015) (same); *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 10, 2014) (same).

**F.      Piper Sandler's Disinterestedness**

17.      Piper Sandler has informed the Debtors that as of the date hereof, except as set forth in the Stratton Declaration, (a) Piper Sandler has no connection with the Debtors, their

---

[6]      To the extent there is any inconsistency between the summary of the indemnification provisions set forth in this Application and the indemnifications set forth in the Indemnification Provisions annexed to the Engagement Letter, the terms of such Indemnification Provisions and the Engagement Letter shall control.

creditors, equity security holders or other parties in interest in these chapter 11 cases; (b) Piper Sandler does not have or represent any entity having an interest adverse to the interests of the Debtors' estates or of any class of creditors or equity security holders; and (c) Piper Sandler (i) is not a creditor, equity security holder or an insider of the Debtors and (ii) is not or was not, within two years before the Petition Date, a director, officer, or employee of any of the Debtors. In addition, none of the Piper Sandler professionals expected to assist the Debtors in these chapter 11 cases are related or connected to any United States Bankruptcy Judge for the Northern District of Georgia, the U.S. Trustee, or any person employed in the office of the U.S. Trustee.

18.    During the ninety (90) day period prior to the commencement of these cases, Piper Sandler was paid in the ordinary course certain Monthly Fees and expense reimbursements.  Specifically, Piper Sandler was paid (i) $75,000 on account of its December 2019 Monthly Fee on January 8, 2020 and (ii) $75,000 on account of its January 2020 Monthly Fee on January 17, 2020.  To the extent that any other amounts remained due as of the Petition Date, Piper Sandler has agreed to waive such amounts upon the approval of its engagement by the Debtors.

19.    The Debtors have been advised that Piper Sandler has agreed not to share with any other person or firm the compensation to be paid for professional services rendered in connection with these chapter 11 cases in accordance with section 504(a) of the Bankruptcy Code.

20.     Based on the foregoing, the Debtors believe that Piper Sandler is a "disinterested person" as that term is defined in Bankruptcy Code section 101(14) and utilized in Bankruptcy Code section 328(c).

### RELIEF REQUESTED

21.     By this Application, the Debtors respectfully request the entry of the an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to employ and retain Piper Sandler as investment banker pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rules 2014(a) and 2016, effective from the Petition Date, pursuant to the terms and subject to the conditions of that certain Engagement Letter between Piper Sandler and the Debtors dated as of December 21, 2019, a copy of which is attached hereto as **Exhibit C**; (b) waiving and modifying certain time-keeping requirements as set forth below; and (c) granting related relief.  The Engagement Letter describes (i) the various services that the Debtors seek Piper Sandler to perform on their behalf during these chapter 11 cases and (ii) the terms and conditions of the proposed engagement of Piper Sandler by the Debtors.

### BASIS FOR RELIEF REQUESTED

22.     Section 327(a) of the Bankruptcy Code provides that a debtor, subject to Court approval:

> [M]ay employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under this title.

11 U.S.C. § 327(a).

23.    Additionally, pursuant to section 328(a) of the Bankruptcy Code, the debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).   Furthermore, Bankruptcy Rule 2014(a) requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014.

24.    The Debtors submit that for all the reasons stated above and in the Stratton Declaration, the retention and employment of Piper Sandler as investment banker to the Debtors is warranted.   Also, given the numerous issues that Piper Sandler may be required to address in performing its services for the Debtors pursuant to the Engagement Letter, Piper Sandler's commitment to the variable time requirements and effort necessary to address all such issues as they arise, and the market prices for Piper Sandler's services for engagements of this nature, the Debtors submit that the terms and conditions of the Engagement Letter are fair, reasonable, and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.  The Debtors also believe that the Fee and Expense Structure appropriately reflects (a) the nature and scope of Piper Sandler's services, (b) Piper Sandler's substantial experience with respect to investment banking services, and (c) the fee structures typically utilized by Piper

Sandler and other investment banks, which do not bill their clients on an hourly basis, in bankruptcy or otherwise.

25.    Further, as stated in the Stratton Declaration, Piper Sandler is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates and has no connection to the Debtors, their creditors, or other parties in interest, except as disclosed in the Stratton Declaration.

26.    Based on the foregoing, the Debtors submit that the relief requested is appropriate.

## NOTICE

27.    Notice of this Application has been provided to: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the Debtors' thirty (30) largest unsecured creditors; (c) counsel to the administrative agent for the Debtors' prepetition credit facilities; (d) the Internal Revenue Service; (e) the Georgia Department of Revenue; (f) the Attorney General for the State of Georgia; (g) the United States Attorney for the Northern District of Georgia; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors request this Court enter an order, substantially in the form of **<u>Exhibit A</u>**, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Blank]*

Date:  February 5, 2020                      /s/ Jonathan Tibus
       Atlanta, Georgia                      Jonathan Tibus
                                             Chief Restructuring Officer
                                             The Krystal Company

**<u>EXHIBIT A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE KRYSTAL COMPANY, *et al.*,[1] | ) | Case No. 20-61065 (PWB) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION**
**OF PIPER SANDLER & CO. AS INVESTMENT BANKER FOR THE DEBTORS**
**AND DEBTORS IN POSSESSION EFFECTIVE FROM THE PETITION DATE,**
**SUBJECT TO OBJECTION**

This matter is before the Court on the *Application for Entry of an Order Authorizing the*

*Employment and Retention of Piper Sandler & Co. as Investment Banker for the Debtors and*

*Debtors in Possession Effective from the Petition Date* (the "Application") [Docket No. __] of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Krystal Company (4140); Krystal Holdings, Inc. (5381); and K-Square Acquisition Co., LLC (8916).  The location of the Debtors' corporate headquarters and service address is: 1455 Lincoln Parkway, Suite 600, Dunwoody, Georgia 30346.

the above-captioned debtors and debtors in possession (collectively, the "Debtors"). All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Application.

No hearing is necessary on the Application absent the filing of an objection to it. Pursuant to a certificate of service filed with the Application, the Application has been served on (a) the Office of the United States Trustee for the Northern District of Georgia, as required by Federal Rule of Bankruptcy Procedure 2014; (b) the Debtors' thirty (30) largest unsecured creditors; (c) counsel to the administrative agent for the Debtors' prepetition credit facilities; (d) the Internal Revenue Service; (e) the Georgia Department of Revenue; (f) the Attorney General for the State of Georgia; (g) the United States Attorney for the Northern District of Georgia; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  No further service of the Application is necessary.

The Application and the *Declaration of Teri Stratton in Support of the Application for Entry of an Order Authorizing the Employment and Retention of Piper Sandler & Co. as Investment Banker for the Debtors and Debtors in Possession Effective from the Petition Date* (the "Stratton Declaration") demonstrate preliminarily the Piper Sandler & Co. is disinterested.

Accordingly, it is HEREBY ORDERED THAT:

1.      The Application is granted to the extent set forth herein.

2.      The Debtors are authorized to employ and retain Piper Sandler as investment banker in these chapter 11 cases, pursuant to the terms and subject to the conditions set forth in the Engagement Letter, effective from the Petition Date.

3.      Except to the extent set forth herein, the Engagement Letter, including, without limitation, the Fee and Expense Structure, is approved pursuant to section 328(a) of the Bankruptcy Code, and the Debtors are authorized to pay, reimburse, and indemnify Piper Sandler in accordance with the terms and conditions of, and at the times specified in, the Engagement Letter.

4.      Piper Sandler shall file applications for allowance of compensation and reimbursement of expenses pursuant to and in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code, such Bankruptcy Rules as may then be applicable, and any other applicable orders and procedures of this Court; *provided*, *however*, that notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, any order of this Court, or any other guideline regarding the submission and approval of fee applications, Piper Sandler's professionals shall be required only to keep reasonably detailed summary time records in one-half hour increments, which time records shall indicate the total hours incurred by each professional for each day and provide a brief description of the nature of the work performed.

5.      The fees and expenses payable to Piper Sandler pursuant to the Engagement Letter shall be subject to review pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code, except by the U.S. Trustee, who, for the avoidance of doubt, shall retain all rights to respond or object to Piper Sandler's interim and final applications on all grounds, including, but not limited to, reasonableness pursuant to section 330 of the Bankruptcy Code.

6.      The indemnification, contribution and reimbursement provisions included in the

Indemnification Provisions annexed to the Engagement Letter are approved, subject during the

pendency of these chapter 11 cases to the following modifications:

a.      subject to the provisions of subparagraphs (b) and (c) below, the Debtors
are authorized to indemnify the indemnified persons in accordance with
the Engagement Letter for any claim arising from, related to, or in
connection with their performance of the services described in the
Engagement Letter; *provided*, *however*, that the indemnified persons
shall not be indemnified for any claim arising from services other than
the services provided under the Engagement Letter, unless such services
and the indemnification, contribution, or reimbursement therefor are
approved by this Court;

b.      notwithstanding anything to the contrary in the Engagement Letter, the
Debtors shall have no obligation to indemnify any person or provide
contribution or reimbursement to any person for any claim or expense
that is either (i) judicially determined (the determination having become
final) to have arisen primarily from that person's gross negligence or
willful misconduct, or (ii) for a contractual dispute in which the Debtors
allege breach of Piper Sandler's obligations under the Engagement Letter
unless this Court determines that indemnification, contribution or
reimbursement would be permissible pursuant to *In re United Artists
Theatre Co.*, 315 F.3d 217 (3d Cir. 2003) or (iii) settled prior to a judicial
determination as to sub-clauses (i) or (ii) above, but determined by this
Court, after notice and a hearing, to be a claim or expense for which that
person should not receive indemnity, contribution, or reimbursement
under the terms of the Engagement Letter as modified by this Order; and

c.      if, before the earlier of (i) the entry of an order confirming a chapter 11
plan in these chapter 11 cases (that order having become a final order no
longer subject to appeal) and (ii) the entry of an order closing these
chapter 11 cases, Piper Sandler believes that it is entitled to the payment
of any amounts by the Debtors on account of the Debtors'
indemnification, contribution or reimbursement obligations under the
Engagement Letter (as modified by this Order), including, without
limitation, the advancement of defense costs, Piper Sandler must file an
application before this Court and the Debtors may not pay any such
amounts before the entry of an order by this Court approving the
payment; *provided*, *however*, that for the avoidance of doubt, this
subparagraph (c) is intended only to specify the period of time under
which this Court shall have jurisdiction over any request for fees and

4

expenses for indemnification, contribution, or reimbursement and not a provision limiting the duration of the Debtors' obligation to indemnify Piper Sandler.

7.    To the extent that there may be any inconsistency between the terms of the Application, the Stratton Declaration, the Engagement Letter, and this Order, the terms of this Order shall govern.

8.    Any party in interest shall have twenty-one (21) days from the service of this Order to file an objection to the Application and/or the relief provided in this Order.

9.    If an objection is timely filed, counsel for the Debtors will set the Application and all such objections for hearing pursuant to the Court's Open Calendar Procedures.

10.    If no objection to this Order is timely filed, this Order shall be a final Order approving the Application.

11.    The Debtors and Piper Sandler are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

12.    Notice of the Application as provided therein is deemed to be good and sufficient notice of such Application.

13.    Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

14.    The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

15.    Counsel for the Debtors is directed to serve a copy of this Order on all the parties that received service of the Application within three (3) days of the entry of this Order and to file a certificate of service with the Clerk of Court.

[END OF ORDER]

Prepared and presented by:

/s/ *Sarah R. Borders*
Sarah R. Borders
Georgia Bar No. 610649
Jeffrey R. Dutson
Georgia Bar No. 637106
Leia Clement Shermohammed
Georgia Bar No. 972711
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: jdutson@kslaw.com
Email: lshermohammed@kslaw.com

*Proposed Counsel for the Debtors in Possession*

## **EXHIBIT B**

**Stratton Declaration**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE KRYSTAL COMPANY, *et al.*,[1] | ) | Case No. 20-61065 (PWB) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF TERI STRATTON IN SUPPORT OF
DEBTORS' APPLICATION FOR ENTRY OF AN ORDER
AUTHORIZING THE EMPLOYMENT AND RETENTION OF
PIPER SANDLER & CO. AS INVESTMENT BANKER FOR THE DEBTORS
AND DEBTORS IN POSSESSION EFFECTIVE FROM THE PETITION DATE**

I, Teri Stratton, hereby state and declare as follows:

1.      I am a Managing Director at Piper Sandler, an investment banking and financial advisory firm with principal offices located in Minneapolis, New York, Chicago, Houston and San Francisco as well as at other locations throughout the United States and abroad.  This Declaration is submitted in support of the *Application for Entry of an Order Authorizing the Employment and Retention of Piper Sandler & Co. as Investment Banker for the Debtors and Debtors in Possession Effective from the Petition Date* (the "Application")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order approving the Debtors' employment and retention of Piper Sandler as investment banker

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Krystal Company (4140); Krystal Holdings, Inc. (5381); and K-Square Acquisition Co., LLC (8916).  The location of the Debtors' corporate headquarters and service address is: 1455 Lincoln Parkway, Suite 600, Dunwoody, Georgia 30346.

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings given to them in the Application.

effective from the Petition Date, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code.

2.       Except as otherwise stated in this Declaration, I have personal knowledge of or have relied upon the knowledge of others employed by Piper Sandler with respect to the matters set forth herein.[3]  If called to testify, I could and would testify competently to the facts set forth herein.

3.       Piper Sandler has agreed to provide investment banking services to the Debtors in the above-captioned chapter 11 cases pursuant to the terms and conditions set forth in that certain engagement letter and attached annexes between the Debtor and Piper Sandler dated as of December 21, 2019 (the "Engagement Letter"), a true and correct copy of which is attached to the Application as **Exhibit C**.

4.       I believe that Piper Sandler and the professionals that it employs are uniquely qualified to advise the Debtors in the matters for which Piper Sandler is proposed to be employed.  Piper Sandler provides a broad range of advisory services to its clients, including investment banking, securities brokerage, and other financial advisory services.

5.       In connection with its retention by the Debtors, Piper Sandler researched its client database to determine whether Piper Sandler had any relationships with the classes of entities identified by the Debtors as potential parties in interest (the "Potential Parties in Interest").  A list of the Potential Parties in Interest is attached hereto as **Schedule 1**. Specifically, Piper Sandler (i) entered the names of the Potential Parties in Interest into a

---

[3]    Certain information set forth herein relates to matters (i) contained in Piper Sandler's books and records and (ii) within the knowledge of other Piper Sandler' employees, and is based on information provided by them.

computer database containing its financial advisory and investment banking engagements (each a "Client," and, collectively, the "Clients"), (ii) compared the names of all Potential Parties in Interest to lists of companies for which Piper Sandler publishes research reports or makes a market in the company's securities, and (iii) compared the names of the Potential Parties in Interest to a list of vendors to Piper Sandler (each a "Vendor," and, collectively, the "Vendors").

6.      To the extent that the inquiry in subsection (i) above revealed that certain of the Potential Parties in Interest were current or former Clients of Piper Sandler's investment banking group (the "Investment Banking Group"), these parties were identified on a list (the "Client Match List") attached hereto as **Schedule 2**.  To the extent that the inquiries in subsections (ii) and (iii) above revealed that certain of the Potential Parties in Interest were Vendors, or that Piper Sandler publishes research reports on the company or makes a market in the company's securities, these parties were identified in a list attached hereto as **Schedule 3**. Through the information generated from the aforementioned inquiries, Piper Sandler determined that the matters identified on **Schedule 2** and **Schedule 3** hereto all concern matters unrelated to the Debtors.  The nature of the connections identified on **Schedule 2** and **Schedule 3** is explained in such schedules.  Piper Sandler will not advise any entity other than the Debtors in matters related to these chapter 11 cases.

7.      To the best of my knowledge, information, and belief, neither Piper Sandler nor any employees of Piper Sandler is, or was within two years before the commencement of these chapter 11 cases, a director, an officer, or an employee of the Debtors.  Also, to the best of my knowledge, information, and belief, neither the undersigned nor the Piper Sandler professionals

expected to assist the Debtors are connected to the United States Bankruptcy Judge presiding over these chapter 11 cases or any persons employed by the Office of the United States Trustee for the Northern District of Georgia.

8.    Given the breadth of Piper Sandler's client and customer base, it is possible that Piper Sandler may have business relationships with certain of the professionals involved in these chapter 11 cases.  Piper Sandler is involved in numerous cases, matters, and transactions involving many different professionals, investors, lenders, accountants, and financial consultants, some of whom may represent claimants and parties in interest in these chapter 11 cases.  Further, Piper Sandler may have in the past, and may in the future, be represented by or advised several attorneys and law firms in the legal community, some of whom may be involved in these chapter 11 cases.  Finally, Piper Sandler has in the past, and may in the future, work with or against other professionals involved in these cases in matters wholly unrelated to these chapter 11 cases.  Based upon our current knowledge of the professionals involved in these chapter 11 cases, and to the best of my knowledge, none of these business relationships constitute interests adverse to the estates in matters with respect to which Piper Sandler is to be employed, and none are in connection with these chapter 11 cases.

9.    As noted above, Piper Sandler provides a broad range of services to its clients. Piper Sandler's investment banking services are provided through the Investment Banking Group.  The services to be provided to the Debtors under the Engagement Letter will be provided only by Piper Sandler' Investment Banking Group personnel and certain other non-Investment Banking Group personnel who may from time to time be needed to assist the Investment Banking Group during the course of this engagement.  Information walls exist

between Piper Sandler's Investment Banking Group and the remainder of Piper Sandler (including the fixed income and equity departments of Piper Sandler). These information walls include physical and technological barriers, compliance and surveillance mechanisms and policies and procedures designed to prevent confidential information from being shared improperly. In the event that the Investment Banking Department needs the assistance of any non-Investment Banking Department personnel during the course of this engagement, such non-Investment Banking Department personnel would be brought within the Investment Banking Department's information barrier group, pursuant to certain procedures designed to maintain the effectiveness of the information barrier.

10.     As of the date hereof, Piper Sandler and its affiliates have approximately 1,500 employees. It is possible that certain of Piper Sandler's and its affiliates' respective directors, officers, and employees may have had in the past, may currently have, or may in the future have connections to (i) the Debtors, (ii) Potential Parties in Interest in these chapter 11 cases, or (iii) funds or other investment vehicles that may own debt or securities of the Debtors or other Potential Parties in Interest. To the best of my knowledge, and except as otherwise disclosed herein, Piper Sandler's professionals that will be responsible for this engagement do not have any material business associations with, or hold any material interests in or adverse to, the Debtors or Potential Parties in Interest in these chapter 11 cases. Such professionals, however, may personally own or continue to own securities or other interests or investments in various of the Potential Parties in Interest (all unrelated to the Debtors and these chapter 11 cases).

11.     The Debtors have numerous creditors and relationships with various individuals and entities that may be parties in interest in these cases. Consequently, although every

5

reasonable effort has been made to discover and eliminate the possibility of any conflict, including the efforts outlined above, Piper Sandler is unable to state with certainty whether any of its clients or an affiliated entity of a client holds a claim or otherwise is a party in interest in these chapter 11 cases.  Additionally, Piper Sandler may be involved in litigation from time to time that may, or may in the future, involve entities that may be parties in interest in these cases.  If Piper Sandler discovers any information that is contrary to or pertinent to the statements made herein, Piper Sandler will promptly disclose such information to the Court.

12.     During the ninety (90) day period prior to the commencement of these cases, Piper Sandler was paid in the ordinary course certain Monthly Fees and expense reimbursements.  Specifically, Piper Sandler was paid (i) $75,000 on account of its December 2019 Monthly Fee on January 8, 2020 and (ii) $75,000 on account of its January 2020 Monthly Fee on January 17, 2020.  To the extent that any other amounts remained due as of the Petition Date, Piper Sandler has agreed to waive such amounts upon the approval of its engagement by the Debtors.

13.     The Fee and Expense Structure set forth in the Application is consistent with Piper Sandler's typical fees for work of this nature.  The fees are set at a level designed to compensate Piper Sandler fairly for the work of its professionals and assistants and to cover fixed and routine overhead expenses.  It is Piper Sandler's policy to charge its clients for all disbursements and expenses incurred in the rendition of services.

14.     The Fee and Expense Structure is comparable to those generally charged by investment banking firms of similar stature to Piper Sandler and for comparable engagements, both in and out of court, and reflect a balance between a fixed, monthly fee, and a contingency

6

amount which are tied to the consummation and closing of a transaction as contemplated in the Engagement Letter.

15.    It is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys.  Piper Sandler's restructuring professionals, when formally retained in chapter 11 cases, and when required by local rules, do, and in these cases will, keep time records in half-hour increments describing their daily activities and the identity of persons who performed such tasks.  Piper Sandler will also supplement this information with a list of the non-restructuring professionals who assist the restructuring department on this matter but who do not, as a matter of general practice, keep records in the same manner.

16.    The Engagement Letter was negotiated at arm's length and in good faith, and I believe that the provisions contained therein are reasonable terms and conditions of Piper Sandler's employment by the Debtors.   With respect to the Engagement Letter's indemnification provisions, unlike the market for other professionals that a debtor or committee may retain, indemnification is a standard term of the market for investment bankers.  The indemnity is comparable to those generally obtained by investment banking firms of similar stature to Piper Sandler and for comparable engagements, both in and out of court.

17.    Other than as set forth above, there is no proposed arrangement between the Debtors and Piper Sandler for compensation to be paid in these cases.  Piper Sandler has no agreement with any other entity to share any compensation received, nor will any be made, except as permitted under Bankruptcy Code section 504(b).

18.    The foregoing constitutes the statement of Piper Sandler pursuant to section 504 of the Bankruptcy Code and Bankruptcy Rules 2014(a) and 5002.

*[Remainder of Page Intentionally Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: February 5, 2020

Teri Stratton
Managing Director
Piper Sandler & Co.

**<u>Schedule 1</u>**

**Potential Parties in Interest**

## The Krystal Company, *et al.*

***Debtors***

The Krystal Company
Krystal Holdings, Inc.
K-Square Acquisition Co., LLC

***Affiliates of the Debtors***

Krystal Parent Holdings, LP
Parallel Funds, LPs
Argonne Capital
Argonne Capital Partners I, LP
Argonne Capital Partners Parallel I, LP
K-Square Realty, LLC
Charles, Frederic & Co.
GCM Grosvenor Secondary Opportunities Fund II, L.P.
HL Secondary Aggregator I L.P.
HSLF IV Holdings LP
Krystal Parent Holdings, LP
Matisse 402, LP
Picasso 304, LP
Strategic Partners VII Investments, L.P.
Elite Restaurant Blocker, LLC
Elite Restaurant MII, LLC
Elite Restaurant Parent Holdings, LP
K-Square GP, LLC
K-Square Restaurant Partners, LP
K-Square Restaurants, LLC

***Current Officers and Directors***

Elliot, Michael
Hardin, Tony
Klump, Michael
Jaeger, Karl
Jefferson, Catherine
Losacco, Dominic
Christensen, Sherman
Perras, Sloane S.

Root, Michael S.
Vermilyea, Bruce J.
Ward, Tim
Wood, Michael L.

***Former Officers and Directors (During Past Two Years)***
Abelkop, Jason T.
Epley, Berry L.
Janjua, Omar R.
Macaluso, Paul M.

***Top 30 Unsecured Creditors***
THE TOMBRAS GROUP
US FOODS, INC.
RADIANT SYSTEMS
SLM WASTE & RECYCLING SERVICES, INC
VEREIT
UNITED HEALTH CARE
ALETHEIA MARKETING & MEDIA LLC
MARRIOTT INTERNATIONAL AND SAWGRASS MARRIOTT GOLF RESORT & SPA
FIREEYE INC
FLOWERS BAKING COMPANY OF OPELIKA
INTERGRATED GRAPHICS, LLC
QUATRRO FPO SOLUTIONS, LLC
MCGUIREWOODS LLP
YEXT, INC.
SNAP TECH IT, LLC
JOHNSON CONTROLS
CSI OF THE SOUTHEAST INC
STRATEGIC EQUIPMENT AND SUPPLY
REPUBLIC SERVICES NATIONAL ACCOUNTS, LLC
HALO BRANDED SOLUTIONS, INC
RAGONA ARCHITECTURE & DESIGN PLLC
DTT SURVEILLANCE
HORIZON RIVER TECHNOLOGIES, LLC
AR GLOBAL
PREFERRED PREMIUM PROPERTIES, LLC
COLLINS, WANDA

HOBBS, ROBIN
REALTY INCOME, LP
STORE CAPITAL CORP/STORE MASTER FUNDING I, LLC
PENSION BENEFIT GUARANTY CORPORATION

### Secured Lenders
Wells Fargo Bank, National Association
Regions Bank
Cadence Bank, N.A.
Citizens Bank, N.A.
First Tennessee Bank National Association
Webster Bank, National Association
KRY, LLC

### Depository Banks (Excluding Secured Lenders)
Ameris Bank
Bank of Dade
BB&T
Citizens State (Peoples Bank)
Crystac Property I LLC
Crystac Property II LLC
First Federal Bank
GE Capital Franchise Finance Corporation
Hancock Bank
Harbor Community Bank
Live Oak Restaurant Services, LLC
National Bank of TN
Planters First
Sterling National Bank
Sun Trust Bank
T.B. of Starke, Inc.
TN State Bank
U.S. Bank Equipment Finance, a Division of U.S. Bank National Association
U.S. Realty Advisors, LLC

### Equipment Lessors
Konica Minolta

***Insurers, Insurance Brokers and Insurance Financers***
AFCO Insurance Premium Finance
Beazley Ins Co
Constitution States Services LLC
Continental Casualty Co
Everest National Insurance Company
Federal Insurance Company
Fireman's Fund Insurance Company
Indian Harbor Insurance Company
Lloyds of London
Mitsui Sumitomo Insurance Company of America
Selective Insurance Company of the Southeast
Southeast Series of Lockton Companies, LLC
The Hartford
The Travelers Indemnity Company of America
Travelers Property Casualty Company of America
CNA
Zurich North America

***Franchisees***
Abblitt Corporation
Anand Patel
B & B Inc. of Garcon Point
B&B Garcoon PT
Big Easy Enterprises, LLC
BJKF, LLC
Circle K Stores, Inc. (Flash Foods)
Circle K Stores, Inc. (The Pantry)
Craddock Oil
DDB&G Enterprises, Inc.
Doogan Mountain Foods, Inc.
Double Quick Inc.
Ejay Foods, Inc.
Faye Foods, Inc.
Fidelity Foods
Flash Foods
Goldt, LLC
GPM Investments, Inc.

Griggs Foods, Inc.
GSM
Kalpesh Das
KPG Investments, Inc.
Lasseter
Lyon Management Company
Meridian Squared, Inc.
MONT J'S, LLC
Moses, Mike
PAW Foods, Inc.
Robden Enterprises, Inc.
SLD, Inc.
Sonny Lyon
Steve Roberson
The Franville Corporation
WAC Enterprises, Inc.
Walter W. Lyon
What A Combo, Inc.

***Landlords***
1 CHIX, LLC
1045 Ellis Avenue Owner, LLC
182 Emerson, LLC
200 South Germantown, LLC
4248 South Dale Mabry Highway, LLC
522 Highway, LLC
747 RUSSELL PARKWAY, LLC
923 6th Street, LLC
Adeline Pepper/Susan P Lile
Airport Properties, LLC/Montgomery Mobile Investments, LLC
Alan B. Watts, and successors, Trustee of the Alan B. Watts Trust dated July 18, 2014
AMIR IBRAHIM LLC
Andrew J. Lineberry Living Trust
Ansonia Properties, LLC
Anthony Perricone, Trustee/Linda Renfroe, Trustee
AR Global
ARC DB5PROP001 LLC (AR Global)
ARC DB5PROP001, LLC (Vereit)

ARC KL VVHALOO 1, LLC (Vereit)
ARC KLABYGA001, LLC (VEREIT)
ARC KLATLGA001, LLC (VEREIT)
ARC KLATLGA002, LLC (VEREIT)
ARC KLATLGA00L, LLC (Vereit)
ARC KLAUGGA001, LLC (VEREIT)
ARC KLCBSGA001, LLC (VEREIT)
ARC KLCNTMS001, LLC (VEREIT)
ARC KLCTNTN001, LLC (VEREIT)
ARC KLCTNTN002, LLC (VEREIT)
ARC KLEPTGA001, LLC (VEREIT)
ARC KLGFPMS001, LLC (VEREIT)
ARC KLGFPMSOOI , LLC (Vereit)
ARC KLHVLAL001, LLC (VEREIT)
ARC KLHVLAL002, LLC (VEREIT)
ARC KLHVLAL003, LLC (VEREIT)
ARC KLJACFL001, LLC (VEREIT)
ARC KLKNXTN001, LLC (VEREIT)
ARC KLKNXTN00L, LLC (Vereit)
ARC KLLWBTN001, LLC (VEREIT)
ARC KLMCNGA001, LLC (VEREIT)
ARC KLMDGGA001, LLC (VEREIT)
ARC KLMFBTN001, LLC (VEREIT)
ARC KLMGY AL002, LLC (Vereit)
ARC KLMGYAL001, LLC (VEREIT)
ARC KLMGYAL002, LLC (VEREIT)
ARC KLMGYAL003, LLC (VEREIT)
ARC KLMPSTN001, LLC (VEREIT)
ARC KLMPSTN002, LLC (VEREIT)
ARC KLORLFL001, LLC (VEREIT)
ARC KLORLFL002, LLC (VEREIT)
ARC KLPLCFL001, LLC (VEREIT)
ARC KLPRLMS001, LLC (VEREIT)
ARC KLSAGFL00 1, LLC (Vereit)
ARC KLSAGFL001, LLC (VEREIT)
ARC KLSNVGA001, LLC (VEREIT)
ARC KLSNVGA00L, LLC (Vereit)
ARC KLTCLAL001, LLC (VEREIT)

ARC KLVLYAL001, LLC (VEREIT)

ARC KLVVHAL001, LLC (VEREIT)

B&M Development Properties, LTD.

Barker's Village, Inc.

Batka, LLC

Beard Holdings, LLC

Ben R. Stevens

BEST CHOICE BURGER

Bohnebarn, LLC

Bonanza Real Estate Holdings, LLC

BOURTOS ENTERPRISES, INC. D/B/A THE SHEIK

Brian S. Munn/R. Jennifer Munn

Brice Shannon, LLC

Brigham Limited

Brooks Hubbard/Kathleen T. Hubbard

Buckhead 14th KB, LLC c/o Newburger-Andes & Company, Inc.

C&L Properties, Inc.

Calvin Walker, Sr./The Walker Management Trust

Capview Income & Value Fund IV, LP

Carpello Family Trust dated February 5, 2004

Cirignano Limited Partnership #3

Clara Schmidt 2012 Family Trust

Clark Dothan LLC

Clark/Willmschen Holdings 2, LLC

CNL Net Lease Funding 2001, LP (VEREIT)

Colluro Family Partners, LLLP

Colvis Investments, LLC

Conrad Marietta, LLC

Crescent Sunset Properties, LLC

Cummings & Associates, Inc.

Davis M Bohler TR Under Item VII, Synovus Trust Company, Successor Trustee

DeGiacomo Holdings, LLC

Desai Holdings, LLC

Dixie Thomas Downer

DJ Rash Realty Company, LLC

Dr. John A. Young/Peggy D. Young

DSS Krystal Conyers, LLC

DSS Krystal Jonesboro, LLC

DSS Krystal Stockbridge, LLC

Duggin Family Limited Partnership

Dung H. Pham/Regina T. Pham

Eden Star Property, LLC

Edwin B. Raskin Co.

Edwin M. Brown/Jessie A. Brown

Emma Lee Hamilton

Fairburn Investments LLC (Gals Real Estate)

Faith Summerson, Trustee

Fan Properties, a Tennessee General Partnership

FCPT Holdings, LLC

GAM Development, LLC

Gate Petroleum Company

George A. Knasi/Susan R. Knaysi

Gloria D. McColl Powell, Trustee

Gosh Enterprises, Inc.

Graham I, LLC

Grigory Barshay dba 747 Russell Parkway, LLC

Guaranty Loan & Real Estate Co.

Hachmann, LLC

Hannah Rocks, LLC

Harden Oil Company, Inc/Willis N Harden, Jr Family Partnership

Hardy Realty and Development Co

IH Krystal Fairburn, LLC/Fairburn KB Freestanding, LLC

J. Brian Gleghorn and Diana Denise Gleghorn, as Trustees of the DB Gleghorn Family
        Revocable Trust Dated February 16, 2006

Jack Jenkins/Claire McFarland Osborn

James A. Miller and A. Elaine Miller, Cotrustees of the Miller Family Trust dated November 5,
2014, a California trust

James Francis McFadden/Maureen Scully McFadden

Jay Shree Ambe, LLC

Jean M Mayer Charitable Remainder Trust

Jefferson Davis Family, LLC/Shropshire Properties, LLC

JER Ocala, LLC

Jerry Hipps

Jet-10 Partnership

JGM Properties, LLC

JMT Land Holdings, LLC

John Carl Blow

Joseph L. Arrighi/Patricia L. Arrighi

Julie Deal, as Trustee of The Julie Deal Krystal Trust

Kalies Properties, LLC

KB Ringgold GA, LLC

Kenneth W. Valk and Jessica H Stansberry 2002 Revocable Trust

Khan Investments of Jacksonville, LLC

Kry Warner Robins Realty, LLC

Krystal - Cleveland, MS, LLC

Krystal Columbus DT, LLC

Krystal Commerce, LLC

Krystal Owned

Krystal V, LLC

Kushner White Associates LP

Ladas Land and Development, Inc.

Lake Point KB, LLC

Laporte, Inc.

LEENA F&B INC.

Lehigh Gas Wholesale Services, Inc.

Lewis Commercial Properties, LLC

Loren LLC

LOS BALITO'S TACO SHOP

M & M Matrix/M & M Medley

M and C Bohne, LLC

Malad Nashville Enterprises, LLC

Malloy Fish Holdings, LLC

Maria, George, and Dimitrios Hrysikos

Mark Lineberry, as Trustee of the Andrew J, Linberry Living Trust under Trust Agreement
        Dated April 2, 2001

Marrero Land and Improvement Association, Ltd

Marvin Espinola

Mary Ann Sage, Trustee of Sanford Sage Trust

McKrystal, LLC

Mile High, LLC

MITCHELL MANAGEMENT OF FLORIDA

Nancy Bradford Booth

Nolensville Old Hickory, LLC

Nunes California Properties, LLC

Oak Creek Family Limited Partnership
OceanSky International, LLC
O'Mar, Inc.
PAD P Partners, LP
PARMENTER REIT FUND V, LLC
Paul Taylor, Trustee of the Taylor 2017 Trust Under Declaration of Trust Dated March 14, 2017
Peach Willow, LLC
PHSK, LLC
Phyllis Uyemura
Pickwick Plaza, LLC
Pope Shenouda and Ava Hedra LLC
PPB&D, Inc
Praxis, LLC
Preferred Premium Properties, LLC
Rachel M. Pruett
Realty Income (Pool 1)
Realty Income (Pool 2)
RI CK2, LLC - Pool 1 (Realty Income)
RI CK2, LLC - Pool 2 (Realty Income)
Robert E Sykes, Jr
Robert Laing
Rock Solid, LP
Sai Shakti, LC
SAKI LIN, LLC
Sam Nasrallah, successor trustee of the Julie Deal Trust
Sam's Seafood
Shake's of Orange Park, LLC
Sherri Miceli-Hurley Revocable Trust
Shiv Investment of Panama City, LLC
Shiva Meladi, LLC
Smith & Lee, LLC
Smokey Mountains, LLC
SPP Investments, LLC
STAR STORES, LLC
Store Capital
Store Master Funding I, LLC (Store Capital)
Sunshine Car Care, LLC

Susan J. Vose Trust of 2002
SUSAN P LILE
Suzanne L. Harris
T.B. of Starke, Inc.
Tabka, LLC
Tarek M. Mogharbel, Trustee/Mira M. Majzoub, Trustee
Tenn Partners, LLC
The DB Gleghorn Family Revocable Trust
The Estate of Sidney Steinberg
The Friedrich Family Trust
The Paladini Family Trust- Archille G. Paladini, Trustee
The Thang P. Bui Revocable Living Trust
Tindell Properties, LLC
Tony & Le Thi Nguyen, Trustees of Tony Nguyen Family Trust
Town and Tennis, LP
Troismange (C. Robert Clark/Bright Interests, Inc.)
Trustees of The Paul D. Fulwood IV, Trust II
VEREIT
Vision Real Estate, LLC
VVDT Investments LLC
Will Hill Newton Jr
Willard Scarbro Family, L.P.
William C Smith
Willliam C. Demetree and Jack C. Demetree as Assigned to Pickwick Plaza, LLC
William F. Kiker/Annette M. Kiker
William J. Wanagaitis
Wright National, LLC
WTD Investments II, LLC
Yardbirds of Northwest Florida II, LLC
Zeavy, LLC

***Material Contract Counter-Parties***
Diversified Commercial Builders
Ecova, Inc.
Exopsol, LLC
Horizon River Technologies, LLC
Kraft Heinz Foods Company
Kraft Heinz (Kool-Aid Licensing)

Marvin F. Poer and Company
Medcor
Mittauer & Associates
Netsurion LLC
PepsiCo Sales, Inc.
Pham, Jenifer
Quatrro FPO Solutions, LLC
Republic Services
Scholarship America
ServSafe
SLM Waste & Recycling Services, Inc.
SMG
Smith & Howard
Spartan
Steritech Brand Standards (Rentokil North America, Inc.)
Techknow, Inc.
The Fidelity and Deposit Company of Maryland
Travelers Companies, Inc.
Travis Meats, Inc.
UberEATS (Portier, LLC)
University of Alabama
US Foods, Inc.
Worldpay, LLC
XL Catlin
Zeavy Jacksonville

***Governmental Agencies***
U.S. Department of Agriculture
Agricultural Marketing Service
Fair Trade Practices Program, PACA Division
Pension Benefit Guaranty Corporation
Florida Department of Environmental Protection
Mississippi Department of Environmental Quality
Orange County (FL) – Environmental Protection Division
Tennessee Department of Environmental and Conservation

**Bankruptcy Professionals**
King & Spalding LLP
Scroggins & Williamson, PC
Alvarez & Marsal North America LLC
Kurtzman Carson Consultants LLC
Piper Sandler & Co.
The Phoenix Group

**Ordinary Course Professionals**
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Evershed Sutherland (US) LLP
Seyfarth Shaw LLP
McGuireWoods LLP
Bodker, Ramsey, Andrews, Winograd & Wildstein, P.C.
Taylor English Duma LLP
Jones, McKnight and Edmonson PC
Quatrro FPO Solutions, LLC
Smith & Howard
Marvin F. Poer and Company
Gray Plant Mooty Mooty & Bennett  P.A.
PricewaterhouseCoopers

**Bankruptcy Judges for the Northern District of Georgia**
Bonapfel, Paul W.
Hagenau, Wendy L.

**The Office of the U.S. Trustee for the Northern District of Georgia**
Adrian Lee
Alexandria R. Davis
Alisa K. Streete
Anne Cabrera
Beth Brown
Chevonne Ducille
David Weidenbaum
Deborah R. Jackson
Elaine A. Thompson
Israel Ham
Julee Rimes

Kenny Elwood

Lindsay Kolba

Lisa Kelly Maness

Martin P. Ochs

Mary Kay Baltzell

Michele Stephens-Taylor

Nancy J. Gargula

Nathan Garmon

R. Jeneane Treace

Randal D. Ennever

Sherri Carlberg

Sheryl L. Ewen

Thomas Dworschak

## <u>Schedule 2</u>

### Client Match List

***Secured Lenders***
Wells Fargo Bank, National Association
Cadence Bank, N.A.
Citizens Bank, N.A.

***Depository Banks***
Hancock Bank
Sterling National Bank

***Material Contract Counter-Parties***
PepsiCo Sales, Inc.

***Insurers, Insurance Brokers, and Insurance Financers***
Selective Insurance Company of the Southeast

## **Schedule 3**

**Potential Parties in Interest that are Also
Piper Sandler Vendors and/or Entities on which Piper Sandler
Publishes Research Reports or Makes a Market in the Entity's Securities**

*NONE*

## EXHIBIT C

**Engagement Letter**

# PiperJaffray®

CONFIDENTIAL

December 21, 2019

The Krystal Company
1455 Lincoln Pkwy, Suite 600
Dunwoody, GA 30346
<u>Attn:  Jon Tibus</u>

<u>Re:</u>      <u>Engagement Letter</u>

Ladies and Gentlemen:

This letter agreement (the "***Agreement***") confirms the terms under which The Krystal Company (the "***Company***" or "***you***") has engaged Piper Jaffray & Co. ("***Piper Jaffray***", "***we***" or "***us***") as your exclusive financial advisor. For purposes hereof, the term "Company" includes subsidiaries of the Company and any entity that the Company or its subsidiaries may form or invest in and shall also include any successor to or assignee of all or any substantial portion of the assets and/or businesses of the Company. The matters referred to in this Agreement constitute our "***Engagement***".  This Agreement shall be effective as of December 21, 2019.

*1.*      S*ERVICES TO BE* R*ENDERED.*

The financial advisory services to be provided by Piper Jaffray shall include the following:

***General Financial Advisory and Investment Banking Services***.  To the extent requested by the Company, we shall:

(a)      Familiarize ourselves with the business, operations, properties, financial condition and prospects of the Company;

(b)      Review the Company's financial condition and outlook;

(c)      Assist you in your development of financial data;

(d)      Present to the Company's Board of Directors, creditors, as you request;

(e)      Analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(f)      Evaluate the Company's debt capacity and alternative capital structures;

(g)      Participate in negotiations among the Company and its creditors, suppliers, lessors and other interested parties with respect to any of the transactions contemplated by this Agreement; and

(h)      Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of any of the transactions contemplated by this Agreement, as requested and mutually agreed.

***Sale Services***.  We shall:

35884397.v4

-2-

(a)     Provide financial advice to the Company in structuring, evaluating and effecting a value-maximizing Sale (as defined below), identify potential purchasers and, at the Company's request, contact and solicit potential purchasers;

(b)     Assist in arranging and executing a Sale, including identifying potential purchasers or parties in interest, assisting in the due diligence process, assisting in the review of letters of intent and the selection of a stalking horse bidder, conducting the auction, if any, and negotiating the terms of any proposed Sale; and

(c)     Appearing in court and testifying in any Court proceeding related to the Sale.

For purposes of this Agreement, the term "***Sale***" shall mean the disposition in one or a series of related transactions of all or substantially all of the assets or businesses of the Company or its subsidiaries.

***Restructuring Services***.  To the extent requested by the Company, we shall:

(a)     Analyze various Restructuring (as defined below) scenarios and the potential impact of these scenarios on the value of the Company and recoveries of stakeholders;

(b)     Provide strategic advice with regard to restructuring or refinancing the Company's obligations;

(c)     Provide financial advice and assistance to the Company in developing a Restructuring;

(d)     In connection therewith, provide financial advice and assistance to the Company in structuring any new securities to be issued under a Restructuring; and

(e)     Assist the Company and/or participate in negotiations with entities or groups affected by the Restructuring.

For purposes of this Agreement, the term "***Restructuring***" means any recapitalization, modification, restructuring or reorganization (whether or not pursuant to chapter 11 ("***Chapter 11***") of the title 11 of the United State Code (the "***Bankruptcy Code***")) of the Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities (including partnership interests, lease obligations, trade credit facilities (but for the avoidance of doubt, not the negotiation by the Company of adjustments of bills from vendors in the ordinary course) and/or contract or tort obligations) (collectively, the "***Obligations***"), including pursuant to any repurchase, exchange, conversion, cancellation, forgiveness, retirement, plan, solicitation of consents, waivers, acceptances, authorizations and/or a modification or amendment to the terms, conditions or covenants thereof (provided such terms, condition or covenants are amended for a period exceeding twelve months); provided that a Restructuring does not included a Sale.

***Generally***.  Notwithstanding anything contained in this Agreement to the contrary, we shall have no responsibility for designing or implementing any initiatives to improve the Company's administration, organization, operations, profitability, cash management or liquidity, or to provide any fairness, valuation, or solvency opinions or to make any independent evaluation or appraisal of any assets or liabilities of the Company or any other party; provided, for the avoidance of doubt, we will, to the extent requested, provide the services described in Section 1(d) in "***General Financial Advisory and Investment Banking Services***." We make no representations or warranties about the Company's ability to (i) successfully improve its operations, or (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring.  We are retained under this Agreement solely to provide advice and services regarding the

-3-

transactions contemplated by this Agreement. Our Engagement does not encompass providing "crisis management" and business consulting services to the Company.

The advisory services and compensation arrangements set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by us at the written request of the Company, or any other specific services not set forth in this Agreement.  The terms and conditions of such investment banking services, including compensation and arrangements, would be set forth in a separate written agreement between us and the Company.

*2.*    *COMPENSATION*

As compensation for our services, the Company agrees to pay us in cash, by wire transfer of immediately available funds when due, the following fees (individually or collectively, "***Fees***"):

(a)        a monthly financial advisory fee ("***Monthly Fee***") of $75,000 for each month of the Engagement, with the first Monthly Fee due and payable on the date hereof, and each subsequent Monthly Fee due and payable in advance of each subsequent calendar month commencing on January 20, 2020; with one-half of each Monthly Fee being credited against any Sale Fee earned hereunder; plus

(b)        a Restructuring fee ("***Restructuring Fee***") in the amount of $1,250,000, payable promptly upon consummation of a Restructuring;

(c)        a Sale fee ("***Sale Fee***") equal to four percent (4.0%) of the Transaction Value of a Sale, payable promptly upon consummation of such Sale.

The minimum fee under (b) or (c) shall be $1,250,000 (the "***Minimum Fee***").

Notwithstanding the foregoing, Piper Jaffray shall not be paid both a Restructuring Fee and a Sale Fee in connection with the same transaction.  For the avoidance of doubt, where the nature of the transaction and services provided may fall into more than one category, the highest of any of the Restructuring Fee or Sale Fee shall apply.  In addition, Piper Jaffray shall not be paid a fee with respect to any DIP financing provided to and incurred by the Company.

For the purpose of calculating a Sale Fee,  "***Transaction Value***" shall include without limitation and without duplication: (i) all cash (including escrowed amounts, and other withheld amounts) paid or payable to the Company or its owners by the purchaser in the transaction; (ii) the fair market value of all notes, securities and other property issued or delivered or to be issued or delivered to the Company by the purchaser in the transaction; (iii) indebtedness for borrowed money of the Company assumed by the purchaser in an acquisition of assets and the amount of any capitalized lease obligations of the Company that are assumed by the purchaser in an acquisition of assets; (iv) the net present value of any contingent payments (whether or not related to future earnings or operations); and (v) the amount of any extraordinary dividends or distributions payable to the Company's securityholders after repayment in full of all bank debt and other senior obligations as required under the Bankruptcy Code.  For purposes of computing Transaction Value hereunder, non-cash consideration shall be valued as follows: (a) publicly traded securities shall be valued at the average of their closing prices (as reported in The Wall Street Journal or other reputable source reasonably designated by us if The Wall Street Journal does not publish such closing prices) for the five trading days prior to the closing of the transaction, (b) options shall be valued using the treasury stock method without giving effect to tax implications, and (c) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by us and the Company.

-4-

3.    *EXPENSES*

In addition to our fees for professional services, the Company agrees that it will promptly reimburse us for all of our reasonable out-of-pocket costs and expenses ("*Expenses*") (including, without limitation, (i) reasonable legal fees and expenses of Piper Jaffray, (ii) reasonable appraisal, consulting and audit fees, and (iii) reasonable travel and hotel expenses, document delivery, and publicity costs) and for a reasonable allocation of database, courier and communication costs, incurred by Piper Jaffray in connection with each transaction contemplated hereby and the Engagement, as incurred by Piper Jaffray.  The Company's obligation to reimburse expenses incurred by us in connection with the Engagement will survive the completion or termination of the Engagement.

4.    *BANKRUPTCY COURT APPROVAL*

In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall use its reasonable efforts to seek an order authorizing our employment pursuant to the terms of this Agreement, as a professional person pursuant to, and subject to the standard of review of, Sections 327(a) and 328(a) of title 11 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and applicable local rules and orders and not subject to any other standard of review under Section 330 of the Bankruptcy Code.  In so agreeing to seek our retention under Sections 327(a) and 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that our general restructuring experience and expertise, our knowledge of the capital markets and our merger and acquisition capabilities will inure to the benefit of the Company in pursuing any transaction, that the value to the Company of our services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Fees are reasonable regardless of the number of hours to be expended by our professionals in the performance of the services to be provided hereunder.  The Company shall submit our employment application as soon as practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company, and use its reasonable efforts to cause such application to be considered on a prompt basis.  The employment application and the proposed order authorizing our employment shall be provided to us as much in advance of any Chapter 11 filing as is practicable, to enable us to review and approve (in our sole discretion) any such application or order prior to its filing.  Following entry of the order authorizing our employment, the Company shall pay all Fees and Expenses due pursuant to this Agreement as promptly as possible subject to (i) the approval of the court having jurisdiction of the bankruptcy case involving the Company (the "*Bankruptcy Court*"), (ii) any fee and expense guidelines, orders of the Bankruptcy Court, the Bankruptcy Rules and applicable local rules and orders, and (iii) any requirements governing interim and final fee applications.  The Company will work with us to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court.  We shall have no obligation to provide services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless our retention under this Agreement is approved under Sections 327(a) and 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court which is acceptable to us and which approves this Agreement in all material respects.  If the order authorizing our employment is not obtained, or is later reversed, modified or set aside for any reason, we may terminate this Agreement, and the Company shall promptly reimburse us for all Fees and Expenses due hereunder, including any Fees due or to become due under the tail period described in the *TERMINATION* section below.  Prior to commencing a Chapter 11 case, the Company shall pay all amounts then due and payable to us in cash. The terms of this Section are solely for our benefit, and may be waived, in whole or in part, only by us.

-5-

5.    **EXPERTISE**

The Company acknowledges and agrees that Piper Jaffray's restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of our Engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of our services hereunder could not be measured merely by reference to the number of hours to be expended by our professionals in the performance of such services.  The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of us and our professionals hereunder over the life of the Engagement, and in light of the fact that such commitment may foreclose other opportunities for us and that the actual time and commitment required of us and our professionals to perform their services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm.  In addition, given the numerous issues which we may be required to address in the performance of our services hereunder, our commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for our services for engagements of this nature in an out-of-court context, the Company agrees that all of the fee arrangements specified herein are commercially reasonable.

6.    **COMPANY INFORMATION**

You agree to furnish Piper Jaffray with such information about the Company, and its subsidiaries and affiliates and the transactions contemplated hereby as Piper Jaffray reasonably requests, including information to be included in a prospectus (including any related registration statement), private placement memorandum, offering memorandum or circular or other disclosure document.  You hereby represent and covenant to Piper Jaffray that (a) all information other than the Projections (as defined below) that has been or will be made available to Piper Jaffray by you, or any of your representatives in connection with the transactions contemplated hereby (the *"Information"*), when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in the light of the circumstances under which such statements are made, not misleading and (b) all financial projections that have been or will be made available to Piper Jaffray by you, or any of your representatives in connection with the transactions contemplated hereby (the *"Projections"*) have been and will be prepared in good faith and will be based upon assumptions believed by you to be reasonable (it being understood that projections by their nature are inherently uncertain and no assurances are being given that the results reflected in the Projections will be achieved).

You agree that if at any time prior to the Closing Date any of the representations in the preceding sentence are or would be no longer accurate and complete in all material respects, if the Information and Projections were being furnished or delivered, and such representations were being made, at any such time, then you will promptly supplement, or cause to be supplemented, the Information and Projections so that such representations will be correct in all material respects at such time.  You also agree to promptly advise Piper Jaffray of all developments materially affecting the Company or any of its subsidiaries or affiliates or the transactions contemplated hereby.  Subject to its confidentiality obligations to you, you acknowledge that Piper Jaffray may share with any of its affiliates, and such affiliates may share with Piper Jaffray, any information related to the Company or any of its subsidiaries or affiliates (including, without limitation, in each case, information relating to creditworthiness) and the transactions contemplated hereby.

In conducting the transactions hereunder, you acknowledge that Piper Jaffray is and will be using and relying on the Information without independent verification thereof.

-6-

*7.*    *W*ORK *P*RODUCT

All documents, materials or information of any kind created by us in connection with this engagement, including, without limitation, any written reports, memoranda, analyses, work papers or status summaries, whether or not delivered to the Company, are work product (collectively, "***Work Product***"). You agree not to use any Work Product except in connection with any transaction contemplated by this Agreement or otherwise within the scope of the Engagement, and not for any other purpose. Unless otherwise expressly agreed, no one, other than senior management or the Company's Board of Directors, is authorized to rely upon the Work Product. You may not publicly disclose, summarize, excerpt from or otherwise refer to any Work Product rendered by us, whether formal or informal, without our prior written consent. Notwithstanding the foregoing, the Company may disclose Work Product if, upon written advice of outside counsel, and then only to the extent required by law, order of a court of competent jurisdiction, or legal process, provided the Company shall provide us prior written notice of such requirement and cooperate with us to seek reasonable protective treatment of such Work Product.

*8.*    *S*COPE OF *P*IPER *J*AFFRAY'S *S*ERVICES

In performing its services pursuant to this Agreement, Piper Jaffray is not assuming any responsibility for the decision of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Restructuring or other transaction contemplated hereby. Piper Jaffray shall not be responsible for providing or deemed to have provided any tax, accounting, actuarial, legal or other specialist advice.

*9.*    *I*NDEMNIFICATION AND *C*ONTRIBUTION

Annex A is hereby incorporated by reference into and made a part of this Agreement.

*10.*    *U*SE AND *D*ISCLOSURE OF *A*DVICE AND *I*NFORMATION

You acknowledge that all opinions and advice we render, whether formal or informal, are intended solely for the benefit and use of your Board of Directors in its consideration of the Restructuring or any other transaction contemplated hereby. Except to the Board of Directors, your senior management and their professional advisors, no advice or opinion we render, whether formal or informal, may be disclosed, in whole or in part, or summarized, excerpted from, or otherwise referred to without our prior written consent, which consent will not be unreasonably withheld.

To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business. This means we must ask you for certain identifying information, including a government-issued identification number (e.g., a U.S. taxpayer identification number) and such other information or documents that we consider appropriate to verify your identity, such as certified articles of incorporation, a government-issued business license, a partnership agreement or a trust instrument.

You agree that Piper Jaffray has the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to you.

*11.*    *R*EPRESENTATIONS, *W*ARRANTIES AND *A*GREEMENTS OF *P*IPER *J*AFFRAY

-7-

We represent and warrant to you that Piper Jaffray is a broker-dealer registered with the U.S. Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, and is a member firm of FINRA, and at all times relevant to this engagement, will maintain such registration and membership.

**12.      OTHER MATTERS RELATING TO OUR ENGAGEMENT**

You acknowledge and agree that you have retained Piper Jaffray solely to provide the services set forth in this Agreement and that your engagement of Piper Jaffray shall not be deemed to be on behalf of, and is not intended to confer rights upon, any of your affiliates, security holders, creditors or other persons not a party hereto as against Piper Jaffray or any of its affiliates or any of their respective directors, officers, agents, employees or representatives.

In rendering such services, we will act as an independent contractor.  You acknowledge and agree that nothing in this Agreement is intended to create duties to you beyond those expressly provided for in this Agreement, and we expressly disclaim the creation of any fiduciary or agent relationship on our part. In no event, shall Piper Jaffray or any of its affiliates or agents be responsible or liable as a fiduciary to you or any of your affiliates, security holders, creditors, or employees, or any other person making any claim on behalf of or through you or any of your affiliates, security holders, creditors or employees, in connection with any activity that Piper Jaffray may undertake or has undertaken in furtherance of a transaction or otherwise pursuant to this Agreement, either before or after the date hereof.

You acknowledge that Piper Jaffray is a securities firm engaged in securities trading and brokerage activities and providing investment banking and financial advisory services.  You further acknowledge that affiliates of Piper Jaffray engage in investment advisory and asset management activities, both for their own accounts and for those of their clients.  In the ordinary course of business, we and our affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in your debt or equity securities, or the debt or equity securities of your affiliates or other entities that may be involved in the transactions contemplated by this Agreement.

In connection with the services to be provided hereunder, Piper Jaffray may employ the services of its affiliates and may share with any such affiliate any information concerning the Company in accordance with the terms of this Agreement.  Any affiliate so employed shall be entitled to all of the benefits afforded to Piper Jaffray hereunder and shall be entitled to be reimbursed for its expenses on the same basis as Piper Jaffray.

In addition, we and our affiliates may from time to time perform various investment banking and financial advisory services for other clients and customers who may have conflicting interests with respect to you.  Except as otherwise provided herein or by separate agreement with you, we and our affiliates will not use confidential information obtained from you pursuant to this engagement in connection with the performance by us and our affiliates of services for other companies, and we and our affiliates will not furnish any such information to other companies.  You also acknowledge that we and our affiliates have no obligation to use in connection with this engagement or to furnish you, confidential information obtained from other companies.

Furthermore, you acknowledge we may have fiduciary or other relationships whereby we or our affiliates may exercise voting power over securities of various persons, which securities may from time to time include securities of the Company.  You acknowledge that we or such affiliates may exercise such powers and otherwise perform our functions in connection with such fiduciary or other relationships without regard to our relationship to you hereunder.

-8-

You acknowledge that we are not an advisor as to legal, tax, accounting or regulatory matters in any jurisdiction.  You should consult with your own advisors concerning such matters and are responsible for making your own independent investigation and appraisal of the transactions contemplated by this agreement, and we have no responsibility or liability to you with respect such matters.

If the definitive transaction agreement includes a provision which disclaims on behalf of you any representation, warranty or agreement, not made in writing in the definitive transaction agreement, you will use your best efforts to include in such agreement a similar disclaimer for the benefit of Piper Jaffray and an acknowledgment by the acquiring party of Piper Jaffray's third party beneficiary status in respect of such disclaimer.

## 13. *CONFIDENTIALITY*

This Agreement is delivered to you upon the condition that neither the existence of this Agreement, nor any of its contents shall be disclosed by you or any of your affiliates, directly or indirectly, to any other person, except that such existence and contents may be disclosed (i) as may be compelled in a judicial or administrative proceeding or as otherwise required by law and (ii) to your directors, officers, employees, legal counsel, accountants, lenders and their legal counsel and advisors in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.

## 14. *TERMINATION*

The engagement of Piper Jaffray hereunder may be terminated (i) by Piper Jaffray at any time or (ii) by you on the date that is 12 months after the date hereof, in each case by prior written notice thereof to the other party; *provided*, that the provisions under the headings *COMPENSATION*, *EXPENSES*, *INDEMNIFICATION AND CONTRIBUTION* (including **Annex A**), *CONFIDENTIALITY*, and *MISCELLANEOUS* shall survive any termination of this Engagement; *provided*, *however*, that prior to any such termination by you, you shall have paid or cause to be paid to Piper Jaffray any fees or other amounts due to Piper Jaffray hereunder; *provided, further*, that in the case of termination by you, we shall be entitled to be paid the full amount of our Fees if, within 9 months of such termination, (x) any Restructuring and/or Sale is effected, or (y) the Company agrees to a Restructuring and/or Sale which is subsequently effected, at any time. Notwithstanding the foregoing, the Company may terminate this engagement on or before January 1, 2020 without the payment of any Minimum Fee and without Piper Jaffray having any additional right to any compensation from the Company.  No Minimum Fee will be due if the Bankruptcy Court does not approve Piper Jaffray's retention on the basis of a conflict of interest provided the Company has fully complied with Paragraph 4 hereof.

## 15. *MISCELLANEOUS*

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  You and we hereby waive any right to trial by jury with respect to any claim, action or counterclaim (whether based in contract, tort or otherwise) in connection with any dispute arising out of this Agreement or any of the matters contemplated herein.  You further agree that the foregoing provisions of this paragraph shall also apply to your subsidiaries to the same extent as to you, and that Piper Jaffray's obligations hereunder are being made in reliance on your foregoing agreements.

This Agreement shall not be assignable by either party without the prior written consent of the other party, provided, however, that either party shall have the absolute right to assign this Agreement to any party that is a successor to the assigning party by contract or operation of law.  Any purported assignment to a non-successor party without such prior written consent shall be void.

-9-

Piper Jaffray reserves the right to employ the services of its affiliates in providing services contemplated by this Agreement and to allocate, in whole or in part, to its affiliates certain fees payable to Piper Jaffray in such manner as Piper Jaffray and its affiliates may agree, in Piper Jaffray's sole discretion.

You further acknowledge that Piper Jaffray may share with any of its affiliates, and such affiliates may share with Piper Jaffray, any information related to the Company or any of its subsidiaries or affiliates (including, without limitation, information relating to creditworthiness) and the transactions contemplated hereby; provided that Piper Jaffray agrees to treat, and cause any such affiliate to treat, all non-public information provided to us by you as confidential information in accordance with customary banking industry practices.

This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to such subject matter, except for the Non-Disclosure Agreement, dated December 3, 2019.  No party has been authorized by Piper Jaffray to make any oral or written statements or agreements that are inconsistent with this Agreement.  This Agreement may not be amended or any provision hereof waived or modified except by an instrument in writing signed by Piper Jaffray and you.  This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of a manually executed counterpart of a signature page of this Agreement by e-mail in PDF format shall be effective as delivery of the hardcopy original signature page. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Agreement.

Except with respect to any Indemnified Person as set forth in Annex A hereto, this Agreement is intended for the benefit of the parties hereto and, is not intended to confer any benefits upon, or create any rights in favor of, and may not be relied on by, any persons other than the parties hereto.

[Signature Page Follows]

-10-

     We are delighted to accept this engagement and look forward to working with you.  Please confirm that the foregoing is our mutual understanding by signing in the appropriate space below and returning this letter to us.

                    Sincerely,

                    PIPER JAFFRAY & CO.

By: _____
      Name:    Teri Stratton
      Title:     Managing Director

By: _____
      Name:    Damon Chandik
      Title:     Managing Director

Accepted and Agreed to as of
the date first above written:

THE KRYSTAL COMPANY

By: _____
    Name:  Jonathan Tibus
    Title:  CRO

-11-

## Annex A

You agree to (i) indemnify and hold harmless us, our affiliates (within the meaning of the Securities Act of 1933), and each of our respective past, present and future partners, managers, members, directors, officers, agents, consultants, employees and controlling persons (within the meaning of the Securities Act of 1933, as amended or Section 20 of the Securities Exchange Act of 1934, as amended) (each of Piper Jaffray and such other person or entity is hereinafter referred to as an "Indemnified Person"), to the fullest extent lawful from and against any losses, claims, damages, liabilities and expenses, joint or several, asserted by or attributable to any third party, and all actions, inquiries, proceedings and investigations in respect thereof, to which any Indemnified Person may become subject, arising out of or in connection with our engagement under, or any matter referred to in the agreement to which this Annex A is attached and of which this Annex A forms a part (whether occurring before, at, or after the date hereof) (including this Annex A, this "Agreement"), regardless of whether any of such Indemnified Persons is a party thereto, and (ii) periodically reimburse an Indemnified Person for such person's legal and other expenses as may be incurred in connection with investigating, preparing, defending, paying, settling or compromising any such action, inquiry, proceeding or investigation, whether or not such action, inquiry, proceeding or investigation is initiated or brought by you, your creditors or stockholders, or any other person. You are not responsible under clause (i) of the foregoing sentence for any losses, claims, damages, liabilities or expenses to the extent that such loss, claim, damage, liability or expense has been finally judicially determined to have resulted primarily and directly from actions taken or omitted to be taken by such Indemnified Person due to such person's gross negligence, willful misconduct or bad faith. To the extent that any prior payment you made to an Indemnified Person is determined to have been improper by reason of such Indemnified Person's gross negligence, willful misconduct or bad faith, such Indemnified Person will promptly reimburse you such amount.

If the indemnity or reimbursement referred to above is, for any reason whatsoever, unenforceable, unavailable or otherwise insufficient to hold each Indemnified Person harmless, you agree to pay to or on behalf of each Indemnified Person contributions for losses, claims, damages, liabilities or expenses so that each Indemnified Person ultimately bears only a portion of such losses, claims, damages, liabilities or expenses as is appropriate (i) to reflect the relative benefits received by each such Indemnified Person, respectively, on the one hand and you and your stockholders on the other hand in connection with the Transaction or (ii) if the allocation on that basis is not permitted by applicable law, to reflect not only the relative benefits referred to in clause (i) of the foregoing sentence but also the relative fault of each such Indemnified Person, respectively, and you as well as any other relevant equitable considerations; provided, however, that in no event will the aggregate contribution of all Indemnified Persons to all losses, claims, expenses, damages, liabilities or expenses in connection with any Transaction exceed the amount of the fee actually received by us pursuant to this Agreement. The respective relative benefits received by us and you in connection with any Transaction will be deemed to be in the same proportion as the aggregate fee paid or proposed to be paid to Piper Jaffray in connection with the Transaction bears to the Aggregate Transaction Value paid or proposed to be paid in the Transaction, whether or not consummated.

Promptly after its receipt of notice of the commencement of any action or proceeding, any Indemnified Person will, if a claim in respect thereof is to be made against you pursuant to this Agreement, notify you in writing of the commencement thereof, but omission to so notify you will not relieve you from any liability which you may have to any Indemnified Person, except to the extent that you suffer actual prejudice as a result of such failure; provided, however, under no circumstances will such omission relieve you from your obligation to indemnify any Indemnified Person pursuant to applicable statutory law, common law, or contractual obligations otherwise than hereunder. If you so elect, you may assume

-12-

the defense of such action or proceeding in a timely manner, including the employment of counsel (reasonably satisfactory to us) and payment of expenses, provided you permit an Indemnified Person and counsel retained by an Indemnified Person at its expense to participate in such defense.  Notwithstanding the foregoing, in the event (i) you fail promptly to assume the defense and employ counsel reasonably satisfactory to us, or (ii) the Indemnified Person has been advised by counsel that there exist actual or potential conflicting interests between you or your counsel and such Indemnified  Person,  an Indemnified  Person  may  employ  separate  counsel  (in  addition  to   local counsel)  to  represent  or defend such Indemnified Person in such action or proceeding, and you agree to pay the fees and disbursements of such separate counsel as incurred; provided however, that you will not, in connection with any one such action or proceeding, or separate but substantially similar actions or proceedings arising out of the same general allegations, be liable for fees and expenses of more than one separate firm of attorneys (in addition to any local counsel).

You will not, without our prior written consent, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought under this agreement, unless such settlement, compromise or consent includes an express, complete and unconditional release of us and each other Indemnified Person from all liability and obligations arising therefrom and does not include any admission of fault on the part of us or any other Indemnified Person. Without your prior written consent, which will not be unreasonably withheld, delayed or conditioned, no Indemnified Person will settle or compromise any claim for which indemnification or contribution may be sought hereunder. Notwithstanding the foregoing sentence, if at any time an Indemnified Person requests that you reimburse the Indemnified Person for fees and expenses as provided in this agreement, you agree that you will be liable for any settlement of any proceeding effected without your prior written consent if (i) such settlement is entered into more than 30 days after receipt by you of the request for reimbursement, and (ii) you will not have reimbursed the Indemnified Person in accordance with such request prior to the date of such settlement.

The provisions of this Annex A shall apply to any modifications of this Agreement, shall be in addition to any liability that the Company may otherwise have, and shall be binding on and inure to the benefit of any of (i) the Company's successors or assigns and (ii) each Indemnified Person.  The provisions of this Annex A shall survive the consummation of any Transaction, as well as any termination or completion of the relationship established by this Agreement, and shall remain operative and in full force and effect. Nothing, however, in this Annex A is intended to confer any right or remedy on any person or entity other than the parties to this Agreement and their respective successors and assigns, other than the Indemnified Persons.

You also agree that no Indemnified Person will have any liability to you or your affiliates, directors, officers, employees, agents, creditors or stockholders, directly or indirectly, related to or arising out of the Agreement or the services performed hereunder, except losses, claims, damages, liabilities and expenses you incur which have been finally judicially determined to have resulted primarily and directly from actions taken or omitted to be taken by such Indemnified Person due to such person's gross negligence, willful misconduct or bad faith.  In no event, regardless of the legal theory advanced, will any Indemnified Person be liable for any consequential, indirect, incidental or special damages of any nature. Your indemnification, reimbursement, exculpation and contribution obligations in this Annex A will be in addition to any rights that any Indemnified Person may have at common law or otherwise.

Capitalized terms used, but not defined in this Annex A, have the meanings assigned to such terms in the Agreement.