UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re:<br><br>THE KRYSTAL COMPANY, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-61065 (PWB)<br><br>(Jointly Administered)<br><br>Re: Docket Nos. 18, 39, and 121<br><br>Hearing Date: March 3, 2020 at 10:00 a.m.<br>Objection Deadline: February 27, 2020 at 5:00 p.m. |

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (1) AUTHORIZING THE DEBTORS
TO USE CASH COLLATERAL; (2) GRANTING ADEQUATE PROTECTION
TO LENDERS; (3) MODIFYING THE AUTOMATIC STAY; (4) SCHEDULING
A FINAL HEARING; AND (5) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of The Krystal Company *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this limited objection (the "Limited Objection") to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (1) Authorizing the Debtors to Use Cash Collateral; (2) Granting Adequate Protection to Lenders; (3) Modifying the Automatic Stay; (4) Scheduling a Final Hearing; and (5) Granting Related Relief* (the "Motion").[2] In support of this Limited Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Krystal Company (4140); Krystal Holdings, Inc. (5381); and K-Square Acquisition Co., LLC (8916). The location of the Debtors' corporate headquarters and service address is: 1455 Lincoln Parkway, Suite 600, Dunwoody, Georgia 30346.

[2] Docket No. 18. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

14710664v1

**PRELIMINARY STATEMENT**[3]

1. The Committee supports the Debtors' use of cash collateral pursuant to a reasonable budget that pays chapter 11 administrative expenses and provides appropriate protections to the Lenders (defined below). The current budget, however, fails to provide for the payment of the costs of administering these chapter 11 cases and the proposed adequate protection provides the lenders with unnecessary and unwarranted protections.

2. Specifically, the budget fails to provide for payment of known administrative claims, including stub rent, section 503(b)(9) claims, utilities, and ordinary course payables, or funds to wind down these estates following the proposed sale. Rather, the Debtors rely on the prospect of a successful sale to provide proceeds to cover these costs. The budget also fails to provide a sufficient budget for the Committee to fulfill its statutory duties in these chapter 11 cases. While the Committee certainly shares the Debtors' hope for a successful sale, in the meantime, the Debtors must provide reasonable assurances that administrative claims will be paid and that funds will be available to properly wind down these estates.

3. As for adequate protection, the Committee understands that the Lenders may receive (i) adequate protection payments that are not currently provided for in the budget, and (ii) adequate protections liens and superpriority claims on previously unencumbered assets, including the proceeds of avoidance actions. Unsecured creditors should not be deprived of the benefit of assets that were unencumbered on the Petition Date that may provide their only source of recovery in these cases. Moreover, to the extent adequate protection payments are authorized, the payments should be included in the budget and subject to disgorgement and

---

[3] As of the filing of this Limited Objection, the Committee has been provided with competing budgets and various cash collateral orders. It is presently unclear which budget or form of order the Debtors intend to submit at the hearing on the Motion. The Committee is also advised that the Debtors and the Lenders are negotiating the terms of a DIP facility, which could impact the arguments made in this Limited Objection.

recharacterization in the event that the Lenders are undersecured or the Committee successfully challenges the Lenders' prepetition liens or claim.

4. Finally, the Committee acknowledges the Lenders' right to credit bid their allowed secured claim against assets in which the Lenders hold validly perfected liens. At this early stage of the case, the Committee has not yet examined the nature, extent, validity, or priority of the Lenders' prepetition liens and claim. Any order that allows the Lenders to credit bid should provide that the Lenders' credit bid rights are subject to the Committee's right to review and challenge the Lenders' liens and claim.

5. In sum, the Committee supports the Debtors' continued use of cash collateral on terms that provide the Lenders reasonable protections and maintain administrative solvency. However, given the benefits the Lenders will receive through the going concern sale of their collateral in chapter 11, as opposed to a foreclosure or liquidation, the Debtors must be afforded sufficient liquidity to fund the sale process and a controlled disposition of these cases.

## BACKGROUND

### I. General Case Background

6. On January 19, 2020 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. On February 11, 2020, the Office of the United States Trustee for Region 21 appointed a seven-member Committee consisting of: (i) NCR Corporation; (ii) Charles Tombras Advertising, Inc.; (iii) The Coca-Cola Company; (iv) Realty Income Corporation; (v) Flower Foods, Inc., (vi) Pension Benefit Guaranty Corporation; and (vii) SLM Waste

Recycling Services, Inc.[4]  The Committee selected Kelley Drye & Warren LLP as its lead counsel and Arnall Golden Gregory LLP as local counsel.  The Committee also selected FTI Consulting as its financial advisor.

## II.   The Debtors' Prepetition Indebtedness

8.   The Debtors are party to the *Third Amended and Restated Credit Agreement* dated as of April 26, 2018 (the "Credit Agreement") with Wells Fargo Bank, National Association, as administrative agent, and various other lenders (collectively, the "Lenders").[5]

9.   As of the Petition Date, approximately $50 million, plus interest and fees, was purportedly due and owing under the Credit Agreement (the "Secured Obligations").[6]  The Secured Obligations are purportedly secured by the Debtors' assets.[7]

10.   The Debtors are also party to the *Second Lien Promissory Note* (the "Second Lien Note") with KRY, LLC ("KRY").[8]  KRY and the Debtors are both indirectly owned by Argonne Capital Group LLC, the Debtors' equity owner.[9]  As of the Petition Date, approximately $1.5 million was purportedly due and owing under the Second Lien Note.[10]  The obligations under the Second Lien Note are purportedly secured by a junior lien in the Debtors' assets.[11]

---

[4]   Docket No. 143.

[5]   *See* Motion ¶ 7.

[6]   *See Second Interim Order (1) Authorizing the Debtors to Use Cash Collateral, (2) Granting Adequate Protection to Prepetition Secured Parties, (3) Modifying The Automatic Stay, and (4) Providing Notice of Final Hearing* ¶ D.2.

[7]   *See Declaration of Jonathan M. Tibus in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), ¶ 16.

[8]   *Id.*, ¶ 17.

[9]   *Verified Statement Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure.*  Docket No. 119.

[10]   First Day Declaration, ¶ 17.

[11]   *Id.*, ¶ 18.

4

### III. The Debtors' Restructuring Efforts

11. As of the Petition Date, the Debtors operated 182 restaurants and franchised an additional 116 restaurants.[12] Like much of the casual dining sector, the Debtors maintain they have suffered from industry headwinds, shifting consumer tastes, growth in labor costs, and unfavorable leases.[13]

12. In 2017, the Debtors retained Boston Consulting Group to advise on competitive repositioning.[14] The Debtors demolished and rebuilt 9 stores, which resulted in increased sales at these locations but required unsustainable capital investments.[15]

13. Due to declining financial performance, at various points during 2018 and 2019, the Debtors failed to comply with financial covenants and defaulted under the Credit Agreement.[16] On October 31, 2019, the Debtors and the Lenders entered into a forbearance agreement, which expired on the Petition Date.[17]

14. In the months leading up to the Petition Date, the Debtors closed 44 restaurants, terminated employees, and hired two seasoned senior executives.[18] In December 2019, the Debtors retained Piper Sandler & Co. ("Piper"), as investment banker, to evaluate strategic alternatives.[19] The Debtors and Piper determined that a sale of the Debtors' assets

---

[12] *Id.*, ¶ 9.

[13] *Id.*, ¶ 19.

[14] *Id.*, ¶ 20

[15] *Id.*

[16] *Id.*, ¶ 21.

[17] *Id.*

[18] *Id.*, ¶¶ 22-23.

[19] *See Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Piper Sandler & Co. as Investment Banker for the Debtors and Debtors in Possession Effective From the Petition Date*, ¶ 8. Docket No. 126.

5

would offer the best recovery for their stakeholders. In December 2019, Piper began marketing the business for sale.

15. On February 12, 2020, the Debtors filed a motion to establish bidding procedures for the sale of their assets, with the goal of closing a sale by May 29, 2020.[20] The motion was filed without a stalking horse purchaser, though the procedures contemplate the selection of a stalking horse bidder by April 1, 2020.

## IV. The Cash Collateral Motion

16. The Debtors initially sought the use of Cash Collateral on a non-consensual basis over the objection of the Lenders.[21] The Lenders ultimately consented to the use of Cash Collateral on an interim basis and the Debtors' use of Cash Collateral was approved on January 22, 2020, subject to an initial three week budget through February 9, 2020 (the "First Interim Order").[22] The First Interim Order provided the Lenders with replacement liens and superpriority claims as adequate protection for any potential diminution in the value of their collateral.[23] The First Interim Order also provided that the Postpetition Collateral (as defined therein) excluded Avoidance Actions.

17. The Court held a further hearing on the Motion on February 5, 2020. The Court again approved the use of Cash Collateral on an interim basis, subject to a four week budget ending the week of March 1, 2020 (the "Second Interim Order," and together with the

---

[20] Docket No. 148.

[21] *See Wells Fargo Bank, National Association's (I) Objection to Debtors' Emergency Motion for Entry of Interim and Final Orders (1) Authorizing the Debtors to Use Cash Collateral; (2) Granting Adequate Protection to Lenders; (3) Modifying the Automatic Stay; (4) Scheduling a Final Hearing; and (5) Granting Related Relief; (II) Limited Objection to Certain First Day Relief; and (III) Request for Adequate Protection.* Docket No. 28.

[22] *See Interim Order (1) Authorizing the Debtors to Use Cash Collateral, (2) Granting Adequate Protection to Lenders, (3) Modifying the Automatic Stay, and (4) Providing Notice of Second Interim Hearing.* Docket No. 39.

[23] *See* First Interim Order, ¶ 6.

6

First Interim Order, the "Interim Orders").[24] The Second Interim Order also provided the Lenders with replacement liens and superpriority claims as adequate protection for any potential diminution in the value of their collateral and confirmed that Postpetition Collateral excluded Avoidance Actions.[25]

18. At the February 13, 2020 hearing on the Motion, the Debtors and Lenders had not agreed to the terms for the use of Cash Collateral on a final basis and agreed to adjourn the final hearing on the Motion to March 3, 2020.

19. The Committee has received a proposed final order (the "Proposed Order")[26] approving the Debtors' use of Cash Collateral in exchange for various protections, including:

- a waiver of all estate rights under sections 506(c) and 552(b) of the Bankruptcy Code, notwithstanding the lack of a case wind down strategy or assurance that administrative claims will be paid;
- adequate protection liens and superpriority claims in previously unencumbered assets, including proceeds of Avoidance Actions; and
- adequate protection fees for the Lenders' advisors.

20. The Proposed Order further provides that (i) the Debtors are deemed to have spent unencumbered cash after the Petition Date, before expending any Cash Collateral, and (ii) the Lenders will be authorized to credit bid, without regard to the Committee's lien and claim challenge rights.

---

[24] *See Second Interim Order (1) Authorizing the Debtors to Use Cash Collateral, (2) Granting Adequate Protection to Prepetition Secured Parties, (3) Modifying the Automatic Stay, and (4) Providing Notice of Final Hearing.* Docket No. 121.

[25] *See* Second Interim Order, ¶ 6.

[26] This Limited Objection responds, in part, to the Proposed Order and Proposed Budget received by the Committee. As of the filing of this Limited Objection, the Committee does not know if the Debtors intend to submit the Proposed Order or the Proposed Budget.

21. The Committee has also received a proposed budget (the "Proposed Budget") from the Debtors through May 31, 2020. In addition to the failure to provide for the payment of certain known administrative claims, the Debtors and the Lenders seek to limit (a) the funding of Committee professionals to less than 25% of that provided to the Debtors' professionals, and (b) the Committee's budget to investigate the claims against the Lenders' to $25,000.[27]

## OBJECTION

### I. The Proposed Order And Budget Threaten Administratively Solvency

22. The quid pro quo for conducting a going concern sale of a lender's collateral in bankruptcy is, at a minimum, a budget that pays the associated costs.[28] Based upon the information provided to the Committee thus far, the Proposed Budget fails to provide for such costs. Given the uncertainty related to the outcome of the sale, the failure to provide for known administrative claims creates a significant risk of administrative insolvency.

23. Specifically, the Proposed Budget fails to account for various administrative claims, including stub rent, ordinary course trade payables, and section 503(b)(9) claims. Precedent in this jurisdiction makes clear that the post-filing, pre-rejection rent is

---

[27] It is noteworthy that Section (G)(vi) of the *Amended and Restated General Order 26-2019, Procedures for Chapter 11 Cases*, dated November 4, 2019 provides that any motion related to the use of cash collateral must highlight "[p]rovisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the Debtor with respect to a professional fee carve-out." The Motion provides that no such provision applies. *See* Motion, at ¶ 6. While that statement may have been accurate at the time that the Motion was filed, based on the Proposed Budget it appears that it is no longer the case.

[28] *See In re Townsends, Inc.*, et al., Case No. 10-14092 (Bankr. D. Del. January 21, 2011); Hr'g. Tr. at 23:25-24:22, an excerpt of which is attached hereto as Exhibit A (Judge Sontchi required a revised budget that included sufficient funds to pay 503(b)(9) claims, noting that "if it appears that the case is administratively insolvent, I would be inclined to…either convert or dismiss the case…."); *see also In re NEC Holdings Corp.*, et al., Case No. 10-11890 (Bankr. D. Del. July 13, 2010); Hr'g. Tr. at 108:1-108:4, an excerpt of which is attached hereto as Exhibit B (Judge Sontchi, sitting for Judge Walsh, stated that he "need[s] some evidence that there's a probability that admin claims are going to get paid in full, including 503(b)(9) claims or [he] won't approve the financing.").

8

entitled to administrative priority and must be satisfied.[29] Such payments protect the going concern value of the Debtors' assets, and are required to be paid under the Bankruptcy Code.[30] Similarly, the services provided by ordinary course trade creditors, employees, and utilities are critical to the sale process and act to preserve the Lenders' collateral pending the sale.[31]

24. The Proposed Budget also fails to provide appropriate funding for the Committee's professionals.[32] Without an appropriate budget, the Committee will be prevented from fulfilling its fiduciary duty to unsecured creditors.[33] The Debtors professionals are slated to receive over $2.9 million (excluding any success fees), while the Committee's professionals are allocated $675,000 for the entire 17-weeks.[34] The Committee also requires an adequate Lender investigation budget and any post-default carve-out should treat the Debtors' and Committee's

---

[29] *See In re Manis Lumber Co.*, 430 B.R. 269, 281 (Bankr. N.D. Ga. 2009) (finding that the landlord had an allowed administrative claim for the postpetition, pre-rejection amounts arising under the lease on a daily basis and directing the debtors to pay that amount).

[30] *See* 11 U.S.C. § 503(b)(1); *In re Goody's Family Clothing, Inc.,* 610 F.3d 812, 818-19 (3d Cir. 2010) (finding that retaining possession of the premises, thereby inducing post-petition services from the landlords, is sufficient to be a transaction justifying administrative priority); *In re ZB Co.,* 302 B.R. 316, 319 (Bankr. D. Del. 2003) ("It is beyond dispute that all of the Debtors' landlords whose properties are occupied and used post-petition have valid administrative claims").

[31] There is precedent in this Court for making appropriate provisions for section 503(b)(9) administrative expenses in the final financing order. In *Atlantis Plastics* (Case No. 08-75473) (PWB) (Bankr. N.D. Ga), based on the Court's remarks at the first day hearing, the final financing order provided for a reserve to be created for 503(b)(9) claims out of sale proceeds. *See Transcript of First Day Motions Hearing*, August 11, 2008, at 41-43 [Docket No. 58].

[32] In addition to generally getting up to speed on the Debtors' businesses and sale process, the Committee's professionals have addressed: (i) the proposed bidding procedures; (ii) the Debtors' use of cash collateral; and (iii) various first day motions. Going forward, the Committee will need to, among other things: (i) address the Debtors' prospective sale; (ii) investigate the liens and claims of the Lenders; and (iii) investigate the Debtors' historic transactions, including the events that led to these chapter 11 cases.

[33] *See Westmoreland Human Opportunities, Inc. v. Walsh,* 246 F.3d 233, 256 (3d Cir. 2001*)* ("We have construed § 1103(c) as implying a fiduciary duty on the part of members of a creditor's committee, such as the present Unsecured Creditors Committee, toward their constituent members.") (*citing In re PWS Holding Corp*., 228 F.3d 224, 246 (3d Cir. 2000)); *Value Prop. Trust v. Zim Co. (In re Mortg. & Realty Trust),* 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997) (noting that the committee's has many functions … "it investigates, it appears, it negotiates, it may litigate, and it is at all times intimately involved …").

[34] This disparity is particularly stark considering the approximately $1.5 million in fees paid to the Debtors' primary counsel prior to the Petition Date in preparation for these chapter 11 cases.

9

professionaly proportionalely and fairly.[35] If no agreement can be reached on these points, the Debtors' and the Committee's professionals should be required to share *pro rata* in the total amount budgeted for the estates' professionals' services in these cases.[36]

25. The Committee is hopeful that the sale process will result in a robust auction that generates recoveries for all creditor constituencies. However, the marketing process is still in its infancy and, unlike most chapter 11 sale cases, there was no meaningful prepetition marketing of the Debtors' assets and no stalking horse bidder has been identified. Accordingly, the Debtors cannot reasonably rely on the proceeds from a sale to satisfy accrued and unpaid administrative expenses.

## II. The 506(c) And 552(b) Waivers Are Inappropriate

26. It is well established that if the Lenders want a going concern sale process in chapter 11, they must "pay the freight." In light of the budget deficiencies noted above, advance waivers of the estates' rights under sections 506(c) and 552(b) of the Bankruptcy Code should be denied.

27. Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself.[37] This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured

---

[35] *See, e.g. In re Ormet Corporation,* No. 13-10334 [Dkt. No. 147] (Bankr. D. Del. Mar. 22, 2013) ($100,000 cap); *In re Buffets Rests. Holdings, Inc.*, No. 12-10237 (MFW) 2012 WL 1141583 (Bankr. D. Del. Jan. 19, 2012) ($100,000 cap)*; In re Rural/Metro Corp.*, No. 13-11952 (KJC) 2013 WL 5594837 (Bankr. D. Del. Sept. 10, 2013) ($100,000 cap); *In re Caribbean Petroleum Corp.*, No. 10-12553 (KG) 2010 WL 6982178 (Bankr. D. Del. Aug. 12, 2010) ($100,000 cap); *In re Source Home Entm't, LLC*, No. 14-11553 (KG) 2014 WL 4655748 at *7 (Bankr. D. Del. Jul. 22, 2014) ($100,000 cap).

[36] *See In re Orchids Paper Products Company, et al.,* Case No. 19-10729 (Bankr. D. Del. May 30, 2019); Hr'g Tr. at 186:18-186:25, an excerpt of which is attached hereto as Exhibit C ("I have always taken the position that I don't care what a line item is for committee professionals or debtors' professionals. That if there's not sufficient funds to pay professionals, generally, that they will be paid pro rata, regardless of what limits the DIP may place on that. I consider the line items for professionals to be an aggregate and it's inappropriate to have line items.").

[37] *See* 11 U.S.C. § 506(c).

creditor recoveries.[38] Courts have widely recognized that section 506(c) waivers are not to be granted lightly.[39] Indeed, courts routinely condition the waiver on the consent of the creditors' committee.[40]

28.  Similarly, the "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor, committee or other party-in-interest to exclude postpetition

---

[38] *See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.),* 57 F.3d 321, 325 (3d Cir. 1995) ("section 506(c) is designed to prevent a windfall to the secured creditor"); *Kivitz v. CIT Group/Sales Fin., Inc.,* 272 B.R. 332, 334 (D. Md. 2000) ("the reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs"); *In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors").

[39] *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 12 (2000) (finding that section 506(c) is a rule of fundamental fairness for all parties in interest and authorizing the surcharge of a secured lender's collateral where reasonable and appropriate). In *Sports Authority*, Judge Walrath explained the high bar lenders seeking a 506(c) waiver must overcome:

> And it's clear, I think, in all my prior rulings, that if a case is being run for the benefit of the lenders in order to foreclose upon their collateral, the lenders are going to have to pay the cost of that. And that includes all administrative. It includes the rent. It includes professional fees.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> The debtor is correct under Montgomery Ward, you don't have to pay the stub rent on the first day of the case. But in a case where the landlords and other administrative claims are clearly not budgeted or being paid while the landlord – excuse me, while the secured lenders' collateral is being liquidated and their secured claim is being paid, I have a serious problem with that. I think the fix is no 506(c) waiver for anybody. And to the extent that administrative claims are not paid at the end of this case, there will be a claim against the lenders for those costs under 506(c) to the extent they were necessary for the preservation or realization of their collateral. If the lenders won't agree, then I'm prepared to convert the case today because I just -- they can go to State Court and liquidate their collateral, but you can't do it in bankruptcy without paying the freight, as was argued.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*In re Sports Authority Holdings, Inc. et al.*, Case No. 16-10527, Hr'g Tr. (Docket No. 1463) at 194-196 (Bankr. D. Del. Apr. 26, 2016) (MFW). This excerpt of the transcript is attached hereto as Exhibit D.

[40] *See In re Mortgage Lenders Network USA, Inc.,* Case No. 07-10146 (PJW), Hr'g Tr. (Docket No. 346) at 21 (Bankr. D. Del. March 20, 2007) (noting that without the committee's prior approval, the 506(c) waiver may not be approved). Excerpts from the transcript are attached hereto as Exhibit E.

proceeds from prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of what is tantamount to a secured lender's foreclosure sale.[41]

29. Where, as here, the Proposed Budget fails to provide for payment of administrative expenses, and the Debtors are required to expend unencumbered cash prior to expending Cash Collateral, these waivers are improper.[42]

### III. Adequate Protection Should Be Limited

30. Section 363(e) of the Bankruptcy Code provides that on request of a party with an interest in property that is to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest.[43] The concept of adequate protection serves the goal of "safeguard[ing] the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."[44]

31. Adequate protection is designed to preserve the secured creditor's position following the commencement of a case, not to enhance it.[45] The focus of the requirement is to "protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor."[46] It is well-established that a secured creditor does not

---

[41] *See* 11 U.S.C. § 552(b).

[42] The Proposed Order provides that the liens and claims granted to the Lenders will be subject to the carve-out, only to the extent that there are insufficient, unencumbered funds in the Debtors' estates to pay such amounts. The Proposed Order further provides that Cash Collateral may be used to fund the carve-out if the Lenders are granted adequate protection liens and claims.

[43] 11 U.S.C. § 363(e).

[44] *In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

[45] *See In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt.").

[46] *See In re Satcon Tech. Corp.,* 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (*citing In re Swedeland Dev. Group, Inc.,* 16 F.3d 552, 564 (3d Cir. 1994))*; see also United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 368 (1988); *In re Energy Future Holdings Corp.,* 546 B.R. 566, 581 (Bankr. D. Del. 2016) ("Adequate Protection Payments are not a payment of collateral—rather, adequate protection is designed to protect secured creditors against

12

suffer a diminution in value where it receives the liquidation value of its collateral.[47] A secured creditor must "prove this decline in value – or the threat of a decline – in order to establish a prima facie case."[48]

32. In the Interim Order, the Court approved adequate protection in the form of replacement liens and superpriority claims to the extent of any diminution in value, but such liens did not attach to Avoidance Actions. Any adequate protection granted in a further order should be similarly limited to that provided in the Interim Orders and also exclude Avoidance Actions from both the Lenders' adequate protection liens **and** claims.[49] Neither the Debtors nor the Lenders have demonstrated that the existing adequate protection is insufficient to safeguard the Lenders' interests. As long as the business is operating and being properly marketed for sale,

---

diminution in value of their collateral."); *In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("Post-Timbers courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.").

[47] *See In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1020 (11th Cir. 1984) (for adequate protection purposes, the value of collateral is based upon what a creditor would have received if it were to sell the collateral at a wholesale price); *In re Case*, 115 B.R. 666, 670 (B.A.P. 9th Cir. 1990) (noting that for adequate protection purposes, "the possibility of forced liquidation would be assumed"); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (secured creditor adequately protected where debtor used cash collateral to preserve overall value of collateral by paying necessary operating expenses); *In re Modern Warehouse, Inc.*, 74 B.R. 173, 177 (Bankr. W.D. Mo. 1987) ("[I]n the context of § 507(b) … the value which is to be protected is 'liquidation' value … This protection is accorded on the theory that the secured creditor should be granted the same value as if he had the collateral in his hands to liquidate as of the date of commencement of the proceeding."); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (permitting expenditure of secured creditor's cash collateral to enhance overall value of collateral).

[48] *In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); *In re Elmira Litho, Inc.,* 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

[49] The grant of a lien on Avoidance Actions or there is unwarranted. Avoidance powers are designed to allow a debtor-in-possession or trustee to recover certain payments for the benefit of unsecured creditors. *See, e.g., In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) [Dkt. No. 133] (Bankr. S.D.N.Y. Aug. 6, 2013) (excluding avoidance actions and proceeds thereof from property that could be used to pay superpriority claims under § 507(b); excluding avoidance actions and proceeds from the scope of adequate protection liens); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) [Dkt. No. 254] (Bankr. S.D.N.Y. Feb. 3, 2012) (same); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV,* 229 F.3d 245, 250 (3d Cir. 2000) (stating, "when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.),* 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover payments made as preferences).

13

there is no decline, or the threat of a decline, in the value of the Lenders' collateral warranting additional adequate protection.[50]

33. Further, the Debtors have not demonstrated their ability to pay administrative expenses, let alone adequate protection payments to their Lender. Unless and until they have done so, no adequate protection payments should be authorized. To the extent such payments are authorized, they should be subject to disgorgement or recharacterization in the event the Lenders are deemed to be undersecured or there is a successful Committee challenge to their liens or claim.

## IV. The Credit Bid Rights Must be Subject to Challenge

34. Pursuant to section 363(k) of the Bankruptcy Code, a secured creditor holding an "allowed claim" is generally allowed to credit bid – unless the Court "for cause" orders otherwise.[51] The purpose of establishing bid procedures for the sale of assets is to "facilitate an open and fair public sale designed to maximize value for the estate."[52] Because section 363(k) authorizes the credit bidding only of "allowed" claims, cause to deny a credit bid may also exist where the validity of the lien securing the creditor's claim is subject to dispute.[53]

35. Here, the Committee is still reviewing the Lenders' loan package and analyzing the nature, extent, validity and priority of the Lenders' asserted pre-petition liens and

---

[50] *See, e.g.*, *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); *In re Pine Lake Village Apartment Co.*, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's collateral . . . clearly ensures that the plaintiff-mortgagee's investment is adequately protected."); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (granting debtor authority to use cash collateral over lienholder's objection where the creditor's "secured position can only be increased by the continued operation of the farm").

[51] 11 U.S.C. § 363(k).

[52] *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).

[53] *See, e.g.*, *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 63-64 (Bankr. D. S.C. 2010); *Nat'l Bank of Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996).

claim. The granting of an unqualified credit bid right in advance of a Committee investigation risks a subsequent determination that the liens were invalid – in which case the Lenders may not have had the right to credit bid on all or certain of the Debtors' assets and the estates will not have received fair value if they did. As such, the Lenders' right to credit must be subject to the Committee's right to investigate and challenge the Lenders' liens and claim.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Motion unless modified as set forth herein; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:   Atlanta, Georgia
        February 27, 2020

ARNALL GOLDEN GREGORY LLP

*/s/ Darryl S. Laddin*
Darryl S. Laddin, Georgia Bar No. 460793
Sean C. Kulka, Georgia Bar No. 648919
171 17th Street NW, Suite 2100
Atlanta, GA 30363
Telephone: (404) 873-8500
darryl.laddin@agg.com
sean.kulka@agg.com

and

KELLEY DRYE & WARREN LLP
Eric R. Wilson
Maeghan J. McLoughlin
101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
Email:  ewilson@kelleydrye.com
       mmcloughlin@kelleydrye.com

*Proposed Counsel to the Official Committee*
*of Unsecured Creditors of The Krystal Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of February 2020, a true and correct copy of the foregoing *Limited Objection of the Official Committee of Unsecured Creditors to Debtors' Emergency Motion for Entry of Interim and Final Orders (1) Authorizing the Debtors to Use Cash Collateral; (2) Granting Adequate Protection to Lenders; (3) Modifying the Automatic Stay; (4) Scheduling a Final Hearing; and (5) Granting Related Relief* was deposited in the U.S. Mail with sufficient postage to ensure delivery, addressed to:

| | |
|---|---|
| Benjamin Keck<br>Rountree Leitman & Klein, LLC<br>Century Plaza I<br>2987 Clairmont Road, Suite 175<br>Atlanta, GA 30329 | J. Robert Williamson<br>Scroggins & Williamson, P.C.<br>One Riverside, Suite 450<br>4401 Northside Parkway<br>Atlanta, GA 30327 |
| Sarah Robinson Borders<br>King & Spalding LLP<br>1180 Peachtree Street NE<br>Atlanta, GA 30309 | Thomas Wayne Dworschak<br>Office of the U.S. Trustee<br>Room 362<br>75 Ted Turner Drive, SW<br>Atlanta, GA 30303 |
| Leia Ashlin Clement Shermohammed<br>King & Spalding LLP<br>1180 Peachtree Street NE<br>Atlanta, GA 30309 | Kurtzman Carson Consultants LLC<br>Noticing Agent<br>222 N. Pacific Coast Highway, Suite 300<br>El Segundo, CA 90245 |
| Matthew W. Levin<br>Scroggins & Williamson, P.C.<br>One Riverside, Suite 450<br>4401 Northside Parkway<br>Atlanta, GA 30327 | |

*/s/ Darryl S. Laddin*
Darryl S. Laddin