## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| THE KRYSTAL COMPANY, *et al.,*[1] | ) | Case No. 20-61065 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## OBJECTION TO PROPOSED CURE AMOUNTS UNDER REAL PROPERTY LEASES; AND RESERVATION OF RIGHTS

**COME NOW** Hannah Rocks, LLC, DJ Rash Realty Company, LLC, and JMT Land Holdings, LLC (collectively, the "Lessors"), lessors to The Krystal Company ("Debtor"), and hereby object to, among other things, the proposed cure in Debtor's April 7, 2020 Notice ("Cure Notice") (doc. 310).

1.      Debtor is the lessee under four (4) pre-petition real estate leases (collectively, the "Leases") with Lessors.

2.      On January 19, 2020, Debtors filed bankruptcy petitions under Chapter 11 of Title 11.

3.      On February 12, 2020, Debtors filed a motion to sell assets pursuant to Bankruptcy Code section 363. (Doc. 148).

4.      On March 4, 2020 the Court entered an order (doc. 227) approving certain procedures in connection with Debtors' proposed sale.

5.      The Debtor states that it may assume and assign the Leases, to the bidder that prevails in the pending sale proceedings.

6.      As to each of the Leases, the default cure amounts set forth in the Cure Notice are incorrect.

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), include: The Krystal Company (4140); Krystal Holdings, Inc. (5381); and K-Square Acquisition Co., LLC (8916). The location of the Debtors' corporate headquarters and service address is: 1455 Lincoln Parkway, Suite 600, Dunwoody, Georgia 30346.

A.      **Hannah Rocks, LLC  – Austin Peay Highway, Memphis, Tennessee**

Hannah Rocks, LLC owns the real property on which Krystal store number MFS012 is located. The address is 3330 Austin Peay Highway, Memphis, Tennessee.

Hannah Rocks, LLC leased the property to Debtor under the Lease Agreement dated September 30, 2013 between Hannah Rocks, LLC and Debtor. (Attached hereto as **EXHIBIT A** is a true and correct copy of the lease.)

Unpaid rent and late fees under the lease total $12,817.84 as of April 1, 2020. [2] The current regular rental rate (not including other components of rent under the Lease) is $6,103.75 per month. Under each of the Leases, the next regular rent payment will be due in May and such amounts, including all future rent which accrues but is unpaid thereafter, must be included in all cure amounts.

Under the lease, Debtor is obligated to timely pay the property taxes. (Lease, para. 7). The Debtor failed to pay the 2019 property taxes. The amount owing thereon as of March 31, 2020 was $7,838.38. (Attached hereto as **EXHIBIT B** are true and correct copies of the applicable tax bills).[3]

The 2020 property taxes will become due October 5, 2020. At a closing of any sale, Hannah Rocks, LLC should receive as part of the cure payment pro rata taxes from the beginning of the year (January 1, 2020) until the closing date.

---

[2]    Under each of the Leases, the Debtor is liable for a 5% late charge on late payments, and for interest at the highest allowable rate. (Rent Addendum to each Lease, para. 4). The interest is being determined and calculated and, once completed, said amounts will be presented.

[3]    On all property taxes yet to be paid by Debtor, interest and penalties to the governmental authorities continue to accrue under state laws, and these components are part of the defaults required to be cured.

The default cure amounts to Hannah Rocks, LLC, based on regular rent, late fees, and property taxes total $20,656.22 as of April 1, 2020, plus unpaid accruals thereafter.

**B.** **Hannah Rocks, LLC - Winchester Road, Memphis, Tennessee**

Hannah Rocks, LLC is the owner of the real property on which Krystal store number MFS021 is located. The address is 7073 Winchester Road, Memphis, Tennessee.

Hannah Rocks, LLC and Debtor entered into a Lease Agreement dated September 30, 2013. (Attached hereto as **EXHIBIT C** is a true and correct copy of the lease.)

Unpaid rent and late fees total $12,817.84 as of April 1, 2020. The current regular rental rate (not including other components of rent under the Lease) is $6,103.75 per month.

Under the lease, Debtor is required to timely pay property taxes. (Lease, para. 7). Debtor failed to pay the 2019 property taxes. The total amount due thereon on March 31, 2020 was $13,540.81. Interest and penalties continue to accrue thereon. (Attached hereto as **EXHIBIT D** are true and correct copies of the applicable tax bills).

The 2020 property taxes become due October 5, 2020. At a closing of any sale, Hannah Rocks, LLC should receive as part of the cure payment pro rata taxes from the beginning of the year until the closing date.

The default cure amounts to Hannah Rocks, LLC, based on regular rent, late fees, and property taxes total $26,358.65 as of April 1, 2020, plus unpaid accrual thereafter.

C.    **DJ Rash Realty Company, LLC**

DJ Rash Realty Company, LLC owns the real property on which Krystal store number CHN004 is located. The address is 307 Cherokee Boulevard, Chattanooga, Tennessee.

DJ Rash Realty Company, LLC and Debtor entered into the Lease Agreement dated February 28, 2013 and, later, the Lease Amendment dated August 29, 2016. (Attached as **EXHIBIT E** are true and correct copies of the lease and of the lease amendment.)

Unpaid rent and late fees total $15,514.82 as of April 1, 2020. The current regular rental rate (not including other components of rent under the Lease) is $7,433.90 per month.

Debtor is required to timely pay property taxes. (Lease, para. 7). The Debtor failed to pay the 2019 property taxes. The 2019 county tax amount due in March 2020 was $8,656.91, and the 2019 city tax amount due in March 2020 was $8,107.94. (Attached hereto as **EXHIBIT F** are true and correct copies of the applicable tax bills). Interest and penalties continue to accrue.

The 2020 county and city taxes are due and payable from October 1, 2020 through February 28, 2021. At a closing of any sale, DJ Rash Realty Company, LLC should receive as part of the cure payment pro rata taxes from the beginning of the year until the closing date.

The default cure amounts to DJ Rash Realty Company, LLC based on regular rent, late fees, and property taxes total $32,279.67 as of April 1, 2020, plus unpaid accruals thereafter.

D.    **JMT Land Holdings, LLC**

JMT Land Holdings, LLC owns the property on which Krystal store number RME002 is located. The address is 519 Shorter Ave. N.W., Rome Georgia.

JMT Land Holdings, LLC and Debtor entered into the Lease Agreement dated February 28, 2013, and the First Amendment dated August 29, 2016. (Attached as **EXHIBIT G** are true and correct copies of the lease and of the lease amendment.)

4

Rent and late fees currently total $17,412.04 as of April 1, 2020. The current regular rental rate (not including other components of rent under the Lease) is $8,342.95 per month.

The 2020 property taxes are due by November 15, 2020. At a closing of any sale, JMT Land Holdings, LLC should receive as part of the cure payment pro rata taxes from the beginning of the year until the closing date.

The default cure amounts to JMT Land Holdings, LLC based on regular rent and late fees total $17,412.04 as of April 1, 2020, plus unpaid accruals thereafter.

## RESERVATION OF RIGHTS

The Lessors hereby reserve all rights and remedies under each of the Leases, Bankruptcy Code section 365, and other applicable law.

## CONCLUSION

Under Bankruptcy Code section 365(b)(1)(A), as a condition to any assumption and assignment of the Leases, the above lease default amounts - to be updated to the ultimate date of the closing of the sale and assignment – must be cured. Lessors also object to the proposed assumption and assignment of the Leases unless, under Bankruptcy Code section 365(b)(1)(C), the Lessors are provided adequate assurance of future performance under the Leases.

This 27th day of April 2020.

        **COHEN POLLOCK MERLIN TURNER, P.C.**
        Counsel for DJ Rash Realty Company, LLC,
        Hannah Rocks, LLC, and JMT Land Holdings, LLC

        By: ___/s/ Bruce Z. Walker_____
            Mark S. Marani
            Georgia Bar No. 469960
            Bruce Z. Walker
            Georgia Bar No. 731260

3350 Riverwood Parkway, Suite 1600
Atlanta, Georgia 30339
(770) 858-1288
FAX: (770) 858-1277
mmarani@cpmtlaw.com
bwalker@cpmtlaw.com

1877621

# EXHIBIT A

**Krystal #  MFS012**
**Address:  3330 Austin Peay Highway**
**Memphis, Tennessee 38128**

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made and entered into as of September 30, 2013, by and between:

    (i)   Hannah Rocks, LLC, a New York limited liability company ("Landlord"), and

    (ii)   The Krystal Company, a Tennessee corporation ("Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord is the owner of that certain tract of land described on Exhibit "A", attached hereto and by this reference incorporated herein (hereinafter called the "Land"), on which a Krystal restaurant is constructed (the "Building");

WHEREAS, Tenant wishes to lease from Landlord the Land and Building (hereinafter called the "Premises");

WHEREAS, Tenant intends to operate an Krystal Restaurant from the Premises;

NOW, THEREFORE, in consideration of the payment of the rent and the keeping and performance of the covenants and agreements by Tenant as hereinafter set forth, Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, together with all rights and privileges appurtenant thereto as may be necessary or convenient to Tenant's business, inclusive of all easements benefiting the Premises, on the terms and conditions hereof.

The following additional stipulations are hereby declared to be covenants of this Lease and shall, unless otherwise expressly stated, be applicable at all times throughout the term of this Lease and any extension or renewal thereof:

## 1.  DEFINITIONS

For purposes of this Lease, the following terms shall have the definitions ascribed to them:

"Affiliate" shall mean any party that controls or is controlled by or is under common control with a party. For purposes of this definition, "control" and correlative terms shall mean the possession, directly or indirectly, of the power to cause the direction of the management and policies of such party, whether through the ownership of voting securities, by contract or otherwise.

"Effective Date" shall mean the date set forth at the beginning of this Lease.

"Landlord" shall mean Hannah Rocks, LLC, a New York limited liability company, its successors and assigns.

"Lease" shall include this Lease Agreement and all amendments hereto, if any, entered into from time to time hereafter, together with the Rent Addendum and exhibits attached hereto.

"Lease Year" shall mean a fiscal period beginning on the Rent Commencement Date (and each anniversary thereof) and expiring on the last day of the twelfth (12th) month thereafter. In the event the Rent Commencement Date is not the first (1st) day of a calendar month, then the Lease Year shall commence on the first (1st) day of the calendar month following the Rent Commencement Date.

"Rent" shall mean the rent payable under this Lease as set forth in the Rent Addendum attached hereto and incorporated herein, and shall include Annual Rent (as defined in the Rent Addendum) and all other items described in this Lease as "additional rent".

"Rent Commencement Date" shall mean the date on which Landlord delivers possession of the Building to Tenant, which date shall be the Effective Date hereof unless Landlord and Tenant otherwise agree in writing.

"Tenant" shall include the named Tenant and any assignee or sublessee thereof pursuant to an assignment or sublease under Section 15 of this Lease.

## 2.   **TERM AND RENT**

(a)     Term.  The term of this Lease shall begin on the Effective Date and shall expire on the date that is fifteen (15) years after the Rent Commencement Date (hereinafter the "Termination Date"), unless previously terminated or renewed or extended as provided herein.

(b)     Rent.  Rent shall be due and payable as provided in the Rent Addendum attached hereto and incorporated herein, without notice, demand, deduction, or set-off.

(c)     Acceptance of Premises.  Tenant confirms that Tenant has accepted the Premises in their current "as is" condition; that the Building and other improvements have been completed to Tenant's satisfaction; and that the Premises are suitable for Tenant's purposes.

## 3.   **ALTERATIONS AND IMPROVEMENTS, INVESTMENT TAX CREDIT, MECHANIC'S LIENS, LANDLORD'S DISCLAIMER**

(a)     Alterations and Improvements.

(i)     Tenant's Property.  Tenant shall be permitted to install, use on and about, and remove from the Premises at any time and from time to time all trade fixtures and other personal property (exclusive of lighting, electrical, and heating and air conditioning improvements) which are not a component of the building located or to be located on the Premises (hereinafter referred to as the "Tenant's Property"), all of which at all times shall remain the property of Tenant with the right of removal (subject to Paragraph 3(d) below) at the expiration of this Lease. Tenant's Property shall include: (1) removable decor items and office equipment; (2) building lettering, signs, sign posts and sign

2

standards; (3) unattached food and customer service equipment; and (4) food, customer service equipment and any other equipment attached to the building by bolts and screws and/or by utility connections, or other means that can be removed without damage to the Premises, including without limitation, walk-in refrigerators and freezers, remote refrigeration systems, exhaust systems and hoods, and water heaters.

(ii)     Subsequent Improvements. Tenant shall also have the right to make any additions, alterations, changes and improvements, structural and nonstructural, including but not limited to tearing down and reconstructing a new restaurant Building, construction of additional buildings and additions to the then existing Building, as Tenant shall desire; provided, however, (A) if such changes are structural or impact the square footage of the then existing buildings, Tenant shall (1) submit plans ("Plans") of all changes to Landlord at least thirty (30) days in advance of the proposed construction date, which plans shall be subject to Landlord's approval, (2) provide Landlord with evidence of Tenant's financial ability to pay for such changes, and (3) deliver the certificate of occupancy, or local equivalent, a current ALTA survey, and as-built plans to Landlord within sixty (60) days after re-opening of the restaurant Building (B) all such construction shall be completed in a workmanlike manner and in material compliance with all laws, building codes and ordinances applicable thereto, at Tenant's sole expense, and (C) such new construction, additions, alterations, changes and improvements (whether structural or non-structural) shall not reduce the fair market value of the Premises, as reasonably determined by Landlord. In the event Tenant is making non-structural changes, alterations or routine repair and maintenance of existing improvements, Landlord's consent shall not be required.

In the event that Tenant renovates or reconstructs the Building during any Option Period (hereinafter defined) as provided herein, and the square footage of the new restaurant Building is eighty (80%) or less than the square footage of the restaurant Building prior to demolition, then commencing upon Tenant's receipt of the certificate of occupancy, or local equivalent, for the reconstructed restaurant Building, Annual Rent shall increase by seven and one-half (7.5%) percent over the Annual Rent then due and payable. Landlord and Tenant shall enter into an amendment to the lease to reflect such increase, however, failure by the parties to enter into such agreement shall not impact the increase in Annual Rent which shall be payable from the date that Tenant receives the certificate of occupancy, or local equivalent, for the reconstructed Building through the end of the term of this Lease, subject to annual increases as provided in Section 2(b) of the Rent Addendum attached hereto.

Upon submission of the Plans to Landlord as provided herein, Landlord shall use reasonable efforts to either give or withhold its approval of the Plans by providing written notice thereof to Tenant within twenty-one (21) days after the Plans are received by Landlord. If Landlord fails to provide either such notice to Tenant with such twenty-one (21) day period, then Landlord shall be deemed to have disapproved the Plans as submitted. Tenant may resubmit the Plans to Landlord for Landlord's review and approval, and upon such resubmission, Landlord shall have twenty-one (21) days after the receipt of the resubmitted Plans to approve or disapprove the same or else the revised Plans as then submitted shall deemed to be approved; provided, however, that the Plans shall only be deemed approved as provided herein if Tenant's resubmission of revised

3

Plans to Landlord are the same as initially provided and contains the following notice in bold font on the cover letter with the Plans:

> "The enclosed plans and specifications are being transmitted to you in accordance with the provisions of Section 3(a)(ii) of the Lease Agreement dated September 30, 2013, by and between Landlord and Tenant. Your failure to respond to the enclosed plans and specifications (specifying in detail reasons for disapproval, if any) within twenty-one (21) days after your receipt of the same will be construed as your approval of the same."

Further, upon receipt of Landlord's approval of the Plans, or provided such Plans have been deemed approved, Tenant is hereby irrevocably vested with a power of attorney from Landlord to execute any and all applications, permits, and/or other submittals required by any governmental authority on behalf of Landlord.

(iii)     Reconstruction of Building. Notwithstanding anything contained herein to the contrary, Tenant covenants and agrees that within two (2) years after the Effective Date subject to (a) receipt of all permits and approvals necessary to demolish, rebuild and operate a Krystal restaurant, and (b) force majeure, Tenant shall commence demolition of the existing Building and thereafter construct a new Building on the Land in accordance with the terms of subsection (ii) above. In all events, however, the reconstruction of the Building shall be complete by the expiration of the initial term of this Lease. After completion of the new Building, upon receipt of written request from Landlord, Tenant agrees to provide copies of any engineer's, architect's, contractor's, or other third-party consultant's reports or plans and a current ALTA survey related to the construction of the new Building in Tenant's possession or control.

(iv)     Upon Termination, Subletting or Assignment. Subject to the requirements of this Section 3, Tenant shall have the right, at its option and expense, to redecorate or otherwise remodel the Premises upon any termination hereof or upon any permitted subletting or assignment in such manner as will, without reducing the fair market value thereof, avoid the appearance of the Krystal Restaurant operated under this Lease; provided, however, that in addition to the other requirements of this Section 3, Tenant shall not impair the structural condition of the Premises, or reduce the size of the buildings on the Premises.

(v)     Landlord's Property. All subsequent improvements referred to in Paragraph 3(a)(ii) above, all improvements upon termination, subletting or assignment referred to in Paragraph 3(a)(iii) above, and any and all other additions, alterations, changes and improvements of any type (other than those that can be removed without causing damage to the Premises) shall be deemed to be a part of the Premises and the sole property of Landlord.

(b)     Investment Tax Credit. Landlord hereby grants Tenant the right and privilege of applying for and receiving all investment tax credits, if any, under the Internal Revenue Code which may be available with respect to the building and other improvements to be constructed. To this end, Landlord agrees to execute all such further documents and supply such additional information as may be required to make such election effective.

4

(c)    Mechanic's and Other Liens.  Tenant shall not do or suffer anything to be done whereby the Premises, or any part thereof, may be encumbered by a mechanic's, materialman's, or other lien for work or labor done, services performed, materials, appliances, or power contributed, used, or furnished in or to the Premises or in connection with any operations or any other activity of Tenant.  If, whenever and as often as any lien is filed against the Premises, or any part thereof, purporting to be for or on account of any labor done, materials or services furnished in connection with any work in or about the Premises, done by, for or under the authority of Tenant, or anyone claiming by, through or under Tenant, Tenant shall discharge the same of record within twenty (20) business days after service upon Tenant of written notice of the filing thereof; provided, however, Tenant shall have the right to remove the lien as an encumbrance upon the Premises by bonding same in accordance with applicable law and to contest any such lien; provided further that Tenant shall diligently prosecute any such contest, at all times effectively staying or preventing any official or judicial sale of the Premises under execution or otherwise, and, if unsuccessful, satisfy any final judgment against Tenant adjudging or enforcing such lien or, if successful, procuring record satisfaction or release thereof.

(d)    Landlord's Disclaimer.  All of Tenant's Property placed in or upon the Premises by Tenant shall remain the property of Tenant with the right to remove the same at any time during the term of this Lease.  Landlord, if requested by Tenant, agrees to execute, acknowledge and deliver an instrument in the form customarily used by any financier of Tenant's Property and reasonably satisfactory to Landlord, by which Landlord subordinates its lien rights to the lien rights of any equipment lender or lessor of Tenant's Property, and to all rights of levy for distraint for rent against same; provided any damage caused by, or resulting from the removal of any of Tenant's Property or other personal property (including the leaving of holes or other openings in the roof or exterior of the building) shall be promptly repaired by Tenant or the party entitled to remove same.   Landlord shall be entitled to charge a reasonable fee covering Landlord's actual costs in connection with execution of such documentation (which fee shall not exceed $1,000.00) and Tenant agrees to pay such fee as a condition precedent to Landlord's execution of such documents.

## 4.    **DESTRUCTION OF PREMISES; INSURANCE**

(a)    If the Premises are damaged or destroyed by fire, flood, tornado or other element, or by any other casualty and such damage or destruction does not occur within the last three (3) years of the original or of any extended or renewed term of this Lease, this Lease shall continue in full force and effect and Tenant shall, as promptly as possible, restore, repair or rebuild the Premises to substantially the same condition as it existed before the damage or destruction, including any improvements or alterations required to be made by any governmental body, county or city agency, due to any changes in code or building regulations.  Tenant shall for this purpose use all, or such part as may be necessary, of the insurance proceeds received from insurance policies required to be carried under the provision of Paragraph 4(b) of this Lease. Should the Premises be damaged or destroyed by any of the foregoing described casualties within the last thirty-six (36) months of the original term or of any extended or renewed term of this Lease, then to the extent that the Premises are untenantable or unsuitable, in Tenant's reasonable opinion, for continued use in the normal conduct of Tenant's business, Tenant shall have the right, exercisable by written notice to Landlord given within thirty (30) days after the date of such damage or destruction, to terminate this Lease effective upon the date of such damage or destruction.  Notwithstanding the foregoing, in the event that the Premises are

5

damaged at any time during the term of this Lease such that Tenant determines, in its reasonable business judgment, that such damage will prevent Tenant from carrying on its normal business operations for a period of more than one hundred twenty (120) days, then Tenant may elect to terminate this Lease by giving written notice thereof to Landlord within thirty (30) days after the date of such damage or destruction. If Tenant terminates this Lease as thus provided Landlord shall be entitled to the insurance proceeds on the Premises as Landlord's interest may appear, but not to the proceeds of insurance carried by Tenant on Tenant's Property or business interruption regarding extra expense or loss of income; provided, however, Tenant shall not have the right to terminate this Lease unless (i) the damage or destruction of the Premises was caused by a peril which was insured against as required by the provisions of Paragraph 4(b) of this Lease; and (ii) at the time of such damage and destruction the said insurance policies required to be carried by Tenant were in the amounts required herein.

(b)     Tenant, at its expense, shall throughout the term of this Lease and any extension or renewal thereof, keep the Premises insured with "Special Form Causes of Loss" coverage (as such term is used in the insurance industry), including coverage for glass breakage, vandalism and malicious mischief, and for fire, windstorm, and other casualty damage for one hundred percent (100%) insurable replacement value (excluding footings and foundations), inclusive of $250,000 ordinance and law limit (coverages A, B and C combined).

(c)     Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense and as additional rent, commercial general liability insurance including product liability covering the Premises (occurrence basis) covering bodily injury, property damage and personal injury, naming Landlord as an additional insured as Landlord's interest may appear, with limits not less than One Million Dollars ($1,000,000.00) per occurrence, with a general aggregate of not less than Two Million Dollars ($2,000,000.00) and a "following form" umbrella liability policy or excess liability policy to include product liability in an amount of not less than Ten Million Dollars ($10,000,000.00) per occurrence.

(d)     Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense, business interruption insurance covering risk of loss due to the occurrence of any of the hazards insured against under Tenant's insurance and providing coverage in an amount sufficient to permit the payment of Rents, any additional rent and continuing operating expenses payable hereunder for a period (in such case) of not less than twelve (12) months.

(e)     In the event the Premises are located in an area identified by the National Flood Insurance Program as an area having "special flood hazards" (zones beginning with "A" or "V"), Tenant shall maintain throughout the term of this Lease and any extension thereof, flood insurance with limits stipulated pursuant to the National Flood Insurance Program, with any deductible in excess of Twenty five Thousand Dollars ($25,000.00) to be approved by Landlord.

(f)     All insurance companies providing the coverage required under this Section 4 shall be selected by Tenant and shall be rated A minus (A-) or better by Best's Insurance Rating Service (or equivalent rating service if not available), and shall be licensed to write insurance policies in the state in which the Premises are located. Tenant shall provide Landlord with copies of all policies and/or certificates of such coverage for the insurance coverages referenced in this Section 4, and all commercial general liability and umbrella liability or excess liability

policies shall name Landlord (and if Landlord is either a general or limited partnership, all general partners) and any mortgagee designated by Landlord as an additional insured as their interests may appear. Any such coverage for additional insureds shall be primary and non-contributory with any insurance carried by Landlord or any other additional insured hereunder. All property insurance policies shall name Landlord (and if Landlord is either a general or limited partnership), all general partners and any mortgagee designated by Landlord as an additional insured or as a loss payee as Landlord's interests may appear, and shall provide that all losses shall be payable as herein provided. All such policies of insurance shall provide that the amount thereof shall not be reduced and that none of the provisions, agreements or covenants contained therein shall be modified or canceled by the insuring company or companies without thirty (30) days prior written notice being given to additional insureds except ten (10) days' notice for non-payment. Such policy or policies of insurance may also cover loss or damage to Tenant's Property, extra expense and loss of income, and the insurance proceeds applicable to Tenant's Property, shall not be paid to Landlord or any mortgagee but shall accrue and be payable solely to Tenant. In the event of a casualty, Tenant shall be responsible for any deficiency between the replacement cost of the Premises and the amount actually paid by the insurance company.

## 5.   **MAINTENANCE AND REPAIR**

(a)      Tenant shall, during the term of this Lease and any renewals thereof, (i) maintain the Premises and all buildings and improvements thereon (interior and exterior, structural and otherwise) in good order and repair, ordinary wear and tear excepted; (ii) not commit waste or permit impairment or deterioration of the Premises (normal wear and tear excepted); (iii) to keep Tenant's Property, including trade fixtures, equipment, machinery and appliances thereon in good repair (ordinary wear and tear excepted) and replace trade fixtures, equipment, machinery and appliances on the Premises when necessary to keep such items in good repair; (iv) comply in all material respects with all laws, ordinances, regulations and requirements of any governmental body; (v) provide prompt notification to Landlord of any material adverse changes to the Premises of which Tenant is aware, such as material changes in any environmental condition, including the presence of biocontaminants, such as, but not limited to mold, and shall promptly undertake reasonable remediation (and preventative) actions in connection therewith; (vi) subject to the provisions of Paragraph 4(a) with respect to material damage or damage within the last three (3) years of this Lease, and Section 6 herein, return the Premises and all buildings and improvements thereon at the expiration of the term of this Lease or any extension thereof in as reasonably as good condition as when received, ordinary wear and tear excepted.

(b)      Tenant agrees that Landlord shall have no obligation under this Lease to make any repairs or replacements (including the replacement of obsolete components) to the Premises or the buildings or improvements thereon, or any alteration, addition, change, substitution or improvement thereof or thereto, whether structural or otherwise. Without limitation of the foregoing, Tenant shall be responsible for, and Landlord shall have no responsibility for, the maintenance, repair and replacement of the roof, foundation and structural components of the Building, together with the mechanical, electrical, plumbing and HVAC components, parking and driveway areas. The terms "repair" and "replacement" include, without limitation, the replacement of any portions of the Premises which have outlived their useful life during the term of this Lease (or any extensions thereof). Landlord and Tenant intend that the Rent received by Landlord shall be free and clear of any expense to Landlord for the construction, care,

7

maintenance (including common area maintenance charges and charges accruing under easements or other agreements relating to the Premises), operation, repair, replacement, alteration, addition, change, substitution and improvement of or to the Premises and any building and improvement thereon. Upon the expiration or earlier termination of this Lease, Tenant shall remain responsible for, and shall pay to Landlord, any cost, charge or expense for which Tenant is otherwise responsible for hereunder attributable to any period (prorated on a daily basis) prior to the expiration or earlier termination of this Lease.

## 6. **CONDEMNATION**

(a)    In the event that the whole or any material part of the building on the Premises or a material portion of the Land (for purposes hereof, "material" shall mean more than 10% of the restaurant building on the Premises, more than 20% of the Land or a portion of the parking area that would reduce the number of available parking spaces below the minimum number of parking spaces required by code, unless suitable alternative parking is provided) shall be taken during the term of this Lease or any extension or renewal thereof for any public or quasi public use under any governmental law, ordinance, regulation or by right of eminent domain, or shall be sold to the condemning authority under threat of condemnation, or if Tenant can demonstrate to Landlord's reasonable satisfaction that the Premises cannot be reasonably operated as the type of restaurant contemplated herein as a result of such condemnation, or if all reasonable access to the adjacent roadways from the existing or comparable curb cuts shall be taken or materially reduced, or if Tenant's activities on the Premises shall be disrupted following such condemnation such that, in Tenant's reasonable discretion, the Premises cannot be operated in the substantially the same manner (any of such events being hereinafter referred to as a "taking"), then in such event, Tenant shall have the option of terminating this Lease as of a date no earlier than the date of such taking, such termination date to be specified in a notice of termination to be given by Tenant to Landlord not fewer than fourteen (14) days prior to the date on which possession of the Premises, or part thereof, must be surrendered to the condemning authority or its designee.

(b)    In the event of any taking which does not give rise to an option to terminate or in the event of a taking which does give rise to an option to terminate under Section 6(a) hereinabove and Tenant does not elect to terminate, Landlord shall make its award available to Tenant and Tenant shall, to the extent of the award from such taking (which term "award" shall mean the net proceeds after deducting expenses of any settlement, or net purchase price under a sale in lieu of condemnation but shall exclude the value of Landlord's reversionary interest), promptly restore or repair the Premises and all improvements thereon (except those items of Tenant's Property which Tenant is permitted to remove under the terms of this Lease) to the same condition as existed immediately prior to such taking insofar as is reasonably possible. If the estimated cost of restoration or repair shall exceed the amount of Landlord's award, Landlord shall promptly provide notice to the Tenant of such deficiency, and Tenant shall have the option to (i) terminate this Agreement by giving written notice to Landlord within thirty (30) days after Tenant receives notice from Landlord of the deficiency, or (ii) deposit with Landlord the amount of such excess. In the event that Tenant elects under clause (ii) in the preceding sentence, the award and any excess shall be held in trust by Landlord and used, to the extent required, for the purpose of such restoration or repair. A just and proportionate part of the Rent payable hereunder shall be abated from the date of such taking until ten (10) days after Tenant has restored same and thereafter the Rent shall be reduced in proportion to the reduction in the then rental value of the Premises after the taking in comparison with the rental value prior to the

8

taking. If the award shall exceed the amount spent or to be spent promptly to effect such restoration, repair or replacement, such excess shall unconditionally belong to Landlord and shall be paid to Landlord.

(c) In the event of any partial taking where this Lease is not terminated, Tenant shall not be entitled (except for use in reconstruction) to any part of the compensation or award given Landlord attributable to the taking of the fee of the Premises, but Tenant shall have the right to amounts (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

(d) If this Lease is terminated by reason of a taking, then Landlord shall be entitled to receive the reimbursement for its entire award in any such condemnation or eminent domain proceedings or purchase in lieu thereof and Tenant hereby assigns to Landlord all of its right, title and interest in and to all and any part of such award, provided, however, Tenant shall be entitled to receive any portion of any award (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

## 7.   TAXES AND ASSESSMENTS

(a) Tenant shall pay prior to delinquency all taxes and assessments which may be levied upon or assessed against the Premises and all taxes and assessments of every kind and nature whatsoever arising in any way from the use, occupancy, possession or transfer of ownership (excluding, however, any taxes incurred by Landlord (or a successor landlord) in connection with a transfer of ownership) of the Premises or assessed against the improvements situated thereon, together with all taxes levied upon or assessed against Tenant's Property. To that end, Landlord shall not be required to pay any taxes or assessments whatsoever which relate to or may be assessed against this Lease, the Rent and other amounts due hereunder, the Premises, improvements and Tenant's Property; provided, however, that any taxes or assessments which may be levied or assessed against the Premises for the period prior to the Rent Commencement Date or for the period ending after the Termination Date hereof shall be prorated between Landlord and Tenant as of such date. Tenant will not be required to pay any income, gross receipts, excess profits, revenue, corporate, personal property, estate, inheritance, gift, devolution, succession, transfer, franchise, capital levy or capital stock tax.

(b) Within ten (10) business days after Tenant receives the paid receipted tax bills, Tenant shall furnish Landlord with copies thereof. Tenant may, at its option, contest in good faith and by appropriate and timely legal proceedings any such tax and assessment; provided, however, that Tenant shall indemnify and hold harmless Landlord from any loss or damage resulting from any such contest, and all reasonable expenses of same (including, without limitation, all attorneys' and paralegal fees, court and other costs) shall be paid solely by Tenant. Landlord, at no cost or liability to Landlord, shall cooperate with Tenant and execute any document which may reasonably be necessary for any proceeding.

## 8.   COMPLIANCE, UTILITIES, SURRENDER

(a) Tenant, at its expense: shall promptly comply with all municipal, county, state, federal and other governmental requirements and regulations, whether or not compliance

9

therewith shall require structural or other changes in the Premises; will procure and maintain all permits, licenses and other authorizations required for the use of the Premises or any part thereof then being made and for the lawful and proper installation, operation and maintenance of all equipment and appliances necessary or appropriate for the operation and maintenance of the Premises; and shall comply with all easements, restrictions, reservations and other instruments of record applicable to the Premises, including without limitation, any requirement in such instruments on behalf of the owner or occupant of the Premises to procure and maintain insurance, and to make any payments thereunder, whether now in effect or enacted during the term of this Lease. Tenant shall indemnify and save Landlord harmless from all expenses and damages by reason of any notices, orders, violations or penalties filed against or imposed upon the Premises (based on Tenant's sole scope of operations at the Premises), or against Landlord as owner thereof, because of Tenant's failure to comply with this paragraph.

(b) Tenant shall pay all charges for heat, water, gas, sewage, electricity and other utilities used or consumed on the Premises and shall contract for the same in its own name. Landlord shall not be liable for any interruption or failure in the supply of any such utility service to the Premises.

(c) Tenant shall peacefully surrender possession of the Premises, the buildings and other improvements thereon to Landlord at the expiration, or earlier termination, of the original term or any extended or renewed term of this Lease in good condition and repair, reasonable wear and tear excepted, and in broom clean condition with all debris removed.

## 9. **QUIET ENJOYMENT**

Landlord covenants and warrants that Landlord has full power and authority to enter into this Lease, and that Tenant shall have and enjoy full, quiet and peaceful possession of the Premises, its appurtenances and all rights and privileges incidental thereto during the term hereof and any renewals or extensions, subject to the provisions of this Lease and any easements, restrictions, reservations and other instruments of record applicable to the Premises and in existence at the time of the conveyance of the Premises to Landlord by Tenant or thereafter. Landlord agrees to cause the holder of any mortgage now or hereafter relating to the Premises to execute and deliver to Tenant a Subordination and Nondisturbance Agreement substantially in the form contemplated by Section 16 of this Lease, or in such form as may be customarily utilized by the lender and reasonably approved by Tenant.

## 10. **OPTION TO RENEW**

Tenant shall have six (6) successive five (5) year options (each, an "Option Period") to extend this Lease for up to an additional thirty (30) years upon the same terms, covenants, conditions and rental as set forth herein provided that Tenant is not in Default hereunder at the commencement of such option period. In the event Tenant elects not to exercise each such five (5) year option, Tenant shall give written notice to Landlord not less than six (6) months prior to the Termination Date. Should Tenant fail to give Landlord such timely written notice during the required period, this Lease shall automatically renew pursuant to the terms hereof.

10

## 11.   **DEFAULT**

(a)   If any one or more of the following events occur, said event or events shall be referred to as a "Default" under this Lease:

(i)   If Tenant fails to pay Rent or any other charges required under this Lease when same shall become due and payable, and such failure continues for ten (10) days or more after written notice from Landlord;

(ii)   If Tenant fails to perform or observe any term, condition, covenant, agreement, or obligation required under this Lease and such failure continues for thirty (30) days after written notice from Landlord (except that such thirty (30) day period shall be automatically extended for such additional period of time as is reasonably necessary to cure such Default, if such Default cannot be cured within such period, provided Tenant is in the process of diligently curing the same).

(iii)   If Tenant shall make an assignment for the benefit of creditors or file a petition, in any federal or state court, in bankruptcy or reorganization, or make an application in any such proceedings for the appointment of a trustee or receiver for all or any portion of its property, and such proceeding shall not be set aside within sixty (60) days.

(iv)   If any petition shall be filed under federal or state law against Tenant in any bankruptcy, reorganization, or insolvency proceedings, and said proceedings shall not be dismissed or vacated within sixty (60) days after such petition is filed.

(v)   If a receiver or trustee shall be appointed under federal or state law for Tenant for all or any portion of the property of either of them, and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

(b)   Upon the happening of any one or more of the aforementioned Defaults which are not cured within the cure period applicable thereto, if any, Landlord shall have the right, in addition to any other rights and remedies, to:

(1)   terminate this Lease by giving written notice of same to Tenant.  Upon such notice, this Lease shall cease and expire, and Tenant shall surrender the Premises to Landlord in the condition required by this Lease, and Landlord will be entitled to recover all unpaid rents that have accrued through the date of termination plus the costs of performing any of Tenant's obligations (other than the payment of rent) that should have been but were not satisfied as of the date of such termination.  In addition, Landlord will be entitled to recover, not as rent or a penalty but as compensation for Landlord's loss of the benefit of its bargain with Tenant, the difference between (i) an amount equal to the present value of the rent and other sums that this lease provides Tenant will pay for the remainder of the Primary Term and for the balance of any then effective extension of the Primary Term, and (ii) the present value of the net future rents for such period that will be or with reasonable efforts could be collected by Landlord by reletting the Premises.

(2)   take possession of the Premises without terminating this Lease and then rent the same for the account of Tenant (which may be for a term extending beyond the Term of

50416335_1

this Lease) in which event Tenant covenants and agrees to pay any deficiency after crediting it with the rent thereby obtained less all repairs and expenses, including the costs of remodeling and brokerage fees, and Tenant waives any claim it may have to any rent obtained on such releting which may be in excess of the Rent required to be paid herein by Tenant;

(3)     perform such obligation (other than payment of Rent) on Tenant's behalf and charge the cost thereof to Tenant as additional rent; or

(4)     exercise any and all other rights granted to Landlord under this Lease or by applicable law or in equity.

Tenant further agrees that in the event of a Default, any monies deposited by Tenant with Landlord shall be immediately and irrevocably assigned and released to Landlord (without further action by Landlord or Tenant) to be applied by Landlord against any and all of Tenant's obligations under this Lease, in any manner as Landlord may determine.

(c)     If Landlord should elect to terminate or repossess the Premises, as provided hereinabove, Landlord may re-enter the Premises and remove Tenant, its agents and subtenants, together with all or any of Tenant's Property, by suitable action at law, or by force. Tenant waives any right to the service of any notice of Landlord's intention to re-enter and Landlord shall not be liable in any way in connection with any action it takes pursuant to this paragraph. Notwithstanding such re-entry or removal, Tenant's liability under Lease shall survive and continue.

(d)     In case of re-entry, repossession or termination of this Lease, Tenant shall remain liable for Rent, any additional rent and all other charges provided for in this Lease for the otherwise remaining term of this Lease, and any and all expenses which Landlord may have incurred in re-entering the Premises including, but not limited to, allocable overhead, alterations to the building to bring the building to "white box" standard, leasing, construction, architectural, and reasonable legal and accounting fees. Landlord shall have the right, but not the obligation, to relet the whole or part of the Premises upon terms which Landlord, in its sole discretion, deems appropriate and Tenant shall be responsible for all reasonable and customary expenses incurred by Landlord in reletting or attempting to relet and all rent collected for reletting shall be credited against all of Tenant's obligations hereunder. Landlord agrees to use commercially reasonable efforts to relet the Premises in order to mitigate its damages

(e)     In the event of and during the continuance of a Default, Landlord may, at its sole option, enter upon the Premises, if deemed necessary by Landlord in its sole discretion, and/or do whatever may be deemed necessary by Landlord in its sole discretion to cure such failure by Tenant. Tenant shall pay to Landlord within five (5) days of Landlord's request, all costs incurred by Landlord in connection with Landlord's curing of such failure. In addition to the above costs, in the event Landlord does not receive payment from Tenant when due under this paragraph, then interest at the rate of eighteen percent (18%) per annum or, if less, the highest rate allowable by law, shall be due and payable with respect to such payment from the due date thereof until Landlord receives such payment.

(f)     In the event either party engages legal counsel in connection with the enforcement of any of the terms and provisions of this Lease, then, in addition to all other sums due from the

12

party deemed liable hereunder, such liable party shall pay to the prevailing party any and all attorneys' fees, paralegal fees, and legal costs and expenses incurred by the prevailing party, including on appeal and in any bankruptcy proceedings.

(g)     The rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now or hereinafter provided by law, and all such rights and remedies shall be cumulative. No action or inaction by Landlord shall constitute a waiver of any Default, and no waiver of any Default shall be effective unless it is in writing, signed by Landlord.

## 12.    **HOLDING OVER**

In the event Tenant remains in possession of the Premises after the expiration of this Lease without executing a new written lease acceptable to Landlord and Tenant, Tenant shall occupy the Premises as a tenant from month to month subject to all the terms hereof (except as modified by this paragraph), but such possession shall not limit Landlord's rights and remedies by reason thereof nor constitute a holding over. In the event of such month to month tenancy, the monthly installment of Annual Rent due for each such month shall increase to be one hundred twenty-five percent (125%) of the monthly installment thereof which was payable during the last month of the term of this Lease.

## 13.    **WAIVER OF SUBROGATION**

Notwithstanding anything in this Lease to the contrary, other than Tenant's obligations to repair, restore or rebuild described in Section 4 of this Lease, neither party shall be liable to the other for any damage or destruction of the Premises resulting from fire or other casualty covered by insurance required of either party hereunder, whether or not such loss, damage or destruction of the Premises are caused by or results from the negligence of such party (which term includes such party's officers, employees, agents and invitees), and each party hereby expressly releases the other from all total liability for or on account of any said insured loss, damage or destruction. Each party shall procure all endorsements of insurance policies carried by it necessary to protect the other from any right of subrogation and/or liability in the event of such loss.

## 14.    **LANDLORD'S LIEN FOR RENTS**

As security for Tenant's payment of Rent and all other payments required to be made by Tenant hereunder (including, by way of illustration only, taxes, damage to the Premises, court costs, and attorneys' fees), Tenant hereby grants to Landlord a lien upon all of Tenant's Property now or hereafter located upon the Premises. The lien herein provided shall be subordinate to the lien of any chattel mortgage, collateral assignment or security interest given by Tenant to any seller or provider of purchase money financing of Tenant's Property ("Leasehold Lender's Lien") and in connection therewith Landlord agrees to execute a Landlord Waiver and Collateral Access Agreement substantially in the form attached hereto as Exhibit "E". Within thirty (30) days after any Lender's Leasehold Lien is satisfied or otherwise released, Tenant shall provide Landlord with written notice of such satisfaction, release or removal. In the event of a Default, Landlord may enter upon the Premises and take possession of Tenant's Property, or any part thereof, and may sell all or any part of Tenant's Property at public or private sale in one or successive sales, with or without notice, to the highest bidder for cash and on behalf of Tenant. Landlord may sell and convey Tenant's Property, or any part thereof, to such bidder, delivering to such bidder all of

13

Tenant's title and interest in such property sold to such bidder. The proceeds of such sale shall be applied by Landlord first toward the costs of such sale and then toward the payment of all sums due from Tenant to Landlord under this Lease. Notwithstanding anything in this paragraph to the contrary, Tenant shall be entitled to collaterally grant a security interest in Tenant's interest in this Lease to any lender, including, without limitation, Wells Fargo Bank, National Association.

## 15.    ASSIGNMENT AND SUBLETTING

(a)    Tenant shall have the right to assign or sublet all or any part of the Premises to any party for any lawful purpose. Notwithstanding the foregoing, Tenant shall have no right to assign or sublet in the event such assignment or subletting would violate any material term of any then material existing agreement applicable to the Premises. Except as set forth in this Section 15, any assignment or subletting permitted hereunder shall not relieve Tenant of its liability for the continued performance of all terms, covenants and conditions of this Lease, including without limitation the payment of all Rent and other charges hereunder. Likewise, as a condition of any such assignment by Tenant, the assignee shall be required to execute and deliver to Landlord, upon the effective date of such assignment, an agreement, in recordable form, whereby such assignee assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Tenant shall be released from all liability under this Lease arising after the date of such assignment or subletting if the assignment or sublease is executed in connection with (i) the sale of all or substantially all of Tenant's (or Tenant's Affiliates') business or assets, including the Premises, to a corporation or other entity that will operate the Premises as an Krystal; and (ii) as of the date of assignment or sublease, the assignee or subtenant or guarantor thereof has an S&P Credit Rating of BBB- or higher, and a Fitch Credit Rating of BBB- or higher, and a Moody's Credit Rating of Baa3 or higher; or (ii) as of the date of assignment, the assignee has an aggregate net worth in accordance with GAAP, of at least $30,000,000; and (iii) the assignee assumes all of Tenant's obligations under this Lease; or (iii) as reasonably approved by Landlord. As used in the immediately preceding sentence, "S&P Credit Rating" means the credit rating assigned by Standard & Poor's Rating Group to the highest rated publicly issued debt securities of the assignee, "Fitch Credit Rating" means the credit rating assigned by Fitch Ratings, Inc. to the highest rated publicly issued debt securities of the assignee, and "Moody's Credit Rating" means the credit rating assigned by Moody's Investors Service to the highest rated publicly issued debt securities of the assignee.

(b)    Prior to any assignment hereunder, Tenant shall deliver to Landlord written notice of such assignment or subletting, together with: (i) a copy of the assignment or subletting documents (including copies of any recorded documents related thereto); (ii) the name, address and telephone number of such assignee or sublet tenant and a designated contact person therefor; (iii) a new insurance policy and binder complying with the terms of this Lease and naming such assignee or sublet tenant as the tenant of the Premises; and (iv) an agreement executed by such assignee or sublet tenant, in recordable form, whereby such assignee or sublet tenant assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Landlord shall execute and return within ten (10) days of receipt any estoppels reasonably requested by Tenant, the assignee or sublessee, or their lenders, in connection with such assignment or sublease.

14

(c)    All rent and other consideration payable under any sublease shall be solely the property of Tenant.

(d)    Landlord shall have the right without limitation to sell, convey, transfer or assign its interest in the Premises or its interest in this Lease. In the event of any sale or other transfer of Landlord's interest in the Premises, other than a transfer for security purposes only, Landlord shall be automatically relieved of any and all obligations and liabilities on the part of Landlord occurring from and after the date of such transfer; provided, that the transferee shall assume all of the obligations of Landlord under this Lease.   It is intended hereby that the covenants and obligations contained in this Lease on the part of the Landlord shall be binding on Landlord only during its period of ownership of the Premises.

## 16.    SUBORDINATION, NON DISTURBANCE, ATTORNMENT, ESTOPPEL CERTIFICATE.

(a)    Upon written request of the holder of any mortgage (which term "mortgage" shall also include deeds of trust) now or hereafter relating to the Premises, Tenant shall subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall execute, acknowledge and deliver an instrument substantially in the form of Exhibit "B" attached hereto or in other reasonable form customarily used by such encumbrance holder to effect such subordination; provided, however, as a condition of all such subordinations, the holder of such mortgage shall be first required to agree with Tenant that, notwithstanding the foreclosure or other exercise of rights under any such first or other mortgage, Tenant's possession and occupancy of the Premises and the improvements and its leasehold estate shall not be disturbed or interfered with, nor shall Tenant's rights and obligations under this Lease be altered or adversely affected thereby so long as Tenant is not in Default.

(b)    Notwithstanding anything in Paragraph 16(a) above to the contrary, in the event the holder of any such mortgage elects to have this Lease be superior to its mortgage, then upon notification to Tenant to that effect by such encumbrance holder, this Lease shall be deemed prior to the lien of said mortgage, whether this Lease is dated prior or subsequent to the date of said mortgage, and Tenant shall execute, acknowledge and deliver an instrument, in the form customarily used by such encumbrance holder to effect such priority.

(c)    In the event proceedings are brought for the foreclosure of, or in the event of the exercise of the power of sale under any mortgage made by Landlord encumbering the Premises, or in the event of delivery of a deed in lieu of foreclosure under such a mortgage, Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as "Landlord" under this Lease, and upon the request of the purchaser, Tenant shall execute, acknowledge and deliver an instrument, in form and substance satisfactory to such purchaser, evidencing such attornment.

(d)    Each party agrees, within ten (10) days after written request by the other, to execute, acknowledge and deliver to and in favor of any proposed mortgagee or purchaser of the Premises, an estoppel certificate, substantially in the form of Exhibit "C" attached hereto, stating, among other things (but limited to factual matters related to this Lease) (i) whether this Lease is in full force and effect, (ii) whether this Lease has been modified or amended and, if so,

15

identifying and describing any such modification or amendment, (iii) the date to which Rent and other charges have been paid, and (iv) whether the party furnishing such certificate knows of any default on the part of the other party under this Lease, or has any claim against such party and, if so, specifying the nature of such default or claim.

(e)     Upon written demand by the holder of any mortgage encumbering the Premises, Tenant shall forthwith execute, acknowledge and deliver an agreement in favor of and in the form reasonably satisfactory to Tenant, by the terms of which Tenant shall agree to give prompt written notice to such encumbrance holder in the event of any casualty damage to the Premises or in the event of any default on the part of Landlord under this Lease, and shall agree to allow such encumbrance holder a reasonable length of time after notice to cure or cause the curing of such default before exercising Tenant's rights under this Lease, or terminating or declaring a default under this Lease.

(f)     Tenant shall be entitled to charge a reasonable fee covering Tenant's actual costs in connection with the execution of any subordination, non-disturbance and attornment agreement or estoppel certificate requested by Landlord hereunder (which fee shall not exceed $1,000.00) and Landlord agrees to pay such fee as a condition precedent to Tenant's execution of such documents.

## 17.    **USE OF PREMISES**

The Premises shall be used by Tenant for any lawful purpose.  Tenant shall operate its business in a high class and reputable manner.  Tenant shall have the right to cease operation of a business on the Premises; provided, however, Tenant shall continue to fulfill all other obligations of Tenant under this Lease, including payment of Rent and performance of Tenant's maintenance obligations.  Tenant shall have the right to place billboard signage on the Premises and receive any and all income derived from signage; provided, however that any and all signage must be allowed by applicable law. The Premises shall be used and occupied only for those purposes that are now or hereafter permitted under the land use designation and zoning district for the Premises and according to all other applicable public and private restrictions, covenants and laws affecting the Premises, including, but not limited to, the covenants and restrictions contained hereinbelow. Neither the Premises, nor any portion thereof, shall be occupied by or used for: nude or semi-nude dancing or service; lingerie modeling; an "adult" or "x-rated" book or video store that sells or rents "adult" or "x-rated" material (which are defined as stores in which thirty percent (30%) or more of the inventory is not available for sale to children under eighteen (18) years old); the display for sale of pornographic or obscene materials (i.e., books, magazines, newspapers, video tapes, video discs, computer software or the like which would be considered obscene or pornographic under prevailing laws or community standards); an "adult" or "x-rated" movie theater; a so-called "head shop" selling or displaying drug paraphernalia; a clinic or health provider offering abortions as a part of its services; a funeral home; a flea market; a bingo parlor; a car wash, a dance hall or nightclub; a skating rink; a bowling alley; a pool hall or billiards room; the use or placement of any telecommunications towers; or, any use that is unlawful or that creates a legal nuisance.

## 18.    NOTICES

All notices and other communications required or permitted to be given hereunder shall be in writing and shall be delivered by a nationally recognized overnight courier or mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Landlord:
Hannah Rocks, LLC
350 Theodore Fremd Avenue
Suite 210
Rye, New York 10580
Attention: John M. Tanenbaum
Facsimile: (516) 932-9822

With a copy to:
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, New York 10022
Attention: Jessica Bozarth
Facsimile: 212-754-0330

If to Tenant:
The Krystal Company
1455 Lincoln Parkway East
6th Floor
Dunwoody, Georgia 30346
Attention: Property Management
Facsimile: (770) 351-4704

With copies to:
Argonne Capital Group, LLC
One Buckhead Plaza, Suite 1560
3060 Peachtree Road, NW
Atlanta, Georgia 30305
Attention: Karl F. Jaeger
Facsimile: (404) 364-2985

McGuireWoods LLP
1230 Peachtree Street, NE, Suite 1230
Atlanta, Georgia 30309
Attention: John T. Grieb, Esq.
Facsimile: (404) 443-5762

Any party may change its address for notices by written notice in like manner as provided in this paragraph and such change of address shall be effective seven (7) days after the date written notice of such change of address is given. Notice for purposes of this Lease shall be deemed given by the party who is giving such notice when it shall have been received or refused from the U.S. certified or registered mail, or from a nationally recognized overnight courier, with sufficient postage prepaid.

With respect to any such notice, Tenant shall, and Landlord shall use its best efforts to, simultaneously deliver a copy of such notice by facsimile at the appropriate facsimile number

50416335_1

above to the other party; provided however, that certified mail or overnight courier delivery shall nevertheless be required to effect proper notice hereunder.

## 19.    **INDEMNIFICATION**

Tenant does hereby indemnify and exonerate and agrees to hold harmless Landlord against and from all liabilities, losses, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable architects' fees, attorneys' fees, paralegal fees, and legal costs and expenses incurred by Landlord, whether or not judicial proceedings are filed, and including on appeal and in any bankruptcy proceedings, which may be imposed upon or asserted against or incurred by Landlord by reason of Tenant's use and occupancy of the Premises, including without limitation any of the following occurring:

(a)    any work or thing done in respect of construction of, in or to the Premises or any part of the improvements now or hereafter constructed on the Premises;

(b)    any use, possession, occupation, operation, maintenance or management of the Premises or any part hereof;

(c)    any failure to, or to properly, use, possess, occupy, operate, maintain or manage the Premises or any part thereof;

(d)    the condition, including environmental conditions, of the Premises or any part thereof;

(e)    any negligence on the part of Tenant or any of its agents, contractors, servants, employees, licensees or invitees;

(f)    any accident, injury or damage to any person or property occurring in, on or about the Premises or any part thereof including any sidewalk adjacent thereto;

(g)    any failure on the part of Tenant to perform or comply with any of the covenants, agreements, terms or conditions contained in this Lease on its part to be performed or complied with.

Landlord shall not be responsible or liable to Tenant for any loss or damage to either the person or property of Tenant unless caused by the negligence or intentional acts of Landlord. Landlord shall not be responsible or liable for any defect, latent, or otherwise, in the Premises, or any of the equipment, machinery, utilities, appliances or apparatus therein, nor shall it be responsible or liable for any injury, loss or damage to any person or to any property caused by or resulting from bursting, breakage, leakage, steam or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of said Premises or for any injury or damage caused by or resulting from acts of God or the elements, or for any injury or damage caused by or resulting from any defect or negligence in the occupancy, construction, operation or use of any of said Premises, building, machinery, apparatus or equipment.

## 20.    COOPERATION

(a)    Landlord shall fully cooperate with Tenant throughout the term of this Lease to secure or maintain proper zoning, building and other permits and compliance with all applicable laws; provided, however, that Landlord shall not be required to incur any additional expense. Landlord shall within ten (10) days of request execute any petitions, requests, applications and the like as Tenant shall reasonably request in order to obtain any permit, license, variances and approvals which, in the reasonable judgment of Tenant, are necessary for the lawful construction and/or operation of Tenant's business on the Premises, provided, however, that Tenant shall indemnify and save Landlord harmless from any and all expenses, costs, charges, liabilities, losses, obligations, damages and claims of any type which may be imposed upon, asserted against or incurred by Landlord by reason of same.

(b)    Landlord shall have the right, in Landlord's sole discretion, to enter into an exchange agreement with a qualified intermediary in order to effectuate a like-kind exchange of the Premises for one or more other properties. Landlord and Tenant agree that Tenant, at no cost to Tenant, shall cooperate with Landlord in effecting a like-kind exchange of the Premises by Landlord pursuant to and in accordance with the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

## 21.    EXCULPATION

Neither Party shall be liable to the other, or the other's employees, agents, invitees, licensees or any other person whomsoever for any injury to person or damage to property on or about the Premises caused by the other party's negligence or misconduct, its agents, servants or employees or of any other person entering the building under express or implied invitation by the other party or due to any other cause whatsoever, except to the extent by the negligence or neglect of such party, its employees or its authorized representatives.

## 22.    LANDLORD'S LIABILITIES

The term "Landlord" as used in this Lease means the owner from time to time of the Premises.  Neither Landlord nor any partner, shareholder or beneficiary thereof shall have any personal liability with respect to any of the provisions of this Lease, and if Landlord is in default with respect to its obligations hereunder, Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of Tenant's remedies for the collection of a judgment or other judicial process requiring the payment of money by Landlord, and no other property or assets of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use or occupancy of the Premises.

## 23.    SUCCESSORS

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

50416335_1

## 24.    ENTIRE AGREEMENT/MEMORANDUM OF LEASE

This Lease contains the entire agreement between the parties hereto and may not be modified in any manner other than in writing signed by the parties hereto or their successors in interest.  A memorandum of this Lease in the form attached hereto as Exhibit "D" shall be executed by the parties and shall be recorded in the official records of the county where the Premises are located.

## 25.    GENDER

Whenever the context hereof permits or requires, words in the singular may be regarded as in the plural and vice-versa, and personal pronouns may be read as masculine, feminine and neuter.

## 26.    BROKERAGE FEES

It is understood and agreed that neither party has incurred any real estate brokerage fees or commissions arising out of this Lease and each party agrees to hold the other harmless from and against all such fees and commissions incurred, and costs related thereto including legal fees, as a result of its own conduct or alleged conduct.

## 27.    CAPTIONS

The captions of this Lease are for convenience only, and do not in any way define, limit, disclose, or amplify terms or provisions of this Lease or the scope or intent thereof.

## 28.    NOT A SECURITY ARRANGEMENT

The parties hereto agree and acknowledge that this transaction is not intended as a security arrangement or financing secured by real property, but shall be construed for all purposes as a true lease.

## 29.    NET LEASE

It is the intention of the parties hereto that this Lease is and shall be treated as a triple net lease.  Any present or future law to the contrary notwithstanding, except as expressly set forth in this Lease, this Lease shall not terminate, nor shall Tenant be entitled to any abatement, suspension, deferment, reduction, setoff, counterclaim, or defense with respect to Rent, nor shall the obligations of Tenant hereunder be affected by reason of:  any damage to or destruction of the Premises or any part thereof; any taking of any Premises or any part thereof or interest therein by condemnation or otherwise; any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any person or for any other reason; any title defect or encumbrance or any matter affecting title to the Premises or any part thereof; any eviction by paramount title or otherwise; any default by Landlord hereunder; any proceeding relating to Landlord; the impossibility or illegality of performance by Landlord, Tenant or both; any action of governmental authority; any breach of warranty or misrepresentation; any defect in the condition, quality or fitness for use of the Premises or any part thereof; or any other cause whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or

20

50416335_1

knowledge of any of the foregoing. The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated in accordance with an express provision of this Lease.

## 30.   **WAIVER**

No waiver by either party of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by the other party of the same or any other provision. Either party's consent to, or approval of, any act as required hereunder shall not be deemed to render unnecessary the obtaining of such party's consent to or approval of any such subsequent act by the other party. The acceptance of Rent, or any partial payment of Rent, hereunder by Landlord shall not be a waiver of any preceding Default by Tenant of any provision hereof, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent.

## 31.   **TIME OF THE ESSENCE**

Landlord and Tenant agree that time shall be of the essence of all terms and provisions of this Lease.

## 32.   **GOVERNING LAW**

This Lease shall be construed in accordance with the laws of the state in which the Premises are located.

## 33.   **SEVERABILITY**

If any provision of this Lease becomes unenforceable for any reason, such unenforceability shall not limit or impair the operation or validity of any other provision of this Lease.

## 34.   **JURISDICTION, VENUE, AND GOVERNING LAW**

If any party to this Lease institutes any lawsuit or other action or proceeding against the other party and pertaining to this Lease, any right or obligation of any party hereunder, breach of this Lease or otherwise pertaining to the Premises, the sole and exclusive venue and jurisdiction for filing and maintaining any such lawsuit or other action or proceeding shall be in the jurisdiction where the Premises are located, and the parties to this Lease waive the right to institute or maintain any such suit, action or proceeding in any other courts or forums whatsoever. Each party by executing this Lease consents and submits itself to the personal jurisdiction of such court. This Lease shall be construed and governed in accordance with the laws of the state where the Premises are located without regard to conflict of law principles.

## 35.   **COUNTERPARTS**

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

50416335_1

## 36.    **RIGHT OF FIRST REFUSAL**

(a)    Landlord grants to Tenant a continuous right of first refusal to purchase the Premises pursuant to this Section 36.

(i)    If (A) Landlord receives a bona fide offer, solicited or unsolicited, to sell the Premises or to otherwise transfer or dispose of the Premises or the sale of the interests of the Landlord for value to any unaffiliated third party (any such sale, transfer or other disposition, a "Sale") and intends to accept the offer, or (B) Landlord decides to make a bona fide offer for a Sale of the Premises for value to any unaffiliated third party (which shall be subject to Tenant's right of first refusal) and Landlord has found an unaffiliated third party ready, willing and able to accept such offer, then Landlord shall provide a written copy of such offer to Tenant (the "Offer"), which Offer shall include all material terms of the proposed sale or transfer (including, without limitation, the interests or property affected, the name and address of any proposed transferees, the amount of the purchase price, the intended date for closing, and all other material terms and conditions of such offer, along with copies of all relevant documents.)  Tenant will have the right to accept Landlord's Offer by written notice to Landlord given within twenty-five (25) days after Tenant's receipt of the Offer, time being of the essence with respect to this and all other periods provided for in this Section 36.  For purposes hereof, a party shall be considered to be "unaffiliated" so long as such party is not a member of the family of Landlord's principal, or Landlord, its principals, or such family members, own or control less than a 25% interest therein in the aggregate.  The right of first refusal shall be applicable to the sale or transfer of stock, membership interests or partnership interests of Landlord or its principal.

(ii)    If Tenant accepts the Offer, settlement shall be held by the earlier of (A) 60 days after Tenant's acceptance, or (B) at Tenant's option, such earlier closing date as was set forth in the Offer.  Upon settlement, Landlord shall convey to Tenant (or its designee) good and marketable title to such interests or property free and clear of all liens, encumbrances and restrictions (except this Lease and such non-material liens as are of record on the date hereof or recorded after the date hereof with the prior written consent of Tenant and which do not impact on Tenant's use of the Premises).

(iii)    If Tenant does not accept the Offer within the time period specified and a Sale closes (A) on terms no more favorable to the transferee than those specified in the Offer, and (B) by the earlier of (1) the time frame set forth in the Offer and (2) six (6) months after the Offer was made to Tenant, then Tenant's right of first refusal hereunder shall be effective with respect to any future sale of the Premises.  If, however, at any time, an intended Sale will not meet both of the conditions set forth in clauses (A) and (B) above, then Tenant's right of first refusal as set forth in this Section 36 shall be deemed reinstated, and Landlord shall be required to again, and thereafter, comply with this Section 36 (i.e. delivering an Offer to Tenant, awaiting Tenant's response, etc.).

(iv)    NOTWITHSTANDING ANYTHING TO THE CONTRARY, IF THIS LEASE TERMINATES (OTHER THAN BY REASON OF TENANT PURCHASING THE PREMISES PURSUANT TO THIS SECTION 36 OR THE TERM EXPIRES, TENANT'S RIGHT OF FIRST REFUSAL SET FORTH HEREIN SHALL TERMINATE

AND BE NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT; AND, IN SUCH EVENT TENANT SHALL EXECUTE SUCH DOCUMENTS AS LANDLORD SHALL REASONABLY REQUEST EVIDENCING SUCH TERMINATION OF ITS RIGHT OF FIRST REFUSAL.   EXCEPT AS AFORESAID, TENANT'S RIGHTS UNDER THIS SECTION 36 SHALL SURVIVE ANY SALE, TRANSFER OR OTHER DISPOSITION OF THE PREMISES BY OR THROUGH LANDLORD (INCLUDING THOSE PERSONS DESCRIBED IN SECTION 36(b) BELOW).

(b)      Notwithstanding anything to the contrary contained herein, the provisions of this Section 36 shall not apply to or prohibit (A) any mortgaging, subjection to deed of trust or other hypothecation of Landlord's interest in the Premises to any Lender, (B) any sale of the Premises pursuant to a private power of sale under or judicial foreclosure of any Mortgage or other security instrument or device to which Landlord's interest in the Premises is now or hereafter subject (including subsequent transfers of title to any Affiliate of any such Lender established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Premises that acquires title to the Premises through such Lender), (C) any transfer of Landlord's interest in the Premises to a Lender, beneficiary under deed of trust or other holder of a security interest therein or their designees by deed in lieu of foreclosure (including subsequent transfers of title to any Affiliate of any such Person established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Property that acquires title to the Property through any such Person, or (D) any transfer of the Property to any governmental or quasi-governmental agency with power of condemnation (including subsequent transfers of title to any Affiliate of any such governmental or quasi-governmental agency established or existing primarily for the purpose of taking title to the Premises).  For the avoidance of doubt, however, Tenant's rights under this Section 36 shall survive all of the foregoing.

(c)      Notwithstanding anything to the contrary contained herein, Landlord covenants and agrees that the Premises shall not be sold within two (2) years of the Effective Date for more than $968,421.00, plus (i) the cost of Landlord's reasonable and actual expenses incurred in connection with the original purchase of the Premises from Tenant and (ii) the cost of Landlord's reasonable and actual expenses incurred in connection with sale of the Premises to a subsequent third party.

**37.    NO ESTATE BY TENANT**.

This Lease shall create the relationship of lessor and lessee between Landlord and Tenant; no estate shall pass out of Landlord. Tenant's interest shall not be subject to levy or sale, and shall not be assignable by Tenant except as provided in Section 14 and 15 of this Lease. Nothing contained in this Lease shall, or shall be deemed or construed so as to, create the relationship or principal-agent, joint venturers, co-adventurers, partners or co-tenants between Landlord and Tenant; it being the express intention of the parties that they are and shall remain independent contractors one as to the other.

**38.    REPRESENTATIONS AND WARRANTIES OF TENANT**.

Tenant, and the individual executing this Lease on behalf of Tenant, hereby represents and warrants and to Landlord that: (a) Tenant is a limited liability company, duly organized and

23

validly existing under the laws of the State of Tennessee; (b) Tenant has qualified with the Secretary of State of the State in which the Premises are situated to transact business in that State; (c) Tenant has all necessary power and authority to enter into this Lease and has all necessary licenses to conduct its business for the uses contemplated hereunder; and (d) this Lease constitutes a binding and enforceable obligation of Tenant and does not conflict with any provision of Tenant's organizational documents or of any other lease or other agreement to which Tenant is a party or by which Tenant may be bound.

## 39.    **HAZARDOUS SUBSTANCES OR CONDITIONS**.

Tenant shall not use, handle, store and dispose of any Hazardous Materials, on or about the Premises, except in accordance with all applicable laws, and hereby agrees to indemnify, defend and hold Landlord harmless from any claim, liability, loss or damage arising from the improper use, handling, storage or disposal of Hazardous Materials on or about the Premises. Without limitation of the foregoing, Tenant shall promptly provide to Landlord copies of any written notice that Tenant may receive from any governmental authority relating to or alleging any improper use, handling storage or disposal of any Hazardous Materials by Tenant, its employees, agents or contractors on or about the Premises. "Hazardous Material(s)" for purposes of this Lease shall include but not be limited to all toxic or hazardous materials, chemicals, wastes, pollutants or similar substances, including, without limitation, Petroleum (as hereinafter defined), asbestos and/or urea formaldehyde insulation, which are regulated, governed, restricted or prohibited by any Hazardous Materials Laws including, but not limited to, those materials or substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "pollutants" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Clean Water Act, 33 U.S.C. Section 1251 et seq., and any rules and regulations promulgated thereunder, all as presently or hereafter amended. "Petroleum" for purposes of this Lease shall include, without limitation, oil or petroleum of any kind and in any form including but not limited to oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other waste, crude oil, gasoline, diesel fuel and kerosene.

## 40.    **FINANCIAL REPORTING.**

Within thirty (30) days after Landlord's written request, Tenant shall deliver to Landlord (i) not more than one (1) time during any twenty-four (24) month period, complete financial statements of the Tenant including a balance sheet, profit and loss statement, statement of changes in financial condition for the most recent fiscal period then ended (the financial statements delivered to Landlord need not be audited); and (ii) not more than one (1) time during any twelve (12) month period an audited gross sales reports for the business at the Premises.

[Remainder of Page Intentionally Left Blank; Signatures Appear on Next Page]

24

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Lease Agreement to be effective as of the day and date first above written.

**"LANDLORD"**

**HANNAH ROCKS, LLC**, a New York limited liability company

By: _____

John M. Tanenbaum
Managing Member

[Signatures Continue on Next Page]

25

**"TENANT"**

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____

Brian Blosser
Vice President of Development and Construction

26

## EXHIBITS AND ADDENDA ATTACHED

Rent Addendum

Exhibit "A" - Legal Description

Exhibit "B" - Subordination, Non-Disturbance and Attornment Agreement

Exhibit "C" - Estoppel Certificate

Exhibit "D" - Memorandum of Lease

Exhibit "E" – Landlord Waiver and Collateral Access Agreement

25

Krystal #  MFS012
Address:  3330 Austin Peay Highway
Memphis, Tennessee 38128

## RENT ADDENDUM
### to
### LEASE AGREEMENT

THIS RENT ADDENDUM dated September 30, 2013, by and between Hannah Rocks, LLC, a New York limited liability company ("Landlord") and The Krystal Company, a Tennessee corporation ("Tenant"), for Krystal # MFS012 is attached to and made a part of that certain Lease Agreement by and between Landlord and Tenant of even date herewith (the "Lease"). Notwithstanding any other provision to the contrary which may be contained in said Lease, it is specifically agreed by and between Landlord and Tenant as follows:

1.  **Definitions.**  Capitalized terms used in this Rent Addendum shall, unless otherwise defined, have the meaning ascribed to them in the Lease.

2.  **Annual Rent.**

(a)  Beginning on the Rent Commencement Date, Tenant covenants and agrees to pay to Landlord annual rent ("Annual Rent") according to the following schedule:

| Lease Year | Annual Rent | Monthly Installment |
|:---:|:---:|:---:|
| 1 | $69,000.00 | $5,750.00 |

All payments of Annual Rent shall be paid in equal monthly installments paid monthly in advance, on the first (1st) business day of each month.

(b)  Increases in Annual Rent.  Commencing at the end of the first (1st) Lease Year after the Rent Commencement Date, and on each anniversary of such date thereafter during the term of this Lease (and any extension thereof), Annual Rent shall be increased by an amount equal to the previous year's Annual Rent multiplied by one percent (1%).

(c)  Partial Months.  If the Rent Commencement Date is on a day other than the first day of a calendar month, then Rent for the partial rental month shall be prorated on a per diem basis and shall be paid by Tenant to Landlord for such month.

3.  **Sales/Use Tax**.  Tenant shall also pay to Landlord any sales and use tax imposed on any Rent payable hereunder from time to time by state law or any other governmental entity, which sums are due monthly as to monthly Rent payments on the due date of the Rent payment under this Lease.

50416335_1

4.    **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent.  All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

_____          _____
By Landlord                                                      By Tenant

4.    **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent.  All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

_____    _____
By Landlord                                                    By Tenant

50416335_1

## EXHIBIT "A"

### Legal Description of Krystal # MFS012
### Located at 3330 Austin Peay Highway, Memphis, Tennessee 38128

BEING ALL OF AMENDED PHASE 28, SECTION 5 OF THE FINAL PLAN-COMMUNITY FACILITIES CENTER BROADMOOR PARK SC-1, AS RECORDED IN PLAT BOOK 206, PAGE 33, SHELBY COUNTY REGISTER OF DEEDS, SHELBY COUNTY, TENNESSEE AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHEAST RIGHT OF WAY LINE OF AUSTIN PEAY HIGHWAY (63 FEET FROM CENTERLINE OF THE NORTHBOUND LANE), 1008.5 FEET, NORTHEASTWARDLY FROM THE TANGENT INTERSECTION OF SAID SOUTHEAST RIGHT-OF-WAY LINE WITH THE NORTHEAST LINE OF COLEMAN ROAD AS MEASURED PARALLEL WITH THE CENTERLINE OF AUSTIN PEAY HIGHWAY; THENCE SOUTH 55 DEGREES 37' EAST, 138.00 FEET TO THE BEGINNING OF A CURVE; THENCE SOUTHWESTWARDLY ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 280 FEET, AN ARC DISTANCE OF 62.51 FEET TO A POINT THAT IS 200.00 FEET SOUTHEASTWARDLY FROM THE SOUTHEAST RIGHT-OF-WAY LINE OF AUSTIN PEAY HIGHWAY, AS MEASURED PERPENDICULAR THERETO; THENCE NORTH 34 DEGREES 23' EAST 106.30 FEET; THENCE NORTH 23 DEGREES 15' 28" EAST 6.62 FEET; THENCE NORTH 55 DEGREES 37' WEST 198.72 FEET ON THE SOUTHEAST RIGHT-OF-WAY LINE OF AUSTIN PEAY HIGHWAY; THENCE SOUTH 34 DEGREES 23' WEST ALONG SAID RIGHT-OF-WAY LINE 119.75 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH ALL RIGHT, TITLE AND INTEREST IN AND TO THAT CERTAIN INGRESS-EGRESS EASEMENT CONTAINED IN THAT CERTAIN AGREEMENT BETWEEN BROADMOOR INVESTMENT CORP. AND THE KRYSTAL COMPANY OF RECORD IN INSTRUMENT P9 1752 AS ASSIGNED IN INSTRUMENT 11036112 AND THAT CERTAIN UNDEDICATED PRIVATE DRIVE AS SHOWN ON PLAT OF RECORD IN PLAT BOOK 206, PAGE 33, ALL IN THE REGISTER'S OFFICE, SHELBY COUNTY, TENNESSEE.

BEING THE SAME PROPERTY CONVEYED TO THE KRYSTAL COMPANY, A TENNESSEE CORPORATION, BY SPECIAL WARRANTY DEED OF RECORD IN INSTRUMENT 13062062, IN THE REGISTER'S OFFICE, SHELBY COUNTY, TENNESSEE.

50416335_1

## EXHIBIT "B"

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

_____

_____

_____
Attention: Loan Administration
Loan No. _____

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

| 1. | Lease | Lease between Landlord and Tenant dated _____, 20___. |
|----|-------|------------------------------------------------|
| 2. | Landlord | |
| 3. | Tenant | |
| 4. | Premises | As described on Exhibit A |
| 5. | Premises Address | As described on Exhibit A |

THIS  SUBORDINATION,  NON-DISTURBANCE  AND  ATTORNMENT
AGREEMENT (the "Agreement") is made as of the ___ day of _____, 20___, by and
between _____(the "Mortgagee") and Tenant.

### R E C I T A L S:

A.     Landlord and Tenant have entered into a certain Lease relating to a portion of the
real property (the "Property") described therein and on the attached Exhibit A (the "Premises");
and

B.     Mortgagee [has recorded] [is about to record] a mortgage on the Property; and

C.     Tenant and Mortgagee desire to establish certain rights, safeguards, obligations,
and priorities with regard to their respective interests by means of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants of the parties, and
other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the Mortgagee and Tenant hereby agree as follows:

1.     Provided the Lease is in full force and effect and the Tenant is not in default under
the Lease (beyond any period given the Tenant to cure defaults), then:

B-1

50416335_1

(a)    The Tenant's right of possession to the Premises and the Tenant's other rights arising out of the Lease shall not be affected or disturbed by the Mortgagee in the exercise of any of its rights under or related to the Mortgage or the note which it secures.

(b)    In the event the Mortgagee or any other person acquires title to the Premises pursuant to the exercise of any remedy provided for in the Mortgage, or by conveyance in lieu of foreclosure, the Lease shall not be terminated or affected by the foreclosure, conveyance or sale in any such proceeding.    The Mortgagee covenants that any sale of the Property as a result of the exercise of any rights and remedies under the Mortgage, or otherwise, shall be made subject to the Lease and the rights of the Tenant under the Lease, and the Tenant covenants and agrees to attorn the Mortgagee, or such person, as its new landlord, and the Lease shall continue in full force and effect as a direct Lease between the Tenant and the Mortgagee, or such other person, upon all of the terms, covenants, conditions and agreements set forth in the Lease.    However, in no event shall the Mortgagee or such person be:

(i)    Liable for any act or omission of the Landlord; or

(ii)    Subject to any offsets or deficiencies, which the Tenant might be entitled to assert against the Landlord.

2.    Subject to the foregoing provisions, the Lease shall be subject and subordinate to the lien of the Mortgage and to all of its terms, conditions and provisions, to all advances made or to be made and to any renewals, extensions, modifications or replacements.

3.    Mortgagee hereby consents to any leasehold mortgage or deed of trust (the "Leasehold Mortgage") now or hereinafter entered into by Tenant for the benefit of Tenant's lender (together with its successors and assigns, the "Leasehold Mortgagee") and the liens and security interests evidenced by same and encumbering (among other things) Tenant's leasehold interest under the Lease.    In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Tenant's moveable trade fixtures, business, equipment, furniture, signs or other personal property at any time placed on or about the Premises; the Mortgagee and Tenant acknowledging that such property is pledged to the Leasehold Mortgagee as further security for the obligations of Tenant under the Leasehold Mortgage.

4.    The above provisions shall be self-operative and effective without the execution of any further instruments on the part of either party.    However, the Tenant agrees to execute and deliver to the Mortgagee or to any other person to whom the Tenant agrees to attorn such other instruments as either shall reasonably request in order to comply with these provisions.

5.    This Agreement may not be modified other than by an agreement in writing signed by the parties or by their respective successors in interest and by Leasehold Mortgagee.

6.    This Agreement shall inure to the benefit of and be binding upon the parties and their successors and assigns (including (with respect to Tenant) the Leasehold Mortgagee and any other person which acquires rights in or title to Tenant's leasehold interest under the Lease).

To indicate their agreement to the above, the parties or their authorized representatives or officers have signed this document under seal as of the day and year first above written.

**"LENDER"**

_____

By:_____
Name:_____
Title:_____

**"LANDLORD"**

_____, a

_____

By:_____
Name: _____
Title: _____

**"TENANT"**

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____
Name: _____
Title: _____

## EXHIBIT "C"

### <u>ESTOPPEL CERTIFICATE</u>

The undersigned with respect to the premises at STORE ADDRESS, as more particularly described in Exhibit "A" attached hereto and made a part hereof by this reference (the "Premises"), certifies and affirms to the best of its knowledge the following to _____, a _____ [[("Tenant")]] [[("Landlord")]] and to _____ [[("Mortgagee")]] [[("Purchaser")]]:

1.    Tenant leases the Premises from Landlord under that certain Lease dated _____, 20___, attached hereto and made a part hereof by this reference (the "Lease").

2.    Rental under this Lease has been paid through _____, 20___. No rent has been paid more than thirty (30) days in advance, except as described in the preceding sentence. The monthly base rental amount is $_____.

3.    The term of the Lease is _____ through _____, a period of _____ years. Tenant has _____ options to extend the Lease for _____ years each, for a total term including all options through _____ as set forth in the Lease.

4.    There is no security deposit under the Lease.

5.    Tenant, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any term of the Lease.

6.    Landlord, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any terms of the Lease.

7.    The Lease is in full force and effect and there have been no modifications or amendments unless attached hereto.

8.    Knowledge means the actual knowledge of _____ without independent investigation.

This Certificate may be relied upon by [[Purchaser]] [[Mortgagee]], who intends to [[purchase the Premises] [and the Lease from Landlord], and by any mortgage lender of such person]] [[provide secured [lease] [loan] financing to [Landlord] [Tenant]].

Dated this _____ day of _____, 20____
[[Landlord]] [[Tenant]]: _____
By: _____
Title: _____

## EXHIBIT "D"

*UPON RECORDATION RETURN TO:*

_____

_____

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

RETURN BY: MAIL (X)    PICK UP ( )

Krystal # __, STORE ADDRESS

## MEMORANDUM OF LEASE

**THIS MEMORANDUM OF LEASE** is made as of _____, 2013 ("Effective Date"), by and between _____, with a mailing address of _____ ("Landlord"), and The Krystal Company, a Tennessee corporation, with a mailing address of _____ ("Tenant").

In consideration of TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration paid by Tenant to Landlord and the mutual covenants contained in that certain Lease Agreement between the parties hereto dated on even date herewith (hereinafter called the "Lease"), Landlord has leased and does hereby lease to Tenant, and Tenant has leased and does hereby lease from Landlord, upon the terms and conditions set forth in said Lease, the real property more particularly described in Exhibit "A" attached hereto and made a part hereof (the "Premises").

The term of the Lease shall commence on the Effective Date and end on the date that is fifteen (15) years after the Rent Commencement Date (as defined in the Lease). Said Lease provides for options to renew for six (6) five (5) year terms. Tenant shall not allow any mechanic's lien or similar type of lien to be filed against the Premises.

**[Signatures on Next Page]**

D-1

50416335_1

IN WITNESS WHEREOF, Landlord and Tenant have executed and sealed this Memorandum of Lease to be effective as of the date first above written.

### "LANDLORD"

Signed, Sealed and Delivered
in the presence of:

_____,

_____

_____    By:_____
Name:_____    Name: _____
Title: _____

_____
Name:_____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this \_\_\_\_ day of _____, 2013, by _____, as _____ of _____, a _____. He/she is (  ) personally known to me or (  ) he/she has produced a driver's license as identification.

_____
Notary Public, State of _____
Print Name: _____
Notary Commission No.:_____
My Commission Expires: _____

[NOTARIAL SEAL]

D-2

**"TENANT"**

Signed, sealed and Delivered
in the presence of:

**THE KRYSTAL COMPANY**, a Tennessee
corporation

By: _____

Name: _____

_____

Title: _____

Name:_____

_____

Name:_____

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2013, by
_____, as _____ of The Krystal Company, a Tennessee corporation.
He/she is (    ) personally known to me or (    ) he/she has produced a driver's license as
identification.

_____

Notary Public, State of _____

Print Name: _____

Notary Commission No.: _____

My Commission Expires: _____

[NOTARIAL SEAL]

D-3

## EXHIBIT "E"

### FORM OF LANDLORD WAIVER
### AND COLLATERAL ACCESS AGREEMENT

**THIS LANDLORD WAIVER AND COLLATERAL ACCESS AGREEMENT** (this "Agreement") is made and entered into between **WELLS FARGO BANK, NATIONAL ASSOCIATION**, in its capacity as administrative agent (in such capacity, the "Senior Agent") for certain lenders (the "Senior Lenders") under the Senior Credit Agreement referred to below, **TRIANGLE CAPITAL CORPORATION**, in its capacity as agent (in such capacity, the "Subordinated Agent", and, collectively with the Senior Agent, the "Agents") for the lenders (the "Subordinated Lenders", and collectively with the Senior Lenders, the "Lenders") under the Subordinated Loan Agreement referred to below, and **[NAME OF OWNER]**, a **[Type of Entity]** (hereinafter referred to as "Owner"), whether one or more, and affects that real property in the City of **[City]**, County of **[County]**, State of **[State]**, commonly known as **[Street Address]** (hereinafter referred to as the "Premises").

**WHEREAS**, this Agreement is executed as required pursuant to that certain Credit Agreement, dated as of March 21, 2012 (the "Senior Credit Agreement") entered into by the Senior Agent and the Senior Lenders and other agreements related thereto (hereinafter collectively referred to as the "Senior Loan Documents") and as required pursuant to that certain Loan Agreement, dated as of March 21, 2012 (the "Subordinated Loan Agreement") entered into by the Subordinated Agent and the Subordinated Lenders and other agreements related thereto (hereinafter collectively referred to as the "Subordinated Loan Documents" and together with the Senior Loan Documents hereinafter collectively referred to as the "Loan Documents"), in each case with The Krystal Company, a Tennessee corporation (hereinafter referred to as "Tenant"), and certain of Tenant's affiliates, for the purpose of securing the repayment of all obligations and the performance of all duties now or hereafter owing by Tenant and its affiliates under the Loan Documents, of every kind and description. This Agreement does not amend any of the terms of the Loan Documents;

**WHEREAS**, by the Loan Documents, the Agents and the Lenders have loaned or have agreed to loan monies and/or extend other financial accommodations against the security of, among other collateral, all of Tenant's personal property, including, but not limited to, Tenant's inventory, equipment, furniture, furnishings, trade fixtures, machinery, and tools, together with all additions, substitutions, replacements, and improvements to the same (hereinafter referred to as "Goods"), which Goods are or are to be located on and may be affixed to the Premises or the improvements thereon; and

**WHEREAS**, Tenant has leased the Premises from Owner by that certain **[Title of Lease Document]** dated **[Date of Lease]** (the "Lease").

**NOW, THEREFORE**, in consideration of any financial accommodations extended by Senior Lenders and Subordinated Lenders to Tenant and/or its affiliates at any time, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follow:

1. Owner hereby acknowledges and agrees that the Goods shall be and remain personal property notwithstanding the manner of their annexation to the Premises, their adaptability to the uses and purposes for which the Premises are used, or the intentions of the party making the annexation.

2. Owner hereby waives, relinquishes and releases, solely during the term of the Loan Documents, any statutory, contractual or possessory rights or liens which Owner may assert against the Goods, including any and all rights of distraint, attachment, lien, levy or execution against or upon the Goods, for any rent or other sum now or hereafter due the Owner under the Lease or otherwise, and all claims and demands of every kind and nature against the Goods.

3. Owner hereby acknowledges and consents to Senior Agent's and Subordinated Agent's senior priority perfected security interests in the Goods and agrees that, notwithstanding anything to the contrary set forth in the Lease, any other agreement, document or instrument to which Owner and Tenant are parties or any applicable law, any and all liens and security interests granted or otherwise accruing to Owner with respect to the Goods and any other assets of Tenant or its affiliates is and shall be junior and subordinate to any and all liens and security interest granted to Senior Agent and to Subordinated Agent with respect to the Goods and all other assets of Tenant and its affiliates. The foregoing subordination shall apply (a) irrespective of the time, order or manner of attachment or perfection of any security interest and irrespective of any statute, rule, law, or court decision to the contrary and (b) irrespective or whether the liens securing the obligations under the Loan Documents are held to be unperfected, invalid, void, unenforceable, discharged or are set aside. This Agreement and the subordination provided herein shall continue to govern as between Senior Agent, Subordinated Agent and Owner during and after any bankruptcy or insolvency proceeding involving Tenant or its affiliates. Until the obligations of Tenant and its affiliates under the Loan Documents have been fully and finally paid in full in accordance with the terms of the Loan Documents and all commitments of the Agents and the Lenders to provide financing thereunder have been terminated (the "Discharge of the Senior Obligations"), Owner shall not, without the prior written consent of the Agents, exercise any rights or remedies with respect to the Goods or any other assets of Tenant or its affiliates which arise by virtue of Owner's status as a secured creditor, whether arising under Article 9 of the Uniform Commercial Code or otherwise.

4. Owner consents to the installation of the Goods on the Premises, agrees that each Agent may do to and with the Goods any or all of the acts below enumerated, and grants each Agent a right, as set forth below, to enter into possession of the Premises to do any or all of the following (the "Permitted Actions") with respect to the Goods: assemble, have appraised, display, sever, remove, maintain, prepare for sale or lease, advertise, inspect, repair, lease, transfer, and/or sell (at public auction or private sale). At the Owner's option, the Owner may elect to have an agent accompany each Agent or its agents or representatives while on the Premises; provided, however, that the Owner's failure to have an agent of the Owner accompany an Agent or its agents or representatives shall not in any way limit such Agent's right to enter upon the Premises. While on the Premises, each Agent shall use reasonable efforts so as not to disturb any other tenant, occupant or the Owner. Each Agent agrees to repair (or pay the

E-2

reasonable cost to repair) any damages to the Premises caused directly by the actions of such Agent or its agents or representatives while on the Premises.

5. Owner acknowledges that Agents may take any or all of the Permitted Actions subject only to the Loan Documents.

6. Owner will provide each of the Agents with written notice of any default by Tenant under the Lease resulting or that could, with the passage of time, the giving of notice, or both, result in termination of the Lease (a "Default Notice") at the same time or promptly after, and in the same manner as, such notice is given to Tenant. Each Agent shall have at least fifteen (15) days following receipt of such Default Notice to cure such default, but no Agent shall be under any obligation to cure any default by Lessee under the Lease. No action by any Agent pursuant to this Agreement shall be deemed to be an assumption by any Agent of any obligation under any Lease and, except as expressly set forth herein, no Agent shall have any obligation to Owner.

7. This Agreement shall continue until such time as the Discharge of the Senior Obligations has occurred.

8. This Agreement shall be governed and controlled by and interpreted under the laws of the State of New York and shall inure to the benefit of and be binding upon the successors, heirs, and assigns of Owner and Agents. Owner will notify any purchaser or successor owner or landlord of the Premises of the existence of this Agreement, which shall be binding upon the executors, administrators, successors, transferees or assignees of Owner. This Agreement shall bind and inure to the benefit of the respective successors and assigns of Agents and Owner.

9. THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF OR, AT THE SOLE OPTION OF AGENTS, IN ANY OTHER COURT IN WHICH AGENTS SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. OWNER AND EACH AGENT WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION. OWNER AND EACH AGENT HEREBY WAIVES THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF

E-3

ACTION BASED UPON OR ARISING OUT OF ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. OWNER AND EACH AGENT REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

[<em>Signature Pages Follow</em>]

Dated:_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Senior Agent

By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (___) ____ - _____

E-5

Dated:_____

**TRIANGLE CAPITAL CORPORATION,**
as Subordinated Agent

By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax: (___) ____ - _____

E-6

50416335_1

Dated:_____

**[NAME OF OWNER],**
a [**Type of Entity**]


By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (___) _____ - _____

E-7

# EXHIBIT B

**REGINA MORRISON NEWMAN, SHELBY COUNTY TRUSTEE**

P.O.Box 2751
Memphis, TN 38101-2751

**QUESTIONS?** Call (901) 222 - 0200

| PARCEL # | TAXING AUTHORITY | NOTICE TYPE | DATE |
|---|---|---|---|
| 085-0170-0-00071-0 | Shelby County | INTERNET NOTICE | 3/13/2020   1:50:42PM |

HANNAH ROCKS LLC
350 THEODORE FREMD AVE
STE 210
RYE NY 10580-1539

Realty
Lot Size:   113 X 0     Acreage:   0.546
Lot No:   0

Classification:   COMMERCIAL
Location:   3330 AUSTIN PEAY
Memphis  0

Subdivision:  COMM FACILITIES CEN BROADMOOR

## PROPERTY TAX NOTICE

| Tax Year | Assessed Value | Tax Rate | Town | Base Tax | Interest | Court | Atty | Misc | Balance Due |
|---|---|---|---|---|---|---|---|---|---|
| 2019 | 190,680.00 | 4.05 | N | 7,722.54 | 115.84 | 0.00 | 0.00 | 0.00 | $7,838.38 |

**IF PAID BY 3/31/2020, TOTAL AMOUNT DUE IS:**   $7,838.38

All Notices received prior to   **3/13/2020**   concerning the tax year (s) listed above should be disregarded.  Please pay using this notice.
Total amount due is calculated with interest through the last day of the month. Other legal fees may be added during the month.

---

085-0170-0-00071-0
HANNAH ROCKS LLC
350 THEODORE FREMD AVE
STE 210
    Enter address change here
Name:
Address:
City:          State:
Zip:          Phone:
changes require signatures of all owners
Signature:
Signature:

Due Date:          March 31, 2020

| Year | Town | Balance Due |
|---|---|---|
| 2019 | N | $7,838.38 |

ENTER AMOUNT PAID

Make check or money order payable to

REGINA MORRISON NEWMAN, TRUSTEE
P.O.Box 2751
Memphis, TN 38101-2751

| Total: | $7,838.38 |
|---|---|

DO NOT WRITE BELOW THIS LINE

08501700 000710 2019 N 0000000 0000783838 5

# EXHIBIT C

**Krystal # MFS021**
**Address:   7073 Winchester Road**
            **Memphis Tennessee 38125**

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made and entered into as of September 30, 2013, by and between:

(i)   Hannah Rocks, LLC, a New York limited liability company ("Landlord"), and

(ii)  The Krystal Company, a Tennessee corporation ("Tenant").

### W I T N E S S E T H:

WHEREAS, Landlord is the owner of that certain tract of land described on Exhibit "A", attached hereto and by this reference incorporated herein (hereinafter called the "Land"), on which a Krystal restaurant is constructed (the "Building");

WHEREAS, Tenant wishes to lease from Landlord the Land and Building (hereinafter called the "Premises");

WHEREAS, Tenant intends to operate an Krystal Restaurant from the Premises;

NOW, THEREFORE, in consideration of the payment of the rent and the keeping and performance of the covenants and agreements by Tenant as hereinafter set forth, Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, together with all rights and privileges appurtenant thereto as may be necessary or convenient to Tenant's business, inclusive of all easements benefiting the Premises, on the terms and conditions hereof.

The following additional stipulations are hereby declared to be covenants of this Lease and shall, unless otherwise expressly stated, be applicable at all times throughout the term of this Lease and any extension or renewal thereof:

## 1.    DEFINITIONS

For purposes of this Lease, the following terms shall have the definitions ascribed to them:

"Affiliate" shall mean any party that controls or is controlled by or is under common control with a party. For purposes of this definition, "control" and correlative terms shall mean the possession, directly or indirectly, of the power to cause the direction of the management and policies of such party, whether through the ownership of voting securities, by contract or otherwise.

"Effective Date" shall mean the date set forth at the beginning of this Lease.

50416344_1

"Landlord" shall mean Hannah Rocks, LLC, a New York limited liability company, its successors and assigns.

"Lease" shall include this Lease Agreement and all amendments hereto, if any, entered into from time to time hereafter, together with the Rent Addendum and exhibits attached hereto.

"Lease Year" shall mean a fiscal period beginning on the Rent Commencement Date (and each anniversary thereof) and expiring on the last day of the twelfth (12th) month thereafter. In the event the Rent Commencement Date is not the first (1st) day of a calendar month, then the Lease Year shall commence on the first (1st) day of the calendar month following the Rent Commencement Date.

"Rent" shall mean the rent payable under this Lease as set forth in the Rent Addendum attached hereto and incorporated herein, and shall include Annual Rent (as defined in the Rent Addendum) and all other items described in this Lease as "additional rent".

"Rent Commencement Date" shall mean the date on which Landlord delivers possession of the Building to Tenant, which date shall be the Effective Date hereof unless Landlord and Tenant otherwise agree in writing.

"Tenant" shall include the named Tenant and any assignee or sublessee thereof pursuant to an assignment or sublease under Section 15 of this Lease.

## 2.  TERM AND RENT

(a)    Term. The term of this Lease shall begin on the Effective Date and shall expire on the date that is fifteen (15) years after the Rent Commencement Date (hereinafter the "Termination Date"), unless previously terminated or renewed or extended as provided herein.

(b)    Rent. Rent shall be due and payable as provided in the Rent Addendum attached hereto and incorporated herein, without notice, demand, deduction, or set-off.

(c)    Acceptance of Premises. Tenant confirms that Tenant has accepted the Premises in their current "as is" condition; that the Building and other improvements have been completed to Tenant's satisfaction; and that the Premises are suitable for Tenant's purposes.

## 3.  ALTERATIONS AND IMPROVEMENTS, INVESTMENT TAX CREDIT, MECHANIC'S LIENS, LANDLORD'S DISCLAIMER

(a)    Alterations and Improvements.

(i)    Tenant's Property. Tenant shall be permitted to install, use on and about, and remove from the Premises at any time and from time to time all trade fixtures and other personal property (exclusive of lighting, electrical, and heating and air conditioning improvements) which are not a component of the building located or to be located on the Premises (hereinafter referred to as the "Tenant's Property"), all of which at all times shall remain the property of Tenant with the right of removal (subject to Paragraph 3(d) below) at the expiration of this Lease. Tenant's Property shall include: (1) removable decor items and office equipment; (2) building lettering, signs, sign posts and sign

50416344_1

standards; (3) unattached food and customer service equipment; and (4) food, customer service equipment and any other equipment attached to the building by bolts and screws and/or by utility connections, or other means that can be removed without damage to the Premises, including without limitation, walk-in refrigerators and freezers, remote refrigeration systems, exhaust systems and hoods, and water heaters.

(ii)      Subsequent Improvements. Tenant shall also have the right to make any additions, alterations, changes and improvements, structural and nonstructural, including but not limited to tearing down and reconstructing a new restaurant Building, construction of additional buildings and additions to the then existing Building, as Tenant shall desire; provided, however, (A) if such changes are structural or impact the square footage of the then existing buildings, Tenant shall (1) submit plans ("Plans") of all changes to Landlord at least thirty (30) days in advance of the proposed construction date, which plans shall be subject to Landlord's approval, not to be unreasonably withheld, conditioned or delayed, (2) provide Landlord with evidence of Tenant's financial ability to pay for such changes, and (3) deliver the certificate of occupancy, or local equivalent, a current ALTA survey, and as-built plans to Landlord within sixty (60) days after re-opening of the restaurant Building (B) all such construction shall be completed in a workmanlike manner and in material compliance with all laws, building codes and ordinances applicable thereto, at Tenant's sole expense, and (C) such new construction, additions, alterations, changes and improvements (whether structural or non-structural) shall not reduce the fair market value of the Premises, as reasonably determined by Landlord. In the event Tenant is making non-structural changes, alterations or routine repair and maintenance of existing improvements, Landlord's consent shall not be required.

In the event that Tenant renovates or reconstructs the Building during any Option Period (hereinafter defined) as provided herein, and the square footage of the new restaurant Building is eighty (80%) or less than the square footage of the restaurant Building prior to demolition, then commencing upon Tenant's receipt of the certificate of occupancy, or local equivalent, for the reconstructed restaurant Building, Annual Rent shall increase by seven and one-half (7.5%) percent over the Annual Rent then due and payable. Landlord and Tenant shall enter into an amendment to the lease to reflect such increase, however, failure by the parties to enter into such agreement shall not impact the increase in Annual Rent which shall be payable from the date that Tenant receives the certificate of occupancy, or local equivalent, for the reconstructed Building through the end of the term of this Lease, subject to annual increases as provided in Section 2(b) of the Rent Addendum attached hereto.

Upon submission of the Plans to Landlord as provided herein, Landlord shall use reasonable efforts to either give or withhold its approval of the Plans by providing written notice thereof to Tenant within twenty-one (21) days after the Plans are received by Landlord. If Landlord fails to provide either such notice to Tenant with such twenty-one (21) day period, then Landlord shall be deemed to have disapproved the Plans as submitted. Tenant may resubmit the Plans to Landlord for Landlord's reasonable review and approval, and upon such resubmission, Landlord shall have twenty-one (21) days after the receipt of the resubmitted Plans to approve or disapprove the same or else the revised Plans as then submitted shall deemed to be approved; provided, however, that the

Plans shall only be deemed approved as provided herein if Tenant's resubmission of revised Plans to Landlord are the same as initially provided and contains the following notice in bold font on the cover letter with the Plans:

"The enclosed plans and specifications are being transmitted to you in accordance with the provisions of Section 3(a)(ii) of the Lease Agreement dated September 30, 2013, by and between Landlord and Tenant. Your failure to respond to the enclosed plans and specifications (specifying in detail reasons for disapproval, if any) within twenty-one (21) days after your receipt of the same will be construed as your approval of the same."

Further, upon receipt of Landlord's approval of the Plans, or provided such Plans have been deemed approved, Tenant is hereby irrevocably vested with a power of attorney from Landlord to execute any and all applications, permits, and/or other submittals required by any governmental authority on behalf of Landlord.

(iii)     Upon Termination, Subletting or Assignment. Subject to the requirements of this Section 3, Tenant shall have the right, at its option and expense, to redecorate or otherwise remodel the Premises upon any termination hereof or upon any permitted subletting or assignment in such manner as will, without reducing the fair market value thereof, avoid the appearance of the Krystal Restaurant operated under this Lease; provided, however, that in addition to the other requirements of this Section 3, Tenant shall not impair the structural condition of the Premises, or reduce the size of the buildings on the Premises.

(iv)     Landlord's Property.     All subsequent improvements referred to in Paragraph 3(a)(ii) above, all improvements upon termination, subletting or assignment referred to in Paragraph 3(a)(iii) above, and any and all other additions, alterations, changes and improvements of any type (other than those that can be removed without causing damage to the Premises) shall be deemed to be a part of the Premises and the sole property of Landlord.

(b)     Investment Tax Credit. Landlord hereby grants Tenant the right and privilege of applying for and receiving all investment tax credits, if any, under the Internal Revenue Code which may be available with respect to the building and other improvements to be constructed. To this end, Landlord agrees to execute all such further documents and supply such additional information as may be required to make such election effective.

(c)     Mechanic's and Other Liens. Tenant shall not do or suffer anything to be done whereby the Premises, or any part thereof, may be encumbered by a mechanic's, materialman's, or other lien for work or labor done, services performed, materials, appliances, or power contributed, used, or furnished in or to the Premises or in connection with any operations or any other activity of Tenant. If, whenever and as often as any lien is filed against the Premises, or any part thereof, purporting to be for or on account of any labor done, materials or services furnished in connection with any work in or about the Premises, done by, for or under the authority of Tenant, or anyone claiming by, through or under Tenant, Tenant shall discharge the same of record within twenty (20) business days after service upon Tenant of written notice of the filing thereof; provided, however, Tenant shall have the right to remove the lien as an

4

encumbrance upon the Premises by bonding same in accordance with applicable law and to contest any such lien; provided further that Tenant shall diligently prosecute any such contest, at all times effectively staying or preventing any official or judicial sale of the Premises under execution or otherwise, and, if unsuccessful, satisfy any final judgment against Tenant adjudging or enforcing such lien or, if successful, procuring record satisfaction or release thereof.

(d)      Landlord's Disclaimer.  All of Tenant's Property placed in or upon the Premises by Tenant shall remain the property of Tenant with the right to remove the same at any time during the term of this Lease.  Landlord, if requested by Tenant, agrees to execute, acknowledge and deliver an instrument in the form customarily used by any financier of Tenant's Property and reasonably satisfactory to Landlord, by which Landlord subordinates its lien rights to the lien rights of any equipment lender or lessor of Tenant's Property, and to all rights of levy for distraint for rent against same; provided any damage caused by, or resulting from the removal of any of Tenant's Property or other personal property (including the leaving of holes or other openings in the roof or exterior of the building) shall be promptly repaired by Tenant or the party entitled to remove same.  Landlord shall be entitled to charge a reasonable fee covering Landlord's actual costs in connection with execution of such documentation (which fee shall not exceed $1,000.00) and Tenant agrees to pay such fee as a condition precedent to Landlord's execution of such documents.

(e)      Current Improvements.  The parties acknowledge that Tenant has completed a renovation of the restaurant Building on the Land.  Tenant shall deliver the certificate of occupancy, or local equivalent, and as-built plans, if existing and available, to Landlord within sixty (60) days after opening of the restaurant Building.

## 4.      DESTRUCTION OF PREMISES; INSURANCE

(a)      If the Premises are damaged or destroyed by fire, flood, tornado or other element, or by any other casualty and such damage or destruction does not occur within the last three (3) years of the original or of any extended or renewed term of this Lease, this Lease shall continue in full force and effect and Tenant shall, as promptly as possible, restore, repair or rebuild the Premises to substantially the same condition as it existed before the damage or destruction, including any improvements or alterations required to be made by any governmental body, county or city agency, due to any changes in code or building regulations.  Tenant shall for this purpose use all, or such part as may be necessary, of the insurance proceeds received from insurance policies required to be carried under the provision of Paragraph 4(b) of this Lease. Should the Premises be damaged or destroyed by any of the foregoing described casualties within the last thirty-six (36) months of the original term or of any extended or renewed term of this Lease, then to the extent that the Premises are untenantable or unsuitable, in Tenant's reasonable opinion, for continued use in the normal conduct of Tenant's business, Tenant shall have the right, exercisable by written notice to Landlord given within thirty (30) days after the date of such damage or destruction, to terminate this Lease effective upon the date of such damage or destruction.  Notwithstanding the foregoing, in the event that the Premises are damaged at any time during the term of this Lease such that Tenant determines, in its reasonable business judgment, that such damage will prevent Tenant from carrying on its normal business operations for a period of more than one hundred twenty (120) days, then Tenant may elect to terminate this Lease by giving written notice thereof to Landlord within thirty (30) days after the date of such damage or destruction.  If Tenant terminates this Lease as thus provided Landlord

5

shall be entitled to the insurance proceeds on the Premises as Landlord's interest may appear, but not to the proceeds of insurance carried by Tenant on Tenant's Property or business interruption regarding extra expense or loss of income; provided, however, Tenant shall not have the right to terminate this Lease unless (i) the damage or destruction of the Premises was caused by a peril which was insured against as required by the provisions of Paragraph 4(b) of this Lease; and (ii) at the time of such damage and destruction the said insurance policies required to be carried by Tenant were in the amounts required herein.

(b)     Tenant, at its expense, shall throughout the term of this Lease and any extension or renewal thereof, keep the Premises insured with "Special Form Causes of Loss" coverage (as such term is used in the insurance industry), including coverage for glass breakage, vandalism and malicious mischief, and for fire, windstorm, and other casualty damage for one hundred percent (100%) insurable replacement value (excluding footings and foundations), inclusive of $250,000 ordinance and law limit (coverages A, B and C combined).

(c)     Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense and as additional rent, commercial general liability insurance including product liability covering the Premises (occurrence basis) covering bodily injury, property damage and personal injury, naming Landlord as an additional insured as Landlord's interest may appear, with limits not less than One Million Dollars ($1,000,000.00) per occurrence, with a general aggregate of not less than Two Million Dollars ($2,000,000.00) and a "following form" umbrella liability policy or excess liability policy to include product liability in an amount of not less than Ten Million Dollars ($10,000,000.00) per occurrence.

(d)     Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense, business interruption insurance covering risk of loss due to the occurrence of any of the hazards insured against under Tenant's insurance and providing coverage in an amount sufficient to permit the payment of Rents, any additional rent and continuing operating expenses payable hereunder for a period (in such case) of not less than twelve (12) months.

(e)     In the event the Premises are located in an area identified by the National Flood Insurance Program as an area having "special flood hazards" (zones beginning with "A" or "V"), Tenant shall maintain throughout the term of this Lease and any extension thereof, flood insurance with limits stipulated pursuant to the National Flood Insurance Program, with any deductible in excess of Twenty five Thousand Dollars ($25,000.00) to be approved by Landlord.

(f)     All insurance companies providing the coverage required under this Section 4 shall be selected by Tenant and shall be rated A minus (A-) or better by Best's Insurance Rating Service (or equivalent rating service if not available), and shall be licensed to write insurance policies in the state in which the Premises are located. Tenant shall provide Landlord with copies of all policies and/or certificates of such coverage for the insurance coverages referenced in this Section 4, and all commercial general liability and umbrella liability or excess liability policies shall name Landlord (and if Landlord is either a general or limited partnership, all general partners) and any mortgagee designated by Landlord as an additional insured as their interests may appear. Any such coverage for additional insureds shall be primary and non-contributory with any insurance carried by Landlord or any other additional insured hereunder. All property insurance policies shall name Landlord (and if Landlord is either a general or

6

limited partnership), all general partners and any mortgagee designated by Landlord as an additional insured or as a loss payee as Landlord's interests may appear, and shall provide that all losses shall be payable as herein provided. All such policies of insurance shall provide that the amount thereof shall not be reduced and that none of the provisions, agreements or covenants contained therein shall be modified or canceled by the insuring company or companies without thirty (30) days prior written notice being given to additional insureds except ten (10) days' notice for non-payment. Such policy or policies of insurance may also cover loss or damage to Tenant's Property, extra expense and loss of income, and the insurance proceeds applicable to Tenant's Property, shall not be paid to Landlord or any mortgagee but shall accrue and be payable solely to Tenant. In the event of a casualty, Tenant shall be responsible for any deficiency between the replacement cost of the Premises and the amount actually paid by the insurance company.

## 5.    MAINTENANCE AND REPAIR

(a)    Tenant shall, during the term of this Lease and any renewals thereof, (i) maintain the Premises and all buildings and improvements thereon (interior and exterior, structural and otherwise) in good order and repair, ordinary wear and tear excepted; (ii) not commit waste or permit impairment or deterioration of the Premises (normal wear and tear excepted); (iii) to keep Tenant's Property, including trade fixtures, equipment, machinery and appliances thereon in good repair (ordinary wear and tear excepted) and replace trade fixtures, equipment, machinery and appliances on the Premises when necessary to keep such items in good repair; (iv) comply in all material respects with all laws, ordinances, regulations and requirements of any governmental body; (v) provide prompt notification to Landlord of any material adverse changes to the Premises of which Tenant is aware, such as material changes in any environmental condition, including the presence of biocontaminants, such as, but not limited to mold, and shall promptly undertake reasonable remediation (and preventative) actions in connection therewith; (vi) subject to the provisions of Paragraph 4(a) with respect to material damage or damage within the last three (3) years of this Lease, and Section 6 herein, return the Premises and all buildings and improvements thereon at the expiration of the term of this Lease or any extension thereof in as reasonably as good condition as when received, ordinary wear and tear excepted.

(b)    Tenant agrees that Landlord shall have no obligation under this Lease to make any repairs or replacements (including the replacement of obsolete components) to the Premises or the buildings or improvements thereon, or any alteration, addition, change, substitution or improvement thereof or thereto, whether structural or otherwise. Without limitation of the foregoing, Tenant shall be responsible for, and Landlord shall have no responsibility for, the maintenance, repair and replacement of the roof, foundation and structural components of the Building, together with the mechanical, electrical, plumbing and HVAC components, parking and driveway areas. The terms "repair" and "replacement" include, without limitation, the replacement of any portions of the Premises which have outlived their useful life during the term of this Lease (or any extensions thereof). Landlord and Tenant intend that the Rent received by Landlord shall be free and clear of any expense to Landlord for the construction, care, maintenance (including common area maintenance charges and charges accruing under easements or other agreements relating to the Premises), operation, repair, replacement, alteration, addition, change, substitution and improvement of or to the Premises and any building and improvement thereon. Upon the expiration or earlier termination of this Lease, Tenant shall remain responsible for, and shall pay to Landlord, any cost, charge or expense for which Tenant

7

is otherwise responsible for hereunder attributable to any period (prorated on a daily basis) prior to the expiration or earlier termination of this Lease.

## 6.    CONDEMNATION

(a)    In the event that the whole or any material part of the building on the Premises or a material portion of the Land (for purposes hereof, "material" shall mean more than 10% of the restaurant building on the Premises, more than 20% of the Land or a portion of the parking area that would reduce the number of available parking spaces below the minimum number of parking spaces required by code, unless suitable alternative parking is provided) shall be taken during the term of this Lease or any extension or renewal thereof for any public or quasi public use under any governmental law, ordinance, regulation or by right of eminent domain, or shall be sold to the condemning authority under threat of condemnation, or if Tenant can demonstrate to Landlord's reasonable satisfaction that the Premises cannot be reasonably operated as the type of restaurant contemplated herein as a result of such condemnation, or if all reasonable access to the adjacent roadways from the existing or comparable curb cuts shall be taken or materially reduced, or if Tenant's activities on the Premises shall be disrupted following such condemnation such that, in Tenant's reasonable discretion, the Premises cannot be operated in the substantially the same manner (any of such events being hereinafter referred to as a "taking"), then in such event, Tenant shall have the option of terminating this Lease as of a date no earlier than the date of such taking, such termination date to be specified in a notice of termination to be given by Tenant to Landlord not fewer than fourteen (14) days prior to the date on which possession of the Premises, or part thereof, must be surrendered to the condemning authority or its designee.

(b)    In the event of any taking which does not give rise to an option to terminate or in the event of a taking which does give rise to an option to terminate under Section 6(a) hereinabove and Tenant does not elect to terminate, Landlord shall make its award available to Tenant and Tenant shall, to the extent of the award from such taking (which term "award" shall mean the net proceeds after deducting expenses of any settlement, or net purchase price under a sale in lieu of condemnation but shall exclude the value of Landlord's reversionary interest), promptly restore or repair the Premises and all improvements thereon (except those items of Tenant's Property which Tenant is permitted to remove under the terms of this Lease) to the same condition as existed immediately prior to such taking insofar as is reasonably possible. If the estimated cost of restoration or repair shall exceed the amount of Landlord's award, Landlord shall promptly provide notice to the Tenant of such deficiency, and Tenant shall have the option to (i) terminate this Agreement by giving written notice to Landlord within thirty (30) days after Tenant receives notice from Landlord of the deficiency, or (ii) deposit with Landlord the amount of such excess. In the event that Tenant elects under clause (ii) in the preceding sentence, the award and any excess shall be held in trust by Landlord and used, to the extent required, for the purpose of such restoration or repair. A just and proportionate part of the Rent payable hereunder shall be abated from the date of such taking until ten (10) days after Tenant has restored same and thereafter the Rent shall be reduced in proportion to the reduction in the then rental value of the Premises after the taking in comparison with the rental value prior to the taking. If the award shall exceed the amount spent or to be spent promptly to effect such restoration, repair or replacement, such excess shall unconditionally belong to Landlord and shall be paid to Landlord.

8

(c)     In the event of any partial taking where this Lease is not terminated, Tenant shall not be entitled (except for use in reconstruction) to any part of the compensation or award given Landlord attributable to the taking of the fee of the Premises, but Tenant shall have the right to amounts (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

(d)     If this Lease is terminated by reason of a taking, then Landlord shall be entitled to receive the reimbursement for its entire award in any such condemnation or eminent domain proceedings or purchase in lieu thereof and Tenant hereby assigns to Landlord all of its right, title and interest in and to all and any part of such award, provided, however, Tenant shall be entitled to receive any portion of any award (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

## 7.     TAXES AND ASSESSMENTS

(a)     Tenant shall pay prior to delinquency all taxes and assessments which may be levied upon or assessed against the Premises and all taxes and assessments of every kind and nature whatsoever arising in any way from the use, occupancy, possession or transfer of ownership (excluding, however, any taxes incurred by Landlord (or a successor landlord) in connection with a transfer of ownership) of the Premises or assessed against the improvements situated thereon, together with all taxes levied upon or assessed against Tenant's Property. To that end, Landlord shall not be required to pay any taxes or assessments whatsoever which relate to or may be assessed against this Lease, the Rent and other amounts due hereunder, the Premises, improvements and Tenant's Property; provided, however, that any taxes or assessments which may be levied or assessed against the Premises for the period prior to the Rent Commencement Date or for the period ending after the Termination Date hereof shall be prorated between Landlord and Tenant as of such date. Tenant will not be required to pay any income, gross receipts, excess profits, revenue, corporate, personal property, estate, inheritance, gift, devolution, succession, transfer, franchise, capital levy or capital stock tax.

(b)     Within ten (10) business days after Tenant receives the paid receipted tax bills, Tenant shall furnish Landlord with copies thereof. Tenant may, at its option, contest in good faith and by appropriate and timely legal proceedings any such tax and assessment; provided, however, that Tenant shall indemnify and hold harmless Landlord from any loss or damage resulting from any such contest, and all reasonable expenses of same (including, without limitation, all attorneys' and paralegal fees, court and other costs) shall be paid solely by Tenant. Landlord, at no cost or liability to Landlord, shall cooperate with Tenant and execute any document which may reasonably be necessary for any proceeding.

## 8.     COMPLIANCE, UTILITIES, SURRENDER

(a)     Tenant, at its expense:  shall promptly comply with all municipal, county, state, federal and other governmental requirements and regulations, whether or not compliance therewith shall require structural or other changes in the Premises; will procure and maintain all permits, licenses and other authorizations required for the use of the Premises or any part thereof then being made and for the lawful and proper installation, operation and maintenance of all equipment and appliances necessary or appropriate for the operation and maintenance of the

50416344_1

Premises; and shall comply with all easements, restrictions, reservations and other instruments of record applicable to the Premises, including without limitation, any requirement in such instruments on behalf of the owner or occupant of the Premises to procure and maintain insurance, and to make any payments thereunder, whether now in effect or enacted during the term of this Lease. Tenant shall indemnify and save Landlord harmless from all expenses and damages by reason of any notices, orders, violations or penalties filed against or imposed upon the Premises (based on Tenant's sole scope of operations at the Premises), or against Landlord as owner thereof, because of Tenant's failure to comply with this paragraph.

(b)     Tenant shall pay all charges for heat, water, gas, sewage, electricity and other utilities used or consumed on the Premises and shall contract for the same in its own name. Landlord shall not be liable for any interruption or failure in the supply of any such utility service to the Premises.

(c)     Tenant shall peacefully surrender possession of the Premises, the buildings and other improvements thereon to Landlord at the expiration, or earlier termination, of the original term or any extended or renewed term of this Lease in good condition and repair, reasonable wear and tear excepted, and in broom clean condition with all debris removed.

## 9.    QUIET ENJOYMENT

Landlord covenants and warrants that Landlord has full power and authority to enter into this Lease, and that Tenant shall have and enjoy full, quiet and peaceful possession of the Premises, its appurtenances and all rights and privileges incidental thereto during the term hereof and any renewals or extensions, subject to the provisions of this Lease and any easements, restrictions, reservations and other instruments of record applicable to the Premises and in existence at the time of the conveyance of the Premises to Landlord by Tenant or thereafter. Landlord agrees to cause the holder of any mortgage now or hereafter relating to the Premises to execute and deliver to Tenant a Subordination and Nondisturbance Agreement substantially in the form contemplated by Section 16 of this Lease, or in such form as may be customarily utilized by the lender and reasonably approved by Tenant.

## 10.    OPTION TO RENEW

Tenant shall have six (6) successive five (5) year options (each, an "Option Period") to extend this Lease for up to an additional thirty (30) years upon the same terms, covenants, conditions and rental as set forth herein provided that Tenant is not in Default hereunder at the commencement of such option period. In the event Tenant elects not to exercise each such five (5) year option, Tenant shall give written notice to Landlord not less than six (6) months prior to the Termination Date. Should Tenant fail to give Landlord such timely written notice during the required period, this Lease shall automatically renew pursuant to the terms hereof.

## 11.    DEFAULT

(a)     If any one or more of the following events occur, said event or events shall be referred to as a "Default" under this Lease:

10

(i)     If Tenant fails to pay Rent or any other charges required under this Lease when same shall become due and payable, and such failure continues for ten (10) days or more after written notice from Landlord;

(ii)     If Tenant fails to perform or observe any term, condition, covenant, agreement, or obligation required under this Lease and such failure continues for thirty (30) days after written notice from Landlord (except that such thirty (30) day period shall be automatically extended for such additional period of time as is reasonably necessary to cure such Default, if such Default cannot be cured within such period, provided Tenant is in the process of diligently curing the same).

(iii)     If Tenant shall make an assignment for the benefit of creditors or file a petition, in any federal or state court, in bankruptcy or reorganization, or make an application in any such proceedings for the appointment of a trustee or receiver for all or any portion of its property, and such proceeding shall not be set aside within sixty (60) days.

(iv)     If any petition shall be filed under federal or state law against Tenant in any bankruptcy, reorganization, or insolvency proceedings, and said proceedings shall not be dismissed or vacated within sixty (60) days after such petition is filed.

(v)     If a receiver or trustee shall be appointed under federal or state law for Tenant for all or any portion of the property of either of them, and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

(b)     Upon the happening of any one or more of the aforementioned Defaults which are not cured within the cure period applicable thereto, if any, Landlord shall have the right, in addition to any other rights and remedies, to:

(1)     terminate this Lease by giving written notice of same to Tenant. Upon such notice, this Lease shall cease and expire, and Tenant shall surrender the Premises to Landlord in the condition required by this Lease, and Landlord will be entitled to recover all unpaid rents that have accrued through the date of termination plus the costs of performing any of Tenant's obligations (other than the payment of rent) that should have been but were not satisfied as of the date of such termination. In addition, Landlord will be entitled to recover, not as rent or a penalty but as compensation for Landlord's loss of the benefit of its bargain with Tenant, the difference between (i) an amount equal to the present value of the rent and other sums that this lease provides Tenant will pay for the remainder of the Primary Term and for the balance of any then effective extension of the Primary Term, and (ii) the present value of the net future rents for such period that will be or with reasonable efforts could be collected by Landlord by reletting the Premises.

(2)     take possession of the Premises without terminating this Lease and then rent the same for the account of Tenant (which may be for a term extending beyond the Term of this Lease) in which event Tenant covenants and agrees to pay any deficiency after crediting it with the rent thereby obtained less all repairs and expenses, including the costs of remodeling and brokerage fees, and Tenant waives any claim it may have to any rent obtained on such releting which may be in excess of the Rent required to be paid herein by Tenant;

11

(3)    perform such obligation (other than payment of Rent) on Tenant's behalf and charge the cost thereof to Tenant as additional rent; or

(4)    exercise any and all other rights granted to Landlord under this Lease or by applicable law or in equity.

Tenant further agrees that in the event of a Default, any monies deposited by Tenant with Landlord shall be immediately and irrevocably assigned and released to Landlord (without further action by Landlord or Tenant) to be applied by Landlord against any and all of Tenant's obligations under this Lease, in any manner as Landlord may determine.

(c)    If Landlord should elect to terminate or repossess the Premises, as provided hereinabove, Landlord may re-enter the Premises and remove Tenant, its agents and subtenants, together with all or any of Tenant's Property, by suitable action at law, or by force. Tenant waives any right to the service of any notice of Landlord's intention to re-enter and Landlord shall not be liable in any way in connection with any action it takes pursuant to this paragraph. Notwithstanding such re-entry or removal, Tenant's liability under Lease shall survive and continue.

(d)    In case of re-entry, repossession or termination of this Lease, Tenant shall remain liable for Rent, any additional rent and all other charges provided for in this Lease for the otherwise remaining term of this Lease, and any and all expenses which Landlord may have incurred in re-entering the Premises including, but not limited to, allocable overhead, alterations to the building to bring the building to "white box" standard, leasing, construction, architectural, and reasonable legal and accounting fees. Landlord shall have the right, but not the obligation, to relet the whole or part of the Premises upon terms which Landlord, in its sole discretion, deems appropriate and Tenant shall be responsible for all reasonable and customary expenses incurred by Landlord in reletting or attempting to relet and all rent collected for reletting shall be credited against all of Tenant's obligations hereunder. Landlord agrees to use commercially reasonable efforts to relet the Premises in order to mitigate its damages

(e)    In the event of and during the continuance of a Default, Landlord may, at its sole option, enter upon the Premises, if deemed necessary by Landlord in its sole discretion, and/or do whatever may be deemed necessary by Landlord in its sole discretion to cure such failure by Tenant. Tenant shall pay to Landlord within five (5) days of Landlord's request, all costs incurred by Landlord in connection with Landlord's curing of such failure. In addition to the above costs, in the event Landlord does not receive payment from Tenant when due under this paragraph, then interest at the rate of eighteen percent (18%) per annum or, if less, the highest rate allowable by law, shall be due and payable with respect to such payment from the due date thereof until Landlord receives such payment.

(f)    In the event either party engages legal counsel in connection with the enforcement of any of the terms and provisions of this Lease, then, in addition to all other sums due from the party deemed liable hereunder, such liable party shall pay to the prevailing party any and all attorneys' fees, paralegal fees, and legal costs and expenses incurred by the prevailing party, including on appeal and in any bankruptcy proceedings.

(g)     The rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now or hereinafter provided by law, and all such rights and remedies shall be cumulative. No action or inaction by Landlord shall constitute a waiver of any Default, and no waiver of any Default shall be effective unless it is in writing, signed by Landlord.

## 12.    **HOLDING OVER**

In the event Tenant remains in possession of the Premises after the expiration of this Lease without executing a new written lease acceptable to Landlord and Tenant, Tenant shall occupy the Premises as a tenant from month to month subject to all the terms hereof (except as modified by this paragraph), but such possession shall not limit Landlord's rights and remedies by reason thereof nor constitute a holding over. In the event of such month to month tenancy, the monthly installment of Annual Rent due for each such month shall increase to be one hundred twenty-five percent (125%) of the monthly installment thereof which was payable during the last month of the term of this Lease.

## 13.    **WAIVER OF SUBROGATION**

Notwithstanding anything in this Lease to the contrary, other than Tenant's obligations to repair, restore or rebuild described in Section 4 of this Lease, neither party shall be liable to the other for any damage or destruction of the Premises resulting from fire or other casualty covered by insurance required of either party hereunder, whether or not such loss, damage or destruction of the Premises are caused by or results from the negligence of such party (which term includes such party's officers, employees, agents and invitees), and each party hereby expressly releases the other from all total liability for or on account of any said insured loss, damage or destruction. Each party shall procure all endorsements of insurance policies carried by it necessary to protect the other from any right of subrogation and/or liability in the event of such loss.

## 14.    **LANDLORD'S LIEN FOR RENTS**

As security for Tenant's payment of Rent and all other payments required to be made by Tenant hereunder (including, by way of illustration only, taxes, damage to the Premises, court costs, and attorneys' fees), Tenant hereby grants to Landlord a lien upon all of Tenant's Property now or hereafter located upon the Premises. The lien herein provided shall be subordinate to the lien of any chattel mortgage, collateral assignment or security interest given by Tenant to any seller or provider of purchase money financing of Tenant's Property ("Leasehold Lender's Lien") and in connection therewith Landlord agrees to execute a Landlord Waiver and Collateral Access Agreement substantially in the form attached hereto as Exhibit "E". Within thirty (30) days after any Lender's Leasehold Lien is satisfied or otherwise released, Tenant shall provide Landlord with written notice of such satisfaction, release or removal. In the event of a Default, Landlord may enter upon the Premises and take possession of Tenant's Property, or any part thereof, and may sell all or any part of Tenant's Property at public or private sale in one or successive sales, with or without notice, to the highest bidder for cash and on behalf of Tenant. Landlord may sell and convey Tenant's Property, or any part thereof, to such bidder, delivering to such bidder all of Tenant's title and interest in such property sold to such bidder. The proceeds of such sale shall be applied by Landlord first toward the costs of such sale and then toward the payment of all sums due from Tenant to Landlord under this Lease. Notwithstanding anything in this paragraph to the contrary, Tenant shall be entitled to collaterally grant a security interest in Tenant's interest

13

in this Lease to any lender, including, without limitation, Wells Fargo Bank, National Association.

## 15.    ASSIGNMENT AND SUBLETTING

(a)      Tenant shall have the right to assign or sublet all or any part of the Premises to any party for any lawful purpose. Notwithstanding the foregoing, Tenant shall have no right to assign or sublet in the event such assignment or subletting would violate any material term of any then material existing agreement applicable to the Premises. Except as set forth in this Section 15, any assignment or subletting permitted hereunder shall not relieve Tenant of its liability for the continued performance of all terms, covenants and conditions of this Lease, including without limitation the payment of all Rent and other charges hereunder. Likewise, as a condition of any such assignment by Tenant, the assignee shall be required to execute and deliver to Landlord, upon the effective date of such assignment, an agreement, in recordable form, whereby such assignee assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Tenant shall be released from all liability under this Lease arising after the date of such assignment or subletting if the assignment or sublease is executed in connection with (i) the sale of all or substantially all of Tenant's (or Tenant's Affiliates') business or assets, including the Premises, to a corporation or other entity that will operate the Premises as an Krystal; and (ii) as of the date of assignment or sublease, the assignee or subtenant or guarantor thereof has an S&P Credit Rating of BBB- or higher, and a Fitch Credit Rating of BBB- or higher, and a Moody's Credit Rating of Baa3 or higher; or (ii) as of the date of assignment, the assignee has an aggregate net worth in accordance with GAAP, of at least $30,000,000; and (iii) the assignee assumes all of Tenant's obligations under this Lease; or (iii) as reasonably approved by Landlord. As used in the immediately preceding sentence, "S&P Credit Rating" means the credit rating assigned by Standard & Poor's Rating Group to the highest rated publicly issued debt securities of the assignee, "Fitch Credit Rating" means the credit rating assigned by Fitch Ratings, Inc. to the highest rated publicly issued debt securities of the assignee, and "Moody's Credit Rating" means   the credit rating assigned by Moody's Investors Service to the highest rated publicly issued debt securities of the assignee.

(b)      Prior to any assignment hereunder, Tenant shall deliver to Landlord written notice of such assignment or subletting, together with: (i) a copy of the assignment or subletting documents (including copies of any recorded documents related thereto); (ii) the name, address and telephone number of such assignee or sublet tenant and a designated contact person therefor; (iii) a new insurance policy and binder complying with the terms of this Lease and naming such assignee or sublet tenant as the tenant of the Premises; and (iv) an agreement executed by such assignee or sublet tenant, in recordable form, whereby such assignee or sublet tenant assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Landlord shall execute and return within ten (10) days of receipt any estoppels reasonably requested by Tenant, the assignee or sublessee, or their lenders, in connection with such assignment or sublease.

(c)      All rent and other consideration payable under any sublease shall be solely the property of Tenant.

(d)      Landlord shall have the right without limitation to sell, convey, transfer or assign its interest in the Premises or its interest in this Lease. In the event of any sale or other transfer

14

of Landlord's interest in the Premises, other than a transfer for security purposes only, Landlord shall be automatically relieved of any and all obligations and liabilities on the part of Landlord occurring from and after the date of such transfer; provided, that the transferee shall assume all of the obligations of Landlord under this Lease.   It is intended hereby that the covenants and obligations contained in this Lease on the part of the Landlord shall be binding on Landlord only during its period of ownership of the Premises.

## 16.    **SUBORDINATION, NON DISTURBANCE, ATTORNMENT, ESTOPPEL CERTIFICATE.**

(a)    Upon written request of the holder of any mortgage (which term "mortgage" shall also include deeds of trust) now or hereafter relating to the Premises, Tenant shall subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall execute, acknowledge and deliver an instrument substantially in the form of Exhibit "B" attached hereto or in other reasonable form customarily used by such encumbrance holder to effect such subordination; provided, however, as a condition of all such subordinations, the holder of such mortgage shall be first required to agree with Tenant that, notwithstanding the foreclosure or other exercise of rights under any such first or other mortgage, Tenant's possession and occupancy of the Premises and the improvements and its leasehold estate shall not be disturbed or interfered with, nor shall Tenant's rights and obligations under this Lease be altered or adversely affected thereby so long as Tenant is not in Default.

(b)    Notwithstanding anything in Paragraph 16(a) above to the contrary, in the event the holder of any such mortgage elects to have this Lease be superior to its mortgage, then upon notification to Tenant to that effect by such encumbrance holder, this Lease shall be deemed prior to the lien of said mortgage, whether this Lease is dated prior or subsequent to the date of said mortgage, and Tenant shall execute, acknowledge and deliver an instrument, in the form customarily used by such encumbrance holder to effect such priority.

(c)    In the event proceedings are brought for the foreclosure of, or in the event of the exercise of the power of sale under any mortgage made by Landlord encumbering the Premises, or in the event of delivery of a deed in lieu of foreclosure under such a mortgage, Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as "Landlord" under this Lease, and upon the request of the purchaser, Tenant shall execute, acknowledge and deliver an instrument, in form and substance satisfactory to such purchaser, evidencing such attornment.

(d)    Each party agrees, within ten (10) days after written request by the other, to execute, acknowledge and deliver to and in favor of any proposed mortgagee or purchaser of the Premises, an estoppel certificate, substantially in the form of Exhibit "C" attached hereto, stating, among other things (but limited to factual matters related to this Lease) (i) whether this Lease is in full force and effect, (ii) whether this Lease has been modified or amended and, if so, identifying and describing any such modification or amendment, (iii) the date to which Rent and other charges have been paid, and (iv) whether the party furnishing such certificate knows of any default on the part of the other party under this Lease, or has any claim against such party and, if so, specifying the nature of such default or claim.

15

(e)    Upon written demand by the holder of any mortgage encumbering the Premises, Tenant shall forthwith execute, acknowledge and deliver an agreement in favor of and in the form reasonably satisfactory to Tenant, by the terms of which Tenant shall agree to give prompt written notice to such encumbrance holder in the event of any casualty damage to the Premises or in the event of any default on the part of Landlord under this Lease, and shall agree to allow such encumbrance holder a reasonable length of time after notice to cure or cause the curing of such default before exercising Tenant's rights under this Lease, or terminating or declaring a default under this Lease.

(f)    Tenant shall be entitled to charge a reasonable fee covering Tenant's actual costs in connection with the execution of any subordination, non-disturbance and attornment agreement or estoppel certificate requested by Landlord hereunder (which fee shall not exceed $1,000.00) and Landlord agrees to pay such fee as a condition precedent to Tenant's execution of such documents.

## 17.    **USE OF PREMISES**

The Premises shall be used by Tenant for any lawful purpose. Tenant shall operate its business in a high class and reputable manner. Tenant shall have the right to cease operation of a business on the Premises; provided, however, Tenant shall continue to fulfill all other obligations of Tenant under this Lease, including payment of Rent and performance of Tenant's maintenance obligations. Tenant shall have the right to place billboard signage on the Premises and receive any and all income derived from signage; provided, however that any and all signage must be allowed by applicable law. The Premises shall be used and occupied only for those purposes that are now or hereafter permitted under the land use designation and zoning district for the Premises and according to all other applicable public and private restrictions, covenants and laws affecting the Premises, including, but not limited to, the covenants and restrictions contained hereinbelow. Neither the Premises, nor any portion thereof, shall be occupied by or used for: nude or semi-nude dancing or service; lingerie modeling; an "adult" or "x-rated" book or video store that sells or rents "adult" or "x-rated" material (which are defined as stores in which thirty percent (30%) or more of the inventory is not available for sale to children under eighteen (18) years old); the display for sale of pornographic or obscene materials (i.e., books, magazines, newspapers, video tapes, video discs, computer software or the like which would be considered obscene or pornographic under prevailing laws or community standards); an "adult" or "x-rated" movie theater; a so-called "head shop" selling or displaying drug paraphernalia; a clinic or health provider offering abortions as a part of its services; a funeral home; a flea market; a bingo parlor; a car wash, a dance hall or nightclub; a skating rink; a bowling alley; a pool hall or billiards room; the use or placement of any telecommunications towers; or, any use that is unlawful or that creates a legal nuisance.

## 18.    **NOTICES**

All notices and other communications required or permitted to be given hereunder shall be in writing and shall be delivered by a nationally recognized overnight courier or mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Landlord:        Hannah Rocks, LLC
                       350 Theodore Fremd Avenue

50416344_1

Suite 210
Rye, New York 10580
Attention: John M. Tanenbaum
Facsimile: (516) 932-9822

With a copy to:      Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, New York 10022
Attention: Jessica Bozarth
Facsimile: 212-754-0330

If to Tenant:        The Krystal Company
1455 Lincoln Parkway East
6th Floor
Dunwoody, Georgia 30346
Attention: Property Management
Facsimile: (770) 351-4704

With copies to:      Argonne Capital Group, LLC
One Buckhead Plaza, Suite 1560
3060 Peachtree Road, NW
Atlanta, Georgia 30305
Attention: Karl F. Jaeger
Facsimile: (404) 364-2985

McGuireWoods LLP
1230 Peachtree Street, NE, Suite 1230
Atlanta, Georgia 30309
Attention: John T. Grieb, Esq.
Facsimile: (404) 443-5762

Any party may change its address for notices by written notice in like manner as provided in this paragraph and such change of address shall be effective seven (7) days after the date written notice of such change of address is given. Notice for purposes of this Lease shall be deemed given by the party who is giving such notice when it shall have been received or refused from the U.S. certified or registered mail, or from a nationally recognized overnight courier, with sufficient postage prepaid.

With respect to any such notice, Tenant shall, and Landlord shall use its best efforts to, simultaneously deliver a copy of such notice by facsimile at the appropriate facsimile number above to the other party; provided however, that certified mail or overnight courier delivery shall nevertheless be required to effect proper notice hereunder.

## 19.    **INDEMNIFICATION**

Tenant does hereby indemnify and exonerate and agrees to hold harmless Landlord against and from all liabilities, losses, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable architects' fees, attorneys' fees, paralegal fees, and legal costs and

17

50416344_1

expenses incurred by Landlord, whether or not judicial proceedings are filed, and including on appeal and in any bankruptcy proceedings, which may be imposed upon or asserted against or incurred by Landlord by reason of Tenant's use and occupancy of the Premises, including without limitation any of the following occurring:

(a)     any work or thing done in respect of construction of, in or to the Premises or any part of the improvements now or hereafter constructed on the Premises;

(b)     any use, possession, occupation, operation, maintenance or management of the Premises or any part hereof;

(c)     any failure to, or to properly, use, possess, occupy, operate, maintain or manage the Premises or any part thereof;

(d)     the condition, including environmental conditions, of the Premises or any part thereof;

(e)     any negligence on the part of Tenant or any of its agents, contractors, servants, employees, licensees or invitees;

(f)     any accident, injury or damage to any person or property occurring in, on or about the Premises or any part thereof including any sidewalk adjacent thereto;

(g)     any failure on the part of Tenant to perform or comply with any of the covenants, agreements, terms or conditions contained in this Lease on its part to be performed or complied with.

Landlord shall not be responsible or liable to Tenant for any loss or damage to either the person or property of Tenant unless caused by the negligence or intentional acts of Landlord. Landlord shall not be responsible or liable for any defect, latent, or otherwise, in the Premises, or any of the equipment, machinery, utilities, appliances or apparatus therein, nor shall it be responsible or liable for any injury, loss or damage to any person or to any property caused by or resulting from bursting, breakage, leakage, steam or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of said Premises or for any injury or damage caused by or resulting from acts of God or the elements, or for any injury or damage caused by or resulting from any defect or negligence in the occupancy, construction, operation or use of any of said Premises, building, machinery, apparatus or equipment.

## 20.    **COOPERATION**

(a)     Landlord shall fully cooperate with Tenant throughout the term of this Lease to secure or maintain proper zoning, building and other permits and compliance with all applicable laws; provided, however, that Landlord shall not be required to incur any additional expense. Landlord shall within ten (10) days of request execute any petitions, requests, applications and the like as Tenant shall reasonably request in order to obtain any permit, license, variances and approvals which, in the reasonable judgment of Tenant, are necessary for the lawful construction and/or operation of Tenant's business on the Premises, provided, however, that Tenant shall indemnify and save Landlord harmless from any and all expenses, costs, charges, liabilities,

18

losses, obligations, damages and claims of any type which may be imposed upon, asserted against or incurred by Landlord by reason of same.

(b)    Landlord shall have the right, in Landlord's sole discretion, to enter into an exchange agreement with a qualified intermediary in order to effectuate a like-kind exchange of the Premises for one or more other properties. Landlord and Tenant agree that Tenant, at no cost to Tenant, shall cooperate with Landlord in effecting a like-kind exchange of the Premises by Landlord pursuant to and in accordance with the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

## 21.    **EXCULPATION**

Neither Party shall be liable to the other, or the other's employees, agents, invitees, licensees or any other person whomsoever for any injury to person or damage to property on or about the Premises caused by the other party's negligence or misconduct, its agents, servants or employees or of any other person entering the building under express or implied invitation by the other party or due to any other cause whatsoever, except to the extent by the negligence or neglect of such party, its employees or its authorized representatives.

## 22.    **LANDLORD'S LIABILITIES**

The term "Landlord" as used in this Lease means the owner from time to time of the Premises.  Neither Landlord nor any partner, shareholder or beneficiary thereof shall have any personal liability with respect to any of the provisions of this Lease, and if Landlord is in default with respect to its obligations hereunder, Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of Tenant's remedies for the collection of a judgment or other judicial process requiring the payment of money by Landlord, and no other property or assets of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use or occupancy of the Premises.

## 23.    **SUCCESSORS**

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

## 24.    **ENTIRE AGREEMENT/MEMORANDUM OF LEASE**

This Lease contains the entire agreement between the parties hereto and may not be modified in any manner other than in writing signed by the parties hereto or their successors in interest.  A memorandum of this Lease in the form attached hereto as Exhibit "D" shall be executed by the parties and shall be recorded in the official records of the county where the Premises are located.

19

25. **GENDER**

Whenever the context hereof permits or requires, words in the singular may be regarded as in the plural and vice-versa, and personal pronouns may be read as masculine, feminine and neuter.

26. **BROKERAGE FEES**

It is understood and agreed that neither party has incurred any real estate brokerage fees or commissions arising out of this Lease and each party agrees to hold the other harmless from and against all such fees and commissions incurred, and costs related thereto including legal fees, as a result of its own conduct or alleged conduct.

27. **CAPTIONS**

The captions of this Lease are for convenience only, and do not in any way define, limit, disclose, or amplify terms or provisions of this Lease or the scope or intent thereof.

28. **NOT A SECURITY ARRANGEMENT**

The parties hereto agree and acknowledge that this transaction is not intended as a security arrangement or financing secured by real property, but shall be construed for all purposes as a true lease.

29. **NET LEASE**

It is the intention of the parties hereto that this Lease is and shall be treated as a triple net lease. Any present or future law to the contrary notwithstanding, except as expressly set forth in this Lease, this Lease shall not terminate, nor shall Tenant be entitled to any abatement, suspension, deferment, reduction, setoff, counterclaim, or defense with respect to Rent, nor shall the obligations of Tenant hereunder be affected by reason of: any damage to or destruction of the Premises or any part thereof; any taking of any Premises or any part thereof or interest therein by condemnation or otherwise; any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any person or for any other reason; any title defect or encumbrance or any matter affecting title to the Premises or any part thereof; any eviction by paramount title or otherwise; any default by Landlord hereunder; any proceeding relating to Landlord; the impossibility or illegality of performance by Landlord, Tenant or both; any action of governmental authority; any breach of warranty or misrepresentation; any defect in the condition, quality or fitness for use of the Premises or any part thereof; or any other cause whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or knowledge of any of the foregoing. The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated in accordance with an express provision of this Lease.

50416344_1

## 30. **WAIVER**

No waiver by either party of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by the other party of the same or any other provision. Either party's consent to, or approval of, any act as required hereunder shall not be deemed to render unnecessary the obtaining of such party's consent to or approval of any such subsequent act by the other party. The acceptance of Rent, or any partial payment of Rent, hereunder by Landlord shall not be a waiver of any preceding Default by Tenant of any provision hereof, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent.

## 31. **TIME OF THE ESSENCE**

Landlord and Tenant agree that time shall be of the essence of all terms and provisions of this Lease.

## 32. **GOVERNING LAW**

This Lease shall be construed in accordance with the laws of the state in which the Premises are located.

## 33. **SEVERABILITY**

If any provision of this Lease becomes unenforceable for any reason, such unenforceability shall not limit or impair the operation or validity of any other provision of this Lease.

## 34. **JURISDICTION, VENUE, AND GOVERNING LAW**

If any party to this Lease institutes any lawsuit or other action or proceeding against the other party and pertaining to this Lease, any right or obligation of any party hereunder, breach of this Lease or otherwise pertaining to the Premises, the sole and exclusive venue and jurisdiction for filing and maintaining any such lawsuit or other action or proceeding shall be in the jurisdiction where the Premises are located, and the parties to this Lease waive the right to institute or maintain any such suit, action or proceeding in any other courts or forums whatsoever. Each party by executing this Lease consents and submits itself to the personal jurisdiction of such court. This Lease shall be construed and governed in accordance with the laws of the state where the Premises are located without regard to conflict of law principles.

## 35. **COUNTERPARTS**

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

## 36. **RIGHT OF FIRST REFUSAL**

(a)      Landlord grants to Tenant a continuous right of first refusal to purchase the Premises pursuant to this Section 36.

21

(i)      If (A) Landlord receives a bona fide offer, solicited or unsolicited, to sell the Premises or to otherwise transfer or dispose of the Premises or the sale of the interests of the Landlord for value to any unaffiliated third party (any such sale, transfer or other disposition, a "Sale") and intends to accept the offer, or (B) Landlord decides to make a bona fide offer for a Sale of the Premises for value to any unaffiliated third party (which shall be subject to Tenant's right of first refusal) and Landlord has found an unaffiliated third party ready, willing and able to accept such offer, then Landlord shall provide a written copy of such offer to Tenant (the "Offer"), which Offer shall include all material terms of the proposed sale or transfer (including, without limitation, the interests or property affected, the name and address of any proposed transferees, the amount of the purchase price, the intended date for closing, and all other material terms and conditions of such offer, along with copies of all relevant documents.) Tenant will have the right to accept Landlord's Offer by written notice to Landlord given within twenty-five (25) days after Tenant's receipt of the Offer, time being of the essence with respect to this and all other periods provided for in this Section 36. For purposes hereof, a party shall be considered to be "unaffiliated" so long as such party is not a member of the family of Landlord's principal, or Landlord, its principals, or such family members, own or control less than a 25% interest therein in the aggregate. The right of first refusal shall be applicable to the sale or transfer of stock, membership interests or partnership interests of Landlord or its principal.

(ii)     If Tenant accepts the Offer, settlement shall be held by the earlier of (A) 60 days after Tenant's acceptance, or (B) at Tenant's option, such earlier closing date as was set forth in the Offer. Upon settlement, Landlord shall convey to Tenant (or its designee) good and marketable title to such interests or property free and clear of all liens, encumbrances and restrictions (except this Lease and such non-material liens as are of record on the date hereof or recorded after the date hereof with the prior written consent of Tenant and which do not impact on Tenant's use of the Premises).

(iii)    If Tenant does not accept the Offer within the time period specified and a Sale closes (A) on terms no more favorable to the transferee than those specified in the Offer, and (B) by the earlier of (1) the time frame set forth in the Offer and (2) six (6) months after the Offer was made to Tenant, then Tenant's right of first refusal hereunder shall be effective with respect to any future sale of the Premises. If, however, at any time, an intended Sale will not meet both of the conditions set forth in clauses (A) and (B) above, then Tenant's right of first refusal as set forth in this Section 36 shall be deemed reinstated, and Landlord shall be required to again, and thereafter, comply with this Section 36 (i.e. delivering an Offer to Tenant, awaiting Tenant's response, etc.).

(iv)     NOTWITHSTANDING ANYTHING TO THE CONTRARY, IF THIS LEASE TERMINATES (OTHER THAN BY REASON OF TENANT PURCHASING THE PREMISES PURSUANT TO THIS SECTION 36 OR THE TERM EXPIRES, TENANT'S RIGHT OF FIRST REFUSAL SET FORTH HEREIN SHALL TERMINATE AND BE NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT; AND, IN SUCH EVENT TENANT SHALL EXECUTE SUCH DOCUMENTS AS LANDLORD SHALL REASONABLY REQUEST EVIDENCING SUCH TERMINATION OF ITS RIGHT OF FIRST REFUSAL. EXCEPT AS AFORESAID, TENANT'S RIGHTS UNDER THIS SECTION 36 SHALL SURVIVE ANY SALE, TRANSFER OR OTHER

DISPOSITION OF THE PREMISES BY OR THROUGH LANDLORD (INCLUDING THOSE PERSONS DESCRIBED IN SECTION 36(b) BELOW).

(b)     Notwithstanding anything to the contrary contained herein, the provisions of this Section 36 shall not apply to or prohibit (A) any mortgaging, subjection to deed of trust or other hypothecation of Landlord's interest in the Premises to any Lender, (B) any sale of the Premises pursuant to a private power of sale under or judicial foreclosure of any Mortgage or other security instrument or device to which Landlord's interest in the Premises is now or hereafter subject (including subsequent transfers of title to any Affiliate of any such Lender established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Premises that acquires title to the Premises through such Lender), (C) any transfer of Landlord's interest in the Premises to a Lender, beneficiary under deed of trust or other holder of a security interest therein or their designees by deed in lieu of foreclosure (including subsequent transfers of title to any Affiliate of any such Person established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Property that acquires title to the Property through any such Person, or (D) any transfer of the Property to any governmental or quasi-governmental agency with power of condemnation (including subsequent transfers of title to any Affiliate of any such governmental or quasi-governmental agency established or existing primarily for the purpose of taking title to the Premises). For the avoidance of doubt, however, Tenant's rights under this Section 36 shall survive all of the foregoing.

(c)     Notwithstanding anything to the contrary contained herein, Landlord covenants and agrees that the Premises shall not be sold within two (2) years of the Effective Date for more than $968,421.00, plus (i) the cost of Landlord's reasonable and actual expenses incurred in connection with the original purchase of the Premises from Tenant and (ii) the cost of Landlord's reasonable and actual expenses incurred in connection with sale of the Premises to a subsequent third party.

## 37.     **NO ESTATE BY TENANT**.

This Lease shall create the relationship of lessor and lessee between Landlord and Tenant; no estate shall pass out of Landlord. Tenant's interest shall not be subject to levy or sale, and shall not be assignable by Tenant except as provided in Section 14 and 15 of this Lease. Nothing contained in this Lease shall, or shall be deemed or construed so as to, create the relationship of principal-agent, joint venturers, co-adventurers, partners or co-tenants between Landlord and Tenant; it being the express intention of the parties that they are and shall remain independent contractors one as to the other.

## 38.     **REPRESENTATIONS AND WARRANTIES OF TENANT**.

Tenant, and the individual executing this Lease on behalf of Tenant, hereby represents and warrants and to Landlord that: (a) Tenant is a limited liability company, duly organized and validly existing under the laws of the State of Tennessee; (b) Tenant has qualified with the Secretary of State of the State in which the Premises are situated to transact business in that State; (c) Tenant has all necessary power and authority to enter into this Lease and has all necessary licenses to conduct its business for the uses contemplated hereunder; and (d) this Lease constitutes a binding and enforceable obligation of Tenant and does not conflict with any

23

provision of Tenant's organizational documents or of any other lease or other agreement to which Tenant is a party or by which Tenant may be bound.

### 39.   HAZARDOUS SUBSTANCES OR CONDITIONS.

Tenant shall not use, handle, store and dispose of any Hazardous Materials, on or about the Premises, except in accordance with all applicable laws, and hereby agrees to indemnify, defend and hold Landlord harmless from any claim, liability, loss or damage arising from the improper use, handling, storage or disposal of Hazardous Materials on or about the Premises. Without limitation of the foregoing, Tenant shall promptly provide to Landlord copies of any written notice that Tenant may receive from any governmental authority relating to or alleging any improper use, handling storage or disposal of any Hazardous Materials by Tenant, its employees, agents or contractors on or about the Premises. "Hazardous Material(s)" for purposes of this Lease shall include but not be limited to all toxic or hazardous materials, chemicals, wastes, pollutants or similar substances, including, without limitation, Petroleum (as hereinafter defined), asbestos and/or urea formaldehyde insulation, which are regulated, governed, restricted or prohibited by any Hazardous Materials Laws including, but not limited to, those materials or substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "pollutants" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Clean Water Act, 33 U.S.C. Section 1251 et seq., and any rules and regulations promulgated thereunder, all as presently or hereafter amended. "Petroleum" for purposes of this Lease shall include, without limitation, oil or petroleum of any kind and in any form including but not limited to oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other waste, crude oil, gasoline, diesel fuel and kerosene.

### 40.   FINANCIAL REPORTING.

Within thirty (30) days after Landlord's written request, Tenant shall deliver to Landlord (i) not more than one (1) time during any twenty-four (24) month period, complete financial statements of the Tenant including a balance sheet, profit and loss statement, statement of changes in financial condition for the most recent fiscal period then ended (the financial statements delivered to Landlord need not be audited); and (ii) not more than one (1) time during any twelve (12) month period an audited gross sales reports for the business at the Premises.

[Remainder of Page Intentionally Left Blank; Signatures Appear on Next Page]

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Lease Agreement to be effective as of the day and date first above written.

**"LANDLORD"**

**HANNAH ROCKS, LLC,** a New York limited liability company

By: _____
      John M. Tanenbaum
      Managing Member

[Signatures Continue on Next Page]

50416344_1

"TENANT"

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____

Brian Blosser
Vice President of Development and Construction

## EXHIBITS AND ADDENDA ATTACHED

Rent Addendum
Exhibit "A" - Legal Description
Exhibit "B" - Subordination, Non-Disturbance and Attornment Agreement
Exhibit "C" - Estoppel Certificate
Exhibit "D" - Memorandum of Lease
Exhibit "E" – Landlord Waiver and Collateral Access Agreement

50416344_1

**Krystal #  MFS021**
**Address:    7073 Winchester Road**
**Memphis Tennessee 38125**

**RENT ADDENDUM**
to
**LEASE AGREEMENT**

THIS RENT ADDENDUM dated September 30, 2013, by and between Hannah Rocks, LLC, a New York limited liability company ("Landlord") and The Krystal Company, a Tennessee corporation ("Tenant"), for Krystal # MFS021 is attached to and made a part of that certain Lease Agreement by and between Landlord and Tenant of even date herewith (the "Lease"). Notwithstanding any other provision to the contrary which may be contained in said Lease, it is specifically agreed by and between Landlord and Tenant as follows:

1.    **Definitions.**    Capitalized terms used in this Rent Addendum shall, unless otherwise defined, have the meaning ascribed to them in the Lease.

2.    **Annual Rent.**

(a)    Beginning on the Rent Commencement Date, Tenant covenants and agrees to pay to Landlord annual rent ("Annual Rent") according to the following schedule:

| Lease Year | Annual Rent | Monthly Installment |
|:----------:|:-----------:|:-------------------:|
| 1 | $69,000.00 | $5,750.00 |

All payments of Annual Rent shall be paid in equal monthly installments paid monthly in advance, on the first (1st) business day of each month.

(b)    Increases in Annual Rent.  Commencing at the end of the first (1st) Lease Year after the Rent Commencement Date, and on each anniversary of such date thereafter during the term of this Lease (and any extension thereof), Annual Rent shall be increased by an amount equal to the previous year's Annual Rent multiplied by one percent (1%).

(c)    Partial Months.  If the Rent Commencement Date is on a day other than the first day of a calendar month, then Rent for the partial rental month shall be prorated on a per diem basis and shall be paid by Tenant to Landlord for such month.

3.    **Sales/Use Tax.**  Tenant shall also pay to Landlord any sales and use tax imposed on any Rent payable hereunder from time to time by state law or any other governmental entity, which sums are due monthly as to monthly Rent payments on the due date of the Rent payment under this Lease.

50416344_1

4.      **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent.  All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

_____          _____
By Landlord                                By Tenant

50416344_1

4.     **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent.  All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

_____          _____
By Landlord                                     By Tenant

50416344_1

## EXHIBIT "A"

### Legal Description of Krystal # MFS021
### Located at 7073 Winchester Road, Memphis, Tennessee 38125

Being a portion of WINCHESTER CROSSING P D PHASE TWO, PART OF AREA "A", as recorded in Plat Book 174, at Page 69, and Plat Book 255, Page 38 Shelby County Register of Deeds, Shelby County, Tennessee and being more particularly described as follows:

Commencing at the Northwest Corner of the aforesaid WINCHESTER CROSSING P D PHASE TWO, PART OF AREA "A", thence South 88°22'20 East along the south right-of-way line of Winchester Road (114' R.O.W.), a distance of 86.02 feet to the Point of Beginning; thence continue South 88°22'20 East along said south right-of-way line, 79.09 feet to the point of curvature of a curve to the right having a radius of 40.00 feet and a central angle of 88°28'20 an arc distance of 61.76 feet; thence South 00°05'55 West, a distance of 198.84 feet; thence South 89°50'51 West, a distance of 59.92 feet; thence North 00°04'31 West, a distance of 18.44 feet; thence North 89°50'08 West, a distance of 58.02 feet; thence North 00°05'55 West, a distance of 222.37 feet to the Point of Beginning. Said lands situate, lying and being in Shelby County, Tennessee and contain 26,844.96 Square Feet more or less.

Bearings are based on the aforesaid Winchester Crossing recorded in Plat Book 174 at page 69 of the records of Shelby County, Tennessee.

Being the same property conveyed to the Krystal Company, a Tennessee corporation, by warranty deed of record in instrument 13084299, in the register's office, Shelby County, Tennessee.

50416344_1

## EXHIBIT "B"

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

_____

_____

_____

Attention:  Loan Administration
Loan No. _____

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

| 1. | Lease | Lease between Landlord and Tenant dated _____ , ____ . |
|----|-------|------------------------------------------------------|
| 2. | Landlord | |
| 3. | Tenant | |
| 4. | Premises | As described on Exhibit A |
| 5. | Premises Address | As described on Exhibit A |

THIS    SUBORDINATION,    NON-DISTURBANCE    AND    ATTORNMENT
AGREEMENT (the "Agreement") is made as of the ___ day of _____, 20__, by and
between _____(the "Mortgagee") and Tenant.

### R E C I T A L S:

A.    Landlord and Tenant have entered into a certain Lease relating to a portion of the
real property (the "Property") described therein and on the attached Exhibit A (the "Premises");
and

B.    Mortgagee [has recorded] [is about to record] a mortgage on the Property; and

C.    Tenant and Mortgagee desire to establish certain rights, safeguards, obligations,
and priorities with regard to their respective interests by means of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants of the parties, and
other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the Mortgagee and Tenant hereby agree as follows:

1.    Provided the Lease is in full force and effect and the Tenant is not in default under
the Lease (beyond any period given the Tenant to cure defaults), then:

B-1

50416344_1

(a)    The Tenant's right of possession to the Premises and the Tenant's other rights arising out of the Lease shall not be affected or disturbed by the Mortgagee in the exercise of any of its rights under or related to the Mortgage or the note which it secures.

(b)    In the event the Mortgagee or any other person acquires title to the Premises pursuant to the exercise of any remedy provided for in the Mortgage, or by conveyance in lieu of foreclosure, the Lease shall not be terminated or affected by the foreclosure, conveyance or sale in any such proceeding.  The Mortgagee covenants that any sale of the Property as a result of the exercise of any rights and remedies under the Mortgage, or otherwise, shall be made subject to the Lease and the rights of the Tenant under the Lease, and the Tenant covenants and agrees to attorn the Mortgagee, or such person, as its new landlord, and the Lease shall continue in full force and effect as a direct Lease between the Tenant and the Mortgagee, or such other person, upon all of the terms, covenants, conditions and agreements set forth in the Lease.  However, in no event shall the Mortgagee or such person be:

(i)    Liable for any act or omission of the Landlord; or

(ii)    Subject to any offsets or deficiencies, which the Tenant might be entitled to assert against the Landlord.

2.    Subject to the foregoing provisions, the Lease shall be subject and subordinate to the lien of the Mortgage and to all of its terms, conditions and provisions, to all advances made or to be made and to any renewals, extensions, modifications or replacements.

3.    Mortgagee hereby consents to any leasehold mortgage or deed of trust (the "Leasehold Mortgage") now or hereinafter entered into by Tenant for the benefit of Tenant's lender (together with its successors and assigns, the "Leasehold Mortgagee") and the liens and security interests evidenced by same and encumbering (among other things) Tenant's leasehold interest under the Lease.  In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Tenant's moveable trade fixtures, business, equipment, furniture, signs or other personal property at any time placed on or about the Premises; the Mortgagee and Tenant acknowledging that such property is pledged to the Leasehold Mortgagee as further security for the obligations of Tenant under the Leasehold Mortgage.

4.    The above provisions shall be self-operative and effective without the execution of any further instruments on the part of either party.  However, the Tenant agrees to execute and deliver to the Mortgagee or to any other person to whom the Tenant agrees to attorn such other instruments as either shall reasonably request in order to comply with these provisions.

5.    This Agreement may not be modified other than by an agreement in writing signed by the parties or by their respective successors in interest and by Leasehold Mortgagee.

6.    This Agreement shall inure to the benefit of and be binding upon the parties and their successors and assigns (including (with respect to Tenant) the Leasehold Mortgagee and any other person which acquires rights in or title to Tenant's leasehold interest under the Lease).

50416344_1

To indicate their agreement to the above, the parties or their authorized representatives or officers have signed this document under seal as of the day and year first above written.

**"LENDER"**

_____

By:_____
Name:_____
Title:_____

**"LANDLORD"**

_____, a
_____

By:_____
Name: _____
Title: _____

**"TENANT"**

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____
Name: _____
Title: _____

50416344_1

## EXHIBIT "C"

### ESTOPPEL CERTIFICATE

The undersigned with respect to the premises at STORE ADDRESS, as more particularly described in Exhibit "A" attached hereto and made a part hereof by this reference (the "Premises"), certifies and affirms to the best of its knowledge the following to _____, a _____ [[("Tenant")]] [[("Landlord")]] and to _____ [[("Mortgagee")]] [[("Purchaser")]]:

1.    Tenant leases the Premises from Landlord under that certain Lease dated _____, 20__, attached hereto and made a part hereof by this reference (the "Lease").

2.    Rental under this Lease has been paid through _____, 20__. No rent has been paid more than thirty (30) days in advance, except as described in the preceding sentence. The monthly base rental amount is $_____.

3.    The term of the Lease is _____ through _____, a period of _____ years. Tenant has _____ options to extend the Lease for _____ years each, for a total term including all options through _____ as set forth in the Lease.

4.    There is no security deposit under the Lease.

5.    Tenant, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any term of the Lease.

6.    Landlord, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any terms of the Lease.

7.    The Lease is in full force and effect and there have been no modifications or amendments unless attached hereto.

8.    Knowledge means the actual knowledge of _____ without independent investigation.

This Certificate may be relied upon by [[Purchaser]] [[Mortgagee]], who intends to [[purchase the Premises] [and the Lease from Landlord], and by any mortgage lender of such person]] [[provide secured [lease] [loan] financing to [Landlord] [Tenant]].

Dated this _____ day of _____, 20____
[[Landlord]] [[Tenant]]: _____
By: _____
Title: _____

50416344_1

## EXHIBIT "D"

*UPON RECORDATION RETURN TO:*

_____
_____
_____
_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

RETURN BY:  MAIL (X)     PICK UP ( )

Krystal # __, STORE ADDRESS

## MEMORANDUM OF LEASE

**THIS MEMORANDUM OF LEASE** is made as of _____, 2013 ("Effective Date"), by and between _____, with a mailing address of _____ ("Landlord"), and The Krystal Company, a Tennessee corporation, with a mailing address of _____ ("Tenant").

In consideration of TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration paid by Tenant to Landlord and the mutual covenants contained in that certain Lease Agreement between the parties hereto dated on even date herewith (hereinafter called the "Lease"), Landlord has leased and does hereby lease to Tenant, and Tenant has leased and does hereby lease from Landlord, upon the terms and conditions set forth in said Lease, the real property more particularly described in Exhibit "A" attached hereto and made a part hereof (the "Premises").

The term of the Lease shall commence on the Effective Date and end on the date that is fifteen (15) years after the Rent Commencement Date (as defined in the Lease).  Said Lease provides for options to renew for six (6) five (5) year terms.  Tenant shall not allow any mechanic's lien or similar type of lien to be filed against the Premises.

**[Signatures on Next Page]**

50416344_1

IN WITNESS WHEREOF, Landlord and Tenant have executed and sealed this Memorandum of Lease to be effective as of the date first above written.

### "LANDLORD"

Signed, Sealed and Delivered
in the presence of:

_____,

_____

_____          By:_____
Name:_____                Name: _____
                                                                            Title: _____

_____
Name:_____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2013, by _____, as _____ of _____, a _____. He/she is (   ) personally known to me or (   ) he/she has produced a driver's license as identification.

_____

Notary Public, State of _____
Print Name: _____
Notary Commission No.: _____
My Commission Expires: _____

[NOTARIAL SEAL]

D-2

"TENANT"

Signed, sealed and Delivered
in the presence of:

**THE KRYSTAL COMPANY**, a Tennessee
corporation

By: _____
Name: _____
Title: _____

Name: _____

Name: _____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2013, by
_____, as _____ of The Krystal Company, a Tennessee corporation.
He/she is (   ) personally known to me or (   ) he/she has produced a driver's license as
identification.

_____
Notary Public, State of _____
Print Name: _____
Notary Commission No.: _____
My Commission Expires: _____

[NOTARIAL SEAL]

D-3

## EXHIBIT "E"

### FORM OF LANDLORD WAIVER
### AND COLLATERAL ACCESS AGREEMENT

**THIS LANDLORD WAIVER AND COLLATERAL ACCESS AGREEMENT** (this "Agreement") is made and entered into between **WELLS FARGO BANK, NATIONAL ASSOCIATION**, in its capacity as administrative agent (in such capacity, the "Senior Agent") for certain lenders (the "Senior Lenders") under the Senior Credit Agreement referred to below, **TRIANGLE CAPITAL CORPORATION**, in its capacity as agent (in such capacity, the "Subordinated Agent", and, collectively with the Senior Agent, the "Agents") for the lenders (the "Subordinated Lenders", and collectively with the Senior Lenders, the "Lenders") under the Subordinated Loan Agreement referred to below, and **[NAME OF OWNER]**, a **[Type of Entity]** (hereinafter referred to as "Owner"), whether one or more, and affects that real property in the City of **[City]**, County of **[County]**, State of **[State]**, commonly known as **[Street Address]** (hereinafter referred to as the "Premises").

**WHEREAS**, this Agreement is executed as required pursuant to that certain Credit Agreement, dated as of March 21, 2012 (the "Senior Credit Agreement") entered into by the Senior Agent and the Senior Lenders and other agreements related thereto (hereinafter collectively referred to as the "Senior Loan Documents") and as required pursuant to that certain Loan Agreement, dated as of March 21, 2012 (the "Subordinated Loan Agreement") entered into by the Subordinated Agent and the Subordinated Lenders and other agreements related thereto (hereinafter collectively referred to as the "Subordinated Loan Documents" and together with the Senior Loan Documents hereinafter collectively referred to as the "Loan Documents"), in each case with The Krystal Company, a Tennessee corporation (hereinafter referred to as "Tenant"), and certain of Tenant's affiliates, for the purpose of securing the repayment of all obligations and the performance of all duties now or hereafter owing by Tenant and its affiliates under the Loan Documents, of every kind and description. This Agreement does not amend any of the terms of the Loan Documents;

**WHEREAS,** by the Loan Documents, the Agents and the Lenders have loaned or have agreed to loan monies and/or extend other financial accommodations against the security of, among other collateral, all of Tenant's personal property, including, but not limited to, Tenant's inventory, equipment, furniture, furnishings, trade fixtures, machinery, and tools, together with all additions, substitutions, replacements, and improvements to the same (hereinafter referred to as "Goods"), which Goods are or are to be located on and may be affixed to the Premises or the improvements thereon; and

**WHEREAS**, Tenant has leased the Premises from Owner by that certain **[Title of Lease Document]** dated **[Date of Lease]** (the "Lease").

**NOW, THEREFORE**, in consideration of any financial accommodations extended by Senior Lenders and Subordinated Lenders to Tenant and/or its affiliates at any time, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follow:

E-1

1.      Owner hereby acknowledges and agrees that the Goods shall be and remain personal property notwithstanding the manner of their annexation to the Premises, their adaptability to the uses and purposes for which the Premises are used, or the intentions of the party making the annexation.

2.      Owner hereby waives, relinquishes and releases, solely during the term of the Loan Documents, any statutory, contractual or possessory rights or liens which Owner may assert against the Goods, including any and all rights of distraint, attachment, lien, levy or execution against or upon the Goods, for any rent or other sum now or hereafter due the Owner under the Lease or otherwise, and all claims and demands of every kind and nature against the Goods.

3.      Owner hereby acknowledges and consents to Senior Agent's and Subordinated Agent's senior priority perfected security interests in the Goods and agrees that, notwithstanding anything to the contrary set forth in the Lease, any other agreement, document or instrument to which Owner and Tenant are parties or any applicable law, any and all liens and security interests granted or otherwise accruing to Owner with respect to the Goods and any other assets of Tenant or its affiliates is and shall be junior and subordinate to any and all liens and security interest granted to Senior Agent and to Subordinated Agent with respect to the Goods and all other assets of Tenant and its affiliates. The foregoing subordination shall apply (a) irrespective of the time, order or manner of attachment or perfection of any security interest and irrespective of any statute, rule, law, or court decision to the contrary and (b) irrespective or whether the liens securing the obligations under the Loan Documents are held to be unperfected, invalid, void, unenforceable, discharged or are set aside. This Agreement and the subordination provided herein shall continue to govern as between Senior Agent, Subordinated Agent and Owner during and after any bankruptcy or insolvency proceeding involving Tenant or its affiliates. Until the obligations of Tenant and its affiliates under the Loan Documents have been fully and finally paid in full in accordance with the terms of the Loan Documents and all commitments of the Agents and the Lenders to provide financing thereunder have been terminated (the "Discharge of the Senior Obligations"), Owner shall not, without the prior written consent of the Agents, exercise any rights or remedies with respect to the Goods or any other assets of Tenant or its affiliates which arise by virtue of Owner's status as a secured creditor, whether arising under Article 9 of the Uniform Commercial Code or otherwise.

4.      Owner consents to the installation of the Goods on the Premises, agrees that each Agent may do to and with the Goods any or all of the acts below enumerated, and grants each Agent a right, as set forth below, to enter into possession of the Premises to do any or all of the following (the "Permitted Actions") with respect to the Goods: assemble, have appraised, display, sever, remove, maintain, prepare for sale or lease, advertise, inspect, repair, lease, transfer, and/or sell (at public auction or private sale). At the Owner's option, the Owner may elect to have an agent accompany each Agent or its agents or representatives while on the Premises; provided, however, that the Owner's failure to have an agent of the Owner accompany an Agent or its agents or representatives shall not in any way limit such Agent's right to enter upon the Premises. While on the Premises, each Agent shall use reasonable efforts so as not to disturb any other tenant, occupant or the Owner. Each Agent agrees to repair (or pay the

E-2

reasonable cost to repair) any damages to the Premises caused directly by the actions of such Agent or its agents or representatives while on the Premises.

5.      Owner acknowledges that Agents may take any or all of the Permitted Actions subject only to the Loan Documents.

6.      Owner will provide each of the Agents with written notice of any default by Tenant under the Lease resulting or that could, with the passage of time, the giving of notice, or both, result in termination of the Lease (a "Default Notice") at the same time or promptly after, and in the same manner as, such notice is given to Tenant. Each Agent shall have at least fifteen (15) days following receipt of such Default Notice to cure such default, but no Agent shall be under any obligation to cure any default by Lessee under the Lease. No action by any Agent pursuant to this Agreement shall be deemed to be an assumption by any Agent of any obligation under any Lease and, except as expressly set forth herein, no Agent shall have any obligation to Owner.

7.      This Agreement shall continue until such time as the Discharge of the Senior Obligations has occurred.

8.      This Agreement shall be governed and controlled by and interpreted under the laws of the State of New York and shall inure to the benefit of and be binding upon the successors, heirs, and assigns of Owner and Agents. Owner will notify any purchaser or successor owner or landlord of the Premises of the existence of this Agreement, which shall be binding upon the executors, administrators, successors, transferees or assignees of Owner. This Agreement shall bind and inure to the benefit of the respective successors and assigns of Agents and Owner.

9.      THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF OR, AT THE SOLE OPTION OF AGENTS, IN ANY OTHER COURT IN WHICH AGENTS SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. OWNER AND EACH AGENT WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION. OWNER AND EACH AGENT HEREBY WAIVES THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF

50416344_1

ACTION BASED UPON OR ARISING OUT OF ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. OWNER AND EACH AGENT REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

*[Signature Pages Follow]*

50416344_1

Dated:_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Senior Agent


By:_____
Name:
Title:

Address:


[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (___)____-_____

E-5

Dated:_____

**TRIANGLE CAPITAL CORPORATION,**
as Subordinated Agent

By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax:   (___)_____-_____

E-6

Dated:_____

**[NAME OF OWNER]**,
a **[Type of Entity]**


By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (____) ____ - _____

50416344_1

# EXHIBIT D

## REGINA MORRISON NEWMAN, SHELBY COUNTY TRUSTEE

P.O.Box 2751
Memphis, TN 38101-2751

**QUESTIONS?** Call (901) 222 - 0200

| PARCEL # | TAXING AUTHORITY | NOTICE TYPE | DATE |
|---|---|---|---|
| 093-5000-0-00606-0 | Shelby County | INTERNET NOTICE | 3/13/2020   2:01:10PM |

HANNAH ROCKS LLC
c/o JOHN M TANENBAUM
350 THEODORE FREMD AVE
STE210

Realty
Lot Size:      0 X 0          Acreage:        0.830
Lot No:        0

Classification:      COMMERCIAL
Location:        7073 WINCHESTER
                         Memphis  0

Subdivision:  PT AREA A WINCHESTER CROSSING PD

### PROPERTY TAX NOTICE

| Tax Year | Assessed Value | Tax Rate | Town | Base Tax | Interest | Court | Atty | Misc | Balance Due |
|---|---|---|---|---|---|---|---|---|---|
| 2019 | 329,400.00 | 4.05 | N | 13,340.70 | 200.11 | 0.00 | 0.00 | 0.00 | $13,540.81 |

IF PAID BY 3/31/2020,  TOTAL AMOUNT DUE IS:            $13,540.81

All Notices received prior to   **3/13/2020**      concerning the tax year (s) listed above should be disregarded.  Please pay using this notice.
Total amount due is calculated with interest through the last day of the month. Other legal fees may be added during the month.

---

| 093-5000-0-00606-0 | Due Date: | March 31, 2020 | |
|---|---|---|---|

HANNAH ROCKS LLC
c/o JOHN M TANENBAUM
350 THEODORE FREMD AVE
**Enter address change here**

| Year | Town | Balance Due |
|---|---|---|
| 2019 | N | $13,540.81 |

ENTER AMOUNT PAID

Name:

Make check or money order payable to

Address:

REGINA MORRISON NEWMAN, TRUSTEE
P.O.Box 2751
Memphis, TN 38101-2751

City:              State:

Zip:           Phone:
changes require signatures of all owners

Signature:

| Total: | $13,540.81 |
|---|---|

Signature:

DO NOT WRITE BELOW THIS LINE

09350000  006060  2019  N  0000000  0001354081  6

# EXHIBIT E

**Krystal #  CHN004**
**Address:   307 Cherokee Boulevard**
**           Chattanooga, Tennessee 37405**

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made and entered into as of *FEBRVARY 28*, 2013, by and between:

> (i)   DJ Rash Realty Company, LLC, a New York limited liability company ("Landlord"), and

> (ii)  The Krystal Company, a Tennessee corporation ("Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of that certain tract of land described on Exhibit "A", attached hereto and by this reference incorporated herein (hereinafter called the "Land"), on which a Krystal restaurant is constructed (the "Building");

WHEREAS, Tenant wishes to lease from Landlord the Land and Building (hereinafter called the "Premises");

WHEREAS, Tenant intends to operate an Krystal Restaurant from the Premises;

NOW, THEREFORE, in consideration of the payment of the rent and the keeping and performance of the covenants and agreements by Tenant as hereinafter set forth, Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, together with all rights and privileges appurtenant thereto as may be necessary or convenient to Tenant's business, inclusive of all easements benefiting the Premises, on the terms and conditions hereof.

The following additional stipulations are hereby declared to be covenants of this Lease and shall, unless otherwise expressly stated, be applicable at all times throughout the term of this Lease and any extension or renewal thereof:

## 1.   DEFINITIONS

For purposes of this Lease, the following terms shall have the definitions ascribed to them:

"Affiliate" shall mean any party that controls or is controlled by or is under common control with a party.  For purposes of this definition, "control" and correlative terms shall mean the possession, directly or indirectly, of the power to cause the direction of the management and

policies of such party, whether through the ownership of voting securities, by contract or otherwise.

"Effective Date" shall mean the date set forth at the beginning of this Lease.

"Landlord" shall mean DJ Rash Realty Company, LLC, a New York limited liability company, its successors and assigns.

"Lease" shall include this Lease Agreement and all amendments hereto, if any, entered into from time to time hereafter, together with the Rent Addendum and exhibits attached hereto.

"Lease Year" shall mean a fiscal period beginning on the Rent Commencement Date (and each anniversary thereof) and expiring on the last day of the twelfth (12th) month thereafter. In the event the Rent Commencement Date is not the first (1st) day of a calendar month, then the Lease Year shall commence on the first (1st) day of the calendar month following the Rent Commencement Date.

"Rent" shall mean the rent payable under this Lease as set forth in the Rent Addendum attached hereto and incorporated herein, and shall include Annual Rent (as defined in the Rent Addendum) and all other items described in this Lease as "additional rent".

"Rent Commencement Date" shall mean the date on which Landlord delivers possession of the Building to Tenant, which date shall be the Effective Date hereof unless Landlord and Tenant otherwise agree in writing.

"Tenant" shall include the named Tenant and any assignee or sublessee thereof pursuant to an assignment or sublease under Section 15 of this Lease.

## 2.   TERM AND RENT

(a)   Term. The term of this Lease shall begin on the Effective Date and shall expire on the date that is twenty (20) years after the Rent Commencement Date (hereinafter the "Termination Date"), unless previously terminated or renewed or extended as provided herein.

(b)   Rent. Rent shall be due and payable as provided in the Rent Addendum attached hereto and incorporated herein, without notice, demand, deduction, or set-off.

(c)   Acceptance of Premises. Tenant confirms that Tenant has accepted the Premises in their current "as is" condition; that the Building and other improvements have been completed to Tenant's satisfaction; and that the Premises are suitable for Tenant's purposes.

## 3.   ALTERATIONS AND IMPROVEMENTS, INVESTMENT TAX CREDIT, MECHANIC'S LIENS, LANDLORD'S DISCLAIMER

(a)   Alterations and Improvements.

(i)   Tenant's Property. Tenant shall be permitted to install, use on and about, and remove from the Premises at any time and from time to time all trade fixtures and

2

other personal property (exclusive of lighting, electrical, and heating and air conditioning improvements) which are not a component of the building located or to be located on the Premises (hereinafter referred to as the "Tenant's Property"), all of which at all times shall remain the property of Tenant with the right of removal (subject to Paragraph 3(d) below) at the expiration of this Lease. Tenant's Property shall include: (1) removable decor items and office equipment; (2) building lettering, signs, sign posts and sign standards; (3) unattached food and customer service equipment; and (4) food, customer service equipment and any other equipment attached to the building by bolts and screws and/or by utility connections, or other means that can be removed without damage to the Premises, including without limitation, walk-in refrigerators and freezers, remote refrigeration systems, exhaust systems and hoods, and water heaters.

(ii)     Subsequent Improvements. Tenant shall also have the right to make any additions, alterations, changes and improvements, structural and nonstructural, including but not limited to tearing down and reconstructing a new restaurant Building, construction of additional buildings and additions to the then existing Building, as Tenant shall desire; provided, however, (A) if such changes are structural or impact the square footage of the then existing buildings, Tenant shall (1) submit plans ("Plans") of all changes to Landlord at least thirty (30) days in advance of the proposed construction date, which plans shall be subject to Landlord's approval, (2) provide Landlord with evidence of Tenant's financial ability to pay for such changes, and (3) deliver the certificate of occupancy, or local equivalent, and as-built plans to Landlord within sixty (60) days after re-opening of the restaurant Building (B) all such construction shall be completed in a workmanlike manner and in material compliance with all laws, building codes and ordinances applicable thereto, at Tenant's sole expense, and (C) such new construction, additions, alterations, changes and improvements (whether structural or non-structural) shall not reduce the fair market value of the Premises, as reasonably determined by Landlord. In the event Tenant is making non-structural changes, alterations or routine repair and maintenance of existing improvements, Landlord's consent shall not be required. In the event that Tenant renovates or reconstructs the Building as provided herein, and the square footage of the new restaurant Building is eighty (80%) or less than the square footage of the restaurant Building prior to demolition, then commencing upon Tenant's receipt of the certificate of occupancy, or local equivalent, for the reconstructed restaurant Building, Annual Rent shall increase by seven and one-half (7.5%) percent over the Annual Rent then due and payable. Landlord and Tenant shall enter into an amendment to the lease to reflect such increase, however, failure by the parties to enter into such agreement shall not impact the increase in Annual Rent which shall be payable from the date that Tenant receives the certificate of occupancy, or local equivalent, for the reconstructed Building through the end of the term of this Lease, subject to annual increases as provided in Section 2(b) of the Rent Addendum attached hereto.

Upon submission of the Plans to Landlord as provided herein, Landlord shall use reasonable efforts to either give or withhold its approval of the Plans by providing written notice thereof to Tenant within twenty-one (21) days after the Plans are received by Landlord. If Landlord fails to provide either such notice to Tenant with such twenty-one (21) day period, then Landlord shall be deemed to have disapproved the Plans as

3

submitted.  Tenant may resubmit the Plans to Landlord for Landlord's review and approval, and upon such resubmission, Landlord shall have twenty-one (21) days after the receipt of the resubmitted Plans to approve or disapprove the same or else the revised Plans as then submitted shall deemed to be approved; provided, however, that the Plans shall only be deemed approved as provided herein if Tenant's resubmission of revised Plans to Landlord are the same as initially provided and contains the following notice in bold font on the cover letter with the Plans:

> "The enclosed plans and specifications are being transmitted to you in accordance with the provisions of Section 3(a)(ii) of the Lease Agreement dated _____, 2013, by and between Landlord and Tenant.  Your failure to respond to the enclosed plans and specifications (specifying in detail reasons for disapproval, if any) within twenty-one (21) days after your receipt of the same will be construed as your approval of the same."

Further, upon receipt of Landlord's approval of the Plans, or provided such Plans have been deemed approved, Tenant is hereby irrevocably vested with a power of attorney from Landlord to execute any and all applications, permits, and/or other submittals required by any governmental authority on behalf of Landlord.

   (iii)    Upon Termination, Subletting or Assignment.  Subject to the requirements of this Section 3, Tenant shall have the right, at its option and expense, to redecorate or otherwise remodel the Premises upon any termination hereof or upon any permitted subletting or assignment in such manner as will, without reducing the fair market value thereof, avoid the appearance of the Krystal Restaurant operated under this Lease; provided, however, that in addition to the other requirements of this Section 3, Tenant shall not impair the structural condition of the Premises, or reduce the size of the buildings on the Premises.

   (iv)    Landlord's Property.    All subsequent improvements referred to in Paragraph 3(a)(ii) above, all improvements upon termination, subletting or assignment referred to in Paragraph 3(a)(iii) above, and any and all other additions, alterations, changes and improvements of any type (other than those that can be removed without causing damage to the Premises) shall be deemed to be a part of the Premises and the sole property of Landlord.

   (b)    Investment Tax Credit.  Landlord hereby grants Tenant the right and privilege of applying for and receiving all investment tax credits, if any, under the Internal Revenue Code which may be available with respect to the building and other improvements to be constructed.  To this end, Landlord agrees to execute all such further documents and supply such additional information as may be required to make such election effective.

   (c)    Mechanic's and Other Liens.  Tenant shall not do or suffer anything to be done whereby the Premises, or any part thereof, may be encumbered by a mechanic's, materialman's, or other lien for work or labor done, services performed, materials, appliances, or power contributed, used, or furnished in or to the Premises or in connection with any operations or any other activity of Tenant.  If, whenever and as often as any lien is filed against the Premises, or

4

any part thereof, purporting to be for or on account of any labor done, materials or services furnished in connection with any work in or about the Premises, done by, for or under the authority of Tenant, or anyone claiming by, through or under Tenant, Tenant shall discharge the same of record within twenty (20) business days after service upon Tenant of written notice of the filing thereof; provided, however, Tenant shall have the right to remove the lien as an encumbrance upon the Premises by bonding same in accordance with applicable law and to contest any such lien; provided further that Tenant shall diligently prosecute any such contest, at all times effectively staying or preventing any official or judicial sale of the Premises under execution or otherwise, and, if unsuccessful, satisfy any final judgment against Tenant adjudging or enforcing such lien or, if successful, procuring record satisfaction or release thereof.

(d)    Landlord's Disclaimer.  All of Tenant's Property placed in or upon the Premises by Tenant shall remain the property of Tenant with the right to remove the same at any time during the term of this Lease.  Landlord, if requested by Tenant, agrees to execute, acknowledge and deliver an instrument in the form customarily used by any financier of Tenant's Property and reasonably satisfactory to Landlord, by which Landlord subordinates its lien rights to the lien rights of any equipment lender or lessor of Tenant's Property, and to all rights of levy for distraint for rent against same; provided any damage caused by, or resulting from the removal of any of Tenant's Property or other personal property (including the leaving of holes or other openings in the roof or exterior of the building) shall be promptly repaired by Tenant or the party entitled to remove same.  Landlord shall be entitled to charge a reasonable fee covering Landlord's actual costs in connection with execution of such documentation (which fee shall not exceed $1,000.00) and Tenant agrees to pay such fee as a condition precedent to Landlord's execution of such documents.

## 4.    **DESTRUCTION OF PREMISES; INSURANCE**

(a)    If the Premises are damaged or destroyed by fire, flood, tornado or other element, or by any other casualty and such damage or destruction does not occur within the last three (3) years of the original or of any extended or renewed term of this Lease, this Lease shall continue in full force and effect and Tenant shall, as promptly as possible, restore, repair or rebuild the Premises to substantially the same condition as it existed before the damage or destruction, including any improvements or alterations required to be made by any governmental body, county or city agency, due to any changes in code or building regulations.  Tenant shall for this purpose use all, or such part as may be necessary, of the insurance proceeds received from insurance policies required to be carried under the provision of Paragraph 4(b) of this Lease. Should the Premises be damaged or destroyed by any of the foregoing described casualties within the last thirty-six (36) months of the original term or of any extended or renewed term of this Lease, then to the extent that the Premises are untenantable or unsuitable, in Tenant's reasonable opinion, for continued use in the normal conduct of Tenant's business,] Tenant shall have the right, exercisable by written notice to Landlord given within thirty (30) days after the date of such damage or destruction, to terminate this Lease effective upon the date of such damage or destruction.  Notwithstanding the foregoing, in the event that the Premises are damaged at any time during the term of this Lease such that Tenant determines, in its reasonable business judgment, that such damage will prevent Tenant from carrying on its normal business operations for a period of more than one hundred twenty (120) days, then Tenant may elect to terminate this Lease by giving written notice thereof to Landlord within thirty (30) days after the

5

date of such damage or destruction. If Tenant terminates this Lease as thus provided Landlord shall be entitled to the insurance proceeds on the Premises as Landlord's interest may appear, but not to the proceeds of insurance carried by Tenant on Tenant's Property or business interruption regarding extra expense or loss of income; provided, however, Tenant shall not have the right to terminate this Lease unless (i) the damage or destruction of the Premises was caused by a peril which was insured against as required by the provisions of Paragraph 4(b) of this Lease; and (ii) at the time of such damage and destruction the said insurance policies required to be carried by Tenant were in the amounts required herein.

(b)    Tenant, at its expense, shall throughout the term of this Lease and any extension or renewal thereof, keep the Premises insured with "Special Form Causes of Loss" coverage (as such term is used in the insurance industry), including coverage for glass breakage, vandalism and malicious mischief, and for fire, windstorm, and other casualty damage for one hundred percent (100%) insurable replacement value (excluding footings and foundations), inclusive of $250,000 ordinance and law limit (coverages A, B and C combined).

(c)    Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense and as additional rent, commercial general liability insurance including product liability covering the Premises (occurrence basis) covering bodily injury, property damage and personal injury, naming Landlord as an additional insured as Landlord's interest may appear, with limits not less than One Million Dollars ($1,000,000.00) per occurrence, with a general aggregate of not less than Two Million Dollars ($2,000,000.00) and a "following form" umbrella liability policy or excess liability policy to include product liability in an amount of not less than Ten Million Dollars ($10,000,000.00) per occurrence.

(d)    Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense, business interruption insurance covering risk of loss due to the occurrence of any of the hazards insured against under Tenant's insurance and providing coverage in an amount sufficient to permit the payment of Rents, any additional rent and continuing operating expenses payable hereunder for a period (in such case) of not less than twelve (12) months.

(e)    In the event the Premises are located in an area identified by the National Flood Insurance Program as an area having "special flood hazards" (zones beginning with "A" or "V"), Tenant shall maintain throughout the term of this Lease and any extension thereof, flood insurance with limits stipulated pursuant to the National Flood Insurance Program, with any deductible in excess of Twenty five Thousand Dollars ($25,000.00) to be approved by Landlord.

(f)    All insurance companies providing the coverage required under this Section 4 shall be selected by Tenant and shall be rated A minus (A-) or better by Best's Insurance Rating Service (or equivalent rating service if not available), and shall be licensed to write insurance policies in the state in which the Premises are located. Tenant shall provide Landlord with copies of all policies and/or certificates of such coverage for the insurance coverages referenced in this Section 4, and all commercial general liability and umbrella liability or excess liability policies shall name Landlord (and if Landlord is either a general or limited partnership, all general partners) and any mortgagee designated by Landlord as an additional insured as their interests may appear. Any such coverage for additional insureds shall be primary and non-

6

45852342_1

contributory with any insurance carried by Landlord or any other additional insured hereunder. All property insurance policies shall name Landlord (and if Landlord is either a general or limited partnership), all general partners and any mortgagee designated by Landlord as an additional insured or as a loss payee as Landlord's interests may appear, and shall provide that all losses shall be payable as herein provided. All such policies of insurance shall provide that the amount thereof shall not be reduced and that none of the provisions, agreements or covenants contained therein shall be modified or canceled by the insuring company or companies without thirty (30) days prior written notice being given to additional insureds except ten (10) days' notice for non-payment. Such policy or policies of insurance may also cover loss or damage to Tenant's Property, extra expense and loss of income, and the insurance proceeds applicable to Tenant's Property, shall not be paid to Landlord or any mortgagee but shall accrue and be payable solely to Tenant. In the event of a casualty, Tenant shall be responsible for any deficiency between the replacement cost of the Premises and the amount actually paid by the insurance company.

## 5.    **MAINTENANCE AND REPAIR**

(a)    Tenant shall, during the term of this Lease and any renewals thereof, (i) maintain the Premises and all buildings and improvements thereon (interior and exterior, structural and otherwise) in good order and repair, ordinary wear and tear excepted; (ii) not commit waste or permit impairment or deterioration of the Premises (normal wear and tear excepted); (iii) to keep Tenant's Property, including trade fixtures, equipment, machinery and appliances thereon in good repair (ordinary wear and tear excepted) and replace trade fixtures, equipment, machinery and appliances on the Premises when necessary to keep such items in good repair; (iv) comply in all material respects with all laws, ordinances, regulations and requirements of any governmental body; (v) provide prompt notification to Landlord of any material adverse changes to the Premises of which Tenant is aware, such as material changes in any environmental condition, including the presence of biocontaminants, such as, but not limited to mold, and shall promptly undertake reasonable remediation (and preventative) actions in connection therewith; (vi) subject to the provisions of Paragraph 4(a) with respect to material damage or damage within the last three (3) years of this Lease, and Section 6 herein, return the Premises and all buildings and improvements thereon at the expiration of the term of this Lease or any extension thereof in as reasonably as good condition as when received, ordinary wear and tear excepted.

(b)    Tenant agrees that Landlord shall have no obligation under this Lease to make any repairs or replacements (including the replacement of obsolete components) to the Premises or the buildings or improvements thereon, or any alteration, addition, change, substitution or improvement thereof or thereto, whether structural or otherwise. Without limitation of the foregoing, Tenant shall be responsible for, and Landlord shall have no responsibility for, the maintenance, repair and replacement of the roof, foundation and structural components of the Building, together with the mechanical, electrical, plumbing and HVAC components, parking and driveway areas. The terms "repair" and "replacement" include, without limitation, the replacement of any portions of the Premises which have outlived their useful life during the term of this Lease (or any extensions thereof). Landlord and Tenant intend that the Rent received by Landlord shall be free and clear of any expense to Landlord for the construction, care, maintenance (including common area maintenance charges and charges accruing under easements or other agreements relating to the Premises), operation, repair, replacement,

7

alteration, addition, change, substitution and improvement of or to the Premises and any building and improvement thereon. Upon the expiration or earlier termination of this Lease, Tenant shall remain responsible for, and shall pay to Landlord, any cost, charge or expense for which Tenant is otherwise responsible for hereunder attributable to any period (prorated on a daily basis) prior to the expiration or earlier termination of this Lease.

## 6. CONDEMNATION

(a)    In the event that the whole or any material part of the building on the Premises or a material portion of the Land (for purposes hereof, "material" shall mean more than 10% of the restaurant building on the Premises, more than 20% of the Land or a portion of the parking area that would reduce the number of available parking spaces below the minimum number of parking spaces required by code, unless suitable alternative parking is provided) shall be taken during the term of this Lease or any extension or renewal thereof for any public or quasi public use under any governmental law, ordinance, regulation or by right of eminent domain, or shall be sold to the condemning authority under threat of condemnation, or if Tenant can demonstrate to Landlord's reasonable satisfaction that the Premises cannot be reasonably operated as the type of restaurant contemplated herein as a result of such condemnation, or if all reasonable access to the adjacent roadways from the existing or comparable curb cuts shall be taken or materially reduced, or if Tenant's activities on the Premises shall be disrupted following such condemnation such that, in Tenant's reasonable discretion, the Premises cannot be operated in the substantially the same manner (any of such events being hereinafter referred to as a "taking"), then in such event, Tenant shall have the option of terminating this Lease as of a date no earlier than the date of such taking, such termination date to be specified in a notice of termination to be given by Tenant to Landlord not fewer than fourteen (14) days prior to the date on which possession of the Premises, or part thereof, must be surrendered to the condemning authority or its designee.

(b)    In the event of any taking which does not give rise to an option to terminate or in the event of a taking which does give rise to an option to terminate under Section 6(a) hereinabove and Tenant does not elect to terminate, Landlord shall make its award available to Tenant and Tenant shall, to the extent of the award from such taking (which term "award" shall mean the net proceeds after deducting expenses of any settlement, or net purchase price under a sale in lieu of condemnation but shall exclude the value of Landlord's reversionary interest), promptly restore or repair the Premises and all improvements thereon (except those items of Tenant's Property which Tenant is permitted to remove under the terms of this Lease) to the same condition as existed immediately prior to such taking insofar as is reasonably possible. If the estimated cost of restoration or repair shall exceed the amount of Landlord's award, Landlord shall promptly provide notice to the Tenant of such deficiency, and Tenant shall have the option to (i) terminate this Agreement by giving written notice to Landlord within thirty (30) days after Tenant receives notice from Landlord of the deficiency, or (ii) deposit with Landlord the amount of such excess. In the event that Tenant elects under clause (ii) in the preceding sentence, the award and any excess shall be held in trust by Landlord and used, to the extent required, for the purpose of such restoration or repair. A just and proportionate part of the Rent payable hereunder shall be abated from the date of such taking until ten (10) days after Tenant has restored same and thereafter the Rent shall be reduced in proportion to the reduction in the then rental value of the Premises after the taking in comparison with the rental value prior to the taking. If the award shall exceed the amount spent or to be spent promptly to effect such

restoration, repair or replacement, such excess shall unconditionally belong to Landlord and shall be paid to Landlord.

(c)     In the event of any partial taking where this Lease is not terminated, Tenant shall not be entitled (except for use in reconstruction) to any part of the compensation or award given Landlord attributable to the taking of the fee of the Premises, but Tenant shall have the right to amounts (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

(d)     If this Lease is terminated by reason of a taking, then Landlord shall be entitled to receive the reimbursement for its entire award in any such condemnation or eminent domain proceedings or purchase in lieu thereof and Tenant hereby assigns to Landlord all of its right, title and interest in and to all and any part of such award, provided, however, Tenant shall be entitled to receive any portion of any award (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

## 7.     TAXES AND ASSESSMENTS

(a)     Tenant shall pay prior to delinquency all taxes and assessments which may be levied upon or assessed against the Premises and all taxes and assessments of every kind and nature whatsoever arising in any way from the use, occupancy, possession or transfer of ownership (excluding, however, any taxes incurred by Landlord (or a successor landlord) in connection with a transfer of ownership) of the Premises or assessed against the improvements situated thereon, together with all taxes levied upon or assessed against Tenant's Property.  To that end, Landlord shall not be required to pay any taxes or assessments whatsoever which relate to or may be assessed against this Lease, the Rent and other amounts due hereunder, the Premises, improvements and Tenant's Property; provided, however, that any taxes or assessments which may be levied or assessed against the Premises for the period prior to the Rent Commencement Date or for the period ending after the Termination Date hereof shall be prorated between Landlord and Tenant as of such date.  Tenant will not be required to pay any income, gross receipts, excess profits, revenue, corporate, personal property, estate, inheritance, gift, devolution, succession, transfer, franchise, capital levy or capital stock tax.

(b)     Within ten (10) business days after Tenant receives the paid receipted tax bills, Tenant shall furnish Landlord with copies thereof.  Tenant may, at its option, contest in good faith and by appropriate and timely legal proceedings any such tax and assessment; provided, however, that Tenant shall indemnify and hold harmless Landlord from any loss or damage resulting from any such contest, and all reasonable expenses of same (including, without limitation, all attorneys' and paralegal fees, court and other costs) shall be paid solely by Tenant. Landlord, at no cost or liability to Landlord, shall cooperate with Tenant and execute any document which may reasonably be necessary for any proceeding.

## 8.     COMPLIANCE, UTILITIES, SURRENDER

(a)     Tenant, at its expense: shall promptly comply with all municipal, county, state, federal and other governmental requirements and regulations, whether or not compliance

9

therewith shall require structural or other changes in the Premises; will procure and maintain all permits, licenses and other authorizations required for the use of the Premises or any part thereof then being made and for the lawful and proper installation, operation and maintenance of all equipment and appliances necessary or appropriate for the operation and maintenance of the Premises; and shall comply with all easements, restrictions, reservations and other instruments of record applicable to the Premises, including without limitation, any requirement in such instruments on behalf of the owner or occupant of the Premises to procure and maintain insurance, and whether now in effect or enacted during the term of this Lease. Tenant shall indemnify and save Landlord harmless from all expenses and damages by reason of any notices, orders, violations or penalties filed against or imposed upon the Premises (based on Tenant's sole scope of operations at the Premises), or against Landlord as owner thereof, because of Tenant's failure to comply with this paragraph.

(b)     Tenant shall pay all charges for heat, water, gas, sewage, electricity and other utilities used or consumed on the Premises and shall contract for the same in its own name. Landlord shall not be liable for any interruption or failure in the supply of any such utility service to the Premises.

(c)     Tenant shall peacefully surrender possession of the Premises, the buildings and other improvements thereon to Landlord at the expiration, or earlier termination, of the original term or any extended or renewed term of this Lease in good condition and repair, reasonable wear and tear excepted, and in broom clean condition with all debris removed.

## 9.     QUIET ENJOYMENT

Landlord covenants and warrants that Landlord has full power and authority to enter into this Lease, and that Tenant shall have and enjoy full, quiet and peaceful possession of the Premises, its appurtenances and all rights and privileges incidental thereto during the term hereof and any renewals or extensions, subject to the provisions of this Lease and any easements, restrictions, reservations and other instruments of record applicable to the Premises and in existence at the time of the conveyance of the Premises to Landlord by Tenant or thereafter. Landlord agrees to cause the holder of any mortgage now or hereafter relating to the Premises to execute and deliver to Tenant a Subordination and Nondisturbance Agreement substantially in the form contemplated by Section 16 of this Lease, or in such form as may be customarily utilized by the lender and reasonably approved by Tenant.

## 10.     OPTION TO RENEW

Tenant shall have six (6) successive five (5) year options to extend this Lease for up to an additional thirty (30) years upon the same terms, covenants, conditions and rental as set forth herein provided that Tenant is not in Default hereunder at the commencement of such option period. In the event Tenant elects not to exercise each such five (5) year option, Tenant shall give written notice to Landlord not less than six (6) months prior to the Termination Date. Should Tenant fail to give Landlord such timely written notice during the required period, this Lease shall automatically renew pursuant to the terms hereof.

45852342_1

## 11.    **DEFAULT**

(a)    If any one or more of the following events occur, said event or events shall be referred to as a "Default" under this Lease:

(i)    If Tenant fails to pay Rent or any other charges required under this Lease when same shall become due and payable, and such failure continues for ten (10) days or more after written notice from Landlord;

(ii)    If Tenant fails to perform or observe any term, condition, covenant, agreement, or obligation required under this Lease and such failure continues for thirty (30) days after written notice from Landlord (except that such thirty (30) day period shall be automatically extended for such additional period of time as is reasonably necessary to cure such Default, if such Default cannot be cured within such period, provided Tenant is in the process of diligently curing the same).

(iii)    If Tenant shall make an assignment for the benefit of creditors or file a petition, in any federal or state court, in bankruptcy or reorganization, or make an application in any such proceedings for the appointment of a trustee or receiver for all or any portion of its property, and such proceeding shall not be set aside within sixty (60) days.

(iv)    If any petition shall be filed under federal or state law against Tenant in any bankruptcy, reorganization, or insolvency proceedings, and said proceedings shall not be dismissed or vacated within sixty (60) days after such petition is filed.

(v)    If a receiver or trustee shall be appointed under federal or state law for Tenant for all or any portion of the property of either of them, and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

(b)    Upon the happening of any one or more of the aforementioned Defaults which are not cured within the cure period applicable thereto, if any, Landlord shall have the right, in addition to any other rights and remedies, to:

(1)    terminate this Lease by giving written notice of same to Tenant.  Upon such notice, this Lease shall cease and expire, and Tenant shall surrender the Premises to Landlord in the condition required by this Lease, and Landlord will be entitled to recover all unpaid rents that have accrued through the date of termination plus the costs of performing any of Tenant's obligations (other than the payment of rent) that should have been but were not satisfied as of the date of such termination.  In addition, Landlord will be entitled to recover, not as rent or a penalty but as compensation for Landlord's loss of the benefit of its bargain with Tenant, the difference between (i) an amount equal to the present value of the rent and other sums that this lease provides Tenant will pay for the remainder of the Primary Term and for the balance of any then effective extension of the Primary Term, and (ii) the present value of the net future rents for such period that will be or with reasonable efforts could be collected by Landlord by reletting the Premises.

11

45852342_1

(2)    take possession of the Premises without terminating this Lease and then rent the same for the account of Tenant (which may be for a term extending beyond the Term of this Lease) in which event Tenant covenants and agrees to pay any deficiency after crediting it with the rent thereby obtained less all repairs and expenses, including the costs of remodeling and brokerage fees, and Tenant waives any claim it may have to any rent obtained on such releting which may be in excess of the Rent required to be paid herein by Tenant;

(3)    perform such obligation (other than payment of Rent) on Tenant's behalf and charge the cost thereof to Tenant as additional rent; or

(4)    exercise any and all other rights granted to Landlord under this Lease or by applicable law or in equity.

Tenant further agrees that in the event of a Default, any monies deposited by Tenant with Landlord shall be immediately and irrevocably assigned and released to Landlord (without further action by Landlord or Tenant) to be applied by Landlord against any and all of Tenant's obligations under this Lease, in any manner as Landlord may determine.

(c)    If Landlord should elect to terminate or repossess the Premises, as provided hereinabove, Landlord may re-enter the Premises and remove Tenant, its agents and subtenants, together with all or any of Tenant's Property, by suitable action at law, or by force.  Tenant waives any right to the service of any notice of Landlord's intention to re-enter and Landlord shall not be liable in any way in connection with any action it takes pursuant to this paragraph. Notwithstanding such re-entry or removal, Tenant's liability under Lease shall survive and continue.

(d)    In case of re-entry, repossession or termination of this Lease, Tenant shall remain liable for Rent, any additional rent and all other charges provided for in this Lease for the otherwise remaining term of this Lease, and any and all expenses which Landlord may have incurred in re-entering the Premises including, but not limited to, allocable overhead, alterations to the building to bring the building to "white box" standard, leasing, construction, architectural, and reasonable legal and accounting fees.  Landlord shall have the right, but not the obligation, to relet the whole or part of the Premises upon terms which Landlord, in its sole discretion, deems appropriate and Tenant shall be responsible for all reasonable and customary expenses incurred by Landlord in reletting or attempting to relet and all rent collected for reletting shall be credited against all of Tenant's obligations hereunder.  Landlord agrees to use commercially reasonable efforts to relet the Premises in order to mitigate its damages

(e)    In the event of and during the continuance of a Default, Landlord may, at its sole option, enter upon the Premises, if deemed necessary by Landlord in its sole discretion, and/or do whatever may be deemed necessary by Landlord in its sole discretion to cure such failure by Tenant.  Tenant shall pay to Landlord within five (5) days of Landlord's request, all costs incurred by Landlord in connection with Landlord's curing of such failure.  In addition to the above costs, in the event Landlord does not receive payment from Tenant when due under this paragraph, then interest at the rate of eighteen percent (18%) per annum or, if less, the highest rate allowable by law, shall be due and payable with respect to such payment from the due date thereof until Landlord receives such payment.

12

45852342_1

(f)     In the event either party engages legal counsel in connection with the enforcement of any of the terms and provisions of this Lease, then, in addition to all other sums due from the party deemed liable hereunder, such liable party shall pay to the prevailing party any and all attorneys' fees, paralegal fees, and legal costs and expenses incurred by the prevailing party, including on appeal and in any bankruptcy proceedings.

(g)     The rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now or hereinafter provided by law, and all such rights and remedies shall be cumulative.  No action or inaction by Landlord shall constitute a waiver of any Default, and no waiver of any Default shall be effective unless it is in writing, signed by Landlord.

## 12.    HOLDING OVER

In the event Tenant remains in possession of the Premises after the expiration of this Lease without executing a new written lease acceptable to Landlord and Tenant, Tenant shall occupy the Premises as a tenant from month to month subject to all the terms hereof (except as modified by this paragraph), but such possession shall not limit Landlord's rights and remedies by reason thereof nor constitute a holding over.  In the event of such month to month tenancy, the monthly installment of Annual Rent due for each such month shall increase to be one hundred twenty-five percent (125%) of the monthly installment thereof which was payable during the last month of the term of this Lease.

## 13.    WAIVER OF SUBROGATION

Notwithstanding anything in this Lease to the contrary, other than Tenant's obligations to repair, restore or rebuild described in Section 4 of this Lease, neither party shall be liable to the other for any damage or destruction of the Premises resulting from fire or other casualty covered by insurance required of either party hereunder, whether or not such loss, damage or destruction of the Premises are caused by or results from the negligence of such party (which term includes such party's officers, employees, agents and invitees), and each party hereby expressly releases the other from all total liability for or on account of any said insured loss, damage or destruction. Each party shall procure all endorsements of insurance policies carried by it necessary to protect the other from any right of subrogation and/or liability in the event of such loss.

## 14.    LANDLORD'S LIEN FOR RENTS

As security for Tenant's payment of Rent and all other payments required to be made by Tenant hereunder (including, by way of illustration only, taxes, damage to the Premises, court costs, and attorneys' fees), Tenant hereby grants to Landlord a lien upon all of Tenant's Property now or hereafter located upon the Premises.  The lien herein provided shall be subordinate to the lien of any chattel mortgage, collateral assignment or security interest given by Tenant to any seller or provider of purchase money financing of Tenant's Property ("Leasehold Lender's Lien") and in connection therewith Landlord agrees to execute a Landlord Waiver and Collateral Access Agreement substantially in the form attached hereto as Exhibit "E". Within thirty (30) days after any Lender's Leasehold Lien is satisfied or otherwise released, Tenant shall provide Landlord with written notice of such satisfaction, release or removal. In the event of a Default, Landlord may enter upon the Premises and take possession of Tenant's Property, or any part thereof, and

may sell all or any part of Tenant's Property at public or private sale in one or successive sales, with or without notice, to the highest bidder for cash and on behalf of Tenant. Landlord may sell and convey Tenant's Property, or any part thereof, to such bidder, delivering to such bidder all of Tenant's title and interest in such property sold to such bidder. The proceeds of such sale shall be applied by Landlord first toward the costs of such sale and then toward the payment of all sums due from Tenant to Landlord under this Lease. Notwithstanding anything in this paragraph to the contrary, Tenant shall be entitled to collaterally grant a security interest in Tenant's interest in this Lease to any lender, including, without limitation, Wells Fargo Bank, National Association.

## 15.    ASSIGNMENT AND SUBLETTING

(a)    Tenant shall have the right to assign or sublet all or any part of the Premises to any party for any lawful purpose. Notwithstanding the foregoing, Tenant shall have no right to assign or sublet in the event such assignment or subletting would violate any material term of any then material existing agreement applicable to the Premises. Except as set forth in this Section 15, any assignment or subletting permitted hereunder shall not relieve Tenant of its liability for the continued performance of all terms, covenants and conditions of this Lease, including without limitation the payment of all Rent and other charges hereunder. Likewise, as a condition of any such assignment by Tenant, the assignee shall be required to execute and deliver to Landlord, upon the effective date of such assignment, an agreement, in recordable form, whereby such assignee assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Tenant shall be released from all liability under this Lease arising after the date of such assignment or subletting if the assignment or sublease is executed in connection with (i) the sale of all or substantially all of Tenant's (or Tenant's Affiliates') business or assets, including the Premises, to a corporation or other entity that will operate the Premises as an Krystal; and (ii) as of the date of assignment or sublease, the assignee or subtenant or guarantor thereof has an S&P Credit Rating of BBB- or higher, and a Fitch Credit Rating of BBB- or higher, and a Moody's Credit Rating of Baa3 or higher; or (ii) as of the date of assignment, the assignee has an aggregate net worth in accordance with GAAP, of at least $30,000,000; and (iii) the assignee assumes all of Tenant's obligations under this Lease; or (iii) as reasonably approved by Landlord. As used in the immediately preceding sentence, "S&P Credit Rating" means the credit rating assigned by Standard & Poor's Rating Group to the highest rated publicly issued debt securities of the assignee, "Fitch Credit Rating" means the credit rating assigned by Fitch Ratings, Inc. to the highest rated publicly issued debt securities of the assignee, and "Moody's Credit Rating" means the credit rating assigned by Moody's Investors Service to the highest rated publicly issued debt securities of the assignee.

(b)    Prior to any assignment hereunder, Tenant shall deliver to Landlord written notice of such assignment or subletting, together with: (i) a copy of the assignment or subletting documents (including copies of any recorded documents related thereto); (ii) the name, address and telephone number of such assignee or sublet tenant and a designated contact person therefor; (iii) a new insurance policy and binder complying with the terms of this Lease and naming such assignee or sublet tenant as the tenant of the Premises; and (iv) an agreement executed by such assignee or sublet tenant, in recordable form, whereby such assignee or sublet tenant assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Landlord shall execute and return within ten (10) days of receipt any

14

estoppels reasonably requested by Tenant, the assignee or sublessee, or their lenders, in connection with such assignment or sublease.

(c)    All rent and other consideration payable under any sublease shall be solely the property of Tenant.

(d)    Landlord shall have the right without limitation to sell, convey, transfer or assign its interest in the Premises or its interest in this Lease. In the event of any sale or other transfer of Landlord's interest in the Premises, other than a transfer for security purposes only, Landlord shall be automatically relieved of any and all obligations and liabilities on the part of Landlord occurring from and after the date of such transfer; provided, that the transferee shall assume all of the obligations of Landlord under this Lease. It is intended hereby that the covenants and obligations contained in this Lease on the part of the Landlord shall be binding on Landlord only during its period of ownership of the Premises.

## 16.    SUBORDINATION, NON DISTURBANCE, ATTORNMENT, ESTOPPEL CERTIFICATE.

(a)    Upon written request of the holder of any mortgage (which term "mortgage" shall also include deeds of trust) now or hereafter relating to the Premises, Tenant shall subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall execute, acknowledge and deliver an instrument substantially in the form of Exhibit "B" attached hereto or in other reasonable form customarily used by such encumbrance holder to effect such subordination; provided, however, as a condition of all such subordinations, the holder of such mortgage shall be first required to agree with Tenant that, notwithstanding the foreclosure or other exercise of rights under any such first or other mortgage, Tenant's possession and occupancy of the Premises and the improvements and its leasehold estate shall not be disturbed or interfered with, nor shall Tenant's rights and obligations under this Lease be altered or adversely affected thereby so long as Tenant is not in Default.

(b)    Notwithstanding anything in Paragraph 16(a) above to the contrary, in the event the holder of any such mortgage elects to have this Lease be superior to its mortgage, then upon notification to Tenant to that effect by such encumbrance holder, this Lease shall be deemed prior to the lien of said mortgage, whether this Lease is dated prior or subsequent to the date of said mortgage, and Tenant shall execute, acknowledge and deliver an instrument, in the form customarily used by such encumbrance holder to effect such priority.

(c)    In the event proceedings are brought for the foreclosure of, or in the event of the exercise of the power of sale under any mortgage made by Landlord encumbering the Premises, or in the event of delivery of a deed in lieu of foreclosure under such a mortgage, Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as "Landlord" under this Lease, and upon the request of the purchaser, Tenant shall execute, acknowledge and deliver an instrument, in form and substance satisfactory to such purchaser, evidencing such attornment.

45852342_1

(d)    Each party agrees, within ten (10) days after written request by the other, to execute, acknowledge and deliver to and in favor of any proposed mortgagee or purchaser of the Premises, an estoppel certificate, substantially in the form of Exhibit "C" attached hereto, stating, among other things (but limited to factual matters related to this Lease) (i) whether this Lease is in full force and effect, (ii) whether this Lease has been modified or amended and, if so, identifying and describing any such modification or amendment, (iii) the date to which Rent and other charges have been paid, and (iv) whether the party furnishing such certificate knows of any default on the part of the other party under this Lease, or has any claim against such party and, if so, specifying the nature of such default or claim.

(e)    Upon written demand by the holder of any mortgage encumbering the Premises, Tenant shall forthwith execute, acknowledge and deliver an agreement in favor of and in the form reasonably satisfactory to Tenant, by the terms of which Tenant shall agree to give prompt written notice to such encumbrance holder in the event of any casualty damage to the Premises or in the event of any default on the part of Landlord under this Lease, and shall agree to allow such encumbrance holder a reasonable length of time after notice to cure or cause the curing of such default before exercising Tenant's rights under this Lease, or terminating or declaring a default under this Lease.

(f)    Tenant shall be entitled to charge a reasonable fee covering Tenant's actual costs in connection with the execution of any subordination, non-disturbance and attornment agreement or estoppel certificate requested by Landlord hereunder (which fee shall not exceed $1,000.00) and Landlord agrees to pay such fee as a condition precedent to Tenant's execution of such documents.

## 17.    USE OF PREMISES

The Premises shall be used by Tenant for any lawful purpose.  Tenant shall operate its business on the Premises in a high class and reputable manner.  Tenant shall have the right to cease operation of a business on the Premises; provided, however, Tenant shall continue to fulfill all other obligations of Tenant under this Lease, including payment of Rent and performance of Tenant's maintenance obligations.  Tenant shall have the right to place billboard signage on the Premises and receive any and all income derived from signage; provided, however that any and all signage must be allowed by applicable law. The Premises shall be used and occupied only for those purposes that are now or hereafter permitted under the land use designation and zoning district for the Premises and according to all other applicable public and private restrictions, covenants and laws affecting the Premises, including, but not limited to, the covenants and restrictions contained hereinbelow. Neither the Premises, nor any portion thereof, shall be occupied by or used for: nude or semi-nude dancing or service; lingerie modeling; an "adult" or "x-rated" book or video store that sells or rents "adult" or "x-rated" material (which are defined as stores in which thirty percent (30%) or more of the inventory is not available for sale to children under eighteen (18) years old); the display for sale of pornographic or obscene materials (i.e., books, magazines, newspapers, video tapes, video discs, computer software or the like which would be considered obscene or pornographic under prevailing laws or community standards); an "adult" or "x-rated" movie theater; a so-called "head shop" selling or displaying drug paraphernalia; a clinic or health provider offering abortions as a part of its services; a funeral home; a flea market; a bingo parlor; a car wash, a dance hall or nightclub; a skating rink; a bowling alley; a pool hall or billiards

room; the use or placement of any telecommunications towers; or, any use that is unlawful or that creates a legal nuisance.

## 18.   **NOTICES**

All notices and other communications required or permitted to be given hereunder shall be in writing and shall be delivered by a nationally recognized overnight courier or mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| If to Landlord: | DJ Rash Realty Company, LLC |
|---|---|
| | 350 Theodore Fremd Avenue |
| | Suite 210 |
| | Rye, New York 10580 |
| | Attention: John M. Tanenbaum |
| | Facsimile: (516) 932-9822 |

| With a copy to: | Golenbock Eiseman Assor Bell & Peskoe LLP |
|---|---|
| | 437 Madison Avenue |
| | New York, New York 10022 |
| | Attention: Amy Silver |
| | Facsimile: 212-754-0777 |

| If to Tenant: | The Krystal Company |
|---|---|
| | One Union Square |
| | Chattanooga, Tennessee 37402 |
| | Attention: Property Management |
| | Facsimile: (423) 757-5660 |

| With copies to: | Argonne Capital Group, LLC |
|---|---|
| | One Buckhead Plaza, Suite 1560 |
| | 3060 Peachtree Road, NW |
| | Atlanta, Georgia 30305 |
| | Attention: Karl F. Jaeger |
| | Facsimile: (404) 364-2985 |

McGuireWoods LLP
1230 Peachtree Street, NE, Suite 1230
Atlanta, Georgia 30309
Attention: John T. Grieb, Esq.
Facsimile: (404) 443-5762

Any party may change its address for notices by written notice in like manner as provided in this paragraph and such change of address shall be effective seven (7) days after the date written notice of such change of address is given. Notice for purposes of this Lease shall be deemed given by the party who is giving such notice when it shall have been received or refused from the U.S. certified or registered mail, or from a nationally recognized overnight courier, with sufficient postage prepaid.

17

45852342_1

With respect to any such notice, Tenant shall, and Landlord shall use its best efforts to, simultaneously deliver a copy of such notice by facsimile at the appropriate facsimile number above to the other party; provided however, that certified mail or overnight courier delivery shall nevertheless be required to effect proper notice hereunder.

## 19.    **INDEMNIFICATION**

Tenant does hereby indemnify and exonerate and agrees to hold harmless Landlord against and from all liabilities, losses, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable architects' fees, attorneys' fees, paralegal fees, and legal costs and expenses incurred by Landlord, whether or not judicial proceedings are filed, and including on appeal and in any bankruptcy proceedings, which may be imposed upon or asserted against or incurred by Landlord by reason of Tenant's use and occupancy of the Premises, including without limitation any of the following occurring:

(a)    any work or thing done in respect of construction of, in or to the Premises or any part of the improvements now or hereafter constructed on the Premises;

(b)    any use, possession, occupation, operation, maintenance or management of the Premises or any part hereof;

(c)    any failure to, or to properly, use, possess, occupy, operate, maintain or manage the Premises or any part thereof;

(d)    the condition, including environmental conditions, of the Premises or any part thereof;

(e)    any negligence on the part of Tenant or any of its agents, contractors, servants, employees, licensees or invitees;

(f)    any accident, injury or damage to any person or property occurring in, on or about the Premises or any part thereof including any sidewalk adjacent thereto;

(g)    any failure on the part of Tenant to perform or comply with any of the covenants, agreements, terms or conditions contained in this Lease on its part to be performed or complied with.

Landlord shall not be responsible or liable to Tenant for any loss or damage to either the person or property of Tenant unless caused by the negligence or intentional acts of Landlord. Landlord shall not be responsible or liable for any defect, latent, or otherwise, in the Premises, or any of the equipment, machinery, utilities, appliances or apparatus therein, nor shall it be responsible or liable for any injury, loss or damage to any person or to any property caused by or resulting from bursting, breakage, leakage, steam or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of said Premises or for any injury or damage caused by or resulting from acts of God or the elements, or for any injury or damage caused by or resulting from any defect or negligence in the occupancy, construction, operation or use of any of said Premises, building, machinery, apparatus or equipment.

18

20.    **COOPERATION**

(a)    Landlord shall fully cooperate with Tenant throughout the term of this Lease to secure or maintain proper zoning, building and other permits and compliance with all applicable laws; provided, however, that Landlord shall not be required to incur any additional expense. Landlord shall within ten (10) days of request execute any petitions, requests, applications and the like as Tenant shall reasonably request in order to obtain any permit, license, variances and approvals which, in the reasonable judgment of Tenant, are necessary for the lawful construction and/or operation of Tenant's business on the Premises, provided, however, that Tenant shall indemnify and save Landlord harmless from any and all expenses, costs, charges, liabilities, losses, obligations, damages and claims of any type which may be imposed upon, asserted against or incurred by Landlord by reason of same.

(b)    Landlord shall have the right, in Landlord's sole discretion, to enter into an exchange agreement with a qualified intermediary in order to effectuate a like-kind exchange of the Premises for one or more other properties. Landlord and Tenant agree that Tenant, at no cost to Tenant, shall cooperate with Landlord in effecting a like-kind exchange of the Premises by Landlord pursuant to and in accordance with the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

21.    **EXCULPATION**

Neither Party shall be liable to the other, or the other's employees, agents, invitees, licensees or any other person whomsoever for any injury to person or damage to property on or about the Premises caused by the other party's negligence or misconduct, its agents, servants or employees or of any other person entering the building under express or implied invitation by the other party or due to any other cause whatsoever, except to the extent by the negligence or neglect of such party, its employees or its authorized representatives.

22.    **LANDLORD'S LIABILITIES**

The term "Landlord" as used in this Lease means the owner from time to time of the Premises. Neither Landlord nor any partner, shareholder or beneficiary thereof shall have any personal liability with respect to any of the provisions of this Lease, and if Landlord is in default with respect to its obligations hereunder, Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of Tenant's remedies for the collection of a judgment or other judicial process requiring the payment of money by Landlord, and no other property or assets of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use or occupancy of the Premises.

23.    **SUCCESSORS**

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

45852342_1

24.   **ENTIRE AGREEMENT/MEMORANDUM OF LEASE**

This Lease contains the entire agreement between the parties hereto and may not be modified in any manner other than in writing signed by the parties hereto or their successors in interest. A memorandum of this Lease in the form attached hereto as Exhibit "D" shall be executed by the parties and shall be recorded in the official records of the county where the Premises are located.

25.   **GENDER**

Whenever the context hereof permits or requires, words in the singular may be regarded as in the plural and vice-versa, and personal pronouns may be read as masculine, feminine and neuter.

26.   **BROKERAGE FEES**

It is understood and agreed that neither party has incurred any real estate brokerage fees or commissions arising out of this Lease and each party agrees to hold the other harmless from and against all such fees and commissions incurred, and costs related thereto including legal fees, as a result of its own conduct or alleged conduct.

27.   **CAPTIONS**

The captions of this Lease are for convenience only, and do not in any way define, limit, disclose, or amplify terms or provisions of this Lease or the scope or intent thereof.

28.   **NOT A SECURITY ARRANGEMENT**

The parties hereto agree and acknowledge that this transaction is not intended as a security arrangement or financing secured by real property, but shall be construed for all purposes as a true lease.

29.   **NET LEASE**

It is the intention of the parties hereto that this Lease is and shall be treated as a triple net lease. Any present or future law to the contrary notwithstanding, except as expressly set forth in this Lease, this Lease shall not terminate, nor shall Tenant be entitled to any abatement, suspension, deferment, reduction, setoff, counterclaim, or defense with respect to Rent, nor shall the obligations of Tenant hereunder be affected by reason of: any damage to or destruction of the Premises or any part thereof; any taking of any Premises or any part thereof or interest therein by condemnation or otherwise; any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any person or for any other reason; any title defect or encumbrance or any matter affecting title to the Premises or any part thereof; any eviction by paramount title or otherwise; any default by Landlord hereunder; any proceeding relating to Landlord; the impossibility or illegality of performance by Landlord, Tenant or both; any action of governmental authority; any breach of warranty or misrepresentation; any defect in the condition, quality or fitness for use of the Premises or any part thereof; or any other cause

20

whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or knowledge of any of the foregoing. The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated in accordance with an express provision of this Lease.

## 30.   WAIVER

No waiver by either party of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by the other party of the same or any other provision. Either party's consent to, or approval of, any act as required hereunder shall not be deemed to render unnecessary the obtaining of such party's consent to or approval of any such subsequent act by the other party. The acceptance of Rent, or any partial payment of Rent, hereunder by Landlord shall not be a waiver of any preceding Default by Tenant of any provision hereof, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent.

## 31.   TIME OF THE ESSENCE

Landlord and Tenant agree that time shall be of the essence of all terms and provisions of this Lease.

## 32.   GOVERNING LAW

This Lease shall be construed in accordance with the laws of the state in which the Premises are located.

## 33.   SEVERABILITY

If any provision of this Lease becomes unenforceable for any reason, such unenforceability shall not limit or impair the operation or validity of any other provision of this Lease.

## 34.   JURISDICTION, VENUE, AND GOVERNING LAW

If any party to this Lease institutes any lawsuit or other action or proceeding against the other party and pertaining to this Lease, any right or obligation of any party hereunder, breach of this Lease or otherwise pertaining to the Premises, the sole and exclusive venue and jurisdiction for filing and maintaining any such lawsuit or other action or proceeding shall be in the jurisdiction where the Premises are located, and the parties to this Lease waive the right to institute or maintain any such suit, action or proceeding in any other courts or forums whatsoever. Each party by executing this Lease consents and submits itself to the personal jurisdiction of such court. This Lease shall be construed and governed in accordance with the laws of the state where the Premises are located without regard to conflict of law principles.

45852342_1

## 35.    COUNTERPARTS

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

## 36.    RIGHT OF FIRST REFUSAL

(a)    Landlord grants to Tenant a continuous right of first refusal to purchase the Premises pursuant to this Section 36.

(i)    If (A) Landlord receives a bona fide offer, solicited or unsolicited, to sell the Premises or to otherwise transfer or dispose of the Premises or the sale of the interests of the Landlord for value to any unaffiliated third party (any such sale, transfer or other disposition, a "Sale") and intends to accept the offer, or (B) Landlord decides to make a bona fide offer for a Sale of the Premises for value to any unaffiliated third party (which shall be subject to Tenant's right of first refusal) and Landlord has found an unaffiliated third party ready, willing and able to accept such offer, then Landlord shall provide a written copy of such offer to Tenant (the "Offer"), which Offer shall include all material terms of the proposed sale or transfer (including, without limitation, the interests or property affected, the name and address of any proposed transferees, the amount of the purchase price, the intended date for closing, and all other material terms and conditions of such offer, along with copies of all relevant documents.)  Tenant will have the right to accept Landlord's Offer by written notice to Landlord given within twenty-five (25) days after Tenant's receipt of the Offer, time being of the essence with respect to this and all other periods provided for in this Section 36.  For purposes hereof, a party shall be considered to be "unaffiliated" so long as such party is not a member of the family of Landlord's principal, or Landlord, its principals, or such family members, own or control less than a 25% interest therein in the aggregate.  The right of first refusal shall be applicable to the sale or transfer of stock, membership interests or partnership interests of Landlord or its principal.

(ii)    If Tenant accepts the Offer, settlement shall be held by the earlier of (A) 60 days after Tenant's acceptance, or (B) at Tenant's option, such earlier closing date as was set forth in the Offer.  Upon settlement, Landlord shall convey to Tenant (or its designee) good and marketable title to such interests or property free and clear of all liens, encumbrances and restrictions (except this Lease and such non-material liens as are of record on the date hereof or recorded after the date hereof with the prior written consent of Tenant and which do not impact on Tenant's use of the Premises).

(iii)    If Tenant does not accept the Offer within the time period specified and a Sale closes (A) on terms no more favorable to the transferee than those specified in the Offer, and (B) by the earlier of (1) the time frame set forth in the Offer and (2) six (6) months after the Offer was made to Tenant, then Tenant's right of first refusal hereunder shall be effective with respect to any future sale of the Premises.  If, however, at any time, an intended Sale will not meet both of the conditions set forth in clauses (A) and (B) above, then Tenant's right of first refusal as set forth in this Section 36 shall be

22

deemed reinstated, and Landlord shall be required to again, and thereafter, comply with this Section 36 (i.e. delivering an Offer to Tenant, awaiting Tenant's response, etc.).

(iv)    NOTWITHSTANDING ANYTHING TO THE CONTRARY, IF THIS LEASE TERMINATES (OTHER THAN BY REASON OF TENANT PURCHASING THE PREMISES PURSUANT TO THIS SECTION 36 OR THE TERM EXPIRES, TENANT'S RIGHT OF FIRST REFUSAL SET FORTH HEREIN SHALL TERMINATE AND BE NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT; AND, IN SUCH EVENT TENANT SHALL EXECUTE SUCH DOCUMENTS AS LANDLORD SHALL REASONABLY REQUEST EVIDENCING SUCH TERMINATION OF ITS RIGHT OF FIRST REFUSAL.  EXCEPT AS AFORESAID, TENANT'S RIGHTS UNDER THIS SECTION 36 SHALL SURVIVE ANY SALE, TRANSFER OR OTHER DISPOSITION OF THE PREMISES BY OR THROUGH LANDLORD (INCLUDING THOSE PERSONS DESCRIBED IN SECTION 36(b) BELOW).

(b)    Notwithstanding anything to the contrary contained herein, the provisions of this Section 36 shall not apply to or prohibit (A) any mortgaging, subjection to deed of trust or other hypothecation of Landlord's interest in the Premises to any Lender, (B) any sale of the Premises pursuant to a private power of sale under or judicial foreclosure of any Mortgage or other security instrument or device to which Landlord's interest in the Premises is now or hereafter subject (including subsequent transfers of title to any Affiliate of any such Lender established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Premises that acquires title to the Premises through such Lender), (C) any transfer of Landlord's interest in the Premises to a Lender, beneficiary under deed of trust or other holder of a security interest therein or their designees by deed in lieu of foreclosure (including subsequent transfers of title to any Affiliate of any such Person established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Property that acquires title to the Property through any such Person, or (D) any transfer of the Property to any governmental or quasi-governmental agency with power of condemnation (including subsequent transfers of title to any Affiliate of any such governmental or quasi-governmental agency established or existing primarily for the purpose of taking title to the Premises).  For the avoidance of doubt, however, Tenant's rights under this Section 36 shall survive all of the foregoing.

## 37.   **NO ESTATE BY TENANT**.

This Lease shall create the relationship of lessor and lessee between Landlord and Tenant; no estate shall pass out of Landlord. Tenant's interest shall not be subject to levy or sale, and shall not be assignable by Tenant except as provided in Section 14 and 15 of this Lease. Nothing contained in this Lease shall, or shall be deemed or construed so as to, create the relationship or principal-agent, joint venturers, co-adventurers, partners or co-tenants between Landlord and Tenant; it being the express intention of the parties that they are and shall remain independent contractors one as to the other.

## 38.   **REPRESENTATIONS AND WARRANTIES OF TENANT**.

45852342_1

Tenant, and the individual executing this Lease on behalf of Tenant, hereby represents and warrants and to Landlord that: (a) Tenant is a limited liability company, duly organized and validly existing under the laws of the State of Tennessee; (b) Tenant has qualified with the Secretary of State of the State in which the Premises are situated to transact business in that State; (c) Tenant has all necessary power and authority to enter into this Lease and has all necessary licenses to conduct its business for the uses contemplated hereunder; and (d) this Lease constitutes a binding and enforceable obligation of Tenant and does not conflict with any provision of Tenant's organizational documents or of any other lease or other agreement to which Tenant is a party or by which Tenant may be bound.

## 39.    HAZARDOUS SUBSTANCES OR CONDITIONS.

Tenant shall not use, handle, store and dispose of any Hazardous Materials, on or about the Premises, except in accordance with all applicable laws, and hereby agrees to indemnify, defend and hold Landlord harmless from any claim, liability, loss or damage arising from the improper use, handling, storage or disposal of Hazardous Materials on or about the Premises. Without limitation of the foregoing, Tenant shall promptly provide to Landlord copies of any written notice that Tenant may receive from any governmental authority relating to or alleging any improper use, handling storage or disposal of any Hazardous Materials by Tenant, its employees, agents or contractors on or about the Premises. "Hazardous Material(s)" for purposes of this Lease shall include but not be limited to all toxic or hazardous materials, chemicals, wastes, pollutants or similar substances, including, without limitation, Petroleum (as hereinafter defined), asbestos and/or urea formaldehyde insulation, which are regulated, governed, restricted or prohibited by any Hazardous Materials Laws including, but not limited to, those materials or substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "pollutants" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Clean Water Act, 33 U.S.C. Section 1251 et seq., and any rules and regulations promulgated thereunder, all as presently or hereafter amended. "Petroleum" for purposes of this Lease shall include, without limitation, oil or petroleum of any kind and in any form including but not limited to oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other waste, crude oil, gasoline, diesel fuel and kerosene.

## 40.    SALES TERMINATION RIGHT.

If Tenant's Gross Sales from the Premises are less than $1,400,000.00 during the fourteenth (14th) Lease Year, as evidenced by an audited gross sales report provided to Landlord in conjunction herewith, Tenant will have the right to terminate the Lease on one hundred eighty (180) days prior written notice to Landlord.

## 41.    FINANCIAL REPORTING.

Within thirty (30) days after Landlord's written request, Tenant shall deliver to Landlord (i) not more than one (1) time during any twenty-four (24) month period, complete financial

24

statements of the Tenant including a balance sheet, profit and loss statement, statement of changes in financial condition for the most recent fiscal period then ended (the financial statements delivered to Landlord need not be audited); and (ii) not more than one (1) time during any twelve (12) month period an audited gross sales reports for the business at the Premises.

25

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Lease Agreement to be effective as of the day and date first above written.

**"LANDLORD"**

**DJ RASH REALTY COMPANY, LLC,** a New York limited liability company

By: _____
Name:   John M Tenenbaum
Title:   Managing Member

[Signatures Continue on Next Page]

"TENANT"

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____

Name: Brian W. Blosser

Title: Vice-President, Development & Construction

45852342_1

## EXHIBITS AND ADDENDA ATTACHED

Rent Addendum
Exhibit "A" - Legal Description
Exhibit "B" - Subordination, Non-Disturbance and Attornment Agreement
Exhibit "C" - Estoppel Certificate
Exhibit "D" - Memorandum of Lease
Exhibit "E" – Landlord Waiver and Collateral Access Agreement

45852342_1

Krystal #  **CHN004**
Address:    **307 Cherokee Boulevard**
            **Chattanooga, Tennessee 37405**

**RENT ADDENDUM**
to
**LEASE AGREEMENT**

THIS RENT ADDENDUM dated  *FEBRUARY 28th* , 2013, by and between DJ Rash Realty Company, LLC, a New York limited liability company ("Landlord") and The Krystal Company, a Tennessee corporation ("Tenant"), for Krystal # CHN004 is attached to and made a part of that certain Lease Agreement by and between Landlord and Tenant of even date herewith (the "Lease").  Notwithstanding any other provision to the contrary which may be contained in said Lease, it is specifically agreed by and between Landlord and Tenant as follows:

1.    **Definitions.**    Capitalized terms used in this Rent Addendum shall, unless otherwise defined, have the meaning ascribed to them in the Lease.

2.    **Annual Rent.**

(a)    Beginning on the Rent Commencement Date, Tenant covenants and agrees to pay to Landlord annual rent ("Annual Rent") according to the following schedule:

| Lease Year | Annual Rent | Monthly Installment |
|:---:|:---:|:---:|
| 1 | $72,500.00 | $6,041.67 |

All payments of Annual Rent shall be paid in equal monthly installments paid monthly in advance, on the first (1st) business day of each month.

(b)    Increases in Annual Rent.  Commencing at the end of the first (1st) Lease Year after the Rent Commencement Date, and on each anniversary of such date thereafter during the term of this Lease (and any extension thereof), Annual Rent shall be increased by an amount equal to the previous year's Annual Rent multiplied by one and one quarter percent (1.25%).

(c)    Partial Months.  If the Rent Commencement Date is on a day other than the first day of a calendar month, then Rent for the partial rental month shall be prorated on a per diem basis and shall be paid by Tenant to Landlord for such month.

3.    **Sales/Use Tax**.  Tenant shall also pay to Landlord any sales and use tax imposed on any Rent payable hereunder from time to time by state law or any other governmental entity, which sums are due monthly as to monthly Rent payments on the due date of the Rent payment under this Lease.

RA-1

4. **Late Charges**. In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent. All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency. In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

By Landlord   Managing Member                    By Tenant

RA-2

4.      **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent.  All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

_____          _____

By Landlord                                              By Tenant

RA-2

## EXHIBIT "A"

### Legal Description of Krystal # CHN004
### Located at 307 Cherokee Boulevard Chattanooga, Tennessee 37405

Land lying in Hamilton County, Tennessee, being Lots Twenty-Four (24), Twenty-five (25), Twenty-six (26), Twenty-seven (27), Twenty-eight (28), Twenty-nine (29) and Thirty (30), Cobb and Minor Subdivision, North Chattanooga (now in the City of Chattanooga) as shown by plat of record in Plat Book 10, page 25, Register's Office for Hamilton County, Tennessee.

Being the same property conveyed to Silver Star Properties, LLC by Quitclaim Deed from L. Jason Morris, III, Trustee of the Lovell Jason Morris, Jr. Family Trust, Vianne Morris Bell, Cindy Morris Pemberton and Stephen Morris of record in Book 8296, page 476, Register's Office for Hamilton County, Tennessee.

THE ABOVE PROPERTY BEING FURTHER DESCRIBED AS FOLLOWS: ALL THAT CERTAIN PIECE, PARCEL, OR TRACT OF LAND SITUATE, LYING, AND BEING LOCATED IN HAMILTON COUNTY, STATE OF TENNESSEE, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO FIND THE POINT OF BEGINNING COMMENCE AT A MAG NAIL FOUND LOCATED AT THE INTERSECTION OF THE NORTHERN RIGHT-OF-WAY OF CHEROKEE BOULEVARD AND THE WESTERN RIGHT-OF-WAY OF MINOR STREET, THENCE ALONG A CURVE TO THE RIGHT, HAVING AN ARC LENGTH OF 141.67 FEET, A RADIUS OF 1465.61 FEET, A CHORD BEARING AND DISTANCE OF N 56°00'43. W 141.61 FEET TO A 5/8. REBAR FOUND CAPPED, THE POINT OF BEGINNING, THENCE CONTINUING ALONG THE NORTHERN RIGHT-OF-WAY OF CHEROKEE BOULEVARD ALONG A CURVE TO THE RIGHT, HAVING AN ARC LENGTH OF 106.48 FEET, A RADIUS OF 1214.95 FEET, A CHORD BEARING AND DISTANCE OF N 51°19'51. W 106.45 FEET TO A 5/8. REBAR FOUND, THENCE N 48°16'48. W 75.08 FEET TO A 1/2" REBAR SET, THENCE LEAVING THE NORTHERN RIGHT-OF-WAY OF CHEROKEE BOULEVARD AND RUNNING ALONG THE COMMON LINE OF LANDS OWNED NOW OR FORMERLY BY THE POSS GROUP, LLC (DEED BOOK 8552-903), N 39°08'52. E 121.78 FEET TO A 1/2" REBAR FOUND, THENCE RUNNING ALONG THE COMMON LINE OF LANDS OWNED NOW OR FORMERLY BY NORTHSIDE NEIGHBORHOOD HOUSE, S 51°02'56. E 75.12 FEET TO A POINT, THENCE CONTINUING ALONG SAID NORTHSIDE NEIGHBORHOOD HOUSE AND THEN ALONG THE COMMON LINE OF LANDS OWNED NOW OR FORMERLY BY MAYLOCKE APARTMENTS, LLC, S 52°35'45. E 100.00 FEET TO A POINT (PASSING OVER A 5/8. REBAR FOUND AT 19.82 FEET) THENCE CONTINUING ALONG THE COMMON LINE OF SAID MAYLOCKE APARTMENTS, LLC PROPERTY, S 36°17'07. W 127.72 FEET TO A 5/8. REBAR FOUND, THE POINT OF BEGINNING, CONTAINING 0.515 ACRES OR 22,419 SQUARE FEET, ACCORDING TO A PLAT ENTITLED ALTA/ACSM LAND TITLE SURVEY FOR THE KRYSTAL COMPANY, 307 CHEROKEE BOULEVARD, CHATTANOOGA, TN., DATED DECEMBER 19, 2012, PREPARED BY R. SCOTT BARRETT, PLS, TN REGISTRATION NO. 2473, OF BARRETT SURVEYING GROUP, LLC, BEARING JOB. NO. 39472.

45852342_1

## EXHIBIT "B"

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

_____

_____

_____

Attention: Loan Administration
Loan No. _____

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

| 1. | Lease | Lease between Landlord and Tenant dated _____, _____. |
|----|-------|-----------------------------------------------------------|
| 2. | Landlord | |
| 3. | Tenant | |
| 4. | Premises | As described on Exhibit A |
| 5. | Premises Address | As described on Exhibit A |

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "Agreement") is made as of the ___ day of _____, 20__, by and between _____(the "Mortgagee") and Tenant.

### R E C I T A L S :

A.    Landlord and Tenant have entered into a certain Lease relating to a portion of the real property (the "Property") described therein and on the attached Exhibit A (the "Premises"); and

B.    Mortgagee [has recorded] [is about to record] a mortgage on the Property; and

C.    Tenant and Mortgagee desire to establish certain rights, safeguards, obligations, and priorities with regard to their respective interests by means of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants of the parties, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagee and Tenant hereby agree as follows:

1.    Provided the Lease is in full force and effect and the Tenant is not in default under the Lease (beyond any period given the Tenant to cure defaults), then:

B-1

45852342_1

(a)    The Tenant's right of possession to the Premises and the Tenant's other rights arising out of the Lease shall not be affected or disturbed by the Mortgagee in the exercise of any of its rights under or related to the Mortgage or the note which it secures.

(b)    In the event the Mortgagee or any other person acquires title to the Premises pursuant to the exercise of any remedy provided for in the Mortgage, or by conveyance in lieu of foreclosure, the Lease shall not be terminated or affected by the foreclosure, conveyance or sale in any such proceeding.  The Mortgagee covenants that any sale of the Property as a result of the exercise of any rights and remedies under the Mortgage, or otherwise, shall be made subject to the Lease and the rights of the Tenant under the Lease, and the Tenant covenants and agrees to attorn the Mortgagee, or such person, as its new landlord, and the Lease shall continue in full force and effect as a direct Lease between the Tenant and the Mortgagee, or such other person, upon all of the terms, covenants, conditions and agreements set forth in the Lease.  However, in no event shall the Mortgagee or such person be:

(i)    Liable for any act or omission of the Landlord; or

(ii)    Subject to any offsets or deficiencies, which the Tenant might be entitled to assert against the Landlord.

2.    Subject to the foregoing provisions, the Lease shall be subject and subordinate to the lien of the Mortgage and to all of its terms, conditions and provisions, to all advances made or to be made and to any renewals, extensions, modifications or replacements.

3.    Mortgagee hereby consents to any leasehold mortgage or deed of trust (the "Leasehold Mortgage") now or hereinafter entered into by Tenant for the benefit of Tenant's lender (together with its successors and assigns, the "Leasehold Mortgagee") and the liens and security interests evidenced by same and encumbering (among other things) Tenant's leasehold interest under the Lease.  In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Tenant's moveable trade fixtures, business, equipment, furniture, signs or other personal property at any time placed on or about the Premises; the Mortgagee and Tenant acknowledging that such property is pledged to the Leasehold Mortgagee as further security for the obligations of Tenant under the Leasehold Mortgage.

4.    The above provisions shall be self-operative and effective without the execution of any further instruments on the part of either party.  However, the Tenant agrees to execute and deliver to the Mortgagee or to any other person to whom the Tenant agrees to attorn such other instruments as either shall reasonably request in order to comply with these provisions.

5.    This Agreement may not be modified other than by an agreement in writing signed by the parties or by their respective successors in interest and by Leasehold Mortgagee.

6.    This Agreement shall inure to the benefit of and be binding upon the parties and their successors and assigns (including (with respect to Tenant) the Leasehold Mortgagee and any other person which acquires rights in or title to Tenant's leasehold interest under the Lease).

45852342_1

To indicate their agreement to the above, the parties or their authorized representatives or officers have signed this document under seal as of the day and year first above written.

**"LENDER"**

_____

By:_____
Name:_____
Title:_____

**"LANDLORD"**

_____, a

_____

By:_____
Name: _____
Title: _____

**"TENANT"**

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____
Name: _____
Title: _____

45852342_1

## EXHIBIT "C"

## ESTOPPEL CERTIFICATE

The undersigned with respect to the premises at STORE ADDRESS, as more particularly described in Exhibit "A" attached hereto and made a part hereof by this reference (the "Premises"), certifies and affirms to the best of its knowledge the following to _____, a _____ [[("Tenant")]]  [[("Landlord")]]  and to _____ [[("Mortgagee")]] [[("Purchaser")]]:

1.    Tenant leases the Premises from Landlord under that certain Lease dated _____, 20___, attached hereto and made a part hereof by this reference (the "Lease").

2.    Rental under this Lease has been paid through _____, 20___. No rent has been paid more than thirty (30) days in advance, except as described in the preceding sentence. The monthly base rental amount is $_____.

3.    The term of the Lease is _____ through _____, a period of _____ years. Tenant has _____ options to extend the Lease for _____ years each, for a total term including all options through _____ as set forth in the Lease.

4.    There is no security deposit under the Lease.

5.    Tenant, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any term of the Lease.

6.    Landlord, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any terms of the Lease.

7.    The Lease is in full force and effect and there have been no modifications or amendments unless attached hereto.

8.    Knowledge means the actual knowledge of _____ without independent investigation.

This Certificate may be relied upon by [[Purchaser]] [[Mortgagee]], who intends to [[purchase the Premises] [and the Lease from Landlord], and by any mortgage lender of such person]] [[provide secured [lease] [loan] financing to [Landlord] [Tenant]].

Dated this _____ day of _____, 20____
[[Landlord]] [[Tenant]]: _____
By: _____
Title: _____

## EXHIBIT "D"

***UPON RECORDATION RETURN TO:***

_____

_____

_____

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

RETURN BY:  MAIL (X)     PICK UP ( )

Krystal # __, STORE ADDRESS

## MEMORANDUM OF LEASE

**THIS MEMORANDUM OF LEASE** is made as of _____, 2013 ("Effective Date"), by and between _____, with a mailing address of _____ ("Landlord"), and The Krystal Company, a Tennessee corporation, with a mailing address of _____ ("Tenant").

In consideration of TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration paid by Tenant to Landlord and the mutual covenants contained in that certain Lease Agreement between the parties hereto dated on even date herewith (hereinafter called the "Lease"), Landlord has leased and does hereby lease to Tenant, and Tenant has leased and does hereby lease from Landlord, upon the terms and conditions set forth in said Lease, the real property more particularly described in Exhibit "A" attached hereto and made a part hereof (the "Premises").

The term of the Lease shall commence on the Effective Date and end on the date that is twenty (20) years after the Rent Commencement Date (as defined in the Lease).  Said Lease provides for options to renew for six (6) five (5) year terms.  Tenant shall not allow any mechanic's lien or similar type of lien to be filed against the Premises.

**[Signatures on Next Page]**

IN WITNESS WHEREOF, Landlord and Tenant have executed and sealed this Memorandum of Lease to be effective as of the date first above written.

**"LANDLORD"**

Signed, Sealed and Delivered
in the presence of:

_____,

_____

_____        By:_____

Name:_____        Name: _____

Title: _____

_____

Name:_____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this \_\_\_\_ day of _____, 2013, by _____, as _____ of _____, a _____. He/she is (  ) personally known to me or (  ) he/she has produced a driver's license as identification.

_____

Notary Public, State of _____
Print Name: _____
Notary Commission No.: _____
My Commission Expires: _____

[NOTARIAL SEAL]

D-2

**"TENANT"**

Signed, sealed and Delivered
in the presence of:

**THE KRYSTAL COMPANY**, a Tennessee
corporation

By: _____
Name: _____
Name:_____

Title: _____

Name:_____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2013, by
_____, as _____ of The Krystal Company, a Tennessee corporation.
He/she is (   ) personally known to me or (   ) he/she has produced a driver's license as
identification.

_____
Notary Public, State of _____
Print Name: _____
Notary Commission No.: _____
My Commission Expires: _____

[NOTARIAL SEAL]

## EXHIBIT "E"

## FORM OF LANDLORD WAIVER
## AND COLLATERAL ACCESS AGREEMENT

**THIS LANDLORD WAIVER AND COLLATERAL ACCESS AGREEMENT** (this "Agreement") is made and entered into between **WELLS FARGO BANK, NATIONAL ASSOCIATION**, in its capacity as administrative agent (in such capacity, the "Senior Agent") for certain lenders (the "Senior Lenders") under the Senior Credit Agreement referred to below, **TRIANGLE CAPITAL CORPORATION**, in its capacity as agent (in such capacity, the "Subordinated Agent", and, collectively with the Senior Agent, the "Agents") for the lenders (the "Subordinated Lenders", and collectively with the Senior Lenders, the "Lenders") under the Subordinated Loan Agreement referred to below, and **[NAME OF OWNER]**, a **[Type of Entity]** (hereinafter referred to as "Owner"), whether one or more, and affects that real property in the City of **[City]**, County of **[County]**, State of **[State]**, commonly known as **[Street Address]** (hereinafter referred to as the "Premises").

**WHEREAS**, this Agreement is executed as required pursuant to that certain Credit Agreement, dated as of March 21, 2012 (the "Senior Credit Agreement") entered into by the Senior Agent and the Senior Lenders and other agreements related thereto (hereinafter collectively referred to as the "Senior Loan Documents") and as required pursuant to that certain Loan Agreement, dated as of March 21, 2012 (the "Subordinated Loan Agreement") entered into by the Subordinated Agent and the Subordinated Lenders and other agreements related thereto (hereinafter collectively referred to as the "Subordinated Loan Documents" and together with the Senior Loan Documents hereinafter collectively referred to as the "Loan Documents"), in each case with The Krystal Company, a Tennessee corporation (hereinafter referred to as "Tenant"), and certain of Tenant's affiliates, for the purpose of securing the repayment of all obligations and the performance of all duties now or hereafter owing by Tenant and its affiliates under the Loan Documents, of every kind and description. This Agreement does not amend any of the terms of the Loan Documents;

**WHEREAS**, by the Loan Documents, the Agents and the Lenders have loaned or have agreed to loan monies and/or extend other financial accommodations against the security of, among other collateral, all of Tenant's personal property, including, but not limited to, Tenant's inventory, equipment, furniture, furnishings, trade fixtures, machinery, and tools, together with all additions, substitutions, replacements, and improvements to the same (hereinafter referred to as "Goods"), which Goods are or are to be located on and may be affixed to the Premises or the improvements thereon; and

**WHEREAS**, Tenant has leased the Premises from Owner by that certain **[Title of Lease Document]** dated **[Date of Lease]** (the "Lease").

**NOW, THEREFORE**, in consideration of any financial accommodations extended by Senior Lenders and Subordinated Lenders to Tenant and/or its affiliates at any time, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follow:

1

1.      Owner hereby acknowledges and agrees that the Goods shall be and remain personal property notwithstanding the manner of their annexation to the Premises, their adaptability to the uses and purposes for which the Premises are used, or the intentions of the party making the annexation.

2.      Owner hereby waives, relinquishes and releases, solely during the term of the Loan Documents, any statutory, contractual or possessory rights or liens which Owner may assert against the Goods, including any and all rights of distraint, attachment, lien, levy or execution against or upon the Goods, for any rent or other sum now or hereafter due the Owner under the Lease or otherwise, and all claims and demands of every kind and nature against the Goods.

3.      Owner hereby acknowledges and consents to Senior Agent's and Subordinated Agent's senior priority perfected security interests in the Goods and agrees that, notwithstanding anything to the contrary set forth in the Lease, any other agreement, document or instrument to which Owner and Tenant are parties or any applicable law, any and all liens and security interests granted or otherwise accruing to Owner with respect to the Goods and any other assets of Tenant or its affiliates is and shall be junior and subordinate to any and all liens and security interest granted to Senior Agent and to Subordinated Agent with respect to the Goods and all other assets of Tenant and its affiliates. The foregoing subordination shall apply (a) irrespective of the time, order or manner of attachment or perfection of any security interest and irrespective of any statute, rule, law, or court decision to the contrary and (b) irrespective or whether the liens securing the obligations under the Loan Documents are held to be unperfected, invalid, void, unenforceable, discharged or are set aside. This Agreement and the subordination provided herein shall continue to govern as between Senior Agent, Subordinated Agent and Owner during and after any bankruptcy or insolvency proceeding involving Tenant or its affiliates. Until the obligations of Tenant and its affiliates under the Loan Documents have been fully and finally paid in full in accordance with the terms of the Loan Documents and all commitments of the Agents and the Lenders to provide financing thereunder have been terminated (the "Discharge of the Senior Obligations"), Owner shall not, without the prior written consent of the Agents, exercise any rights or remedies with respect to the Goods or any other assets of Tenant or its affiliates which arise by virtue of Owner's status as a secured creditor, whether arising under Article 9 of the Uniform Commercial Code or otherwise.

4.      Owner consents to the installation of the Goods on the Premises, agrees that each Agent may do to and with the Goods any or all of the acts below enumerated, and grants each Agent a right, as set forth below, to enter into possession of the Premises to do any or all of the following (the "Permitted Actions") with respect to the Goods: assemble, have appraised, display, sever, remove, maintain, prepare for sale or lease, advertise, inspect, repair, lease, transfer, and/or sell (at public auction or private sale). At the Owner's option, the Owner may elect to have an agent accompany each Agent or its agents or representatives while on the Premises; provided, however, that the Owner's failure to have an agent of the Owner accompany an Agent or its agents or representatives shall not in any way limit such Agent's right to enter upon the Premises. While on the Premises, each Agent shall use reasonable efforts so as not to disturb any other tenant, occupant or the Owner. Each Agent agrees to repair (or pay the reasonable cost to repair) any damages to the Premises caused directly by the actions of such Agent or its agents or representatives while on the Premises.

2

45852342_1

5.      Owner acknowledges that Agents may take any or all of the Permitted Actions subject only to the Loan Documents.

6.      Owner will provide each of the Agents with written notice of any default by Tenant under the Lease resulting or that could, with the passage of time, the giving of notice, or both, result in termination of the Lease (a "Default Notice") at the same time or promptly after, and in the same manner as, such notice is given to Tenant. Each Agent shall have at least fifteen (15) days following receipt of such Default Notice to cure such default, but no Agent shall be under any obligation to cure any default by Lessee under the Lease. No action by any Agent pursuant to this Agreement shall be deemed to be an assumption by any Agent of any obligation under any Lease and, except as expressly set forth herein, no Agent shall have any obligation to Owner.

7.      This Agreement shall continue until such time as the Discharge of the Senior Obligations has occurred.

8.      This Agreement shall be governed and controlled by and interpreted under the laws of the State of New York and shall inure to the benefit of and be binding upon the successors, heirs, and assigns of Owner and Agents. Owner will notify any purchaser or successor owner or landlord of the Premises of the existence of this Agreement, which shall be binding upon the executors, administrators, successors, transferees or assignees of Owner. This Agreement shall bind and inure to the benefit of the respective successors and assigns of Agents and Owner.

9.      THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF OR, AT THE SOLE OPTION OF AGENTS, IN ANY OTHER COURT IN WHICH AGENTS SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. OWNER AND EACH AGENT WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION. OWNER AND EACH AGENT HEREBY WAIVES THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. OWNER AND EACH AGENT REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY

3

45852342_1

TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

*[Signature Pages Follow]*

45852342_1

Dated:_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Senior Agent

By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn:  [_____]
Fax:   (___) ____ - _____

Dated:_____

**TRIANGLE CAPITAL CORPORATION,**
as Subordinated Agent


By:_____
Name:
Title:

Address:


[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (___) ____ - _____

Dated:_____

**[NAME OF OWNER]**,
a **[Type of Entity]**


By:_____
Name:
Title:

Address:


[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (___) _____ - _____

45852342_1

## FIRST AMENDMENT TO LEASE

This First Lease Amendment to Lease (the "First Amendment") is entered into as of this 29ʳᵈ day of August, 2016 (the "Effective Date"), by and among, DJ Rash Realty Company, LLC, a New York limited liability company ("Landlord") and THE KRYSTAL COMPANY, a Tennessee corporation ("Tenant").

## WITNESSETH:

**WHEREAS**, Landlord and Tenant entered into that certain Lease dated as of February 28, 2013 (the "Lease"), whereby Tenant leased from Landlord certain property located in Chattanooga, TN, which property is more particularly described therein (the "Premises") on Exhibit "A"; and

**WHEREAS**, Tenant has indicated its desire to alter and improve the Premises and for Landlord to contribute a portion of the cost thereof upon completion of such alterations and improvements and Landlord has agreed that Landlord will so contribute to the cost of the improvements and alterations so long as Tenant reimburses Landlord for such amounts so contributed by increasing the Rent payable hereunder and provided, that all such alterations and improvements are performed in strict accordance with the terms and condition of the Lease, as amended hereby

**WHEREAS**, the parties desire to amend the Lease as more particularly described herein;

**NOW, THEREFORE**, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration as provided herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree that such Lease shall be and is hereby amended and modified as follows:

1. <u>Term</u>. As of the Effective Date, Paragraph 2(a) of the Lease is hereby modified and amended to provide that the term of the Lease is extended to and including December 31, 2035, unless sooner terminated pursuant to any of the provisions of the Lease. All references made to the "Termination Date" in the Lease shall mean and refer to December 31, 2035.

2. <u>Remodeling of Premises</u>. Landlord hereby agrees that Tenant shall be permitted to remodel the Premises so long such remodeling work is performed in strict accordance with the terms and conditions of the Lease as amended hereby. Prior to the submission for a building permit for any alterations or improvements, Tenant shall submit to Landlord, for Landlord's approval (such approval not to be unreasonably withheld), plans and specifications for the work, alterations and improvements Tenant proposes to perform ("Tenant's Work"). All Tenant's Work shall be performed by Tenant, at Tenant's sole cost and expense (subject to Landlord's Contribution as hereinafter defined): (a) in a good and workerlike manner, (b) in compliance with all applicable laws, governmental regulations,

1



insurance requirements and (c) using new materials and equipment; provided, however, that, Tenant shall be permitted to utilize like new equipment after receiving Landlord's consent therefor (such consent not to be unreasonably withheld). Tenant shall submit a copy of the building permit and all other licenses and approvals required for Tenant's Work, prior to the commencement of such work, it being acknowledged and agreed by Tenant, that no Tenant's Work may commence until Landlord receives such copies and also, that Landlord receives certificates of insurance (and all endorsements thereto) from any contractor performing work at the Premises. In addition, the general contractor must execute and deliver an indemnity for the benefit of Landlord (in such form as is acceptable to Landlord) prior to performing work at the Premises. All Tenant's Work must be substantially complete on or before the date which occurs sixteen (16) months following the Effective Date (the "Outside Date").

3. <u>Landlord's Contribution</u>. Provided that Tenant is not then in default under the Lease (as amended hereby) and Tenant complies with the terms and conditions hereof, Landlord shall bear up to a maximum of $150,000.00 of the total cost actually incurred and paid by Tenant in connection with the performance of Tenant's Work ("<u>Landlord's Contribution</u>"). Landlord's Contribution, in an amount equal to the lesser of $150,000.00 or the cost of Tenant's Work, shall be paid to Tenant within thirty (30) days after the latest to occur of (i) completion of Tenant's Work, (ii) the restaurant reopening for business and (iii) Landlord's receipt of (x) written request for same from Tenant, (y) receipt of a certificate of occupancy and "as built" plans for Tenant's Work and (z) final paid invoices and unconditional lien waivers from all contractors and sub-contractors that performed any Tenant's Work or supplied any materials in connection therewith the cost of which is in excess of $10,000.00. If any lien be filed against the building, the Premises, the land on which the Premises stands, or Tenant's Work, or any portion of any of the foregoing, Tenant shall, at Tenant's own cost and expense, cause the same to be removed of record by bonding or otherwise within fifteen (15) business days after the filing of any such lien. The right to receive reimbursement for the cost (or a portion thereof) of Tenant's Work as set forth herein shall be the exclusive benefit of Tenant; it being the express intent of the parties hereto that in no event shall such right be conferred upon or for the benefit of any third party, including without limitation, any contractor, subcontractor, materialman, laborer, architect, engineer, attorney or any other person, firm or entity. Notwithstanding anything to the contrary contained herein, in the event that Tenant fails to substantially complete Tenant's Work prior to the Outside Date, Tenant shall have waived the right to receive Landlord's Contribution and Landlord's obligation to make Landlord's Contribution shall be null and void and of no further force or effect.

4. <u>Rent Increase</u>. Upon Tenant's receipt of the Landlord's Contribution, the current Annual Rent as well as the Annual Rent payable for each year thereafter, shall increase by an amount equal to six and a half (6.5%) percent of the Landlord's Contribution, which amount shall be equal to $9,750.00 if Landlord's Contribution is equal to $150,000.00. Following this adjustment, the Annual Rent shall increase on an incremental basis by an additional one and one quarter percent (1.25%) annually as specified in the Lease.

2



5.   Additional Options to Extend. As of the Effective Date, Section 10 of the Lease is hereby  modified and amended by adding one (1) additional, successive five (5) year extension option, which option shall be exercisable on the terms and conditions set forth in Section 10 of the Lease.  The option period shall follow the Sixth Option Period (the "Seventh Option Period")  The First Option Period, the Second Option Period, the Third Option Period, the Fourth Option Period, the Fifth Option Period, Sixth Option Period, and Seventh Option Period shall now be referred to collectively as the "Option Periods" and individually as an "Option Period."

6.   Due Diligence Period.  Tenant shall diligently seek approvals for Tenant's Work for a period of sixty (60) days following the Effective Date (the "Due Diligence Period"). Landlord will reasonably cooperate with Tenant, at no cost to Landlord, regarding Tenant's obtaining building permits required for Tenant's Work.  In the event that Tenant is unable to ascertain that it will be able to obtain a building permit for Tenant's Work within the Due Diligence Period, then Tenant may elect to forego performing Tenant's Work, which election Tenant shall make by delivering notice thereof to Landlord within ten (10) days following the expiration of the Due Diligence Period.  If Tenant timely elects to forego performing Tenant's Work, this First Amendment shall be void and of no further force or effect.

7.   Notice.  Landlord and Tenant agree that Section 18 of the Lease is hereby amended delete the notice addresses for Tenant and to Landlord's attorney and to replace such addresses with the following:

To Tenant:

The Krystal Company
Attn: Real Estate
1455 Lincoln Pkwy E., Suite 600
Dunwoody, GA  30346
Facsimile: (770) 351-4740

with a copy to:

Argonne Capital Group, LLC
3060 Peachtree Rd NW, Suite 400
Atlanta, GA 30305
Attn: Karl Jaeger
Facsimile: (404) 364-2985

and a copy to:

McGuire Woods LLP
1230 Peachtree St NE, Suite 1230
Atlanta, GA  30309
Attn: John T. Grieb, Esq.

3



Facsimile: (404) 443-5762

Copies to Landlord to:

Lazer Aptheker Rosella & Yedid, PC
225 Old Country Road
Melville, New York 11747
Attn:  Amy L. Silver, Esq.

8.  <u>Broker</u>.  Landlord and Tenant each represents that this First Amendment was not brought about by a broker, and all negotiations with respect to this First Amendment were conducted exclusively between Landlord and Tenant.  Landlord and Tenant each agrees that if any claim is made for commissions by any broker through or on account of any acts of the representing party, such party will hold the other party free and harmless from any and all liabilities and expenses in connection therewith, including the other party's reasonable attorneys' fees and disbursements.

9.  <u>Amendment</u>.  The parties hereby ratify and confirm all of the terms, covenants and conditions of the Lease, except to the extent that those terms, covenants and conditions are amended, modified or varied by this First Amendment.  Unless expressly modified or amended herein, the Lease shall remain unmodified and in full force and effect. In the event of any inconsistencies between the provisions and conditions of the Lease and this First Amendment, the provisions and conditions of this First Amendment shall govern.

10. <u>Counterparts</u>. This First Amendment may be executed in counterparts, all of which when taken together shall constitute one original document.  The parties agree that copies of the signature pages of this First Amendment transmitted by email of a .pdf, .tiff, JPEG or similar file or otherwise electronically transmitted, whether sent to the other party or to such other party's counsel, shall be deemed to have been definitively executed and delivered, and with the same force and effect as if manually signed and delivered, and for all purposes whatsoever.



**IN WITNESS WHEREOF,** the parties hereto have caused this First Amendment to be executed as of the day and year shown opposite their respective signatures.

LANDLORD:

DJ RASH REALTY COMPANY, LLC

By: John M. Tanenbaum

Title:   Authorized Signatory

TENANT:

THE KRYSTAL COMPANY

Name: Brian Blosser
Title: VP Development & Construct

5



## EXHIBIT "A"

### Legal Description of Krystal # CHN004
### Located at 307 Cherokee Boulevard Chattanooga, Tennessee 37405

Land lying in Hamilton County, Tennessee, being Lots Twenty-Four (24), Twenty-five (25), Twenty-six (26), Twenty-seven (27), Twenty-eight (28), Twenty-nine (29) and Thirty (30), Cobb and Minor Subdivision, North Chattanooga (now in the City of Chattanooga) as shown by plat of record in Plat Book 10, page 25, Register's Office for Hamilton County, Tennessee.

Being the same property conveyed to Silver Star Properties, LLC by Quitclaim Deed from L. Jason Morris, III, Trustee of the Lovell Jason Morris, Jr. Family Trust, Vianne Morris Bell, Cindy Morris Pemberton and Stephen Morris of record in Book 8296, page 476, Register's Office for Hamilton County, Tennessee.

THE ABOVE PROPERTY BEING FURTHER DESCRIBED AS FOLLOWS: ALL THAT CERTAIN PIECE, PARCEL, OR TRACT OF LAND SITUATE, LYING, AND BEING LOCATED IN HAMILTON COUNTY, STATE OF TENNESSEE, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO FIND THE POINT OF BEGINNING COMMENCE AT A MAG NAIL FOUND LOCATED AT THE INTERSECTION OF THE NORTHERN RIGHT-OF-WAY OF CHEROKEE BOULEVARD AND THE WESTERN RIGHT-OF-WAY OF MINOR STREET, THENCE ALONG A CURVE TO THE RIGHT, HAVING AN ARC LENGTH OF 141.67 FEET, A RADIUS OF 1465.61 FEET, A CHORD BEARING AND DISTANCE OF N 56°00'43. W 141.61 FEET TO A 5/8. REBAR FOUND CAPPED, THE POINT OF BEGINNING, THENCE CONTINUING ALONG THE NORTHERN RIGHT-OF-WAY OF CHEROKEE BOULEVARD ALONG A CURVE TO THE RIGHT, HAVING AN ARC LENGTH OF 106.48 FEET, A RADIUS OF 1214.95 FEET, A CHORD BEARING AND DISTANCE OF N 51°19'51. W 106.45 FEET TO A 5/8. REBAR FOUND, THENCE N 48°16'48. W 75.08 FEET TO A 1/2" REBAR SET, THENCE LEAVING THE NORTHERN RIGHT-OF-WAY OF CHEROKEE BOULEVARD AND RUNNING ALONG THE COMMON LINE OF LANDS OWNED NOW OR FORMERLY BY THE POSS GROUP, LLC (DEED BOOK 8552-903), N 39°08'52. E 121.78 FEET TO A 1/2" REBAR FOUND, THENCE RUNNING ALONG THE COMMON LINE OF LANDS OWNED NOW OR FORMERLY BY NORTHSIDE NEIGHBORHOOD HOUSE, S 51°02'56. E 75.12 FEET TO A POINT, THENCE CONTINUING ALONG SAID NORTHSIDE NEIGHBORHOOD HOUSE AND THEN ALONG THE COMMON LINE OF LANDS OWNED NOW OR FORMERLY BY MAYLOCKE APARTMENTS, LLC, S 52°35'45. E 100.00 FEET TO A POINT (PASSING OVER A 5/8. REBAR FOUND AT 19.82 FEET) THENCE CONTINUING ALONG THE COMMON LINE OF SAID MAYLOCKE APARTMENTS, LLC PROPERTY, S 36°17'07. W 127.72 FEET TO A 5/8. REBAR FOUND, THE POINT OF BEGINNING, CONTAINING 0.515 ACRES OR 22,419 SQUARE FEET, ACCORDING TO A PLAT ENTITLED ALTA/ACSM LAND TITLE SURVEY FOR THE KRYSTAL COMPANY, 307 CHEROKEE BOULEVARD, CHATTANOOGA, TN., DATED DECEMBER 19, 2012, PREPARED BY R. SCOTT BARRETT, PLS, TN REGISTRATION NO. 2473, OF BARRETT SURVEYING GROUP, LLC, BEARING JOB. NO. 39472.



# EXHIBIT F



Bill Hullander, Trustee
Hamilton County, Tennessee



March 12, 2020

DJ RASH REALTY COMPANY LLC
ATTN JOHN M TANENBAUM
350 THEODORE FREMD AVE SUITE 210
RYE, NY 10580

| | |
|---|---|
| BILLING YEAR: | 2019 |
| BILL NUMBER: | 17647 |
| STATE GRID: | 135F D 009 |
| DISTRICT: | Chattanooga |

PROPERTY ADDRESS:    307   CHEROKEE BLVD

This is to notify you that the 2019 tax on the property described above has not been paid.
The amount due is listed below according to the month in which payment is received.

If this tax is not paid by March 1, 2021, it will be turned over to the Delinquent Tax Attorney
who will, according to state statute, file suit in Court.

Should you have any questions concerning this bill, please contact the Trustee's Office at
(423) 209-7270.

Received
03/24/2020

| INTEREST INCREASES EACH MONTH | | |
|---|---|---|
| Your Tax Amount Due If Paid In: | | |
| MARCH | 2020 | $8,656.91 |
| APRIL | 2020 | $8,784.84 |
| MAY | 2020 | $8,912.77 |
| JUNE | 2020 | $9,040.70 |
| JULY | 2020 | $9,168.63 |
| AUGUST | 2020 | $9,296.56 |
| SEPTEMBER | 2020 | $9,424.49 |
| OCTOBER | 2020 | $9,552.42 |
| NOVEMBER | 2020 | $9,680.35 |
| DECEMBER | 2020 | $9,808.28 |
| JANUARY | 2021 | $9,936.21 |
| FEBRUARY | 2021 | $10,064.14 |

MAKE CHECK PAYABLE TO AND MAIL TO:

HAMILTON COUNTY TRUSTEE
625 GEORGIA AVE, ROOM 210
CHATTANOOGA, TN 37402-1494
PHONE (423) 209-7270    FAX (423) 209-7271

**City of Chattanooga**

Office of the City Treasurer
City Hall  101 E 11th St Room 100
Chattanooga, Tennessee  37402
423-643-7262

Tanikia Jackson
Interim City Treasurer

Date: 3/9/2020

ԻⅠⅡⅠⅠⅠⅠ...ⅠⅠⅠⅠ...ⅠⅠⅠⅠⅠⅠⅠ...ⅠⅠⅠⅠ...ⅠⅠ
3/12/20 10:26 AM 3  0000322 20200312 1PC3LX101.CUATT / 01 DOM PC3LX10000T.162297 L1
**DJ RASH REALTY COMPANY LLC**
ATTN JOHN M TANENBAUM
350 THEODORE FREMD AVE STE 210
RYE NY 10580-1539



**2019 PAST DUE NOTICE**

Dear Taxpayer,

Our records indicate the  "2019" City of Chattanooga Property taxes and/or water quality fees have not
been paid.  For your convenience we have calculated necessary payments for the months of March 2020 through
February 2021, dependent upon the month your payment is made.

| Parcel Id | Location of Property | Bill Year | Bill Number |
|---|---|---|---|
| 135F D  009 | 307 CHEROKEE BLVD | 2019 | 37628 |

| If paid in: | Taxes | Water Quality Fee (Mandated by Congress) | TOTAL DUE (with Interest/Penalty) |
|---|---|---|---|
| Mar 2020 | $7,128.53 | $979.41 | $8,107.94 |
| Apr 2020 | $7,233.88 | $987.51 | $8,221.39 |
| May 2020 | $7,339.22 | $995.60 | $8,334.82 |
| Jun 2020 | $7,444.57 | $1,003.70 | $8,448.27 |
| Jul 2020 | $7,549.92 | $1,011.79 | $8,561.71 |
| Aug 2020 | $7,655.27 | $1,019.89 | $8,675.16 |
| Sep 2020 | $7,760.61 | $1,027.98 | $8,788.59 |
| Oct 2020 | $7,865.96 | $1,036.07 | $8,902.03 |
| Nov 2020 | $7,971.31 | $1,044.17 | $9,015.48 |
| Dec 2020 | $8,076.66 | $1,052.26 | $9,128.92 |
| Jan 2021 | $8,182.00 | $1,060.36 | $9,242.36 |
| Feb 2021 | $8,287.35 | $1,068.45 | $9,355.80 |

2019 property taxes unpaid on March 1, 2021 will be filed in Hamilton County Chancery Court. On that date,
2019 past due water quality fees will be referred to a collection agency.

Mail your payments to CITY OF CHATTANOOGA, 101 E 11TH STREET ROOM 100, CHATTANOOGA TN
37402.  If you have any questions, please call 423-643-7262 or email us at PTAX@CHATTANOOGA.GOV.

Thank you

3/13/2020                                            Hamilton County Trustee



# Hamilton County Trustee
## Property Tax Inquiry

**Bill Hullander - Hamilton County Trustee**
210 Courthouse @ 625 Georgia Ave.
Chattanooga, TN 37402
Phone: (423) 209-7270 Fax: (423) 209-7271
Office Hours: Mon - Fri 8:00am-4:00pm except these holidays

**Hamilton County Tennessee**
*A great place to work and live.*

| Search >> | Map Group Parcel | Last Name | Bill Number | Property Address |

- **Trustee Home**
- **Satellite Location Directions**
- **General Property Tax FAQs**
- **Current Property Tax Rates**
- Email the Trustee
- **2016 Tax Roll File**
- **Delinquent File Download**

### Trustee - Tax Bill

**Return to Property Details**                    GIS    **Printing Tips**

| | | | |
|---|---|---|---|
| **State Grid** | 135F D 009 | **Flags** | **None** |
| **District** | Chattanooga (1) | | |
| **Property Address** | 307 CHEROKEE BLVD | | |

| | | | |
|---|---|---|---|
| **Bill Type** | Real Property | **Bill Year** | 2019 |
| **Status** | Active | **Bill #** | 17647 |
| **Mailing Address** | DJ RASH REALTY COMPANY LLC<br>ATTN JOHN M TANENBAUM<br>350 THEODORE FREMD AVE SUITE 210<br>RYE NY, 10580 | | |
| | | **Assessment** | $308,440.00 |
| **Legal Desc** | 1. LTS 24-30 COBB & MINORS PB 10 PG 25 0046 01 08<br>2.<br>3.<br>4. | | |

**Billing Information**

| Date | Transaction Type | Fee Type | Amount |
|---|---|---|---|
| 9/26/2019 | Tax Billing | County Tax | $8,528.98 |

**Interest/Penalty**

| Fee | Amount |
|---|---|
| Interest: | $127.93 |

| **Total Due** | **$8,656.91** |
IF PAID BY 3/31/2020 U S POSTMARK ACCEPTED

**Make Payment**

### Other Links
County Officials & Departments
Hamilton County Assessor
Hamilton County Register Of Deeds

MAKE CHECKS PAYABLE AND MAIL TO:

**HAMILTON COUNTY TRUSTEE**
**625 Georgia Ave., Room 210**
**Chattanooga, TN 37402-1494**

Send any suggestions about this site to County Webmaster
© 2015, General Government of Hamilton County

3/13/2020                                                    City of Chattanooga

# Chattanooga Tax Bill

| | | | |
|---|---|---|---|
| **State Grid** | 135F D 009 | **Flags** | **City Water Quality Fee Past Due** **City Taxes Past Due** |
| **Property Address** | 307 CHEROKEE BLVD | | |

| | | | |
|---|---|---|---|
| **Bill #** | 37628 | | |
| **Bill Type** | Real Property | **Bill Year** | 2019 |
| **Status** | Active | | |
| **Owner Name** | DJ RASH REALTY COMPANY LLC | | |
| **Mailing Address** | PO BOX 52427 %MARVIN F POER & COMPANY | **Assessment** | $308,440.00 |

## Billing Information

| Year | Transaction Type | Fee Type | Amount |
|---|---|---|---|
| 2019 | Tax Billing | City Tax | $7,023.18 |
| 2019 | Tax Billing | City Water Quality Fee | $971.32 |

## Outstanding Balances

| Fee | Amount |
|---|---|
| Taxes & Interest | $7,128.53 |
| Water Quality Fee & Interest | $979.41 |

**MAKE CHECKS PAYABLE AND MAIL TO:**
**City Treasurer**
**101 E 11th St Room 100**
**Chattanooga TN 37402**

**Total Due**          $8,107.94

Total due changes on the first calendar day of the month if past due. US Postmark honored when received by mail. Pay online at https://paydirect.link2gov.com/ChattPropertyTax.

# EXHIBIT G

**Krystal #  RME002**
**Address:   519 Shorter Avenue NW**
**            Rome, Georgia 30615**

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made and entered into as of *FEBRUARY 28*, 2013, by and between:

(i)    JMT Land Holdings, LLC, a New York limited liability company ("Landlord"), and

(ii)   The Krystal Company, a Tennessee corporation ("Tenant").

## WITNESSETH:

WHEREAS, Landlord is the owner of that certain tract of land described on Exhibit "A", attached hereto and by this reference incorporated herein (hereinafter called the "Land"), on which a Krystal restaurant is constructed (the "Building");

WHEREAS, Tenant wishes to lease from Landlord the Land and Building (hereinafter called the "Premises");

WHEREAS, Tenant intends to operate an Krystal Restaurant from the Premises;

NOW, THEREFORE, in consideration of the payment of the rent and the keeping and performance of the covenants and agreements by Tenant as hereinafter set forth, Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, together with all rights and privileges appurtenant thereto as may be necessary or convenient to Tenant's business, inclusive of all easements benefiting the Premises, on the terms and conditions hereof.

The following additional stipulations are hereby declared to be covenants of this Lease and shall, unless otherwise expressly stated, be applicable at all times throughout the term of this Lease and any extension or renewal thereof:

## 1.    DEFINITIONS

For purposes of this Lease, the following terms shall have the definitions ascribed to them:

"Affiliate" shall mean any party that controls or is controlled by or is under common control with a party. For purposes of this definition, "control" and correlative terms shall mean the possession, directly or indirectly, of the power to cause the direction of the management and

45854229_1

policies of such party, whether through the ownership of voting securities, by contract or otherwise.

"Effective Date" shall mean the date set forth at the beginning of this Lease.

"Landlord" shall mean JMT Land Holdings, LLC, a New York limited liability company, its successors and assigns.

"Lease" shall include this Lease Agreement and all amendments hereto, if any, entered into from time to time hereafter, together with the Rent Addendum and exhibits attached hereto.

"Lease Year" shall mean a fiscal period beginning on the Rent Commencement Date (and each anniversary thereof) and expiring on the last day of the twelfth (12th) month thereafter. In the event the Rent Commencement Date is not the first (1st) day of a calendar month, then the Lease Year shall commence on the first (1st) day of the calendar month following the Rent Commencement Date.

"Rent" shall mean the rent payable under this Lease as set forth in the Rent Addendum attached hereto and incorporated herein, and shall include Annual Rent (as defined in the Rent Addendum) and all other items described in this Lease as "additional rent".

"Rent Commencement Date" shall mean the date on which Landlord delivers possession of the Building to Tenant, which date shall be the Effective Date hereof unless Landlord and Tenant otherwise agree in writing.

"Tenant" shall include the named Tenant and any assignee or sublessee thereof pursuant to an assignment or sublease under Section 15 of this Lease.

## 2.   TERM AND RENT

(a)    Term.  The term of this Lease shall begin on the Effective Date and shall expire on the date that is twenty (20) years after the Rent Commencement Date (hereinafter the "Termination Date"), unless previously terminated or renewed or extended as provided herein.

(b)    Rent.  Rent shall be due and payable as provided in the Rent Addendum attached hereto and incorporated herein, without notice, demand, deduction, or set-off.

(c)    Acceptance of Premises. Tenant confirms that Tenant has accepted the Premises in their current "as is" condition; that the Building and other improvements have been completed to Tenant's satisfaction; and that the Premises are suitable for Tenant's purposes.

## 3.   ALTERATIONS AND IMPROVEMENTS, INVESTMENT TAX CREDIT, MECHANIC'S LIENS, LANDLORD'S DISCLAIMER

(a)    Alterations and Improvements.

(i)    Tenant's Property.  Tenant shall be permitted to install, use on and about, and remove from the Premises at any time and from time to time all trade fixtures and

2

other personal property (exclusive of lighting, electrical, and heating and air conditioning improvements) which are not a component of the building located or to be located on the Premises (hereinafter referred to as the "Tenant's Property"), all of which at all times shall remain the property of Tenant with the right of removal (subject to Paragraph 3(d) below) at the expiration of this Lease. Tenant's Property shall include: (1) removable decor items and office equipment; (2) building lettering, signs, sign posts and sign standards; (3) unattached food and customer service equipment; and (4) food, customer service equipment and any other equipment attached to the building by bolts and screws and/or by utility connections, or other means that can be removed without damage to the Premises, including without limitation, walk-in refrigerators and freezers, remote refrigeration systems, exhaust systems and hoods, and water heaters.

      (ii)    <u>Subsequent Improvements</u>. Tenant shall also have the right to make any additions, alterations, changes and improvements, structural and nonstructural, including but not limited to tearing down and reconstructing a new restaurant Building, construction of additional buildings and additions to the then existing Building, as Tenant shall desire; provided, however, (A) if such changes are structural or impact the square footage of the then existing buildings, Tenant shall (1) submit plans ("Plans") of all changes to Landlord at least thirty (30) days in advance of the proposed construction date, which plans shall be subject to Landlord's approval, (2) provide Landlord with evidence of Tenant's financial ability to pay for such changes, and (3) deliver the certificate of occupancy, or local equivalent, and as-built plans to Landlord within sixty (60) days after re-opening of the restaurant Building (B) all such construction shall be completed in a workmanlike manner and in material compliance with all laws, building codes and ordinances applicable thereto, at Tenant's sole expense, and (C) such new construction, additions, alterations, changes and improvements (whether structural or non-structural) shall not reduce the fair market value of the Premises, as reasonably determined by Landlord. In the event Tenant is making non-structural changes, alterations or routine repair and maintenance of existing improvements, Landlord's consent shall not be required. In the event that Tenant renovates or reconstructs the Building as provided herein, and the square footage of the new restaurant Building is eighty (80%) or less than the square footage of the restaurant Building prior to demolition, then commencing upon Tenant's receipt of the certificate of occupancy, or local equivalent, for the reconstructed restaurant Building, Annual Rent shall increase by seven and one-half (7.5%) percent over the Annual Rent then due and payable. Landlord and Tenant shall enter into an amendment to the lease to reflect such increase, however, failure by the parties to enter into such agreement shall not impact the increase in Annual Rent which shall be payable from the date that Tenant receives the certificate of occupancy, or local equivalent, for the reconstructed Building through the end of the term of this Lease, subject to annual increases as provided in Section 2(b) of the Rent Addendum attached hereto.

      Upon submission of the Plans to Landlord as provided herein, Landlord shall use reasonable efforts to either give or withhold its approval of the Plans by providing written notice thereof to Tenant within twenty-one (21) days after the Plans are received by Landlord. If Landlord fails to provide either such notice to Tenant with such twenty-one (21) day period, then Landlord shall be deemed to have disapproved the Plans as

3

45854229_1

submitted. Tenant may resubmit the Plans to Landlord for Landlord's review and approval, and upon such resubmission, Landlord shall have twenty-one (21) days after the receipt of the resubmitted Plans to approve or disapprove the same or else the revised Plans as then submitted shall deemed to be approved; provided, however, that the Plans shall only be deemed approved as provided herein if Tenant's resubmission of revised Plans to Landlord are the same as initially provided and contains the following notice in bold font on the cover letter with the Plans:

> "The enclosed plans and specifications are being transmitted to you in accordance with the provisions of Section 3(a)(ii) of the Lease Agreement dated _____, 2013, by and between Landlord and Tenant. Your failure to respond to the enclosed plans and specifications (specifying in detail reasons for disapproval, if any) within twenty-one (21) days after your receipt of the same will be construed as your approval of the same."

Further, upon receipt of Landlord's approval of the Plans, or provided such Plans have been deemed approved, Tenant is hereby irrevocably vested with a power of attorney from Landlord to execute any and all applications, permits, and/or other submittals required by any governmental authority on behalf of Landlord.

     (iii)   Upon Termination, Subletting or Assignment. Subject to the requirements of this Section 3, Tenant shall have the right, at its option and expense, to redecorate or otherwise remodel the Premises upon any termination hereof or upon any permitted subletting or assignment in such manner as will, without reducing the fair market value thereof, avoid the appearance of the Krystal Restaurant operated under this Lease; provided, however, that in addition to the other requirements of this Section 3, Tenant shall not impair the structural condition of the Premises, or reduce the size of the buildings on the Premises.

     (iv)   Landlord's Property. All subsequent improvements referred to in Paragraph 3(a)(ii) above, all improvements upon termination, subletting or assignment referred to in Paragraph 3(a)(iii) above, and any and all other additions, alterations, changes and improvements of any type (other than those that can be removed without causing damage to the Premises) shall be deemed to be a part of the Premises and the sole property of Landlord.

     (b)   Investment Tax Credit. Landlord hereby grants Tenant the right and privilege of applying for and receiving all investment tax credits, if any, under the Internal Revenue Code which may be available with respect to the building and other improvements to be constructed. To this end, Landlord agrees to execute all such further documents and supply such additional information as may be required to make such election effective.

     (c)   Mechanic's and Other Liens. Tenant shall not do or suffer anything to be done whereby the Premises, or any part thereof, may be encumbered by a mechanic's, materialman's, or other lien for work or labor done, services performed, materials, appliances, or power contributed, used, or furnished in or to the Premises or in connection with any operations or any other activity of Tenant. If, whenever and as often as any lien is filed against the Premises, or

45854229_1

any part thereof, purporting to be for or on account of any labor done, materials or services furnished in connection with any work in or about the Premises, done by, for or under the authority of Tenant, or anyone claiming by, through or under Tenant, Tenant shall discharge the same of record within twenty (20) business days after service upon Tenant of written notice of the filing thereof; provided, however, Tenant shall have the right to remove the lien as an encumbrance upon the Premises by bonding same in accordance with applicable law and to contest any such lien; provided further that Tenant shall diligently prosecute any such contest, at all times effectively staying or preventing any official or judicial sale of the Premises under execution or otherwise, and, if unsuccessful, satisfy any final judgment against Tenant adjudging or enforcing such lien or, if successful, procuring record satisfaction or release thereof.

(d)     Landlord's Disclaimer.  All of Tenant's Property placed in or upon the Premises by Tenant shall remain the property of Tenant with the right to remove the same at any time during the term of this Lease.  Landlord, if requested by Tenant, agrees to execute, acknowledge and deliver an instrument in the form customarily used by any financier of Tenant's Property and reasonably satisfactory to Landlord, by which Landlord subordinates its lien rights to the lien rights of any equipment lender or lessor of Tenant's Property, and to all rights of levy for distraint for rent against same; provided any damage caused by, or resulting from the removal of any of Tenant's Property or other personal property (including the leaving of holes or other openings in the roof or exterior of the building) shall be promptly repaired by Tenant or the party entitled to remove same.  Landlord shall be entitled to charge a reasonable fee covering Landlord's actual costs in connection with execution of such documentation (which fee shall not exceed $1,000.00) and Tenant agrees to pay such fee as a condition precedent to Landlord's execution of such documents.

## 4.    DESTRUCTION OF PREMISES; INSURANCE

(a)     If the Premises are damaged or destroyed by fire, flood, tornado or other element, or by any other casualty and such damage or destruction does not occur within the last three (3) years of the original or of any extended or renewed term of this Lease, this Lease shall continue in full force and effect and Tenant shall, as promptly as possible, restore, repair or rebuild the Premises to substantially the same condition as it existed before the damage or destruction, including any improvements or alterations required to be made by any governmental body, county or city agency, due to any changes in code or building regulations.  Tenant shall for this purpose use all, or such part as may be necessary, of the insurance proceeds received from insurance policies required to be carried under the provision of Paragraph 4(b) of this Lease.  Should the Premises be damaged or destroyed by any of the foregoing described casualties within the last thirty-six (36) months of the original term or of any extended or renewed term of this Lease, then to the extent that the Premises are untenantable or unsuitable, in Tenant's reasonable opinion, for continued use in the normal conduct of Tenant's business,] Tenant shall have the right, exercisable by written notice to Landlord given within thirty (30) days after the date of such damage or destruction, to terminate this Lease effective upon the date of such damage or destruction.  Notwithstanding the foregoing, in the event that the Premises are damaged at any time during the term of this Lease such that Tenant determines, in its reasonable business judgment, that such damage will prevent Tenant from carrying on its normal business operations for a period of more than one hundred twenty (120) days, then Tenant may elect to terminate this Lease by giving written notice thereof to Landlord within thirty (30) days after the

5

date of such damage or destruction. If Tenant terminates this Lease as thus provided Landlord shall be entitled to the insurance proceeds on the Premises as Landlord's interest may appear, but not to the proceeds of insurance carried by Tenant on Tenant's Property or business interruption regarding extra expense or loss of income; provided, however, Tenant shall not have the right to terminate this Lease unless (i) the damage or destruction of the Premises was caused by a peril which was insured against as required by the provisions of Paragraph 4(b) of this Lease; and (ii) at the time of such damage and destruction the said insurance policies required to be carried by Tenant were in the amounts required herein.

(b)      Tenant, at its expense, shall throughout the term of this Lease and any extension or renewal thereof, keep the Premises insured with "Special Form Causes of Loss" coverage (as such term is used in the insurance industry), including coverage for glass breakage, vandalism and malicious mischief, and for fire, windstorm, and other casualty damage for one hundred percent (100%) insurable replacement value (excluding footings and foundations), inclusive of $250,000 ordinance and law limit (coverages A, B and C combined).

(c)      Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense and as additional rent, commercial general liability insurance including product liability covering the Premises (occurrence basis) covering bodily injury, property damage and personal injury, naming Landlord as an additional insured as Landlord's interest may appear, with limits not less than One Million Dollars ($1,000,000.00) per occurrence, with a general aggregate of not less than Two Million Dollars ($2,000,000.00) and a "following form" umbrella liability policy or excess liability policy to include product liability in an amount of not less than Ten Million Dollars ($10,000,000.00) per occurrence.

(d)      Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense, business interruption insurance covering risk of loss due to the occurrence of any of the hazards insured against under Tenant's insurance and providing coverage in an amount sufficient to permit the payment of Rents, any additional rent and continuing operating expenses payable hereunder for a period (in such case) of not less than twelve (12) months.

(e)      In the event the Premises are located in an area identified by the National Flood Insurance Program as an area having "special flood hazards" (zones beginning with "A" or "V"), Tenant shall maintain throughout the term of this Lease and any extension thereof, flood insurance with limits stipulated pursuant to the National Flood Insurance Program, with any deductible in excess of Twenty five Thousand Dollars ($25,000.00) to be approved by Landlord.

(f)      All insurance companies providing the coverage required under this Section 4 shall be selected by Tenant and shall be rated A minus (A-) or better by Best's Insurance Rating Service (or equivalent rating service if not available), and shall be licensed to write insurance policies in the state in which the Premises are located. Tenant shall provide Landlord with copies of all policies and/or certificates of such coverage for the insurance coverages referenced in this Section 4, and all commercial general liability and umbrella liability or excess liability policies shall name Landlord (and if Landlord is either a general or limited partnership, all general partners) and any mortgagee designated by Landlord as an additional insured as their interests may appear. Any such coverage for additional insureds shall be primary and non-

6

45854229_1

contributory with any insurance carried by Landlord or any other additional insured hereunder. All property insurance policies shall name Landlord (and if Landlord is either a general or limited partnership), all general partners and any mortgagee designated by Landlord as an additional insured or as a loss payee as Landlord's interests may appear, and shall provide that all losses shall be payable as herein provided. All such policies of insurance shall provide that the amount thereof shall not be reduced and that none of the provisions, agreements or covenants contained therein shall be modified or canceled by the insuring company or companies without thirty (30) days prior written notice being given to additional insureds except ten (10) days' notice for non-payment. Such policy or policies of insurance may also cover loss or damage to Tenant's Property, extra expense and loss of income, and the insurance proceeds applicable to Tenant's Property, shall not be paid to Landlord or any mortgagee but shall accrue and be payable solely to Tenant. In the event of a casualty, Tenant shall be responsible for any deficiency between the replacement cost of the Premises and the amount actually paid by the insurance company.

5.    **MAINTENANCE AND REPAIR**

(a)    Tenant shall, during the term of this Lease and any renewals thereof, (i) maintain the Premises and all buildings and improvements thereon (interior and exterior, structural and otherwise) in good order and repair, ordinary wear and tear excepted; (ii) not commit waste or permit impairment or deterioration of the Premises (normal wear and tear excepted); (iii) to keep Tenant's Property, including trade fixtures, equipment, machinery and appliances thereon in good repair (ordinary wear and tear excepted) and replace trade fixtures, equipment, machinery and appliances on the Premises when necessary to keep such items in good repair; (iv) comply in all material respects with all laws, ordinances, regulations and requirements of any governmental body; (v) provide prompt notification to Landlord of any material adverse changes to the Premises of which Tenant is aware, such as material changes in any environmental condition, including the presence of biocontaminants, such as, but not limited to mold, and shall promptly undertake reasonable remediation (and preventative) actions in connection therewith; (vi) subject to the provisions of Paragraph 4(a) with respect to material damage or damage within the last three (3) years of this Lease, and Section 6 herein, return the Premises and all buildings and improvements thereon at the expiration of the term of this Lease or any extension thereof in as reasonably as good condition as when received, ordinary wear and tear excepted.

(b)    Tenant agrees that Landlord shall have no obligation under this Lease to make any repairs or replacements (including the replacement of obsolete components) to the Premises or the buildings or improvements thereon, or any alteration, addition, change, substitution or improvement thereof or thereto, whether structural or otherwise. Without limitation of the foregoing, Tenant shall be responsible for, and Landlord shall have no responsibility for, the maintenance, repair and replacement of the roof, foundation and structural components of the Building, together with the mechanical, electrical, plumbing and HVAC components, parking and driveway areas. The terms "repair" and "replacement" include, without limitation, the replacement of any portions of the Premises which have outlived their useful life during the term of this Lease (or any extensions thereof). Landlord and Tenant intend that the Rent received by Landlord shall be free and clear of any expense to Landlord for the construction, care, maintenance (including common area maintenance charges and charges accruing under easements or other agreements relating to the Premises), operation, repair, replacement,

7

45854229_1

alteration, addition, change, substitution and improvement of or to the Premises and any building and improvement thereon. Upon the expiration or earlier termination of this Lease, Tenant shall remain responsible for, and shall pay to Landlord, any cost, charge or expense for which Tenant is otherwise responsible for hereunder attributable to any period (prorated on a daily basis) prior to the expiration or earlier termination of this Lease.

## 6. **CONDEMNATION**

(a)     In the event that the whole or any material part of the building on the Premises or a material portion of the Land (for purposes hereof, "material" shall mean more than 10% of the restaurant building on the Premises, more than 20% of the Land or a portion of the parking area that would reduce the number of available parking spaces below the minimum number of parking spaces required by code, unless suitable alternative parking is provided) shall be taken during the term of this Lease or any extension or renewal thereof for any public or quasi public use under any governmental law, ordinance, regulation or by right of eminent domain, or shall be sold to the condemning authority under threat of condemnation, or if Tenant can demonstrate to Landlord's reasonable satisfaction that the Premises cannot be reasonably operated as the type of restaurant contemplated herein as a result of such condemnation, or if all reasonable access to the adjacent roadways from the existing or comparable curb cuts shall be taken or materially reduced, or if Tenant's activities on the Premises shall be disrupted following such condemnation such that, in Tenant's reasonable discretion, the Premises cannot be operated in the substantially the same manner (any of such events being hereinafter referred to as a "taking"), then in such event, Tenant shall have the option of terminating this Lease as of a date no earlier than the date of such taking, such termination date to be specified in a notice of termination to be given by Tenant to Landlord not fewer than fourteen (14) days prior to the date on which possession of the Premises, or part thereof, must be surrendered to the condemning authority or its designee.

(b)     In the event of any taking which does not give rise to an option to terminate or in the event of a taking which does give rise to an option to terminate under Section 6(a) hereinabove and Tenant does not elect to terminate, Landlord shall make its award available to Tenant and Tenant shall, to the extent of the award from such taking (which term "award" shall mean the net proceeds after deducting expenses of any settlement, or net purchase price under a sale in lieu of condemnation but shall exclude the value of Landlord's reversionary interest), promptly restore or repair the Premises and all improvements thereon (except those items of Tenant's Property which Tenant is permitted to remove under the terms of this Lease) to the same condition as existed immediately prior to such taking insofar as is reasonably possible. If the estimated cost of restoration or repair shall exceed the amount of Landlord's award, Landlord shall promptly provide notice to the Tenant of such deficiency, and Tenant shall have the option to (i) terminate this Agreement by giving written notice to Landlord within thirty (30) days after Tenant receives notice from Landlord of the deficiency, or (ii) deposit with Landlord the amount of such excess. In the event that Tenant elects under clause (ii) in the preceding sentence, the award and any excess shall be held in trust by Landlord and used, to the extent required, for the purpose of such restoration or repair. A just and proportionate part of the Rent payable hereunder shall be abated from the date of such taking until ten (10) days after Tenant has restored same and thereafter the Rent shall be reduced in proportion to the reduction in the then rental value of the Premises after the taking in comparison with the rental value prior to the taking. If the award shall exceed the amount spent or to be spent promptly to effect such

8

restoration, repair or replacement, such excess shall unconditionally belong to Landlord and shall be paid to Landlord.

(c)    In the event of any partial taking where this Lease is not terminated, Tenant shall not be entitled (except for use in reconstruction) to any part of the compensation or award given Landlord attributable to the taking of the fee of the Premises, but Tenant shall have the right to amounts (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

(d)    If this Lease is terminated by reason of a taking, then Landlord shall be entitled to receive the reimbursement for its entire award in any such condemnation or eminent domain proceedings or purchase in lieu thereof and Tenant hereby assigns to Landlord all of its right, title and interest in and to all and any part of such award, provided, however, Tenant shall be entitled to receive any portion of any award (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

## 7.    <u>TAXES AND ASSESSMENTS</u>

(a)    Tenant shall pay prior to delinquency all taxes and assessments which may be levied upon or assessed against the Premises and all taxes and assessments of every kind and nature whatsoever arising in any way from the use, occupancy, possession or transfer of ownership (excluding, however, any taxes incurred by Landlord (or a successor landlord) in connection with a transfer of ownership) of the Premises or assessed against the improvements situated thereon, together with all taxes levied upon or assessed against Tenant's Property. To that end, Landlord shall not be required to pay any taxes or assessments whatsoever which relate to or may be assessed against this Lease, the Rent and other amounts due hereunder, the Premises, improvements and Tenant's Property; provided, however, that any taxes or assessments which may be levied or assessed against the Premises for the period prior to the Rent Commencement Date or for the period ending after the Termination Date hereof shall be prorated between Landlord and Tenant as of such date. Tenant will not be required to pay any income, gross receipts, excess profits, revenue, corporate, personal property, estate, inheritance, gift, devolution, succession, transfer, franchise, capital levy or capital stock tax.

(b)    Within ten (10) business days after Tenant receives the paid receipted tax bills, Tenant shall furnish Landlord with copies thereof. Tenant may, at its option, contest in good faith and by appropriate and timely legal proceedings any such tax and assessment; provided, however, that Tenant shall indemnify and hold harmless Landlord from any loss or damage resulting from any such contest, and all reasonable expenses of same (including, without limitation, all attorneys' and paralegal fees, court and other costs) shall be paid solely by Tenant. Landlord, at no cost or liability to Landlord, shall cooperate with Tenant and execute any document which may reasonably be necessary for any proceeding.

## 8.    <u>COMPLIANCE, UTILITIES, SURRENDER</u>

(a)    Tenant, at its expense: shall promptly comply with all municipal, county, state, federal and other governmental requirements and regulations, whether or not compliance

9

therewith shall require structural or other changes in the Premises; will procure and maintain all permits, licenses and other authorizations required for the use of the Premises or any part thereof then being made and for the lawful and proper installation, operation and maintenance of all equipment and appliances necessary or appropriate for the operation and maintenance of the Premises; and shall comply with all easements, restrictions, reservations and other instruments of record applicable to the Premises, including without limitation, any requirement in such instruments on behalf of the owner or occupant of the Premises to procure and maintain insurance, and whether now in effect or enacted during the term of this Lease. Tenant shall indemnify and save Landlord harmless from all expenses and damages by reason of any notices, orders, violations or penalties filed against or imposed upon the Premises (based on Tenant's sole scope of operations at the Premises), or against Landlord as owner thereof, because of Tenant's failure to comply with this paragraph.

(b)    Tenant shall pay all charges for heat, water, gas, sewage, electricity and other utilities used or consumed on the Premises and shall contract for the same in its own name. Landlord shall not be liable for any interruption or failure in the supply of any such utility service to the Premises.

(c)    Tenant shall peacefully surrender possession of the Premises, the buildings and other improvements thereon to Landlord at the expiration, or earlier termination, of the original term or any extended or renewed term of this Lease in good condition and repair, reasonable wear and tear excepted, and in broom clean condition with all debris removed.

## 9.    QUIET ENJOYMENT

Landlord covenants and warrants that Landlord has full power and authority to enter into this Lease, and that Tenant shall have and enjoy full, quiet and peaceful possession of the Premises, its appurtenances and all rights and privileges incidental thereto during the term hereof and any renewals or extensions, subject to the provisions of this Lease and any easements, restrictions, reservations and other instruments of record applicable to the Premises and in existence at the time of the conveyance of the Premises to Landlord by Tenant or thereafter. Landlord agrees to cause the holder of any mortgage now or hereafter relating to the Premises to execute and deliver to Tenant a Subordination and Nondisturbance Agreement substantially in the form contemplated by Section 16 of this Lease, or in such form as may be customarily utilized by the lender and reasonably approved by Tenant.

## 10.    OPTION TO RENEW

Tenant shall have six (6) successive five (5) year options to extend this Lease for up to an additional thirty (30) years upon the same terms, covenants, conditions and rental as set forth herein provided that Tenant is not in Default hereunder at the commencement of such option period. In the event Tenant elects not to exercise each such five (5) year option, Tenant shall give written notice to Landlord not less than six (6) months prior to the Termination Date. Should Tenant fail to give Landlord such timely written notice during the required period, this Lease shall automatically renew pursuant to the terms hereof.

45854229_1

11.    **DEFAULT**

(a)    If any one or more of the following events occur, said event or events shall be referred to as a "Default" under this Lease:

(i)    If Tenant fails to pay Rent or any other charges required under this Lease when same shall become due and payable, and such failure continues for ten (10) days or more after written notice from Landlord;

(ii)    If Tenant fails to perform or observe any term, condition, covenant, agreement, or obligation required under this Lease and such failure continues for thirty (30) days after written notice from Landlord (except that such thirty (30) day period shall be automatically extended for such additional period of time as is reasonably necessary to cure such Default, if such Default cannot be cured within such period, provided Tenant is in the process of diligently curing the same).

(iii)    If Tenant shall make an assignment for the benefit of creditors or file a petition, in any federal or state court, in bankruptcy or reorganization, or make an application in any such proceedings for the appointment of a trustee or receiver for all or any portion of its property, and such proceeding shall not be set aside within sixty (60) days.

(iv)    If any petition shall be filed under federal or state law against Tenant in any bankruptcy, reorganization, or insolvency proceedings, and said proceedings shall not be dismissed or vacated within sixty (60) days after such petition is filed.

(v)    If a receiver or trustee shall be appointed under federal or state law for Tenant for all or any portion of the property of either of them, and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

(b)    Upon the happening of any one or more of the aforementioned Defaults which are not cured within the cure period applicable thereto, if any, Landlord shall have the right, in addition to any other rights and remedies, to:

(1)    terminate this Lease by giving written notice of same to Tenant. Upon such notice, this Lease shall cease and expire, and Tenant shall surrender the Premises to Landlord in the condition required by this Lease, and Landlord will be entitled to recover all unpaid rents that have accrued through the date of termination plus the costs of performing any of Tenant's obligations (other than the payment of rent) that should have been but were not satisfied as of the date of such termination. In addition, Landlord will be entitled to recover, not as rent or a penalty but as compensation for Landlord's loss of the benefit of its bargain with Tenant, the difference between (i) an amount equal to the present value of the rent and other sums that this lease provides Tenant will pay for the remainder of the Primary Term and for the balance of any then effective extension of the Primary Term, and (ii) the present value of the net future rents for such period that will be or with reasonable efforts could be collected by Landlord by reletting the Premises.

11

45854229_1

(2)    take possession of the Premises without terminating this Lease and then rent the same for the account of Tenant (which may be for a term extending beyond the Term of this Lease) in which event Tenant covenants and agrees to pay any deficiency after crediting it with the rent thereby obtained less all repairs and expenses, including the costs of remodeling and brokerage fees, and Tenant waives any claim it may have to any rent obtained on such reletting which may be in excess of the Rent required to be paid herein by Tenant;

(3)    perform such obligation (other than payment of Rent) on Tenant's behalf and charge the cost thereof to Tenant as additional rent; or

(4)    exercise any and all other rights granted to Landlord under this Lease or by applicable law or in equity.

Tenant further agrees that in the event of a Default, any monies deposited by Tenant with Landlord shall be immediately and irrevocably assigned and released to Landlord (without further action by Landlord or Tenant) to be applied by Landlord against any and all of Tenant's obligations under this Lease, in any manner as Landlord may determine.

(c)    If Landlord should elect to terminate or repossess the Premises, as provided hereinabove, Landlord may re-enter the Premises and remove Tenant, its agents and subtenants, together with all or any of Tenant's Property, by suitable action at law, or by force.  Tenant waives any right to the service of any notice of Landlord's intention to re-enter and Landlord shall not be liable in any way in connection with any action it takes pursuant to this paragraph. Notwithstanding such re-entry or removal, Tenant's liability under Lease shall survive and continue.

(d)    In case of re-entry, repossession or termination of this Lease, Tenant shall remain liable for Rent, any additional rent and all other charges provided for in this Lease for the otherwise remaining term of this Lease, and any and all expenses which Landlord may have incurred in re-entering the Premises including, but not limited to, allocable overhead, alterations to the building to bring the building to "white box" standard, leasing, construction, architectural, and reasonable legal and accounting fees.  Landlord shall have the right, but not the obligation, to relet the whole or part of the Premises upon terms which Landlord, in its sole discretion, deems appropriate and Tenant shall be responsible for all reasonable and customary expenses incurred by Landlord in reletting or attempting to relet and all rent collected for reletting shall be credited against all of Tenant's obligations hereunder.  Landlord agrees to use commercially reasonable efforts to relet the Premises in order to mitigate its damages

(e)    In the event of and during the continuance of a Default, Landlord may, at its sole option, enter upon the Premises, if deemed necessary by Landlord in its sole discretion, and/or do whatever may be deemed necessary by Landlord in its sole discretion to cure such failure by Tenant.  Tenant shall pay to Landlord within five (5) days of Landlord's request, all costs incurred by Landlord in connection with Landlord's curing of such failure.  In addition to the above costs, in the event Landlord does not receive payment from Tenant when due under this paragraph, then interest at the rate of eighteen percent (18%) per annum or, if less, the highest rate allowable by law, shall be due and payable with respect to such payment from the due date thereof until Landlord receives such payment.

12

45854229_1

(f)    In the event either party engages legal counsel in connection with the enforcement of any of the terms and provisions of this Lease, then, in addition to all other sums due from the party deemed liable hereunder, such liable party shall pay to the prevailing party any and all attorneys' fees, paralegal fees, and legal costs and expenses incurred by the prevailing party, including on appeal and in any bankruptcy proceedings.

(g)    The rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now or hereinafter provided by law, and all such rights and remedies shall be cumulative. No action or inaction by Landlord shall constitute a waiver of any Default, and no waiver of any Default shall be effective unless it is in writing, signed by Landlord.

## 12.    HOLDING OVER

In the event Tenant remains in possession of the Premises after the expiration of this Lease without executing a new written lease acceptable to Landlord and Tenant, Tenant shall occupy the Premises as a tenant from month to month subject to all the terms hereof (except as modified by this paragraph), but such possession shall not limit Landlord's rights and remedies by reason thereof nor constitute a holding over. In the event of such month to month tenancy, the monthly installment of Annual Rent due for each such month shall increase to be one hundred twenty-five percent (125%) of the monthly installment thereof which was payable during the last month of the term of this Lease.

## 13.    WAIVER OF SUBROGATION

Notwithstanding anything in this Lease to the contrary, other than Tenant's obligations to repair, restore or rebuild described in Section 4 of this Lease, neither party shall be liable to the other for any damage or destruction of the Premises resulting from fire or other casualty covered by insurance required of either party hereunder, whether or not such loss, damage or destruction of the Premises are caused by or results from the negligence of such party (which term includes such party's officers, employees, agents and invitees), and each party hereby expressly releases the other from all total liability for or on account of any said insured loss, damage or destruction. Each party shall procure all endorsements of insurance policies carried by it necessary to protect the other from any right of subrogation and/or liability in the event of such loss.

## 14.    LANDLORD'S LIEN FOR RENTS

As security for Tenant's payment of Rent and all other payments required to be made by Tenant hereunder (including, by way of illustration only, taxes, damage to the Premises, court costs, and attorneys' fees), Tenant hereby grants to Landlord a lien upon all of Tenant's Property now or hereafter located upon the Premises. The lien herein provided shall be subordinate to the lien of any chattel mortgage, collateral assignment or security interest given by Tenant to any seller or provider of purchase money financing of Tenant's Property ("Leasehold Lender's Lien") and in connection therewith Landlord agrees to execute a Landlord Waiver and Collateral Access Agreement substantially in the form attached hereto as <u>Exhibit "E"</u>. Within thirty (30) days after any Lender's Leasehold Lien is satisfied or otherwise released, Tenant shall provide Landlord with written notice of such satisfaction, release or removal. In the event of a Default, Landlord may enter upon the Premises and take possession of Tenant's Property, or any part thereof, and

13

may sell all or any part of Tenant's Property at public or private sale in one or successive sales, with or without notice, to the highest bidder for cash and on behalf of Tenant. Landlord may sell and convey Tenant's Property, or any part thereof, to such bidder, delivering to such bidder all of Tenant's title and interest in such property sold to such bidder. The proceeds of such sale shall be applied by Landlord first toward the costs of such sale and then toward the payment of all sums due from Tenant to Landlord under this Lease. Notwithstanding anything in this paragraph to the contrary, Tenant shall be entitled to collaterally grant a security interest in Tenant's interest in this Lease to any lender, including, without limitation, Wells Fargo Bank, National Association.

## 15.    ASSIGNMENT AND SUBLETTING

(a)      Tenant shall have the right to assign or sublet all or any part of the Premises to any party for any lawful purpose. Notwithstanding the foregoing, Tenant shall have no right to assign or sublet in the event such assignment or subletting would violate any material term of any then material existing agreement applicable to the Premises. Except as set forth in this Section 15, any assignment or subletting permitted hereunder shall not relieve Tenant of its liability for the continued performance of all terms, covenants and conditions of this Lease, including without limitation the payment of all Rent and other charges hereunder. Likewise, as a condition of any such assignment by Tenant, the assignee shall be required to execute and deliver to Landlord, upon the effective date of such assignment, an agreement, in recordable form, whereby such assignee assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Tenant shall be released from all liability under this Lease arising after the date of such assignment or subletting if the assignment or sublease is executed in connection with (i) the sale of all or substantially all of Tenant's (or Tenant's Affiliates') business or assets, including the Premises, to a corporation or other entity that will operate the Premises as an Krystal; and (ii) as of the date of assignment or sublease, the assignee or subtenant or guarantor thereof has an S&P Credit Rating of BBB- or higher, and a Fitch Credit Rating of BBB- or higher, and a Moody's Credit Rating of Baa3 or higher; or (ii) as of the date of assignment, the assignee has an aggregate net worth in accordance with GAAP, of at least $30,000,000; and (iii) the assignee assumes all of Tenant's obligations under this Lease; or (iii) as reasonably approved by Landlord. As used in the immediately preceding sentence, "S&P Credit Rating" means the credit rating assigned by Standard & Poor's Rating Group to the highest rated publicly issued debt securities of the assignee, "Fitch Credit Rating" means the credit rating assigned by Fitch Ratings, Inc. to the highest rated publicly issued debt securities of the assignee, and "Moody's Credit Rating" means the credit rating assigned by Moody's Investors Service to the highest rated publicly issued debt securities of the assignee.

(b)      Prior to any assignment hereunder, Tenant shall deliver to Landlord written notice of such assignment or subletting, together with: (i) a copy of the assignment or subletting documents (including copies of any recorded documents related thereto); (ii) the name, address and telephone number of such assignee or sublet tenant and a designated contact person therefor; (iii) a new insurance policy and binder complying with the terms of this Lease and naming such assignee or sublet tenant as the tenant of the Premises; and (iv) an agreement executed by such assignee or sublet tenant, in recordable form, whereby such assignee or sublet tenant assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Landlord shall execute and return within ten (10) days of receipt any

14

estoppels reasonably requested by Tenant, the assignee or sublessee, or their lenders, in connection with such assignment or sublease.

(c)    All rent and other consideration payable under any sublease shall be solely the property of Tenant.

(d)    Landlord shall have the right without limitation to sell, convey, transfer or assign its interest in the Premises or its interest in this Lease.  In the event of any sale or other transfer of Landlord's interest in the Premises, other than a transfer for security purposes only, Landlord shall be automatically relieved of any and all obligations and liabilities on the part of Landlord occurring from and after the date of such transfer; provided, that the transferee shall assume all of the obligations of Landlord under this Lease.    It is intended hereby that the covenants and obligations contained in this Lease on the part of the Landlord shall be binding on Landlord only during its period of ownership of the Premises.

## 16.    SUBORDINATION, NON DISTURBANCE, ATTORNMENT, ESTOPPEL CERTIFICATE.

(a)    Upon written request of the holder of any mortgage (which term "mortgage" shall also include deeds of trust) now or hereafter relating to the Premises, Tenant shall subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall execute, acknowledge and deliver an instrument substantially in the form of Exhibit "B" attached hereto or in other reasonable form customarily used by such encumbrance holder to effect such subordination; provided, however, as a condition of all such subordinations, the holder of such mortgage shall be first required to agree with Tenant that, notwithstanding the foreclosure or other exercise of rights under any such first or other mortgage, Tenant's possession and occupancy of the Premises and the improvements and its leasehold estate shall not be disturbed or interfered with, nor shall Tenant's rights and obligations under this Lease be altered or adversely affected thereby so long as Tenant is not in Default.

(b)    Notwithstanding anything in Paragraph 16(a) above to the contrary, in the event the holder of any such mortgage elects to have this Lease be superior to its mortgage, then upon notification to Tenant to that effect by such encumbrance holder, this Lease shall be deemed prior to the lien of said mortgage, whether this Lease is dated prior or subsequent to the date of said mortgage, and Tenant shall execute, acknowledge and deliver an instrument, in the form customarily used by such encumbrance holder to effect such priority.

(c)    In the event proceedings are brought for the foreclosure of, or in the event of the exercise of the power of sale under any mortgage made by Landlord encumbering the Premises, or in the event of delivery of a deed in lieu of foreclosure under such a mortgage, Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as "Landlord" under this Lease, and upon the request of the purchaser, Tenant shall execute, acknowledge and deliver an instrument, in form and substance satisfactory to such purchaser, evidencing such attornment.

(d)    Each party agrees, within ten (10) days after written request by the other, to execute, acknowledge and deliver to and in favor of any proposed mortgagee or purchaser of the Premises, an estoppel certificate, substantially in the form of <u>Exhibit "C"</u> attached hereto, stating, among other things (but limited to factual matters related to this Lease) (i) whether this Lease is in full force and effect, (ii) whether this Lease has been modified or amended and, if so, identifying and describing any such modification or amendment, (iii) the date to which Rent and other charges have been paid, and (iv) whether the party furnishing such certificate knows of any default on the part of the other party under this Lease, or has any claim against such party and, if so, specifying the nature of such default or claim.

(e)    Upon written demand by the holder of any mortgage encumbering the Premises, Tenant shall forthwith execute, acknowledge and deliver an agreement in favor of and in the form reasonably satisfactory to Tenant, by the terms of which Tenant shall agree to give prompt written notice to such encumbrance holder in the event of any casualty damage to the Premises or in the event of any default on the part of Landlord under this Lease, and shall agree to allow such encumbrance holder a reasonable length of time after notice to cure or cause the curing of such default before exercising Tenant's rights under this Lease, or terminating or declaring a default under this Lease.

(f)    Tenant shall be entitled to charge a reasonable fee covering Tenant's actual costs in connection with the execution of any subordination, non-disturbance and attornment agreement or estoppel certificate requested by Landlord hereunder (which fee shall not exceed $1,000.00) and Landlord agrees to pay such fee as a condition precedent to Tenant's execution of such documents.

## 17.    <u>USE OF PREMISES</u>

The Premises shall be used by Tenant for any lawful purpose.  Tenant shall operate its business in a high class and reputable manner.  Tenant shall have the right to cease operation of a business on the Premises; provided, however, Tenant shall continue to fulfill all other obligations of Tenant under this Lease, including payment of Rent and performance of Tenant's maintenance obligations.  Tenant shall have the right to place billboard signage on the Premises and receive any and all income derived from signage; provided, however that any and all signage must be allowed by applicable law. The Premises shall be used and occupied only for those purposes that are now or hereafter permitted under the land use designation and zoning district for the Premises and according to all other applicable public and private restrictions, covenants and laws affecting the Premises, including, but not limited to, the covenants and restrictions contained hereinbelow. Neither the Premises, nor any portion thereof, shall be occupied by or used for: nude or semi-nude dancing or service; lingerie modeling; an "adult" or "x-rated" book or video store that sells or rents "adult" or "x-rated" material (which are defined as stores in which thirty percent (30%) or more of the inventory is not available for sale to children under eighteen (18) years old); the display for sale of pornographic or obscene materials (i.e., books, magazines, newspapers, video tapes, video discs, computer software or the like which would be considered obscene or pornographic under prevailing laws or community standards); an "adult" or "x-rated" movie theater; a so-called "head shop" selling or displaying drug paraphernalia; a clinic or health provider offering abortions as a part of its services; a funeral home; a flea market; a bingo parlor; a car wash, a dance hall or nightclub; a skating rink; a bowling alley; a pool hall or billiards

16

room; the use or placement of any telecommunications towers; or, any use that is unlawful or that creates a legal nuisance.

## 18.    NOTICES

All notices and other communications required or permitted to be given hereunder shall be in writing and shall be delivered by a nationally recognized overnight courier or mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Landlord:  JMT Land Holdings, LLC
350 Theodore Fremd Avenue
Suite 210
Rye, New York 10580
Attention: John M. Tanenbaum
Facsimile: (516) 932-9822

With a copy to:  Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, New York 10022
Attention: Amy Silver
Facsimile: 212-754-0777

If to Tenant:  The Krystal Company
One Union Square
Chattanooga, Tennessee 37402
Attention: Property Management
Facsimile: (423) 757-5660

With copies to:  Argonne Capital Group, LLC
One Buckhead Plaza, Suite 1560
3060 Peachtree Road, NW
Atlanta, Georgia 30305
Attention: Karl F. Jaeger
Facsimile: (404) 364-2985

McGuireWoods LLP
1230 Peachtree Street, NE, Suite 1230
Atlanta, Georgia 30309
Attention: John T. Grieb, Esq.
Facsimile: (404) 443-5762

Any party may change its address for notices by written notice in like manner as provided in this paragraph and such change of address shall be effective seven (7) days after the date written notice of such change of address is given.  Notice for purposes of this Lease shall be deemed given by the party who is giving such notice when it shall have been received or refused from the U.S. certified or registered mail, or from a nationally recognized overnight courier, with sufficient postage prepaid.

17

45854229_1

With respect to any such notice, Tenant shall, and Landlord shall use its best efforts to, simultaneously deliver a copy of such notice by facsimile at the appropriate facsimile number above to the other party; provided however, that certified mail or overnight courier delivery shall nevertheless be required to effect proper notice hereunder.

## 19.    INDEMNIFICATION

Tenant does hereby indemnify and exonerate and agrees to hold harmless Landlord against and from all liabilities, losses, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable architects' fees, attorneys' fees, paralegal fees, and legal costs and expenses incurred by Landlord, whether or not judicial proceedings are filed, and including on appeal and in any bankruptcy proceedings, which may be imposed upon or asserted against or incurred by Landlord by reason of Tenant's use and occupancy of the Premises, including without limitation any of the following occurring:

(a)    any work or thing done in respect of construction of, in or to the Premises or any part of the improvements now or hereafter constructed on the Premises;

(b)    any use, possession, occupation, operation, maintenance or management of the Premises or any part hereof;

(c)    any failure to, or to properly, use, possess, occupy, operate, maintain or manage the Premises or any part thereof;

(d)    the condition, including environmental conditions, of the Premises or any part thereof;

(e)    any negligence on the part of Tenant or any of its agents, contractors, servants, employees, licensees or invitees;

(f)    any accident, injury or damage to any person or property occurring in, on or about the Premises or any part thereof including any sidewalk adjacent thereto;

(g)    any failure on the part of Tenant to perform or comply with any of the covenants, agreements, terms or conditions contained in this Lease on its part to be performed or complied with.

Landlord shall not be responsible or liable to Tenant for any loss or damage to either the person or property of Tenant unless caused by the negligence or intentional acts of Landlord. Landlord shall not be responsible or liable for any defect, latent, or otherwise, in the Premises, or any of the equipment, machinery, utilities, appliances or apparatus therein, nor shall it be responsible or liable for any injury, loss or damage to any person or to any property caused by or resulting from bursting, breakage, leakage, steam or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of said Premises or for any injury or damage caused by or resulting from acts of God or the elements, or for any injury or damage caused by or resulting from any defect or negligence in the occupancy, construction, operation or use of any of said Premises, building, machinery, apparatus or equipment.

18

45854229_1

## 20.   **COOPERATION**

(a)   Landlord shall fully cooperate with Tenant throughout the term of this Lease to secure or maintain proper zoning, building and other permits and compliance with all applicable laws; provided, however, that Landlord shall not be required to incur any additional expense. Landlord shall within ten (10) days of request execute any petitions, requests, applications and the like as Tenant shall reasonably request in order to obtain any permit, license, variances and approvals which, in the reasonable judgment of Tenant, are necessary for the lawful construction and/or operation of Tenant's business on the Premises, provided, however, that Tenant shall indemnify and save Landlord harmless from any and all expenses, costs, charges, liabilities, losses, obligations, damages and claims of any type which may be imposed upon, asserted against or incurred by Landlord by reason of same.

(b)   Landlord shall have the right, in Landlord's sole discretion, to enter into an exchange agreement with a qualified intermediary in order to effectuate a like-kind exchange of the Premises for one or more other properties. Landlord and Tenant agree that Tenant, at no cost to Tenant, shall cooperate with Landlord in effecting a like-kind exchange of the Premises by Landlord pursuant to and in accordance with the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

## 21.   **EXCULPATION**

Neither Party shall be liable to the other, or the other's employees, agents, invitees, licensees or any other person whomsoever for any injury to person or damage to property on or about the Premises caused by the other party's negligence or misconduct, its agents, servants or employees or of any other person entering the building under express or implied invitation by the other party or due to any other cause whatsoever, except to the extent by the negligence or neglect of such party, its employees or its authorized representatives.

## 22.   **LANDLORD'S LIABILITIES**

The term "Landlord" as used in this Lease means the owner from time to time of the Premises. Neither Landlord nor any partner, shareholder or beneficiary thereof shall have any personal liability with respect to any of the provisions of this Lease, and if Landlord is in default with respect to its obligations hereunder, Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of Tenant's remedies for the collection of a judgment or other judicial process requiring the payment of money by Landlord, and no other property or assets of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use or occupancy of the Premises.

## 23.   **SUCCESSORS**

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

45854229_1

## 24.  ENTIRE AGREEMENT/MEMORANDUM OF LEASE

This Lease contains the entire agreement between the parties hereto and may not be modified in any manner other than in writing signed by the parties hereto or their successors in interest. A memorandum of this Lease in the form attached hereto as Exhibit "D" shall be executed by the parties and shall be recorded in the official records of the county where the Premises are located.

## 25.  GENDER

Whenever the context hereof permits or requires, words in the singular may be regarded as in the plural and vice-versa, and personal pronouns may be read as masculine, feminine and neuter.

## 26.  BROKERAGE FEES

It is understood and agreed that neither party has incurred any real estate brokerage fees or commissions arising out of this Lease and each party agrees to hold the other harmless from and against all such fees and commissions incurred, and costs related thereto including legal fees, as a result of its own conduct or alleged conduct.

## 27.  CAPTIONS

The captions of this Lease are for convenience only, and do not in any way define, limit, disclose, or amplify terms or provisions of this Lease or the scope or intent thereof.

## 28.  NOT A SECURITY ARRANGEMENT

The parties hereto agree and acknowledge that this transaction is not intended as a security arrangement or financing secured by real property, but shall be construed for all purposes as a true lease.

## 29.  NET LEASE

It is the intention of the parties hereto that this Lease is and shall be treated as a triple net lease. Any present or future law to the contrary notwithstanding, except as expressly set forth in this Lease, this Lease shall not terminate, nor shall Tenant be entitled to any abatement, suspension, deferment, reduction, setoff, counterclaim, or defense with respect to Rent, nor shall the obligations of Tenant hereunder be affected by reason of: any damage to or destruction of the Premises or any part thereof; any taking of any Premises or any part thereof or interest therein by condemnation or otherwise; any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any person or for any other reason; any title defect or encumbrance or any matter affecting title to the Premises or any part thereof; any eviction by paramount title or otherwise; any default by Landlord hereunder; any proceeding relating to Landlord; the impossibility or illegality of performance by Landlord, Tenant or both; any action of governmental authority; any breach of warranty or misrepresentation; any defect in the condition, quality or fitness for use of the Premises or any part thereof; or any other cause

45854229_1

whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or knowledge of any of the foregoing. The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated in accordance with an express provision of this Lease.

### 30.    WAIVER

No waiver by either party of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by the other party of the same or any other provision. Either party's consent to, or approval of, any act as required hereunder shall not be deemed to render unnecessary the obtaining of such party's consent to or approval of any such subsequent act by the other party. The acceptance of Rent, or any partial payment of Rent, hereunder by Landlord shall not be a waiver of any preceding Default by Tenant of any provision hereof, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent.

### 31.    TIME OF THE ESSENCE

Landlord and Tenant agree that time shall be of the essence of all terms and provisions of this Lease.

### 32.    GOVERNING LAW

This Lease shall be construed in accordance with the laws of the state in which the Premises are located.

### 33.    SEVERABILITY

If any provision of this Lease becomes unenforceable for any reason, such unenforceability shall not limit or impair the operation or validity of any other provision of this Lease.

### 34.    JURISDICTION, VENUE, AND GOVERNING LAW

If any party to this Lease institutes any lawsuit or other action or proceeding against the other party and pertaining to this Lease, any right or obligation of any party hereunder, breach of this Lease or otherwise pertaining to the Premises, the sole and exclusive venue and jurisdiction for filing and maintaining any such lawsuit or other action or proceeding shall be in the jurisdiction where the Premises are located, and the parties to this Lease waive the right to institute or maintain any such suit, action or proceeding in any other courts or forums whatsoever. Each party by executing this Lease consents and submits itself to the personal jurisdiction of such court. This Lease shall be construed and governed in accordance with the laws of the state where the Premises are located without regard to conflict of law principles.

21

45854229_1

### 35.  COUNTERPARTS

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

### 36.  RIGHT OF FIRST REFUSAL

(a)    Landlord grants to Tenant a continuous right of first refusal to purchase the Premises pursuant to this Section 36.

(i)    If (A) Landlord receives a bona fide offer, solicited or unsolicited, to sell the Premises or to otherwise transfer or dispose of the Premises or the sale of the interests of the Landlord for value to any unaffiliated third party (any such sale, transfer or other disposition, a "Sale") and intends to accept the offer, or (B) Landlord decides to make a bona fide offer for a Sale of the Premises for value to any unaffiliated third party (which shall be subject to Tenant's right of first refusal) and Landlord has found an unaffiliated third party ready, willing and able to accept such offer, then Landlord shall provide a written copy of such offer to Tenant (the "Offer"), which Offer shall include all material terms of the proposed sale or transfer (including, without limitation, the interests or property affected, the name and address of any proposed transferees, the amount of the purchase price, the intended date for closing, and all other material terms and conditions of such offer, along with copies of all relevant documents.) Tenant will have the right to accept Landlord's Offer by written notice to Landlord given within twenty-five (25) days after Tenant's receipt of the Offer, time being of the essence with respect to this and all other periods provided for in this Section 36.  For purposes hereof, a party shall be considered to be "unaffiliated" so long as such party is not a member of the family of Landlord's principal, or Landlord, its principals, or such family members, own or control less than a 25% interest therein in the aggregate.  The right of first refusal shall be applicable to the sale or transfer of stock, membership interests or partnership interests of Landlord or its principal.

(ii)    If Tenant accepts the Offer, settlement shall be held by the earlier of (A) 60 days after Tenant's acceptance, or (B) at Tenant's option, such earlier closing date as was set forth in the Offer.  Upon settlement, Landlord shall convey to Tenant (or its designee) good and marketable title to such interests or property free and clear of all liens, encumbrances and restrictions (except this Lease and such non-material liens as are of record on the date hereof or recorded after the date hereof with the prior written consent of Tenant and which do not impact on Tenant's use of the Premises).

(iii)    If Tenant does not accept the Offer within the time period specified and a Sale closes (A) on terms no more favorable to the transferee than those specified in the Offer, and (B) by the earlier of (1) the time frame set forth in the Offer and (2) six (6) months after the Offer was made to Tenant, then Tenant's right of first refusal hereunder shall be effective with respect to any future sale of the Premises.  If, however, at any time, an intended Sale will not meet both of the conditions set forth in clauses (A) and (B) above, then Tenant's right of first refusal as set forth in this Section 36 shall be

22

deemed reinstated, and Landlord shall be required to again, and thereafter, comply with this Section 36 (i.e. delivering an Offer to Tenant, awaiting Tenant's response, etc.).

(iv)    NOTWITHSTANDING ANYTHING TO THE CONTRARY, IF THIS LEASE TERMINATES (OTHER THAN BY REASON OF TENANT PURCHASING THE PREMISES PURSUANT TO THIS SECTION 36 OR THE TERM EXPIRES, TENANT'S RIGHT OF FIRST REFUSAL SET FORTH HEREIN SHALL TERMINATE AND BE NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT; AND, IN SUCH EVENT TENANT SHALL EXECUTE SUCH DOCUMENTS AS LANDLORD SHALL REASONABLY REQUEST EVIDENCING SUCH TERMINATION OF ITS RIGHT OF FIRST REFUSAL.   EXCEPT AS AFORESAID, TENANT'S RIGHTS UNDER THIS SECTION 36 SHALL SURVIVE ANY SALE, TRANSFER OR OTHER DISPOSITION OF THE PREMISES BY OR THROUGH LANDLORD (INCLUDING THOSE PERSONS DESCRIBED IN SECTION 36(b) BELOW).

(b)    Notwithstanding anything to the contrary contained herein, the provisions of this Section 36 shall not apply to or prohibit (A) any mortgaging, subjection to deed of trust or other hypothecation of Landlord's interest in the Premises to any Lender, (B) any sale of the Premises pursuant to a private power of sale under or judicial foreclosure of any Mortgage or other security instrument or device to which Landlord's interest in the Premises is now or hereafter subject (including subsequent transfers of title to any Affiliate of any such Lender established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Premises that acquires title to the Premises through such Lender), (C) any transfer of Landlord's interest in the Premises to a Lender, beneficiary under deed of trust or other holder of a security interest therein or their designees by deed in lieu of foreclosure (including subsequent transfers of title to any Affiliate of any such Person established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Property that acquires title to the Property through any such Person, or (D) any transfer of the Property to any governmental or quasi-governmental agency with power of condemnation (including subsequent transfers of title to any Affiliate of any such governmental or quasi-governmental agency established or existing primarily for the purpose of taking title to the Premises).   For the avoidance of doubt, however, Tenant's rights under this Section 36 shall survive all of the foregoing.

## 37.   **NO ESTATE BY TENANT**.

This Lease shall create the relationship of lessor and lessee between Landlord and Tenant; no estate shall pass out of Landlord. Tenant's interest shall not be subject to levy or sale, and shall not be assignable by Tenant except as provided in Section 14 and 15 of this Lease. Nothing contained in this Lease shall, or shall be deemed or construed so as to, create the relationship or principal-agent, joint venturers, co-adventurers, partners or co-tenants between Landlord and Tenant; it being the express intention of the parties that they are and shall remain independent contractors one as to the other.

23

45854229_1

38.   **REPRESENTATIONS AND WARRANTIES OF TENANT**.

Tenant, and the individual executing this Lease on behalf of Tenant, hereby represents and warrants and to Landlord that: (a) Tenant is a limited liability company, duly organized and validly existing under the laws of the State of Tennessee; (b) Tenant has qualified with the Secretary of State of the State in which the Premises are situated to transact business in that State; (c) Tenant has all necessary power and authority to enter into this Lease and has all necessary licenses to conduct its business for the uses contemplated hereunder; and (d) this Lease constitutes a binding and enforceable obligation of Tenant and does not conflict with any provision of Tenant's organizational documents or of any other lease or other agreement to which Tenant is a party or by which Tenant may be bound.

39.   **HAZARDOUS SUBSTANCES OR CONDITIONS**.

Tenant shall not use, handle, store and dispose of any Hazardous Materials, on or about the Premises, except in accordance with all applicable laws, and hereby agrees to indemnify, defend and hold Landlord harmless from any claim, liability, loss or damage arising from the improper use, handling, storage or disposal of Hazardous Materials on or about the Premises. Without limitation of the foregoing, Tenant shall promptly provide to Landlord copies of any written notice that Tenant may receive from any governmental authority relating to or alleging any improper use, handling storage or disposal of any Hazardous Materials by Tenant, its employees, agents or contractors on or about the Premises. "Hazardous Material(s)" for purposes of this Lease shall include but not be limited to all toxic or hazardous materials, chemicals, wastes, pollutants or similar substances, including, without limitation, Petroleum (as hereinafter defined), asbestos and/or urea formaldehyde insulation, which are regulated, governed, restricted or prohibited by any Hazardous Materials Laws including, but not limited to, those materials or substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "pollutants" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Clean Water Act, 33 U.S.C. Section 1251 et seq., and any rules and regulations promulgated thereunder, all as presently or hereafter amended. "Petroleum" for purposes of this Lease shall include, without limitation, oil or petroleum of any kind and in any form including but not limited to oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other waste, crude oil, gasoline, diesel fuel and kerosene.

40.   **SALES TERMINATION RIGHT**.

If Tenant's Gross Sales from the Premises are less than $1,600,000.00 during the fourteenth (14th) Lease Year, as evidenced by an audited gross sales report provided to Landlord in conjunction herewith, Tenant will have the right to terminate the Lease on one hundred eighty (180) days prior written notice to Landlord.

41.   **FINANCIAL REPORTING.**

45854229_1

Within thirty (30) days after Landlord's written request, Tenant shall deliver to Landlord (i) not more than one (1) time during any twenty-four (24) month period, complete financial statements of the Tenant including a balance sheet, profit and loss statement, statement of changes in financial condition for the most recent fiscal period then ended (the financial statements delivered to Landlord need not be audited); and (ii) not more than one (1) time during any twelve (12) month period an audited gross sales reports for the business at the Premises.

[Remainder of Page Intentionally Left Blank; Signatures Begin on Next Page]

45854229_1

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Lease Agreement to be effective as of the day and date first above written.

**"LANDLORD"**

**JMT LAND HOLDINGS, LLC,** a New York limited liability company

By: _John M. Tarenbaum_
Name: _John M. Tarenbaum_
Title: _Managing Member_

[Signatures Continue on Next Page]

26

45854229_1

**"TENANT"**

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____

Name:  Brian W. Blosser

Title:   Vice-President, Construction & Development

26

## EXHIBITS AND ADDENDA ATTACHED

Rent Addendum
Exhibit "A" - Legal Description
Exhibit "B" - Subordination, Non-Disturbance and Attornment Agreement
Exhibit "C" - Estoppel Certificate
Exhibit "D" - Memorandum of Lease
Exhibit "E" – Landlord Waiver and Collateral Access Agreement

45854229_1

Krystal #  RME002
Address:    519 Shorter Avenue NW
            Rome, Georgia 30165

## RENT ADDENDUM
to
## LEASE AGREEMENT

THIS RENT ADDENDUM dated *FEBRUARY 28th*, 2013, by and between JMT Land Holdings, LLC, a New York limited liability company ("Landlord") and The Krystal Company, a Tennessee corporation ("Tenant"), for Krystal # RME002 is attached to and made a part of that certain Lease Agreement by and between Landlord and Tenant of even date herewith (the "Lease"). Notwithstanding any other provision to the contrary which may be contained in said Lease, it is specifically agreed by and between Landlord and Tenant as follows:

1.  **Definitions.** Capitalized terms used in this Rent Addendum shall, unless otherwise defined, have the meaning ascribed to them in the Lease.

2.  **Annual Rent.**

    (a)   Beginning on the Rent Commencement Date, Tenant covenants and agrees to pay to Landlord annual rent ("Annual Rent") according to the following schedule:

| Lease Year | Annual Rent | Monthly Installment |
|:----------:|:-----------:|:-------------------:|
| 1          | $82,500.00  | $6,875.00           |

All payments of Annual Rent shall be paid in equal monthly installments paid monthly in advance, on the first (1st) business day of each month.

    (b)   Increases in Annual Rent.  Commencing at the end of the first (1st) Lease Year after the Rent Commencement Date, and on each anniversary of such date thereafter during the term of this Lease (and any extension thereof), Annual Rent shall be increased by an amount equal to the previous year's Annual Rent multiplied by one and one quarter percent (1.25%).

    (c)   Partial Months.  If the Rent Commencement Date is on a day other than the first day of a calendar month, then Rent for the partial rental month shall be prorated on a per diem basis and shall be paid by Tenant to Landlord for such month.

3.  **Sales/Use Tax.**  Tenant shall also pay to Landlord any sales and use tax imposed on any Rent payable hereunder from time to time by state law or any other governmental entity, which sums are due monthly as to monthly Rent payments on the due date of the Rent payment under this Lease.

RA-1

45854229_1

4.      **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent.  All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

_____        _____
By Landlord                              By Tenant

4.    **Late Charges**.  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent.  All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

By Landlord   Managing Member

_____
By Tenant

RA-2

45854229_1

## EXHIBIT "A"

### Legal Description of Krystal # RME002
### Located at 519 Shorter Avenue NW, Rome, Georgia 30165

All that certain piece, parcel or tract of land situate, lying and being in Land Lot 239, 23rd District, 3rd Section in the City of Rome, County of Floyd, State of Georgia, containing 0.676 acres according to a plat entitled "ALTA/ACSM Land Title Survey for the Krystal Company", dated November 27, 2012, prepared by Site Design, Inc. and having, according to said plat. The following metes and bounds to wit:

Beginning at an old ½ inch solid rod (bent) located on the eastern right of way of South Division Street at the northeastern end of a mitered corner marking the intersection of eastern right of way of South Division Street and the southern right of way of Shorter avenue; thence running along said mitered corner North 59 degrees 21 minutes 29 seconds East 35.69 feet to an old concrete monument located on the southern right of way of Shorter Avenue; thence turning and running along said right of way the following courses and distances: South 74 degrees 26 minutes 29 seconds East 170.45 feet to an old concrete monument; thence South 87 degrees 50 minutes 09 seconds East 29.84 feet to an old concrete monument; thence South 17 degrees 12 minutes 34 seconds West 7.70 feet to a point; thence South 75 degrees 31 minutes 28 seconds East 6.00 feet to a point; thence North 17 degrees 11 minutes 27 seconds East 9.02 feet to a point; thence South 86 degrees 24 minutes 52 seconds East 15.39 feet to an old hole at the joint corner of Jerry King Property, now or formerly; thence turning and leaving said right of way and running along the common line of said King property South 15 degrees 20 minutes 00 seconds West 138.51 feet to an old 5/8 inch rebar iron pin located on the common line of Charlie Hack Property, now or formerly; thence turning and running along the common line of said Hack Property North 73 degrees 22 minutes 41 seconds West 222.89 feet to a point in concrete located on the eastern right of way of South Division Street; thence turning and running along said right of way North 02 degrees 14 minutes 40 seconds East 99.74 feet to the point and place of beginning.

45854229_1

## EXHIBIT "B"

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

_____

_____

_____

Attention: Loan Administration
Loan No. _____

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

| 1. | Lease | Lease between Landlord and Tenant dated _____, ____, . |
|----|-------|------------------------------------------------------------------|
| 2. | Landlord | |
| 3. | Tenant | |
| 4. | Premises | As described on Exhibit A |
| 5. | Premises Address | As described on Exhibit A |

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "Agreement") is made as of the ___ day of _____, 20__, by and between _____(the "Mortgagee") and Tenant.

### R E C I T A L S :

A.      Landlord and Tenant have entered into a certain Lease relating to a portion of the real property (the "Property") described therein and on the attached Exhibit A (the "Premises"); and

B.      Mortgagee [has recorded] [is about to record] a mortgage on the Property; and

C.      Tenant and Mortgagee desire to establish certain rights, safeguards, obligations, and priorities with regard to their respective interests by means of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants of the parties, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagee and Tenant hereby agree as follows:

1.      Provided the Lease is in full force and effect and the Tenant is not in default under the Lease (beyond any period given the Tenant to cure defaults), then:

45854229_1

(a)     The Tenant's right of possession to the Premises and the Tenant's other rights arising out of the Lease shall not be affected or disturbed by the Mortgagee in the exercise of any of its rights under or related to the Mortgage or the note which it secures.

(b)     In the event the Mortgagee or any other person acquires title to the Premises pursuant to the exercise of any remedy provided for in the Mortgage, or by conveyance in lieu of foreclosure, the Lease shall not be terminated or affected by the foreclosure, conveyance or sale in any such proceeding. The Mortgagee covenants that any sale of the Property as a result of the exercise of any rights and remedies under the Mortgage, or otherwise, shall be made subject to the Lease and the rights of the Tenant under the Lease, and the Tenant covenants and agrees to attorn the Mortgagee, or such person, as its new landlord, and the Lease shall continue in full force and effect as a direct Lease between the Tenant and the Mortgagee, or such other person, upon all of the terms, covenants, conditions and agreements set forth in the Lease. However, in no event shall the Mortgagee or such person be:

(i)     Liable for any act or omission of the Landlord; or

(ii)    Subject to any offsets or deficiencies, which the Tenant might be entitled to assert against the Landlord.

2.      Subject to the foregoing provisions, the Lease shall be subject and subordinate to the lien of the Mortgage and to all of its terms, conditions and provisions, to all advances made or to be made and to any renewals, extensions, modifications or replacements.

3.      Mortgagee hereby consents to any leasehold mortgage or deed of trust (the "Leasehold Mortgage") now or hereinafter entered into by Tenant for the benefit of Tenant's lender (together with its successors and assigns, the "Leasehold Mortgagee") and the liens and security interests evidenced by same and encumbering (among other things) Tenant's leasehold interest under the Lease. In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Tenant's moveable trade fixtures, business, equipment, furniture, signs or other personal property at any time placed on or about the Premises; the Mortgagee and Tenant acknowledging that such property is pledged to the Leasehold Mortgagee as further security for the obligations of Tenant under the Leasehold Mortgage.

4.      The above provisions shall be self-operative and effective without the execution of any further instruments on the part of either party. However, the Tenant agrees to execute and deliver to the Mortgagee or to any other person to whom the Tenant agrees to attorn such other instruments as either shall reasonably request in order to comply with these provisions.

5.      This Agreement may not be modified other than by an agreement in writing signed by the parties or by their respective successors in interest and by Leasehold Mortgagee.

6.      This Agreement shall inure to the benefit of and be binding upon the parties and their successors and assigns (including (with respect to Tenant) the Leasehold Mortgagee and any other person which acquires rights in or title to Tenant's leasehold interest under the Lease).

45854229_1

To indicate their agreement to the above, the parties or their authorized representatives or officers have signed this document under seal as of the day and year first above written.

**"LENDER"**

_____

By:_____
Name:_____
Title:_____

**"LANDLORD"**

_____, a
_____

By:_____
Name: _____
Title: _____

**"TENANT"**

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____
Name: _____
Title: _____

B-3

## EXHIBIT "C"

### ESTOPPEL CERTIFICATE

The undersigned with respect to the premises at STORE ADDRESS, as more particularly described in Exhibit "A" attached hereto and made a part hereof by this reference (the "Premises"), certifies and affirms to the best of its knowledge the following to _____, a _____ [[("Tenant")]] [[("Landlord")]] and to _____ [[("Mortgagee")]] [[("Purchaser")]]:

1.    Tenant leases the Premises from Landlord under that certain Lease dated _____, 20__, attached hereto and made a part hereof by this reference (the "Lease").

2.    Rental under this Lease has been paid through _____, 20__. No rent has been paid more than thirty (30) days in advance, except as described in the preceding sentence. The monthly base rental amount is $_____.

3.    The term of the Lease is _____ through _____, a period of _____ years. Tenant has _____ options to extend the Lease for _____ years each, for a total term including all options through _____ as set forth in the Lease.

4.    There is no security deposit under the Lease.

5.    Tenant, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any term of the Lease.

6.    Landlord, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any terms of the Lease.

7.    The Lease is in full force and effect and there have been no modifications or amendments unless attached hereto.

8.    Knowledge means the actual knowledge of _____ without independent investigation.

This Certificate may be relied upon by [[Purchaser]] [[Mortgagee]], who intends to [[purchase the Premises] [and the Lease from Landlord], and by any mortgage lender of such person]] [[provide secured [lease] [loan] financing to [Landlord] [Tenant]].

Dated this _____ day of _____, 20_____
[[Landlord]] [[Tenant]]: _____
By: _____
Title: _____

45854229_1

## EXHIBIT "D"

*UPON RECORDATION RETURN TO*:

_____

_____

_____

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

RETURN BY:  MAIL (X)    PICK UP ( )

Krystal # __, STORE ADDRESS

## MEMORANDUM OF LEASE

**THIS MEMORANDUM OF LEASE** is made as of _____, 2013 ("Effective Date"), by and between _____, with a mailing address of _____ ("Landlord"), and The Krystal Company, a Tennessee corporation, with a mailing address of _____ ("Tenant").

In consideration of TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration paid by Tenant to Landlord and the mutual covenants contained in that certain Lease Agreement between the parties hereto dated on even date herewith (hereinafter called the "Lease"), Landlord has leased and does hereby lease to Tenant, and Tenant has leased and does hereby lease from Landlord, upon the terms and conditions set forth in said Lease, the real property more particularly described in Exhibit "A" attached hereto and made a part hereof (the "Premises").

The term of the Lease shall commence on the Effective Date and end on the date that is twenty (20) years after the Rent Commencement Date (as defined in the Lease).  Said Lease provides for options to renew for six (6) five (5) year terms.  Tenant shall not allow any mechanic's lien or similar type of lien to be filed against the Premises.

**[Signatures on Next Page]**

D-1

45854229_1

IN WITNESS WHEREOF, Landlord and Tenant have executed and sealed this Memorandum of Lease to be effective as of the date first above written.

**"LANDLORD"**

Signed, Sealed and Delivered
in the presence of:

_____,

_____

_____          By:_____
Name:_____     Name:_____
                                           Title: _____

_____
Name:_____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2013, by _____, as _____ of _____, a _____. He/she is (  ) personally known to me or (  ) he/she has produced a driver's license as identification.

_____
Notary Public, State of _____
Print Name: _____
Notary Commission No.: _____
My Commission Expires: _____

[NOTARIAL SEAL]

D-2

"TENANT"

Signed, sealed and Delivered
in the presence of:

**THE KRYSTAL COMPANY**, a Tennessee
corporation

By: _____
Name: _____
Title: _____

Name:_____

Name:_____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2013, by
_____, as _____ of The Krystal Company, a Tennessee corporation.
He/she is (    ) personally known to me or (    ) he/she has produced a driver's license as
identification.

_____
Notary Public, State of _____
Print Name: _____
Notary Commission No.: _____
My Commission Expires: _____

[NOTARIAL SEAL]

45854229_1

<u>EXHIBIT "E"</u>

## FORM OF LANDLORD WAIVER
## AND COLLATERAL ACCESS AGREEMENT

**THIS LANDLORD WAIVER AND COLLATERAL ACCESS AGREEMENT** (this "Agreement") is made and entered into between **WELLS FARGO BANK, NATIONAL ASSOCIATION**, in its capacity as administrative agent (in such capacity, the "Senior Agent") for certain lenders (the "Senior Lenders") under the Senior Credit Agreement referred to below, **TRIANGLE CAPITAL CORPORATION**, in its capacity as agent (in such capacity, the "Subordinated Agent", and, collectively with the Senior Agent, the "Agents") for the lenders (the "Subordinated Lenders", and collectively with the Senior Lenders, the "Lenders") under the Subordinated Loan Agreement referred to below, and **[NAME OF OWNER]**, a **[Type of Entity]** (hereinafter referred to as "Owner"), whether one or more, and affects that real property in the City of **[City]**, County of **[County]**, State of **[State]**, commonly known as **[Street Address]** (hereinafter referred to as the "Premises").

**WHEREAS**, this Agreement is executed as required pursuant to that certain Credit Agreement, dated as of March 21, 2012 (the "Senior Credit Agreement") entered into by the Senior Agent and the Senior Lenders and other agreements related thereto (hereinafter collectively referred to as the "Senior Loan Documents") and as required pursuant to that certain Loan Agreement, dated as of March 21, 2012 (the "Subordinated Loan Agreement") entered into by the Subordinated Agent and the Subordinated Lenders and other agreements related thereto (hereinafter collectively referred to as the "Subordinated Loan Documents" and together with the Senior Loan Documents hereinafter collectively referred to as the "Loan Documents"), in each case with The Krystal Company, a Tennessee corporation (hereinafter referred to as "Tenant"), and certain of Tenant's affiliates, for the purpose of securing the repayment of all obligations and the performance of all duties now or hereafter owing by Tenant and its affiliates under the Loan Documents, of every kind and description. This Agreement does not amend any of the terms of the Loan Documents;

**WHEREAS**, by the Loan Documents, the Agents and the Lenders have loaned or have agreed to loan monies and/or extend other financial accommodations against the security of, among other collateral, all of Tenant's personal property, including, but not limited to, Tenant's inventory, equipment, furniture, furnishings, trade fixtures, machinery, and tools, together with all additions, substitutions, replacements, and improvements to the same (hereinafter referred to as "Goods"), which Goods are or are to be located on and may be affixed to the Premises or the improvements thereon; and

**WHEREAS**, Tenant has leased the Premises from Owner by that certain **[Title of Lease Document]** dated **[Date of Lease]** (the "Lease").

**NOW, THEREFORE**, in consideration of any financial accommodations extended by Senior Lenders and Subordinated Lenders to Tenant and/or its affiliates at any time, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follow:

1

45854229_1

1.    Owner hereby acknowledges and agrees that the Goods shall be and remain personal property notwithstanding the manner of their annexation to the Premises, their adaptability to the uses and purposes for which the Premises are used, or the intentions of the party making the annexation.

2.    Owner hereby waives, relinquishes and releases, solely during the term of the Loan Documents, any statutory, contractual or possessory rights or liens which Owner may assert against the Goods, including any and all rights of distraint, attachment, lien, levy or execution against or upon the Goods, for any rent or other sum now or hereafter due the Owner under the Lease or otherwise, and all claims and demands of every kind and nature against the Goods.

3.    Owner hereby acknowledges and consents to Senior Agent's and Subordinated Agent's senior priority perfected security interests in the Goods and agrees that, notwithstanding anything to the contrary set forth in the Lease, any other agreement, document or instrument to which Owner and Tenant are parties or any applicable law, any and all liens and security interests granted or otherwise accruing to Owner with respect to the Goods and any other assets of Tenant or its affiliates is and shall be junior and subordinate to any and all liens and security interest granted to Senior Agent and to Subordinated Agent with respect to the Goods and all other assets of Tenant and its affiliates. The foregoing subordination shall apply (a) irrespective of the time, order or manner of attachment or perfection of any security interest and irrespective of any statute, rule, law, or court decision to the contrary and (b) irrespective or whether the liens securing the obligations under the Loan Documents are held to be unperfected, invalid, void, unenforceable, discharged or are set aside. This Agreement and the subordination provided herein shall continue to govern as between Senior Agent, Subordinated Agent and Owner during and after any bankruptcy or insolvency proceeding involving Tenant or its affiliates. Until the obligations of Tenant and its affiliates under the Loan Documents have been fully and finally paid in full in accordance with the terms of the Loan Documents and all commitments of the Agents and the Lenders to provide financing thereunder have been terminated (the "Discharge of the Senior Obligations"), Owner shall not, without the prior written consent of the Agents, exercise any rights or remedies with respect to the Goods or any other assets of Tenant or its affiliates which arise by virtue of Owner's status as a secured creditor, whether arising under Article 9 of the Uniform Commercial Code or otherwise.

4.    Owner consents to the installation of the Goods on the Premises, agrees that each Agent may do to and with the Goods any or all of the acts below enumerated, and grants each Agent a right, as set forth below, to enter into possession of the Premises to do any or all of the following (the "Permitted Actions") with respect to the Goods: assemble, have appraised, display, sever, remove, maintain, prepare for sale or lease, advertise, inspect, repair, lease, transfer, and/or sell (at public auction or private sale). At the Owner's option, the Owner may elect to have an agent accompany each Agent or its agents or representatives while on the Premises; provided, however, that the Owner's failure to have an agent of the Owner accompany an Agent or its agents or representatives shall not in any way limit such Agent's right to enter upon the Premises. While on the Premises, each Agent shall use reasonable efforts so as not to disturb any other tenant, occupant or the Owner. Each Agent agrees to repair (or pay the reasonable cost to repair) any damages to the Premises caused directly by the actions of such Agent or its agents or representatives while on the Premises.

2

45854229_1

5.      Owner acknowledges that Agents may take any or all of the Permitted Actions subject only to the Loan Documents.

6.      Owner will provide each of the Agents with written notice of any default by Tenant under the Lease resulting or that could, with the passage of time, the giving of notice, or both, result in termination of the Lease (a "Default Notice") at the same time or promptly after, and in the same manner as, such notice is given to Tenant. Each Agent shall have at least fifteen (15) days following receipt of such Default Notice to cure such default, but no Agent shall be under any obligation to cure any default by Lessee under the Lease. No action by any Agent pursuant to this Agreement shall be deemed to be an assumption by any Agent of any obligation under any Lease and, except as expressly set forth herein, no Agent shall have any obligation to Owner.

7.      This Agreement shall continue until such time as the Discharge of the Senior Obligations has occurred.

8.      This Agreement shall be governed and controlled by and interpreted under the laws of the State of New York and shall inure to the benefit of and be binding upon the successors, heirs, and assigns of Owner and Agents. Owner will notify any purchaser or successor owner or landlord of the Premises of the existence of this Agreement, which shall be binding upon the executors, administrators, successors, transferees or assignees of Owner. This Agreement shall bind and inure to the benefit of the respective successors and assigns of Agents and Owner.

9.      THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF OR, AT THE SOLE OPTION OF AGENTS, IN ANY OTHER COURT IN WHICH AGENTS SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. OWNER AND EACH AGENT WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION. OWNER AND EACH AGENT HEREBY WAIVES THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY

3

CLAIMS. OWNER AND EACH AGENT REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

*[Signature Pages Follow]*

4

Dated:_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Senior Agent

By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (___) ____ - _____

F-6

Dated:_____

**TRIANGLE CAPITAL CORPORATION,**
as Subordinated Agent

By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (___) _____ - _____

2

Dated:_____

**[NAME OF OWNER]**,
a **[Type of Entity]**

By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax:  (___) ____ - _____

3

## FIRST AMENDMENT TO LEASE

This First Lease Amendment to Lease (the "First Amendment") is entered into as of this $29^{r}$ day of $August$, 2016 (the "Effective Date"), by and among, JMT Land Holdings, LLC, a New York limited liability company ("Landlord") and THE KRYSTAL COMPANY, a Tennessee corporation ("Tenant").

### WITNESSETH:

**WHEREAS**, Landlord and Tenant entered into that certain Lease dated as of February 28, 2013 (the "Lease"), whereby Tenant leased from Landlord certain property located in Rome, GA, which property is more particularly described therein (the "Premises") on Exhibit "A"; and

**WHEREAS**, Tenant has indicated its desire to alter and improve the Premises and for Landlord to contribute a portion of the cost thereof upon completion of such alterations and improvements and Landlord has agreed that Landlord will so contribute to the cost of the improvements and alterations so long as Tenant reimburses Landlord for such amounts so contributed by increasing the Rent payable hereunder and provided, that all such alterations and improvements are performed in strict accordance with the terms and condition of the Lease, as amended hereby

**WHEREAS**, the parties desire to amend the Lease as more particularly described herein;

**NOW, THEREFORE**, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration as provided herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree that such Lease shall be and is hereby amended and modified as follows:

1. Term. As of the Effective Date, Paragraph 2(a) of the Lease is hereby modified and amended to provide that the term of the Lease is extended to and including December 31, 2035, unless sooner terminated pursuant to any of the provisions of the Lease. All references made to the "Termination Date" in the Lease shall mean and refer to December 31, 2035.

2. Remodeling of Premises. Landlord hereby agrees that Tenant shall be permitted to remodel the Premises so long such remodeling work is performed in strict accordance with the terms and conditions of the Lease as amended hereby. Prior to the submission for a building permit for any alterations or improvements, Tenant shall submit to Landlord, for Landlord's approval (such approval not to be unreasonably withheld), plans and specifications for the work, alterations and improvements Tenant proposes to perform ("Tenant's Work"). All Tenant's Work shall be performed by Tenant, at Tenant's sole cost and expense (subject to Landlord's Contribution as hereinafter defined): (a) in a good and workerlike manner, (b) in compliance with all applicable

1

laws, governmental regulations, insurance requirements and (c) using new materials and equipment; provided, however, that, Tenant shall be permitted to utilize like new equipment after receiving Landlord's consent therefor (such consent not to be unreasonably withheld). Tenant shall submit a copy of the building permit and all other licenses and approvals required for Tenant's Work, prior to the commencement of such work, it being acknowledged and agreed by Tenant, that no Tenant's Work may commence until Landlord receives such copies and also, that Landlord receives certificates of insurance (and all endorsements thereto) from any contractor performing work at the Premises. In addition, the general contractor must execute and deliver an indemnity for the benefit of Landlord (in such form as is acceptable to Landlord) prior to performing work at the Premises. All Tenant's Work must be substantially complete on or before the date which occurs sixteen (16) months following the Effective Date (the "Outside Date").

3. Landlord's Contribution. Provided that Tenant is not then in default under the Lease (as amended hereby) and Tenant complies with the terms and conditions hereof, Landlord shall bear up to a maximum of $150,000.00 of the total cost actually incurred and paid by Tenant in connection with the performance of Tenant's Work ("Landlord's Contribution"). Landlord's Contribution, in an amount equal to the lesser of $150,000.00 or the cost of Tenant's Work, shall be paid to Tenant within thirty (30) days after the latest to occur of (i) completion of Tenant's Work, (ii) the restaurant reopening for business and (iii) Landlord's receipt of (x) written request for same from Tenant, (y) receipt of a certificate of occupancy and "as built" plans for Tenant's Work and (z) final paid invoices and unconditional lien waivers from all contractors and sub-contractors that performed any Tenant's Work or supplied any materials in connection therewith the cost of which is in excess of $10,000.00. If any lien be filed against the building, the Premises, the land on which the Premises stands, or Tenant's Work, or any portion of any of the foregoing, Tenant shall, at Tenant's own cost and expense, cause the same to be removed of record by bonding or otherwise within fifteen (15) business days after the filing of any such lien. The right to receive reimbursement for the cost (or a portion thereof) of Tenant's Work as set forth herein shall be the exclusive benefit of Tenant; it being the express intent of the parties hereto that in no event shall such right be conferred upon or for the benefit of any third party, including without limitation, any contractor, subcontractor, materialman, laborer, architect, engineer, attorney or any other person, firm or entity. Notwithstanding anything to the contrary contained herein, in the event that Tenant fails to substantially complete Tenant's Work prior to the Outside Date, Tenant shall have waived the right to receive Landlord's Contribution and Landlord's obligation to make Landlord's Contribution shall be null and void and of no further force or effect.

4. Rent Increase. Upon Tenant's receipt of the Landlord's Contribution, the current Annual Rent as well as the Annual Rent payable for each year thereafter, shall increase by an amount equal to six and a half (6.5%) percent of the Landlord's Contribution, which amount shall be equal to $9,750.00 if Landlord's Contribution is equal to $150,000.00.   Following this adjustment, the Annual Rent shall increase on an incremental basis by an additional one and one quarter percent (1.25%) annually as

specified in the Lease.

5.    Additional Options to Extend. As of the Effective Date, Section 10 of the Lease is
hereby modified and amended by adding one (1) additional, successive five (5) year
extension option, which option shall be exercisable on the terms and conditions set forth
in Section 10 of the Lease. The option period shall follow the Sixth Option Period (the
"Seventh Option Period") The First Option Period, the Second Option Period, the Third
Option Period, the Fourth Option Period, the Fifth Option Period, Sixth Option Period,
and Seventh Option Period shall now be referred to collectively as the "Option Periods"
and individually as an "Option Period."

6.    Due Diligence Period. Tenant shall diligently seek approvals for Tenant's Work
for a period of sixty (60) days following the Effective Date (the "Due Diligence Period").
Landlord will reasonably cooperate with Tenant, at no cost to Landlord, regarding
Tenant's obtaining building permits required for Tenant's Work. In the event that Tenant
is unable to ascertain that it will be able to obtain a building permit for Tenant's Work
within the Due Diligence Period, then Tenant may elect to forego performing Tenant's
Work, which election Tenant shall make by delivering notice thereof to Landlord within
ten (10) days following the expiration of the Due Diligence Period. If Tenant timely
elects to forego performing Tenant's Work, this First Amendment shall be void and of no
further force or effect.

7.    Notice. Landlord and Tenant agree that Section 18 of the Lease is hereby
amended delete the notice addresses for Tenant and to Landlord's attorney and to replace
such addresses with the following:

To Tenant:

The Krystal Company
Attn: Real Estate
1455 Lincoln Pkwy E., Suite 600
Dunwoody, GA  30346
Facsimile: (770) 351-4740

with a copy to:

Argonne Capital Group, LLC
3060 Peachtree Rd NW, Suite 400
Atlanta, GA 30305
Attn: Karl Jaeger
Facsimile: (404) 364-2985

and a copy to:

McGuire Woods LLP
1230 Peachtree St NE, Suite 1230

3



Atlanta, GA 30309
Attn: John T. Grieb, Esq.
Facsimile: (404) 443-5762

Copies to Landlord to:

Lazer Aptheker Rosella & Yedid, PC
225 Old Country Road
Melville, New York 11747
Attn: Amy L. Silver, Esq.

8. Broker. Landlord and Tenant each represents that this First Amendment was not brought about by a broker, and all negotiations with respect to this First Amendment were conducted exclusively between Landlord and Tenant. Landlord and Tenant each agrees that if any claim is made for commissions by any broker through or on account of any acts of the representing party, such party will hold the other party free and harmless from any and all liabilities and expenses in connection therewith, including the other party's reasonable attorneys' fees and disbursements.

9. Amendment. The parties hereby ratify and confirm all of the terms, covenants and conditions of the Lease, except to the extent that those terms, covenants and conditions are amended, modified or varied by this First Amendment. Unless expressly modified or amended herein, the Lease shall remain unmodified and in full force and effect. In the event of any inconsistencies between the provisions and conditions of the Lease and this First Amendment, the provisions and conditions of this First Amendment shall govern.

10. Counterparts. This First Amendment may be executed in counterparts, all of which when taken together shall constitute one original document. The parties agree that copies of the signature pages of this First Amendment transmitted by email of a .pdf, .tiff, JPEG or similar file or otherwise electronically transmitted, whether sent to the other party or to such other party's counsel, shall be deemed to have been definitively executed and delivered, and with the same force and effect as if manually signed and delivered, and for all purposes whatsoever.

4



**IN WITNESS WHEREOF,** the parties hereto have caused this First Amendment to be executed as of the day and year shown opposite their respective signatures.

LANDLORD:

JMT LAND HOLDINGS, LLC

By: John M. Tanenbaum
Title:   Authorized Signatory

TENANT:

THE KRYSTAL COMPANY

Name: Brian Blosser
Title: VP Development + Construction

5



## EXHIBIT "A"

### Legal Description of Krystal # RME002
### Located at 519 Shorter Avenue NW, Rome, Georgia 30165

All that certain piece, parcel or tract of land situate, lying and being in Land Lot 239, 23rd District, 3rd Section in the City of Rome, County of Floyd, State of Georgia, containing 0.676 acres according to a plat entitled "ALTA/ACSM Land Title Survey for the Krystal Company", dated November 27, 2012, prepared by Site Design, Inc. and having, according to said plat. The following metes and bounds to wit:

Beginning at an old ½ inch solid rod (bent) located on the eastern right of way of South Division Street at the northeastern end of a mitered corner marking the intersection of eastern right of way of South Division Street and the southern right of way of Shorter avenue; thence running along said mitered corner North 59 degrees 21 minutes 29 seconds East 35.69 feet to an old concrete monument located on the southern right of way of Shorter Avenue; thence turning and running along said right of way the following courses and distances: South 74 degrees 26 minutes 29 seconds East 170.45 feet to an old concrete monument; thence South 87 degrees 50 minutes 09 seconds East 29.84 feet to an old concrete monument; thence South 17 degrees 12 minutes 34 seconds West 7.70 feet to a point; thence South 75 degrees 31 minutes 28 seconds East 6.00 feet to a point; thence North 17 degrees 11 minutes 27 seconds East 9.02 feet to a point; thence South 86 degrees 24 minutes 52 seconds East 15.39 feet to an old hole at the joint corner of Jerry King Property, now or formerly; thence turning and leaving said right of way and running along the common line of said King property South 15 degrees 20 minutes 00 seconds West 138.51 feet to an old 5/8 inch rebar iron pin located on the common line of Charlie Hack Property, now or formerly; thence turning and running along the common line of said Hack North 73 degrees 22 minutes 41 seconds West 222.89 feet to a point in concrete located on the eastern right of way of South Division Street; thence turning and running along said right of way North 02 degrees 14 minutes 40 seconds East 99.74 feet to the point and place of beginning.

45854229_1

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have on this day electronically filed the foregoing **Objection to Proposed Cure Amounts Under Real Property Leases; and Reservation of Rights** using the Bankruptcy Court's Electronic Case Filing program which sends a copy of this document to all registered parties in the above captioned jointly administered case.

This 27th day of April, 2020.

          **COHEN POLLOCK MERLIN TURNER, P.C**.
          Counsel for DJ Rash Realty Company, LLC,
          Hannah Rocks, LLC, and JMT Land Holdings, LLC

              By:  _____/s/ Bruce Z. Walker_____
                     Mark S. Marani
                     Georgia Bar No. 469960
                     Bruce Z. Walker
                     Georgia Bar No. 731260

3350 Riverwood Pkwy., Suite 1600
Atlanta, GA 30339
(770) 857-4818; (770) 857-4819 (fax)
mmarani@cpmtlaw.com
bwalker@cpmtlaw.com

1