IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-61065-PWB |
| THE KRYSTAL COMPANY, | ) | |
| | ) | Chapter 11 Proceedings |
| Debtor. | ) | |

**THE CARPELLO FAMILY TRUST'S OMNIBUS RESPONSE AND OBJECTION TO (1) DEBTOR'S MOTION FOR ENTRY OF AN ORDER EXTENDING EXCLUSIVITY PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF, (2) DEBTOR'S MOTION FOR AN ORDER EXTENDING TIME TO ASSUME OR REJECT UNEXPIRED LEASES THROUGH AND INCLUDING AUGUST 16, 2020, AND (3) DEBTOR'S PROPOSED CURE COSTS**

Landlord, The Carpello Family Trust ("Carpello"), by and through its undersigned attorneys, hereby files this Omnibus Response and Objection to (1) Debtor's Motion for Entry of an Order Extending the Exclusivity  Periods During Which Only the Debtor May File a Plan and Solicit Acceptances Thereof ("Exclusivity Motion") (Docket 316); (2) Debtor's Motion for an Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Through and Including August 16, 2020 ("Lease Motion") (Docket 315); and (3) Debtor's Proposed Cure Costs ("Proposed Cure Costs") (Docket 310).  The

substance of Carpello's Omnibus Response and Objection is set out below in the

Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## FACTUAL BACKGROUND

1.      Debtor, The Krystal Company ("Krystal"), filed its Chapter 11 bankruptcy

petition on January 19, 2020 ("Petition Date"), in conjunction with the two other

related Debtor cases in this Jointly Administered proceeding.  At the time of

Krystal's filing, Krystal was in default under that certain Lease Agreement dated

July 1, 2016, as amended by First Lease Agreement dated January 18, 2020 (the

day before the Chapter 11 filing) ("Lease"), whereby Carpello leased to Krystal a

Krystal restaurant located at 9986 US Highway 64, Lakeland Tennessee, 38002

(the "Premises").  As of the Petition Date, Krystal had paid rent through October

2019, but no rent was paid for November 2019 through the Petition Date.

Minimum Rent, together with Minimum Rent Adjustments, Additional Rent, late

fees and other charges, as provided by the Lease was $8,414.13 per month. (A

copy of the Lease is attached to Carpello's Proof of Claim which Proof of Claim

and Lease, as amended, is attached hereto as Exhibit A and incorporated herein by

reference.)

2.      As stated earlier, prepetition rent and late fees for November and December

2019 and January 1 - 18, 2020, have not been paid.  No stub rent (January 19 – 31)

has been paid although the rent was renegotiated and reduced at Krystal's request

in the First Lease Amendment (signed the day before the Chapter 11 filing).

Although rent was paid for February and March 2020, property taxes for 2019,

which first became due on February 29, 2020 in the amount of $19,433.34 (the

payment of which were a critical part of the renegotiated First Amendment), have

not been paid.  No rent has been paid for April 2020.  No late fees have been paid

for April.  As of the date of the filing of this Omnibus Response and Objection, the

April 2020 rent, property taxes and late fees remain unpaid.

3.      The Debtor, surprisingly, contends that because the cases are large and

complex and that a sale process is underway that Carpello and other landlords are

not damaged beyond the compensation provided under the Bankruptcy Code.

(Lease Motion paragraph 14).  The Debtor provides a representation that the lease

defaults will be cured if the leases are assumed and assigned.

        However, contrary to these representations and false promises, the Debtor

remains in violation of important related provisions of the Bankruptcy Code by

failing to "timely" pay rent or "promptly cure" defaults as required by the

Bankruptcy Code. 11 USC 365 (b)(1)(A); (d)(3).  Carpello and many of the

3

landlords are suffering the Debtor's failure to pay rent post-petition, forcing the

landlords to charge late fees and hire and pay attorneys to protect their interest, all

costs and fees which must be paid as part of any future  assumption and assignment

and adequate assurance of future performance.  Carpello real property taxes due

February 29, 2020, also remain unpaid.

As a result, administrative expenses are growing as the Debtor remains

unable to keep current with its post-petition payment obligations and its budget

apparently due to "the sale process that is ongoing" and the fact that the cases are

"complex" with many leases to evaluate in light of many non-performing leases.

However, the Debtor appears also to have problems with deciding what leases it

wants to assume and assign, as it has not identified any prospective buyers or

offered any information regarding adequate assurance of future performance. The

cure costs remain woefully underestimated.  This forces landlords, some of whom,

like Carpello, are small businessmen who rely on the monthly rent to endure the

difficulties of continuing defaults by a debtor who is not paying its obligations as

required by the Bankruptcy Code. 11 USC 365(b)(1)(A);(d)(3).  Additional

difficulties with nonperforming leases, past disputes with vendors, and the effect of

the Coronavirus are all being offered as reasons rent is not being paid or as cause

for the requested extension.  However, upon information and belief, Krystal has

4

various cash collateral Orders in place where Krystal is authorized to use the

Prepetition Secured Parties' (as defined therein) cash collateral to pay

administrative expenses, including rent payments.  Krystal has not performed

under those Orders nor in accordance with its approved Budget.

4.     The current amount owing under the Lease (the actual Cure Costs), as of

April 24, 2020 is as follows:

Prepetition rent and late fees:

| | |
|---|---|
| November rent | $ 8,414.13 |
| November late fees | $   420.71 |
| December rent | $ 8,414.13 |
| December late fees | $   420.71 |
| January stub rent | $ 4,885.56 |
| January late fees | $   244.28 |
| Interest on past due rent | $   156.00 |
| | |
| Total Prepetition rent and fees | $22,955.52 |

Post-petition rent, charges and late fees:

| | |
|---|---|
| January stub rent (January 19-31) | $ 2,489.50 |
| January late fees | $   124.47 |
| April rent | $ 5,833.33 |
| April late fees | $   291.66 |
| Post-petition property taxes | $19,433.34 |
| Interest on past due property taxes | $   247.50 |
| Post-petition interest on unpaid Prepetition rent | $   161.85 |
| Attorneys' Fees | |
|    Prepetition | $   732.50 |
|    Post-petition | $ 4,500.00 |

      Total Post-petition rent, charges and late fees      $33,814.15

**TOTAL PRE AND POST PETITION RENT, FEES AND
     CHARGES:**      **$56,769.67**

5.     These jointly administered cases are not trending well towards a successful

reorganization as little information has been supplied by Krystal as to assumptions

and assignments, information necessary for a confirmable plan or accurate cure

costs.

<strong>LEGAL ARGUMENT</strong>

     **A.    Response to Exclusivity Motion**

6.     Debtor seeks to extend the exclusivity deadlines of §§ 1121(b) and (c) by

120 days each, until September 15, 2020 and November 14, 2020.  Given the

record in these jointly administered cases, there is no legal basis to grant such

extreme extensions.  Section 1121(d)(1) of the Bankruptcy Code allows extensions

of the exclusivity extensions only upon a showing of "cause."  Carpello does not

dispute the well-recognized case law that holds that requests for extensions are

"within the sound discretion of the bankruptcy judge, and the determination is fact-

specific."

7.     However, courts have also held that establishing "cause" to support such

extension requests must be analyzed under a nine-part test, as enunciated in *In re*

*Express One International, Inc*., 194 B.R. 98, 100 (Bankr.E.D.Tex. 1996) and

cases cited therein as follows:

> (a) the size and complexity of the case;
> (b) the necessity of sufficient time for the Debtor to negotiate a
> plan of reorganization and prepare adequate information;
> (c) the existence of good faith progress toward reorganization;
> (d) the fact that the debtor is paying its bills as they become
> due;
> (e) whether the debtor has demonstrated reasonable prospects
> for filing a viable plan;
> (f) whether the debtor has made progress in negotiations with
> its creditors;
> (g) the amount of time which has elapsed in the case;
> (h) whether the debtor is seeking an extension of exclusivity in
> order to pressure creditors to submit to the debtor's
> reorganization demands; and
> (i)  whether an unresolved contingency exists.

See, e.g. *In re Grand Traverse Development Co. Ltd*., 147 B.R. 418 (Bankr.W.D.

Mich.1992); *In re McLean Industries, Inc*., 87 B.R. 830 (Bankr.S.D.N.Y.1988); *In

re Wisconsin Barge Line, Inc*. 78 B.R. 946 (Bankr.E.D.Mo.1987).

8.     In the present case, the Debtor cannot satisfy these components. The Debtor

is not demonstrating good faith in formulating a plan, nor is the Debtor paying its

administrative claims as they become due.  As a result, an extension would further

damage Carpello and the other landlords by the Debtor's failure to pay

administrative rent which remains due.  The Debtor has not yet demonstrated any

reasonable prospect for filing a viable plan, and the Debtor has not made

7

meaningful progress in negotiations with its large group of lease creditors.  The

Debtor attempts to establish "cause" by suggesting they anticipate engaging in a

sale process and that the speculative and elusive "sale" will become the basis of a

plan that might be filed in these Cases.  (See Exclusivity Motion, at page 5.)

This is not legally sufficient "cause" to support the Exclusivity Motion.

More specifically, Debtor has not yet presented accurate cure costs for many of the

leases to be assigned, has not identified which leases are to be assumed and

assigned, and most importantly has not even paid post-petition administrative rent

and costs as required by its budget to many landlords, including Carpello.

9.      Debtor's exclusivity extension requests are also overly aggressive, especially

given the lack of § 1121(d)(1) "cause."  Under no circumstances should the

exclusivity periods be extended for 120 days each.  Debtor's Exclusivity Motion is

not legally supported and must be denied.

**B.      Response to Lease Motion**

10.     The Debtor also seeks to extend the deadline to assume or reject its non-

residential real property leases, which are the primary assets of this debtor, for a

period of 90 additional days under § 365(d)(4)(B)(i) until August 16, 2020.  That

section of the Bankruptcy Code also requires that such extensions may only be

granted "for cause."

11.    The *In re Burger Boys, Inc*., 94 F.3d 755 (2nd Cir. 1996) case, also cited by

the Debtor, provides a four-part test to determine whether "cause" for §

365(d)(4)(B)(i) motions may be granted.  Those four components are:

> (1) whether the debtor was "paying for the use of the property;"
> (2) whether "the debtor's continued occupation . . . could
> damage the lessor[ ] beyond the compensation available under
> the Bankruptcy Code;"
> (3) whether the lease is the debtor's primary asset; and
> (4) whether the debtor has had sufficient time to formulate a
> plan of reorganization."

94 F.3d at 761, quoting *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105-06

(2nd Cir. 1982).

12.    Other cases concur with the *Burger Boys'* four-part test and give additional

factors to consider.  In *In re Panaco, Inc*. 2002 WL 31990368, at *5 (Bankr. S.D.

Tex. 2002), the court set out a seven-part test, to determine whether "cause" exists:

> (a)    whether the lease is the debtor's primary asset;
> (b)    whether the debtor has had sufficient time to intelligently
> appraise its financial situation and potential value of its assets in
> terms of the formulation of a plan of reorganization;
> (c)    whether the lessor continues to receive rent for the use of the
> property;
> (d)    whether the debtor's continued occupation could damage the
> lessor beyond the compensation available under the Bankruptcy
> Code;
> (e)    whether the case is exceptionally complex and involves a
> large number of leases;
> (f)    whether the debtor has failed or is unable to formulate a plan
> when it has had sufficient time to do so; and

(g)    any other factors bearing on whether the debtor has had a
reasonable amount of time in which to decide whether to assume or
reject the lease.

See also, *In re Beautyco, Inc*., 307 B.R. 225, 231 (Bankr. N.D. Okla. 2004); *In re*

*Adelphia Communications Corp*., 291 B.R. 283, 293 (Bankr. S.D.N.Y. 2003); and

*In re Service Merchant Co., Inc*., 256 B.R. 744, 748 (Bankr. M.D. Tenn. 2000).

Applying these four- and seven-part tests to the present case shows that the

Debtor has failed to show "cause" to support the granting of the Lease Motion.

Namely:

- Carpello is not receiving rent for Krystal's use of the property.

- The Lease is not the Debtor's primary asset, but one of hundreds.

- The Debtor has had sufficient time to formulate a confirmable plan and
  identify the leases it wants to assume and assign to a buyer.

- Krystal's continued occupancy of the premises for the remaining period
  under the Lease without timely paying rent will damage Carpello beyond
  the rejection damage cap of one year's rent.

- Krystal remains in violation of 11 USC 365(b)(1);(d)(3)

13.    The Debtor has not met its burden to show "cause" sufficient to justify an

extension of 90 additional days to August 16, 2020 to decide whether to assume or

reject their leases.  Carpello has been damaged by Krystal's prepetition failure to

pay rent and continues to be damaged by Krystal's ongoing failure to pay rent post-petition.  For all these reasons, the Lease Motion must be denied.

### C.    Objection to Cure Costs

14.    In the Sale Notice, the Debtor contends that $31,075.72 is the amount of unpaid monetary defaults or "Cure Costs" under the Lease which the Debtor is required to cure in order to assume or assign the Lease pursuant to 11 USC § 365(b)(1)(A);(d)(3).  The Debtor has provided no itemization or explanation of same.

15.    Capello objects to the cure amount listed by Debtor.  The correct amount is at least $56,769.67 as set forth hereinabove in paragraph 4, plus accruing interest, late fees, attorney's fees and other administrative charges including future rent all as authorized by the Lease.  (*See* Lease paragraph 11, Rent Addendum paragraph 4 and First Lease Amendment paragraph 2).  Carpello's Proof of Claim filed in this case, a copy of which is attached hereto as Exhibit "A," reflects an itemization of the cure costs as of the date of its filing March 25, 2020, which were $51,148.59. Carpello reserves the right to amend these cure costs and to add additional charges.

16.    Moreover, the Lease contains provisions for payment of attorney's fees (Lease paragraph 11), and all other appropriate costs, including property taxes.

Such fees are and remain recoverable in curing lease defaults under similar circumstances. *In re Child World, Inc*. 161 BR 349 (SDNY 1993).

17.    Additionally, the Debtor has not provided any information regarding adequate assurance of future performance by any successful bidder at a sale, preventing a knowledgeable assessment of what a possible successful bidder might offer. However, the Sale Notice requires objections to whether a successful bidder can provide adequate assurance. So, as a result, Carpello also objects to the lack of adequate assurance or necessary information.

## CONCLUSION

18.    Chapter 11 relief can only be afforded where the debtor has a reasonable prospect for an effective reorganization over a reasonable period of time. Chapter 11 was never intended to be a vehicle through which a debtor may incur more debt and not pay its administrative expenses. Here, Debtor has shown no reasonable prospect for a successful reorganization and is continuing to accrue more debt, post-petition.

19.    Based on the facts recited above and the legal arguments state herein, Carpello respectfully urges the Court to: (1) deny the Exclusivity Motion, (2) deny the Lease Motion, and (3) reject the proposed Cure Costs, and for such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 27th day of April, 2020.


/s/ *Joseph J. Burton, Jr.*
Joseph J. Burton, Jr.
Georgia Bar No. 097875

MOZLEY, FINLAYSON & LOGGINS LLP
1050 Crown Pointe Parkway
Suite 1500
Atlanta, Georgia 30338
Telephone:  (404) 256-0700
Facsimile:  (404) 250-9355
jburton@mfllaw.com
*Attorneys for Creditor Carpello Family Trust*

# Exhibit A

Case 20-61065-pwb    Claim 943    Filed 03/25/20    Desc Main Document    Page 1 of 48

**Fill in this information to identify the case:**

Debtor 1    The Krystal Company

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Northern District of Georgia

Case number  20-61065

---

Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

---

| **Part 1:** | **Identify the Claim** |
| --- | --- |

| 1. Who is the current creditor? | The Carpello Family Trust |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor  Joseph Carpello |

| 2. Has this claim been acquired from someone else? | ☑ No |
| | ☐ Yes.  From whom? |

| 3. Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- | --- |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Mozley, Finlayson & Loggins/Attn: Jay Burton | |
| | Name | Name |
| | 1050 Crown Pointe Parkway, Suite 1500 | |
| | Number       Street | Number       Street |
| | Atlanta              GA        30338 | |
| | City                State           ZIP Code | City                State           ZIP Code |
| | Contact phone  404-256-0700 X134 | Contact phone |
| | Contact email  jburton@mfllaw.com | Contact email |
| | | |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | __ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ | |

| 4. Does this claim amend one already filed? | ☑ No | | |
| --- | --- | --- | --- |
| | ☐ Yes.  Claim number on court claims registry (if known) _____ | Filed on _____ | |
| | | | MM / DD / YYYY |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
| | ☐ Yes.  Who made the earlier filing? _____ |

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|-------------------------------------------------------------------|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**   $_____51,148.39 .   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).
See attached Exhibit A

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Lease charges per lease attached hereto as Exhibit B

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                   $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:** $_____23,688.02 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____23,688.02

**Annual Interest Rate** (when case was filed)___8.45 %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____23,688.02

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                                    **Proof of Claim**                                    page 2

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | |
|---|---|---|
| | ☑ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ 19,545.81 |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(_2_) that applies. | $_____ 7,914.56 (See Exhibit A) |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:    Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
|---|---|

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    **3 / 25 / 20**
MM / DD / YYYY

*Signature*

**Print the name of the person who is completing and signing this claim:**

| Name | Joseph Carpello | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Trustee | | |
| Company | The Carpello Family Trust | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1693 Benik Road | | |
| | Number        Street | | |
| | La Habra Heights | CA | 90631 |
| | City | State | ZIP Code |
| Contact phone | 714-529-0111 | Email | jcarpello@bkolaw.com |

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) |  |
|  | ) |  |
| THE KRYSTAL COMPANY, *et al.*, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Case No.:  20-61065 |
|  | ) |  |
| _____ | ) | (Jointly-Administered) |
|  | ) |  |

## EXHIBIT A TO PROOF OF CLAIM

The following itemizes Pre and Post-Petition Charges due under the Carpello Family Trust, Joseph and Katherine Ann Carpello, Trustees ("Carpello Trust") Lease as amended between The Krystal Company ("Lessee") and The Carpello Family Trust ("Lessor") dated July 1, 2016, as amended January 18, 2020.

| PRE-PETITION CHARGES |  |
|---|---|
| A.  Past Due Rent |  |
| 1.   Unpaid Rent – November 2019 | $8,414.13 |
| 2.   Unpaid rent – December 2019 | $8,414.13 |
| 3.   Unpaid Rent – January 2020 (January 1 – 18) @ $271.42/day x 18 days | $4,885.56 |
| **TOTAL PAST DUE RENT** | **$21,713.82** |
| B. Late Charges (5% of each rent installment) |  |
| 1.   November 2019 | $420.71 |
| 2.   December 2019 | $420.71 |
| 3.   January 2020 ((January 1-18, 2020) | $244.28 |
| **TOTAL LATE CHARGES ON PAST DUE RENT** | **$ 1,085.70** |
| C. Interest (8.45% in Tennessee = per diem rate of $1.95/day per installment, not including 10-day grace period) |  |
| 1.   November 2019 - (46 days x $1.95/day) | $89.70 |
| 2.   December 2019 (27 days x $1.95/day) | $52.65 |
| 3.   January 2020 (7 days x $1.95/day) | $13.65 |
| **TOTAL INTEREST ON PAST DUE RENT** | **$ 156.00** |
| D. Legal Fees - Tennessee Eviction Case: Harkavy Shainberg Kaplan PLC 6060 Poplar Avenue, Suite 140 Memphis, TN 38119 | $732.50 |

| | |
|---|---|
| **TOTAL LEGAL FEES** | **$ 732.50** |
| **TOTAL PRE-PETITION LEASE CLAIMS** | **$23,688.02** |
| | |
| **POST-PETITION CHARGES (ADMINISTRATIVE CLAIM)** | |
| A. Property Taxes Due on February 29, 2020 (Shelby County and City of Lakeland, Tennessee) | **$19,433.34** |
| B. Interest on past due property taxes from February 29, 2020 through March 25, 2020<br>TN legal rate of interest 8.45% x $4.50 per diem x 25 days = $112.47 | **$112.47** |
| C. Post-petition Rent (January 19 – 31) | **$3,528.46** |
| D. Post-petition Interest on unpaid pre-petition rent thru March 25 calculated at $1.95/day for 66 days (January 19, 2020 - March 25, 2020) = $128.70 | |
|    1.  November 2019 | $128.70 |
|    2.  December 2019 | $128.70 |
|    3.  January 2020 | $128.70 |
| **TOTAL Post-petition Interest on Unpaid Pre-petition Rent through March 25** | **$386.10** |
| E. Post-petition Legal Fees to date (Mozley, Finlayson & Loggins LLP) | **$4,000.00** |
| | |
| **TOTAL POST-PETITION LEASE CLAIMS** | **$27,460.37** |
| **TOTAL CLAIM (PRE AND POST-PETITION)** | **$51,148.39** |

EXHIBIT B

**Krystal #** MFS024
**Address:** 9986 US Highway 64
Lakeland, Tennessee 38002

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made and entered into as of the ⟨15⟩ day of ⟨July⟩ , 2016, by and between:

    (i)    Joseph Carpello and Katherine Ann Carpello, as Trustees of the CARPELLO FAMILY TRUST DATED FEBRUARY 5, 2004 ("Landlord"), and

    (ii)    THE KRYSTAL COMPANY, a Tennessee corporation ("Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of that certain tract of land described on Exhibit "A", attached hereto and by this reference incorporated herein (hereinafter called the "Land"), on which a Krystal restaurant is constructed (the "Building");

WHEREAS, Tenant wishes to lease from Landlord the Land and Building (hereinafter called the "Premises");

WHEREAS, Tenant intends to operate a Krystal Restaurant from the Premises;

NOW, THEREFORE, in consideration of the payment of the rent and the keeping and performance of the covenants and agreements by Tenant as hereinafter set forth, Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, together with all rights and privileges appurtenant thereto as may be necessary or convenient to Tenant's business, inclusive of all easements benefiting the Premises, on the terms and conditions hereof.

The following additional stipulations are hereby declared to be covenants of this Lease and shall, unless otherwise expressly stated, be applicable at all times throughout the term of this Lease and any extension or renewal thereof:

## 1.    DEFINITIONS

For purposes of this Lease, the following terms shall have the definitions ascribed to them:

"Affiliate" shall mean any party that controls or is controlled by or is under common control with a party. For purposes of this definition, "control" and correlative terms shall mean the possession, directly or indirectly, of the power to cause the direction of the management and policies of such party, whether through the ownership of voting securities, by contract or otherwise.

"Effective Date" shall mean the date set forth at the beginning of this Lease.

1

"Landlord" shall mean Joseph Carpello and Katherine Ann Carpello, as Trustees of the Carpello Family Trust Dated February 5, 2004, its successors and assigns.

"Lease" shall include this Lease Agreement and all amendments hereto, if any, entered into from time to time hereafter, together with the Rent Addendum and exhibits attached hereto.

"Lease Year" shall mean a fiscal period beginning on the Rent Commencement Date (and each anniversary thereof) and expiring on the last day of the twelfth (12th) month thereafter. In the event the Rent Commencement Date is not the first (1st) day of a calendar month, then the Lease Year shall commence on the first (1st) day of the calendar month following the Rent Commencement Date.

"Rent" shall mean the rent payable under this Lease as set forth in the Rent Addendum attached hereto and incorporated herein, and shall include Annual Rent (as defined in the Rent Addendum) and all other items described in this Lease as "additional rent".

"Rent Commencement Date" shall mean the date on which Landlord delivers possession of the Building to Tenant, which date shall be the Effective Date hereof unless Landlord and Tenant otherwise agree in writing.

"Tenant" shall include the named Tenant and any assignee or sublessee thereof pursuant to an assignment or sublease under Section 15 of this Lease.

## 2.    TERM AND RENT

(a)    Term. The term of this Lease shall begin on the Effective Date and shall expire on the date that is fifteen (15) Lease Years after the Rent Commencement Date (hereinafter the "Termination Date"), unless previously terminated or renewed or extended as provided herein.

(b)    Rent. Rent shall be due and payable as provided in the Rent Addendum attached hereto and incorporated herein, without notice, demand, deduction, or set-off.

(c)    Acceptance of Premises. Tenant confirms that Tenant has accepted the Premises in their current "as is" condition; that the Building and other improvements have been completed to Tenant's satisfaction; and that the Premises are suitable for Tenant's purposes. Tenant acknowledges that it's development partner owned the Land and constructed the Building prior to selling same to Landlord, concurrently with the Effective Date hereof and that Landlord has never had physical possession of the Premises.

## 3.    ALTERATIONS AND IMPROVEMENTS, INVESTMENT TAX CREDIT, MECHANIC'S LIENS, LANDLORD'S DISCLAIMER

(a)    Alterations and Improvements.

(i)    Tenant's Property. Tenant shall be permitted to install, use on and about, and remove from the Premises at any time and from time to time all trade fixtures and other personal property (exclusive of lighting, electrical, and heating and air conditioning improvements) which are not a component of the building located or to be located on the Premises (hereinafter referred to as the "Tenant's Property"), all of which at all times shall remain the

2

property of Tenant with the right of removal (subject to Paragraph 3(d) below) at the expiration of this Lease. Tenant's Property shall include: (1) removable decor items and office equipment; (2) building lettering, signs, sign posts and sign standards; (3) unattached food and customer service equipment; and (4) food, customer service equipment and any other equipment attached to the building by bolts and screws and/or by utility connections, or other means that can be removed without damage to the Premises, including without limitation, walk-in refrigerators and freezers, remote refrigeration systems, exhaust systems and hoods, and water heaters.

   (ii) <u>Subsequent Improvements</u>. Tenant shall have the right, without abatement, deduction or set off in Rent, to make any additions, alterations, changes and improvements, structural and nonstructural, including but not limited to tearing down and reconstructing a new restaurant Building, construction of additional buildings and additions to the then existing Building, as Tenant shall desire; provided (A) that such changes are consistent with Tenant's prototypical restaurant building, and (B) all such construction shall be completed  in a workmanlike manner and in material compliance with all laws, building codes and ordinances applicable thereto, at Tenant's sole expense and will not reduce the size of the Building or the fair market value of the Premises. Tenant is hereby irrevocably vested with a power of attorney from Landlord to execute any and all applications, permits, and/or other submittals required by any governmental authority on behalf of Landlord.

   (iii) <u>Upon Termination, Subletting or Assignment</u>. Subject to the requirements of this Section 3, Tenant shall have the right, without abatement, deduction or set off in Rent, at its option and expense, to redecorate or otherwise remodel the Premises upon any termination hereof or upon any permitted subletting or assignment in such manner as will, without reducing the fair market value thereof, avoid the appearance of the Krystal Restaurant operated under this Lease; provided, however, that in addition to the other requirements of this Section 3, Tenant shall not impair the structural condition of the Premises, or reduce the size of the buildings on the Premises.

   (iv) <u>Landlord's Property</u>. All subsequent improvements referred to in Paragraph 3(a)(ii) above, all improvements upon termination, subletting or assignment referred to in Paragraph 3(a)(iii) above, and any and all other additions, alterations, changes and improvements of any type (other than those that can be removed without causing damage to the Premises) shall be deemed to be a part of the Premises and the sole property of Landlord.

  (b) <u>Investment Tax Credit</u>. Landlord hereby grants Tenant the right and privilege of applying for and receiving all investment tax credits, if any, under the Internal Revenue Code which may be available with respect to the building and other improvements to be constructed. To this end, Landlord agrees to execute all such further documents and supply such additional information as may be required to make such election effective.

  (c) <u>Mechanic's and Other Liens</u>. Tenant shall not do or suffer anything to be done whereby the Premises, or any part thereof, may be encumbered by a mechanic's, materialman's, or other lien for work or labor done, services performed, materials, appliances, or power contributed, used, or furnished in or to the Premises or in connection with any operations or any other activity of Tenant. If, whenever and as often as any lien is filed against the Premises, or any part thereof, purporting to be for or on account of any labor done, materials or services furnished in connection with any work in or about the Premises, done by, for or under the authority of Tenant, or anyone claiming by, through or under Tenant, Tenant shall discharge the same of record within twenty

(20) business days after service upon Tenant of written notice of the filing thereof; provided, however, Tenant shall have the right to remove the lien as an encumbrance upon the Premises by bonding same in accordance with applicable law and to contest any such lien; provided further that Tenant shall diligently prosecute any such contest, at all times effectively staying or preventing any official or judicial sale of the Premises under execution or otherwise, and, if unsuccessful, satisfy any final judgment against Tenant adjudging or enforcing such lien or, if successful, procuring record satisfaction or release thereof.

(d)    Landlord's Disclaimer.  All of Tenant's Property placed in or upon the Premises by Tenant shall remain the property of Tenant with the right to remove the same at any time during the term of this Lease.  Landlord, if requested by Tenant, agrees to execute, acknowledge and deliver an instrument in the form customarily used by any financier of Tenant's Property and reasonably satisfactory to Landlord, by which Landlord subordinates its lien rights to the lien rights of any equipment lender or lessor of Tenant's Property, and to all rights of levy for distraint for rent against same; provided any damage caused by, or resulting from the removal of any of Tenant's Property or other personal property (including the leaving of holes or other openings in the roof or exterior of the building) shall be promptly repaired by Tenant.

## 4.    DESTRUCTION OF PREMISES; INSURANCE

(a)    If the Premises are damaged or destroyed by fire, flood, tornado or other element, or by any other casualty, this Lease shall continue in full force and effect and Tenant shall, as promptly as possible, restore, repair or rebuild the Premises to substantially the same condition as it existed before the damage or destruction, including any improvements or alterations required to be made by any governmental body, county or city agency, due to any changes in code or building regulations.  Tenant shall for this purpose use all, or such part as may be necessary, of the insurance proceeds received from insurance policies required to be carried under the provision of Paragraph 4(b) of this Lease. Should the Premises be damaged or destroyed by any of the foregoing described casualties within the last Twenty-Four (24) months of the original term or of any extended or renewed term of this Lease, then to the extent that the Premises are untenantable or unsuitable, in Tenant's reasonable opinion, for continued use in the normal conduct of Tenant's business, Tenant shall have the right, exercisable by written notice to Landlord given within thirty (30) days after the date of such damage or destruction, to terminate this Lease effective upon the date of such damage or destruction. If Tenant terminates this Lease as thus provided Landlord shall be entitled to the insurance proceeds on the Premises as Landlord's interest may appear, but not to the proceeds of insurance carried by Tenant on Tenant's Property or business interruption regarding extra expense or loss of income; provided, however, Tenant shall not have the right to terminate this Lease unless (i) the damage or destruction of the Premises was caused by a peril which was insured against as required by the provisions of Paragraph 4(b) of this Lease; and (ii) at the time of such damage and destruction the said insurance policies required to be carried by Tenant were in the amounts required herein.

(b)    Tenant, at its expense, shall throughout the term of this Lease and any extension or renewal thereof, keep the Premises insured with "Special Form Causes of Loss" coverage (as such term is used in the insurance industry), including coverage for glass breakage, vandalism and malicious mischief, and for fire, windstorm, and other casualty damage for one hundred percent (100%) insurable replacement value (excluding footings and foundations), inclusive of $250,000 ordinance and law limit (coverages A, B and C combined).

4

(c)    Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense and as additional rent, commercial general liability insurance including product liability covering the Premises (occurrence basis) covering bodily injury, property damage and personal injury, naming Landlord as an additional insured as Landlord's interest may appear, with limits not less than One Million Dollars ($1,000,000.00) per occurrence, with a general aggregate of not less than Two Million Dollars ($2,000,000.00) and a "following form" umbrella liability policy or excess liability policy to include product liability in an amount of not less than Ten Million Dollars ($10,000,000.00) per occurrence.

(d)    Tenant shall maintain throughout the term of this Lease and any extension thereof, at its own expense, business interruption insurance covering risk of loss due to the occurrence of any of the hazards insured against under Tenant's insurance and providing coverage in an amount sufficient to permit the payment of Rents, any additional rent and continuing operating expenses payable hereunder for a period (in such case) of not less than twelve (12) months.

(e)    In the event the Premises are located in an area identified by the National Flood Insurance Program as an area having "special flood hazards" (zones beginning with "A" or "V"), Tenant shall maintain throughout the term of this Lease and any extension thereof, flood insurance with limits stipulated pursuant to the National Flood Insurance Program, with any deductible in excess of Twenty five Thousand Dollars ($25,000.00) to be approved by Landlord.

(f)    All insurance companies providing the coverage required under this Section 4 shall be selected by Tenant and shall be rated A minus (A-) or better by Best's Insurance Rating Service (or equivalent rating service if not available), and shall be licensed to write insurance policies in the state in which the Premises are located.  Tenant shall provide Landlord with copies of all policies or certificates (with proper endorsements) of such coverage for the insurance coverages referenced in this Section 4, and all commercial general liability and umbrella liability or excess liability policies shall name Landlord (and if Landlord is either a general or limited partnership, all general partners) and any mortgagee designated by Landlord as an additional insured as their interests may appear.  Any such coverage for additional insureds shall be primary and non-contributory with any insurance carried by Landlord or any other additional insured hereunder.  All property insurance policies shall name Landlord (and if Landlord is either a general or limited partnership), all general partners and any mortgagee designated by Landlord as an additional insured or as a loss payee as Landlord's interests may appear, and shall provide that all losses shall be payable as herein provided.  All such policies of insurance shall provide that the amount thereof shall not be reduced and that none of the provisions, agreements or covenants contained therein shall be modified or canceled by the insuring company or companies without thirty (30) days prior written notice being given to additional insureds except ten (10) days' notice for non-payment.  Such policy or policies of insurance may also cover loss or damage to Tenant's Property, extra expense and loss of income, and the insurance proceeds applicable to Tenant's Property, shall not be paid to Landlord or any mortgagee but shall accrue and be payable solely to Tenant.  In the event of a casualty, Tenant shall be responsible for any deficiency between the replacement cost of the Premises and the amount actually paid by the insurance company.

## 5.    **MAINTENANCE AND REPAIR**

Tenant shall, during the term of this Lease and any renewals thereof repair, replace and maintain the Premises and all buildings and improvements thereon (interior and exterior, structural

75558897_1

and otherwise) in good order and repair, ordinary wear and tear excepted.

## 6.    CONDEMNATION

(a)    In the event that the whole or any material part of the building on the Premises or a material portion of the Land (for purposes hereof, "material" shall mean more than 10% of the restaurant building on the Premises, more than 20% of the Land or a portion of the parking area that would reduce the number of available parking spaces below the minimum number of parking spaces required by code, unless suitable alternative parking is provided) shall be taken during the term of this Lease or any extension or renewal thereof for any public or quasi-public use under any governmental law, ordinance, regulation or by right of eminent domain, or shall be sold to the condemning authority under threat of condemnation, or if Tenant can demonstrate to Landlord's reasonable satisfaction that the Premises cannot be reasonably operated as the type of restaurant contemplated herein as a result of such condemnation, or if all reasonable access to the adjacent roadways from the existing or comparable curb cuts shall be taken or materially reduced, or if Tenant's activities on the Premises shall be disrupted following such condemnation such that, in Tenant's reasonable discretion, the Premises cannot be operated in the substantially the same manner (any of such events being hereinafter referred to as a "taking"), then in such event, Tenant shall have the option of terminating this Lease as of a date no earlier than the date of such taking, such termination date to be specified in a notice of termination to be given by Tenant to Landlord not fewer than fourteen (14) days prior to the date on which possession of the Premises, or part thereof, must be surrendered to the condemning authority or its designee.

(b)    In the event of any taking which does not give rise to an option to terminate or in the event of a taking which does give rise to an option to terminate under Section 6(a) hereinabove and Tenant does not elect to terminate, Landlord shall make its award available to Tenant and Tenant shall, to the extent of the award from such taking (which term "award" shall mean the net proceeds after deducting expenses of any settlement, or net purchase price under a sale in lieu of condemnation but shall exclude the value of Landlord's reversionary interest), promptly restore or repair the Premises and all improvements thereon (except those items of Tenant's Property which Tenant is permitted to remove under the terms of this Lease) to the same condition as existed immediately prior to such taking insofar as is reasonably possible.  If the estimated cost of restoration or repair shall exceed the amount of Landlord's award, Landlord shall promptly provide notice to the Tenant of such deficiency, and Tenant shall have the option to (i) terminate this Agreement by giving written notice to Landlord within thirty (30) days after Tenant receives notice from Landlord of the deficiency, or (ii) deposit with Landlord the amount of such excess.  In the event that Tenant elects under clause (ii) in the preceding sentence, the award and any excess shall be held in trust by Landlord and used, to the extent required, for the purpose of such restoration or repair.  A just and proportionate part of the Rent payable hereunder shall be abated from the date of such taking until ten (10) days after Tenant has restored same and thereafter the Rent shall be reduced in proportion to the reduction in the then rental value of the Premises after the taking in comparison with the rental value prior to the taking.  If the award shall exceed the amount spent or to be spent promptly to effect such restoration, repair or replacement, such excess shall unconditionally belong to Landlord and shall be paid to Landlord.

(c)    In the event of any partial taking where this Lease is not terminated, Tenant shall not be entitled (except for use in reconstruction) to any part of the compensation or award given

Landlord attributable to the taking of the fee of the Premises, but Tenant shall have the right to amounts (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

(d)    If this Lease is terminated by reason of a taking, then Landlord shall be entitled to receive the reimbursement for its entire award in any such condemnation or eminent domain proceedings or purchase in lieu thereof and Tenant hereby assigns to Landlord all of its right, title and interest in and to all and any part of such award, provided, however, Tenant shall be entitled to receive any portion of any award (i) to reimburse Tenant for any cost which Tenant may incur in removing Tenant's Property from the Premises and (ii) to compensate Tenant for loss of Tenant's business.

## 7.    TAXES AND ASSESSMENTS

(a)    Tenant shall pay prior to delinquency all taxes and assessments which may be levied upon or assessed against the Premises and all taxes and assessments of every kind and nature whatsoever arising in any way from the use, occupancy, possession or transfer of ownership of the Premises or assessed against the improvements situated thereon, together with all taxes levied upon or assessed against Tenant's Property. To that end, Landlord shall not be required to pay any taxes or assessments whatsoever which relate to or may be assessed against this Lease, the Rent and other amounts due hereunder, the Premises, improvements and Tenant's Property; provided, however, that any taxes or assessments which may be levied or assessed against the Premises for the period ending after the Termination Date hereof shall be prorated between Landlord and Tenant as of such date. Tenant will not be required to pay any income, gross receipts, excess profits, revenue, corporate, personal property, estate, inheritance, gift, devolution, succession, transfer, franchise, capital levy or capital stock tax.

(b)    Within ten (10) business days after Tenant receives the paid receipted tax bills, Tenant shall furnish Landlord with copies thereof. Tenant may, at its option, contest in good faith and by appropriate and timely legal proceedings any such tax and assessment; provided, however, that Tenant shall indemnify and hold harmless Landlord from any loss or damage resulting from any such contest, and all reasonable expenses of same (including, without limitation, all attorneys' and paralegal fees, court and other costs) shall be paid solely by Tenant. Landlord, at no cost or liability to Landlord, shall cooperate with Tenant and execute any document which may reasonably be necessary for any proceeding.

## 8.    COMPLIANCE, UTILITIES, SURRENDER

(a)    Tenant, at its expense: shall promptly comply with all municipal, county, state, federal and other governmental requirements and regulations, whether or not compliance therewith shall require structural or other changes in the Premises; will procure and maintain all permits, licenses and other authorizations required for the use of the Premises or any part thereof then being made and for the lawful and proper installation, operation and maintenance of all equipment and appliances necessary or appropriate for the operation and maintenance of the Premises; and shall comply with all easements, restrictions, reservations and other instruments of record applicable to the Premises.

7

(b)    Tenant shall pay all charges for heat, water, gas, sewage, electricity and other utilities used or consumed on the Premises and shall contract for the same in its own name. Landlord shall not be liable for any interruption or failure in the supply of any such utility service to the Premises.

(c)    Tenant shall peacefully surrender possession of the Premises, the buildings and other improvements thereon to Landlord at the expiration, or earlier termination, of the original term or any extended or renewed term of this Lease in good condition and repair, reasonable wear and tear excepted, and in broom clean condition with all debris removed.

## 9.    QUIET ENJOYMENT

Landlord covenants and warrants that Landlord has full power and authority to enter into this Lease, and that Tenant shall have and enjoy full, quiet and peaceful possession of the Premises, its appurtenances and all rights and privileges incidental thereto during the term hereof and any renewals or extensions, subject to the provisions of this Lease and any easements, restrictions, reservations and other instruments of record applicable to the Premises and in existence at the time of the conveyance of the Premises to Landlord by Tenant or thereafter.

## 10.    OPTION TO RENEW

Tenant shall have six (6) successive five (5) year options to extend this Lease for up to an additional thirty (30) years upon the same terms, covenants, conditions and rental as set forth herein provided that Tenant is not in Default hereunder at the commencement of such option period. In the event Tenant elects not to exercise each such five (5) year option, Tenant shall give written notice to Landlord not less than Six (6) months prior to the Termination Date. Should Tenant fail to give Landlord such timely written notice during the required period, this Lease shall automatically renew pursuant to the terms hereof.

## 11.    DEFAULT

(a)    If any one or more of the following events occur, said event or events shall be referred to as a "Default" under this Lease:

(i)    If Tenant fails to pay Rent or any other charges required under this Lease when same shall become due and payable, and such failure continues for ten (10) days or more after written notice from Landlord;

(ii)    If Tenant fails to perform or observe any term, condition, covenant, agreement, or obligation required under this Lease and such failure continues for thirty (30) days after written notice from Landlord (except that such thirty (30) day period shall be automatically extended for such additional period of time as is reasonably necessary to cure such Default, if such Default cannot be cured within such period, provided Tenant is in the process of diligently curing the same).

(iii)    If Tenant shall make an assignment for the benefit of creditors or file a petition, in any federal or state court, in bankruptcy or reorganization, or make an application in

8

any such proceedings for the appointment of a trustee or receiver for all or any portion of its property, and such proceeding shall not be set aside within sixty (60) days.

(iv)    If any petition shall be filed under federal or state law against Tenant in any bankruptcy, reorganization, or insolvency proceedings, and said proceedings shall not be dismissed or vacated within sixty (60) days after such petition is filed.

(v)    If a receiver or trustee shall be appointed under federal or state law for Tenant for all or any portion of the property of either of them, and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

(b)    Upon the happening of any one or more of the aforementioned Defaults which are not cured within the cure period applicable thereto, if any, Landlord shall have the right, in addition to any other rights and remedies, to:

(1)    terminate this Lease by giving written notice of same to Tenant. Upon such notice, this Lease shall cease and expire, and Tenant shall surrender the Premises to Landlord in the condition required by this Lease, and Landlord will be entitled to recover all unpaid rents that have accrued through the date of termination plus the costs of performing any of Tenant's obligations (other than the payment of rent) that should have been but were not satisfied as of the date of such termination. In addition, Landlord will be entitled to recover, not as rent or a penalty but as compensation for Landlord's loss of the benefit of its bargain with Tenant, the difference between (i) an amount equal to the present value of the rent and other sums that this lease provides Tenant will pay for the remainder of the Primary Term and for the balance of any then effective extension of the Primary Term, and (ii) the present value of the net future rents for such period that will be or with reasonable efforts could be collected by Landlord by reletting the Premises.

(2)    take possession of the Premises without terminating this Lease and then rent the same for the account of Tenant (which may be for a term extending beyond the Term of this Lease) in which event Tenant covenants and agrees to pay any deficiency after crediting it with the rent thereby obtained less all repairs and expenses, including the costs of remodeling and brokerage fees, and Tenant waives any claim it may have to any rent obtained on such releting which may be in excess of the Rent required to be paid herein by Tenant;

(3)    perform such obligation (other than payment of Rent) on Tenant's behalf and charge the cost thereof to Tenant as additional rent; or

(4)    exercise any and all other rights granted to Landlord under this Lease or by applicable law or in equity.

Tenant further agrees that in the event of a Default, any monies deposited by Tenant with Landlord shall be immediately and irrevocably assigned and released to Landlord (without further action by Landlord or Tenant) to be applied by Landlord against any and all of Tenant's obligations under this Lease, in any manner as Landlord may determine.

(c)    If Landlord should elect to terminate or repossess the Premises, as provided hereinabove, Landlord may re-enter the Premises and remove Tenant, its agents and subtenants, together with all or any of Tenant's Property, by suitable action at law, or by force. Tenant waives

75558897_1

any right to the service of any notice of Landlord's intention to re-enter and Landlord shall not be liable in any way in connection with any action it takes pursuant to this paragraph. Notwithstanding such re-entry or removal, Tenant's liability under Lease shall survive and continue.

(d)    In case of re-entry, repossession or termination of this Lease, Tenant shall remain liable for Rent, any additional rent and all other charges provided for in this Lease for the otherwise remaining term of this Lease, and any and all expenses which Landlord may have incurred in re-entering the Premises including, but not limited to, allocable overhead, alterations to the building to bring the building to "white box" standard, leasing, construction, architectural, and reasonable legal and accounting fees. Landlord shall have the right, but not the obligation, to relet the whole or part of the Premises upon terms which Landlord, in its sole discretion, deems appropriate and Tenant shall be responsible for all reasonable and customary expenses incurred by Landlord in reletting or attempting to relet and all rent collected for reletting shall be credited against all of Tenant's obligations hereunder. Landlord agrees to use commercially reasonable efforts to relet the Premises in order to mitigate its damages

(e)    In the event of and during the continuance of a Default, Landlord may, at its sole option, enter upon the Premises, if deemed necessary by Landlord in its sole discretion, and/or do whatever may be deemed necessary by Landlord in its sole discretion to cure such failure by Tenant. Tenant shall pay to Landlord within five (5) days of Landlord's request, all costs incurred by Landlord in connection with Landlord's curing of such failure. In addition to the above costs, in the event Landlord does not receive payment from Tenant when due under this paragraph, then interest at the rate of eighteen percent (18%) per annum or, if less, the highest rate allowable by law, shall be due and payable with respect to such payment from the due date thereof until Landlord receives such payment.

(f)    In the event either party engages legal counsel in connection with the enforcement of any of the terms and provisions of this Lease, then, in addition to all other sums due from the party deemed liable hereunder, such liable party shall pay to the prevailing party any and all attorneys' fees, paralegal fees, and legal costs and expenses incurred by the prevailing party, including on appeal and in any bankruptcy proceedings.

(g)    The rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now or hereinafter provided by law, and all such rights and remedies shall be cumulative. No action or inaction by Landlord shall constitute a waiver of any Default, and no waiver of any Default shall be effective unless it is in writing, signed by Landlord.

## 12.    **HOLDING OVER**

In the event Tenant remains in possession of the Premises after the expiration of this Lease without executing a new written lease acceptable to Landlord and Tenant, Tenant shall occupy the Premises as a tenant from month to month subject to all the terms hereof (except as modified by this paragraph), but such possession shall not limit Landlord's rights and remedies by reason thereof nor constitute a holding over. In the event of such month to month tenancy, the monthly installment of Annual Rent due for each such month shall increase to be one hundred twenty-five percent (125%) of the monthly installment thereof which was payable during the last month of the term of this Lease.

10

## 13. WAIVER OF SUBROGATION

Notwithstanding anything in this Lease to the contrary, other than Tenant's obligations to repair, restore or rebuild described in Section 4 of this Lease, neither party shall be liable to the other for any damage or destruction of the Premises resulting from fire or other casualty covered by insurance required of either party hereunder, whether or not such loss, damage or destruction of the Premises are caused by or results from the negligence of such party (which term includes such party's officers, employees, agents and invitees), and each party hereby expressly releases the other from all total liability for or on account of any said insured loss, damage or destruction. Each party shall procure all endorsements of insurance policies carried by it necessary to protect the other from any right of subrogation and/or liability in the event of such loss.

## 14. LANDLORD'S LIEN FOR RENTS

As security for Tenant's payment of Rent and all other payments required to be made by Tenant hereunder (including, by way of illustration only, taxes, damage to the Premises, court costs, and attorneys' fees), Tenant hereby grants to Landlord a lien upon all of Tenant's Property now or hereafter located upon the Premises. The lien herein provided shall be subordinate to the lien of any chattel mortgage, collateral assignment or security interest given by Tenant to any seller or provider of purchase money financing of Tenant's Property and in connection therewith Landlord agrees to execute a Landlord Waiver and Collateral Access Agreement substantially in the form attached hereto as Exhibit "E". In the event of a Default, Landlord may enter upon the Premises and take possession of Tenant's Property, or any part thereof, and may sell all or any part of Tenant's Property at public or private sale in one or successive sales, with or without notice, to the highest bidder for cash and on behalf of Tenant. Landlord may sell and convey Tenant's Property, or any part thereof, to such bidder, delivering to such bidder all of Tenant's title and interest in such property sold to such bidder. The proceeds of such sale shall be applied by Landlord first toward the costs of such sale and then toward the payment of all sums due from Tenant to Landlord under this Lease. Notwithstanding anything in this paragraph to the contrary, Tenant shall be entitled to collaterally grant a security interest in Tenant's interest in this Lease to any lender, including, without limitation, Wells Fargo Bank, National Association.

## 15. ASSIGNMENT AND SUBLETTING

(a)     Tenant shall have the right to assign or sublet all or any part of the Premises to any party for any lawful purpose. Notwithstanding the foregoing, Tenant shall have no right to assign or sublet in the event such assignment or subletting would violate any material term of any then material existing agreement applicable to the Premises. Except as set forth in this Section 15, any assignment or subletting permitted hereunder shall not relieve Tenant of its liability for the continued performance of all terms, covenants and conditions of this Lease, including without limitation the payment of all Rent and other charges hereunder. Likewise, as a condition of any such assignment by Tenant, the assignee shall be required to execute and deliver to Landlord, upon the effective date of such assignment, an agreement, in recordable form, whereby such assignee assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting. Tenant shall be released from all liability under this Lease arising after the date of such assignment or subletting if the assignment or sublease is executed in connection with (i) the sale of all or substantially all of Tenant's (or Tenant's Affiliates') business or assets, including the Premises, to a corporation or other entity that will operate the Premises as

11

an Krystal; and (ii) as of the date of assignment or sublease, the assignee or subtenant or guarantor thereof has an S&P Credit Rating of BBB- or higher, and a Fitch Credit Rating of BBB- or higher, and a Moody's Credit Rating of Baa3 or higher; or (ii) as of the date of assignment, the assignee has an aggregate net worth in accordance with GAAP, of at least $30,000,000; and (iii) the assignee assumes all of Tenant's obligations under this Lease; or (iii) as reasonably approved by Landlord.  As used in the immediately preceding sentence, "S&P Credit Rating" means the credit rating assigned by Standard & Poor's Rating Group to the highest rated publicly issued debt securities of the assignee, "Fitch Credit Rating" means the credit rating assigned by Fitch Ratings, Inc. to the highest rated publicly issued debt securities of the assignee, and "Moody's Credit Rating" means  the credit rating assigned by Moody's Investors Service to the highest rated publicly issued debt securities of the assignee.

(b)    Prior to any assignment hereunder, Tenant shall deliver to Landlord written notice of such assignment or subletting, together with: (i) a copy of the assignment or subletting documents (including copies of any recorded documents related thereto); (ii) the name, address and telephone number of such assignee or sublet tenant and a designated contact person therefor; (iii) a new insurance policy and binder complying with the terms of this Lease and naming such assignee or sublet tenant as the tenant of the Premises; and (iv) an agreement executed by such assignee or sublet tenant, in recordable form, whereby such assignee or sublet tenant assumes and agrees to discharge all obligations of Tenant under this Lease arising after the date of such assignment or subletting.  Landlord shall execute and return within ten (10) days of receipt any estoppels reasonably requested by Tenant, the assignee or sublessee, or their lenders, in connection with such assignment or sublease.

(c)    All rent and other consideration payable under any sublease shall be solely the property of Tenant.

(d)    Landlord shall have the right without limitation to sell, convey, transfer or assign its interest in the Premises or its interest in this Lease.  In the event of any sale or other transfer of Landlord's interest in the Premises, other than a transfer for security purposes only, Landlord shall be automatically relieved of any and all obligations and liabilities on the part of Landlord occurring from and after the date of such transfer; provided, that the transferee shall assume all of the obligations of Landlord under this Lease.   It is intended hereby that the covenants and obligations contained in this Lease on the part of the Landlord shall be binding on Landlord only during its period of ownership of the Premises.

## 16.    **SUBORDINATION, NON DISTURBANCE, ATTORNMENT, ESTOPPEL CERTIFICATE.**

(a)    Upon written request of the holder of any mortgage (which term "mortgage" shall also include deeds of trust) now or hereafter relating to the Premises, Tenant shall subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall execute, acknowledge and deliver an instrument substantially in the form of Exhibit "B" attached hereto or in other reasonable form customarily used by such encumbrance holder to effect such subordination; provided, however, as a condition of all such subordinations, the holder of such mortgage shall be first required to agree with Tenant that, notwithstanding the foreclosure or other exercise of rights under any such first or other mortgage, Tenant's possession and occupancy of the Premises and the improvements and its

12

leasehold estate shall not be disturbed or interfered with, nor shall Tenant's rights and obligations under this Lease be altered or adversely affected thereby so long as Tenant is not in Default.

      (b)    Notwithstanding anything in Paragraph 16(a) above to the contrary, in the event the holder of any such mortgage elects to have this Lease be superior to its mortgage, then upon notification to Tenant to that effect by such encumbrance holder, this Lease shall be deemed prior to the lien of said mortgage, whether this Lease is dated prior or subsequent to the date of said mortgage, and Tenant shall execute, acknowledge and deliver an instrument, in the form customarily used by such encumbrance holder to effect such priority.

      (c)    In the event proceedings are brought for the foreclosure of, or in the event of the exercise of the power of sale under any mortgage made by Landlord encumbering the Premises, or in the event of delivery of a deed in lieu of foreclosure under such a mortgage, Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as "Landlord" under this Lease, and upon the request of the purchaser, Tenant shall execute, acknowledge and deliver an instrument, in form and substance satisfactory to such purchaser, evidencing such attornment.

      (d)    Each party agrees, within ten (10) days after written request by the other, to execute, acknowledge and deliver to and in favor of any proposed mortgagee or purchaser of the Premises, an estoppel certificate, substantially in the form of Exhibit "C" attached hereto, stating, among other things (but limited to factual matters related to this Lease) (i) whether this Lease is in full force and effect, (ii) whether this Lease has been modified or amended and, if so, identifying and describing any such modification or amendment, (iii) the date to which Rent and other charges have been paid, and (iv) whether the party furnishing such certificate knows of any default on the part of the other party under this Lease, or has any claim against such party and, if so, specifying the nature of such default or claim.

      (e)    Upon written demand by the holder of any mortgage encumbering the Premises, Tenant shall forthwith execute, acknowledge and deliver an agreement in favor of and in the form reasonably satisfactory to Tenant, by the terms of which Tenant shall agree to give prompt written notice to such encumbrance holder in the event of any casualty damage to the Premises or in the event of any default on the part of Landlord under this Lease, and shall agree to allow such encumbrance holder a reasonable length of time after notice to cure or cause the curing of such default before exercising Tenant's rights under this Lease, or terminating or declaring a default under this Lease.

## 17.    <u>USE OF PREMISES</u>

      The Premises shall be used by Tenant for any lawful purpose; provided, however, in the event that a gas station or any similar service station selling or storing Petroleum (as defined in Section 39) products or selling or servicing automobiles is operated on the Property Tenant shall be required to obtain (and thereafter carry throughout the Term until the Property is no longer used for such purpose) an environmental insurance policy with reasonable and customary limits substantially similar to those carried by other similarly situated businesses in Western Tennessee. Tenant shall operate its business in a high class and reputable manner. Tenant shall have the right to cease operation of a business on the Premises; provided, however, Tenant shall continue to fulfill all other obligations of Tenant under this Lease, including payment of Rent and performance

of Tenant's maintenance obligations. Tenant shall have the right to place billboard signage on the Premises and receive any and all income derived from signage; provided, however that any and all signage must be allowed by applicable law. The Premises shall be used and occupied only for those purposes that are now or hereafter permitted under the land use designation and zoning district for the Premises and according to all other applicable public and private restrictions, covenants and laws affecting the Premises, including, but not limited to, the covenants and restrictions contained hereinbelow. Neither the Premises, nor any portion thereof, shall be occupied by or used for: nude or semi-nude dancing or service; lingerie modeling; an "adult" or "x-rated" book or video store that sells or rents "adult" or "x-rated" material (which are defined as stores in which thirty percent (30%) or more of the inventory is not available for sale to children under eighteen (18) years old); the display for sale of pornographic or obscene materials (i.e., books, magazines, newspapers, video tapes, video discs, computer software or the like which would be considered obscene or pornographic under prevailing laws or community standards); an "adult" or "x-rated" movie theater; a so-called "head shop" selling or displaying drug paraphernalia; a clinic or health provider offering abortions as a part of its services; a funeral home; a flea market; a bingo parlor; a car wash, a dance hall or nightclub; a skating rink; a bowling alley; a pool hall or billiards room; the use or placement of any telecommunications towers; or, any use that is unlawful or that creates a legal nuisance.

## 18.   NOTICES

All notices and other communications required or permitted to be given hereunder shall be in writing and shall be delivered by a nationally recognized overnight courier or mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Landlord: | Carpello Family Trust dated February 5, 2004<br>c/o Joseph Carpello<br>324 S. Brea Boulevard.<br>Brea, California  92821<br>Attention: Joseph & Katherine Ann Carpello, Trustees<br>E-mail: jcarpello@brealaw.com<br>Facsimile: (714) 529-7237 |
| If to Tenant: | The Krystal Company<br>1455 Lincoln Parkway East, 6th Floor<br>Dunwoody, Georgia 30346<br>Attention: Property Management<br>Facsimile: (770) 351-4704 |
| With copies to: | Argonne Capital Group, LLC<br>One Buckhead Plaza, Suite 1560<br>3060 Peachtree Road, NW<br>Atlanta, Georgia 30305<br>Attention: Layton Grisette<br>Facsimile: (404) 364-2985 |
| | McGuireWoods LLP |

1230 Peachtree Street, NE, Suite 1230
Atlanta, Georgia 30309
Attention: Josiah A. Bancroft, Esq.
Facsimile: (404) 443-5688

Any party may change its address for notices by written notice in like manner as provided in this paragraph and such change of address shall be effective seven (7) days after the date written notice of such change of address is given. Notice for purposes of this Lease shall be deemed given by the party who is giving such notice when it shall have been received or refused from the U.S. certified or registered mail, or from a nationally recognized overnight courier, with sufficient postage prepaid.

With respect to any such notice, Tenant shall, and Landlord shall use its best efforts to, simultaneously deliver a copy of such notice by facsimile or email at the appropriate facsimile number or email address above to the other party; provided however, that certified mail or overnight courier delivery shall nevertheless be required to effect proper notice hereunder. The phone numbers provided are for convenience only and shall not be deemed to allow for verbal notification.

## 19.    **INDEMNIFICATION**

Tenant does hereby indemnify and exonerate and agrees to hold harmless Landlord and their agents, principals, partners, employees, consultants, successors, predecessors, assigns, affiliates, personal consultants, administrators, personal representatives, executors heirs, legatees beneficiaries and devisees (herein "Indemnitees") against and from all liabilities, losses, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable architects' fees, attorneys' fees, paralegal fees, and legal costs and expenses incurred by Indemnitees, whether or not judicial proceedings are filed, and including on appeal and in any bankruptcy proceedings, which may be imposed upon or asserted against or incurred by Indemnities by reason of Tenant's use and occupancy of the Premises, including without limitation any of the following occurring:

(a)    any work or thing done in respect of construction of, in or to the Premises or any part of the improvements now or hereafter constructed on the Premises;

(b)    any use, possession, occupation, operation, maintenance or management of the Premises or any part hereof;

(c)    any failure to, or to properly, use, possess, occupy, operate, maintain or manage the Premises or any part thereof;

(d)    the condition, including environmental conditions, of the Premises or any part thereof;

(e)    any negligence on the part of Tenant or any of its agents, contractors, servants, employees, licensees or invitees;

15

(f)    any accident, injury or damage to any person or property occurring in, on or about the Premises or any part thereof including any sidewalk adjacent thereto;

(g)    any failure on the part of Tenant to perform or comply with any of the covenants, agreements, terms or conditions contained in this Lease on its part to be performed or complied with.

Landlord shall not be responsible or liable to Tenant for any loss or damage to either the person or property of Tenant unless caused by the negligence or intentional acts of Landlord. Landlord shall not be responsible or liable for any defect, latent, or otherwise, in the Premises, or any of the equipment, machinery, utilities, appliances or apparatus therein, nor shall it be responsible or liable for any injury, loss or damage to any person or to any property caused by or resulting from bursting, breakage, leakage, steam or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of said Premises or for any injury or damage caused by or resulting from acts of God or the elements, or for any injury or damage caused by or resulting from any defect or negligence in the occupancy, construction, operation or use of any of said Premises, building, machinery, apparatus or equipment.

## 20.    COOPERATION

(a)    Landlord shall fully cooperate with Tenant throughout the term of this Lease to secure or maintain proper zoning, building and other permits and compliance with all applicable laws; provided, however, that Landlord shall not be required to incur any additional expense. Landlord shall within ten (10) days of request execute any petitions, requests, applications and the like as Tenant shall reasonably request in order to obtain any permit, license, variances and approvals which, in the reasonable judgment of Tenant, are necessary for the lawful construction and/or operation of Tenant's business on the Premises, provided, however, that Tenant shall indemnify and save Landlord harmless from any and all expenses, costs, charges, liabilities, losses, obligations, damages and claims of any type which may be imposed upon, asserted against or incurred by Landlord by reason of same.

(b)    Landlord shall have the right, in Landlord's sole discretion, to enter into an exchange agreement with a qualified intermediary in order to effectuate a like-kind exchange of the Premises for one or more other properties. Landlord and Tenant agree that Tenant, at no cost to Tenant, shall cooperate with Landlord in effecting a like-kind exchange of the Premises by Landlord pursuant to and in accordance with the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

## 21.    EXCULPATION

Neither Party shall be liable to the other, or the other's employees, agents, invitees, licensees or any other person whomsoever for any injury to person or damage to property on or about the Premises caused by the other party's negligence or misconduct, its agents, servants or employees or of any other person entering the building under express or implied invitation by the other party or due to any other cause whatsoever, except to the extent by the negligence or neglect of such party, its employees or its authorized representatives, or as otherwise provided in Section 19 hereof.

## 22.    LANDLORD'S LIABILITIES

The term "Landlord" as used in this Lease means the owner from time to time of the Premises. Neither Landlord nor any partner, shareholder or beneficiary thereof shall have any personal liability with respect to any of the provisions of this Lease, and if Landlord is in default with respect to its obligations hereunder, Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of Tenant's remedies for the collection of a judgment or other judicial process requiring the payment of money by Landlord, and no other property or assets of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use or occupancy of the Premises.

## 23.    SUCCESSORS

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

## 24.    ENTIRE AGREEMENT/MEMORANDUM OF LEASE

This Lease contains the entire agreement between the parties hereto and may not be modified in any manner other than in writing signed by the parties hereto or their successors in interest. A memorandum of this Lease in the form attached hereto as Exhibit "D" shall be executed by the parties and shall be recorded in the official records of the county where the Premises are located.

## 25.    GENDER

Whenever the context hereof permits or requires, words in the singular may be regarded as in the plural and vice-versa, and personal pronouns may be read as masculine, feminine and neuter.

## 26.    BROKERAGE FEES

It is understood and agreed that neither party has incurred any real estate brokerage fees or commissions arising out of this Lease and each party agrees to hold the other harmless from and against all such fees and commissions incurred, and costs related thereto including legal fees, as a result of its own conduct or alleged conduct.

## 27.    CAPTIONS

The captions of this Lease are for convenience only, and do not in any way define, limit, disclose, or amplify terms or provisions of this Lease or the scope or intent thereof.

## 28.    NOT A SECURITY ARRANGEMENT

The parties hereto agree and acknowledge that this transaction is not intended as a security arrangement or financing secured by real property, but shall be construed for all purposes as a true lease.

17

29.    **NET LEASE**

It is the intention of the parties hereto that this Lease is and shall be treated as a triple net lease. Any present or future law to the contrary notwithstanding, except as expressly set forth in this Lease, this Lease shall not terminate, nor shall Tenant be entitled to any abatement, suspension, deferment, reduction, setoff, counterclaim, or defense with respect to Rent, nor shall the obligations of Tenant hereunder be affected by reason of: any damage to or destruction of the Premises or any part thereof; any taking of any Premises or any part thereof or interest therein by condemnation or otherwise; any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any person or for any other reason; any title defect or encumbrance or any matter affecting title to the Premises or any part thereof; any eviction by paramount title or otherwise; any default by Landlord hereunder; any proceeding relating to Landlord; the impossibility or illegality of performance by Landlord, Tenant or both; any action of governmental authority; any breach of warranty or misrepresentation; any defect in the condition, quality or fitness for use of the Premises or any part thereof; or any other cause whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or knowledge of any of the foregoing. The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated in accordance with an express provision of this Lease.

30.    **WAIVER**

No waiver by either party of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by the other party of the same or any other provision. Either party's consent to, or approval of, any act as required hereunder shall not be deemed to render unnecessary the obtaining of such party's consent to or approval of any such subsequent act by the other party. The acceptance of Rent, or any partial payment of Rent, hereunder by Landlord shall not be a waiver of any preceding Default by Tenant of any provision hereof, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent.

31.    **TIME OF THE ESSENCE**

Landlord and Tenant agree that time shall be of the essence of all terms and provisions of this Lease.

32.    **GOVERNING LAW**

This Lease shall be construed in accordance with the laws of the state in which the Premises are located.

33.    **SEVERABILITY**

If any provision of this Lease becomes unenforceable for any reason, such unenforceability shall not limit or impair the operation or validity of any other provision of this Lease.

18

## 34.  JURISDICTION, VENUE, AND GOVERNING LAW

If any party to this Lease institutes any lawsuit or other action or proceeding against the other party and pertaining to this Lease, any right or obligation of any party hereunder, breach of this Lease or otherwise pertaining to the Premises, the sole and exclusive venue and jurisdiction for filing and maintaining any such lawsuit or other action or proceeding shall be in the jurisdiction where the Premises are located, and the parties to this Lease waive the right to institute or maintain any such suit, action or proceeding in any other courts or forums whatsoever. Each party by executing this Lease consents and submits itself to the personal jurisdiction of such court. This Lease shall be construed and governed in accordance with the laws of the state where the Premises are located without regard to conflict of law principles.

## 35.  COUNTERPARTS

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

## 36.  RIGHT OF FIRST REFUSAL

(a)    Provided Tenant is not in continuing default past all applicable notice and cure periods, Landlord grants to Tenant a continuous right of first refusal to purchase the Premises pursuant to this Section 36.

(i)    If (A) Landlord receives a bona fide offer, solicited or unsolicited, to sell the Premises or to otherwise transfer or dispose of the Premises or the sale of the interests of the Landlord for value to any unaffiliated third party (any such sale, transfer or other disposition, a "Sale") and intends to accept the offer, or (B) Landlord decides to make a bona fide offer for a Sale of the Premises for value to any unaffiliated third party (which shall be subject to Tenant's right of first refusal) and Landlord has found an unaffiliated third party ready, willing and able to accept such offer, then Landlord shall provide a written copy of such offer to Tenant (the "Offer"), which Offer shall include all material terms of the proposed sale or transfer (including, without limitation, the interests or property affected, the name and address of any proposed transferees, the amount of the purchase price, the intended date for closing, and all other material terms and conditions of such offer, along with copies of all relevant documents.) Tenant will have the right to accept Landlord's Offer by written notice to Landlord given within Fifteen (15) days after Tenant's receipt of the Offer, time being of the essence with respect to this and all other periods provided for in this Section 36. For purposes hereof, a party shall be considered to be "unaffiliated" so long as Landlord, its principals, trustees, beneficiaries or any of their family members own or control less than a 25% interest therein. The right of first refusal shall be applicable to the sale or transfer of stock, membership interests or partnership interests of Landlord or its principal.

(ii)    If Tenant accepts the Offer, settlement shall be held by the earlier of (A) 60 days after Tenant's acceptance, or (B) at Tenant's option, such earlier closing date as was set forth in the Offer. Upon settlement, Landlord shall convey to Tenant (or its designee) good and marketable title to such interests or property free and clear of all liens, encumbrances and restrictions (except this Lease and such non-material liens as are of record on the date hereof or recorded after the date hereof with the prior written consent of Tenant and which do not impact on Tenant's use of the Premises).

75558897_1

(iii)    If Tenant does not accept the Offer within the time period specified and a Sale closes (A) on terms no more favorable to the transferee than those specified in the Offer, and (B) by the earlier of (1) the time frame set forth in the Offer and (2) six (6) months after the Offer was made to Tenant, then Tenant's right of first refusal hereunder shall be effective with respect to any future sale of the Premises. If, however, at any time, an intended Sale will not meet both of the conditions set forth in clauses (A) and (B) above, then Tenant's right of first refusal as set forth in this Section 36 shall be deemed reinstated, and Landlord shall be required to again, and thereafter, comply with this Section 36 (i.e. delivering an Offer to Tenant, awaiting Tenant's response, etc.).

(iv)    NOTWITHSTANDING ANYTHING TO THE CONTRARY, IF THIS LEASE TERMINATES (OTHER THAN BY REASON OF TENANT PURCHASING THE PREMISES PURSUANT TO THIS SECTION 36 OR THE TERM EXPIRES, TENANT'S RIGHT OF FIRST REFUSAL SET FORTH HEREIN SHALL TERMINATE AND BE NULL AND VOID AND OF NO FURTHER FORCE AND EFFECT; AND, IN SUCH EVENT TENANT SHALL EXECUTE SUCH DOCUMENTS AS LANDLORD SHALL REASONABLY REQUEST EVIDENCING SUCH TERMINATION OF ITS RIGHT OF FIRST REFUSAL. EXCEPT AS AFORESAID, TENANT'S RIGHTS UNDER THIS SECTION 36 SHALL SURVIVE ANY SALE, TRANSFER OR OTHER DISPOSITION OF THE PREMISES BY OR THROUGH LANDLORD (INCLUDING THOSE PERSONS DESCRIBED IN SECTION 36(b) BELOW).

(b)    Notwithstanding anything to the contrary contained herein, the provisions of this Section 36 shall not apply to or prohibit (A) any mortgaging, subjection to deed of trust or other hypothecation of Landlord's interest in the Premises to any Lender, (B) any sale of the Premises pursuant to a private power of sale under or judicial foreclosure of any Mortgage or other security instrument or device to which Landlord's interest in the Premises is now or hereafter subject (including subsequent transfers of title to any Affiliate of any such Lender established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Premises that acquires title to the Premises through such Lender), (C) any transfer of Landlord's interest in the Premises to a Lender, beneficiary under deed of trust or other holder of a security interest therein or their designees by deed in lieu of foreclosure (including subsequent transfers of title to any Affiliate of any such Person established or existing primarily for the purpose of taking title to the Premises and the first subsequent third-party purchaser for value of the Property that acquires title to the Property through any such Person, or (D) any transfer of the Property to any governmental or quasi-governmental agency with power of condemnation (including subsequent transfers of title to any Affiliate of any such governmental or quasi-governmental agency established or existing primarily for the purpose of taking title to the Premises). For the avoidance of doubt, however, Tenant's rights under this Section 36 shall survive all of the foregoing.

## 37.    **NO ESTATE BY TENANT.**

This Lease shall create the relationship of lessor and lessee between Landlord and Tenant; no estate shall pass out of Landlord. Tenant's interest shall not be subject to levy or sale, and shall not be assignable by Tenant except as provided in Section 14 and 15 of this Lease. Nothing contained in this Lease shall, or shall be deemed or construed so as to, create the relationship or

principal-agent, joint venturers, co-adventurers, partners or co-tenants between Landlord and Tenant; it being the express intention of the parties that they are and shall remain independent contractors one as to the other.

## 38.    REPRESENTATIONS AND WARRANTIES OF TENANT.

Tenant, and the individual executing this Lease on behalf of Tenant, hereby represents and warrants and to Landlord that: (a) Tenant is a corporation, duly organized and validly existing under the laws of the State of Tennessee; (b) Tenant has qualified with the Secretary of State of the State in which the Premises are situated to transact business in that State; (c) Tenant has all necessary power and authority to enter into this Lease and has all necessary licenses to conduct its business for the uses contemplated hereunder; and (d) this Lease constitutes a binding and enforceable obligation of Tenant and does not conflict with any provision of Tenant's organizational documents or of any other lease or other agreement to which Tenant is a party or by which Tenant may be bound.

## 39.    HAZARDOUS SUBSTANCES OR CONDITIONS.

Tenant shall not use, handle, store and dispose of any Hazardous Materials, on or about the Premises, except in accordance with all applicable laws, and hereby agrees to indemnify, defend and hold Landlord harmless from any claim, liability, loss or damage arising from the improper use, handling, storage or disposal of Hazardous Materials on or about the Premises. Without limitation of the foregoing, Tenant shall promptly provide to Landlord copies of any written notice that Tenant may receive from any governmental authority relating to or alleging any improper use, handling storage or disposal of any Hazardous Materials by Tenant, its employees, agents or contractors on or about the Premises. "Hazardous Material(s)" for purposes of this Lease shall include but not be limited to all toxic or hazardous materials, chemicals, wastes, pollutants or similar substances, including, without limitation, Petroleum (as hereinafter defined), asbestos and/or urea formaldehyde insulation, which are regulated, governed, restricted or prohibited by any Hazardous Materials Laws including, but not limited to, those materials or substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "pollutants" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Clean Water Act, 33 U.S.C. Section 1251 et seq., and any rules and regulations promulgated thereunder, all as presently or hereafter amended. "Petroleum" for purposes of this Lease shall include, without limitation, oil or petroleum of any kind and in any form including but not limited to oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other waste, crude oil, gasoline, diesel fuel and kerosene.

## 40.    FINANCIAL STATEMENTS.

Tenant shall, within thirty (30) days following written request from Landlord, provide Landlord, no more than once in any eighteen (18) month period during the Term, the following: (i) the gross sales figures for Tenant's operations on the Premises for the prior twelve (12) months; and (ii) Tenant's annual financial statements for the most recent year end then available (audited financial statements to be provided, if available). Landlord will not disclose any of the sales or

21

financial information provided by Tenant except to: (x) Landlord's Affiliates, agents, trustees and beneficiaries, attorneys, consultants, and accountants; (y) in litigation between Landlord and Tenant, or as required by court order; or (z) any bona fide investor, purchaser or lender of Landlord or the Premises, provided such bona fide investor, purchaser or lender has entered into an agreement to buy the Property, or issued a loan commitment which loan shall be secured by the Property, as applicable, and executed a confidentiality agreement with respect to the Property, Tenant's gross sales and financial statements.

[Remainder of Page Intentionally Left Blank; Signatures Begin on Next Page]

75558897_1

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Lease Agreement to be effective as of the day and date first above written.

Signed, sealed and delivered
in the presence of:

Name: KAREN C MILLS

Name: Craig A Mills

**"LANDLORD"**

JOSEPH CARPELLO, Trustee of the Carpello
Family Trust dated February 5, 2004

Signed, sealed and delivered
in the presence of:

Name: KAREN C MILLS

Name: Craig A. Mills

KATHERINE ANN CARPELLO, Trustee of
the Carpello Family Trust dated February 5,
2004

75558897_1

Signed, sealed and Delivered
in the presence of:

Name: Meredith N Donohue

Name:

**"TENANT"**

THE KRYSTAL COMPANY, a Tennessee
corporation

By: 
Name: Brian Blosser
Title: VP Development + Constrsolm

EXHIBITS AND ADDENDA ATTACHED

Rent Addendum
Exhibit "A" - Legal Description
Exhibit "B" - Subordination, Non-Disturbance and Attornment Agreement
Exhibit "C" - Estoppel Certificate
Exhibit "D" - Memorandum of Lease
Exhibit "E" – Landlord Waiver and Collateral Access Agreement

MFS024
9986 US Highway 64
Lakeland, Tennessee 38002

## RENT ADDENDUM
### to
## LEASE AGREEMENT

THIS RENT ADDENDUM is dated as of the ____ day of _____, 2016, by and between Joseph Carpello and Katherine Ann Carpello, as Trustees of the Carpello Family Trust Dated February 5, 2004 ("Landlord") and The Krystal Company, a Tennessee corporation ("Tenant"), for Krystal # MFS024 is attached to and made a part of that certain Lease Agreement by and between Landlord and Tenant of even date herewith (the "Lease"). Notwithstanding any other provision to the contrary which may be contained in said Lease, it is specifically agreed by and between Landlord and Tenant as follows:

1. **Definitions.** Capitalized terms used in this Rent Addendum shall, unless otherwise defined, have the meaning ascribed to them in the Lease.

2. **Annual Rent.**

(a) Beginning on the Rent Commencement Date, Tenant covenants and agrees to pay to Landlord annual rent ("Annual Rent") according to the following schedule:

| Lease Year | Annual Rent | Monthly Installment |
|------------|-------------|---------------------|
| 1 | $98,000.00 | $8,166.67 |

All payments of Annual Rent shall be paid in equal monthly installments paid monthly in advance, on the first (1st) business day of each month.

(b) Increases in Annual Rent. Commencing at the end of the first (1st) Lease Year after the Rent Commencement Date, and on each anniversary of such date thereafter during the term of this Lease (and any extension thereof), Annual Rent shall be increased by an amount equal to the previous year's Annual Rent multiplied by one percent (1.00%).

(c) Partial Months. If the Rent Commencement Date is on a day other than the first day of a calendar month, then Rent for the partial rental month shall be prorated on a per diem basis and shall be paid by Tenant to Landlord for such month.

3. **Sales/Use Tax**. Tenant shall also pay to Landlord any sales and use tax imposed on any Rent payable hereunder from time to time by state law or any other governmental entity, which sums are due monthly as to monthly Rent payments on the due date of the Rent payment under this Lease.

75558897_1

4.      **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent. All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

_____          _____
By Landlord                                               By Tenant

75558897_1

4.     **Late Charges.**  In the event any installment of Rent is not received by Landlord within ten (10) days after Tenant's receipt of written notice from Landlord that such installment has not been received before its respective due date, there shall be an automatic late charge due to Landlord from Tenant in the amount of five percent (5%) of such delinquent installment of Rent. All such late charges due hereunder shall be deemed additional rent, and are not penalties but rather are charges attributable to administrative and collection costs arising out of such delinquency.  In addition to such late charge, in the event Landlord does not receive Rent when due hereunder, interest at the rate of the maximum rate allowable by law shall be due and payable with respect to such payment from the expiration of any applicable grace period until Landlord receives such Rent.

Initialed for Identification:

_____          _____
By Landlord                                                          By Tenant

## EXHIBIT "A"

### Legal Description

### 9986 US Highway 64, Lakeland, Tennessee 38002

Being situated in the City of Lakeland, County of Shelby, State of Tennessee, and being all of Lot 1, Final Plat - Phase 3 Woodland Commercial Subdivision, as recorded in Plat Book 266, Page 36, in the Registers Office in and for Shelby County, Tennessee, and more particularly described below:

Beginning at a found T-Post located in the base of a tree, said T-Post being the Northwest corner of the property owned by Don Stewart Properties, LLC, as recorded in Plat Book 33, Page 40; thence South 00°19'31" West, a distance of 277.01 feet to a found flagged Angle Iron, said Angle Iron being the Southwest corner of Don Stewart Properties, LLC and being in the Northern Right-of-Way Line of U.S. Highway 64/S.R. 15; thence along said Northern Right-Of-Way line North 85°18'07" West, a distance of 142.00 feet to a Set Iron Rod with Cap, said Iron Rod being the Southwest corner of the property described herein; thence leaving said Right-Of-Way North 01°44'30" East, a distance of 266.51 feet to a Set Iron Rod with Cap, said Iron Rod being the Northwest corner of the property described herein; thence South 89°34'06" East, a distance of 135.00 feet to the Point of Beginning.

The aforesaid described property contains 37,595.16 Square Feet or 0.86 Acres more or less.

Surveyed Legal Description taken from ALTA/ACSM Land Title Survey dated June 11, 2015, Project Number 15-018, prepared by Dean M. Gerchar, TN R.L.S. No. 2663, of Pinnacle Land Surveying, Inc., 212 Battle Front Trail, Knoxville, TN 37934.

TOGETHER WITH the easements and rights created under that Declaration dated December 30, 2015, recorded on December 31, 2015, in Instrument 15130358, in the Register's Office for Shelby County, Tennessee.

Being the same property conveyed to Joseph Carpello and Katherine Ann Carpello, as Trustees of the Carpello Family Trust Dated February 5, 2004, by Special Warranty Deed of record in Instrument _____, in the Register's Office for Shelby County, Tennessee.

75558897_1

## EXHIBIT "B"

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

_____

_____

_____

Attention:  Loan Administration
Loan No. _____

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

| 1. | Lease | Lease between Landlord and Tenant dated _____, \_\_\_\_\_. |
| 2. | Landlord | |
| 3. | Tenant | |
| 4. | Premises | As described on Exhibit A |
| 5. | Premises Address | As described on Exhibit A |

THIS   SUBORDINATION,   NON-DISTURBANCE   AND   ATTORNMENT
AGREEMENT (the "Agreement") is made as of the \_\_\_ day of _____, 20\_\_, by and
between _____(the "Mortgagee") and Tenant.

### R E C I T A L S :

A.    Landlord and Tenant have entered into a certain Lease relating to a portion of the
real property (the "Property") described therein and on the attached Exhibit A (the "Premises");
and

B.    Mortgagee [has recorded] [is about to record] a mortgage on the Property; and

C.    Tenant and Mortgagee desire to establish certain rights, safeguards, obligations,
and priorities with regard to their respective interests by means of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants of the parties, and
other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the Mortgagee and Tenant hereby agree as follows:

1.    Provided the Lease is in full force and effect and the Tenant is not in default under
the Lease (beyond any period given the Tenant to cure defaults), then:

(a)     The Tenant's right of possession to the Premises and the Tenant's other rights arising out of the Lease shall not be affected or disturbed by the Mortgagee in the exercise of any of its rights under or related to the Mortgage or the note which it secures.

(b)     In the event the Mortgagee or any other person acquires title to the Premises pursuant to the exercise of any remedy provided for in the Mortgage, or by conveyance in lieu of foreclosure, the Lease shall not be terminated or affected by the foreclosure, conveyance or sale in any such proceeding. The Mortgagee covenants that any sale of the Property as a result of the exercise of any rights and remedies under the Mortgage, or otherwise, shall be made subject to the Lease and the rights of the Tenant under the Lease, and the Tenant covenants and agrees to attorn the Mortgagee, or such person, as its new landlord, and the Lease shall continue in full force and effect as a direct Lease between the Tenant and the Mortgagee, or such other person, upon all of the terms, covenants, conditions and agreements set forth in the Lease. However, in no event shall the Mortgagee or such person be:

(i)     Liable for any act or omission of the Landlord; or

(ii)    Subject to any offsets or deficiencies, which the Tenant might be entitled to assert against the Landlord.

2.     Subject to the foregoing provisions, the Lease shall be subject and subordinate to the lien of the Mortgage and to all of its terms, conditions and provisions, to all advances made or to be made and to any renewals, extensions, modifications or replacements.

3.     Mortgagee hereby consents to any leasehold mortgage or deed of trust (the "Leasehold Mortgage") now or hereinafter entered into by Tenant for the benefit of Tenant's lender (together with its successors and assigns, the "Leasehold Mortgagee") and the liens and security interests evidenced by same and encumbering (among other things) Tenant's leasehold interest under the Lease. In no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Tenant's moveable trade fixtures, business, equipment, furniture, signs or other personal property at any time placed on or about the Premises; the Mortgagee and Tenant acknowledging that such property is pledged to the Leasehold Mortgagee as further security for the obligations of Tenant under the Leasehold Mortgage.

4.     The above provisions shall be self-operative and effective without the execution of any further instruments on the part of either party. However, the Tenant agrees to execute and deliver to the Mortgagee or to any other person to whom the Tenant agrees to attorn such other instruments as either shall reasonably request in order to comply with these provisions.

5.     This Agreement may not be modified other than by an agreement in writing signed by the parties or by their respective successors in interest and by Leasehold Mortgagee.

6.     This Agreement shall inure to the benefit of and be binding upon the parties and their successors and assigns (including (with respect to Tenant) the Leasehold Mortgagee and any other person which acquires rights in or title to Tenant's leasehold interest under the Lease).

75558897_1

To indicate their agreement to the above, the parties or their authorized representatives or officers have signed this document under seal as of the day and year first above written.

**"LENDER"**

_____

By:_____
Name:_____
Title:_____

**"LANDLORD"**

_____, a
_____

By:_____
Name:_____
Title:_____

**"TENANT"**

**THE KRYSTAL COMPANY**, a Tennessee corporation

By:_____
Name:_____
Title:_____

B-3

## EXHIBIT "C"

## ESTOPPEL CERTIFICATE

The undersigned with respect to the premises at STORE ADDRESS, as more particularly described in Exhibit "A" attached hereto and made a part hereof by this reference (the "Premises"), certifies and affirms to the best of its knowledge the following to _____, a _____    [[("Tenant")]]    [[("Landlord")]]    and    to _____ [[("Mortgagee")]] [[("Purchaser")]]:

1.    Tenant leases the Premises from Landlord under that certain Lease dated _____, 20__, attached hereto and made a part hereof by this reference (the "Lease").

2.    Rental under this Lease has been paid through _____, 20__.  No rent has been paid more than thirty (30) days in advance, except as described in the preceding sentence.  The monthly base rental amount is $_____.

3.    The term of the Lease is _____ through _____, a period of _____ years.  Tenant has _____ options to extend the Lease for _____ years each, for a total term including all options through _____ as set forth in the Lease.

4.    There is no security deposit under the Lease.

5.    Tenant, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any term of the Lease.

6.    Landlord, to the best of the undersigned's knowledge and belief without any independent investigation, is not in default under any terms of the Lease.

7.    The Lease is in full force and effect and there have been no modifications or amendments unless attached hereto.

8.    Knowledge means the actual knowledge of _____ without independent investigation.

This Certificate may be relied upon by [[Purchaser]] [[Mortgagee]], who intends to [[purchase the Premises] [and the Lease from Landlord], and by any mortgage lender of such person]] [[provide secured [lease] [loan] financing to [Landlord] [Tenant]].

Dated this _____ day of _____, 20____
[[Landlord]] [[Tenant]]: _____
By: _____
Title: _____

C-1

## EXHIBIT "D"

*UPON RECORDATION RETURN TO:*

_____

_____

_____

_____

**SPACE ABOVE THIS LINE FOR RECORDER'S USE**

RETURN BY:  MAIL (X)    PICK UP ( )

Krystal # \_\_, STORE ADDRESS

## MEMORANDUM OF LEASE

**THIS MEMORANDUM OF LEASE** is made as of _____, 20\_\_ ("Effective Date"), by and between _____, with a mailing address of _____ ("Landlord"), and The Krystal Company, a Tennessee    corporation,    with    a    mailing    address    of _____ ("Tenant").

In consideration of TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration paid by Tenant to Landlord and the mutual covenants contained in that certain Lease Agreement between the parties hereto dated on even date herewith (hereinafter called the "Lease"), Landlord has leased and does hereby lease to Tenant, and Tenant has leased and does hereby lease from Landlord, upon the terms and conditions set forth in said Lease, the real property more particularly described in Exhibit "A" attached hereto and made a part hereof (the "Premises").

The term of the Lease shall commence on the Effective Date and end on the date that is fifteen (15) years after the Rent Commencement Date (as defined in the Lease).  Said Lease provides for options to renew for six (6) five (5) year terms.

[Signatures on Next Page]

D-1

IN WITNESS WHEREOF, Landlord and Tenant have executed and sealed this Memorandum of Lease to be effective as of the date first above written.

### "LANDLORD"

Signed, Sealed and Delivered
in the presence of:

_____,

_____

_____
Name:_____

By:_____
Name:_____
Title:_____

_____
Name:_____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 20__, by _____, as _____ of _____, a _____. He/she is ( ) personally known to me or ( ) he/she has produced a driver's license as identification.

_____
Notary Public, State of _____
Print Name: _____
Notary Commission No.: _____
My Commission Expires: _____

[NOTARIAL SEAL]

D-2

**"TENANT"**

Signed, sealed and Delivered
in the presence of:

**THE KRYSTAL COMPANY**, a Tennessee
corporation

By: _____

Name: _____

_____

Name:_____

Title: _____

_____

Name:_____

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 20__, by _____, as _____ of The Krystal Company, a Tennessee corporation. He/she is (    ) personally known to me or (    ) he/she has produced a driver's license as identification.

_____

Notary Public, State of _____

Print Name: _____

Notary Commission No.: _____

My Commission Expires: _____

[NOTARIAL SEAL]

**EXHIBIT "E"**

**FORM OF LANDLORD WAIVER
AND COLLATERAL ACCESS AGREEMENT**

**THIS LANDLORD WAIVER AND COLLATERAL ACCESS AGREEMENT** (this "Agreement") is made and entered into between **WELLS FARGO BANK, NATIONAL ASSOCIATION**, in its capacity as administrative agent (in such capacity, the "Administrative Agent") for certain lenders (the "Lenders") under the Amended and Restated Credit Agreement referred to below, and **[NAME OF OWNER]**, a **[Type of Entity]** (hereinafter referred to as "Owner"), whether one or more, and affects that real property in the City of **[City]**, County of **[County]**, State of **[State]**, commonly known as **[Street Address]** (hereinafter referred to as the "Premises").

**WHEREAS**, this Agreement is executed as required pursuant to that certain Amended and Restated Credit Agreement, dated as of June 28, 2013 (the "Credit Agreement") entered into by the Administrative Agent and the Lenders and other agreements related thereto (hereinafter collectively referred to as the "Loan Documents") and as required pursuant to that certain, in each case with The Krystal Company, a Tennessee corporation (hereinafter referred to as "Tenant"), and certain of Tenant's affiliates, for the purpose of securing the repayment of all obligations and the performance of all duties now or hereafter owing by Tenant and its affiliates under the Loan Documents, of every kind and description. This Agreement does not amend any of the terms of the Loan Documents;

**WHEREAS**, by the Loan Documents, the Administrative Agent and the Lenders have loaned or have agreed to loan monies and/or extend other financial accommodations against the security of, among other collateral, all of Tenant's personal property, including, but not limited to, Tenant's inventory, equipment, furniture, furnishings, trade fixtures, machinery, and tools, together with all additions, substitutions, replacements, and improvements to the same (hereinafter referred to as "Goods"), which Goods are or are to be located on and may be affixed to the Premises or the improvements thereon; and

**WHEREAS**, Tenant has leased the Premises from Owner by that certain Lease Agreement dated _____ (the "Lease").

**NOW, THEREFORE**, in consideration of any financial accommodations extended by Lenders to Tenant and/or its affiliates at any time, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follow:

1.      Owner hereby acknowledges and agrees that the Goods shall be and remain personal property notwithstanding the manner of their annexation to the Premises, their adaptability to the uses and purposes for which the Premises are used, or the intentions of the party making the annexation.

2.      Owner hereby waives, relinquishes and releases, solely during the term of the Loan Documents, any statutory, contractual or possessory rights or liens which Owner may assert against the Goods, including any and all rights of distraint, attachment, lien, levy or execution

against or upon the Goods, for any rent or other sum now or hereafter due the Owner under the Lease or otherwise, and all claims and demands of every kind and nature against the Goods.

3.      Owner hereby acknowledges and consents to Administrative Agent's senior priority perfected security interests in the Goods and agrees that, notwithstanding anything to the contrary set forth in the Lease, any other agreement, document or instrument to which Owner and Tenant are parties or any applicable law, any and all liens and security interests granted or otherwise accruing to Owner with respect to the Goods and any other assets of Tenant or its affiliates is and shall be junior and subordinate to any and all liens and security interest granted to Administrative Agent with respect to the Goods and all other assets of Tenant and its affiliates. The foregoing subordination shall apply (a) irrespective of the time, order or manner of attachment or perfection of any security interest and irrespective of any statute, rule, law, or court decision to the contrary and (b) irrespective of whether the liens securing the obligations under the Loan Documents are held to be unperfected, invalid, void, unenforceable, discharged or are set aside. This Agreement and the subordination provided herein shall continue to govern as between Administrative Agent and Owner during and after any bankruptcy or insolvency proceeding involving Tenant or its affiliates.  Until the obligations of Tenant and its affiliates under the Loan Documents have been fully and finally paid in full in accordance with the terms of the Loan Documents and all commitments of the Administrative Agent and the Lenders to provide financing thereunder have been terminated (the "Discharge of the Obligations"), Owner shall not, without the prior written consent of the Administrative Agent, exercise any rights or remedies with respect to the Goods or any other assets of Tenant or its affiliates which arise by virtue of Owner's status as a secured creditor, whether arising under Article 9 of the Uniform Commercial Code or otherwise.

4.      Owner consents to the installation of the Goods on the Premises, agrees that Administrative Agent may do to and with the Goods any or all of the acts below enumerated, and grants Administrative Agent a right, as set forth below, to enter into possession of the Premises to do any or all of the following (the "Permitted Actions") with respect to the Goods: assemble, have appraised, display, sever, remove, maintain, prepare for sale or lease, advertise, inspect, repair, lease, transfer, and/or sell (at public auction or private sale).  At the Owner's option, the Owner may elect to have an agent accompany Administrative Agent or its agents or representatives while on the Premises; provided, however, that the Owner's failure to have an agent of the Owner accompany Administrative Agent or its agents or representatives shall not in any way limit Administrative Agent's right to enter upon the Premises.  While on the Premises, Administrative Agent shall use reasonable efforts so as not to disturb any other tenant, occupant or the Owner. Administrative Agent agrees to repair (or pay the reasonable cost to repair) any damages to the Premises caused directly by the actions of Administrative Agent or its agents or representatives while on the Premises.

5.      Owner acknowledges that Administrative Agent may take any or all of the Permitted Actions subject only to the Loan Documents.

6.      Owner will provide Administrative Agent with written notice of any default by Tenant under the Lease resulting or that could, with the passage of time, the giving of notice, or both, result in termination of the Lease (a "Default Notice") at the same time or promptly after, and in the same manner as, such notice is given to Tenant.  Administrative Agent shall have at least

fifteen (15) days following receipt of such Default Notice to cure such default, but Administrative Agent shall not be under any obligation to cure any default by Lessee under the Lease. No action by Administrative Agent pursuant to this Agreement shall be deemed to be an assumption by Administrative Agent of any obligation under any Lease and, except as expressly set forth herein, Administrative Agent shall have no obligation to Owner.

7.      This Agreement shall continue until such time as the Discharge of the Obligations has occurred.

8.      This Agreement shall be governed and controlled by and interpreted under the laws of the State of New York and shall inure to the benefit of and be binding upon the successors, heirs, and assigns of Owner and Administrative Agent. Owner will notify any purchaser or successor owner or landlord of the Premises of the existence of this Agreement, which shall be binding upon the executors, administrators, successors, transferees or assignees of Owner. This Agreement shall bind and inure to the benefit of the respective successors and assigns of Administrative Agent and Owner.

9.      THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF OR, AT THE SOLE OPTION OF ADMINISTRATIVE AGENT, IN ANY OTHER COURT IN WHICH ADMINISTRATIVE AGENT SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. OWNER AND ADMINISTRATIVE AGENT WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION. OWNER AND ADMINISTRATIVE AGENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. OWNER AND ADMINISTRATIVE AGENT REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

[Signature Pages Follow]

Dated:_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION**,
as Administrative Agent

By:_____
    Maureen S. Malphus
    Vice President

Address:

1808 Aston Avenue
Suite 250
Carlsbad, CA 92008
Attn: Loan Administration
Fax: (760) 918-2727

Dated:_____

**[NAME OF OWNER]**,
a **[Type of Entity]**                              ,

By:_____
Name:
Title:

Address:

[_____]
[_____]
[_____]
Attn: [_____]
Fax: (___) _____ - _____

## FIRST LEASE AMENDMENT

This First Lease Amendment (the "First Amendment") is entered into as of this 18th day of January 2020 (the "Effective Date"), by and among Joseph Carpello and Katherine Ann Carpello, as Trustees of the CARPELLO FAMILY TURST DATED FEBRUARY 5, 2004 ("Landlord"), and THE KRYSTAL COMPANY, a Tennessee corporation ("Tenant").

### WITNESSETH:

**WHEREAS**, Landlord and Tenant entered into that certain Lease Agreement dated July 1, 2016 (the "Lease"), whereby Tenant leased from Landlord certain property located at 9986 US Highway 64, Lakeland, TN 38016 (MFS024), which property is more particularly described therein (the "Premises"); and

**WHEREAS**, the parties desire to amend the Lease in certain respects, as more particularly described herein;

**NOW, THEREFORE**, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration as provided herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree that such Lease shall be and is hereby amended and modified as follows:

1.  This First Amendment is made and entered into with reference to the following:

    a.  The Parties have agreed to amend the Lease, in accordance with the provisions and conditions in this First Amendment. This First Amendment shall be deemed effective as of the Effective Date.

    b.  The obligations contained in the Lease shall continue in accordance with the Lease until such time as the obligations set forth herein shall commence.

    c.  Unless otherwise defined herein, all capitalized terms used in this First Amendment shall have the meanings attributed to them in the Lease.

2.  Reduction of Rent and Lease Obligations: Effective February 1, 2020, Paragraph 2 of The Rent Addendum to the Lease "Annual Rent" is amended as follows:

    a.  Annual Base Rent shall be reduced and amended to Seventy Thousand Dollars ($70,000.00), which shall be paid in equal monthly installments on the First (1st) day of each month

    b.  Increases in Annual Rent, beginning February 1, 2021 through June 30, 2031, on an annual basis and on each annual anniversary of such, the Annual Base Rent shall increase to the greater of (i) the current Annual Base Rent increased by one percent (1.0%) or (ii) seven and one-half percent (7.5%) of actual sales (sales to be based on the TTP Trailing Thirteen Periods). At no time during the Initial Term shall rent be greater than 7.5% of sales.

     c.     Real Property Taxes; Tennent will continue to pay all property taxes as they come due in accordance with Tenant's obligations under the Lease.

3.     Except as expressly modified or amended herein, the Lease shall remain unmodified and in full force and effect. In the event of any inconsistencies between the provisions and conditions of the Lease and this First Amendment, the provisions and conditions of this First Amendment shall govern.

5.     If at any time Tenant enters into bankruptcy proceedings or filings, and subject to approval and as directed by such Federal Bankruptcy Court or Magistrate, tenant shall pay all back and/or delinquent rents in full, with allowable interest, in accordance with the Lease and Paragraph 4 of the Rent Addendum of the Lease.

4.     This First Amendment may be executed in counterparts, all of which when taken together shall constitute one original document.

     IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be executed as of the Effective Date.

**LANDLORD:**

By: _____

JOSEPH CARPELLO, Trustee of the Carpello Family Trust dated February 5, 2004

By: _____

KATHERINE ANN CARPELLO, Trustee of the Carpello Family Trust dated February 5, 2004

**TENANT:**

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _Mike Wood, CRO_____

Mike Wood, Vice President and Chief Real Estate Officer

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this, the 27th day of April, 2020, I electronically filed the foregoing **THE CARPELLO FAMILY TRUST'S OMNIBUS RESPONSE AND OBJECTION TO (1) DEBTOR'S MOTION FOR ENTRY OF AN ORDER EXTENDING EXCLUSIVITY PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF, (2) DEBTOR'S MOTION FOR AN ORDER EXTENDING TIME TO ASSUME OR REJECT UNEXPIRED LEASES THROUGH AND INCLUDING AUGUST 16, 2020, AND (3) DEBTOR'S PROPOSED CURE COSTS** with the Clerk of Court using the CM/ECF system, which will insure delivery upon all parties receiving electronic notice in this case.

/s/ *Joseph J. Burton, Jr.*
Joseph J. Burton, Jr.
Georgia Bar No. 097875

MOZLEY, FINLAYSON & LOGGINS LLP
1050 Crown Pointe Parkway
Suite 1500
Atlanta, Georgia 30338
Telephone:  (404) 256-0700
Facsimile:  (404) 250-9355
jburton@mfllaw.com
*Attorneys for Creditor Carpello Family Trust*