**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE KRYSTAL COMPANY, *et al.*,[1] | ) | Case No. 20-61065 (PWB) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF NO AUCTION AND FILING OF ASSET PURCHASE AGREEMENT

**PLEASE TAKE NOTICE** that on February 12, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief* (the "Bidding Procedures Motion") [Docket No. 148].

**PLEASE TAKE FURTHER NOTICE** that on March 4, 2020, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief* (the "Bidding Procedures Order")[2] [Docket No. 227].

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures Order established May 5, 2020 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") as the deadline by which all Qualified Bids must be actually received by the Debtors.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Krystal Company (4140); Krystal Holdings, Inc. (5381); and K-Square Acquisition Co., LLC (8916).  The location of the Debtors' corporate headquarters and service address is: 1455 Lincoln Parkway, Suite 600, Dunwoody, Georgia 30346.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that the Debtors received only one Qualified Bid by the Bid Deadline, which was a Qualified Bid submitted by DB KRST Investors LLC.

**PLEASE TAKE FURTHER NOTICE** that since no other Qualified Bids were received by the Bid Deadline, the Auction will not take place.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file that certain Asset Purchase Agreement by and between DB KRST Investors LLC and The Krystal Company, dated as of May 6, 2020 (the "Asset Purchase Agreement") (excluding schedules to the Asset Purchase Agreement), attached hereto as Exhibit A, which constitutes the prevailing bid for the sale of substantially all of the Debtors' assets.

**PLEASE TAKE FURTHER NOTICE** that, consistent with the Bidding Procedures Order, the deadline to object to approval of the Sale is **May 12, 2020 at 5:00 p.m. (prevailing Eastern Time)** and the Sale Hearing will be held before the Honorable Paul W. Bonapfel, United States Bankruptcy Judge, Courtroom 1401, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303 on **May 13, 2020 at 11:00 a.m. (prevailing Eastern Time)**. Given the current public health crisis, the hearing may be telephonic only. Please check the "Important Information Regarding Court Operations During COVID-19 Outbreak" tab at the top of the GANB website prior to the hearing for instructions on whether to appear in person or by phone.

**PLEASE TAKE FURTHER NOTICE** that a copy of each document filed in the above-captioned chapter 11 cases can be viewed on the Court's website at http://ecf.ganb.uscourts.gov (registered users) or at http://pacer.psc.uscourts.gov (unregistered users) and the website of the Debtors' notice and claims agent, Kurtzman Carson Consultants LLC, at https://www.kccllc.net/krystal. Further information may be obtained by calling Kurtzman Carson Consultants LLC toll free at (888) 249-2792 (U.S./Canada) or (310) 751-2607 (International).

[*Remainder of page intentionally left blank.*]

Date:  May 6, 2020            Respectfully submitted,
       Atlanta, GA
                              KING & SPALDING LLP


                              /s/  *Sarah R. Borders*
                              Sarah R. Borders
                              Georgia Bar No. 610649
                              Jeffrey R. Dutson
                              Georgia Bar No. 637106
                              Leia Clement Shermohammed
                              Georgia Bar No. 972711
                              **KING & SPALDING LLP**
                              1180 Peachtree Street NE
                              Atlanta, Georgia 30309
                              Telephone: (404) 572-4600
                              Email: sborders@kslaw.com
                              Email: jdutson@kslaw.com
                              Email: lshermohammed@kslaw.com

                              *Counsel for the Debtors in Possession*

## <u>Exhibit A</u>

**Asset Purchase Agreement (excluding Schedules)**

*Execution Version*

---

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**DB KRST INVESTORS LLC**

**AND**

**THE KRYSTAL COMPANY**

**May 6, 2020**

---

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of May 6, 2020 (this "Agreement"), is entered into by and between DB KRST Investors LLC, a Delaware limited liability company ("Purchaser"), on the one hand, and The Krystal Company, a Tennessee corporation ("Seller"), on the other hand.  Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS**, Seller operates a portfolio of Krystal brand quick-service restaurants, consisting of both company-owned and franchised locations, which offer a variety of fast food and beverages in a casual atmosphere (the "Business");

**WHEREAS**, Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities upon the terms and subject to the conditions set forth herein;

**WHEREAS**, Seller and certain affiliates (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia (Atlanta Division) (the "Bankruptcy Court"), which commenced chapter 11 bankruptcy cases for Debtors (collectively, the "Bankruptcy Case") pending as Jointly Administered Case No. 20-61065 (PWB) in the Bankruptcy Court;

**WHEREAS**, Debtors and others are parties to that certain Third Amended and Restated Credit Agreement, dated as of April 26, 2018 (the "Credit Agreement"), by and among the Debtors, Wells Fargo Bank, National Association, as Administrative Agent (the "Agent"), Issuing Bank and Swing Line Lender, Regions Bank, as Syndication Agent, and the other lenders party thereto;

**WHEREAS**, Purchaser, as duly appointed sub-agent of Agent, desires to credit bid the Prepetition First Lien Obligations for the Purchased Assets, for the benefit of and on behalf of the holders of the outstanding Prepetition First Lien Obligations, in an amount equal to the Credit Bid Amount, in accordance with Section 363(k) of the Bankruptcy Code, the Bidding Procedures, and the Sale Order; and

**WHEREAS**, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to a Sale Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

39748401v22

1.      **Definitions**.

1.1     <u>Definitions</u>.  The following terms, as used herein, have the following meanings:

(a)      "<u>Accounts Receivable</u>" means all accounts and notes receivable (whether current or non-current) of Seller, in respect of goods shipped, products sold or services rendered prior to the Closing Date, including receivables from credit card processors, franchisees, the sale of gift cards in retail outlets, and allowances due from landlords under Real Property Leases (but only to the extent such Real Property Leases constitute Assigned Contracts).

(b)      "<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person; <u>provided</u>, <u>however</u>, that with reference to each Debtor, its only Affiliate shall be the other Debtors.  Notwithstanding the foregoing, Softbank and members of the Softbank Group shall not be deemed Affiliates of Purchaser.

(c)      "<u>Ancillary Documents</u>" shall mean the Assignment and Assumption Agreement, the Bill of Sale, the IP Assignment and Assumption Agreement, the Deeds, the Management Agreement and any other agreement, document or certificate of the Purchaser or Seller, which is executed and delivered pursuant to this Agreement or in connection with the Transaction or the Closing.

(a)      "<u>Auction</u>" shall mean the auction as contemplated by the Bidding Procedures Order.

(b)      "<u>Bidding Procedures</u>" means the bidding procedures approved by the Bidding Procedures Order at Docket No. 227, <u>Exhibit 1</u>.

(c)      "<u>Bidding Procedures Order</u>" means the Order of the Bankruptcy Court approving the Bidding Procedures at Docket No. 227.

(d)      "<u>Business Day</u>" means a day other than Saturday, Sunday or other day on which commercial banks in Atlanta, Georgia are authorized or required by Law to close.

(e)      "<u>CARES Act</u>" means the Coronavirus Aid, Relief, and Economic Security Act as signed by the President on March 27, 2020.

(f)      "<u>CARES Act Tax Relief</u>" means (i) any tax credits available pursuant to Section 2301 of the CARES Act, and (ii) any deferral of payroll taxes claimed pursuant to Section 2302 of the CARES Act.

(g)      "<u>Cash Management Motion</u>" means the Emergency Motion for Entry of an Order (I) Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records and (II) Granting Related Relief at Docket No. 8.

(h)    "Cash Out Option" means the option of the Purchaser, which shall be exercised at the sole and absolute discretion of the Required Lenders (as defined in the Credit Agreement), to pay at Closing an amount of cash equal to any Prepetition First Lien Lender's pro rata share of the Credit Bid Amount, which amount shall be payable by the Purchaser directly to such Prepetition First Lien Lender by wire transfer or certified check at the Closing and, in consideration thereof, the amount of such Prepetition First Lien Lender's portion of the Prepetition First Lien Obligations equal to such Prepetition First Lien Lender's pro rata share of the Credit Bid Amount shall be automatically extinguished and satisfied.

(i)    "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any Laws promulgated thereunder.

(j)    "Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

(k)    "Closing Date" means the date of the Closing.

(l)    "Closing Date Cash" means the cash on hand in Debtors' estates as of the Closing Date, but excluding cash in Store Level Depository Accounts (as defined in the Cash Management Motion) and any cash physically located at a Purchased Location.

(m)    "Code" means the Internal Revenue Code of 1986, as amended.

(n)    "Confidential Information" means any trade secret, confidential proprietary information and any other non-public information with respect to the Purchased Assets, including, without limitation, any trade secret or confidential proprietary information included in or embodied in any of the following:  methods of operation, products, technology, inventions, trade secrets, know-how, software, marketing methods, sales plans and strategies, suppliers, competitors, markets, market surveys, techniques, research, development, production processes, finances, technical data, policies, strategies, designs, formulas, developmental or experimental work, improvements, discoveries, plans for research or future developments, database schemas or tables, infrastructure, development tools or techniques, training manuals, marketing, distribution and installation plans, processes and strategies, methodologies, business plans, budgets, financial information and data, customer and client information, prices and pricing strategies, costs, fees, customer and client lists and profiles, employee, customer and client nonpublic personal information, supplier lists, business records, audit processes, management methods and information, reports, recommendations and conclusions or other specialized information or proprietary matters as of the Closing Date. "Confidential Information" does not include, and there shall be no obligation hereunder with respect to, information that (i) is generally available to the public on the date of this Agreement, (ii) becomes generally available to the public other than as a result of a disclosure by such Person not otherwise permissible hereunder, or (iii) is required by Law or legal requirement to be disclosed.

4

(o)    "Contracts" means any contract, agreement, lease, license, purchase order, commitment or other legally binding arrangement with respect to which Seller is a party.

(p)    "Credit Bid" means a bid by Purchaser in accordance with Section 363(k) of the Bankruptcy Code.

(q)    "Credit Bid Amount" means a Credit Bid of the Prepetition First Lien Obligations equal to $27,000,000.00.

(r)    "Credit Card Liabilities" means all Liabilities and other rights of credit card processors or other Persons to amounts payable by Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Seller in respect of credit or debit cards to any credit card processors to Seller, including any and all Claims arising from, related to, or in connection with the Data Breach.  For the avoidance of doubt, to the extent that they do not arise under an Assigned Contract, Credit Card Liabilities are Excluded Liabilities hereunder.

(s)    "Credit Card Receivables" means all accounts and accounts receivable and other rights of Seller to amounts owed to Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Seller that are made with credit or debit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Seller.

(t)    "Cure Costs" means that, for only the Assigned Contracts, all amounts that are determined by a final and nonappealable order of the Bankruptcy Court must be paid, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Contracts to Purchaser as provided herein.

(u)    "Data Breach" means that certain security incident involving the presence of malware on a certain point of sale system in the Seller's environment which malware allowed for the unauthorized access to and theft of payment card information of Seller's customers, as further described on Schedule 3.8(g).

(v)    "Deeds" means one or more grant deeds conveying to Purchaser good, clear and marketable fee title to the Owned Real Property free and clear of all Liens to the extent permitted under Sections 363 and 365 of the Bankruptcy Code, in form and substance reasonably satisfactory to Purchaser.

(w)    "Designation Rights Period" means the period of forty-five (45) days from and after the Closing Date.

(x)    "Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other employee benefit arrangements or payroll practices, including, without limitation, bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation

5

arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance or scholarship programs maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability.

(y)    "Environmental Laws" means, whenever in effect, all foreign, federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations, all common Law, and published policy or guidance,  in each case concerning public health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Substances or wastes, including, without limitation, CERCLA, the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and including the laws of nuisance and trespass, and the regulations promulgated pursuant thereto.

(z)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(aa)    "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Seller for purposes of Code § 414.

(bb)    "Farmer's Lien" shall mean any Lien (including any trust or other arrangement in the nature of a Lien) for the benefit of producers, suppliers or sellers of livestock, poultry, fruits, vegetables or other farm products that operates to create a first priority Lien in favor of such producers, suppliers or sellers (or agents or assignees thereof) covering farm products (and the products and proceeds thereof), to secure the unpaid purchase price of such farm products, including any trust established by Section 499e of the PACA, Section 196b of the PSA, Section 197b of the PSA or any equivalent applicable state laws.

(cc)    "Franchise Agreement" shall mean any Contract between Seller, on the one hand, and a third party on the other hand, pursuant to which Seller has granted a license to the third party to use Seller's brand name, trademark, trade name, logo, or service mark in conducting business.

(dd)    "GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

(ee)    "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission,

department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

(ff)     "Hazardous Substances" means any man-made or naturally occurring substance, product, material, waste or recyclable material which is regulated by any Governmental Authority including, without limitation, petroleum and its by products, asbestos, urea, formaldehyde, lead based paint, and any material or substance which is defined as "hazardous waste", "hazardous substance", "hazardous material", "restricted hazardous waste", "industrial waste", "special waste", "medical waste or biohazardous waste", "solid waste", "pollutant", "contaminant", "toxic waste" or "toxic substance" or other words of similar import under any provision of Environmental Law.  Hazardous Substances shall include mold, if such mold is present under such conditions as to render any structure, or portion thereof, unsafe or unfit for its intended uses.

(gg)     "Improvements" means all leasehold improvements located, placed, constructed or installed on or under any parcel of Leased Real Property (but only to the extent the related Real Property Lease constitutes an Assigned Contract), including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

(hh)     "Intellectual Property Licenses" means any Contract pursuant to which (i) Seller grants to any third Person any right to use (including through releases, immunities from suit or covenants not to sue) any of the Owned Intellectual Property or Licensed Intellectual Property and (ii) Seller received from any third Person any right to use (including through releases, immunities from suit or covenants not to sue) such third Person's Intellectual Property Rights.

(ii)     "Intellectual Property Rights" means all of Seller's intellectual property rights and other similar proprietary rights throughout the world, to the extent transferable under Section 365 of the Bankruptcy Code, including:  (i) patents, patent applications, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, and patent rights; (ii) trademarks (registered, unregistered and at common law), trademark registrations and applications, trade names, logos, all trade dress rights, logos, corporate names, identifying symbols, emblems, brand names, service marks (registered and at common law), service mark registrations and applications, service names, websites, Internet domain names, web pages, social media channels (including, without limitation, Facebook, Instagram and Twitter handles), signs or insignia and general intangibles of a like nature, and other indicia of source and all goodwill associated  with any of the foregoing, and all applications and registrations therefor and renewals thereof; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, recipes, databases and data collections, confidential inventions and confidential business information (including recipes, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, customer and supplier lists, pricing and cost information, business and marketing plans and proposals); (v) all source and

7

object code, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools; (vi) all documentation and media constituting, describing or relating to the above, including manuals, memoranda and records; (vii) income and royalty payments arising from or relating to any of the foregoing; and (viii) causes of action and rights to sue or seek other remedies (including with respect to any past, present or future infringement, misuse or misappropriation) arising from or relating to any of the foregoing.

(jj)    "Inventory" means all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory and stock in trade owned by Seller, whether or not prepaid, and wherever located, held or owned, including all fresh and frozen foodstuffs, beverages, disposable paper goods (such as napkins and paper towels), soaps and detergents, condiments, retail merchandise, replacement and spare parts and fuels and other similar items.

(kk)    "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by the following individuals after due inquiry: Jonathan Tibus, Tim Ward and Bruce Vermilyea.

(ll)    "Law" means any law, statute, regulation, rule, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(mm)    "Leased Real Property" means all of the real property leased or subleased by Seller in connection with conducting the Business, including the real property locations set forth on Schedule 1.1(kk).

(nn)    "Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or Claims or any proceedings by or before a Governmental Authority, and any appeal from any of the foregoing.

(oo)    "Liability" means any debt, loss, damage, adverse claim, fine, penalty, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), whether contingent, at law or in equity or otherwise, including any liability based on successor liability theories, and including all costs and expenses related thereto.

(pp)    "Licensed Intellectual Property" means any Intellectual Property Rights that Seller is licensed or otherwise permitted by other Persons to use pursuant to any Intellectual Property License.

(qq)    "Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise, including Farmer's Liens), pledge, security interest, Claim, encumbrance, option, restriction, charge, instrument, preference, priority, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent,

8

material or non-material, known or unknown and also includes any "interest" as that term is used in Section 363(f) of the Bankruptcy Code. For the avoidance of doubt, the definition of Lien shall not be deemed to include the grant of any license or sublicense by Seller of Intellectual Property Rights.

(rr)    "Management Agreement" means a Management Agreement by and between Seller and Purchaser in the form attached hereto as Exhibit A.

(ss)    "Material Adverse Effect" means a condition, fact or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have a material adverse effect (1) on the Business, the Assumed Liabilities or the Purchased Assets or the Seller's operations, results of operations, or condition (financial or otherwise), or (2) on the ability of Seller to perform its obligations hereunder in a timely manner, excluding in the case of clause (1) above any such effect to the extent resulting from or arising in connection with (i) the pendency or consummation of the Transactions or the public announcement thereof, in each case arising as a result of the identity of Purchaser; (ii) changes or conditions affecting the industries generally in which Seller operates; (iii) changes in national or international economic or political conditions; (iv) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) changes in Law or in GAAP or interpretations thereof; (vi) changes resulting from the commencement and continuation of the Bankruptcy Case; (vii) changes arising in connection with the COVID-19 pandemic or any earthquake, flood, hurricane, tornado or other act of God, (viii) failure of Seller to meet financial projections (provided that the underlying causes of such failure (subject to the other provisions of this definition) shall not be excluded), or (ix) any action taken by Seller as required or contemplated by this Agreement.

(tt)    "Multiemployer Plan" means any "multiemployer plan" (as defined in ERISA § 3(37)) contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability.

(uu)    "Non-Assigned Contracts" means any contract or agreement not listed as an Assigned Contract, or is at any point excluded from being an Assigned Contract. For the avoidance of doubt, notwithstanding any provision of this Agreement to the contrary, the Contracts listed on Schedule 1.1(ss) (including any amendment or supplement thereto) shall in all circumstances be Non-Assigned Contracts except to the extent expressly otherwise agreed by Purchaser and Seller via a written amendment to Schedule 1.1(ss).

(vv)    "Order" means any award, decision, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

(ww)    "Owned Intellectual Property" means the Intellectual Property Rights owned by Seller.

(xx)    "Owned Real Property" shall mean, collectively, the real property owned by Seller (including all improvements, buildings, structures, and all fixtures related thereto).

(yy)    "PACA" means the Perishable Agricultural Commodities Act, 7 U.S.C. Section 499a *et seq.*

(zz)    "Permits" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like, in each case to the extent transferable without the consent of any Governmental Authority.

(aaa)    "Permitted Liens" means (i) Liens granted by Purchaser at or after the Closing in connection with any financing of Purchaser related to the purchase of the Purchased Assets pursuant to this Agreement; (ii) Liens that arise under zoning, building codes, land use and other similar Laws, none of which would materially interfere with the ownership or operation by Purchaser of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement; (iii) Liens for Taxes not yet due and payable; and (iv) with respect to leased or licensed property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assigned Contract.

(bbb)    "Person" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(ccc)    "Petition Date" means the date on which Debtors commenced the Bankruptcy Case.

(ddd)    "Post-Petition Contracts" means all Contracts entered into by the Seller after the Petition Date (except any Contracts related to money loaned to Seller by any bank or other financial institution or person), including all contracts with vendors, suppliers, and customers.

(eee)    "Prepetition First Liens" means the security interests and Liens granted by Debtors in favor of the Agent and for the benefit of the Secured Parties as more particularly described in the Credit Agreement and related loan documents.

(fff)    "Prepetition First Lien Lenders" means the Agent, Purchaser, individually and in its capacity as sub-agent, and each of the lenders party to the Credit Agreement.

(ggg)    "Prepetition First Lien Obligations" means all "Obligations" (as defined in the Credit Agreement).

(hhh)    "Property Taxes" means all personal property Taxes, real property Taxes and similar ad valorem obligations with respect to Purchased Assets for any Tax period.

(iii)     "PSA" means the Packers and Stockyards Act, 7 U.S.C. Section 181 et seq.

(jjj)     "Purchased Avoidance Actions" means all causes of action, lawsuits, Claims, rights of recovery and other similar rights of Seller arising under Chapter 5 of the Bankruptcy Code, whether relating to the Business and the Purchased Assets or otherwise.

(kkk)    "Purchased Location" means a restaurant location that is subject to a Real Property Lease that is an Assigned Contract.

(lll)     "Purchaser Material Adverse Effect" means a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(mmm)"Release" has the meaning set forth in CERCLA.

(nnn)    "Relief Proceeds" means, all rights of, or on behalf of, Seller in respect of any current or future disaster relief or other similar assistance program of any Governmental Authority in respect of, or enacted in response to, the COVID-19 pandemic, including any CARES Act Tax Relief.

(ooo)    "Remedial Action" means all actions to (i) clean up, remove, treat or in any other way address any Hazardous Substances or restore natural resources, (ii) prevent the Release of any Hazardous Substances so it does not endanger or threaten to endanger worker or public health or welfare or the indoor or outdoor environment, (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care, or (iv) correct a condition of noncompliance with Environmental Laws.

(ppp)    "Representatives" shall mean, with respect to any Person, such Person's directors, officers, employees, financial advisors, attorneys, accountants, consultants, agents and other representatives.

(qqq)    "Restaurant Cash" means, with respect to any individual restaurant that is a Purchased Location or is otherwise acquired by Purchaser under this Agreement, cash on hand and physically located at such restaurant.

(rrr)     "Retained Cash" mean cash in the amount of $4,696,300.

(sss)    "Sale Order" means an Order of the Bankruptcy Court (i) approving this Agreement, (ii) authorizing the sale of the Purchased Assets pursuant to Sections 363 of the Bankruptcy Code, (iii) authorizing the assumption and assignment of the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) containing findings of fact and conclusions of law that Purchaser has acted in "good faith" within the meaning and entitled to the protections of Section 363(m) of the Bankruptcy Code, and (v) authorizing the Transactions, and satisfactory, in form and substance, to the Purchaser, in its reasonable discretion.

(ttt)    "Section 503(b)(9) Order" means the *Order (I) Authorizing Payment of Undisputed Claims Under Section 503(B)(9); (II) Establishing the Bar Date for Filing Requests for Payment of Administrative Expense Claims Under Section 503(B)(9); (III) Approving the Form, Manner, and Sufficiency of Notice of Bar Date Pursuant to Bankruptcy Rule 9007; (VI) Approving the Procedure for Submitting Section 503(B)(9) Claims; (V) Establishing and Implementing Exclusive and Global Procedures for Resolving Claims Relating to Goods Received Within Twenty Days Prior to the Petition Date; and (VI) Granting Related Relief.*

(uuu)    "Secured Parties" has the meaning set forth in the Credit Agreement.

(vvv)    "SoftBank" mean SoftBank Group Corp.

(www) "Softbank Group" means any Person controlling, controlled by or under common control with SoftBank that is not also controlled by Fortress Investment Group LLC. For purposes of this definition, "control" means the power, through ownership of securities, Contract or otherwise, to direct the policies of the applicable person or entity.

(xxx)    "Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

(yyy)    "Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition, administration, or collection of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being (a) a transferee or successor or by having been a member of a combined, affiliated, unitary, consolidated or similar group or otherwise by operation of Law or (b) a party to any agreement or any express or implied obligation to indemnify any other Person.

(zzz)    "Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(aaaa) "Transfer Tax" means any stamp, documentary, registration, transfer, added-value or similar Tax imposed under any applicable Law in connection with the Transactions.

(bbbb) "Treasury Regulations" means regulations promulgated by the United States Department of Treasury under the Code.

1.2    Cross References. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Assignment and Assumption Agreement | 2.9(a) |

| | |
|---|---|
| Assigned Contracts | 2.1(a) |
| Assumed Liabilities | 2.3 |
| Assumption Notice | 2.5(b)(ii) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale | 2.9(a) |
| Business | Recitals |
| Casualty | 7.7(b) |
| Casualty Proceeds | 7.7(b) |
| Closing | 2.8 |
| Condemnation | 7.7(a) |
| Condemnation Proceeds | 7.7(a) |
| Continuation Costs | 2.5(b)(i) |
| Contract & Cure Schedule | 7.5(a) |
| Credit Card Contracts | 3.16(a)(viii) |
| Designation Right Asset | 2.5(b)(i) |
| Employment-Related Laws and Obligations | 3.12 |
| Encumbrance Documents | 3.14(b) |
| End Date | 12.1(b) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Financial Statements | 3.17 |
| Initial Allocation | 2.6(b) |
| Material Contract | 3.16(a) |
| Non-Recourse Parties | 13.10 |
| Organizational Amendments | 5.5(a) |
| Party or Parties | Preamble |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Real Property Lease | 3.15(d) |
| Registered Owned Intellectual Property | 3.8(a) |
| Rejection Notice | 2.5(b)(iii) |
| Retained Cash Shortfall | 6.6 |
| Seller | Preamble |
| Seller Core Representations | 10.2(b) |
| Taxing Authority | 1.1(vvv) |
| Transactions | Recitals |
| Transferred Employee | 9.1(a) |
| Transferred Employee's Employment Date | 9.2 |

2.    _Purchase and Sale_.

13

2.1    <u>Purchase and Sale</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller agrees to sell, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to all of Seller's tangible and intangible assets, properties and rights (other than the Excluded Assets), in each case free and clear of all Liens (excluding Permitted Liens) except as required by Sections 363 and 365 of the Bankruptcy Code, on an "as is, where is" basis and without any representation or warranty on the part of Seller as to fitness, merchantability or otherwise, except as otherwise provided herein (the "<u>Purchased Assets</u>"), which Purchased Assets shall include, without limitation:

(a)    all rights of Seller under the Contracts (including, without limitation) that are set forth on <u>Schedule 2.1(a)</u> (collectively, the "<u>Assigned Contracts</u>"); provided, however, that notwithstanding anything herein to the contrary (including the provisions set forth in <u>Section 2.5(b)</u>), (i) Assigned Contracts shall include all Post-Petition Contracts to the extent there are no Cure Costs due and payable in connection with such Post-Petition Contracts and solely to the extent the Post-Petition Contracts collectively do not require the Purchaser to make payments in excess of $275,000 over a twelve-month period, and, (ii) for the sake of clarity, any Post-Petition Contract with Keen-Summit Capital Partners LLC shall be an Assigned Contract;

(b)    except for the Retained Cash, all of Seller's cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions, including short-term marketable securities, and including the Restaurant Cash in respect of all Purchased Locations;

(c)    all Accounts Receivable and all claims against third parties related to the collectability thereof;

(d)    all Inventory (including Inventory in transit and Inventory located at restaurants that are not acquired by Purchaser under this Agreement);

(e)    all tangible personal property, including all machinery, equipment, tools, point of sale systems, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, cutlery, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Seller (including any of the foregoing property that is subject to a capital lease);

(f)    any Tax refund due to Seller or the other Debtors (including, for the avoidance of doubt, K-Square Acquisition Co., LLC);

(g)    all Permits set forth on <u>Schedule 2.1(g)</u> (in each case to the extent transferable without the consent of any Governmental Authority) other than Permits that relate specifically to a restaurant or real property that is covered by a Real Property Lease that does not constitute an Assigned Contract;

14

(h)      all Intellectual Property Rights, including the items set forth on Schedule 2.1(h) and all indoor and outdoor signage, advertising, promotional materials, décor, pieces, accents, and artwork or decorations;

(i)      all cars, trucks, forklifts, other industrial vehicles and other motor vehicles;

(j)      except as set forth in Section 2.2(a), all security deposits, utility deposits, and other deposits;

(k)      all Improvements other than Improvements that relate specifically to a restaurant or real property that is covered by a Real Property Lease that does not constitute an Assigned Contract and is not otherwise acquired by Purchaser pursuant to this Agreement;

(l)      all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current or former employees and agents of Seller or with third parties, including, without limitation, non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the sale of the Seller's assets and all rights of Seller, whether under a Contract or otherwise, concerning obligations not to disclose Confidential Information relating to the Business and all obligations not to compete with the Business that any current or former employee owes to Seller (notwithstanding the foregoing, nothing in this Agreement shall require Seller to pay any Cure Costs or make any other payment that may be required in order to enforce Seller's rights under any Contract included in this Section 2.1(l));

(m)      all rights to the telephone and facsimile numbers and email addresses used by Seller other than telephone and facsimile numbers that relate specifically to a restaurant or real property that is covered by a Real Property Lease that does not constitute an Assigned Contract;

(n)      all of Seller's recipes, methods, procedures, cooking/preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages, or otherwise (in each case, written or oral or in any other form whatsoever);

(o)      all books, records, files and papers of Seller relating primarily to (i) the Business, (ii) the Purchased Assets, including equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, Tax records and other similar documents and records (all in the state in which such records and information currently exist), (iii) the Transferred Employees (to the extent the Transferred Employee consents to such transfer) or (iv) eligibility and rights to receive Relief Proceeds; provided that Seller shall be entitled to retain copies of such books, records, files and papers;

15

(p)    except to the extent that the same is an Excluded Asset, all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Seller, arising out of or relating to the Business and the Purchased Assets as of the Closing;

(q)    the Purchased Avoidance Actions; provided, however, that: (i) as of the Closing, Purchaser shall be deemed to have waived all Purchased Avoidance Actions and shall be deemed to have fully and finally released such claims, and (ii) neither the Purchaser, nor any Person claiming by, through or on behalf of the Purchaser (including by operation of law, sale, assignment, conveyance or otherwise), will pursue, prosecute, litigate institute or commence an action based on, assert, sell, convey, assign or file any claim that relates to the Purchased Avoidance Actions;

(r)    all rights arising from Relief Proceeds;

(s)    all Claims under insurance policies for property damage claims related to the Purchased Assets and, to the extent set forth in Section 7.7, all proceeds of any condemnation proceeding affecting the Purchased Assets, and all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Seller or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(t)    all goodwill associated with the Business or the Purchased Assets;

(u)    the Owned Real Property;

(v)    to the extent transferable, all Store Level Depository Accounts (as defined in the Cash Management Motion), but excluding any negative cash balances in such Store Level Depository Accounts;

(w)    all refunds or other payments due or to become due to Seller or the other Debtors in connection with and pursuant to workers' compensation insurance policies of Seller, to the extent such policies become Assigned Contracts hereunder; and

(x)    except for Excluded Assets set forth in Section 2.2, all other assets of Seller (including any Designation Right Assets elected to be included as Purchased Assets by written notice from Purchaser to Seller during the Designation Rights Period).

Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear (except for the Assumed Liabilities and Permitted Liens) of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, claims for successor liability under any theory of Law or equity), or Liens, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date.

16

2.2    <u>Excluded Assets</u>.  Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets shall not include the following (the "<u>Excluded Assets</u>"):

(a)    the Retained Cash;

(b)    all security deposits and deposits held by landlords, vendors or trade creditors that are parties to Non-Assigned Contracts, and, for the avoidance of doubt, all cash in the Debtors' Adequate Assurance Account (as defined in the Seller's Utilities Motion filed at Docket No. 120 in the Bankruptcy Case);

(c)    except for the Purchased Avoidance Actions or as set forth in <u>Sections 2.1(s)</u> or <u>7.7</u> hereof, all Claims or causes of action of Seller, whether arising under the Bankruptcy Code, applicable state law or otherwise (excluding actions available to Seller under Chapter 5 of the Bankruptcy Code) and the proceeds thereof, of whatever kind or nature, and whether asserted or unasserted;

(d)    Seller's corporate seals, stock record books, minute books, and organizational documents;

(e)    all Permits of Seller that are not otherwise set forth on <u>Schedule 2.1(g)</u>;

(f)    Non-Assigned Contracts;

(g)    any directors and officers insurance policies of Seller;

(h)    all rights of Seller arising under this Agreement or in connection with the Transactions;

(i)    [reserved];

(j)    all amounts owed to Seller by any one or more of Seller's Affiliates;

(k)    all tangible personal property listed on <u>Schedule 2.2(k)</u>;

(l)    all Improvements not included in <u>Section 2.1(k)</u>;

(m)    all telephone and facsimile numbers not included in <u>Section 2.1(m)</u>;

(n)    all books, records, files and papers of Seller not included in <u>Section 2.1(o)</u>; <u>provided</u> that Purchaser shall have the right (at its sole expense) to make copies of such retained records to the extent relating to the Business or any Purchased Asset;

(o)    all assets, if any, listed on <u>Schedule 2.2(o)</u>;

(p)    all Employee Benefit Plans (and any assets and liabilities that are part of or arise under such Employee Benefit Plans) unless they are included as Assigned Contracts; and

17

(q)    any assets, properties and/or rights identified by Purchaser in writing (including any Contract previously designated as an Assigned Contract) in its sole discretion, at any time until the date that is three (3) Business Days prior to the Closing Date, except for those Assigned Contracts set forth on <u>Schedule 2.2(q)</u> for which Purchaser shall not have the right to designate as an Excluded Asset after the date hereof, and any Designation Right Assets elected to be included as Excluded Assets by written notice from Purchaser to Seller during the Designation Rights Period.

2.3    <u>Assumed Liabilities</u>.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, only the following liabilities and obligations of Seller or the Business (the "<u>Assumed Liabilities</u>"):

(a)    all Claims, liabilities and obligations arising in connection with the Business or the Purchased Assets after the Closing;

(b)    all liabilities and obligations of Seller arising under the Assigned Contracts, Permits included within Purchased Assets and Intellectual Property Rights to the extent not otherwise set forth in this <u>Section 2.3</u>;

(c)    (i) all Cure Costs, and any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Assigned Contracts (as contemplated by Section 365 of the Bankruptcy Code); and (ii) to the extent not included in Cure Costs, all unpaid rent obligations for Purchased Locations for the months of April and May 2020;

(d)    all liabilities and obligations of Seller arising under outstanding gift cards, including gift cards issued or sold prior to or after the Petition Date, but excluding any escheatment claims related to such gift card obligations and excluding any claims for cash refunds to the extent not otherwise required by applicable Law in any jurisdiction in which a Purchased Location is located;

(e)    all obligations and liabilities for accrued salaries, benefits, wages and applicable payroll taxes in each case solely with respect to the most current and active pay period as of the Closing Date;

(f)    all accounts payable for trade payables and accrued liabilities of Seller arising in the ordinary course of business arising before or after the Petition Date that are entitled to priority status under Section 503(b) of the Bankruptcy Code (it being understood that trade payables and accrued liabilities shall not include any fees or expenses due to professional persons retained by Seller or any other party involved in the Bankruptcy Case, including any creditors' committees; <u>provided</u>, that Purchaser shall pay such accounts payable arising under Section 503(b)(9) of the Bankruptcy Code within three (3) Business Days of reconciliation in accordance with the Section 503(b)(9) Order;

(g)    all accrued and unpaid sales tax obligations of the Seller outstanding as of the Closing Date; and

18

(h)    all Property Taxes that are attributable to the Purchased Assets;

provided, however, that the aggregate amount of Assumed Liabilities with respect to subpart (c) (excluding the obligation to provide adequate assurance of future performance), subparts (d) – (g), and subpart (h) (excluding Property Taxes accruing after the Closing Date) of this Section 2.3 shall not exceed $21,500,000.

2.4    Excluded Liabilities.    Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or Liability of Seller of whatever nature, whether presently in existence or arising hereafter.  All such other Claims and Liabilities not being assumed (the "Excluded Liabilities") shall be retained by and remain the sole Liabilities of Seller.

2.5    Assumption/Assignment of Contracts and Rights.

(a)    To the maximum extent permitted by the Bankruptcy Code, the Assigned Contracts shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code.  Purchaser shall have sole responsibility for paying any Cure Costs due in connection with the assumption and assignment of the Assigned Contracts to the extent set forth in Section 2.3(c).  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if such attempted assignment would not be permitted under Sections 363 or 365 of the Bankruptcy Code and a third party objects to the assignment and it is determined by the Bankruptcy Court that the Seller is incapable as a matter of law of assigning that particular Purchased Asset.  If applicable counterparty consent is not obtained or such assignment is not permitted pursuant to Sections 363 and/or 365 of the Bankruptcy Code as set forth in the preceding sentence, then such Purchased Assets shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price.

(b)    Designation Right Asset.

(i)    Purchaser shall have the right, by written notice to Seller no later than three (3) Business Days prior to the Closing Date, to specify that any Contract and/or asset that is not a Purchased Asset shall be held by Seller (and, to the extent a Contract, not rejected pursuant to Section 365 of the Bankruptcy Code) (any such Contract, a "Designation Right Asset") for the duration of the Designation Rights Period; provided that, with respect to any such Designation Right Asset: (A) Purchaser shall promptly pay and be solely responsible for, all costs, expenses or liabilities associated with the continuation by, and (to the extent such Designation Right Asset is a Contract) ultimate assumption or rejection by, Seller of such Designation Right Asset for the period from the Closing through the end of the Designation Rights Period, including costs, expenses or liabilities arising from or incurred in connection with the administration of the Bankruptcy Case and related primarily to the Designation Right Assets (such costs, "Continuation Costs"); (B) the foregoing shall not affect the validity of the transfer to Purchaser

19

of any other Purchased Asset that may be related to such Designation Right Asset; and (C) after the Closing, Purchaser shall provide all employees necessary for the operation of the Designation Right Assets.

(ii)    As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, an "Assumption Notice") from Purchaser during the Designation Rights Period requesting assumption and assignment of any Designation Right Asset, Seller shall, at the sole cost and expense of the Purchaser and subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code such Designation Right Asset(s) set forth in an Assumption Notice.

(iii)    As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, a "Rejection Notice") from Purchaser during the Designation Rights Period requesting rejection of any Designation Right Asset, Seller shall, at the sole cost and expense of the Purchaser, take all actions required by the Sale Order or otherwise that are reasonably necessary to reject such contract pursuant to Section 365 of the Bankruptcy Code.

(iv)    Seller and Purchaser agree and acknowledge that the covenants set forth in this Section 2.5 shall survive the Closing.

(v)    Notwithstanding anything in this Agreement to the contrary, on the date any Designation Right Asset is assumed and assigned to Purchaser pursuant to this Section 2.5(b), such Designation Right Asset shall be deemed a Purchased Asset for all purposes under this Agreement and no further consideration shall be required to be paid for any Designation Right Asset that is assumed and assigned to Purchaser.

2.6    Purchase Price; Allocation of Purchase Price.

(a)    The aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

(i)    the Credit Bid in the amount of the Credit Bid Amount; and

(ii)    the assumption by Purchaser of the Assumed Liabilities.

(b)    The Purchase Price shall be satisfied at the Closing as to:

(i)    the Credit Bid, by extinguishing the Prepetition First Lien Obligations covered by the Credit Bid Amount, which shall be deemed to occur automatically and without further action on the Closing Date; and

(ii)    the amount of the Assumed Liabilities described in and pursuant to Section 2.3, by assuming such Assumed Liabilities pursuant to the Assignment and Assumption Agreement.

(c)    Purchaser and Seller agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with Section 1060 of the Code and the regulations thereunder (and similar applicable state Laws and regulations). No later than one hundred twenty (120) days following the Closing Date, Purchaser will prepare and deliver to Seller a copy of IRS Form 8594 and any required exhibits thereto allocating the Purchase Price (and any other amounts hereunder that are treated as acquisition consideration for U.S. federal, state and local income Tax purposes) among the Purchased Assets, the Assumed Liabilities and the Business (the "Initial Allocation").  Seller shall have thirty (30) days from the receipt of the Initial Allocation to provide comments to Purchaser with respect to the Initial Allocation.  Purchaser and Seller shall use reasonable efforts in good faith to resolve any disputes with respect to the Initial Allocation.  The final allocation determined in accordance with this Section 2.6(c) shall be binding on Purchaser and Seller for all purposes, including the reporting of gain or loss and determination of basis for income Tax purposes, and each of the Parties agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income Tax Returns and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state Laws and regulations.

2.7    Cash Out Option for Credit Bid.  In lieu of any applicable Prepetition First Lien Lender receiving a direct or indirect interest in the Purchased Assets, the Purchaser may exercise the Cash Out Option.

2.8    Closing.  The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place on May 15, 2020 (or such other date agreed to by the Seller) subject to satisfaction of the conditions set forth in Section 10 (other than those requiring a delivery, or the taking of other action, at the Closing), remotely via the electronic exchange of documents and signatures, no later than five (5) Business Days after satisfaction of the conditions set forth in Section 10 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Seller may agree; provided that the Closing shall be effective as of 12:01 a.m. on the Closing Date.

2.9    Deliveries by Seller.  At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)    a Bill of Sale (the "Bill of Sale"), Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") and Intellectual Property Assignment and Assumption Agreement (the "IP Assignment and Assumption Agreement"), substantially in the form attached hereto as Exhibit B, Exhibit C and Exhibit D, respectively, in each case duly executed by Seller;

21

(b)      originals (or, to the extent originals are not available, copies) of all Assigned Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to the Purchaser through the Seller's datasite;

(c)      physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(d)      an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that Seller is not a foreign person as defined in Section 1445 of the Code;

(e)      certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets;

(f)      the officer's certificates required to be delivered pursuant to <u>Section 10.2(d)</u>;

(g)      the Management Agreement duly executed by the Seller;

(h)      Deeds with respect to the Owned Real Property, executed by Seller; and

(i)      all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement.

2.10      <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)      the Purchase Price, in the form of the Credit Bid, in form reasonably satisfactory to Seller;

(b)      the Bill of Sale, Assignment and Assumption Agreement and IP Assignment and Assumption Agreement, in each case duly executed by Purchaser;

(c)      the Management Agreement duly executed by the Purchaser; and

(d)      all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

2.11      <u>Farmer's Liens</u>.  Seller shall be obligated to pay, satisfy and discharge any and all Farmer's Liens that are outstanding as of the Closing with respect to the Purchased Assets.

2.12      <u>Bulk Sales Laws</u>.  Purchaser hereby waives compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

39748401v22

3.      **Representations and Warranties of Seller**.  Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date of this Agreement and as of the Closing Date as follows:

3.1      <u>Organization and Good Standing</u>. Seller is an entity duly organized, incorporated or formed, validly existing and in good standing under the Laws of the jurisdiction listed for Seller in the Preamble, and has all power and authority to own, lease and operate its properties, including the Purchased Assets, and to carry on the Business as now being conducted. Seller is duly qualified or authorized to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or leased by it requires such qualification or authorization, except where the failures to be so qualified, authorized or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2      <u>Due Authorization</u>.  Subject to the entry of the Sale Order, Seller has all power, authority and legal capacity to execute and deliver this Agreement and the Ancillary Documents to which Seller is a party, to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to the entry of the Sale Order, the execution and delivery of this Agreement and the Ancillary Documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary actions on the part of Seller and no other corporate action on the part of Seller is necessary to authorize the execution and delivery of this Agreement and the Ancillary Documents to which Seller is a party by Seller and the consummation of the transactions contemplated hereby and thereby by Seller.  Subject to the entry of the Sale Order, this Agreement and each of the Ancillary Documents to which Seller is a party has been duly and validly executed and delivered by Seller and, subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, this Agreement and each of the Ancillary Documents to which Seller is a party constitutes a legal, valid and binding agreement of Seller that is enforceable against Seller in accordance with its terms.

3.3      <u>Governmental Authorization</u>.  Except as disclosed on <u>Schedule 3.3</u>, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions by Seller require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

3.4      <u>Noncontravention</u>.  Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions do not and will not (a) violate Seller's organizational documents, (b) assuming compliance with the matters referred to in <u>Section 3.3</u>, materially violate any applicable Law, (c) except as to matters which would not reasonably be expected to have a Material Adverse Effect, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which Seller is entitled under any provision of any Contract binding upon Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code,

23

or (d) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens, Assumed Liabilities or Liens that will be released at or prior to Closing.

3.5    Required Consents.  Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on Schedule 3.5, there is no Contract binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date.

3.6    Litigation.  Except as disclosed on Schedule 3.6, as of the date hereof, there is no action, suit, investigation or proceeding pending against, or to the Knowledge of Seller, threatened against or affecting, the Purchased Assets before any Governmental Authority which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

3.7    Permits.  To the Knowledge of Seller, Schedule 3.7 sets forth a complete and correct list of all Permits required to conduct and operate the Business in a manner consistent with the current practices of Seller.  Except as set forth on Schedule 3.7, to the Knowledge of Seller, (a) Seller is in material compliance with the terms and requirements of each such Permit; and (b) no written notice of violation of any Permit has been received from any Governmental Authority and, to the Knowledge of Seller no proceeding is pending seeking to revoke or limit any such Permit.

3.8    Intellectual Property Rights.

(a)    Schedule 3.8(a) sets forth an accurate and complete list of all Owned Intellectual Property included in the Purchased Assets for which Seller has received or applied for a registration or issuance, including, without limitation, any patent, patent application, copyright registration or application therefor, and trademark, trade name, service mark, domain name registration or application therefor ("Registered Owned Intellectual Property").  To the Knowledge of Seller, all of the Registered Owned Intellectual Property is subsisting, valid and enforceable.

(b)    Except as set forth on Schedule 3.8(b), (i) Seller owns or has valid and enforceable Intellectual Property Licenses to use all material Intellectual Property Rights owned or used by it, and (ii) to the Knowledge of Seller, the Owned Intellectual Property and Licensed Intellectual Property constitute all Intellectual Property Rights used in the Business as currently conducted.

(c)    Except as set forth on Schedule 3.8(c), none of the Owned Intellectual Property or Licensed Intellectual Property is subject to any Legal Proceeding and there exist no challenges received or outstanding to the validity, enforceability, ownership or use by Seller of the Intellectual Property Rights, nor any alleged infringements of such Intellectual Property Rights by third parties.

24

(d)      Except as set forth on Schedule 3.8(d), none of the Intellectual Property Rights included in the Purchased Assets have been licensed by Seller to any other Person.

(e)      Schedule 3.8(e) sets forth all material Intellectual Property Licenses to which Seller is a party.  Except as set forth on Schedule 3.8(e), Seller has not received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any material Intellectual Property License.

(f)      To the Knowledge of Seller, Seller and its products or services is not currently infringing, misappropriating or otherwise violating, and the operation of the Business as currently conducted does not infringe, misappropriate or violate, any Intellectual Property Rights of any Person, except for any infringement, misappropriation or violation that is not and would not reasonably be expected to be material to the Business. Except as set forth on Schedule 3.8(f), to the Knowledge of Seller, no Person is currently infringing, misappropriating or violating any of the Owned Intellectual Property included in the Purchased Assets.

(g)      To the Knowledge of Seller, (i) except as set forth on Schedule 3.8(g), Seller has not experienced any material failures, disruptions, unauthorized intrusions or breaches of its information technology or telecommunications networks, nor any material loss, theft or unauthorized access to or use of any personal information held by or on behalf of Seller, and (ii) Seller has implemented industry standard security measures to protect the security of its information technology and telecommunications networks and systems and the privacy and security of any material data or personal information stored thereon. Schedule 3.8(g) includes a description of the Data Breach, which is true, complete and correct in all material respects. The identities and addresses of Seller's customers (and/or other holders of credit and debit cards) impacted by the Data Breach is not readily ascertainable from Seller's books and records or otherwise.

(h)      Seller and its Affiliates shall not retain any Intellectual Property Rights as of the Closing.

3.9      Compliance with Laws and Court Orders.  To the Knowledge of Seller, Seller is not in violation of any Law applicable to the Purchased Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect.

3.10      Environmental Matters. Other than as may be set forth in the reports described on Schedule 3.10, Seller has not received written notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Leased Real Property which to the Knowledge of Seller remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Leased Real Property which to the Knowledge of Seller remains unperformed.

3.11      Employee Benefit Plans.

(a)      Schedule 3.11(a) sets forth a complete and accurate list of Seller's Employee Benefit Plans.  Seller has provided to, or made available to, Purchaser true and correct copies of each Employee Benefit Plan (including all plan documents and amendments thereto).  Except as set forth on Schedule 3.11(a), to the Knowledge of Seller, each Employee Benefit Plan has been established, maintained, funded and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws.  Except as set forth on Schedule 3.11(a), to the Knowledge of Seller, each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) is so qualified and has received a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and to the Knowledge of Seller, nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan.  Except as set forth on Schedule 3.11(a), no Employee Benefit Plan is subject to Title IV or Section 302 of ERISA or Section 412 of the Code, and Seller and its ERISA Affiliates do not contribute to nor have any liability with respect to any such plan.

(b)      Seller and its ERISA Affiliates are not a party to any Multiemployer Plan.  As of the date of this Agreement, Seller and its ERISA Affiliates have not incurred any unsatisfied withdrawal liability with respect to any Multiemployer Plan, and Seller and its ERISA Affiliates are not bound by any contract or has any liability described in Section 4204 of ERISA.

(c)      Except as set forth on Schedule 3.11(c), with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

3.12    Personnel Matters.  Seller has provided to Purchaser an accurate and complete list of the names, job classifications, dates of hire, base compensation, and any supplemental or bonus compensation (including any retention bonus arrangements) for all salaried employees of Seller. To the Knowledge of Seller and except as to matters which would not reasonably be expected to have a Material Adverse Effect, Seller is currently complying and has for the past 5 years complied with all Employment-Related Laws and Obligations, which means all Laws and Orders of any Governmental Authority relating to, touching upon or concerning the employment of the employees who perform work in connection with the operation of the Business, including relating to the hiring, firing and treatment of employees, or any legal obligation or duty regarding employment practices, terms and conditions of employment, equal opportunity, non-discrimination, discharge, immigration, anti-harassment, anti-retaliation, whistle blowing, compensation, wages, overtime payments, hours, benefits, collective bargaining, pension plans, the modification or termination of benefit plans and retiree health insurance plans, policies, programs, agreements, occupational safety and health, workers' compensation or other similar benefits and payments on account of occupational illness and injuries, employment contracts, collective bargaining agreements, grievances originating under the collective bargaining agreements, wrongful discharge, torts such as invasion of privacy, infliction of emotional distress, defamation, and slander (hereinafter "Employment-Related Laws and Obligations").  Additionally,

26

to the Knowledge of Seller, there are no threatened or pending charges, complaints, demands, lawsuits, or petitions against, or investigations being conducted of Seller concerning or relating to any alleged violations of, or failure to comply with, any Employment-Related Laws and Obligations, except as set forth on Schedule 3.12, except for such matters that would not have a Material Adverse Effect. To the Knowledge of Seller, there are no, and there has not occurred during the past 5 years, any union organizing campaigns or certification or representation demands or proceedings or campaigns that relate to the Business or any person or entity performing services for Seller and no such action or activity has been threatened. There are no organizing activities involving Seller pending with any labor organization or group of employees. No individuals or groups of individuals performing services for, on, or in connection with the Business are represented by a labor union or covered by a collective bargaining agreement, and no collective bargaining agreement, card check or recognition agreement, or any other agreement or arrangement with any labor union affects the operation of any Purchased Asset or any employees of Seller. There are no existing or, to the Knowledge of Seller, threatened labor strikes, lockouts, walkouts, work stoppages, organized slowdowns, unfair labor practice charges or complaints, labor arbitration proceedings affecting or relating to any employees of Seller or the Purchased Assets, and Seller has not experienced any such event within the past 5 years.

3.13    Sufficiency of and Title to the Purchased Assets.

(a)    Seller will have at Closing good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets. Upon consummation of the Transactions at the Closing, Purchaser will have acquired good, valid and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens (other than Assumed Liabilities) to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code.

(b)    The Purchased Assets (which, for the avoidance of doubt, do not include Excluded Assets) constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used (to the extent Seller holds rights, title and interest in such tangible personal property) or held for use by Seller, or otherwise necessary for Purchaser to conduct and operate the Purchased Assets and the Business (assuming that the Purchased Assets include all assets that the Purchaser has the right to acquire under this Agreement) immediately after the Closing in all material respects as conducted and operated by Seller as presently conducted. No Person other than Seller is engaged in the operation of, or holds rights, title and interest in, the Purchased Assets or assets that are used or useful in the operation of the Business.

(c)    K-Square Acquisition Co., LLC and Krystal Holdings, Inc. do not own any assets, other than equity interests in other Debtors, potential tax refunds, and rights and claims under insurance policies.

3.14    Owned Real Property.

(a)    Schedule 3.14(a) contains a true, complete and correct list of all Owned Real Property. Seller is the sole owner of the Owned Real Property and, except as set forth on Schedule 3.14(a), holds the Owned Real Property in fee simple with good and

27

marketable title.  With respect to the Owned Real Property:  (i) except as set forth in Schedule 3.14(a), Seller has not leased or otherwise granted to any person the right to use or occupy such Owned Real Property or any portion thereof; and (ii) except as may otherwise be disclosed by the Permitted Liens and other than the right of Purchaser pursuant to this Agreement, there are no pending or outstanding contracts of sale, leases, options to purchase, rights of first offer or rights of first refusal or other agreements (other than Permitted Liens) which affect the Owned Real Property or any portion thereof or interest therein.

(b)    The current use and occupancy of the Owned Real Property and the operation of the Business as currently conducted thereon do not violate any easement, covenant, condition, restriction or similar provision in any instrument of record or, to the Knowledge of Seller, other unrecorded agreement affecting such Owned Real Property (for the purposes of this Section 3.14(b), the "Encumbrance Documents").  The Seller has not received any notice of violation of any Encumbrance Documents and there is no basis for the issuance of any such notice or the taking of any action for such violation.

3.15    Leased Real Property.

(a)    The Leased Real Property constitutes all of the real property used by Seller in connection with the Business.

(b)    Except as set forth on Schedule 3.15(b), to the Knowledge of Seller, none of the Leased Real Property is subject to an eminent domain or condemnation proceeding.

(c)    Except as set forth on Schedule 3.15(c), Seller does not own any real property in fee.

(d)    Schedule 3.15(d) lists each lease or sublease, including all amendments, modifications or supplements thereof, pursuant to which Seller occupies any Leased Real Property (collectively, the "Real Property Leases").  The Seller has delivered (or otherwise made available) to the Purchaser a correct and complete copy of each Real Property Lease, together with all amendments thereto.

3.16    Contracts.

(a)    Schedule 3.16(a) lists the following Contracts (all Contracts listed or required to be listed herein are referred to as "Material Contracts") as of the date of this Agreement:

(i)    all Real Property Leases;

(ii)    all Franchise Agreements;

(iii)    all employment, confidentiality and/or noncompetition Contracts with employees of Seller and Contracts with independent contractors or consultants (or similar arrangements) engaged in connection with the Business;

28

(iv)     all Contracts under which Seller leases personal property in connection with the Business;

(v)     all Contracts with any material supplier of the Business;

(vi)     all Contracts with any Governmental Authority related to the Business;

(vii)     all Post-Petition Contracts; and

(viii)    all Contracts with credit card processors or otherwise pertaining to Credit Card Receivables or Credit Card Liabilities (collectively, "Credit Card Contracts").

(b)     Seller has made available to Purchaser true and complete copies of such Material Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

(c)     Except as to matters which would not reasonably be expected to have a Material Adverse Effect and except as set forth on Schedule 3.16(c), each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of Seller and of the other parties thereto, enforceable against it in accordance with its terms and, upon consummation of the Transactions, shall continue in full force and effect without penalty or other adverse consequence.  Except as set forth on Schedule 3.16(c), Seller is not in default under any Material Contract, nor, to the Knowledge of Seller, is any other party to any Material Contract in breach of or default thereunder, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a breach or default by Seller or any other party thereunder.  Except as set forth on Schedule 3.16(c), no party to any of the Material Contracts has exercised any termination rights with respect thereto, and no party has given notice of any significant dispute with respect to any Material Contract.

(d)     Except as set forth on Schedule 3.16(d), to the Knowledge of Seller, Seller has not received any written notice from any Person asserting a Claim with respect to the Data Breach.

(e)     The Post-Petition Contracts collectively do not require the Seller to make payments in excess of $275,000 over a twelve-month period.

3.17    Financial Statements.  Schedule 3.17 contains a true and correct copy of the unaudited consolidated balance sheet of Seller as at December 31, 2019 and the related consolidated statement of income and cash flows of Seller for the 12-month period then ended. The financial statements referred to in the foregoing sentence are collectively referred to as the "Financial Statements." The Financial Statements have been prepared from the books and records of Seller on an accrual basis consistent with Seller's internal accounting practices. Each of the Financial Statements were prepared in accordance with GAAP consistently applied without modification of the accounting principles used in preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of

29

operations and cash flows of Seller as at the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements. The Seller's monthly operating reports and statements of financial affairs filed with the Bankruptcy Court are true and correct in all material respects as of the date of such filing.

3.18    Certain Fees.  Except for the fees and expenses of Piper Jaffray & Co., for which Seller shall be solely responsible, Seller has not incurred any liability for any investment banking fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

3.19    Absence of Certain Changes.  Except (a) as set forth on Schedule 3.19 and (b) for the commencement or pendency of the Bankruptcy Case, since December 31, 2019 there has been no event or condition that has had (or is reasonably likely to result in) a Material Adverse Effect.

3.20    Taxes. Except as set forth in Schedule 3.20:

(a)    Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct and complete in all material respects.  All material Taxes owed by the Seller and all material Taxes owed with respect to the Purchased Assets and the Business (in each case, whether or not shown on any Tax Return) have been timely paid.

(b)    To the Knowledge of Seller, there is no audit, examination, dispute, claim or controversy concerning any Tax Liability or Tax Return of Seller or with respect to the Purchased Assets or the Business in progress or pending by any Taxing Authority.

(c)    Seller has collected or withheld all material Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been or will be duly and timely paid to the proper Taxing Authority, and Seller has complied in all material respects with all Laws relating to collection and withholding, including any reporting and record keeping requirements.

3.21    "AS IS" TRANSACTION.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS SECTION 3, THE CONSENT OF A PARTY TO THE CLOSING SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND FOLLOWING CLOSING SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL OR REAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSIGNED TO PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF

ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

4.    **Representations and Warranties of Purchaser**.  Purchaser represents and warrants to Seller as of the date of this Agreement and as of the Closing Date as follows:

4.1    Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted, except where the failure to have such power and authority would not have a Purchaser Material Adverse Effect.

4.2    Corporate Authorization.  The execution, delivery and performance by Purchaser of this Agreement and the Ancillary Documents to which Purchaser is a party and the consummation of the transactions contemplated hereby and thereby are within the powers and authority of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser.  This Agreement and the Ancillary Documents to which Purchaser is a party constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3    Governmental Authorization.  The execution, delivery and performance by Purchaser of this Agreement and the Ancillary Documents to which Purchaser is a party and the consummation of the transactions contemplated hereby and thereby by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a Purchaser Material Adverse Effect.

31

4.4     Noncontravention.  Neither the execution and delivery of this Agreement or the Ancillary Documents to which Purchaser is a party nor the consummation of the transactions contemplated hereby or thereby will (a) conflict with or result in any breach of any provision of the organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any Contract to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults, terminations, cancellations or rights (i) which would not have a Purchaser Material Adverse Effect, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Seller.

4.5     Financing.  Purchaser has sufficient cash or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

4.6     Litigation.   There is no Legal Proceeding pending against or, to the knowledge of Purchaser, threatened against Purchaser before any Governmental Authority expected to have a Purchaser Material Adverse Effect.

4.7     Certain Fees.   Except as set forth on Schedule 4.7, Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

4.8     Inspections; No Other Representations.  Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and assumption of liabilities such as the Assumed Liabilities as contemplated hereunder.   Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Purchaser acknowledges that Seller has given Purchaser reasonable and open access to the key employees, documents and facilities of the Business.  Purchaser acknowledges and agrees that the Purchased Assets are being sold on an "as is, where is" basis and Purchaser agrees to accept the Purchased Assets and the Assumed Liabilities in the condition they are in on the Closing Date based on its own inspection, examination and determination with respect to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement.  Without limiting the generality of the foregoing, Purchaser acknowledges that Seller makes no representation or warranty with respect to (a) any projections, estimates or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business or the future prospects or operations of the Business or (b) any other information or documents made available to Purchaser or its counsel, accountants or advisors

32

with respect to the Business, except as expressly set forth in this Agreement. Purchaser acknowledges and agrees with the provisions of <u>Section 3.21</u> herein.

5.    **Covenants of Seller**. Seller agrees that:

5.1    <u>Conduct of the Business</u>. From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 12.1</u> or the Closing Date, except (i) as disclosed on <u>Schedule 5.1</u>, (ii) as may be required by the Bankruptcy Court, (iii) for the consequences resulting from the continuation of the Bankruptcy Case, or (iv) as may be required or contemplated by this Agreement, Seller shall conduct the Business and maintain the Purchased Assets in the ordinary course and use its commercially reasonable efforts to preserve intact the Purchased Assets (and all goodwill relating thereto) and all respective relationships with customers, vendors, creditors, employees, landlords, agents, and others having business relationships with them. Without limiting the generality of the foregoing, during the period from the date of this Agreement to the Closing, except as otherwise contemplated by this Agreement or as Purchaser shall otherwise consent in advance in writing, Seller shall do the following:

(a)    pay all undisputed post-petition bills and invoices for post-petition goods or services promptly when due (except for amounts reflected on <u>Schedule 5.1(a)</u>) through the Closing Date;

(b)    notify Purchaser of any material adverse change in its condition (financial or otherwise), business, properties, assets or liabilities, or of the commencement of or any material development or disposition with respect to any material governmental complaints, investigations, or hearings (or any written threats thereof);

(c)    use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits necessary or required by Law to own, lease and operate its respective properties (including the Purchased Assets) and to carry on the Business or that are material to the operation of the Business or the Purchased Assets, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date; and

(d)    maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and Seller on the Petition Date; and

(e)    Seller shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Seller. Seller shall withhold and remit all applicable payroll taxes (to the extent not included in Assumed Liabilities) as required by Law on or prior to the Closing Date with respect to all employees of Seller as of such date.

5.2    <u>Certain Restricted Conduct</u>. Except as set forth on <u>Schedule 5.2</u> and except as otherwise set forth in this Agreement or as Purchaser shall otherwise consent in advance in writing, during the period from the date of this Agreement to the Closing, Seller shall not, with respect to the Purchased Assets:

(a)     sell, lease, license, transfer, or dispose of other than in the ordinary course of business any Purchased Assets;

(b)     authorize or enter into any Contract, arrangement, or commitment other than a Contract that is in the ordinary course of business;

(c)     dispose of or permit to lapse any rights in, to or for the use of any Intellectual Property Right that is part of the Purchased Assets, or grant a license, release, immunity or covenant not to sue under any Owned Intellectual Property or Licensed Intellectual Property, other than non-exclusive licenses of Owned Intellectual Property granted by Seller in the ordinary course of business to a service provider (where such license is granted solely for the benefit of Seller) or to a customer;

(d)     other than in the ordinary course, authorize, undertake, make, or enter into any commitments obligating Seller to (i) make or accelerate any capital expenditures or (ii) undertake or approve any material renovation or rehabilitation of any Leased Real Property;

(e)     (i) increase any compensation payable to or to become payable to, or enter into or amend any employment, severance or other agreement with, any of Seller's officers, directors or salaried employees, (ii) increase any compensation payable to or to become payable by Seller to any other employee of Seller, except in the ordinary course of business, (iii) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any officer, director or employee, (iv) create or adopt any new Employee Benefit Plan or amend or terminate or increase the coverage or benefits available under any existing Employee Benefit Plan, (v) hire any employee or individual independent contractor with annual compensation in excess of $125,000 (except to the extent such hire is in replacement of an existing employee with comparable compensation), or enter into any employment, severance, deferred compensation, consulting, non-competition or similar agreements to which Seller is a party or involving a director, officer, employee or independent contractor of Seller, or (vi) assume, enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization relating to the Business, any employee, or any Purchased Asset;

(f)     permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien, except for Permitted Liens, Liens already existing prior to the date of this Agreement and Liens granted before a Closing in connection with any debtor-in-possession financing facility agreement or order, and/or cash collateral agreement;

(g)     do any other act that would, to the Knowledge of Seller, cause any representation or warranty of Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect;

34

(h)    acquire any material properties or assets that would be Purchased Assets or sell, assign, transfer, convey, lease or otherwise dispose of (including, without limitation, by abandoning, cancelling, letting lapse or forfeiting to the public any Owned Intellectual Property or Licensed Intellectual Property) any Purchased Assets (except acquisitions of Inventory, equipment and similar assets in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets);

(i)    cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes a Purchased Asset;

(j)    transfer, to the extent that following such transfer such amounts would be treated as Excluded Assets, any security deposits, prepaid rentals, unbilled charges, fees, deposits or, other than in the ordinary course of business, cash, cash equivalents or negotiable instruments, in each case constituting Purchased Assets;

(k)    conduct, outside the ordinary course of business, any promotion between execution of this Agreement and the Closing Date on gift card sales, coupons or rebates or conduct any other promotion that would have the effect of increasing the amount of Assumed Liabilities related to gift cards, coupons ore rebates;

(l)    other than in the ordinary course of business, satisfy any Excluded Liability with a Purchased Asset;

(m)    in each case to the extent it could bind or adversely affect Purchaser post-Closing, (A) make, change or revoke any material Tax election, settle or compromise any Tax Claim or Liability or enter into a settlement or compromise, or change (or make a request to any Taxing Authority to change) any aspect of its method of accounting for Tax purposes, or (B) prepare or file any Tax Return (or any amendment thereof) unless such Tax Return was prepared in a manner consistent with past practice;

(n)    other than in the ordinary course of business, transfer cash from a Purchased Location; or

(o)    authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

5.3    Access to Information.  From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 or the Closing Date, Seller shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to Purchaser and its counsel, accountants and other Representatives, access (at reasonable times during normal business hours) to officers and other employees of Seller for the purposes of evaluating the Business and all corporate offices, restaurants, warehouses or other facilities, properties, books, accounts, records and documents of, or relating to, the Business, subject to the terms of the confidentiality provisions in the Credit Agreement.  All access to the officers, employees, properties, restaurants, books, accounts, records and/or documents of the Business shall be arranged on behalf of Seller by Representatives of Alvarez & Marsal.

5.4    <u>Notices of Certain Events</u>.  Seller shall promptly notify Purchaser of and deliver copies to Purchaser of:

(a)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)    any material written communication from any Governmental Authority in connection with or relating to the Transactions or the Data Breach, including with respect to any condemnation or eminent domain event affecting any of the Purchased Locations; and

(c)    the commencement of any actions, suits, investigations or proceedings relating to Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to <u>Section 3.6</u>.

5.5    <u>Locations not Purchased</u>.

(a)    Within five (5) Business Days after the Closing, Seller shall deliver to Purchaser duly and properly authorized and executed evidence (in form and substance satisfactory to Purchaser) as to the amendment of Seller's organizational documents (collectively, the "<u>Organizational Amendments</u>") changing Seller's name (and the name of any applicable Affiliates of Seller) on the Closing Date to another name that does not include the word "Krystal".  Seller hereby irrevocably authorizes Purchaser to file the Organizational Amendments with the applicable Secretary of State (or equivalent) of Seller's (or its applicable Affiliate's) jurisdiction of formation and in each State in which Seller (or its applicable Affiliate) is qualified to do business on Seller's or its applicable Affiliate's behalf.

(b)    Within sixty (60) days after the Closing, Seller shall, and shall cause any of its Affiliates to, discontinue the use of its current name (and any other trade name or d/b/a currently utilized by Seller or such Affiliate) and shall not subsequently change its name to or otherwise use or employ any name that includes the word "Krystal" without the prior written consent of Purchaser.  From and after the Closing, Seller, on behalf of itself and its Affiliates, covenants and agrees not to use or otherwise employ any trade name, corporate or entity name, d/b/a or similar Intellectual Property Right or attribute previous utilized by Seller or any applicable Affiliate of Seller or thereafter utilized by Purchaser in the conduct of the Business, which rights shall be included in the Purchased Assets purchased hereunder.

5.6    <u>Data Breach</u>.  Prior to Closing, Seller and its Affiliates will cooperate with Purchaser to ensure the publication (including by Seller posting an update to Seller's website in which the Data Breach is disclosed) of one or more notices reasonably calculated to reach: (a) those customers of Seller who may have been affected by the Data Breach, (b) applicable Governmental Authorities (including relevant state attorneys general), (c) counterparties to Credit Card Contracts, and (d) such other Persons as reasonably determined by Purchaser.

39748401v22

6.     **Covenants of Purchaser**.  Purchaser agrees that:

6.1     Confidentiality.  Prior to the Closing Date and after any termination of this Agreement, the confidentiality provisions in the Credit Agreement shall remain in full force and effect. After the Closing has occurred, such provisions shall be terminated to the extent relating to the Purchased Assets, Assumed Liabilities and the employees of Seller, and shall, with respect to any of the Excluded Assets and Excluded Liabilities, remain in full force and effect for a period of two (2) years after the Closing Date.

6.2     Access.  For a period of two (2) years after the Closing Date, upon reasonable advance notice and at the sole cost and liability of Seller, Purchaser will afford promptly to Seller and its counsel, advisors and other agents reasonable access during normal business hours to Purchaser's books and records relating to the Purchased Assets to the extent necessary for financial reporting and accounting matters, the preparation and filing of any tax returns, reports or forms, the defense of any Tax audit, Claim or assessment, the reconciliation of Claims in the Bankruptcy Case, to permit Seller to determine any matter relating to its rights and obligations hereunder, any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities, or in connection with addressing any other issues arising in connection with or relating to the Bankruptcy Case; provided, however, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser.  Seller will hold, and will use its commercially reasonable efforts to cause its officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Purchaser or the Business provided to them pursuant to this Section 6.2. For the avoidance of doubt, for a period of two (2) years after the Closing Date, Purchaser will also afford any estate-retained representative, including the advisors to the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case, and any chapter 7 trustee or post-confirmation trustee, reasonable access during normal business hours to the books and records relating to the Purchased Assets.

6.3     Adequate Assurance Information. The Purchaser shall, no later than five (5) Business Days after the date hereof, provide the Seller with the Purchaser's Adequate Assurance Information (as defined in the Bidding Procedures Order).  Seller shall provide the Adequate Assurance Information in accordance with the Bidding Procedures Order and Purchaser shall provide Seller with such information reasonably required by Seller to comply with the foregoing obligation.

6.4     Acquired Inventory and Equipment.  The Purchaser shall be responsible for paying any and all costs, expenses, and liabilities related to the removal, transportation, and storage of any inventory and equipment that constitute Purchased Assets but are not located at Purchased Locations.

6.5     Assumed Liabilities; Pre-Closing Payroll Taxes.  Purchaser shall pay or otherwise satisfy all Assumed Liabilities when they become due, subject to the terms and conditions thereof as they may be modified between Purchaser and any third-party and otherwise in accordance with the terms and conditions of this Agreement.  Purchaser shall not seek or obtain any CARES Act Tax Relief pursuant to Section 2302 of the CARES Act with respect to payroll

Tax obligations that accrued prior to Closing, and Purchaser shall timely pay when due (without regard to any ability to defer such obligations under Section 2302 of the CARES Act) all such obligations to the extent they constitute Assumed Liabilities.

      6.6    <u>Retained Cash Backstop</u>. If the Debtors' Closing Date Cash is less than the required Retained Cash, Purchaser agrees to backstop and fund the difference between such the Retained Cash and the Closing Date Cash (the "<u>Retained Cash Shortfall</u>") on the Closing Date by making a payment to Seller of the Retained Cash Shortfall by wire transfer in immediately available funds at the time of the Closing; <u>provided</u>, <u>however</u>, that under no circumstances shall Purchaser be required to fund the Retained Cash Shortfall in an amount exceeding $2,000,000.00.

      7.    **<u>Covenants of Purchaser and Seller</u>**.  Purchaser and Seller agree that:

      7.1    <u>Efforts; Further Assurances</u>.  Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the Transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Case (including soliciting higher or better offers for the Purchased Assets).  Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.  In no way limiting the foregoing, Purchaser and Seller shall reasonably cooperate to transfer all Bank Accounts (as such term is defined in the Cash Management Motion), other than the Wells Fargo Accounts Payable Account, ending in 8928, and those otherwise included as Purchased Assets pursuant to <u>Section 2.1(v)</u> hereof, from Seller to Purchaser or its designee, but excluding any negative cash balances in such accounts, and subject to Purchaser bearing any costs associated with the transfer of such accounts.

      7.2    <u>Certain Filings</u>.  Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assigned Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

      7.3    <u>Public Announcements</u>.  Neither Purchaser nor Seller shall make any public announcements or statements concerning the Transactions without the prior written consent of the other Party (which consent may not be unreasonably withheld, condition or delayed).  Purchaser acknowledges and agrees that Seller may provide copies of this Agreement to parties in interest in the Bankruptcy Case and to those parties to whom Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Case.  Seller also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions in any newspaper selected by Seller.

7.4    <u>Bankruptcy Issues</u>.

(a)    After the entry of the Sale Order, neither Seller, its Affiliates, nor their respective Representatives shall solicit or negotiate any offer or proposal from any third party with respect to an acquisition of or investment in Seller, its Affiliates or any of their respective assets.

(b)    Seller and Purchaser shall cooperate, assist and consult with each other and each use commercially reasonable efforts, to secure the entry of the Sale Order; provided, however, Seller shall be entitled to take such actions as may be required in connection with the discharge of its fiduciary duties in the Bankruptcy Case (including soliciting higher or better offers for the Purchased Assets). In connection with the assumption and assignment of the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all actions reasonably required in the discretion of the Purchaser or otherwise as directed by the Court to provide "adequate assurance of future performance" by Purchaser under the Assigned Contracts after the Closing.

(c)    This Agreement shall qualify as a Qualifying Bid and the Purchaser shall qualify as a Qualifying Bidder, as such terms are defined in the Bidding Procedures.

(d)    The Seller shall use reasonable best efforts to make any filings, take all actions and obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Ancillary Documents as promptly as practicable following the date hereof. In the event that the Sale Order is appealed, the Seller shall use reasonable best efforts to defend such appeal.

7.5    <u>Cure Costs; Schedule Updates</u>.

(a)    No later than three (3) Business Days following the execution of this Agreement, the Seller will provide the Purchaser with <u>Schedule 7.5(a)</u> (the "<u>Contract & Cure Schedule</u>"), which the Seller shall file with the Bankruptcy Court, and serve on each counterparty listed in the Contract & Cure Schedule. The Contract and Cure Schedule shall contain a list of each Contract of the Seller and the Seller's good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost has been designated for such Contract as "$0.00"). Counterparties having an objection to the Cure Costs listed in the Contract & Cure Schedule, and any supplements thereto, shall have fifteen (15) days, after the date the Contract & Cure Schedule is filed with the Bankruptcy Court and served on the Contract counterparty to file objections to the Cure Costs listed, or as shall be provided in the Bidding Procedures Order, be irrevocably bound to the Cure Cost stated. Without limiting the foregoing, if it is discovered that a Contract that should have been listed on the Contract & Cure Schedule was not so listed, the Seller shall, promptly following the discovery thereof, file a notice with the Bankruptcy Court supplementing the Contract and Cure Schedule and notify the Purchaser in writing of any such Contract and the Seller's good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any

39

such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"). Counterparties having an objection to the Cure Costs listed in the post-Closing Contract & Cure Schedule supplement shall have fifteen (15) days, after the date the post-Closing Contract & Cure Schedule supplement is filed with the Court and served on the Contract counterparty to file objections to the Cure Costs listed, or as shall be provided in the Bidding Procedures Order, be irrevocably bound to the Cure Cost stated. The Purchaser shall have thirty (30) days to elect to assume such Contract listed in the post-Closing Contract & Cure Schedule supplement.

(b)     The Purchaser may, at any time and from time to time through (and including) the date that is three business days prior to the Closing Date, exclude from the definition of Assigned Contracts, any Contract of the Seller otherwise included in the definition of Assigned Contracts, including, for the avoidance of doubt, Post-Petition Contracts to the extent that such Post-Petition Contracts would require the payment of Cure Costs and/or the Purchaser to make payments in excess of $275,000 over any twelve-month period; provided, that no such change of the definitions of Assigned Contracts referred to in this sentence shall reduce or increase the amount of the Purchase Price.

(c)     The Seller shall be responsible for the verification of all Cure Costs for each Assigned Contract and shall use commercially reasonable efforts to correctly calculate the proper Cure Costs, if any, for each Assigned Contract prior to the filing of the Contract & Cure Schedule. To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Cure Costs related to such Assigned Contract, or any portion thereof, shall be paid by the Purchaser within seven (7) days of the Closing Date, or such other date that the Assigned Contract is assumed by the Seller and assigned to the Purchaser. Notwithstanding the foregoing, unless otherwise ordered by the Bankruptcy Court and unless such Liability is an Assumed Liability, the Purchaser shall not have any Liabilities with respect to any Non-Assigned Contract or to the extent that the Cure Costs exceed the applicable amounts set forth in Section 2.3(c).

7.6     Notices. If at any time (a) Purchaser actually becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller actually become aware of any material breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 13.1, in writing of such breach. In addition, each of Seller and Purchaser shall be required to promptly notify the other Party in writing and in accordance with Section 13.1, of any fact, circumstance, event or action the existence, occurrence or taking of which has resulted in, or could reasonably be expected to result in, any representation or warranty made by such Party hereunder not being true and correct in all material respects or of a material breach of any covenant or agreement of such Party contained in this Agreement. Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving or giving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

7.7    Casualty, Condemnation, Loss of Lease.

(a)    If, prior to Closing, any Leased Real Property and the associated Improvements or any part thereof shall be subject to a taking by any public or quasi-public authority through condemnation, eminent domain or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking) (collectively, "Condemnation"), Purchaser shall take title to the Purchased Assets relating to such affected Leased Real Property and Improvements notwithstanding such Condemnation.  At the Closing, Purchaser, shall succeed to (x) the rights of the Seller to the Condemnation proceeds, including insurance proceeds, with respect to a Condemnation ("Condemnation Proceeds"), and (y) the rights to settle any such Condemnation proceeding, and Purchaser shall, at Closing, succeed to the rights of the Seller to all required proofs of loss, assignments of claims and similar items.  The Seller, at Closing, shall assign to Purchaser all right, title and interest to any claims or proceeds Seller may have.  The Seller shall not settle any such proceedings without the consent of Purchaser, such consent not to be unreasonably withheld or delayed.  Seller's compliance with this Section 7.7(a) shall cure any breach of covenant or inaccuracy of any representation and warranty arising as a result of a Condemnation Event.

(b)    If, prior to Closing, any Leased Real Property and the associated Improvements or any part thereof shall be destroyed or damaged by fire, earthquake, flood or other casualty (collectively, "Casualty"), Purchaser shall take title to the Purchased Assets relating to such affected Leased Real Property and Improvements notwithstanding such Casualty.  At the Closing, Purchaser shall succeed to (x) the rights of the Seller to the Casualty proceeds, including insurance proceeds, with respect to such Casualty ("Casualty Proceeds"), including without duplication, giving Purchaser a credit against the Purchase Price in the amount of the Casualty Proceeds actually received by the Seller and not applied by the Seller to repair prior to Closing, and (y) the rights to settle after Closing any loss under all policies of insurance applicable to the Casualty, and Purchaser shall, at Closing and thereafter, succeed to the rights of the Seller to all required proofs of loss, assignments of claims and other similar items and Seller shall, at Closing, assign same to Purchaser.  The Seller shall not settle any such claims without the consent of Purchaser; such consent not to be unreasonably withheld or delayed.  Seller's compliance with this Section 7.7(b) shall cure any breach of covenant or inaccuracy of any representation and warranty arising as a result of a Casualty.

8.    **Tax Matters**.

8.1    Tax Cooperation.  Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax.  Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

41

8.2    <u>Transfer Taxes</u>. To the extent not exempt under Section 1146 of the Bankruptcy Code, Purchaser shall pay all Transfer Taxes. Seller and Purchaser shall cooperate (at Purchaser's sole cost and expense) to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

8.3    <u>Wage Reporting</u>. Purchaser and Seller agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

9.    **<u>Employee Matters</u>**.

9.1    <u>Employees and Offers of Employment</u>.

(a)    Prior to the Closing Date, Purchaser shall offer employment, effective as of the Closing Date, to substantially all of the employees of Seller who are employed in connection with the Business at the Purchased Locations, at the same (or better) salary or wage levels and on such other terms and conditions as determined by Purchaser in its sole discretion, and Seller shall cooperate with Purchaser in connection with such offers of employment. Any employee of Seller who accepts an offer of employment from Purchaser pursuant to this <u>Section 9.1(a)</u> shall be a "<u>Transferred Employee</u>". Unless agreed to otherwise in writing by the Purchaser and a Transferred Employee, all Transferred Employees shall be employees "at-will" of Purchaser.

(b)    Purchaser shall maintain employee records transferred to Purchaser hereunder for a period of not less than two (2) years and during that period will afford Seller reasonable access to such records during Purchaser's normal business hours, with such maintenance and access at Seller's sole cost and expense. Purchaser shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records.

(c)    Nothing herein, express or implied, shall confer upon any employee or former employee of Seller any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement. Purchaser and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of Seller.

(d)    Seller shall retain liability for, and Purchaser shall not acquire or assume, any litigation related to or arising out of any Employment-Related Laws and Obligations of Seller arising prior to the Closing, whether a claim in respect thereto is brought on, before, or after the Closing Date.

(e)    Following the Closing Date, Purchaser shall use commercially reasonable efforts to ensure that no waiting periods, exclusions or limitations with respect to any pre-existing conditions, evidence of insurability or good health or actively-at-work exclusions are applicable to any Transferred Employee or their dependents or beneficiaries under any welfare benefit plans of Purchaser in which such employees may be eligible to participate, subject in all events to the terms of such plans. The Parties acknowledge and

42

agree that any or all (or none) of the Employee Benefit Plans may be designated as an Assigned Contract, as determined in Purchaser's sole discretion and subject to the other terms and conditions of this Agreement.

9.2    <u>Workers' Compensation</u>.    Seller shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by Seller's employees prior to the Closing Date.    Purchaser shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by any Transferred Employee on and after the date (hereinafter, "<u>Transferred Employee's Employment Date</u>") Purchaser hires them, including injuries sustained by such Transferred Employee on or after the applicable Transferred Employee's Employment Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the applicable Transferred Employee's Employment Date. Seller shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Seller's facilities and which have been sustained or contracted prior to the Closing Date.    Purchaser shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted on or after the applicable Transferred Employee's Employment Date.

10.    **<u>Closing Conditions</u>**.

10.1    <u>Conditions to Obligations of Purchaser and Seller</u>.    The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case, authorizing the Transactions and approving this Agreement under Sections 105(a), 363, 365, of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Purchaser, and as of the Closing Date the Sale Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed.

(b)    The Bankruptcy Court shall have entered the Settlement Order (as defined in that certain Settlement Agreement entered into by and among the Debtors and Purchaser), and as of the Closing Date the Settlement Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed.

(c)    No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

10.2    <u>Conditions to Obligations of Purchaser</u>.    The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

43

(b)     (i) the representations and warranties of Seller set forth in <u>Sections 3.1</u> (Organization), <u>3.2</u> (Due Authorization), <u>3.4(a)</u> (Noncontravention), <u>3.13</u> (Sufficiency of and Title to the Purchased Assets) and <u>3.18</u> (Certain Fees), (collectively, the "<u>Seller Core Representations</u>") shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date), and (ii) the representations and warranties of Seller contained in this Agreement other than the Seller Core Representations shall be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect;

(c)     Purchaser shall have received the Organizational Amendments;

(d)     Purchaser shall have received an officer's certificate signed by a duly authorized officer of each Seller, dated as of the Closing Date, certifying compliance with the conditions set forth in <u>Sections 10.2(a)</u> and <u>10.2(b)</u>; and

(e)     Seller shall have delivered all of the items required by <u>Section 2.9</u>.

10.3    <u>Conditions to Obligations of Seller</u>.  The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)     Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)     the representations and warranties of Purchaser contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be expected to have a Purchaser Material Adverse Effect;

(c)     Seller shall have received all documents they may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Seller; and

(d)     Purchaser shall have delivered all of the items required by <u>Section 2.10</u>.

10.4    <u>Waiver of Closing Conditions</u>.  Notwithstanding anything to the contrary contained herein, if any of the conditions to Closing were not fulfilled at or prior to the Closing and the parties hereto agree to close the transactions contemplated by this Agreement, then following the Closing all such conditions to Closing shall be deemed to have been waived effective as of the Closing

11.     **<u>Survival; Indemnification</u>**.

44

11.1    <u>Survival</u>.  The (a) representations and warranties of Seller and Purchaser, and (b) covenants and agreements of Seller and Purchaser that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing.  The covenants and agreements of Seller and Purchaser contained herein that by their terms are to be performed on or after Closing shall survive the Closing for such terms.

11.2    <u>Indemnification</u>.  Each of Purchaser and Seller agrees to indemnify the other with respect to any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees which are alleged to be due and payable with respect to the Transactions and which are asserted as a result of the actions of the indemnifying party.  There shall be no post-Closing indemnification of Purchaser by Seller with respect to any matter not set forth in this <u>Section 11.2</u>.

12.    **<u>Termination</u>**.

12.1    <u>Grounds for Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Purchaser;

(b)    by Seller or Purchaser, if the Closing shall not have been consummated on or before May 18, 2020 (the "<u>End Date</u>"), unless the Party seeking termination is in material breach of its obligations hereunder;

(c)    by Seller or Purchaser, if any condition set forth in <u>Section 10.1</u> is not satisfied, and such condition is incapable of being satisfied by the End Date;

(d)    by Purchaser, if there shall be an inaccuracy in any representation or warranty of Seller, or a breach by Seller of any covenant or agreement contained in this Agreement, in each case which would result in a failure of a condition set forth in <u>Section 10.1</u> or <u>Section 10.2</u> and which breach cannot be cured or has not been cured by the earlier of (i) 10 days after the delivery of written notice by Purchaser to Seller of such breach and (ii) the End Date; provided, however, that if there shall be an inaccuracy or breach of any representations, warranties, covenants or agreements of Purchaser contained in this Agreement to an extent which would give Seller the right not to close pursuant to <u>Section 10</u>, then Purchaser may not terminate this Agreement pursuant to this <u>Section 12.1(d)</u>;

(e)    by Seller, if there shall be an inaccuracy in any representation or warranty of Purchaser, or a breach by Purchaser of any covenant or agreement contained in this Agreement, in each case which would result in a failure of a condition set forth in <u>Section 10.1</u> or <u>Section 10.3</u> and which breach cannot be cured or has not been cured by the earlier of (i) 10 days after the delivery of written notice by Seller to Purchaser of such breach and (ii) the End Date; provided, however, that if there shall be an inaccuracy or breach of any representations, warranties, covenants or agreements of Seller contained in this Agreement to an extent which would give Purchaser the right not to close pursuant to <u>Section 10</u>, then Seller may not terminate this Agreement pursuant to this <u>Section 12.1(e)</u>;

(f)    by Seller, if (i) prior to the entry of the Sale Order Seller executes a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets in compliance with the Bidding Procedures, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Case approving such definitive agreement; and

(g)    [reserved].

(h)    The Party desiring to terminate this Agreement pursuant to this Section 12.1 (other than pursuant to Section 12.1(a)) shall give notice of such termination to the other Party in accordance with Section 13.1.

12.2    Effect of Termination.  If this Agreement is terminated as permitted by Section 12.1, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in Section 7.4(b), and Section 12.4.  The provisions of Sections 6.1, 7.4(b), 11.2, 12.2, 12.3, 12.4, 13.1, 13.4, 13.5, 13.6, 13.7, 13.8, 13.9, 13.10 and 13.11 shall survive any termination hereof pursuant to Section 12.1.

12.3    Expenses.  Except as otherwise set forth expressly herein, all costs and expenses incurred in connection with this Agreement or the Transactions shall be paid by the Party incurring such cost or expense.

12.4    Exclusive Remedies.  Effective as of Closing, except in the case of intentional fraud, Purchaser waives irrevocably any rights and Claims Purchaser may have against Seller, whether in Law or in equity, relating to any breach of a representation, warranty, covenant or agreement contained herein and occurring on or prior to the Closing.  Purchaser and Seller acknowledge and agree that if this Agreement is terminated pursuant to and in accordance with Section 12.1, the provisions of Section 12.2, and this Section 12.4 set forth the sole and exclusive remedies of the Parties.

12.5    Specific Performance.  The Parties acknowledge and agree that (i) irreparable damage to Purchaser would occur in the event that any of the provisions of this Agreement are not performed by Seller in accordance with their specific terms or are otherwise breached or threatened to be breached by Seller, and (ii) damages and/or remedies at law would be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by Seller, and, accordingly, Purchaser shall be entitled to seek injunctive relief (without the posting of any bond or other security) with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining Purchaser from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. Purchaser's right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. The rights set forth in this Section 12.5 shall be in addition to any other rights which Purchaser may have at law or in equity in connection with this Agreement. If any action, suit or proceeding is brought to enforce this Agreement against Seller, Seller shall waive the defense that there is an adequate remedy at law and agrees not to assert that specific performance, injunctive and other equitable remedies are

46

unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason. The right to specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, Purchaser would not have entered into this Agreement.

13.    **Miscellaneous**.

13.1    Notices.    All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Purchaser, to:

DB KRST Investors LLC
1345 Avenue of the Americas, 46th Floor
New York, NY 10105
Tel: 212-798-6100
Attention: David N. Brooks, General Counsel
          David Sharpe, Credit Operations
E-mail: gccredit@fortress.com
          creditoperations@fortress.com

and to:

Morgan J. McClure
Managing Director
Fortress Investment Group
3290 Northside Pkwy NW, Suite 350
Atlanta, GA 30327
E-mail: mmcclure@fortress.com

with a copy to (which shall not constitute notice):

Alston & Bird LLP
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309
Attention:  Jonathan Edwards, Esq.
          Jeremy Silverman, Esq.
Email:  Jonathan.Edwards@alston.com
          Jeremy.Silverman@alston.com

if to Seller, to:

The Krystal Company
1455 Lincoln Parkway, Suite 600

47

39748401v22

Dunwoody, Georgia 30346
Attention:  Jonathan Tibus
Email:  jtibus@alvarezmarsal.com

with copies to (which shall not constitute notice):

King & Spalding LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Attention:  Sarah Borders
Fax:  404-572-5134

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

13.2    Waivers.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative.

13.3    Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party.  Notwithstanding the preceding sentence, Purchaser shall be permitted to assign any or all of its rights and obligations under this Agreement to any of Purchaser's Affiliates and/or to Purchaser's and/or its Affiliates' financing sources (i) without the prior written consent of Seller prior to the entry of the Sale Order; provided, however, that Purchaser shall at all times remain liable for all obligations under this Agreement following any assignment hereunder prior to the entry of the Sale Order; and (ii) with the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed, after the entry of the Sale Order.

13.4    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Georgia and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

13.5    Jurisdiction.

(a)    Prior to the closing of the Bankruptcy Case, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest

48

extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.1 shall be deemed effective service of process on such Party.

(b)    After the closing or dismissal of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Georgia, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.1 shall be deemed effective service of process on such Party.

13.6    Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

13.7    No Third Party Beneficiaries.  No provision of this Agreement (other than Section 6.3) is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

13.8    Entire Agreement; Amendments; Counterparts.  This Agreement (including the Schedules and Exhibits hereto) set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.  This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party hereto.

13.9    Headings, Interpretation.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the

39748401v22

Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

13.10  Non-Recourse.  The Parties acknowledge that (i) no direct or indirect equity holder or lender of any Party, (ii) no member of any board of managers or special committee of any Party or any Affiliate of any Party and (iii) no past, present or future director, officer, committee member, employee, incorporator, member, partner or direct or indirect equity holder or lender of any Party (such Persons described in clauses (i)-(iii) above, the "Non-Recourse Parties") is a party to this Agreement or, except as expressly contemplated therein as parties thereto, any Ancillary Document. The Parties further acknowledge that none of the Non-Recourse Parties, whether individually or collectively, shall have any liability whatsoever of any kind or description for any obligations or liabilities of any Party under this Agreement or, except as expressly contemplated therein as parties thereto, any Ancillary Document or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or thereby. Accordingly, the Parties hereby agree that in the event (a) there is any alleged breach or alleged default or breach or default by any Party under this Agreement or any of the Ancillary Documents or (b) any Party has or may have any claim arising from or relating to the terms of this Agreement or any Ancillary Document, no Party shall, or shall have any right to, commence any proceedings or otherwise seek to impose any Liability or obligation whatsoever of any kind or description on or against the Non-Recourse Parties, whether collectively or individually, by reason of such alleged breach, default or claim, except and only to the extent that a Non-Recourse Party is expressly contemplated in an Ancillary Document as a party to such Ancillary Document.

13.11  Affiliate Acquisitions.  Notwithstanding anything to the contrary contained in this Agreement, Purchaser may elect to have any or all of the Purchased Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more of its Affiliates as may be designated by Purchaser from time to time prior to the Closing.

13.12  Disclosure Schedules.  The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Seller of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.  If any Schedule discloses an item or information, the matter shall be deemed to have been disclosed in all other Schedules for which such information is reasonably apparent on its face to be relevant or applicable, notwithstanding the omission of an appropriate cross-reference to such other Schedules.

*[Signature pages follow.]*

39748401v22

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

DB KRST INVESTORS LLC

By: _____

Name: _Constantine Dakolias_____

Title: _Managing Partner_____

THE KRYSTAL COMPANY

By: _____

Name: _Jonathan Tibus_____

Title: _Chief Restructuring Officer_____

**Exhibit A**

**Management Agreement**

*Final Form*

## U.S. BANKRUPTCY COURT APPROVED
## MASTER INTERIM MANAGEMENT AGREEMENT
## BETWEEN
## DB KRST INVESTORS LLC (the "Owner")
## AND
## THE KRYSTAL COMPANY (the "Manager")

Pursuant to that certain [*Order: (I) Approving Asset Purchase Agreement And Authorizing the Sale of Certain Assets of the Debtors Outside of the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, (III) Authorizing the Assumption and Assignment or Rejection of Certain Executory Contracts and Unexpired Leases, (IV) Granting Related Relief*] dated [●], 2020, and issued by the United States Bankruptcy Court for the Northern District of Georgia (Atlanta Division) (the "Bankruptcy Court") in Case No. 20-61065 (PWB) (the "Sale Order"), this Master Interim Management Agreement (this "Agreement") is entered into by and between DB KRST Investors LLC, a Delaware limited liability company (the "Owner") and The Krystal Company, a Tennessee corporation (the "Manager"), effective as of the closing date of the transactions contemplated by the Asset Purchase Agreement (as defined below) (the "Effective Date").

**WHEREAS**, Owner and Manager have executed that certain Asset Purchase Agreement, dated as of May 6, 2020; a true and correct copy of the Asset Purchase Agreement without Schedules or Exhibits is attached to this Agreement as **Exhibit A** (the "Asset Purchase Agreement").[1]  As a consequence, pursuant to the Sale Order, on [●], 2020, Owner has either (i) purchased from Manager out of bankruptcy, and now owns, all or substantially all the assets at each restaurant listed on **Schedule 1** of this Agreement (each a "Retained Restaurant" and collectively the "Retained Restaurants", including any Designation Rights Restaurant (as defined below) that is designated by the Owner as a Retained Restaurant in accordance with the Asset Purchase Agreement) or (ii) designated the Real Property Lease with respect to each restaurant set forth on **Schedule 2** of this Agreement (each a "Designation Rights Restaurant" and collectively the "Designation Rights Restaurants") as a Designation Rights Asset (as defined in the Asset Purchase Agreement). The Retained Restaurants and the Designation Rights Restaurants are collectively referred to as the "Restaurants."

**WHEREAS**, each Restaurant is a fast-casual restaurant including the sale of food under the respective Permits in the name of Manager listed on **Schedule 3** (each a "Permit" and collectively the "Permits").

**WHEREAS**, both Owner and Manager desire the operation of each of the Restaurants to continue without interruption until Owner, with respect to each such Restaurant, either (i) with respect to each Retained Restaurant, obtains from the relevant state and/or local government regulatory authorities the Permits, as applicable, at such Retained Restaurant in its name either through transfer or initial application or (ii) with respect to each Designation Rights Restaurant, designates such Designation Rights Restaurant as a Retained Restaurant (to be treated in

---

[1] Capitalized terms not otherwise defined in this Agreement have the meanings ascribed to them in the Asset Purchase Agreement.

*Privileged & Confidential*
*Attorney Client Privileged*

accordance with clause (i) above) or an Excluded Asset in accordance with the Asset Purchase Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and other good and valuable consideration as provided herein and in the Asset Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do agree as follows:

1.      The "Term" shall commence on the Effective Date and shall terminate, (i) for each Retained Restaurant, upon the earliest to occur of (a) Owner's receipt via transfer from the Manager or through initial application for license issuance from all applicable Governmental Authorities of each Permit for said Restaurant, (b) five (5) Business Days after the date that Manager receives written notice of termination from Owner, (c) [ninety (90)] days from the Effective Date (unless this Agreement is otherwise terminated prior to the earliest of such dates pursuant to the terms hereof or by mutual agreement of the parties) or (d) such later date as may be agreed by the parties, and (ii) for each Designation Rights Restaurant, on the date that the Real Property Lease for such Designation Rights Restaurant is assumed or rejected in accordance with the Sale Order.

2.      During the Term, Manager shall remain the licensed retail vendor of food for each Restaurant, and in such capacity shall manage, control, and operate each Restaurant solely to the extent required for each Permit, as applicable, to remain effective in accordance with the Sale Order. Manager hereby appoints Owner as its agent to manage, control and operate the Restaurants to the extent permitted by applicable Law and each applicable Permit. Pursuant to its appointment as Manager's agent and subject to the following sentence, Owner shall be entitled to collect and to retain all revenues generated by the Restaurants during the Term (the "Revenues"), and shall reimburse Manager for and be solely responsible for (i) any reasonable and documented costs, fees, and expenses and all other liabilities or expenses incurred by Manager in the performance of its obligations under this Agreement or incurred as a result of the operation of Restaurants (including, without limitation, costs, expenses or liabilities arising from or incurred in connection with the administration of the Bankruptcy Case and related primarily to the Restaurants) and (ii) the insurance obligations of Manager set forth in Section 5 below (individually a "Liability" and collectively the "Liabilities"). Notwithstanding anything contained herein to the contrary, all employees of the Restaurants shall be employed by the Owner, and Manager shall have no duty or authority to take action as an employer with respect to any such employee or to enter into any contract on behalf of the Owner, without the Owner's prior written consent.

3.      For valuable consideration received, and in order to induce Manager to enter into this Agreement, Owner and Manager covenant, agree, warrant, and represent that the following are now true and shall remain true throughout the Term, which covenants, agreements, representations, and warranties shall survive the termination of this Agreement:

(a)      Manager shall have no duties or responsibilities under this Agreement other than those specified herein and no implied obligations (other than to act in good faith) shall be read into this Agreement.

*Privileged & Confidential*
*Attorney Client Privileged*

(b)    Neither Manager, nor any of its Affiliates, employees, officers, directors, managers, members, representatives, agents, attorneys, direct or indirect equityholders, successors, predecessors or assigns, will be liable to Owner for, and Owner releases and forever discharges Manager and its Affiliates, employees, officers, directors, managers, members, representatives, agents, attorneys, direct or indirect equityholders, successors, predecessors and assigns from, any and all claims, liabilities, actions, suits, judgments, losses, injuries, damages, costs or expenses arising out of or connected with any act or omission of Manager, or its Affiliates, employees, officers, directors, managers, members, representatives, agents, attorneys, direct or indirect equityholders, successors, predecessors and assigns pursuant to this Agreement or with respect to the performance of Manager's obligations under this Agreement ;

(c)    Owner agrees to indemnify, defend and hold harmless and discharges Manager and its Affiliates, employees, officers, directors, managers, members, representatives, agents, attorneys, direct or indirect equityholders, successors, predecessors and assigns (collectively, the "Manager Indemnified Parties") from and against any and all claims, actions, demands, judgments, losses, costs, expenses, damages and liabilities (including attorneys' fees and other expenses of litigation) arising out of or resulting from such Manager Indemnified Parties' performance of Manager's obligations under this Agreement and/or the operation of the Restaurants;

(d)    During the Term, all purchases and services rendered with respect to the operation of the Restaurants shall be in the name of the Owner, including, without limitation, all utility service and all accounts for the purchase of inventory; and

(e)    Nothing in this Agreement or the Asset Purchase Agreement shall be deemed to be a transfer of any Permits unless and until such transfer is duly approved by all applicable Governmental Authorities having applicable licensing authority, and each Permit is issued in the name of Owner or its designee. Notwithstanding the foregoing, Owner agrees to: (i) pay for all applicable annual license fees and/or license renewal fees due to the licensing authorities as of and after the Effective Date in connection with the maintenance of each Permit; and (ii) provide all funds reasonably necessary to maintain each Permit in full force and effect (including the providing of letters of credit and/or bonds as required by the various Governmental Authorities). If prior to the issuance of all Permits, one or more of the Permits are required to be renewed or otherwise require action by the licensee or permittee of record to fulfill any administrative or legal responsibility associated with said Permit(s), Manager agrees to (at the sole cost and expense of Owner) cooperate in good faith with and facilitate the filing of state and/or local license renewal applications of any such Permit so as to secure the continued ability to sell and serve food at the Restaurants to the extent allowed by applicable Law, provided, however, that Owner shall pay any license fees and expenses required to be paid as part of such renewals or actions (including the providing of letters of credit and/or bonds as required by the various Governmental Authorities).

4.    Manager agrees that all equipment, facilities and personal property relating to the Restaurants including, without limitation, glassware, dishwashing equipment, dispensing

*Privileged & Confidential*
*Attorney Client Privileged*

equipment, storage areas and facilities, and cash registers shall be owned and maintained by Owner, and shall be insured during the Term for the benefit of Owner in accordance with this Agreement and the Asset Purchase Agreement (all such costs with respect to such insurance (including any premiums) to be paid for by Owner).  Owner agrees that Manager shall be named as an additional loss payee under such insurance policies maintained by Owner.

5.      During the full Term hereof, Owner shall keep in full force and effect: (a) commercial general liability insurance with limits of at least $[to be reasonably agreed by Owner and Manager prior to Closing] per occurrence for personal injury and death and property damage, which shall, among other risks, and such commercial general liability policy shall name Manager as an additional insured for so long as Manager holds the Permits; and (b) worker's compensation insurance as required by Law. During the full Term hereof, Manager shall (at the sole cost and expense of Owner): (i) use commercially reasonable efforts to keep each Permit in full force and effect; and (ii) to the extent that Manager's obligations under this Agreement are insurable, maintain commercial general liability insurance for the benefit of Owner insuring Manager's obligations under this Agreement, in accordance with Manager's standard corporate insurance policies, processes and procedures (all such costs with respect to such insurance (including any premiums) to be paid for by Owner).

6.      In the event that either party violates: (a) any condition of this Agreement other than those related to Legal Requirements (as defined below) and such violation remains uncured for five (5) business days after notice thereof to the violating party via email and overnight mail to the notice parties at the addresses listed in the Asset Purchase Agreement or (b) any Legal Requirement (i) after issuance of a final decision is either not appealed or is upheld on appeal, or (ii) upon the issuance of a second citation alleging a violation of any Legal Requirement prior to a final decision described in clause (i) hereof where there is a finding of the applicable authority adverse to Owner or Manager, the non-violating party shall have the right to terminate this Agreement immediately after five (5) business days' written notice to the violating party, provided that, if a violation of subparagraph (b)(i) or (b)(ii) above can be cured by payment of a fine or otherwise, the non-violating party may not terminate this Agreement if the violating party cures such violation within the earlier to occur of (x) the time required by law or set forth in the citation, or (y) ten (10) business days after such decision is upheld on appeal, or if no appeal is filed, the last day permitted for filing an appeal. Upon the issuance to Owner of the required transferred or newly-issued Permits for a Retained Restaurant, Manager shall (aa) deliver promptly the original Permits, as the case may be, for such Retained Restaurant to Owner or to the pertinent Governmental Authority, (bb) notify the pertinent Governmental Authority that it is surrendering the original Permit(s), as the case may be, and desires that they be canceled, and/or (cc) take such other action with respect to the pertinent Governmental Authority as it may be necessary or proper to effect and confirm the cancellation of the original Permit(s), as the case may be and as if it had actually surrendered the original Permit(s). "Legal Requirements" shall mean and include all those Laws applicable to maintaining each relevant Permit and obtaining each relevant Permit.

7.      Time is of the essence in this Agreement. Owner shall use its reasonable best efforts to obtain at the earliest practicable date all necessary authorizations, consents and approvals to transfer the Permits at the Retained Restaurants in Owner's name; provided that

*Privileged & Confidential*
*Attorney Client Privileged*

Manager shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval. Manager agrees to cooperate with Owner's efforts to make any required filings or obtain the Permits at Owner's sole cost and expense as may be reasonably necessary.

8.     This Agreement shall be governed and construed in accordance with the laws of the State of Georgia applicable to contracts made and performed in such State.

9.     This Agreement and the Asset Purchase Agreement (including the schedules and exhibits thereto) and the Ancillary Agreements represent the entire understanding and agreement among the parties with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

10.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party except as otherwise expressly provided herein. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Manager or Owner (by operation of law or otherwise) without the prior written consent of the other party and any attempted assignment without the required consent shall be void and without effect. No assignment of any obligations hereunder shall relieve the parties of any such obligations.  Notwithstanding the foregoing, Owner shall be permitted to assign any or all of its rights under this Agreement to an Affiliate of Owner without the prior written consent of Manager; provided, however, that Owner shall at all times remain liable for all obligations under this Agreement

11.     Except as otherwise expressly set forth herein, nothing contained herein shall be construed as to constitute the relationship hereby created as an employment, an agency, partnership, or a joint venture, Manager having no authority to make any binding agreement or commitment on behalf of Owner.

12.     This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign).  The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without

*Privileged & Confidential*
*Attorney Client Privileged*

limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the dates set forth below to be effective as of the latest date set forth below (previously defined as the "Effective Date").

**MANAGER:**

**THE KRYSTAL COMPANY**

By: _____
Name:
Title:
Date:

**OWNER:**

**DB KRST INVESTORS LLC**

By: _____
Name:
Title:
Date:

[Signature Page to Management Agreement]

## **SCHEDULE 1**

[List of all Retained Restaurants pending Permits as of the Closing Date]

## SCHEDULE 2

[List of all Designation Rights Restaurants pending Permits as of the Closing Date]

## **SCHEDULE 3**

[List of all Permits (i) being transferred or applied for as of the Closing Date at the Retained Restaurants and (ii) at the Designation Rights Restaurants]

## **EXHIBIT A**

[Copy of executed Asset Purchase Agreement]

**Exhibit B**

**Bill of Sale**

*Final Form*

**FORM OF**

**BILL OF SALE**

This BILL OF SALE, dated as of [●], 2020 (this "Bill of Sale"), is entered into by and between The Krystal Company, a Tennessee corporation ("Seller") and DB KRST Investors LLC, a Delaware limited liability company ("Purchaser"). Seller and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

**WHEREAS**, the Parties entered into that certain Asset Purchase Agreement dated as of May 6, 2020 (the "Asset Purchase Agreement").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.      Sale and Transfer of Purchased Assets. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to, and subject to, the terms and conditions of, the Asset Purchase Agreement, effective as of the Closing, Seller hereby sells, assigns, transfers, conveys and delivers to Purchaser, and Purchaser hereby purchases, acquires and accepts from Seller, all of Seller's right, title and interest in or to the Purchased Assets (other than the Intellectual Property Rights and Assigned Contracts). For the avoidance of doubt, Seller is not selling, assigning, transferring, conveying or delivering to Purchaser any of the Excluded Assets.

2.      Assumption of Assumed Liabilities. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions set forth in the Asset Purchase Agreement, effective as of the Closing, Purchaser hereby assumes and agrees to pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto, the Assumed Liabilities. For the avoidance of doubt, Purchaser is not assuming in any manner and shall not be liable or responsible for any of the Excluded Liabilities.

3.      Entire Agreement. This Bill of Sale, together with the Asset Purchase Agreement and the other agreements, instruments, certificates and documents executed and delivered in connection therewith, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.

4.      Amendment and Waiver. This Bill of Sale can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Bill of Sale signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

5.      Terms of the Asset Purchase Agreement. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement. This Bill of

Sale is entered into pursuant to, and subject to all of the terms and conditions of, the Asset Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller or Purchaser contained in the Asset Purchase Agreement. In the event of any conflict or inconsistency between this Bill of Sale and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

6.  <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Georgia applicable to contracts made and performed in such State.

7.  <u>Binding Effect</u>. This Bill of Sale is being executed by Seller and Purchaser and shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors and assigns, for the uses and purposes above set forth and referred to, and shall be effective as of the date hereof. Nothing in this Bill of Sale shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.

8.  <u>Counterparts</u>. This Bill of Sale may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," signed," "signature," and words of like import in this Bill of Sale shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

9.  <u>Headings</u>. The division of this Bill of Sale into Articles, Sections and other Subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Bill of Sale.

*[Remainder of page intentionally left blank.]*

      **IN WITNESS WHEREOF**, the Parties have caused this Bill of Sale to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**

**THE KRYSTAL COMPANY**


By: _____
Name:
Title:



**PURCHASER:**

**DB KRST INVESTORS LLC**


By: _____
Name:
Title:

[Signature Page to Bill of Sale]

**Exhibit C**

**Assignment and Assumption Agreement**

*Exhibit C*

*Final Form*

## FORM OF

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of [●], 2020 (this "Assignment"), is entered into by and between The Krystal Company, a Tennessee corporation ("Seller") and DB KRST Investors LLC, a Delaware limited liability company ("Purchaser"). Seller and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

WHEREAS, the Parties are parties to that certain Asset Purchase Agreement, dated as of May 6, 2020 (the "Asset Purchase Agreement").

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.      Assignment and Assumption. Pursuant to, and subject to the terms and conditions of, the Asset Purchase Agreement, effective as of the Closing, (a) Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, and Purchaser hereby accepts the sale, transfer, assignment, conveyance and delivery of, all of Seller's right, title and interest in and to the Intellectual Property Rights and the Assigned Contracts set forth on Schedule 1 and (b) Purchaser assumes and agrees to pay, perform and discharge in accordance with their respective terms, and subject to all defenses or counterclaims with respect thereto, any Assumed Liabilities associated with the Intellectual Property Rights and Assigned Contracts set forth on Schedule 1.

2.      Entire Agreement. This Assignment, together with the Asset Purchase Agreement and the other agreements, instruments, certificates and documents executed and delivered in connection therewith, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.

3.      Amendment and Waiver. This Assignment can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Assignment signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

4.      Terms of the Asset Purchase Agreement. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement. This Assignment is entered into pursuant to, and subject to all of the terms and conditions of, the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of any Seller or Purchaser contained in the Asset Purchase Agreement. In the event of any conflict or inconsistency between this Assignment and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

5.      <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Georgia applicable to contracts made and performed in such State.

6.      <u>Binding Effect</u>. This Assignment is being executed by Seller and Purchaser and shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors and assigns, for the uses and purposes above set forth and referred to, and shall be effective as of the date hereof. Nothing in this Assignment shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.

7.      <u>Counterparts</u>. This Assignment may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," signed," "signature," and words of like import in this Assignment shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign).  The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

8.      <u>Headings</u>. The division of this Assignment into Articles, Sections and other Subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Assignment.

[*Remainder of page intentionally left blank.*]

**IN WITNESS WHEREOF**, the Parties have caused this Assignment to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**

**THE KRYSTAL COMPANY**

By: _____
Name:
Title:

**PURCHASER:**

**DB KRST INVESTORS LLC**

By: _____
Name:
Title:

[Signature Page to Assignment and Assumption Agreement]

**Schedule 1**

<u>Intellectual Property Rights and Assigned Contracts</u>

<u>(Excluding Real Property Leases)</u>

[To be inserted]

*Final Form*

<u>FORM OF</u>

## <u>ASSIGNMENT AND ASSUMPTION AGREEMENT (REAL PROPERTY)</u>

This ASSIGNMENT AND ASSUMPTION AGREEMENT (REAL PROPERTY), dated as of [●], 2020 (this "<u>Assignment</u>"), is entered into by and between The Krystal Company, a Tennessee corporation ("<u>Seller</u>") and DB KRST Investors LLC, a Delaware limited liability company ("<u>Purchaser</u>"). Seller and Purchaser are sometimes herein referred to collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

**WHEREAS,** the Parties are parties to that certain Asset Purchase Agreement, dated as of May 6, 2020 (the "<u>Asset Purchase Agreement</u>").

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Assignment and Assumption</u>. Pursuant to and subject to the terms and conditions of the Asset Purchase Agreement, effective as of the Closing, (a) Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, and Purchaser hereby accepts the sale, transfer, assignment, conveyance and delivery of, all of Seller's right, title and interest in and to the Real Property Leases that are Assigned Contracts as set forth on <u>Schedule 1</u>, and (b) Purchaser assumes and agrees to pay, perform and discharge in accordance with their respective terms, and subject to all defenses or counterclaims with respect thereto, any Assumed Liabilities associated with the Real Property Leases that are Assigned Contracts as set forth on <u>Schedule 1</u>.

2.    <u>Entire Agreement</u>. This Assignment, together with the Asset Purchase Agreement and the other agreements, instruments, certificates and documents executed and delivered in connection therewith, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.

3.    <u>Amendment and Waiver</u>. This Assignment can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Assignment signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

4.    <u>Terms of the Asset Purchase Agreement</u>. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement. This Assignment is entered into pursuant to, and subject to all of the terms and conditions of, the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller or Purchaser contained in the Asset Purchase Agreement. In the event of any conflict or inconsistency between this Assignment and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

5.      <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Georgia applicable to contracts made and performed in such State.

6.      <u>Binding Effect</u>. This Assignment is being executed by Seller and Purchaser and shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors and assigns, for the uses and purposes above set forth and referred to, and shall be effective as of the date hereof. Nothing in this Assignment shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.

7.      <u>Counterparts</u>. This Assignment may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," signed," "signature," and words of like import in this Assignment shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif' or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign).  The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

8.      <u>Headings</u>. The division of this Assignment into Articles, Sections and other Subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Assignment.

[*Remainder of page intentionally left blank.*]

**IN WITNESS WHEREOF**, the Parties have caused this Assignment to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**

**THE KRYSTAL COMPANY**

By: _____
Name:
Title:

**PURCHASER:**

**DB KRST INVESTORS LLC**

By: _____
Name:
Title:

**Schedule 1**

<u>Purchased Real Property Leases</u>

[To be inserted]

**Exhibit D**

**IP Assignment and Assumption Agreement**

*Final Form*

<u>FORM OF</u>

**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT, dated as of [●], 2020 (such date, the "<u>Effective Date</u>", and such agreement, this "<u>Intellectual Property Assignment</u>"), is entered into by and between The Krystal Company, a Tennessee corporation (the "<u>Assignor</u>") and DB KRST Investors LLC, a Delaware limited liability company (the "<u>Assignee</u>"). The Assignor and the Assignee are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

**WHEREAS**, the Parties entered into that certain Asset Purchase Agreement dated as of May 6, 2020 (the "<u>Asset Purchase Agreement</u>");

**WHEREAS**, the Assignor owns the Owned Intellectual Property, including the (a) issued patents and patent applications, (b) trademark and service mark registrations and applications, (c) copyright registrations and applications and (d) registered Internet domain names, in each case, set forth on <u>Schedule 1</u> hereto; and

**WHEREAS**, pursuant to the Asset Purchase Agreement, the Assignor desires to assign, transfer, convey and deliver to the Assignee, and the Assignee wishes to acquire from the Assignor, all of the Assignor's right, title and interest in, to and under the Owned Intellectual Property and all goodwill associated therewith or symbolized thereby.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1. <u>Assignment</u>. As of the Effective Date, the Assignor hereby irrevocably sells, transfers, assigns, conveys and delivers to the Assignee, and the Assignee hereby accepts the sale, transfer, assignment, conveyance and delivery of, all of Assignor's right, title and interest in and to the Owned Intellectual Property, together with (a) all goodwill of the business associated with or symbolized by the Owned Intellectual Property, (b) all common law rights in, and all rights derived from, the Owned Intellectual Property and all issuances and registrations that may be granted thereon, (c) any past, present or future claims or causes of action (either in law or in equity) arising out of or related to any infringement, misappropriation, dilution or other violation of any of the Owned Intellectual Property, and the right to sue for damages, injunctive relief, lost profits in connection therewith or any other remedy or otherwise recover therefor, (d) any and all income, royalties, damages and payments now or hereafter due and/or payable with respect to the Owned Intellectual Property and the right to receive such income, royalties and payments, (e) the right to prosecute, maintain and defend the Owned Intellectual Property, (f) the right to claim priority based on the Owned Intellectual Property and (g) the right to fully and entirely stand in the place of the Assignor in all matters related thereto, the same to be held and enjoyed by the Assignee for its own use and enjoyment and the use and enjoyment of its successors and assigns as fully and entirely as the same would have

been held and enjoyed by the Assignor if this assignment had not been made. The assignment contemplated herein is meant to be an absolute assignment and not by way of security.

2. <u>Further Assurances</u>. As may be necessary, the Assignor shall use reasonable efforts (at the sole cost and expense of Assignee) to (i) execute, acknowledge and deliver such other instruments, documents and agreements and (ii) do such other things, in each case, as may be reasonably necessary to carry out its obligations under this Intellectual Property Assignment and as may be reasonably necessary to more completely effectuate, consummate, record, perfect or confirm the transactions contemplated hereby. The Assignor further agrees to (at the sole cost and expense of Assignee) assist the Assignee in changing the technical and administrative contact information for the Internet domain names included in the Owned Intellectual Property with the applicable Internet domain name registrars to such information of the Assignee's choice (including by delivering to the Assignee any and all applicable user names and passwords for any accounts related to such Internet domain names to enable the Assignee to assume control of such Internet domain names). If the Assignor fails to promptly take or execute any action or document described in this Section 2 after written request by the Assignee, then the Assignor hereby constitutes and appoints the Assignee as its true and lawful agent and attorney-in-fact, with full power of substitution, in the name and stead of the Assignor but on behalf and for the benefit of the Assignee, to take and execute in the name of the Assignor any and all actions and documents that may be deemed necessary or proper to effectuate, consummate, record, perfect or confirm the transactions contemplated in this Intellectual Property Assignment.  Assignee shall be responsible for payment of all costs and expenses of Assignor in connection with the obligations under this Section 2.

3. <u>Entire Agreement</u>. This Intellectual Property Assignment, together with the Asset Purchase Agreement and the other agreements, instruments, certificates and documents executed and delivered in connection therewith, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.

4. <u>Amendment and Waiver</u>. This Intellectual Property Assignment can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Intellectual Property Assignment signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

5. <u>Terms of the Asset Purchase Agreement</u>. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement. This Intellectual Property Assignment is entered into pursuant to, and subject to all of the terms and conditions of, the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of the Seller or Purchaser contained in the Asset Purchase Agreement. In the event of any conflict or inconsistency between this Intellectual Property Assignment and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

6. <u>Governing Law</u>. This Intellectual Property Assignment shall be governed by and construed in accordance with the laws of the State of Georgia applicable to contracts made and performed in such State.

7.       <u>Binding Effect</u>. This Intellectual Property Assignment shall be binding upon and inure to the Parties and their respective successors and assigns. Nothing in this Intellectual Property Assignment shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.

8.       <u>Counterparts</u>. This Intellectual Property Assignment may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," signed," "signature," and words of like import in this Intellectual Property Assignment shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign).  The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

9.       <u>Headings</u>. The division of this Intellectual Property Assignment into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Intellectual Property Assignment.

*[Remainder of page intentionally left blank.]*

**IN WITNESS WHEREOF**, the Parties have caused this Intellectual Property Assignment to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**ASSIGNOR:**

**THE KRYSTAL COMPANY**

By: _____
Name:
Title:

**ASSIGNEE:**

**DB KRST INVESTORS LLC**

By: _____
Name:
Title:

**Schedule 1**

<u>Owned Intellectual Property</u>

Issued and Applied-For Patents

| Title | Jurisdiction | Patent No. | App. No. | Issue Date | Filing Date | Legal Owner |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

Registered and Applied-For Trademarks

| Mark | Jurisdiction | Reg. No. | App. No. | Reg. Date | Filing Date | Legal Owner |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

Registered and Applied-For Copyrights

| Title | Jurisdiction | Reg. No. | App. No. | Reg. Date | Filing Date | Legal Owner |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

Registered Internet Domain Names

| Domain | Legal Owner | Expiration Date |
|---|---|---|
|  |  |  |

*Final Form*

# FORM OF

## [PATENT][TRADEMARK][COPYRIGHT] ASSIGNMENT AGREEMENT

This [PATENT][TRADEMARK][COPYRIGHT] ASSIGNMENT AGREEMENT, dated as of [●], 2020 (such date, the "Effective Date", and such agreement, this "[Patent][Trademark][Copyright] Assignment"), is entered into by and between The Krystal Company, a Tennessee corporation (the "Assignor"), and DB KRST Investors LLC, a Delaware limited liability company (the "Assignee"). The Assignor and the Assignee are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

WHEREAS, the Parties entered into that certain Asset Purchase Agreement dated as of May 6, 2020 (the "Asset Purchase Agreement");

WHEREAS, pursuant to the Asset Purchase Agreement, the Parties entered into that certain Intellectual Property Assignment Agreement dated as of [●], 2020 (the "Master IP Assignment Agreement");

WHEREAS, the Assignor owns the [issued patents and patent applications][trademark and service mark registrations and applications][copyright registrations and applications] set forth on Schedule 1 (the "Assigned [Patents][Marks][Copyrights]"); and

WHEREAS, pursuant to the Master IP Assignment Agreement, the Assignor desires to assign, transfer, convey and deliver to the Assignee, and the Assignee wishes to acquire from the Assignor, all of the Assignor's right, title and interest in, to and under the Assigned [Patents][Marks and all goodwill associated therewith or symbolized thereby][Copyrights].

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.    Assignment. As of the Effective Date, the Assignor hereby irrevocably sells, transfers, assigns, conveys and delivers to the Assignee, and the Assignee hereby accepts the sale, transfer, assignment, conveyance and delivery of, all of the Assignor's right, title and interest in and to the Assigned [Patents][Marks][Copyrights], together with [(a) all rights derived from the Assigned Patents, including the inventions claimed therein, and any reissues, reexamination, divisions, continuations, continuations-in-part, extensions, renewals and counterparts thereof already granted and which may be granted thereon, (b) any past, present or future claims or causes of action (either in law or in equity) arising out of or related to any infringement of any of the Assigned Patents, and the right to sue for damages, injunctive relief or any other remedy or otherwise recover therefor, (c) any and all income, royalties, damages and payments now or hereafter due and/or payable with respect to the Assigned Patents and the right to receive such income, royalties and payments, (d) the right to prosecute, maintain and defend the Assigned Patents, (e) the right to claim priority based on any of the Assigned Patents and (f) the right to fully and entirely stand in the place of the Assignor in all matters related

thereto, the same to be held and enjoyed by the Assignee for its own use and enjoyment and the use and enjoyment of its successors and assigns as fully and entirely as the same would have been held and enjoyed by the Assignor if this assignment had not been made][(a) all goodwill of the business associated with or symbolized by the Assigned Marks, (b) all common law rights in, and all rights derived from, the Assigned Marks and all registrations that may be granted thereon, and any renewals thereof, (c) any past, present or future claims or causes of action (either in law or in equity) arising out of or related to any infringement, misappropriation, dilution or other violation of any of the Assigned Marks, and the right to sue for damages, injunctive relief, lost profits in connection therewith or any other remedy or otherwise recover therefor, (d) any and all income, royalties, damages and payments now or hereafter due and/or payable with respect to the Assigned Marks and the right to receive such income, royalties and payments, (e) the right to prosecute, maintain and defend the Assigned Marks, (f) the right to claim priority based on the Assigned Marks and (g) the right to fully and entirely stand in the place of the Assignor in all matters related thereto, the same to be held and enjoyed by the Assignee for its own use and enjoyment and the use and enjoyment of its successors and assigns as fully and entirely as the same would have been held and enjoyed by the Assignor if this assignment had not been made.][(a) all common law rights in, and all rights derived from, the Assigned Copyrights and all registrations that may be granted thereon, and any extensions and renewals thereof, (c) any past, present or future claims or causes of action (either in law or in equity) arising out of or related to any infringement, misappropriation, dilution or other violation of any of the Assigned Copyrights, and the right to sue for damages, injunctive relief, lost profits in connection therewith or any other remedy or otherwise recover therefor, (d) any and all income, royalties, damages and payments now or hereafter due and/or payable with respect to the Assigned Copyrights and the right to receive such income, royalties and payments, (e) the right to prosecute, maintain and defend the Assigned Copyrights, (f) the right to claim priority based on the Assigned Copyrights and (g) the right to fully and entirely stand in the place of the Assignor in all matters related thereto, the same to be held and enjoyed by the Assignee for its own use and enjoyment and the use and enjoyment of its successors and assigns as fully and entirely as the same would have been held and enjoyed by the Assignor if this assignment had not been made.] The assignment contemplated herein is meant to be an absolute assignment and not by way of security.

2.  <u>Further Assurances</u>. As may be necessary, the Assignor shall use reasonable efforts (at the sole cost and expense of Assignee) to (i) execute, acknowledge and deliver such other instruments, documents and agreements and (ii) do such other things, in each case, as may be reasonably necessary to carry out its obligations under this [Patent][Trademark][Copyright] Assignment and as may be reasonably necessary to more completely effectuate, consummate, record, perfect or confirm the transactions contemplated hereby. If the Assignor fails to promptly take or execute any action or document described in this Section 2 after written request by the Assignee, then the Assignor hereby constitutes and appoints the Assignee as its true and lawful agent and attorney-in-fact, with full power of substitution, in the name and stead of the Assignor but on behalf and for the benefit of the Assignee, to take and execute in the name of the Assignor any and all actions and documents that may be deemed necessary or proper to effectuate, consummate, record, perfect or confirm the transactions contemplated in this [Patent][Trademark][Copyright] Assignment.  Assignee shall be responsible for payment of all costs and expenses of Assignor in connection with the obligations under this Section 2.

3.      Recordation. The Assignee shall be solely responsible for all actions associated with the perfection of Assignee's right, title and interest in and to the Assigned [Patents][Marks][Copyrights] and recordation and/or registration of this [Patent][Trademark][Copyright] Assignment or any other document evidencing the assignment to the Assignee of the Assigned [Patents][Marks][Copyrights]. The Assignor hereby authorizes the [Commissioner for Patents in the United States Patent and Trademark Office][Commissioner for Trademarks in the United States Patent and Trademark Office][Register of Copyrights in the United States Copyright Office] to record the Assignee as the assignee and owner of the Assigned [Patents][Marks][Copyrights] and to deliver to the Assignee, and to the Assignee's attorneys, agents, successors or assigns, all official documents and communications as may be warranted by this [Patent][Trademark][Copyright] Assignment[, including but not limited to issuing any and all Letters Patents of the United States on inventions claimed in the Assigned Patents].

4.      Entire Agreement. This [Patent][Trademark][Copyright] Assignment, together with the Asset Purchase Agreement and the other agreements, instruments, certificates and documents executed and delivered in connection therewith, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.

5.      Amendment and Waiver. This [Patent][Trademark][Copyright] Assignment can be amended supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this [Patent][Trademark[Copyright] Assignment signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

6.      Terms of the Asset Purchase Agreement. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement. This [Patent][Trademark][Copyright] Assignment is entered into pursuant to, and subject to all of the terms and conditions of, the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller or Purchaser contained in the Asset Purchase Agreement. In the event of any conflict or inconsistency between this [Patent][Trademark][Copyright] Assignment and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

7.      Governing Law. This [Patent][Trademark][Copyright] Assignment shall be governed by and construed in accordance with the laws of the State of Georgia applicable to contracts made and performed in such State.

8.      Binding Effect. This [Patent][Trademark][Copyright] Assignment shall be binding upon and inure to the Parties and their respective successors and assigns. Nothing in this [Patent][Trademark][Copyright] Assignment shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.

9.      Counterparts. This [Patent][Trademark][Copyright] Assignment may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The

words "execution," signed," "signature," and words of like import in this [Patent][Trademark][Copyright] shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

10.    Headings. The division of this [Patent][Trademark][Copyright] Assignment into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this [Patent][Trademark][Copyright] Assignment.

*[Remainder of page intentionally left blank.]*

**IN WITNESS WHEREOF**, the Parties have caused this [Patent][Trademark][Copyright] Assignment to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**ASSIGNOR:**

**THE KRYSTAL COMPANY**

By: _____
Name:
Title:

**ASSIGNEE:**

**DB KRST INVESTORS LLC**

By: _____
Name:
Title:

**Schedule 1**

Assigned [Patents][Marks][Copyrights]

[Issued and Applied-For Patents

| Title | Jurisdiction | Patent No. | App. No. | Issue Date | Filing Date | Legal Owner |
|-------|--------------|------------|----------|------------|-------------|-------------|
|       |              |            |          |            |             |             |

]

[Registered and Applied-For Trademarks

| Mark | Jurisdiction | Reg. No. | App. No. | Reg. Date | Filing Date | Legal Owner |
|------|--------------|----------|----------|-----------|-------------|-------------|
|      |              |          |          |           |             |             |

]

[Registered and Applied-For Copyrights

| Title | Jurisdiction | Reg. No. | App. No. | Reg. Date | Filing Date | Legal Owner |
|-------|--------------|----------|----------|-----------|-------------|-------------|
|       |              |          |          |           |             |             |

]