**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | Chapter 11 |
| **THE KRYSTAL COMPANY, et al.,** | : | |
| | : | Case No. 20-61065 (PWB) |
| **Debtors.** | : | (Jointly Administered) |
| ━━━━━━━━━━━━━━━━ | : | |
| | : | |
| **LIVE OAK RESTAURANT SERVICES, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | Adv. Proc. No. 20- |
| **v.** | : | |
| | : | |
| **THE KRYSTAL COMPANY, and** | : | |
| | : | |
| **KRYSTAL RESTAURANTS, LLC,** | : | |
| | : | |
| **Defendants.** | : | |
| ━━━━━━━━━━━━━━━━ | : | |

**COMPLAINT FOR (A) DECLARATORY JUDGMENT TO DETERMINE THE
NATURE, EXTENT AND VALIDITY OF LIEN, (B) BREACH OF CONTRACT, (C)
UNJUST ENRICHMENT, AND (D) APPLICATION FOR ADMINSTRATIVE EXPENSE**

COMES NOW Live Oak Restaurant Services, LLC, a creditor and the Plaintiff in this

proceeding ("**Plaintiff**" or "**LORS**"), by and through its undersigned counsel, and hereby files

this Adversary Complaint to Determine the Nature, Extent and Validity of Lien, for Breach of

Contract, for Unjust Enrichment, and for Allowance and Payment of an Administrative Expense

pursuant to 11 U.S.C. Sections 503(b), 506 and 507, and Fed. R. Bankr. P. 7001(1), 7001(2) and

7001(9), (the "**Complaint**") against The Krystal Company, ("**Debtor**" or "**Krystal Company**")

and Krystal Restaurants, LLC ("**Krystal LLC**"), and in support thereof states as follows:

## PRELIMINARY STATEMENT

1.      On or about September 9, 2019 Plaintiff and Krystal Company entered into an Asset Purchase Agreement ("**Florida APA**") reflecting a sale under which Plaintiff agreed to sell, and Krystal Company agreed to purchase, the operations and assets of a Krystal-branded restaurant in Live Oak, Florida owned by Plaintiff and related contractual rights (collectively "**Sale Assets**"). The primary consideration for the sale was $100,000.00 and other consideration, the "**Purchase Price**". The Sale transaction closed on or about September 9, 2019. By its express terms, the Florida APA makes Florida substantive law applicable to all aspects of the contract. Under the terms of the Florida APA, Plaintiff was granted a lien in the Sale Assets, and Plaintiff perfected its liens properly in the State of Florida. The Florida APA provided that the $100,000 payment was to be paid in cash by March 1, 2020.

2.      The Krystal Company and related entities filed Chapter 11 Voluntary Petitions on January 19, 2020 (the "**Petition Date**"). As shown below, the Plaintiff has not been paid the Purchase Price, even though it became due on March 1, 2020. Plaintiff has sought without success the payment of the Purchase Price from the Debtor Krystal Company and from Krystal, LLC, the purchaser of assets from the Debtor. The salient fact is that one or both of the Debtor and Krystal LLC has ownership and possession of the Sale Assets despite having not paid for them, and Plaintiff accordingly seeks relief from the Court to determine the Plaintiff's and Defendants' respective rights and obligations.

## JURISDICTION AND VENUE

3.      This Adversary Proceeding is brought pursuant to Bankruptcy Rules 7001(1), 7001(2) and 7001(9) seeking an order, judgment and decree from this Court determining the nature, validity and extent of Plaintiff's liens and for related relief.

4.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1334(b) and orders entered in this district pursuant to 28 U.S.C. § 157(a).  Subject matter jurisdiction exists pursuant to 28 U.S.C. § 157(b) as a case under title 11 and a core proceeding arising under title 11, or arising in a case under title 11 in accordance with 28 U.S.C. § 157(b)(2).

5.      Venue of the case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      This adversary proceeding is a core proceeding as defined at 28 U.S.C. § 157(b)(2)(K) in that it is an action to determine the nature, extent and validity of liens on property, for the recovery of property, and for the allowance and payment of an administrative expense.

## PARTIES

7.      Plaintiff is a limited liability company organized and formed under the laws of the State of Florida.

8.      Debtor Krystal Company is a corporation organized under the laws of the State of Tennessee.

9.      Krystal LLC is a limited liability company organized and formed under the laws of the State of Delaware.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS FOR RELIEF

10.      At the time it entered into the Florida APA, Plaintiff owned and operated the franchised Krystal-branded store in Live Oak, Florida. Under the Florida APA dated September 9, 2019, Krystal Company agreed to purchase the Sale Assets, which consisted of, inter alia, the operations, assets, cash, and goodwill of that Live Oak, Florida store. The Sale closed on or about September 9, 2019, and Krystal Company took immediate control and possession of the

Sale Assets. Notably, under the Florida APA, the Krystal Company's obligation to pay the Purchase Price did not mature until March 1, 2019. On September 13, 2019, Plaintiff recorded a UCC-1 Financing Statement to perfect its security interests and liens in the Sale Assets. A copy of that filing is attached as Exhibit 1. On September 16, 2019, the Krystal Company recorded a UCC-1 Financing Statement in favor of Plaintiff in the UCC registry of the State of Tennessee. A copy of the "**UCC Document Detail**" reflecting that filing is attached as Exhibit 2.[1]

11.     At all times during the period from the September 2019 closing until its Petition Date, Krystal Company enjoyed the possession, use and profits from the Sale Assets to the exclusion of Plaintiff but subject to its security interests and liens and to Krystal Company's obligation to pay the Purchase Price by March 1, 2020. As of this date, Plaintiff remains unpaid.

### PLAINTIFF'S SCHEDULED CLAIM AND ITS FILED CLAIM (NO. 630)

12.     On February 21, 2020, Debtor filed, inter alia, its Summary of Schedules and Schedules A-H (Docket No. 182) in which it (a) acknowledged the Purchase Price obligation as an undisputed secured claim in favor of Plaintiff[2] on Schedule D ("**Plaintiff's Scheduled Secured Claim**") and  (b) the Florida APA as an executory contract on Schedule G.  This filing reflected that although Krystal Company's obligation to pay the Purchase Price was binding as of the Petition Date, the act of paying Purchase Price itself was not due until March 1, 2020.

13.     On May 6, 2020, although it was not required to do so to the extent it agreed with the Debtor's listing of Plaintiff's Scheduled Secured Claim, Plaintiff filed a Proof of Claim in the form attached as Exhibit 3 (the "**Proof of Claim**"). That Proof of Claim, which was assigned Claim No. 630, was based on the Debtor's obligations to pay the Purchase Price under the

---

[1] An image of the actual recorded UCC-1 is not available, and Plaintiff acknowledges that the UCC Document Detail recites that it is an unofficial record. As will be set forth below, the Debtor acknowledged the validity of the records in its Schedules filed in this case.
[2] Debtor listed the Tennessee Financing Statement as the basis for the security interests and liens.

Florida APA (the full text of which was made part of the Proof of Claim). In addition, the Proof of Claim made specific reference to the fact that the Debtor had scheduled the unpaid Purchase Price due in Plaintiff's Scheduled Secured Claim. *See*, Ex. 3, page 5.

14.     On May 11, 2020, as part of its contemplated sale transaction with Krystal LLC, Debtor filed its "Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases" (Docket No. 441) ("**Supplemental Notice**"), in which Debtor purported to list all "Cure Amounts" due as of April 30, 2020. Despite the fact that Debtor had acknowledged that its payment of the Purchase Price was due by March 1, 2020, in the Supplemental Notice it listed the "Cure Amount" on the Florida APA as $0. In retrospect, the Debtor's filing was inconsistent with its previous filing identifying Plaintiff's Scheduled Secured Claim.

15.     On May 13, 2020 the Debtor filed the "Notice Regarding Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases" (Docket No. 460) ("**Corrected Supplemental Notice**"), which states in relevant part:

> **PLEASE TAKE NOTICE** that on May 11, 2020, the Debtors filed the *Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 441] (the "Supplemental Cure Notice").
>
> **PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this *Notice Regarding Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* to clarify that the Cure Costs set forth on Exhibit A to the Supplemental Cure Notice on account of unexpired leases reflect unpaid monetary obligations as of April 30, 2020. **The Cure Costs set forth on Exhibit A to the Supplemental Cure Notice on account of executory contracts reflect unpaid monetary obligations as of the Petition Date**.

(Emphasis added in final sentence.)

16.     As the Florida APA recites clearly, the $100,000 Purchase Price payment the Debtor promised to make to Plaintiff was not due until March 1, 2020. That payment became due

during the course of this Chapter 11 case. There was no "cure amount" due under the Florida APA as of the Petition Date.

17.     On May 13, 2020, the Court entered its "Order (A) Approving Sale Motion and Asset Purchase Agreement, (B) Authorizing the Sale of Assets Outside the Ordinary Course o Business and Free and Clear of All Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief" (Docket No. 468) (the "**Sale Order**"). In the Sale Order, the Court retained jurisdiction to consider disputes regarding its implementation.

18.     On or about May 18, 2020, the sale of substantially all of the Debtor's assets to Krystal LLC occurred based on the "Asset Purchase Agreement Between DB KRST Investors, LLC and The Krystal Company" made part of Doc. No. 425 ("**Krystal APA**"), presumably as authorized by the Sale Order.[3] On information and belief, the consideration for the sale was a credit bid and the assumption by Krystal LLC of certain "Assumed Liabilities" up to an "Assumed Liabilities Cap" of $21,500,000.00. Plaintiff asserts that, pursuant to the Krystal APA, Krystal LLC assumed Krystal Company's obligations under the Florida APA, including the obligation to pay the Purchase Price under the Assumed Liabilities Cap, and that the Purchase Price is an "Assumed Liability". *See* Doc. No. 577.

19.     There has been no filing by the Debtor (or any other party) contesting the validity of Debtor's prepetition security interests and liens in the Sale Assets to secure the payment of the Purchase Price due March 1, 2020.

20.     At this point, Plaintiff asserts that the Florida APA has been breached in a material fashion. But despite repeated attempts by Plaintiff, made to (a) counsel for the Debtor,

---

[3] It appears that DC KRST Investors, LLC assigned its rights and obligations under the Krystal APA to Krystal Restaurants, LLC.

(b) bankruptcy counsel for Krystal LLC, and (c) corporate counsel for Krystal LLC, for an acknowledgement of the payment obligations under the Florida APA, those attempts have been unsuccessful and the Plaintiff remains unpaid.

**COUNT I**
**DECLARATORY JUDGMENT- 11 U.S.C. SECTION 506- BOTH DEFENDANTS**

21.     Plaintiff reincorporates and realleges the allegations contains in Paragraphs 1 through 20 above as if fully set forth herein.

22.     This is an action for equitable and declaratory relief brought pursuant to Fed. R. Bankr. P. 7001(2) and 7001(9) to determine the nature, validity and extent of Plaintiff's security interests and liens in the Sale Assets, in the sale proceeds related thereto, or in other property of the estate. There is a bona fide dispute concerning the nature, validity, and extent of those security interests and liens.

23.     Debtor acknowledged the validity of Plaintiff's security interests and liens by, inter alia, listing Plaintiff's Scheduled Secured Claim in its schedules. That listing was consistent with Krystal Company's prior recording of the UCC-1 in the Tennessee public records.

24.     Despite repeated requests made after the May 18, 2020 closing, Debtor has failed to acknowledge whether it currently recognizes those same security interests and liens.

25.     Krystal LLC has asserted an entitlement to enjoy the benefits of the Florida APA (by retaining the Sale Assets, including the operations, assets and goodwill of the Plaintiff's store) without paying the Purchase Price or acknowledging Plaintiff's security interests and liens.

26.     Accordingly, Plaintiff submits that the intervention of the Court is necessary and appropriate to determine its rights.

**WHEREFORE**, Plaintiff prays this Court enter a declaratory judgment that determines the nature, validity and extent of Plaintiff's security interests and liens in the Sale Assets,

the proceeds of their sale, or other property of the estate, and for such other and further relief as the Court deems appropriate.

## COUNT II
## BREACH OF CONTRACT- THE KRYSTAL COMPANY

27.     Plaintiff reincorporates and realleges the allegations contains in Paragraphs 1 through 20 above as if fully set forth herein.

28.     Prior to the Petition Date and at all operative times since, the Florida APA constituted a valid contract between Plaintiff and Defendant Krystal Company.

29.     As part of the Florida APA, which by its express terms made Florida substantive law applicable, Defendant Krystal Company owed a duty of good faith and fair dealing to Plaintiff.

30.     Defendant Krystal Company has breached the Florida APA in one or material ways, by (a) failing to pay the Purchase Price, and (b) failing to recognize Plaintiff's security interest and liens in the Sale Assets or the associated Sale Proceeds or other property of the estate.

31.     Defendant Krystal Company has breached in a material way its duty of good faith and fair dealing to Plaintiff by, inter alia, (a) failing to recognize Plaintiff's security interest and liens in the Sale Assets or the associated Sale Proceeds or other property of the estate, (b) preparing and filing documents in this case that were inconsistent with its knowledge of the facts and status of the Florida APA, and (c) failing to respond to Plaintiff's inquiries in anything approaching a timely fashion, or, in the alternative, failing to disclose its knowledge of the intended treatment of the Florida APA in this Court.

32.     Defendant Krystal Company's breaches are the proximate cause of damages to Plaintiff in an amount not less than $100,000.00.

**WHEREFORE**, Plaintiff prays this Court enter a judgment in favor of Plaintiff for all Plaintiff's damages, and such other and further relief as the Court deems appropriate

## COUNT III
### BREACH OF CONTRACT- KRYSTAL RESTAURANTS, LLC

33.    Plaintiff reincorporates and realleges the allegations contains in Paragraphs 1 through 20 above as if fully set forth herein.

34.    Prior to the Petition Date and at all operative times since, the Florida APA constituted a valid contract between Plaintiff and Defendant Krystal Company.

35.    As part of the Florida APA, which by its express terms made Florida substantive law applicable, Defendant Krystal Company owed a duty of good faith and fair dealing to Plaintiff.

36.    Pursuant to the Krystal APA, Defendant Krystal Restaurants, LLC assumed obligations under the Florida APA including (a) the obligation to pay the Purchase Price, and (b) a duty of good faith and fair dealing to Plaintiff. Those obligations are "Assumed Liabilities" under the APA.

37.    Defendant Krystal Restaurants LLC has breached its obligations under the Krystal APA and the assigned Florida APA in a material way.

38.    Defendant Krystal Restaurants LLC's breaches are the proximate cause of damages to Plaintiff in an amount not less than $100,000.00.

**WHEREFORE**, Plaintiff prays this Court enter a judgment in favor of Plaintiff for all Plaintiff's damages, and such other and further relief as the Court deems appropriate.

## COUNT IV
### UNJUST ENRICHMENT- AGAINST BOTH DEFENDANTS

39.    Plaintiff reincorporates and realleges the allegations contains in Paragraphs 1 through 20 above as if fully set forth herein.

40.     By transferring the Sale Assets identified in the Florida APA to Defendant Krystal Company and their subsequent sale to Defendant Krystal Restaurants, LLC, Plaintiff has conferred a benefit on Defendant Krystal Company and Defendant Krystal Restaurants, LLC.

41.     Defendant Krystal Company has received benefits under the Florida APA, in that it accepted and enjoyed the possession and use of the Sale Assets prior to and after the Petition Date and, may have received consideration in exchange for the sale of the Sale Assets and the Florida APA to Defendant Krystal Restaurants, LLC.

42.     Defendant Krystal Restaurants, LLC has received benefits under the Florida APA, in that it accepted and enjoyed the possession and use of the Sale Assets.

43.     Both Defendants have accepted and have retained benefits from the Sale Assets.

44.     Under the circumstances, it would be inequitable for either Defendant to retain the benefits of the Sale Assets.

**WHEREFORE**, Plaintiff prays this Court enter a judgment in favor of Plaintiff for all the amount of the unjust enrichment both Defendants have enjoyed, and requests such other and further relief as the Court deems appropriate, including the imposition of equitable liens.

## COUNT V
## APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINSTRATIVE EXPENSE- 11 U.S.C. SECTION 503(b)

45.     Plaintiff reincorporates and realleges the allegations contains in Paragraphs 1 through 20 above as if fully set forth herein.

46.     Under the Florida APA, the payment due date of March 1, 2020 fell after the Petition Date. Despite having not ever paid for the Sale Assets, Defendant Krystal Company has enjoyed the use of the Sale Assets, and on information and belief has sold them for consideration.

47.     Plaintiff is entitled to administrative expense priority for the Purchase Price of the Sale Assets as one of the "actual, necessary costs and expenses of preserving the estate" 11 U.S.C. § 503(b)(1). In addition, Section 507(a)(2) of the Bankruptcy Code provides that administrative expenses allowed under § 503(b) are entitled to priority in payment.

   **WHEREFORE**, Plaintiff prays this Court enter an order allowing an administrative expense in an amount equal to the Purchase Price and requiring the immediate payment of it, and requests such other and further relief as the Court deems appropriate.

Respectfully submitted, this 20th day of September, 2020.


**STONE & BAXTER, LLP**

/s/ Matthew S. Cathey
Matthew S. Cathey
Georgia Bar No. 759547
Thomas B. Norton
Georgia Bar No. 997178
577 Mulberry Street, Suite 800
Macon, Georgia 31201
(478) 750-9898
mcathey@stoneandbaxter.com
tnorton@stoneandbaxter.com

and

**WILCOX LAW FIRM**

Robert D. Wilcox (*pro hac vice* pending)
Florida Bar No. 755168
1301 Riverplace Blvd., Suite 800
Jacksonville, Florida 32207
(904) 405-1250
rw@wlflaw.com
admin@wlflaw.com

Counsel for T.B. of Starke, Inc.

# EXHIBIT 1

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE
## FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

Mary A. Robison, Esquire  (904) 356-2600

B. Email Address

C. SEND ACKNOWLEDGEMENT TO:

Name        Mary A. Robison, Esquire

Address   501 Riverside Avenue, Suite 600

Address

City/State/Zip   Jacksonville, FL  32202

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

**2019 Sep 13 08:00 AM**

****** 201909640563 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME  THE KRYSTAL COMPANY | | | |
|---|---|---|---|
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One  1455 Lincoln Parkway East, 6th Floor | This space not available. | | |
| MAILING ADDRESS Line Two | CITY  Dunwoody | STATE  GA | POSTAL CODE  30346 | COUNTRY  USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME**   (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY **ONE** SECURED PARTY (3a OR 3b)

| 3.a ORGANIZATION'S NAME  LIVE OAK RESTAURANT SERVICES, LLC | | | |
|---|---|---|---|
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One  798 SW Main Blvd | This space not available. | | |
| MAILING ADDRESS Line Two | CITY  Lake City | STATE  FL | POSTAL CODE  32025 | COUNTRY  USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

Those assets located at 10555 Suwannee Plaza Boulevard, in Live Oak, Florida as described on Exhibit A.

| **5. ALTERNATE DESIGNATION** (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☑ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-1 (REV.05/2013)        **Filing Office Copy**        Approved by the Secretary of State, State of Florida

## EXHIBIT A

(a)     all fixed assets, signage, furniture, equipment, lifts, machinery, lubrication equipment, tools, parts, furnishings, decorations, computer hardware, point-of-sale systems, fixtures, uniforms, telephone systems, vehicles, cameras, TVs, video equipment and other items of tangible personal property owned, leased, used or otherwise held for use by Debtor, and purchased by Debtor from Secured Party, with respect to the Krystal restaurant previously operated by Secured Party and located at 10555 Suwannee Plaza Boulevard, Live Oak, Florida (the "Business") and located at the restaurant, which tangible personal property is listed on **Exhibit "B"** attached hereto, but specifically excluding any portion of the electrical, heating or air conditioning systems serving the restaurant;

(b)     all supplies and Inventory owned by Debtor, purchased by Debtor from Secured Party, and used or held for use by Debtor in the operation of the Business, including without limitation, office and other supplies, spare, replacement and component parts, and other inventory property located at, stored on behalf of or in transit to Debtor or the Restaurant;

(c)     all of the intangible rights and property of Debtor, and purchased by Debtor from Secured Party, with respect to the Business, including goodwill, Intellectual Property and Software, to the extent assignable;

(d)     all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by Debtor, and purchased by Debtor from Secured Party, relating to the Assets or the Business, whether arising by way of counterclaim or otherwise;

(e)     all rights in and under all express or implied guarantees, warranties, representations, covenants, indemnities, insurance proceeds and similar rights in favor of Debtor, and purchased by Debtor from Secured Party, with respect to the Assets or the Business, to the extent assignable without payment of money;

(f)     all Licenses held by Debtor, and purchased by Debtor from Secured Party, relating to the Assets or the Business, to the extent that they are assignable;

(g)     all information, files, correspondence, records, data, plans, reports, specifications, design drawings, operations or maintenance manuals, all servers used by Debtor with respect to the Business, and purchased by Debtor from Secured Party, contracts and recorded knowledge, including customer, supplier (including supplier cost information), price and mailing lists, and all accounting or other books and records of Debtor with respect to the Business in whatever media retained or stored, including, without limitation, computer programs and disks; and

(h)     all other tangible and intangible assets of any kind or description, wherever located, that are carried on the books of Debtor or which are owned by Debtor in respect of the Business, and which were purchased by Debtor from Secured Party.

**EXHIBIT B**

| | |
|---|---|
| 1005 | Prism Date-Paseo In Store System |
| 1006 | Par POS Registers |
| 1008 | Mobile Fixture & Equipment |
| 1014 | Wall Mural |
| 1015 | Seating Package FCC |
| 1016 | Used Ball Roof Decor |
| 1017 | Hand Dryer |
| 1018 | 60 Side Chairs |
| 1019 | Muzak System |
| 1020 | Countertop Remodeling |
| 1044 | Fryer |
| 1045 | Griddle-Angus Grill |
| 1046 | Fry Master |
| 1061 | Conference Table |
| 1062 | Canopy |
| 1087 | Channel Timer |
| 1089 | Menu Image Point |
| 1100 | Shakequake Freezer/Mixer |
| 1101 | Coffee Grinder/Airpot |
| 1119 | 3/4 HP Roof Top Unit |
| 1328 | Cash Counting Machine |
| 1329 | TVs |
| 1537 | Freezer |
| 1539 | Computer |
| 1540 | Toaster |
| 1541 | Cabinet/Hot Plate |
| 1542 | Refrigerator |
| 1543 | Oven |
| 1562 | Hot Plate/Double Burner |
| 1563 | Lobby Ice Machine |
| 1587 | Sunscreen Roller Shades |
| 1588 | Controller Board |
| 1589 | Security Cameras |
| 1590 | Hotplate |
| 1592 | Blinds |
| 1593 | Office Chair |
| 1594 | Office Computer |
| 1596 | Heat Lamp |
| 1637 | Timer |
| 1638 | Ice Machine |
| 1639 | Computer |
| 1640 | Water Heater |
| 1642 | Freezer |

| | |
|---|---|
| 1643 | Grill Timer |
| 1644 | Sigma Money Counter |
| 1704 | Ice Cream Machine |
| 1706 | Hot Well |
| 1707 | Grill Timer |
| 1708 | Fryer |
| 1737 | Seating |
| 1004 | Krystal Sign |
| 1022 | Signcraft Sign |
| 1023 | Plasti-Line Signs |
| 1738 | Sign |

960133

# EXHIBIT 2

**Tennessee Secretary of State**
Tre Hargett

Business Services    Charitable    Civics    Elections    Publications    Library & Archives    Safe At Home    Contact Us

UCC Services Online > UCC Database Search > UCC1 Financing Statement Detail

# UCC Document Detail

### As of April 09, 2020 we have processed all UCC documents received in our office through April 03, 2020.

Document details cannot be edited. This detail reflects the current state of the document in the system.

Please note, it can take up to 48 hours for filings received in our office to be processed and reflected in search results.

Actions Available For This Document:

File an Amendment (UCC3)

File an Information Statement (UCC5)

Information Request (UCC11)

Return to the UCC Document Search.

| UCC Document #: 431268053 | Printer Friendly Version |
|---|---|

UCC Financing Statement

| File Date: | 09/16/2019 9:49 AM |
|---|---|
| Lapse Date: | 09/16/2024 11:59 PM |

| Debtors | Secured Parties |
|---|---|
| THE KRYSTAL COMPANY<br>1455 LINCOLN PKWY E<br>FL 6<br>DUNWOODY, GA 30346-2209 | LIVE OAK RESTAURANT SERVICES, LLC<br>798 SW MAIN BLVD<br>LAKE CITY, FL 32025-5742 |

Related UCC Documents:

| Filing Date | UCC Document # | Type |
|---|---|---|
| 09/16/2019 9:49 AM | 431268053 | UCC Financing Statement |

Division of Business Services
312 Rosa L. Parks Avenue, Snodgrass Tower, 6th Floor
Nashville, TN 37243
615-741-2286
8:00 a.m. until 4:30 p.m. (Central) Monday - Friday.

Directions | State Holidays | Methods of Payment

Business Filings and Information (615) 741-2286 | TNSOS.CORPINFO@tn.gov

Certified Copies and Certificate of Existence (615) 741-6488 | TNSOS.CERT@tn.gov

Motor Vehicle Temporary Liens (615) 741-0529 | TNSOS.MVTL@tn.gov

Notary Commissions (615) 741-3699 | TNSOS.ATS@tn.gov

Uniform Commercial Code (UCC) (615) 741-3276 | TNSOS.UCC@tn.gov

Workers' Compensation Exemption Registrations (615) 741-0526 | TNSOS.WCER@tn.gov

Apostilles & Authentications (615) 741-0536 | TNSOS.ATS@tn.gov

Summons (615) 741-1799 | TNSOS.ATS@tn.gov

Trademarks (615) 741-0531 | TNSOS.ATS@tn.gov

Nonresident Fiduciaries (615) 741-0536 | TNSOS.ATS@tn.gov

OUR MISSION

Our mission is to exceed the expectations of our customers, the taxpayers, by operating at the highest levels of accuracy, cost-effectiveness, and accountability in a customer-centered environment.

CUSTOMER SUPPORT

Contact Us

Library & Archives Visitor Information

DEPARTMENT INFORMATION

About the Secretary of State's Office

Secretary of State Bio

Sign up for email updates

DIVISIONS

Administrative Hearings

Business Services

Charitable Solicitations and Gaming

Elections

Human Resources and Organizational Development

Library & Archives

Division of Publications

Records Management

LINKS

Tennessee General Assembly

Bureau of Ethics and Campaign Finance

Tennessee Code Unannotated

State Comptroller

State Treasurer

National Association of Secretaries of State

Tennessee Secretary of State
Tre Hargett

     

© 2016 Tennessee Secretary of State | Web and Social Media Policies

# UCC Document Detail (Unofficial)

| | | |
|---|---|---|
| **UCC Document #:** 431268053 | **Filing Date:** | 9/16/2019 9:49 AM |
| | **Lapse Date:** | 9/16/2024 11:59 PM |

## Debtors:

THE KRYSTAL COMPANY , FL 6 1455 LINCOLN PKWY E, DUNWOODY, GA  30346-2209

## Secured Parties:

LIVE OAK RESTAURANT SERVICES, LLC , 798 SW MAIN BLVD, LAKE CITY, FL  32025-5742

## Related UCC Documents:

| Filing Date | UCC Document # | Type |
|---|---|---|

EXHIBIT 3

Claim #630  Date Filed: 5/6/2020

**Fill in this information to identify the case:**

Debtor _____The Krystal Company_____

United States Bankruptcy Court for the: _____Northern_____ District of _Georgia_
<br>(State)

Case number  _____20-61065_____

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| **Part 1:** | **Identify the Claim** |
| --- | --- |

**1. Who is the current creditor?**

LIVE OAK RESTAURANT SERVICES
<br>Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

LIVE OAK RESTAURANT SERVICES
ATTN  MIKE MOSES
798 SW MAIN BLVD
LAKE CITY, FL 32025

Contact phone  386-755-9673
Contact email  t.dicks@comcast.net

**Where should payments to the creditor be sent?** (if different)

Contact phone _____
Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.   Claim number on court claims registry (if known) _____    Filed on _____
<br>MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

20610652003162227070001030

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

6.  **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7.  **How much is the claim?**  $ _100,000_____. **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8.  **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See summary page_____

9.  **Is all or part of the claim secured?**

☐ No

☑ Yes.   The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:    _Assets located at 10555 Suwanee Plaza Blvd., Live_

**Basis for perfection:**    _Tennessee UCC Financing Statement # 431268053_

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                    $_100,000 or more_

**Amount of the claim that is secured:**   $_100,000_____

**Amount of the claim that is unsecured:**  $_0_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10.  **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11.  **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                         **Proof of Claim**

2061065200316222707001030

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

| | | Amount entitled to priority |
|---|---|---|
| ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ | Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ | Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

| Part 3: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   05/06/2020
                    MM / DD / YYYY

/s/Robert D. Wilcox
Signature

**Print the name of the person who is completing and signing this claim:**

Name      Robert D. Wilcox
          First name          Middle name          Last name

Title     Attorney

Company   Wilcox Law Firm
          Identify the corporate servicer as the company if the authorized agent is a servicer.

          93 Rio Drive, Ponte Vedra Beach, FL, 32082, USA

Address

Contact phone   904-405-1250          Email   rw@wlflaw.com

---

2061065200316222707001030

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (888) 249-2792 | International (310) 751-2607

| | |
|---|---|
| **Debtor:** <br> 20-61065 - The Krystal Company | |
| **District:** <br> Northern District of Georgia, Atlanta Division | |
| **Creditor:** <br> LIVE OAK RESTAURANT SERVICES <br> ATTN  MIKE MOSES <br> 798 SW MAIN BLVD <br><br> LAKE CITY, FL, 32025 <br><br> **Phone:** <br> 386-755-9673 <br> **Phone 2:** <br> 386-755-9673 ext. 15 <br> **Fax:** <br><br> **Email:** <br> t.dicks@comcast.net | **Has Supporting Documentation:** <br> Yes, supporting documentation successfully uploaded <br> **Related Document Statement:** <br><br> **Has Related Claim:** <br> No <br> **Related Claim Filed By:** <br><br> **Filing Party:** <br> Authorized agent |
| **Other Names Used with Debtor:** | **Amends Claim:** <br> No <br> **Acquired Claim:** <br> No |
| **Basis of Claim:** <br> Amounts due under Asset Purchase Agreement dated September 9, 2019 and related agreements | **Last 4 Digits:** No  **Uniform Claim Identifier:** |
| **Total Amount of Claim:** <br> 100,000 | **Includes Interest or Charges:** <br> No |
| **Has Priority Claim:** <br> No | **Priority Under:** |
| **Has Secured Claim:** <br> Yes: 100,000 <br> **Based on Lease:** <br> No <br> **Subject to Right of Setoff:** <br> No | **Nature of Secured Amount:** <br> Other <br> Describe: Assets located at 10555 Suwanee Plaza Blvd., Live <br> **Value of Property:** <br> 100,000 or more <br> **Annual Interest Rate:** <br><br> **Arrearage Amount:** <br><br> **Basis for Perfection:** <br> Tennessee UCC Financing Statement # 431268053 <br> **Amount Unsecured:** <br> 0 |
| **Submitted By:** <br> Robert D. Wilcox on 06-May-2020 2:03:50 p.m. Eastern Time <br> **Title:** <br> Attorney <br> **Company:** <br> Wilcox Law Firm | |
| **Optional Signature Address:** <br> Robert D. Wilcox <br> 93 Rio Drive <br><br> Ponte Vedra Beach, FL, 32082 <br> USA <br> **Telephone Number:** <br> 904-405-1250 <br> **Email:** <br> rw@wlflaw.com | |

VN: 7193CF2D3B8F46BE77D89FC72F140823

<u>Statement Regarding Proof of Claim- Live Oak Restaurant Services, LLC (LORS)</u>

The claimant LORS is a party to an Asset Purchase Agreement dated September 9, 2019 and related agreements under which The Krystal Company acquired certain assets located at 10555 Suwanee Plaza Blvd., Live Oak, FL from Claimant for $100,000.00.

The Krystal Company's schedules (Doc. 182) identifies LORS as a secured creditor based on a a recorded Tennessee UCC Financing Statement # 431268053.

The schedules also identify the Asset Purchase Agreement and related contracts as executory contracts.  Claimant's current claim is $100,000.00  but since the contract contains a consequential damages indemnity provision, the claim may increase.

**Tennessee Secretary of State**
Tre Hargett

Business Services    Charitable    Civics    Elections    Publications    Library & Archives    Safe At Home    Contact Us

UCC Services Online > UCC Database Search > UCC1 Financing Statement Detail

# UCC Document Detail

### As of April 09, 2020 we have processed all UCC documents received in our office through April 03, 2020.

Document details cannot be edited. This detail reflects the current state of the document in the system.

Please note, it can take up to 48 hours for filings received in our office to be processed and reflected in search results.

**Actions Available For This Document:**

File an Amendment (UCC3)

File an Information Statement (UCC5)

Information Request (UCC11)

Return to the UCC Document Search.

| UCC Document #: 431268053 | Printer Friendly Version |
| --- | --- |

UCC Financing Statement

**File Date:**          09/16/2019 9:49 AM

**Lapse Date:**         09/16/2024 11:59 PM

| Debtors | Secured Parties |
| --- | --- |
| THE KRYSTAL COMPANY<br>1455 LINCOLN PKWY E<br>FL 6<br>DUNWOODY, GA 30346-2209 | LIVE OAK RESTAURANT SERVICES, LLC<br>798 SW MAIN BLVD<br>LAKE CITY, FL 32025-5742 |

Related UCC Documents:

| Filing Date | UCC Document # | Type |
| --- | --- | --- |
| 09/16/2019 9:49 AM | 431268053 | UCC Financing Statement |

Division of Business Services
312 Rosa L. Parks Avenue, Snodgrass Tower, 6th Floor
Nashville, TN 37243
615-741-2286
8:00 a.m. until 4:30 p.m. (Central)
Monday - Friday.

Directions | State Holidays | Methods of Payment

Business Filings and Information (615) 741-2286 | TNSOS.CORPINFO@tn.gov

Certified Copies and Certificate of Existence (615) 741-6488 | TNSOS.CERT@tn.gov

Motor Vehicle Temporary Liens (615) 741-0529 | TNSOS.MVTL@tn.gov

Notary Commissions (615) 741-3699 | TNSOS.ATS@tn.gov

Uniform Commercial Code (UCC) (615) 741-3276 | TNSOS.UCC@tn.gov

Workers' Compensation Exemption Registrations (615) 741-0526 | TNSOS.WCER@tn.gov

Apostilles & Authentications (615) 741-0536 | TNSOS.ATS@tn.gov

Summons (615) 741-1799 | TNSOS.ATS@tn.gov

Trademarks (615) 741-0531 | TNSOS.ATS@tn.gov

Nonresident Fiduciaries (615) 741-0536 | TNSOS.ATS@tn.gov

OUR MISSION

Our mission is to exceed the expectations of our customers, the taxpayers, by operating at the highest levels of accuracy, cost-effectiveness, and accountability in a customer-centered environment.

CUSTOMER SUPPORT

Contact Us

Library & Archives Visitor Information

DEPARTMENT INFORMATION

About the Secretary of State's Office

Secretary of State Bio

Sign up for email updates

DIVISIONS

Administrative Hearings

Business Services

Charitable Solicitations and Gaming

Elections

Human Resources and Organizational Development

Library & Archives

Division of Publications

Records Management

LINKS

Tennessee General Assembly

Bureau of Ethics and Campaign Finance

Tennessee Code Unannotated

State Comptroller

State Treasurer

National Association of Secretaries of State

Tennessee Secretary of State
Tre Hargett

     

© 2016 Tennessee Secretary of State | Web and Social Media Policies

# UCC Document Detail (Unofficial)

| | | |
|---|---|---|
| **UCC Document #:** 431268053 | **Filing Date:** | 9/16/2019 9:49 AM |
| | **Lapse Date:** | 9/16/2024 11:59 PM |

## Debtors:

THE KRYSTAL COMPANY , FL 6 1455 LINCOLN PKWY E, DUNWOODY, GA  30346-2209

## Secured Parties:

LIVE OAK RESTAURANT SERVICES, LLC , 798 SW MAIN BLVD, LAKE CITY, FL  32025-5742

## Related UCC Documents:

| Filing Date | UCC Document # | Type |
|---|---|---|

**ASSET PURCHASE AGREEMENT**

**by and between**

**THE KRYSTAL COMPANY, a Tennessee corporation**

**and**

**LIVE OAK RESTAURANT SERVICES, LLC, a Florida limited liability company**

**September 9, 2019**

119183456_6.docx

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of the 9th day of September, 2019, is made and entered into by and between **THE KRYSTAL COMPANY**, a Tennessee corporation ("Purchaser"), and **LIVE OAK RESTAURANT SERVICES, LLC**, a Florida limited liability company (collectively, "Seller"). Purchaser and Seller are sometimes referred to herein each individually as a "Party" and collectively as the "Parties."

WHEREAS, Seller as franchisee, currently operates a Krystal restaurant as a going concern (collectively, the "Business"), pursuant to that certain The Krystal Company Franchise Agreement dated January 22, 2003 as amended by that certain First Addendum to The Krystal Company Franchise Agreements dated December 10, 2007, with Purchaser as franchisor, as subsequently amended and modified thereafter (collectively, the "Franchise Agreement"), which Business is located on land owned by Seller at 10555 Suwannee Plaza Blvd., Live Oak, Florida 32060;

WHEREAS, the Parties desire to enter into this Agreement pursuant to which Seller proposes to sell to Purchaser, and Purchaser proposes to purchase from Seller (the "Acquisition"), all of the assets used or held for use by Seller in the conduct of the Business; and

WHEREAS, the Parties desire to make certain representations, warranties and agreements in connection with the Acquisition.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Key Terms.  The following defined terms shall have the meanings set forth below:

| | | |
|---|---|---|
| (a) | "Purchase Price": | One Hundred Thousand and No/100 Dollars ($100,000.00). |
| (b) | "Diligence Period": | the period between the date hereof and September 5, 2019. |
| (c) | "Outside Closing Date": | September 9, 2019. |

Section 1.2    Definitions.  All other capitalized terms used in this Agreement, if not defined in Section 1.1 or otherwise herein, shall have the meanings set forth on **Appendix 1**.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Agreement to Purchase and Sell.  Subject to the terms and conditions of this Agreement, at the consummation of the transactions contemplated by this Agreement (the "Closing"), Seller will grant, sell, assign, transfer and deliver to Purchaser or its designees, and Purchaser will

purchase and acquire from Seller, all right, title and interest of Seller in and to (i) the Business and (ii) the Assets, free and clear of all Liens, and Purchaser will assume the Assumed Liabilities.

Section 2.2    Assets. Except as otherwise expressly set forth in Section 2.3, the Assets shall include, without limitation, all of the assets, properties and rights of Seller of every kind and description, personal and mixed, tangible and intangible, wherever situated, used by or held for use by Seller in the operation of the Business (which assets, properties and rights are collectively referred to in this Agreement as the "Assets") as of the opening of business on the Closing Date, including the following assets, properties and rights of Seller:

(a)    all rights of Seller under any Assumed Contract and any rights of first refusal or first offer arising thereunder or otherwise with respect to any of the Assets;

(b)    all fixed assets, signage, furniture, equipment, lifts, machinery, lubrication equipment, tools, parts, furnishings, decorations, computer hardware, point-of-sale systems, fixtures, uniforms, telephone systems, vehicles, cameras, TVs, video equipment and other items of tangible personal property owned, leased, used or otherwise held for use by Seller with respect to the Business and located at the restaurant on the Closing Date, which tangible personal property is listed on **Exhibit "B"** attached hereto, but specifically excluding any portion of the electrical, heating or air conditioning systems serving the restaurant;

(c)    all supplies and Inventory owned by Seller and used or held for use in the operation of the Business, including without limitation, office and other supplies, spare, replacement and component parts, and other inventory property located at, stored on behalf of or in transit to Seller or the Restaurant, all as of the Closing Date and all to the extent paid for prior to the Closing Date or payable by Seller after the Closing Date in the ordinary course of business, consistent with past practices of Seller;

(d)    all of the intangible rights and property of Seller with respect to the Business, including goodwill, Intellectual Property and Software, to the extent assignable;

(e)    all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by Seller relating to the Assets or the Business, whether arising by way of counterclaim or otherwise;

(f)    all rights in and under all express or implied guarantees, warranties, representations, covenants, indemnities, insurance proceeds and similar rights in favor of Seller with respect to the Assets or the Business, to the extent assignable without payment of money;

(g)    all Licenses held by Seller relating to the Assets or the Business, to the extent that they are assignable;

(h)    all information, files, correspondence, records, data, plans, reports, specifications, design drawings, operations or maintenance manuals, all servers used by Seller with respect to the Business, contracts and recorded knowledge, including customer, supplier (including supplier cost information), price and mailing lists, and all accounting or other books and records of

2

Seller with respect to the Business in whatever media retained or stored, including, without limitation, computer programs and disks;

        (i)     all Store Cash of the restaurant; and

        (j)     all other tangible and intangible assets of any kind or description, wherever located, that are carried on the books of Seller or which are owned by Seller in respect of the Business.

        Section 2.3     Excluded Assets. The following items shall be excluded from the definition of Assets and shall not be conveyed to Purchaser (collectively, the "Excluded Assets"):

        (a)     All real property assets of Seller, including the restaurant, and those which are being leased to Purchaser of even date herewith;

        (b)     Other than the Store Cash, all cash in bank accounts, bank deposits, and accounts receivable;

        (c)     All deposits on hand with lessors, vendors or utility companies, including utility deposits related to the restaurant; and

        (d)     Computers and cell phones.

        Section 2.4     Assumption of Assumed Liabilities.

        (a)     Except as provided in Section 2.4(b), Purchaser will not assume, in connection with the transactions contemplated by this Agreement, any liability or obligation of Seller or any other Person whatsoever, and Seller will retain responsibility for all liabilities and obligations relating to the Assets accrued prior to the Closing Date and all liabilities and obligations arising from Seller's operations prior to the Closing Date, whether or not accrued and whether or not disclosed.

        (b)     As the sole exceptions to the provisions in Section 2.4(a), effective as of the opening of business on the Closing Date, Purchaser will assume and agree to pay, discharge or perform, as appropriate, (i) the obligations of Seller under the Assumed Contracts to the extent such obligations are not required to be performed prior to the Closing Date, are disclosed on the face of such Assumed Contracts and accrue and relate to the operations of the Business on or subsequent to the Closing Date and (ii) the obligations of Seller with respect to the Assumed Prepaid Cards (collectively, the "Assumed Liabilities").

        Section 2.5     Excluded Liabilities. Specifically, and without in any way limiting the generality of Section 2.4(a), the Assumed Liabilities will not include, and in no event will Purchaser assume, agree to pay, discharge or satisfy any liability or obligation under this Agreement or otherwise have any responsibility for, any liability or obligation (together with all other liabilities of Seller that are not Assumed Liabilities, the "Excluded Liabilities"):

        (a)     relating to any liability or obligation (including, without limitation, accounts payable) owed to any equity owner or Affiliate of Seller;

3

119183456_6.docx

(b)    for Taxes related to the Business and any of the Assets prior to the Closing Date;

(c)    relating to trade or other accounts payable, notes payable, short or long term debt or otherwise relating to borrowed money;

(d)    relating to, resulting from or arising out of (i) claims made in pending or future suits, actions, investigations or other legal, governmental or administrative proceedings or (ii) claims based on violations of law, breach of contract, employment practices or environmental, health and safety matters or any other actual or alleged failure of Seller to perform any obligation, in each case arising out of or relating to events which shall have occurred, or services performed, or the operation of the Business, prior to the Closing, including any and all workers' compensation and other similar claims asserted by or with respect to any employee or former employee of Seller in respect of any injury or other compensable event or occupational illness or disease that occurred or is attributable to any event, state of facts or condition that existed or occurred prior to the Closing Date (it being understood by the parties that any liability or obligations relating to, resulting from or arising out of such claims shall be the responsibility of Seller to the extent relating to the operation of the Business prior to the Closing);

(e)    all bonds, debentures, notes, loans, credit and loan agreements or loan commitments, mortgages, indentures, guarantees and other contracts relating to the Indebtedness of Seller;

(f)    pertaining to, relating to, resulting from or arising out of any operations of Seller pertaining to any operations not constituting the Business;

(g)    pertaining to any contract that is not an Assumed Contract or any prepaid services card or package that is not an Assumed Prepaid Card;

(h)    pertaining to any Assumed Contract, to the extent such liability or obligation was not assumed by Purchaser under Section 2.4(b);

(i)    pertaining to any Assumed Contract, to the extent such liability or obligation accrued or relates to the period prior to the Closing Date;

(j)    relating to, resulting from or arising out of any former operations of Seller or predecessor entities thereof that have been discontinued or disposed of prior to the Closing;

(k)    arising out of or relating to products of Seller to the extent sold prior to the Closing Date or services provided by Seller prior to the Closing Date;

(l)    relating to any Environmental, Health and Safety Liabilities arising out of or relating to the operation of the Business prior to the Closing;

(m)    under or relating to the Employee Benefit Plan, whether or not such liability or obligation arises prior to, on or after the Closing Date;

4

(n)     any and all liabilities under any employment, severance, retention or termination agreement involving Seller with any current or former employee or consultant of Seller or any of its Affiliates;

(o)     arising out of or relating to a matter which occurred or existed or is alleged to have occurred or existed prior to the Closing, between Seller and any current or former employee or consultant of Seller or any of its Affiliates;

(p)     arising out of or is based upon any expressed or implied representation, warranty, agreement or guaranty made by Seller or any of its predecessors, or alleged to have been made by Seller or any of its predecessors, or which is imposed or asserted to be imposed by operation of law, in connection with any service performed or product sold or leased by or on behalf of Seller or any of its predecessors on or prior to the Closing Date, including without limitation any claim seeking recovery for consequential damages, lost revenue or income;

(q)     except as set forth in this Agreement, to indemnify, reimburse or advance amounts to any director, officer, shareholder, employee or agent of Seller;

(r)     arising out of any action, suit, litigation or proceeding pending as of the Closing Date;

(s)     arising out of or relating, directly or indirectly, to any action or proceeding commenced on or after the Closing Date and arising out of or relating to any occurrence or event happening prior to the Closing Date;

(t)     arising out of or resulting from Seller's compliance or noncompliance with any law, statute, rule, regulation, order, decree, injunction or judgment of any Governmental Entity, including bulk transfer laws;

(u)     of Seller arising or incurred in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby and any fees and expenses of counsel, accountants, brokers, financial advisors or other experts of Seller;

(v)     for payments and expenses for which Seller is specifically responsible under the terms of this Agreement or the Seller Ancillary Documents;

(w)     for payment of any items of Inventory, including any amounts payable after the Closing Date in the ordinary course of business;

(x)     any and all liabilities related to accrued vacation time or bonuses credited to any employee; and

(y)     any accounts payable or accrued expenses related to bonuses or distributions for periods ending prior to the Closing Date.

Such Excluded Liabilities shall include all claims, actions, litigation and proceedings relating to any or all of the foregoing and all costs and expenses in connection therewith.  Seller shall promptly pay

5

and discharge, as they become due and payable, and perform in accordance with their respective terms, any claims against, or liabilities, potential liabilities or obligations of Seller relating to the time period prior to the Closing (other than the Assumed Liabilities) whether liquidated or unliquidated, known or unknown, whether accrued or arising out of occurrences prior to, at or after the date hereof and the Closing Date, including without limitation all Excluded Liabilities. Except as set forth herein, Purchaser is not assuming and shall not be liable for, and none of the Assets shall be subject to, any debts, liabilities, Liens or obligations of Seller of any character whatsoever.

## ARTICLE III
## PURCHASE PRICE; ALLOCATIONS

Section 3.1     _Purchase Price_.  Subject to adjustment pursuant to Sections 3.2 and 3.3, the aggregate amount to be paid for the Assets is the Purchase Price. The Purchase Price shall be paid by March 1, 2020, and Seller shall be able to file a UCC Financing Statement against the Assets but will be required to prepare a UCC Termination once payment is received. In addition to the Purchase Price, Purchaser shall pay to Seller in cash at Closing an amount equal to the Inventory Costs plus the Store Cash as of the Inventory and Store Cash Accounting. In addition to the foregoing, as consideration for the grant, sale, assignment, transfer and delivery of the Assets, Purchaser shall assume and discharge the Assumed Liabilities.

Section 3.2     _Allocation of Certain Items_.  With respect to certain expenses and liabilities incurred with respect to the Assets in the operation of the Business, the following allocations will be made between Purchaser and Seller (or their respective Affiliates), as applicable, with respect to those incurred expenses applicable to Seller's conduct of the Business:

(a)     _Taxes_.  General Taxes and assessments for the year of Closing with respect to any personal property will be apportioned at Closing based upon the number of days in the taxable period before the Closing Date and after (and including) the Closing Date and the amounts set forth in the most recent Tax bills available at the Closing Date. The Parties will make appropriate payments at Closing to reflect such apportionment estimate, provided that the Parties will make appropriate cash payments to one another to reflect the actual Tax bill promptly after receipt thereof. All other Taxes or assessments relating to the time period before the Closing Date (whenever assessed) will be paid by Seller and those relating to the time period after (and including) the Closing Date (whenever assessed) will be paid by Purchaser. Each Party shall pay directly, or, if necessary, reimburse the other Party, with respect to its allocation of such Taxes pursuant to this Section 3.2(a).

(b)     _Utilities_.  Seller will pay all utility costs, including, without limitation, local and long distance telephone services, electricity, internet access and water and sewer charges for the period up to and including the day before Closing.  Purchaser will open new utility accounts on or before Closing, if possible, or as soon as possible after Closing, and will pay all utilities for the period beginning on the Closing Date. The parties covenant and agree that they will cooperate to ensure a transition of utilities without a break in service. In no event shall Seller take any action that would cause utility service at the real property to cease.  Any utility bills including periods before and after Closing will be apportioned based upon the number of calendar days occurring before the Closing Date and after (and including) the Closing Date during the billing period for each such charge.

6

(c)    *Other Prorations.*  All payroll, business license fees for any business licenses transferred to Purchaser in connection with the Closing, rents, continuing fees and royalties and other payments payable under or with respect to any Assumed Contract, shall be prorated between Seller and Purchaser as of the Closing Date.  Notwithstanding anything herein to the contrary, Seller shall be solely responsible for, and shall pay at or prior to the Closing, all amounts accrued or payable with respect to any compensation (including, without limitation, any bonuses and other similar amounts to which any employees may be entitled), severance, payroll taxes, accrued vacation pay, fringe benefits or other payments or benefits owed, whether under applicable law or any of Seller's personnel policies, to all employees (regardless of whether such employee becomes a Transferred Employee) for all periods ending on or prior to the Closing Date.

(d)    *Assumed Prepaid Cards.*  All prepaid cards and other packages providing customers with prepaid goods or services to the extent outstanding and not redeemed prior to the Closing Date will be determined and Purchaser will receive a credit equal to the amount of all unredeemed Assumed Prepaid Cards.  The Parties will estimate the credit for unredeemed Assumed Prepaid Cards as required under this subsection (d) and make appropriate payments to reflect such estimates at Closing subject to adjustment as required hereunder.

Unless otherwise expressly set forth in this Agreement, appropriate cash payments by Purchaser or Seller relating to allocations or reimbursements under this Section 3.2, as the case may require, shall be made from time to time as soon as practicable after the facts giving rise to the obligation for such payments are known and agreed upon.  To the extent any obligation to a third party covered by this Section 3.2 becomes due and payable prior to the Closing Date, Seller shall make the payments necessary to satisfy such obligation and may seek reimbursement from Purchaser under this Section 3.2.  To the extent any obligation to a third party covered by this Section 3.2 becomes due and payable on or after the Closing Date, Purchaser shall make the payments necessary to satisfy such obligation and may seek reimbursement from Seller under this Section 3.2.  Without limiting the foregoing, Purchaser and Seller will use commercially reasonable efforts to (i) determine within sixty (60) days after the Closing Date all prorations, and other items the amount and appropriate proration of which cannot be ascertained within such sixty (60) day period, and (ii) make payments with respect to all such prorations within seventy-five (75) days after the Closing Date.

Section 3.3    Post-Closing Adjustment.  To the extent (a) any amounts used to calculate the Purchase Price pursuant to Section 3.1 or in the allocation of expenses pursuant to Section 3.2 were based on projected or estimated amounts, (b) Purchaser or Seller has discovered errors in the items previously included in the Purchase Price calculation or allocated between Purchaser and Seller, Purchaser and Seller shall recalculate the Purchase Price or such allocations, as applicable, as soon as practicable after the facts giving rise to such recalculation are known and agreed upon.  Appropriate cash payments by Purchaser or Seller relating to any such recalculation under this Section 3.3, as the case may require, shall be made from time to time as soon as practicable after such recalculation.

Section 3.4    Purchase Price Allocation.  Attached hereto as **Exhibit "C"** is the allocation of the Purchase Price to the Assets (such allocation, the "Purchase Price Allocation").  The Purchase Price Allocation shall be binding on the Parties for all purposes, including the reporting of gain or loss and determination of basis for income tax purposes, and each of the Parties hereto agrees that it or they will file a statement setting forth such Purchase Price Allocation with its or their federal income Tax

7

Returns and will also file such further information or take such further actions as may be necessary to comply with Section 1060 of the Code and the Treasury Regulations thereunder. No Party shall take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with such Purchase Price Allocation unless required to do so by applicable law. If any state or federal taxing authority challenges such Purchase Price Allocation, the Parties shall cooperate in good faith in responding to such challenge. Each Party shall give prompt written notice to the other Party of any such challenge.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing, as follows:

Section 4.1    Organization.  Seller is validly existing and in good standing under the laws of the State of Florida and it has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

Section 4.2    Authorization; Enforceability.  Seller has the right, power and capacity to execute and deliver, and to perform its obligations under, this Agreement and the Seller Ancillary Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The entering into, execution and delivery of, and the performance of Seller's obligations under, this Agreement and the Seller Ancillary Agreements by Seller, and the consummation of the transactions provided for hereby and thereby have been duly and validly authorized and approved by all necessary action on the part of Seller.  This Agreement has been and, as of the Closing Date, the Seller Ancillary Documents to which such Seller is a party will be, duly executed and delivered by Seller and do or will, as the case may be, constitute the valid and binding agreements of Seller, enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.  No proceedings have been taken or authorized with respect to the bankruptcy, insolvency, liquidation, dissolution or winding-up of Seller.

Section 4.3    Absence of Restrictions and Conflicts.  The execution, delivery and performance of this Agreement and the Seller Ancillary Documents, the consummation of the transactions contemplated by this Agreement and the Seller Ancillary Documents and the fulfillment of and compliance with the terms and conditions of this Agreement and the Seller Ancillary Documents do not or will not (as the case may be), with the passing of time or the giving of notice or both, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any party the right to terminate, modify or cancel, (a) any term or provision of the Governing Documents of Seller, (b) except as indicated on **Exhibit "E-1"** attached hereto, any Assumed Contract or any other contract, agreement, permit, franchise, license or other instrument applicable to Seller or the Business, (c) any judgment, decree or order of any Governmental Entity to which Seller is a party or by which Seller or any of its properties is bound or (d) any statute, law, rule, regulation or arbitration award applicable to Seller or the Business.  No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required with respect to Seller in connection with the execution, delivery or performance of this Agreement or the Seller Ancillary Documents.

8

119183456_6.docx

Section 4.4    Intentionally Deleted.

Section 4.5    Title to Assets; Related Matters.  Seller has (and will convey to Purchaser at the Closing) good and marketable title to the Assets, free and clear of all Liens.  The Assets, combined with the Excluded Assets, constitute all of the assets necessary and sufficient to conduct the operations of the Business in accordance with the past practice of Seller.  Except as set forth on **Appendix 2** attached hereto (as to Section 4.5), all equipment and other items of tangible personal property and assets included in the Assets are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, are usable in the regular and ordinary course of business and conform in all material respects to all applicable laws, ordinances, codes, rules and regulations applicable thereto, and Seller has no Knowledge of any defects or problems with any of the Assets.  Except as set forth on **Appendix 2** attached hereto (as to Section 4.5), no Person other than Seller owns any equipment or other tangible personal property or assets situated on the premises of Seller which are necessary to the operation of the Business.  **Exhibit "B"** attached hereto sets forth a true, correct and complete list and general description of each item of tangible personal property of Seller carries on its books with respect to the Business.

Section 4.6    Financial Statements.  The Financial Statements are set forth in **Exhibit "D"** attached hereto and are true and correct in all material respects.  The Financial Statements have been prepared from, and are in accordance with, the books and records of Seller, which books and records are maintained on the modified tax basis method of accounting consistently applied throughout the periods indicated, and such books and records have been maintained on a basis consistent with the past practice of Seller.  Each of the balance sheets included in such Financial Statements (including the related notes and schedules) fairly presents in all material respects the financial position of Seller as of the date of such balance sheet, and each of the statements of income and cash flows included in such Financial Statements fairly presents in all material respects the results of operations and changes in cash flows, as the case may be, of Seller for the periods set forth therein, in each case in accordance with the modified tax basis of accounting.

Section 4.7    No Undisclosed Liabilities.  Except as disclosed on **Appendix 2** attached hereto (as to Section 4.7), Seller does not have any liabilities or obligations (whether absolute, contingent or otherwise), that are not adequately reflected or provided for in the reviewed balance sheets of Seller contained in the Financial Statements, except liabilities and obligations that have been incurred since the date of such balance sheets in the ordinary course of business, consistent with the past practice of Seller, and that are not (individually or in the aggregate) material to the Business.

Section 4.8    Absence of Certain Changes.  To the best of Seller's Knowledge, and except as set forth in **Appendix 2** attached hereto (as to Section 4.8), there has not been (a) any Material Adverse Effect, (b) any damage, destruction, loss or casualty to property or assets of Seller (including the Assets) with a value in excess of $10,000.00, whether or not covered by insurance, or (c) any action taken of the type described in Section 6.1, which, had such action occurred after the date hereof without Purchaser's prior approval, would be in violation of such Section 6.1.

Section 4.9    Legal Proceedings. Except as set forth on **Appendix 2** attached hereto (as to Section 4.9), there is no existing order, writ, injunction, judgment or decree nor any claim, action, suit, proceeding, arbitration, mediation, alternative dispute resolution action, complaint, charge, inquiry or investigation pending or, to the Knowledge of Seller, currently threatened (a) relating to or involving

9

Seller, the Business or the Assets, or (b) that questions or would affect the ability of Seller to consummate the transactions contemplated by this Agreement. None of the matters set forth on **Appendix 2** attached hereto with respect to this Section 4.9, if finally determined adversely, would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. Neither Seller nor any director, shareholder, officer or employee of Seller, is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality, or of any arbitrator, arbitration panel or mediator. Except as set forth on **Appendix 2** attached hereto (as to Section 4.9), there is no action, suit, proceeding or investigation by Seller pending or that Seller intends to initiate. Seller agrees that it is responsible for the claim by Sheryl Rose, either through its insurance company or itself.

Section 4.10    Compliance with Law.  Seller is (and has been at all times during the past five [5] years) in compliance in all material respects with all applicable laws (including, without limitation, applicable laws relating to zoning, environmental matters and the safety and health of employees), ordinances, regulations and orders of all Governmental Entities. Except as set forth on **Appendix 2** attached hereto (as to Section 4.10), Seller is not under investigation with respect to, a violation of any applicable law, regulation, ordinance, order or other requirement of a Governmental Entity and Seller is not subject to any order, settlement or judgment regarding the same.

Section 4.11    Contracts.

(a)    **Exhibit "E"** attached hereto sets forth a true, correct and complete list of the Business Contracts related to the Business or otherwise affecting the Assets (other than the Employment Agreements set forth on **Appendix 2** attached hereto, with respect to Section 4.13).

(b)    True, correct and complete copies of all contracts and agreements, if any, affecting the ownership, operation, management and maintenance of the Assets, including without limitation the Business Contracts, have been made available to Purchaser.

(c)    The Business Contracts are legal, valid, binding and enforceable in accordance with their respective terms with respect to Seller and each other party to such Business Contracts. There are no existing defaults or breaches of Seller under any Business Contract (or events or conditions which, with notice or lapse of time or both, would constitute a default or breach) and, to the Knowledge of Seller, there are no such defaults or breaches (or events or conditions which, with notice or lapse of time or both, would constitute a default or breach) with respect to any third party to any Business Contract. Seller is not participating in any discussions or negotiations regarding modification of or amendment to any Business Contract or entry in any new material contract applicable to the Business or the Assets.

(d)    **Exhibit "E-1"** hereto identifies each Business Contract set forth on **Exhibit "E"** that requires the consent of or notice to any other party thereto to avoid any breach, default or violation or termination of such contract, agreement or other instrument in connection with the transactions contemplated hereby, including the assignment of such Business Contract to Purchaser (collectively, the "Non-Assignable Contracts").

10

119183456_6.docx

(e)    Seller has not, nor has any predecessor of Seller, made any express written warranty or any other express or implied warranty or guaranty with respect to products sold or services performed by Seller or predecessors except for standard express written warranties.

Section 4.12    Employees.

(a)    **Exhibit "F"** hereto contains a true and complete list of all of the employees (whether full-time, part-time or otherwise) and independent contractors of Seller as of the most recent payroll run prior to the date hereof, other than those employed in Seller's corporate office, in each case specifying with respect to each such individual his or her position, status, date of hire, annual salary and hourly wages (including material changes in such compensation since date of hire), including consulting or other independent contractor fees, bonuses, sick and vacation leave that is accrued but unused, service credited for purposes of vesting and eligibility to participate under any Employee Benefit Plan. Except as indicated on **Exhibit "F,"** all employees of Seller are active on the date hereof.

(b)    **Exhibit "F"** contains a complete and accurate list of the following information for each retired employee or manager of Seller, or their dependents, receiving benefits or scheduled to receive benefits in the future: name; pension benefits; pension option election; retiree medical insurance coverage; retiree life insurance coverage; and other benefits.

(c)    **Exhibit "F"** states the number of full-time employees who have been terminated by Seller in the last six (6) months, and contains a complete and accurate list of the following information for each such employee who has been terminated or laid off, or whose hours of work have been reduced by more than fifty percent (50%) by Seller, in the six (6) months prior to the date of this Agreement: (i) the date of such termination, layoff or reduction in hours; and (ii) the reason for such termination, layoff or reduction in hours.

(d)    Except as set forth on **Appendix 2**, with respect to Section 4.13, Seller is not a party to or bound by any Employment Agreements. Seller has provided to Purchaser true, correct and complete copies of each Employment Agreement.

(e)    Seller has not received a claim from any Governmental Entity to the effect that Seller has (i) improperly classified as an independent contractor any individual who performs services for Seller or (ii) improperly classified any employee as exempt under the FLSA or any similar state or local law, and no basis for such claim exists. Seller has not made any commitment that creates, or would create upon the consummation of the transaction completed by this Agreement, an obligation on behalf of Purchaser on or following the Closing to any such officers, employees or former employees, consultants or independent contractors with respect to compensation, promotion, retention, termination, severance or similar matters in connection with the transactions completed by this Agreement or otherwise, and Seller has not made any written commitments to any employee of Seller with respect to compensation, promotion, retention, termination, severance or similar matters in connection with the transactions contemplated by this Agreement or otherwise. To the Knowledge of Seller, there have been no violations of the WARN Act or any similar state or local law.

(f)    Purchaser and Seller acknowledge and agree that certain information provided by Seller to Purchaser under this Agreement, including without limitation, disclosures regarding workers' compensation, unemployment, disability or other benefits, wrongful discharge, retaliation,

11

libel, slander, discrimination, harassment, tax, wage and hour or other claims, complaints, grievances, charges or investigations that arise out of the employment relationship between Seller and its employees, whether filed, pending or threatened against Seller under Labor Laws or any other applicable law (collectively, "Employee Claims"), may (i) reveal sensitive information regarding a particular employee, and (ii) indicate the existence of or potential for claims, liabilities, losses, damages, costs, expenses, penalties, fines, judgments or other monetary obligations resulting from Employee Claims or otherwise arising out of or relating to said employment relationship between Seller and its employees. Purchaser agrees that Purchaser will not allow the existence (or non-existence) of Employee Claims to influence, contrary to applicable law, individual decisions regarding the re-hiring of Seller's employees by Purchaser. Purchaser shall not be responsible for any Employee Claims and Seller shall pay for all Employee Claims.

Section 4.13    Labor Relations. To the best of Seller's Knowledge, except as set forth on **Appendix 2** (as to Section 4.13): (a) Seller's employees have not filed or have currently pending a representation election petition or application for certification, nor have they been, and currently are not, represented by a labor organization or group which was either certified or voluntarily recognized by any labor relations board, including, without limitation, the United States National Labor Relations Board, or certified or voluntarily recognized by any other Governmental Entity, and no union organizing campaign or other attempt to organize or establish a labor union, employee organization or labor organization or group involving employees of Seller has occurred, is in progress or is threatened; (b) Seller is not a signatory to a collective bargaining agreement or any other contract between Seller and any labor union or other employee representative of a group of employees relating to wages, hours and other conditions of employment; (c) Seller has not engaged in any unfair labor practice and there is no pending or threatened labor dispute, walk out, strike, slowdown, hand billing, picketing, work stoppage (sympathetic or otherwise) or other "concerted action," or labor board proceeding of any kind, including any such proceeding against Seller or any trade union, labor union, employee organization or labor organization representing Seller's employees; (d) Seller is not a federal or state contractor; (e) no citation has been issued by OSHA against Seller and no notice of contest, claim, complaint, charge, investigation or other administrative enforcement proceeding involving Seller has been filed or is pending or threatened against Seller under OSHA or any other applicable law relating to occupational safety and health; (f) no workers' compensation, wrongful discharge, retaliation, libel, slander, discrimination, harassment, wage and hour or other claim, complaint, grievance, charge or investigation that arises out of the employment relationship between Seller and its employees has been filed or is pending or threatened against Seller under any applicable law; (g) Seller has maintained and currently maintains compliance with all applicable laws, including, without limitation, Labor Laws, insurance requirements with respect to workers' compensation claims and unemployment benefits claims, regulations and orders relating to immigration and employment eligibility verification (including the Immigration Reform and Control Act of 1986); (h) Seller is not liable for any liabilities, judgments, decrees, orders, arrearage of wages or taxes, fines or penalties for failure to comply with any of the Labor Laws; (i) Seller has provided Purchaser with a copy of its policy for providing leaves of absence under the FMLA, and **Exhibit "F"** identifies: each employee who will be on FMLA leave at the Closing Date and his or her job title and description, salary and benefits; each employee who has requested FMLA leave to begin after the Closing Date; a description of the leave requested; and a copy of all notices provided to such employee regarding that leave; and (j) Seller has paid or accrued all current assessments under workers' compensation legislation, and has not been subject to any special or penalty assessment under such legislation which has not been paid.

12

Section 4.14    Environmental, Health and Safety Matters. Except as set forth on **Appendix 2** attached hereto (as to Section 4.14):

(a)    To the best of Seller's Knowledge, Seller is in compliance in all material respects with all applicable Environmental Laws, and in compliance in all material respects with all applicable limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in those laws or contained in any law, regulation, code, plan, order, decree, judgment, notice, permit or demand letter issued, entered, promulgated or approved thereunder;

(b)    Seller has obtained all necessary authorizations from the relevant Governmental Entities required for the operation of the Business required by any applicable Environmental Law, and Seller is operating in compliance with such authorizations;

(c)    Seller has not received notice of actual or threatened liability under CERCLA or any similar foreign, state or local statute or ordinance from any governmental agency or any third party and, to the best of Seller's Knowledge, there are no facts or circumstances which would be reasonably likely to form the basis for the assertion of any claim against Seller under any Environmental Laws including, without limitation, CERCLA or any similar local, state or foreign law with respect to any on-site or off-site location.  If any such notice has been received, Seller has heretofore delivered to Purchaser true, correct and complete copies of such notice;

(d)    Seller has not entered into, or agreed to enter into, nor contemplates entering into, any consent decree or order.  Seller is not subject to any judgment, decree or judicial or administrative order relating to compliance with, or the cleanup of Hazardous Materials under, any applicable Environmental Laws;

(e)    Seller has not been alleged to be in violation of, and has not been subject to any administrative or judicial proceeding pursuant to, applicable Environmental Laws or regulations either now or any time during the past five (5) years;

(f)    To the best of Seller's Knowledge, Seller is not subject to any material claim, obligation, liability, loss, damage or expense of whatever kind or nature, contingent or otherwise, incurred or imposed or based upon any provision of any Environmental Law or arising out of any act or omission of Seller, or Seller's employees, agents or representatives or arising out of the ownership, use, control or operation by Seller or any other building, plant, facility, site, area or property (including, without limitation, any building, plant, facility, site, area or property currently or previously owned or leased by Seller) from which any Hazardous Materials were released into the Environment;

(g)    Seller has not assumed, or agreed to assume, any liability of any Person for cleanup, compliance or required capital expenditures in connection with any claims under Environmental Laws, investigations, litigation, administrative proceedings, orders, judgments, decrees or injunctions relating to any Hazardous Materials;

(h)    Seller has heretofore made available to Purchaser true, correct and complete copies of all reports and filings prepared by or on behalf of Seller or made by Seller relating to environmental matters;

13

(i)      To the best of Seller's Knowledge, none of the improvements or equipment included within the Assets contains any asbestos, PCBs, underground storage tanks, open or closed pits, sumps or other containers on or under any such Assets; and

(j)      Seller has not used any of its assets, or permitted them to be used, to generate, import, manufacture, store, use, operate, transport, treat or dispose of any Hazardous Materials other than in compliance with all applicable Environmental Laws.

Section 4.15    Property.  **Exhibit "G"** hereto contains a list of all software used in connection with the Business (the "Software").  Seller owns and has good and exclusive title to, or has licenses (sufficient for the conduct of the Business as currently conducted and as proposed to be conducted) to, each item of Intellectual Property free and clear of any Lien (excluding licenses and related restrictions).  Except as set forth on **Appendix 2** attached hereto (as to Section 4.15), Seller is not a party to any contracts, licenses and agreements pursuant to which a third party has licensed or transferred Intellectual Property to Seller.  The operation of the Business as it is currently conducted has not and does not infringe or misappropriate in any manner the Intellectual Property of any third party or, to the Knowledge of Seller, constitute unfair competition or trade practices under the laws of any jurisdiction or violate or breach any of the Software license agreements.  Seller has taken reasonable steps to protect Seller's rights in the confidential information and trade secrets used by Seller.  Except as set forth in the Franchise Agreement, Seller is the exclusive owner or exclusive licensee of all trademarks and service marks, trade names and domain names used by Seller to market or sell products or services. Seller has not granted any rights or interest in the Intellectual Property to a third party.

Section 4.16    Supplier Relations.  **Exhibit "H"** hereto contains a complete and accurate list of the names and addresses of the suppliers of Seller to whom Seller paid more than $10,000.00 during the 2018 fiscal year (collectively, the "Suppliers").  Seller maintains good relations with each of its Suppliers, and, to the Knowledge of Seller, no event has occurred that would materially and adversely affect Seller's relations with any Supplier.  Except as set forth on **Appendix 2** attached hereto (as to Section 4.16) no Supplier (or former supplier) during the last twelve (12) months has canceled, terminated or made any threat to cancel or otherwise terminate any contract or agreement with Seller. Seller has not received any notice and has no Knowledge to the effect that any current Supplier may terminate or materially alter its business relations with Seller, either as a result of the transactions contemplated by this Agreement or otherwise.

Section 4.17    Transactions with Affiliates.  Except as set forth on **Appendix 2** attached hereto (as to Section 4.17),  no owner, officer or director of Seller, no individual with whom any such officer or director has any direct or indirect relation by blood, marriage or adoption, no Person in which any such officer, director or individual owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than five percent of the stock of which is beneficially owned by all such officers, directors and individuals in the aggregate), no Affiliate of any of the foregoing and no current or former Affiliate of Seller has any interest in: (a) any contract, arrangement or understanding with, or relating to, the Business, the Assets or the Assumed Liabilities; (b) any loan, arrangement, understanding, agreement or contract for or relating to the Business or the Assets; or (c) any property (personal or mixed), tangible or intangible, used or currently intended to be used by Seller.

14

Section 4.18    Licenses.    **Exhibit "I"** hereto contains a true, correct and complete list of all Licenses held by Seller.  Seller owns or possesses all of the Licenses necessary to carry on the Business as presently conducted.  All Licenses are valid, binding, and in full force and effect.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby will not constitute a default under or otherwise adversely affect any License.  Seller has taken all necessary action to maintain each License, except where the failure to so act would not have an adverse effect on Seller or the Business.  No loss or expiration of any License is threatened, pending, or reasonably foreseeable (other than expiration upon the end of any term).

Section 4.19    Brokers, Finders and Investment Bankers.  Except as set forth on **Appendix 2** (as to Section 4.19), neither Seller, nor any officer, director or employee of Seller, nor any Affiliate of Seller, has employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated by this Agreement.

Section 4.20    Privacy and Security.  Except as set forth on **Appendix 2** (as to Section 4.20), Seller is in compliance in all material respects with all applicable laws and applicable policies of Seller (or, to the Knowledge of Seller, the applicable policies of third parties with which Seller is legally or contractually obligated to comply) pertaining to the protection of Personal Data and Security and satisfy in all respects the Payment Card Industry (PCI) data security standards.  Seller is not subject to any pending, or to the Knowledge of Seller, any threatened, legal proceeding against Seller nor has Seller received any written notice alleging that Seller has experienced a Security breach materially adversely affecting Seller's protection of Personal Data or violated any Person's privacy rights, privacy-related law or privacy policy.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

Section 5.1    Organization.  Purchaser is a corporation duly formed, validly existing and in good standing under the laws of the State of Tennessee and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

Section 5.2    Authorization.  Purchaser has full power and authority to execute and deliver, and to perform its obligations under, this Agreement, and has or will have as of the Closing Date full power and authority to execute and deliver, and to perform its obligations under, the Purchaser Ancillary Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The entering into, execution and delivery of, and the performance of Purchaser's obligations under this Agreement have been duly and validly authorized by all necessary action on the part of Purchaser and the entering into, execution and delivery of, and the performance of Purchaser's obligations under, the Purchaser Ancillary Documents by Purchaser, and the consummation of the transactions provided for hereby and thereby have been or as of the Closing Date will be duly and validly authorized by all necessary action on the part of Purchaser.  This Agreement has been and, as of the Closing Date, the Purchaser Ancillary Documents to which Purchaser is a party will be, duly executed and delivered by Purchaser and do or will, as the case may be, constitute the valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their respective terms,

15

subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 5.3    Employees.    Purchaser hereby acknowledges and agrees to each of the acknowledgements and agreements attributed to it in Section 4.12 hereof.  Subject to its due diligence investigation, Purchaser will offer employment to Seller's current employees of the business in its sole discretion, and will notify Seller, in the course of its due diligence investigation, Purchaser decides not to hire any of such employees.  Purchaser does not intend to offer employment to any employee who works in Seller's corporate office.

## ARTICLE VI
## CERTAIN COVENANTS AND AGREEMENTS

Section 6.1    Conduct of Business by Seller.  From the date hereof until the Closing Date or earlier termination of this Agreement, Seller shall, except as expressly required by this Agreement and except as otherwise consented to in advance in writing by Purchaser: (a) operate the restaurant in the ordinary course of business consistent with the past practice of Seller (including with respect to the payment of accounts payable of Seller related to the restaurant) and the Franchise Agreement, provided however, that no change shall be made to existing customer pricing (including a change in or addition of any shop or other fees charged to customers), (b) use commercially reasonable efforts to preserve intact the restaurant, maintain the Assets in good condition and repair, to keep available the services of its current employees and agents and to maintain its relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations, (c) use commercially reasonable efforts to maintain appropriate levels of Inventory so that at Closing there will exist an appropriate level and mix of Inventory to allow the Business (including the restaurant) to be open and run normally, (d) not voluntarily take any action inconsistent with this Agreement or with the consummation of the Closing, (e) not sell, assign, transfer, convey, pledge, mortgage, lease, license or otherwise dispose of or encumber any of the Assets, or any interests therein, other than, with respect to Assets other than waste oil, in the ordinary course of business and consistent with past practice, (f) continue all existing policies of insurance (or comparable insurance) of or for the benefit of Seller in full force and effect at such levels in effect on the date hereof, (g) maintain the books and records of Seller in the usual, regular and ordinary manner and consistent with past practice, (h) not make or agree to make any change in the compensation of any director or officer or employee of Seller, (i) not amend or terminate any existing Employment Agreement or enter into any new Employment Agreement, (j) not amend, terminate or enter into any renegotiations with respect to any Assumed Contract, including any oil supply contract, (k) not negotiate, amend, terminate or enter into any oil supply contract (l) not declare any dividend, pay or set aside for payment any dividend or other distribution or make any payment to any related parties other than the payment of salaries in the ordinary course of business and consistent with past practice and tax distributions made in the ordinary course and consistent with past practice and (m) not take any action that could reasonably be expected to result in (i) any of the representations or warranties of Seller set forth in this Agreement or any Seller Ancillary Document being untrue in any material respect, (ii) any covenant of Seller set forth in this Agreement or any Seller Ancillary Document being breached in any material respect, or (iii) any of the conditions specified herein not being satisfied.  In connection with the continued operation of the Business between the date hereof and the Closing Date, Seller will confer in good faith on a regular and frequent

16

basis with Purchaser regarding operational matters and the general status of on-going operations of Seller. Seller acknowledges that Purchaser does not and will not waive any rights it may have under this Agreement or the Franchise Agreement as a result of such consultations.

Section 6.2    Inspection and Access to Information.

(a)    Seller agrees that it will not contest or challenge Purchaser's exercise of its right to terminate this Agreement within the Diligence Period on the basis of any diligence done by Purchaser prior to the date hereof. Seller shall deliver to Purchaser, to the extent in Seller's possession or control, within two (2) days of the approval of this Agreement by the parties, (i) all contracts and agreements, if any, affecting the ownership, operation, management and maintenance of the Assets, including the Business Contracts and any rights of first refusal or first offer arising thereunder or otherwise with respect to any of the Assets; (ii) with respect to the tangible personal property, all warranties, operations, maintenance or user manuals, sales receipts and any other due diligence materials, (iii) documentation relating to the Intellectual Property and Software; (iv) documentation of all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by Seller relating to the Assets or the Business, whether arising by way of counterclaim or otherwise; (v) documentation relating to any guarantees, warranties, representations, covenants, indemnities, insurance proceeds and similar rights in favor of Seller with respect to the Assets or the Business; and (vi) all Licenses held by Seller relating to the Assets or the Business.

(b)    From the date hereof to the Closing Date or until earlier termination of this Agreement, Seller will (and will cause its officers, auditors and agents to) provide Purchaser and its accountants, investment bankers, legal counsel, environmental consultants, financing sources, investors, partners and other authorized representatives full access, with reasonable prior notice given by Purchaser to Seller via hard copy or email, during reasonable hours and under reasonable circumstances, to any and all of its premises, officers, and all information, files, correspondence, records, data, all servers used by Seller with respect to the Business, contracts and recorded knowledge, including customer, supplier (including supplier cost information), price and mailing lists, and all accounting or other books and records of Seller with respect to the Business in whatever media retained or stored, including, without limitation, computer programs and disk, contracts, commitments, Tax Returns (whether filed or in preparation), Governing Documents, minute books, stock ledgers, books of account, other constituent records relating to the organization of Seller, and other records and information and will cause its officers to furnish to Purchaser and its authorized representatives, promptly upon request therefor, copies of the foregoing and any and all financial, technical and operating data and other information pertaining to Seller and the Business and otherwise fully cooperate with the conduct of due diligence by Purchaser and its representatives.

(c)    On or prior to the last day of the Diligence Period, if (x) Purchaser is not satisfied for any reason, or no reason, with its diligence review, including, without limitation, its review of the materials described in this Section 6.2 or Section 6.5, its review of Seller's classification of employees under the FLSA and applicable state laws and other matters with respect to FLSA and similar state law compliance, and its evaluation of Seller's financial performance, or (y) Purchaser otherwise is unable to complete such diligence review to its satisfaction, then Purchaser may terminate this Agreement by delivery of written notice to Seller on or prior to 5:00 p.m. Eastern prevailing time on the last day of the Diligence Period. No investigation or diligence by Purchaser, or knowledge

17

acquired (or capable of being acquired) by Purchaser, whether before or after the execution of this Agreement, shall limit Purchaser's right to exercise its right to terminate this Agreement in accordance with this Section 6.2 or Section 8.1 or otherwise affect Seller's obligations under Section 9.1.

Section 6.3    Intentionally Omitted.

Section 6.4    Interim Financials.  As promptly as practicable after each regular accounting period subsequent to the end of the most recent fiscal year and prior to the Closing Date, Seller shall deliver to Purchaser periodic financial reports in the form that Seller customarily prepares for its internal purposes concerning the Business.

Section 6.5    Notification.  Between the date of this Agreement and the Closing, Seller and Purchaser shall promptly notify each other in writing if either becomes aware of (a) any fact or condition that causes or constitutes a breach of any of its representations and warranties made as of the date of this Agreement, or (b) the occurrence after the date of this Agreement of any fact or condition that would or would be reasonably likely to (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had that representation or warranty been made as of the time of the occurrence of, or such Party's discovery of, such fact or condition. During the same period, Seller and Purchaser also shall promptly notify each other of the occurrence of any breach of any covenant of such Party in this Article VI or of the occurrence of any event that may make the satisfaction of the conditions in Article VII impossible or reasonably unlikely.

Section 6.6    No Solicitation of Transactions.  Neither Seller nor any of its respective Affiliates will, directly or indirectly, through any officer, director or agent of any of them or otherwise, initiate, solicit or encourage (including by way of furnishing non-public information or assistance), or enter into negotiations of any type, directly or indirectly, or enter into a confidentiality agreement, letter of intent or purchase agreement, merger agreement or other similar agreement with any Person (other than Purchaser) with respect to a sale of any of the Assets other than sales of Inventory in the ordinary course of business consistent with past practice of Seller, or a merger, consolidation, business combination, joint venture, sale of equity interests in Seller, or the liquidation or similar extraordinary transaction with respect to Seller.  Any remedy at law for any breach of the foregoing provisions contained in this Section 6.6 shall be inadequate and Purchaser shall be entitled to injunctive relief in addition to any other remedy Purchaser might have hereunder.  Seller will notify Purchaser in writing as soon as practicable of all relevant terms of any inquiry or proposal by a third party to do any of the foregoing that Seller or any of its Affiliates or any of its respective officers, directors, employees, investment bankers, financial advisors, attorneys, accountants or other representatives may receive relating to any of such matters and, if such proposal is in writing, Seller will deliver to Purchaser a copy of such inquiry or proposal together with such written notice.  Purchaser hereby acknowledges that Seller has entered into a representation agreement with Marcus & Millichap, and a purchase agreement, each relating to the sale of the real property on which the Business is operated (the "Real Property"), and agrees that such agreements do not conflict with the terms of this Section 6.6.

Section 6.7    Reasonable Efforts; Further Assurances; Cooperation.  Subject to the other provisions of this Agreement, the Parties will each use their reasonable, good faith efforts to perform their obligations under this Agreement and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable law to obtain all consents and all regulatory approvals and to satisfy all conditions to their respective obligations under this Agreement and to cause

18

the transactions contemplated in this Agreement to be effected in accordance with the terms hereof and will cooperate fully with each other and their respective officers, directors, employees, managers, partners, agents, counsel, accountants and other designees in connection with any steps required to be taken as a part of their respective obligations under this Agreement. Any costs or expenses, including reimbursable legal expenses of lessors and other contract counterparties, associated with the consents required to be obtained by Seller pursuant to this Agreement, including the applicable consents indicated on **Exhibit "E-1,"** to the extent any relate to Assumed Contracts, shall be borne exclusively by Seller.

Section 6.8    <u>Business Contracts</u>.

(a)    *Assumed Contracts*. Prior to the end of the Diligence Period, Purchaser shall designate, by notice in writing to Seller, those Business Contracts that Purchaser desires to assume at Closing. Subject to subsection (b) immediately below, Seller shall cause all Business Contracts that are not designated by Purchaser as Assumed Contracts to be terminated effective as of the Closing Date.

(b)    *Non-Assignable Assumed Contracts*. With respect to those Non-Assignable Contracts that are (i) designated by Purchaser as Assumed Contracts in accordance with subsection (a) immediately above, and (ii) for which Seller has not obtained third-party consents for assignment of the Closing, (collectively, the "<u>Non-Assignable Assumed Contracts</u>"), Seller shall, during the remaining term of each, use all commercially available efforts to (i) obtain the consent of the third parties required thereunder, (ii) make the benefit of such Non-Assignable Assumed Contract available to Purchaser so long as Purchaser fully cooperates with Seller and promptly reimburses Seller for all payments made by Seller (with the prior approval of Purchaser) in connection therewith and (iii) enforce, at the request of Purchaser and at the expense and for the account of Purchaser, any right of Seller arising from such Non-Assignable Assumed Contract against the other party or parties thereto (including the right to elect or terminate any such Non-Assignable Assumed Contract in accordance with the terms thereof). Seller shall not take any action or suffer any omission that could limit, restrict or terminate the benefits to Purchaser of such Non-Assignable Assumed Contract unless, in good faith and after consultation with and prior written notice to Purchaser, Seller is (i) ordered orally or in writing to do so by a Governmental Entity of competent jurisdiction or (ii) otherwise required to do so by law; provided that if any such order is appealable, Seller shall, at Purchaser's cost and expense, take such actions as are requested by Purchaser to file and pursue such appeal and to obtain a stay of such order. With respect to any such Non-Assignable Assumed Contract as to which the necessary approval or consent for the assignment or transfer to Purchaser is obtained following the Closing, Seller shall transfer such Non-Assignable Assumed Contract to Purchaser by execution and delivery of an instrument of conveyance reasonably satisfactory to Purchaser and Seller within three (3) Business Days following receipt of such approval or consent. Notwithstanding the foregoing, Seller shall not be indemnified to the extent of any losses that result from (A) Seller's failure to take any lawful action in accordance with Purchaser's reasonable instructions, or (B) Seller's fraud, bad faith, gross negligence or willful misconduct.

Section 6.9    <u>Public Announcements</u>. Unless otherwise required by applicable law, neither Purchaser nor Seller nor their respective Affiliates will issue any public release or announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of

the other Party. No disclosure or announcement of the transactions contemplated hereby shall be made to vendors or employees of the Business prior to Closing without the prior consent of the other Party.

Section 6.10    Confidentiality.  Prior to the Closing, each Party agrees that all information received from the other Party, the fact of the Parties' negotiations and any terms of the transaction contemplated by this Agreement will be kept strictly confidential and will not be used for any purpose other than the evaluation and consummation of the transactions contemplated by this Agreement, provided that (a) each Party may disclose such information to such Party's Affiliates and its and their respective employees, directors, officers, representatives, agents, attorneys, accountants, financial advisors and consultants; provided however, that Seller may not disclose such information to the employees of the Business, (b) Purchaser may disclose such information to (i) direct and indirect owners of interests in Purchaser and its Affiliates and (ii) any actual or potential financing sources of Purchaser or any of its Affiliates related to the Business, (c) Purchaser may disclose such information to (i) direct and indirect owners of the Real Property, and (ii) to Marcus & Millichap, and (d) each Party may disclose such information (i) upon the order of any court or administrative agency, (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Party, (iii) to the extent required by law or legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests or (iv) to the extent necessary in connection with the exercise of any remedy hereunder; provided, however, that any disclosure set forth in the foregoing clauses (a) and (b) shall be made only to such Persons who understand the confidential nature of such information and are bound to keep such information confidential.  This Section 6.10 shall survive the termination of this Agreement.

Section 6.11    Employees.

(a)    *Transferred Employees.*  On the Closing Date, Seller shall terminate all of its employees. Purchaser shall have no obligation to rehire or offer employment or otherwise with respect to any employee of Seller but, subject to the terms of Section 4.12(f) above, shall have the right to do so.  Any employee rehired or offered employment by Purchaser shall constitute a "Transferred Employee" under this Agreement.

(b)    *COBRA Coverage.*  Seller shall be solely responsible for offering and providing any continuation coverage required under Section 4980B of the Code and Part 6 of Title I of ERISA ("COBRA Coverage") with respect to any "qualified beneficiary" who is covered by the Employee Benefit Plan that is a "group health plan" (as defined under COBRA) and who experiences a "qualifying event" on or prior to the Closing Date.  Purchaser shall be solely responsible for offering and providing any COBRA Coverage required with respect to any Transferred Employee (or other "qualified beneficiary") who becomes covered by a group health plan sponsored or contributed to by Purchaser and who experiences a "qualifying event" on or after the Closing Date.  "Qualified beneficiary," "group health plan" and "qualifying event" are as defined in Section 4980B of the Code.

(c)    *Labor Laws.*  Seller shall be solely responsible for compliance with Labor Laws, including the WARN Act to the extent applicable, with respect to the continued employment or termination of Seller's employees. Seller shall be solely responsible for any and all payments or notices to Seller's employees required under the WARN Act with respect to any event occurring on or prior to the Closing Date.

(d)    *Information.*  To the extent not provided under Section 4.12 above, Seller shall provide Purchaser all information relating to each Transferred Employee as Purchaser may reasonably require including, without limitation, initial employment dates, termination dates, reemployment dates, hours of service, compensation and Tax withholding history in a form that will be usable by Purchaser and such information shall be true and correct in all respects.

Section 6.12.    Purchaser Reliance and Due Diligence.    Purchaser acknowledges that, except for the matters that are expressly covered by the provisions of this Agreement, Purchaser is relying on its own investigation and analysis in entering into this Agreement and consummating the transactions contemplated hereby.  Purchaser acknowledges that, except as expressly set forth in this Agreement, it is consummating the transactions without any representation, warranty or assurance, express or implied, at law or in equity, by Seller or any of the Seller' s respective officers, directors, employees, affiliates or advisors.  With respect to any projection or forecast delivered by or on behalf of Seller to Purchaser, Purchaser acknowledges that (x) there are uncertainties inherent in attempting to make such projections and forecasts, (y) the accuracy and correctness of such projections and forecasts may be affected by information which may become available through discovery or otherwise after the date of such projections and forecasts and (z) it is familiar with each of the foregoing.  Nothing contained in this Section 6.12 will be construed as a waiver of a defense to claims for fraud.  This Section 6.12 shall survive the termination of, or the closing of the transactions contemplated by this Agreement.

# ARTICLE VII
## CLOSING

Section 7.1    Date and Place of Closing.  The Closing shall occur on the Outside Closing Date or on such earlier date as may be designated by Purchaser by notice to Seller specifying the earlier date, given not less than five (5) days prior to such earlier date for Closing, simultaneously with Purchaser's execution of a Lease for the Real Estate.  The Closing will take place through an escrow with Title Company and neither Party will be required to be physically present for Closing.

Section 7.2    Inventory and Store Cash Accounting.  Purchaser shall designate a date and time preceding the Closing Date, which date may be any day of the week and shall be as close to the Closing Date as reasonably practicable, during which Seller will close the restaurant so that Purchaser may undertake a good faith accounting of the Inventory and Store Cash (the "Inventory and Store Cash Accounting").  Seller shall cause a representative of Seller to be present at the Inventory and Store Cash Accounting.  Purchaser will be permitted to open the restaurant for business and operation by Purchaser at any time after the Inventory and Store Cash Accounting.

Section 7.3    Closing Deliveries.

(a)    *Seller's Deliveries.*  At Closing, Seller shall deliver in escrow, the Seller Ancillary Documents, the Bring Down Certificate and any other documents required by this Agreement for the consummation of the Acquisition, including without limitation, the following:

(i)    executed bill of sale, instruments of assignment, and other conveyance documents, dated as of the Closing Date, transferring to Purchaser all of Seller's right, title and interest in and to the Assets, together with possession of the Assets, including, and  a bill of sale for the personal property, executed by Seller, in a form acceptable to Purchaser;

21

(ii)    a termination of franchise agreement for the Franchise Agreement (the "Termination of Franchise Agreement");

(iii)    documents evidencing the assignment of the Assumed Contracts, executed by Seller, in a form acceptable to Purchaser (the "Assumed Contracts Assignment and Assumption Agreement"), and documents evidencing the assignment of any assignable Licenses in a form reasonably acceptable to Purchaser, and executed by Seller;

(iv)    a certificate executed by the secretary of Seller, dated as of the Closing Date, as to (A) the good standing of Seller in its jurisdiction of registration, (B) the absence of amendments to Seller's Governing Documents and (C) the effectiveness of the resolutions of the members and managers of Seller, authorizing the execution, delivery and performance of this Agreement by Seller passed in connection with this Agreement and the transactions contemplated hereby;

(v)    a non-foreign status and reporting affidavit required under Sections 1445 and 1099 of the Code, and any state required withholding affidavit for non-residents as appropriate; and

(vi)    all other documents required under this Agreement or reasonably requested by Purchaser to convey the Assets to Purchaser or to otherwise consummate the transactions contemplated by this Agreement.

(b)    *Purchaser's Deliveries.*  At Closing, Purchaser shall deliver in escrow, the Purchaser Ancillary Documents, the Termination of Franchise Agreement, the Assumed Contracts Assignment and Assumption Agreement, a copy of the resolutions of the board of directors body for Purchaser authorizing the execution and delivery of this Agreement and the documents to which Purchaser is a party and the consummation of the transactions contemplated hereby and thereby, any other documents required by this Agreement for the consummation of the Acquisition, and cash for the net amount of any adjustments, as set forth herein.

Section 7.4    Closing Costs and Taxes.  Any sales Taxes, gains Taxes, or any other Taxes payable as a result of the Acquisition or any other action contemplated by this Agreement (other than any federal, state, local or foreign Taxes measured by or based upon income or gains imposed upon Purchaser, or any other Taxes which are expressly Purchaser's responsibility hereunder) will be paid by Seller. The Parties will cooperate in the preparation, execution and filing of all returns, questionnaires, applications or other documents regarding any transfer or gains, sales, use, transfer, value added, stock transfer and stamp Taxes, any transfer, recording, registration and other fees and any similar Taxes which become payable in connection with the transactions contemplated hereby that are required or permitted to be filed on or before the Closing. All costs of transferring Licenses to Purchaser, to the extent such Licenses are assignable, or of obtaining new Licenses in Purchaser's name shall be borne solely by Purchaser. All costs associated with obtaining title insurance shall be paid by Purchaser. Purchaser will bear the costs associated with any Phase I Assessments. Except as provided above or as otherwise expressly provided herein, each Party will pay its own fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees, costs and expenses of its financial advisors, accountants and counsel.

119183456_6.docx

Section 7.5    Prorations. All prorations and adjustments shall be made by the Parties as of midnight on the day prior to the Closing Date, all as more particularly set forth in Sections 3.1 and 3.2 above.

Section 7.6    Conditions to Obligations of Purchaser.    The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of each of the following conditions:

(a)    *Representations and Warranties*.  The representations and warranties of Seller set forth in Article IV shall have been true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that those representations and warranties that by their terms are qualified by materiality shall be true and correct in all respects.

(b)    *Performance of Obligations of Seller*.  Seller shall have performed or complied with, in all material respects, all covenants and agreements required to be performed or complied with by Seller under this Agreement on or prior to the Closing.

(c)    *No Material Adverse Effect*.  Between the date hereof and the Closing Date, there shall not have occurred (nor shall Purchaser have become aware of) any Material Adverse Effect, or any development likely to result in a Material Adverse Effect.

(d)    *Applicable Law*.  Neither the consummation nor the performance of any of the transactions contemplated by this Agreement, directly or indirectly (with or without notice or lapse of time), would contravene or conflict with or result in a violation of or cause Purchaser or any of its Affiliates to suffer any adverse consequence under any applicable law or order.

(e)    *Franchise Agreement*.  Seller shall have performed or complied with, in all material respects, all covenants and agreements required to be performed or complied with by Seller under the Franchise Agreement until the termination thereof in accordance with this Agreement.

(f)    *Seller's Certificate*.  Seller shall have executed and delivered to Purchaser a certificate as to compliance by Seller with the conditions set forth in Sections 7.6(b), 7.6(c), 7.6(d) and 7.6(e) (the "Bring Down Certificate").

(g)    *Consents*.  Seller shall have delivered the notices and obtained and delivered to Purchaser all written consents (or waivers with respect thereto) for the Assumed Contracts (except for the Non-Assignable Assumed Contracts), and all such consents and waivers shall be in full force and effect.

(h)    *Release of Liens*.  At Closing, Seller shall have delivered to Purchaser satisfactory evidence that all Liens affecting the Assets have been released.

(i)    *Diligence Period*.  The Diligence Period shall have expired or have been waived by Purchaser.

23

119183456_6.docx

(j)      *Lender Approval.*  Purchaser shall have either obtained approval from its lender to consummate the Acquisition or determined that such lender approval is not required.

(k)      *Internal Approval.*  Purchaser shall have obtained approval for the transaction contemplated by this Agreement from its Real Estate Committee.

Section 7.7    Conditions to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of each of the following conditions:

(a)      *Representations and Warranties.*    The representations and warranties of Purchaser set forth in Article V shall have been true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that those representations and warranties that by their terms are qualified by materiality shall be true and correct in all respects.

(b)      *Performance of Obligations of Purchaser.*  Purchaser shall have performed or complied with, in all material respects, all covenants and agreements required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing.

(c)      *Applicable Law.*  Neither the consummation nor the performance of any of the transactions contemplated by this Agreement, directly or indirectly (with or without notice or lapse of time), would contravene or conflict with or result in a violation of or cause Seller or any of its Affiliates to suffer any adverse consequence under any applicable law or order.

(d)      *Purchaser's Certificate.*  Purchaser shall have executed and delivered to Seller a certificate as to compliance by Purchaser with the conditions set forth in Sections 7.7(b) and 7.7(c) (the "Bring Down Certificate")

(e)      *Lease.*  Purchaser shall have simultaneously entered into the lease of the Real Estate.

**ARTICLE VIII**
**DEFAULT**

Section 8.1    Seller's Default; Purchaser's Remedy.  In the event Purchaser performs all of its obligations hereunder and Seller fails to close on the Acquisition pursuant to the terms of this Agreement, or in the event Seller otherwise breaches any term of this Agreement prior to Closing and fails to cure the breach within ten (10) days after receipt of written notice of the breach from Purchaser, then Purchaser may: (i) seek to specifically enforce performance of Seller's obligation(s) under this Agreement; (ii) terminate this Agreement by delivery of written notice to Seller, in which event Purchaser shall be entitled to recover from Seller Purchaser's actual out of pocket costs incurred with this Agreement; and/or (iii) exercise any other remedies available to Purchaser at law or in equity.  The foregoing remedies shall survive the termination of this Agreement.  If a default or breach by Seller occurs, or is discovered, after Closing, then Purchaser shall have the remedies set forth in Article IX below.

24

Section 8.2    Purchaser's Default; Seller's Remedy.  In the event that all of the conditions precedent to Purchaser's obligations to close hereunder have been satisfied or waived and Seller performs all of its obligations hereunder and Purchaser fails to close on the Acquisition in breach of the terms of this Agreement and within ten (10) days after receipt of written notice of the same from Seller, then Seller, as its sole and exclusive remedy, may terminate this Agreement by delivery of written notice to Purchaser, in which event, this Agreement will forthwith become void and there will be no liability on the part of any Party or its respective members, managers, partners, officers, directors or stockholders, except for those obligations expressly stated to survive the termination of this Agreement.

**ARTICLE IX**
**INDEMNIFICATION**

Section 9.1    Indemnification Obligations.  Subject to the other provisions of this Article IX, Seller shall defend and hold harmless the Purchaser Indemnified Parties from, against, and in respect of, any and all claims, liabilities, obligations, damages, losses, costs, expenses, penalties, fines and judgments (at equity or at law, including statutory and common) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' fees and expenses) arising out of or relating to (a) any liability or obligation of Seller of any nature whatsoever, except the Assumed Liabilities; (b) events or circumstances occurring or existing with respect to the ownership, operation and maintenance of the Business and the Assets prior to the Closing Date; (c) any breach or inaccuracy of any representation or warranty made by Seller in this Agreement (and in the Bring Down Certificate to the extent relating thereto) or in the Seller Ancillary Documents; (d) any breach of any covenant, agreement or undertaking made by Seller in this Agreement or in any of the Seller Ancillary Documents; (e) any fraud, willful misconduct or bad faith of Seller in connection with this Agreement or the Seller Ancillary Documents; or (f) any provision of any Environmental Law and arising out of, or relating to, (i) any act or omission of Seller or its employees, agents or representatives, including from the release of any Hazardous Materials or off-site shipment of any Hazardous Materials at or from such real property, plant, facility, site, area or property.  The claims, liabilities, obligations, losses, damages, costs, expenses, penalties, fines and judgments of the Purchaser Indemnified Parties described in this Section 9.1 as to which the Purchaser Indemnified Parties are entitled to indemnification are collectively referred to as "Purchaser Losses."  Subject to the other provisions of this Article IX, Purchaser shall defend and hold harmless the Seller Indemnified Parties from, against, and in respect of, any and all claims, liabilities, obligations, damages, losses, costs, expenses, penalties, fines and judgments (at equity or at law, including statutory and common) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' fees and expenses) arising out of or relating to (a) any obligations arising under the Assumed Liabilities, but solely to the extent such obligations were required to be performed on or after the Closing Date; (b) events or circumstances occurring or existing with respect to the ownership, operation and maintenance of the Business and the Assets on or after the Closing Date; (c) any breach or inaccuracy of any representation or warranty made by Purchaser in this Agreement (and in the Bring Down Certificate to the extent relating thereto) or in the Purchaser Ancillary Documents; (d) any breach of any covenant, agreement or undertaking made by Purchaser in this Agreement or in any of the Purchaser Ancillary Documents; (e) any fraud, willful misconduct or bad faith of Purchaser in connection with this Agreement or the Purchaser Ancillary Documents; or (f) any provision of any Environmental Law and arising out of, or relating to, (i) any act or omission of Purchaser or its

25

employees, agents or representatives, including from the release of any Hazardous Materials or off-site shipment of any Hazardous Materials at or from such real property, plant, facility, site, area or property on or after the Closing Date. The claims, liabilities, obligations, losses, damages, costs, expenses, penalties, fines and judgments of the Seller Indemnified Parties described in this Section 9.1 as to which the Seller Indemnified Parties are entitled to indemnification are collectively referred to as "Seller Losses."

Section 9.2    Indemnification Procedure.

(a)    Promptly following receipt by a Purchaser Indemnified Party or a Seller Indemnified Party (the "Indemnified Party") of notice by a third party of any complaint or the commencement of any audit, investigation, action or proceeding with respect to which such Indemnified Party may be entitled to receive payment from the other party (the "Indemnifying Party") for a Purchaser Loss or a Seller loss, respectively (a "Loss") in accordance with this Article IX, such Indemnified Party shall notify the Indemnifying Party; provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from liability hereunder with respect to such claim only if, and only to the extent that, such failure results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnifying Party within twenty (20) days thereafter assuming full responsibility for any Losses (subject to any limitations set forth in this Article IX) resulting from such audit, investigation, action or proceeding, to assume the defense of such audit, investigation, action or proceeding, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, that the Indemnifying Party will not be entitled to assume the defense of any audit, investigation, action or proceeding if (i) such claim, based on the remedy being sought, could result in criminal liability of, or equitable remedies against, the Indemnified Party; or (ii) the Indemnified Party reasonably believes that the interests of the Indemnifying Party and the Indemnified Party with respect to such claim are in irreconcilable conflict with one another, and as a result, the Indemnifying Party could not adequately represent the interests of the Indemnified Party in such claim. In the event, however, that the Indemnifying Party declines or fails to assume the defense of the audit, investigation, action or proceeding on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty (20) day period, or if the Indemnifying Party is not entitled to assume the defense of the audit, investigation, action or proceeding in accordance with the preceding sentence, then the Indemnifying Party shall pay the reasonable fees and disbursements of counsel for the Indemnified Party as incurred; provided, however, that the Indemnified Party shall not be required to pay the fees and disbursements of more than one counsel for all Indemnified Parties in any jurisdiction in any single audit, investigation, action or proceeding. In any audit, investigation, action or proceeding for which indemnification is being sought hereunder, the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such action, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or the Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter the defense of which it is maintaining and to cooperate in good faith with each other with respect to the defense of any such matter.

26

(b)      No Indemnified Party may settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party, unless (i) the Indemnifying Party fails to assume and maintain the defense of such claim pursuant to Section 9.3; or (ii) such settlement, compromise or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all liability arising out of such claim. The Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless (A) such settlement, compromise or consent includes an unconditional release of the Indemnified Party and its officers, directors, employees and Affiliates from all liability arising out of such claim, (B) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of the Indemnified Party and (C) does not contain any equitable order, judgment or term that in any manner affects, restrains or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)      In the event a Indemnified Party claims a right to payment pursuant hereto, such Indemnified Party shall send written notice of such claim to the Indemnifying Party. In the event the Indemnifying Party disputes its liability with respect to such claim, as promptly as possible, such Indemnified Party and the Indemnifying Party shall establish the merits and amount of such claim (by mutual agreement, litigation or otherwise) and, within five (5) Business Days following the final determination of the merits and amount, if any, of such claim, the Indemnifying Party shall pay to the Indemnified Party in immediately available funds an amount equal to such claim as determined hereunder.

Section 9.3      Claims Period. The period during which a claim for indemnification may be asserted under this Agreement by a Indemnified Party (the "Claims Period") shall begin on the date hereof and terminate twelve (12) months after the date hereof (the "Claims Period Expiration Date"). Notwithstanding the foregoing, if, prior to the close of business on the Claims Period Expiration Date, the Indemnifying Party shall have been properly notified of a claim for indemnification hereunder and such claim shall not have been finally resolved or disposed of at such date, such claim shall continue to survive and shall remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof. For the avoidance of doubt, the survival period for any representation or warranty shall expire on the date on which the Claims Period applicable to such representation or warranty terminates.

Section 9.4      Treatment of Indemnity Payments. All payments made pursuant to Sections 9.1 and 9.2 shall for tax purposes, be deemed adjustments to the Purchase Price.

Section 9.5      Limitations on Indemnification. The indemnification provided for in this Article IX shall be subject to the following limitations:

(a)      No Indemnifying Party shall be obligated to indemnify any Indemnified Party for any Losses to the extent the Losses are recovered by the Indemnified Party under any insurance policy either now or hereafter maintained by such Indemnified Party. Each Indemnified Party shall use commercially reasonable efforts to obtain recoveries under any potentially applicable insurance policy. If an Indemnified Party obtains such recoveries after the

27

Indemnifying Party makes any indemnification payment with respect to the same Losses, then such Indemnified Party shall promptly reimburse the Indemnifying Party for the amount of such recoveries it received (not to exceed the payment previously made by the Indemnifying Party with respect to such Losses).

(b)    No Indemnifying Party shall be liable to any Person for any consequential, incidental, or punitive damages, damages in the nature of lost profits, damages based on multiples of revenues, or damages relating to diminution in value

Section 9.6    <u>Exclusive Remedies</u>.  The provisions of this Article IX set forth the exclusive rights and remedies of Seller and Purchaser after the Closing Date to seek or obtain damages or any other remedy or relief whatsoever from any party with respect to matters arising under or in connection with this Agreement and the transactions contemplated hereby.

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

Section 10.1    <u>Notices</u>.  Any notice or other communication permitted or required to be given hereunder by one party to the other shall be in writing and shall be either (i) hand delivered, (ii) sent by Federal Express or other overnight delivery service, or (iii) transmitted by electronic mail transmission; to the Party entitled or required to receive the same at the address specified below or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith. Any such notice, request, demand or communication shall be deemed to have been given on the date of sending. The refusal to accept delivery by any Party or the inability to deliver any communication because of a changed address of which no notice has been given in accordance with this section shall constitute delivery. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

|                     |                                                                                                                                                                              |
|---------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| To Purchaser:       | The Krystal Company<br>1455 Lincoln Parkway East, 6th Floor<br>Dunwoody, Georgia 30346<br>Attention: Real Estate<br>Email: mike.wood@krystal.com                              |
| With a copy to:     | McGuireWoods LLP<br>1230 Peachtree Street, NE, Suite 2100<br>Atlanta, Georgia 30309<br>Attention: Colleen K. Heibeck<br>Fax:  404-443-5599<br>E-mail:  cheibeck@mcguirewoods.com |
| To Seller:          | Live Oak Restaurant Services, LLC<br>798 SW Main Blvd.<br>Lake City, Florida 32025<br>Attention: Michael C. Moses, President<br>E-mail: m.c.moses@comcast.net                  |

28

With a copy to:    Fisher, Tousey, Leas & Ball, P.A.
501 Riverside Avenue, Suite 600
Jacksonville, Florida 32202
Attention: Mary A. Robison
Fax: 904-355-0233
E-mail: mrobison@fishertousey.com

Section 10.2    <u>Exhibits and Appendices</u>.  The Exhibits and appendices to this Agreement are hereby incorporated into this Agreement by reference and are hereby made a part of this Agreement as if set out in full in this Agreement.

Section 10.3    <u>Dates</u>.  All references to a number of days shall mean calendar days unless "Business Days" are expressly referred to.  Any date specified in this Agreement for the performance of an obligation or expiration of a time period that falls on a day that is not a Business Day shall be automatically extended to the first regular Business Day after such date or expiration.

Section 10.4    <u>Assignment; Successors in Interest</u>.  This Agreement may be assigned or transferred by Purchaser at any time provided the assignee agrees to be specifically bound by the terms hereof.  Seller shall not assign its interest under this Agreement.  This Agreement will be binding upon and will inure to the benefit of the Parties and their respective heirs, successors and permitted assigns, and any reference to a Party will also be a reference to a respective heir, successor or permitted assign.

Section 10.5    <u>Number; Gender</u>.  Whenever the context so requires, the singular number will include the plural and the plural will include the singular, and the gender of any pronoun will include the other genders.

Section 10.6    <u>Captions</u>.  The titles and captions contained in this Agreement are inserted in this Agreement only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.  Unless otherwise specified to the contrary, all references to Articles, Sections, Exhibits, or Appendices are references to Articles, Sections, Exhibits and Appendices of this Agreement.

Section 10.7    <u>Controlling Law; Amendment</u>.  This Agreement and any claim or controversy hereunder (whether in contract or tort) will be governed by and construed and enforced in accordance with the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.  This Agreement may not be amended, modified or supplemented except by written agreement of the Parties.

Section 10.8    <u>Consent to Service of Process; Waiver of Jury Trial</u>.  Each Party hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of Section 10.1.  THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY OTHER DOCUMENTS, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH OR THEREWITH, OR ANY COURSE OF

29

CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

Section 10.9    Severability.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by law, the Parties waive any provision of law which renders any such provision prohibited or unenforceable in any respect.

Section 10.10    Counterparts.    This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, and it will not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one (1) of such counterparts.

Section 10.11    Enforcement of Certain Rights.    Nothing expressed or implied in this Agreement is intended, or will be construed, to confer upon or give any Person other than the Parties, and their respective heirs, successors, and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such Person being deemed a third party beneficiary of this Agreement.

Section 10.12    Waiver.    Any agreement on the part of a Party to any extension or waiver of any provision of this Agreement will be valid only if set forth in an instrument in writing signed on behalf of such Party.  A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation or warranty will not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty.  A waiver by any Party of the performance of any act will not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

Section 10.13    Construction.    The Parties acknowledge that they have been represented by counsel and have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 10.14    Time of Essence.    Time is of the essence with respect to this Agreement.

Section 10.15    Integration.    This Agreement and the documents executed pursuant to this Agreement supersede all negotiations, agreements and understandings among the Parties with respect to the subject matter of this Agreement and constitutes the entire agreement between the Parties.

Section 10.16    Compliance with Bulk Sales Laws.    Subject to the obligations of Seller under Article IX, the Parties hereby waive compliance by the Parties with the bulk sales laws and any other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. In consideration of such waiver, Seller agrees to defend and indemnify Purchaser against

and hold it harmless from any and all loss, liability, claims, damage or expense (including reasonable attorneys' fees) arising out of or resulting from such noncompliance.

Section 10.17  <u>Cooperation Following the Closing</u>.  Following the Closing, each of the Parties shall deliver to the others such further information and documents and shall execute and deliver to the others such further instruments and agreements as the other Party shall reasonably request to consummate or confirm the transactions provided for in this Agreement, to accomplish the purpose of this Agreement or to assure to the other Party the benefits of this Agreement.  Without limiting the foregoing, Purchaser and Seller jointly covenant and agree that, from and after the Closing Date, Purchaser and Seller will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to any audit of Purchaser and/or any audit of Seller with respect to the sales, transfer and similar taxes imposed by the laws of any state or political subdivision thereof, relating to the transactions contemplated by this Agreement.  In furtherance hereof, Purchaser and Seller further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith.  All costs and expenses incurred in connection with this Section 10.17 referred to herein shall be borne by the party who is subject to such action.

Section 10.18  <u>Prevailing Party</u>.  In the event it shall be necessary for either Party to this Agreement to bring suit to enforce any provision hereof or for damages on account of any breach of this Agreement, the prevailing Party in any such litigation and any appeals therefrom shall be entitled to recover from the other Party, in addition to any damages or other relief granted as a result of such litigation, all costs and expenses of such litigation and a reasonable attorneys' fee as fixed by the court.

[Signatures Begin on Next Page]

31

119183456_6.docx

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed, as of the date first above written.

PURCHASER:

**THE KRYSTAL COMPANY**, a Tennessee corporation

By: _____
       Mike Wood, Vice President and Chief Real Estate Officer

[Signatures Continue on Next Page]

*[Signature Page to Asset Purchase Agreement]*

119183456_6.docx

SELLER:

**LIVE OAK RESTAURANT SERVICES, LLC,** a
Florida limited liability company

By: _____

      Name:  Michael C. Moses
      Title:    President

*[Signature Page to Asset Purchase Agreement]*

## EXHIBIT "A"

<u>Intentionally Deleted</u>

Exhibit "A"

EXHIBIT "B"

Tangible Personal Property

ATTACHED

Exhibit "B"

REDACTED

REDACTED

960133

# EXHIBIT "C"

## Purchase Price Allocation

REDACTED

Exhibit "C"

# EXHIBIT "D"

## Financial Statements

### ATTACHED

Exhibit "D"

119183456_6.docx

LIVE OAK RESTAURANT SERVICES LLC
Income Statement vs. Budget Consolidated
For the Thirteen Months Ending December 25, 2018

REDACTED

## EXHIBIT "E"

### Business Contracts

Coca-Cola/The Krystal Company Franchisee Beverage Marketing Agreement, including First Amendment between T. B. of Starke, Inc., an Affiliate of Seller, and The Coca-Cola Company, acting by and through Coca-Cola North America

Used Cooking Oil Removal Service Agreement between Momex Foods, Inc., an Affiliate of Seller, and Darling Ingredients Inc. operating as Dar Pro Solutions

Master Purchasing Agreement and Subscription Agreement between Momex Foods, Inc. and T.B. of Starke, Inc., which are Affiliates of Seller, and DTT Surveillance

Lawn Service Agreement between Momex Foods, Inc., an Affiliate of Seller, and Florida Pest Control & Chemical Co.

Energy Efficiency Services Agreement between T.B. of Starke Inc., an Affiliate of Seller, and PowerSecure, Inc.

Service Agreement between T.B. of Starke Inc., an Affiliate of Seller, and Advanced Disposal

Contract with US Foods

Drive-Thru Maintenance and Music Service Agreements with Muzak LLC

Bulk CO2 Budget Plan Agreement with NUCO2 Inc.

Exhibit "E"

119183456_6.docx

## EXHIBIT "E-1"

### Non-Assignable Contracts

**Consent is required prior to the assignment of the following Contracts:**

Used Cooking Oil Removal Service Agreement between Momex Foods, Inc., an Affiliate of Seller, and Darling Ingredients Inc. operating as Dar Pro Solutions

Master Purchasing Agreement and Subscription Agreement between Momex Foods, Inc. and T.B. of Starke, Inc., which are Affiliates of Seller, and DTT Surveillance

Energy Efficiency Services Agreement between T.B. of Starke Inc., an Affiliate of Seller, and PowerSecure, Inc.

Service Agreement between T.B. of Starke Inc., an Affiliate of Seller, and Advanced Disposal

BulkCO2 Budget Plan Agreement with NUCO2 Inc.

**Consent may be required prior to the assignment of the following Contracts:**

Coca-Cola/The Krystal Company Franchisee Beverage Marketing Agreement, including First Amendment between T. B. of Starke, Inc., an Affiliate of Seller, and The Coca-Cola Company, acting by and through Coca-Cola North America

Contract with US Foods

Drive-Thru Maintenance and Music Service Agreements with Muzak LLC

Exhibit "E-1"

## EXHIBIT "F"

Independent Contractors, Employees and Terminated Employees

**ATTACHED**

Exhibit "F"

| Employee: Department Name (Home) | Employee: Employment Status | Employee Date: Hire | Employee Date: Termination |
|---|---|---|---|
| | | 1/22/2018 | |

REDACTED

| Employee: SSN | Employee Date: Birth Date | Employee: Last Name | Employee: First Name | Employee Pay: Rate 1 |
|---|---|---|---|---|

REDACTED

| Employee Pay: Salary Per Period | Employee Pay: Pay Rate Change Date | Employee Pay: Previous Pay Rate |
|---|---|---|
| 0 | 2/4/2019 | 0 |
| 0 | 4/8/2019 | 8.25 |
| 0 | 6/6/2019 | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | 4/3/2019 | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | 5/16/2019 | 0 |
| 0 | 7/3/2019 | 0 |
| 0 | 11/28/2018 | 0 |
| 0 | 6/18/2019 | 0 |
| 0 | 6/12/2019 | 0 |
| 0 | 3/6/2019 | 8.75 |
| 0 | 5/29/2019 | 0 |
| 0 | 7/4/2019 | 0 |
| 0 | 4/12/2019 | 0 |
| 0 | 5/16/2019 | 0 |
| 0 | 11/14/2018 | 0 |
| 0 | 6/26/2019 | 12 |
| 0 | 4/3/2019 | 0 |
| 0 | 6/8/2019 | 0 |
| 0 | 1/29/2019 | 8.25 |
| 0 | 5/1/2019 | 0 |
| 0 | | 0 |
| 0 | 4/8/2019 | 8.25 |
| 0 | 3/5/2019 | 0 |
| 0 | | 0 |
| 0 | 2/4/2019 | 0 |
| 0 | 6/18/2019 | 0 |
| 0 | 6/12/2019 | 0 |
| 0 | 3/7/2019 | 0 |
| 0 | 7/4/2019 | 0 |
| 1153.85 | 3/22/2019 | 0 |
| 0 | 1/21/2019 | 0 |
| 0 | 7/4/2019 | 0 |
| 0 | 2/19/2019 | 0 |
| 0 | 2/19/2019 | 0 |
| 0 | 3/5/2019 | 0 |
| 0 | 4/8/2019 | 8.25 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | 1/10/2018 | 0 |
| 0 | | 0 |
| 0 | 9/20/2018 | 0 |
| 0 | 12/31/2018 | 8.5 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | 7/24/2018 | 0 |
| 0 | | 0 |
| 0 | 1/10/2018 | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | | 0 |
| 0 | | 0 |

| Employee Address: Line 1 | Employee Address: Line 2 | Employee Address: City | Employee Address: State |
|---|---|---|---|
| 1182 SW Yorktown Glen | | Lake City | FL |
| 13139 164TH ST | | MCALPIN | FL |
| 6594 bulb rd | | welborn | FL |
| 1294 STEPHENS ST | | JENNINGS | FL |
| 511 WATERMAN AVE SE | | LIVE OAK | FL |
| 115 se wilford court | | lake city | FL |
| 210 LAFAYETTE AVE SW | | LIVE OAK | FL |
| 366 NE HOLLYWOOD BLVD | | MAYO | FL |
| 1734 SW 4th St | | Jasper | FL |
| 6746 SR 6 W | | Jasper | FL |
| 328 NE MACE WAY | | LEE | FL |
| 11787 138th St | | Live Oak | FL |
| 7041 119th Rd | | Live Oak | FL |
| 7041 119TH ROAD | | LIVE OAK | FL |
| 11939 184th Street | | MC Alpin | FL |
| 10494 NW 36th Drive | | Jasper | FL |
| 1294 Stephens St | | Jennings | FL |
| 2927 Southwest Blvd | | Live Oak | FL |
| 1602 OHIO AVE S | | LIVE OAK | FL |
| 512 WATERMAN AVE SE | | LIVE OAK | FL |
| 511 Waterman Avenue SE | | Live Oak | FL |
| 923 6th St SW | | Live Oak | FL |
| 12574 72ND TER | | LIVE OAK | FL |
| 5510 Daniell Place | | Lake Park | FL |
| 19130 76TH STREET | | LIVE OAK | FL |
| 401 HAMILTON AVE | | LIVE OAK | FL |
| 9586 102nd Street | | Live Oak | FL |
| 1003 NOBLES FERRY RD | | LIVE OAK | FL |
| 1120 Silas Drive SW | 204 | Live Oak | FL |
| 308 8th Ave Sw | | Jasper | FL |
| 1809 NW 2ND ST | | Live Oak | FL |
| 9586 102nd Street | | Live Oak | FL |
| 1094 NW 36th | | Jasper | FL |
| 808 SW MLK Drive | | Jasper | FL |
| 11193 NE 39th Drive | | Jasper | FL |
| 109 Margie LN | | Jasper | FL |
| 102 Green Avenue SW | | Live Oak | FL |
| 1444 SE Myrtle Avenue | | Live Oak | FL |
| 263 SE Bennett Street | | Madison | FL |
| 3441 CR 795 | | LIVE OAK | FL |
| 10129 80TH ST | | LIVE OAK | FL |
| 1316 MAIN ST NE | | LIVE OAK | FL |
| 907 BROWN AVE NW | | LIVE OAK | FL |
| 603 ADA ST SE | | LIVE OAK | FL |
| 6862 59TH DRIVE | | LIVE OAK | FL |
| 914 SWQ 59TH TER | APT D | GAINESVILLE | FL |
| 11380 SE CR 132 | | JASPER | FL |
| 165 NE BLUE RIDGE LANDING A | | LEE | FL |
| 3043 133 TF ROAD | | LIVE OAK | FL |
| 14591 104TH ST | | LIVE OAK | FL |
| 3723 NW 109TH AVE | | JASPER | FL |
| 161 SE NORTON WAY | | LEE | FL |
| 146 NW WATERFALL CT | | LAKE CITY | FL |
| 5432 109TH DR | | LIVE OAK | FL |
| 174 SW CARSON AVE | APT 11/A | MADISON | FL |
| 24671 SR 247 | | OBRIEN | FL |
| 1738 CARL ST NW | | JASPER | FL |
| 170 SW JUNE GLEN | | LAKE CITY | FL |
| 178 HORIZON CIRCLE SW | | LIVE OAK | FL |
| 7068 213TH ROAD | | LIVE OAK | FL |

**Employee Address: Zip Code**

32025
32062
32094
32053
32064
32025
32064
32066
32052
32052
32059
32060
32060
32060
32062
32052
32053
32064
32064
32064
32064
32064
32060
31636
32060
32064
32060
32064
32064
32052
32064
32068
32052
32052
32052
32052
32064
32064
32340
32060
32060
32064
32064
32064
32060
32607
32052
32059
32060
32060
32052
32059
32025
32060
32340
32071
32052
32025
32064
32060

## <u>EXHIBIT "G"</u>

<u>Intellectual Property</u>

**KRIS**
**PAR Registers**

Exhibit "G"

## EXHIBIT "H"

### Suppliers

**US Foods**

Exhibit "H"

## EXHIBIT "I"

Licenses

**ATTACHED**

Exhibit "I"

119183456_6.docx



**STATE OF FLORIDA**
**DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION**

DIVISION OF HOTELS AND RESTAURANTS          850-487-1395
2601 BLAIR STONE ROAD
TALLAHASSEE      FL 32399-1011

TARA DICKS
KRYSTAL LIVE OAK
798 SW MAIN BLVD
LAKE CITY      FL 32025

Congratulations!  With this license you become one of the nearly
one million Floridians licensed by the Department of Business and
Professional Regulation.  Our professionals and businesses range
from architects to yacht brokers, from boxers to barbeque
restaurants, and they keep Florida's economy strong.

Every day we work to improve the way we do business in order
to serve you better.  For information about our services, please
log onto www.myfloridalicense.com.  There you can find more
information about our divisions and the regulations that impact
you, subscribe to department newsletters and learn more about
the Department's initiatives.

Our mission at the Department is: License Efficiently, Regulate
Fairly.  We constantly strive to serve you better so that you can
serve your customers.  Thank you for doing business in Florida,
and congratulations on your new license!



DETACH HERE

RON DESANTIS, GOVERNOR                              HALSEY BESHEARS, SECRETARY



 The Department of Management Services' Office of Supplier Diversity "serves those who serve Florida."

The Office of Supplier Diversity provides resources designed to improve business and economic opportunities for Florida's woman-, veteran- and minority-owned businesses. Learn more about becoming a certified business enterprise at _dms.myflorida.com/osd_ or call 850-487-0915.

 To find out about State of Florida tools supporting statewide centralized procurement activities which have streamlined interactions between vendors and state government entities, please contact or visit the Department of Management Services' MyFloridaMarketPlace at: _https://vendor.myfloridamarketplace.com_

# AC# 02631246

## SIGNATURE

**(For the protection of our professional license holders, this license contains hidden security features to prevent counterfeiting. Unauthorized reproduction is strictly prohibited and will be prosecuted to the fullest extent of the law)**

The Department of Business and Professional Regulation (DBPR), issues licenses for many licensed businesses and practitioners in the State of Florida.

DBPR is changing the way you interact with state government. Many of DBPR's services are available online at www.MyFloridaLicense.com. We encourage you to utilize these services to make address changes, licensing changes or to renew your license.

Name changes require legal documentation verifying the name change, which must be mailed to the DBPR. An original, a certified copy or a duplicate copy of an original or certified copy of a document that shows the legal name change will be accepted, unless the DBPR has a question about the authenticity of the document.

If applicable, the DBPR will send a renewal notice to your last known address or email address of record. If you have not received your renewal notice, please call our Customer Contact Center at 850.487.1395 or online at www.MyFloridaLicense.com/contactus.

Please refer to your profession's governing statutes and Administrative codes for further information regarding renewals. These may be accessed from our website.

# AC# 02631246

# APPENDIX 1

## Definitions

The following terms, as used in the Agreement, have the following meanings:

(1)    "Affiliate" of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

(2)    "Assumed Contracts" means those Business Contracts, if any, that Purchaser has expressly elected to assume from Seller in a written notice delivered to Seller prior to the expiration of the Diligence Period, as set forth in Section 6.9(a).

(3)    "Assumed Prepaid Cards" means all gift cards, gift certificates and other prepaid packages or promotions, issued in the ordinary course of business consistent with past practice, pursuant to which a customer may prepay or receive a discount or one or more free services to the extent outstanding and not redeemed prior to the Closing Date. For purposes of calculating the value of any prepaid package or promotion, the value assigned to such promotion or package shall be the unredeemed balance of the discounted amount paid by the customer for such package or promotion, as shown on the books and records of Seller, not the current retail price for the services to be provided pursuant to the package or promotion.

(4)    "Business Contracts" means all of those contracts and agreements, if any, whether written or oral, affecting the ownership, operation, management and maintenance of the Assets, including without limitation the (other than the Employment Agreements set forth on **Appendix 2** attached hereto, as to Section 4.13): (i) any bonds, debentures, notes, loans, credit or loan agreements or loan commitments, mortgages, indentures, guarantees or other contracts relating to the Indebtedness of Seller, in each case, other than the Excluded Liabilities; (ii) any leases, subleases or licenses involving any properties or assets (whether personal or mixed, tangible or intangible); (iii) any contracts or agreements which limit or restrict Seller or any officers or key employees of Seller from engaging in any business in any jurisdiction; (iv) any contract or agreement for capital expenditures or the acquisition or construction of fixed assets requiring the payment by Seller of an amount; (v) any contract that provides for an increased payment or benefit, or accelerated vesting, upon the execution of this Agreement or the Closing or in connection with the transactions contemplated hereby; (vi) any contract or agreement granting any Person a Lien on all or any part of any Assets; (vii) any contract or agreement for the cleanup, abatement or other actions in connection with any Hazardous Materials, the remediation of any existing environmental condition or relating to the performance of any environmental audit or study; (viii) any contract or agreement granting to any Person an option or a first refusal, first-offer or similar preferential right to purchase or acquire any assets; (ix) any contract or agreement with any agent, distributor or representative which is not terminable without penalty on thirty (30) calendar days' or less notice; (x) any contract or agreement for the granting or receiving of a license, sublicense or franchise or under which any Person is obligated to pay or has the right to receive a royalty, license fee, franchise fee or similar payment, other than the Franchise Agreement; (xi) any contract providing for the indemnification or holding harmless of any officer, director, employee or other Person; (xii) any joint venture or partnership contract or other contract providing

Appendix 1
Page 1 of 7

for the sharing of any profits; (xiii) any contract between Seller and any Related Person or any Affiliate; (xiv) any customer contract for the provision of goods or services; (xv) any existing contracts and commitments (other than those described in subparagraphs [i] through [xiv] of this definition to which Seller is a party or by which its properties or assets are bound (A) involving an annual commitment or annual payment to or from Seller of more than $2,500.00 individually or (B) that is material to the Business.

(5)    "Business Day" means any day except Saturday, Sunday or any day on which banks are generally not open for business in Atlanta, Georgia.

(6)    "CERCLA" means the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended.

(7)    "Closing Date" means the date upon which the Closing actually occurs.

(8)    "Code" means the Internal Revenue Code of 1986, as amended.

(9)    "Control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(10)    "Employee Benefit Plan" means each plan, fund, program, agreement, arrangement or scheme, including, but not limited to each plan, fund, program, agreement, arrangement or scheme maintained or required to be maintained under the laws of a jurisdiction outside the United States of America, in each case, that is at any time sponsored or maintained or required to be sponsored or maintained at any time by Seller or to which Seller makes or has made, or has or has had an obligation to make, contributions at any time providing for employee benefits or for the remuneration, direct or indirect, of the employees, former employees, directors, officers, consultants, independent contractors, contingent workers or leased employees of Seller or the dependents of any of them (whether written or oral), including, without limitation, each deferred compensation, bonus, incentive compensation, pension, retirement, stock purchase, stock option and other equity compensation plan, "welfare" plan (within the meaning of Section 3(1) of ERISA, determined without regard to whether such plan is subject to ERISA); each "pension" plan (within the meaning of Section 3(2) of ERISA, determined without regard to whether such plan is subject to ERISA); each severance plan or agreement, health, vacation, summer hours, supplemental unemployment benefit, hospitalization insurance, medical, dental, legal and each other employee benefit plan, fund, program, agreement or arrangement.

(11)    "Employment Agreements" means any employment contracts, consulting agreements, termination or severance agreements, change of control agreements or any other agreement respecting the terms and conditions of employment or of a consulting or independent contractor relationship in respect to any current or former officer, employee, consultant or independent contractor.

(12)    "Environment" means any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

Appendix 1
Page 2 of 7

(13)    "Environmental, Health and Safety Liabilities" means any cost, damages, expense, liability, obligation or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law, including those consisting of or relating to: (a) any environmental, health or safety matter or condition (including on-site or off-site contamination, occupational safety and health and regulation of any Hazardous Materials, chemical substance or product); (b) any fine, penalty, judgment, award, settlement, legal or administrative proceeding, damages, loss, claim, demand or response, remedial or inspection cost or expense arising under any Environmental Law or Occupational Safety and Health Law; (c) financial responsibility under any Environmental Law or Occupational Safety and Health Law for investigative costs, cleanup costs or corrective action, including any cleanup, removal, containment or other remediation or response actions ("Cleanup") required by any Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or (d) any other compliance, corrective or remedial measure required under any Environmental Law or Occupational Safety and Health Law.  The terms "removal," "remedial" and "response action" include the types of activities covered by CERCLA.

(14)    "Environmental Laws" means all local, state and federal laws, statutes, by-laws and regulations relating to protection of human health and the environment, pollution control, product registration and Hazardous Materials, including the need to investigate or remediate releases of such substances.

(15)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(16)    "Financial Statements" means the compiled balance sheets, statements of income and cash flows of Seller for the period most recently ended.

(17)    "FLSA" means the United States Fair Labor Standards Act, as amended.

(18)    "FMLA" means the United States Family and Medical Leave Act, as amended.

(19)    "Governing Documents" means, with respect to any particular entity, (a) if a corporation, the Articles or certificate of incorporation and the bylaws; (b) if a general partnership, the partnership agreement and any statement of partnership; (c) if a limited partnership, the limited partnership agreement and the certificate of limited partnership; (d) if a limited liability company, the Articles of organization or certificate of formation and operating agreement; (e) if another type of Person, any other charter or similar document adopted or filed in connection with the creation, formation or organization of the Person; (f) all security holders' agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization, management or operation of any Person or relating to the rights, duties and obligations of the security holders of any Person; and (g) any amendment or supplement to any of the foregoing.

(20)    "Governmental Entity" means any federal, state or local or foreign government or any court, administrative or regulatory agency or commission or other governmental authority or agency, domestic or foreign.

Appendix 1
Page 3 of 7

(21)    "Hazardous Materials" means any waste, pollutant, contaminant, hazardous substance, toxic, ignitable, reactive or corrosive substance, hazardous waste, special waste, industrial substance, by-product, process intermediate product or waste, petroleum or petroleum-derived substance or waste, chemical liquids or solids, liquid or gaseous products, or any constituent of any such substance or waste, the use, handling or disposal of which by Seller is in any way governed by or subject to any applicable Environmental Law.

(22)    "Indebtedness" means, with respect to any Person, (a) all obligations for money borrowed, (b) all obligations evidenced by bonds, debentures, notes, other similar instruments, (c) all obligations upon which interest charges are customarily paid, (d) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations issued or assumed as the deferred purchase price of property or services (including the value of any consulting arrangements entered into in connection with such acquisition), (f) all indebtedness of others secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all guarantees by such Person of indebtedness of others, (h) all obligations (determined on the basis of actual, not notional, obligations) in respect of interest rate protection agreements, interest rate swap agreements, foreign currency exchange agreements or other interest or exchange rate hedging agreements or arrangements, (i) all obligations relating to a letter of credit, banker's acceptance or note purchase facility, (j) all expenses incurred in connection with the negotiation, preparation and execution of this Agreement, and (l) any accrued interest and any prepayment, termination, cancellation or similar penalties, costs or expenses on any of the foregoing.

(23)    "Intellectual Property" means any intellectual property that is owned by or licensed to Seller and used in connection with the Business, including any telephone or facsimile numbers, domain names, websites and other electronic identifiers related to the restaurant.

(24)    "Inventory" means all inventory held by Seller for sale in the Business to customers in the ordinary course, consistent with past practice of Seller, stored on behalf of or in transit to Seller or the restaurant, all as of the Closing Date and all to the extent paid for prior to the Closing Date or payable by Seller after the Closing Date in the ordinary course of business, excluding, for clarification, waste oil and supplies used by Seller in the provision of services.

(25)    "Inventory Costs" means (x) the aggregate fair market value of the unopened and useable Inventory of Seller located at the restaurant as determined during the Inventory and Store Cash Accounting and set forth in written documentation delivered by Purchaser to Seller immediately prior to Closing, excluding (y) any Inventory that has been held by Seller for more than six months as of the Closing Date or, for any product, any portion of the supply of such product that exceeds the amount of the product sold by Seller in the twelve month period preceding the Closing Date, and reduced by (z) any rebates related to the Inventory to the extent paid or payable to Seller.

(26)    "Knowledge" with respect to Seller means all facts known by Michael C. Moses on the date hereof.

Appendix 1
Page 4 of 7

119183456_6.docx

(27)    "Labor Laws" means all laws, regulations and orders and all contracts or collective bargaining agreements governing or concerning labor relations, unions and collective bargaining, conditions of employment, employment discrimination and harassment, wages, hours or occupational safety and health, including, without limitation, ERISA, the Immigration Reform and Control Act of 1986, the National Labor Relations Act of 1947, the Civil Rights Acts of 1866 and 1964, the Equal Pay Act, the United States Age Discrimination in Employment Act, as amended, the United States Americans with Disabilities Act, as amended, FMLA, the WARN Act, the Occupational Safety and Health Act of 1970, as amended, the Davis Bacon Act, the Walsh-Healy Act, the Service Contract Act, Executive Order 11246, FLSA and the Rehabilitation Act of 1973, in each case as amended, and all regulations under such acts.

(28)    "Licenses" means all notifications, licenses, permits (including, without limitation, environmental, construction and operation permits), franchises, certificates, approvals, exemptions, classifications, registrations and other similar documents and authorizations issued by a Governmental Entity, and applications therefor.

(29)    "Liens" mean all deeds to secure debt, mortgages, liens, pledges, security interests, charges, claims, rights of first refusal, covenants, licenses, restrictions and encumbrances of any nature whatsoever.

(30)    "Material Adverse Effect" means any state of facts, change, event, effect or occurrence (when taken together with all other states of facts, changes, events, effects or occurrences) that is or may be reasonably likely to be materially adverse to the financial condition, results of operations, prospects, properties, customer base, customer relations, assets or liabilities (including, without limitation, contingent liabilities) of Seller, the Business or the Assets taken as a whole.  A Material Adverse Effect shall also include any state of facts, change, event or occurrence that shall have occurred or been threatened that (when taken together with all other states of facts, changes, events, effects or occurrences that have occurred or been threatened) would or would be reasonably likely to prevent or materially delay the performance by Seller of any of its obligations under this Agreement or the consummation of the transactions contemplated hereby.

(31)    "Occupational Safety and Health Law" means any law designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act of 1970, as amended, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance Seller), designed to provide safe and healthful working conditions.

(32)    "OSHA" means the Occupational Safety and Health Administration.

(33)    "Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization or government or any agency or political subdivision thereof.

(34)    "Personal Data" means any information from which an individual may be identified, including: an individual's names; addresses; location; telephone numbers; fax numbers; email addresses; unique biometric data, including fingerprint or retina scans; social security number; any

other government-issued identification numbers; and "personal information," "nonpublic personal information," "protected health information" (and other similar information, however described) as defined in any laws.

(35)    "Purchaser Ancillary Documents" means any other certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by Purchaser in connection with the transactions contemplated by this Agreement.

(36)    "Purchaser Indemnified Parties" means Purchaser and its Affiliates, each of their respective officers, directors, employees, agents and representatives and each of the heirs, executors, successors and assigns of any of the foregoing.

(37)    "Related Person" with respect to a particular individual means (a) each other member of such individual's Family; (b) any Person that is directly or indirectly controlled by such individual; (c) any Person with respect to which such individual or one or more members of such individual's Family serves as a director officer, partner, executor or trustee (or in a similar capacity). For purposes of this definition, the "Family" of an individual includes the individual's spouse and issue.

(38)    "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the Environment.

(39)    "Security" means technological, physical, administrative and procedural safeguards relating to the protection of Personal Data, including policies, procedures, guidelines, practices standards, controls, hardware, software, firmware and physical security measures, the function or purpose of which is, in whole or part, to: (i) protect the confidentiality, integrity or availability of Personal Data on Seller's systems; (ii) prevent the unauthorized use of or unauthorized access to Personal Data on Seller's systems; or (iii) prevent a Security breach or malicious code infection of the Seller's systems that could reasonably be expected to affect the Seller's ability to protect Personal Data.

(40)    "Seller Ancillary Documents" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by Seller in connection with the transactions contemplated by this Agreement.

(41)    "Seller Indemnified Parties" means Seller and its Affiliates, each of their respective officers, directors, employees, agents and representatives and each of the heirs, executors, successors and assigns of any of the foregoing.

(42)    "Store Cash" means cash held by the restaurant at Closing and included in the Assets. The Store Cash shall be counted as part of the Inventory and Store Cash Accounting.

(43)    "Tax Return" means any report, return, declaration or other information required to be supplied to a Governmental Entity in connection with Taxes, including estimated returns and reports of every kind with respect to Taxes.

119183456_6.docx

(44)    "Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including income, franchise, capital stock, personal property, tangible, withholding, employment, payroll, social security, social contribution, unemployment compensation, disability, transfer, sales, use, excise, gross receipts, value-added and all other taxes of any kind for which Seller may have any liability imposed by any Governmental Entity, whether disputed or not, and any charges, interest or penalties imposed by any Governmental Entity.

(45)    "Title Company" means First American Title Insurance Company, whose address is Six Concourse Parkway, Suite 2000, Atlanta, GA 30328, Attention: Angie Yarbrough.

(46)    "WARN Act" means the United States Worker Adjustment and Retraining Notification Act, as amended.

Appendix 1<br>Page 7 of 7

119183456_6.docx

**APPENDIX 2**

Exceptions to Seller's Representations and Warranties

Following are exceptions to the representations contained in each of the referenced Sections (if there is no exception, insert "none" [and any item left blank will be deemed to state "none"]):

1. Section 4.5 Title to Assets; Related Matters: Darling Ingredients Inc. operating as Dar Pro Solutions owns its equipment, as set forth in its Contract, and Advanced Disposal owns its dumpster and The Coca-Cola Company and Muzak own equipment as set forth in their agreements

2. Section 4.7 No Undisclosed Liabilities: None

3. Section 4.8 Absence of Certain Changes: None

4. Section 4.9 Legal Proceedings: Purchaser received a letter dated June 19, 2019 from Donald W. Edwards, P.A., representing Sheryl Rose, a copy of which is attached, and turned it over to its insurance company, as evidenced by the copy of the Liability Notice of Occurrence/Claim which is also attached

5. Section 4.10 Compliance with Law: None

6. Section 4.13 Labor Relations [include any Employment Agreements]: None.  No written employment agreements.

7. Section 4.14 Environmental, Health and Safety Matters: None

8. Section 4.15 Licensed Intellectual Property: KRIS, Par Registers

9. Section 4.16 Supplier Relations: None

10. Sections 4.17 Transactions with Affiliates: Seller's accountant is Odom, Moses & Company, LLP, CPAs, a principal of which Philip J. Moses, Jr., CPA/PFS) is the brother of Michael C. Moses

11. Section 4.19 Brokers, Finders and Investment Bankers: None

12. Section 4.20 Privacy and Security: None

Appendix 2

119183456_6.docx

## *Donald W. Edwards, P.A.*

**Bank of America Building**
**1333 S. University Drive, Suite 209**
**Plantation, FL 33324**
**Phone (954) 577-2820**
**Fax (954) 577-2822**
*donaldedwardslaw@gmail.com*



**CERTIFIED LETTER – RECEIPT NO.: 7016-2070-0000-9461-6265**

June 19, 2019

The Krystal Company
1455 Lincoln Parkway, Suite 600
Dunwoody, GA 30346

Attn: Risk Management Department

| Re: | My client | : | Sheryl Rose |
|-----|-----------|---|-------------|
|     | Slip & Fall | : | 10555 Suwannee Plaza Boulevard |
|     |           |   | Live Oak, Florida 33060 |
|     | DOI       | : | 05/22/2019 |
|     | Time of Incident: | | 2:14 p.m. |

To Whom It May Concern:

I am placing you on notice that any and all relevant evidence pertaining to the above referenced incident must be preserved by Krystal and its employees and should not be destroyed, altered or changed. This evidence would include but not be limited to all store surveillance video of May 22, 2019 at approximately 2:14 p.m. showing my client slip and fall inside the restaurant. Please provide us with video surveillance from 1:30 pm to 3:00 p.m. on the date of this incident. The evidence that is in your possession is crucial to Sheryl Rose's civil claims. Please keep the evidence in a secure facility until it can be viewed as well as inspected by this office and experts retained on behalf of Ms. Rose. You must also prevent any individuals or entities from destroying, altering or changing any of the crucial evidence in this matter.

The crucial evidence in this case, which must be preserved, includes, but is not limited to, the following items:

1. Any and all photographs, videotapes, etc. regarding the subject incident.

2. Any and all documents or videotapes, which were made in the investigation of this particular incident.

3. Any and all correspondence, clearance or inspection between any of the entities that worked on the subject project.

4. Any and all work logs, work orders, and employee names for anyone involved with the subject accident on the date of this incident or which would be relevant to this incident.

5. Any and all statements of any of the eye-witnesses or parties to this matter.

6. Any other items that may in any way be utilized by any entity to assist in proving a claim or defense that has not been listed above, but that you know, or should know, could be utilized as such.

Accordingly, I would respectfully request that you preserve all of the evidence listed above and any other evidence that would be relevant to a civil claim and assure that everyone within Krystal is aware of same, and please contact those that you are aware of that have possession of any items mentioned above or which would be crucial to a civil claim.

Please take note that if you fail to preserve any crucial evidence which could have been preserved had you acted reasonable, Krystal could be subject of liability on claims of spoliation of evidence by any interested party.

Therefore, please make every effort to preserve any item relevant to this matter. I thank you in advance for your anticipated cooperation and would appreciate it if you would contact me as soon as possible so that we may work tighter in preserving the evidence in this matter.

Sincerely,

Donald W. Edwards
cm

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

THE KRYSTAL COMPANY
1455 Lincoln PARKWAY
Suite 600
DunwooDy, GA 30346

9590 9402 2635 6336 6703 22

2. Article Number (Transfer from service label)

7016 2070 0000 9461 6265

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

6-24

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053        Domestic Return Receipt





CERTIFIED MAIL®

7016 2070 0000 9461 6265

Donald W. Edwards, P.A.
Bank of America Building
1333 S. University Drive, Suite 209
Plantation, FL 33324

U.S. POSTAGE PAID
FCM LETTER
DAVIE, FL
33328
JUN 19, '19
AMOUNT
**$6.85**
R2303S102862-02

30346

1020

The Krystal Company
1455 Lincoln Parkway, Suite 600
Dunwoody, GA 30346
Attn: Risk Management Dept.

# ACORD®  LIABILITY NOTICE OF OCCURRENCE / CLAIM

| DATE (MM/DD/YYYY) |
|---|
| 07/01/2019 |

| AGENCY | | |
|---|---|---|
| George H. Odiorne Insurance Agency Inc. | | |
| PO Box 830 | | |
| Brandon | FL | 33509 |

| CONTACT NAME: | Shawanda Williams |
|---|---|
| PHONE (A/C, No, Ext): | (813) 685-7731 |
| FAX (A/C, No): | (813) 685-1823 |
| E-MAIL ADDRESS: | sharden@odiorneinsurance.com |

| CODE: | SUBCODE: |
|---|---|

AGENCY CUSTOMER ID: 00002659

| INSURED LOCATION CODE | | |
|---|---|---|
| DATE OF LOSS AND TIME | 05/22/2019 | 12:00 ☒ AM / PM |

| CARRIER | NAIC CODE |
|---|---|
| The Main Street America Group | |

POLICY NUMBER: BPG1542L

LINE OF BUSINESS: BOP

## INSURED

| NAME OF INSURED (First, Middle, Last) |
|---|
| Momex Foods Inc & T B of Starke Inc |

| DATE OF BIRTH | FEIN (If applicable) |
|---|---|
| | 030393715 |

| PRIMARY PHONE # | ☐ HOME ☒ BUS ☐ CELL | SECONDARY PHONE # | ☐ HOME ☐ BUS ☒ CELL |
|---|---|---|---|
| (386) 755-9673 | | (386) 365-1141 | |

| INSURED'S MAILING ADDRESS |
|---|
| 798 SW Main Blvd |
| Lake City          FL  32025 |

PRIMARY E-MAIL ADDRESS: t.dicks@comcast.net

SECONDARY E-MAIL ADDRESS:

## CONTACT        ☐ CONTACT INSURED

| NAME OF CONTACT (First, Middle, Last) |
|---|
| Tara Dicks |

| PRIMARY PHONE # | ☐ HOME ☒ BUS ☐ CELL | SECONDARY PHONE # | ☐ HOME ☐ BUS ☐ CELL |
|---|---|---|---|
| (386) 755-9673 10 | | | |

WHEN TO CONTACT

| CONTACT'S MAILING ADDRESS |
|---|
| 798 SW Main Blvd |
| Lake City          FL  32025 |

PRIMARY E-MAIL ADDRESS: tdicks@comcast.net

SECONDARY E-MAIL ADDRESS:

## OCCURRENCE

| LOCATION OF OCCURRENCE | | |
|---|---|---|
| STREET: | 10555 Suwannee Plaza Blvd | |
| CITY, STATE, ZIP: | Live Oak | FL  32060 |
| COUNTRY: | | |

| POLICE OR FIRE DEPARTMENT CONTACTED |
|---|
| REPORT NUMBER |

DESCRIBE LOCATION OF OCCURRENCE IF NOT AT SPECIFIC STREET ADDRESS:

DESCRIPTION OF OCCURRENCE (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Slip and fall - Please see attached for more information.

## TYPE OF LIABILITY

| PREMISES: INSURED IS | | ☐ OWNER | ☐ TENANT |
|---|---|---|---|

OWNER'S NAME & ADDRESS (If not insured)

| TYPE OF PREMISES |
|---|
| PRIMARY PHONE # ☐ HOME ☐ BUS ☐ CELL   SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL |
| PRIMARY E-MAIL ADDRESS: |
| SECONDARY E-MAIL ADDRESS: |

| PRODUCTS: INSURED IS | | ☐ MANUFACTURER | ☐ VENDOR |
|---|---|---|---|

MANUFACTURER'S NAME & ADDRESS (If not insured)

| TYPE OF PRODUCT |
|---|
| PRIMARY PHONE # ☐ HOME ☐ BUS ☐ CELL   SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL |
| PRIMARY E-MAIL ADDRESS: |
| SECONDARY E-MAIL ADDRESS: |

WHERE CAN PRODUCT BE SEEN?

© 1986-2016 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD